## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

GRAYSCALE INVESTMENTS, LLC,

        Petitioner,

   v.

SECURITIES AND EXCHANGE
COMMISSION,

        Respondent.

Case No. 22-1142

## UNDERLYING DECISION FROM WHICH PETITION ARISES

Pursuant to this Court's Order dated July 1, 2022, Petitioner Grayscale Investments, LLC submits the attached copy of the underlying order from which this petition for review arises.

Dated:  August 1, 2022                              Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Sarah Weiner*
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001-5369
Telephone: (202) 220-1100
Email: Donald.Verrilli@mto.com

*Admitted in New York only; Practicing under the
supervision of District of Columbia Bar members

Paul S. Mishkin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Email: Paul.Mishkin@davispolk.com

*Attorneys for Petitioner*

Market Makers a $0.40 per contract rebate when adding liquidity in VOLQ does not impose an undue burden on competition. Maker Makers take on a number of obligations,[39] including quoting obligations,[40] unlike other market participants. Further, the proposed pricing for Lead Market Makers and Market Makers in VOLQ is intended to incentivize them to quote and trade more on the Exchange, thereby providing more trading opportunities for all market participants. As noted above, the $0.40 per contract rebate when adding liquidity in VOLQ is intended to offset the $0.40 per contract VOLQ transaction fee. The Exchange believes the proposed pricing will incentivize Lead Market Makers and Market Makers to provide liquidity in the new product. Additionally, the proposed VOLQ rebate will be applied equally to all Lead Market Makers and Market Makers.

*C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants, or Others*

No written comments were either solicited or received.

**III. Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action**

The foregoing rule change has become effective pursuant to Section 19(b)(3)(A)(ii) of the Act.[41]

At any time within 60 days of the filing of the proposed rule change, the Commission summarily may temporarily suspend such rule change if it appears to the Commission that such action is: (i) necessary or appropriate in the public interest; (ii) for the protection of investors; or (iii) otherwise in furtherance of the purposes of the Act. If the Commission takes such action, the Commission shall institute proceedings to determine whether the proposed rule should be approved or disapproved.

**IV. Solicitation of Comments**

Interested persons are invited to submit written data, views, and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act. Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*http://www.sec.gov/rules/sro.shtml*); or

• Send an email to *rule-comments@sec.gov*. Please include File Number SR–Phlx–2022–27 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to File Number SR–Phlx–2022–27. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*http://www.sec.gov/rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549 on official business days between the hours of 10:00 a.m. and 3:00 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. All comments received will be posted without change. Persons submitting comments are cautioned that we do not redact or edit personal identifying information from comment submissions. You should submit only information that you wish to make available publicly. All submissions should refer to File Number SR–Phlx–2022–27, and should be submitted on or before July 27, 2022.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[42]

**Jill M. Peterson,**

*Assistant Secretary.*

[FR Doc. 2022–14293 Filed 7–5–22; 8:45 am]

**BILLING CODE 8011–01–P**

---

**SECURITIES AND EXCHANGE COMMISSION**

**[Release No. 34–95180; File No. SR–NYSEArca–2021–90]**

**Self-Regulatory Organizations; NYSE Arca, Inc.; Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to List and Trade Shares of Grayscale Bitcoin Trust Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares)**

June 29, 2022.

**I. Introduction**

On October 19, 2021, NYSE Arca, Inc. ("NYSE Arca" or "Exchange") filed with the Securities and Exchange Commission ("Commission"), pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Exchange Act")[1] and Rule 19b–4 thereunder,[2] a proposed rule change to list and trade shares ("Shares") of Grayscale Bitcoin Trust ("Trust") under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares). The proposed rule change was published for comment in the **Federal Register** on November 8, 2021.[3]

On December 15, 2021, pursuant to Section 19(b)(2) of the Exchange Act,[4] the Commission designated a longer period within which to approve the proposed rule change, disapprove the proposed rule change, or institute proceedings to determine whether to disapprove the proposed rule change.[5] On February 4, 2022, the Commission instituted proceedings under Section 19(b)(2)(B) of the Exchange Act[6] to determine whether to approve or disapprove the proposed rule change.[7] On April 21, 2022, the Exchange filed Amendment No. 1, which replaced and superseded the proposed rule change in its entirety, and on May 4, 2022, the Commission provided notice of Amendment No. 1 to the proposed rule change and designated a longer period for Commission action on the proposed rule change, as modified by Amendment No. 1.[8]

---

[39] *See* Options 2, Section 4.

[40] *See* Options 2, Section 5 and Options 3, Section 8.

[41] 15 U.S.C. 78s(b)(3)(A)(ii).

[42] 17 CFR 200.30–3(a)(12).

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

[3] *See* Securities Exchange Act Release No. 93504 (Nov. 2, 2021), 86 FR 61804. Comments received on the proposed rule change are available at: *https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190.htm.*

[4] 15 U.S.C. 78s(b)(2).

[5] *See* Securities Exchange Act Release No. 93788, 86 FR 72291 (Dec. 21, 2021).

[6] 15 U.S.C. 78s(b)(2)(B).

[7] *See* Securities Exchange Act Release No. 94151, 87 FR 7889 (Feb. 10, 2022).

[8] *See* Securities Exchange Act Release No. 94844, 87 FR 28043 (May 10, 2022) ("Amendment No. 1"). Amendment No. 1 to the proposed rule change can

Continued

This order disapproves the proposed rule change, as modified by Amendment No. 1. The Commission concludes that NYSE Arca has not met its burden under the Exchange Act and the Commission's Rules of Practice to demonstrate that its proposal is consistent with the requirements of Exchange Act Section 6(b)(5), which requires, in relevant part, that the rules of a national securities exchange be "designed to prevent fraudulent and manipulative acts and practices" and "to protect investors and the public interest." [9]

When considering whether NYSE Arca's proposal to list and trade the Shares is designed to prevent fraudulent and manipulative acts and practices, the Commission applies the same analytical framework used in its orders considering previous proposals to list bitcoin [10]-based commodity trusts and bitcoin-based trust issued receipts to assess whether a listing exchange of an exchange-traded product ("ETP") can meet its obligations under Exchange Act Section 6(b)(5).[11] As the Commission

has explained, an exchange that lists bitcoin-based ETPs [12] can meet its

Bitcoin ETF Trust Under NYSE Arca Rule 8.201–E, Securities Exchange Act Release No. 94006 (Jan. 20, 2022), 87 FR 3869 (Jan. 25, 2022) (SR–NYSEArca–2021–37) ("SkyBridge Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Wise Origin Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 94080 (Jan 27, 2022), 87 FR 5527 (Feb. 1, 2022) (SR–CboeBZX–2021–039) ("Wise Origin Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the NYDIG Bitcoin ETF Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 94395 (Mar. 10, 2022), 87 FR 14932 (Mar. 16, 2022) (SR–NYSEArca–2021–57) ("NYDIG Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Global X Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 94396 (Mar. 10, 2022), 87 FR 14912 (Mar. 16, 2022) (SR–CboeBZX–2021–052) ("Global X Order"); Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To List and Trade Shares of the ARK 21Shares Bitcoin ETF Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 94571 (Mar. 31, 2022), 87 FR 20014 (Apr. 6, 2022) (SR–CboeBZX–2021–051) ("ARK 21Shares Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the One River Carbon Neutral Bitcoin Trust Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 94999 (May 27, 2022), 87 FR 33548 (June 2, 2022) (SR–NYSEArca–2021–67) ("One River Order"). In addition, orders were issued by delegated authority on the following matters: Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, Relating to the Listing and Trading of Shares of the SolidX Bitcoin Trust Under NYSE Arca Equities Rule 8.201, Securities Exchange Act Release No. 80319 (Mar. 28, 2017), 82 FR 16247 (Apr. 3, 2017) (SR–NYSEArca–2016–101) ("SolidX Order"); Order Disapproving a Proposed Rule Change To List and Trade the Shares of the ProShares Bitcoin ETF and the ProShares Short Bitcoin ETF, Securities Exchange Act Release No. 83904 (Aug. 22, 2018), 83 FR 43934 (Aug. 28, 2018) (SR–NYSEArca–2017–139) ("ProShares Order"); Order Disapproving a Proposed Rule Change To List and Trade the Shares of the GraniteShares Bitcoin ETF and the GraniteShares Short Bitcoin ETF, Securities Exchange Act Release No. 83913 (Aug. 22, 2018), 83 FR 43923 (Aug. 28, 2018) (SR–CboeBZX–2018–001) ("GraniteShares Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the VanEck Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93559 (Nov. 12, 2021), 86 FR 64539 (Nov. 18, 2021) (SR–CboeBZX–2021–019) ("VanEck Order"); Order Granting Approval of a Proposed Rule Change, as Modified by Amendment No. 2, To List and Trade Shares of the Teucrium Bitcoin Futures Fund Under NYSE Arca Rule 8.200–E, Commentary .02 (Trust Issued Receipts), Securities Exchange Act Release No. 94620 (Apr. 6, 2022), 87 FR 21676 (Apr. 12, 2022) (SR–NYSEArca–2021–53) ("Teucrium Order"); Order Granting Approval of a Proposed Rule Change, as Modified by Amendment Nos. 1 and 2, To List and Trade Shares of the Valkyrie XBTO Bitcoin Futures Fund Under Nasdaq Rule 5711(g), Securities Exchange Act Release No. 94853 (May 5, 2022), 87 FR 28848 (May 11, 2022) (SR–NASDAQ–2021–066) ("Valkyrie XBTO Order").

[12] As used in this order, the term "ETFs" refers to open-end funds that register the offer and sale of their shares under the Securities Act of 1933 ("Securities Act") and are regulated as investment companies under the Investment Company Act of 1940 ("1940 Act"). The term "ETPs" refers to

obligations under Exchange Act Section 6(b)(5) by demonstrating that the exchange has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets.[13]

In this context, the terms "significant market" and "market of significant size" include a market (or group of markets) as to which (a) there is a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, so that a surveillance-sharing agreement would assist in detecting and deterring misconduct, and (b) it is unlikely that trading in the ETP would be the predominant influence on prices in that market.[14] A surveillance-sharing agreement must be entered into with a "significant market" to assist in detecting and deterring manipulation of the ETP, because a person attempting to manipulate the ETP is reasonably likely to also engage in trading activity on that "significant market." [15]

Although surveillance-sharing agreements are not the exclusive means by which a listing exchange of a commodity-trust ETP can meet its obligations under Exchange Act Section 6(b)(5), such agreements have previously provided the basis for the exchanges that list commodity-trust ETPs to meet those obligations, and the Commission has historically recognized their importance. And where, as here, a listing exchange fails to establish that other means to prevent fraudulent and manipulative acts and practices will be sufficient, the listing exchange must enter into a surveillance-sharing agreement with a regulated market of significant size because such agreements detect and deter fraudulent and manipulative activity.[16]

exchange-traded products that register the offer and sale of their shares under the Securities Act but are not regulated under the 1940 Act, such as commodity trusts and trust issued receipts. Commenters have sometimes used these terms interchangeably, and it is not always clear which type of product a commenter is referring to. Accordingly, unless clear from the context, the Commission interprets statements from the Exchange or a commenter to refer to an ETP.

[13] See USBT Order, 85 FR at 12596. See also Winklevoss Order, 83 FR at 37592 n.202 and accompanying text (discussing previous Commission approvals of commodity-trust ETPs); GraniteShares Order, 83 FR at 43925–27 nn.35–39 and accompanying text (discussing previous Commission approvals of commodity-futures ETPs).

[14] See Winklevoss Order, 83 FR at 37594. See also USBT Order, 85 FR at 12596–97; WisdomTree Order, 86 FR at 69322.

[15] See USBT Order, 85 FR at 12597.

[16] See Amendment to Rule Filing Requirements for Self-Regulatory Organizations Regarding New Derivative Securities Products, Securities Exchange

be found at: https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-20125938-286383.pdf.

[9] 15 U.S.C. 78f(b)(5).

[10] Bitcoins are digital assets that are issued and transferred via a decentralized, open-source protocol used by a peer-to-peer computer network through which transactions are recorded on a public transaction ledger known as the "bitcoin blockchain." The bitcoin protocol governs the creation of new bitcoins and the cryptographic system that secures and verifies bitcoin transactions. See, e.g., Amendment No. 1, 87 FR at 28045.

[11] See Order Setting Aside Action by Delegated Authority and Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, To List and Trade Shares of the Winklevoss Bitcoin Trust, Securities Exchange Act Release No. 83723 (July 26, 2018), 83 FR 37579 (Aug. 1, 2018) (SR–BatsBZX–2016–30) ("Winklevoss Order"); Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To Amend NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares) and To List and Trade Shares of the United States Bitcoin and Treasury Investment Trust Under NYSE Arca Rule 8.201–E, Securities Exchange Act Release No. 88284 (Feb. 26, 2020), 85 FR 12595 (Mar. 3, 2020) (SR–NYSEArca–2019–39) ("USBT Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the WisdomTree Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93700 (Dec. 1, 2021), 86 FR 69322 (Dec. 7, 2021) (SR–CboeBZX–2021–024) ("WisdomTree Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Valkyrie Bitcoin Fund Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 93859 (Dec. 22, 2021), 86 FR 74156 (Dec. 29, 2021) (SR–NYSEArca–2021–31) ("Valkyrie Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Kryptoin Bitcoin ETF Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93860 (Dec. 22, 2021), 86 FR 74166 (Dec. 29, 2021) (SR–CboeBZX–2021–029) ("Kryptoin Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the First Trust SkyBridge

The Commission has long recognized that surveillance-sharing agreements "provide a necessary deterrent to manipulation because they facilitate the availability of information needed to fully investigate a manipulation if it were to occur" and thus "enable the Commission to continue to effectively protect investors and promote the public interest." [17] As the Commission has emphasized, it is essential for an exchange listing a derivative securities product to have the ability that surveillance-sharing agreements provide to obtain information necessary to detect, investigate, and deter fraud and market manipulation, as well as violations of exchange rules and applicable federal securities laws and rules.[18] The hallmarks of a surveillance-sharing agreement are that the agreement provides for the sharing of information about market trading activity, clearing activity, and customer identity; that the parties to the agreement have reasonable ability to obtain access to and produce requested information; and that no existing rules, laws, or practices would impede one party to the agreement from obtaining this information from, or producing it to, the other party.[19]

The Commission has explained that the ability of a national securities exchange to enter into surveillance-sharing agreements "furthers the protection of investors and the public interest because it will enable the [e]xchange to conduct prompt investigations into possible trading violations and other regulatory improprieties." [20] The Commission has

also long taken the position that surveillance-sharing agreements are important in the context of exchange listing of derivative security products, such as equity options, because a surveillance-sharing agreement "permits the sharing of information" that is "necessary to detect" manipulation and "provide[s] an important deterrent to manipulation because [it] facilitate[s] the availability of information needed to fully investigate a potential manipulation if it were to occur." [21] With respect to ETPs, when approving the listing and trading of one of the first commodity-linked ETPs—a commodity-linked exchange-traded note—on a national securities exchange, the Commission continued to emphasize the importance of surveillance-sharing agreements, stating that the listing exchange had entered into surveillance-sharing agreements with each of the futures markets on which pricing of the ETP would be based and stating that "[t]hese agreements should help to ensure the availability of information necessary to detect and deter potential manipulations and other trading abuses, thereby making [the commodity-linked notes] less readily susceptible to manipulation." [22]

Consistent with these statements, for the commodity-trust ETPs approved to date for listing and trading, there has been in *every* case at least one significant, regulated market for trading futures on the underlying commodity and the ETP listing exchange has entered into surveillance-sharing agreements with, or held Intermarket Surveillance Group ("ISG") membership in common with, that market.[23]

Moreover, the surveillance-sharing agreements have been consistently present whenever the Commission has approved the listing and trading of derivative securities, even where the underlying securities were also listed on national securities exchanges—such as options based on an index of stocks traded on a national securities exchange—and were thus subject to the Commission's direct regulatory authority.[24]

Listing exchanges have also attempted to demonstrate that other means besides surveillance-sharing agreements will be sufficient to prevent fraudulent and manipulative acts and practices, including that the bitcoin market as a whole or the relevant underlying bitcoin

---

Act Release No. 40761 (Dec. 8, 1998), 63 FR 70952, 70954, 70959 (Dec. 22, 1998) (File No. S7–13–98) ("NDSP Adopting Release"). *See also* Winklevoss Order, 83 FR at 37593–94; ProShares Order, 83 FR at 43936; GraniteShares Order, 83 FR at 43924; USBT Order, 85 FR at 12596.

[17] *See* NDSP Adopting Release, 63 FR at 70954, 70959. *See also id.* at 70959 ("It is essential that the SRO [self-regulatory organization] have the ability to obtain the information necessary to detect and deter market manipulation, illegal trading and other abuses involving the new derivative securities product. Specifically, there should be a comprehensive ISA [information-sharing agreement] that covers trading in the new derivative securities product and its underlying securities in place between the SRO listing or trading a derivative product and the markets trading the securities underlying the new derivative securities product.").

[18] *See* NDSP Adopting Release, 63 FR at 70959.

[19] *See* Winklevoss Order, 83 FR at 37592–93 (discussing Letter from Brandon Becker, Director, Division of Market Regulation, Commission, to Gerard D. O'Connell, Chairman, Intermarket Surveillance Group (June 3, 1994), *available at* https://www.sec.gov/divisions/marketreg/mr-noaction/isg060394.htm).

[20] Securities Exchange Act Release No. 27877 (Apr. 4, 1990), 55 FR 13344 (Apr. 10, 1990) (Notice of Filing and Order Granting Accelerated Approval

to Proposed Rule Change Regarding Cooperative Agreements With Domestic and Foreign Self-Regulatory Organizations) (SR–NYSE–90–14).

[21] Securities Exchange Act Release No. 33555 (Jan. 31, 1994), 59 FR 5619, 5621 (Feb. 7, 1994) (SR–Amex–93–28) (order approving listing of options on American Depositary Receipts ("ADR")) ("ADR Option Order"). The Commission further stated that it "generally believes that having a comprehensive surveillance sharing agreement in place, between the exchange where the ADR option trades and the exchange where the foreign security underlying the ADR primarily trades, will ensure the integrity of the marketplace. The Commission further believes that the ability to obtain relevant surveillance information, including, among other things, the identity of the ultimate purchasers and sellers of securities, is an essential and necessary component of a comprehensive surveillance sharing agreement." *Id.*

[22] Securities Exchange Act Release No. 35518 (Mar. 21, 1995), 60 FR 15804, 15807 (Mar. 27, 1995) (SR–Amex–94–30). *See also* Winklevoss Order, 83 FR at 37593 n.206.

[23] *See* Winklevoss Order, 83 FR at 37594. Furthermore, the Commission notes that those cases dealt with a futures market that had been trading for a long period of time before an exchange proposed a commodity-trust ETP based on the asset underlying those futures. For example, silver

futures and gold futures began trading in 1933 and 1974, respectively, *see* https://www.cmegroup.com/media-room/historical-first-trade-dates.html, and the first ETPs based on spot silver and gold were approved for listing and trading in 2006 and 2004. *See* Securities Exchange Act Release No. 53521 (Mar. 20, 2006), 71 FR 14967 (Mar. 24, 2006) (SR–Amex–2005–072) (order approving iShares Silver Trust); Securities Exchange Act Release No. 50603 (Oct. 28, 2004), 69 FR 64614 (Nov. 5, 2004) (SR–NYSE–2004–22) (order approving streetTRACKS Gold Shares). Platinum futures and palladium futures began trading in 1956 and 1968, respectively, *see* https://www.cmegroup.com/media-room/historical-first-trade-dates.html, and the first ETPs based on spot platinum and palladium were approved for listing and trading in 2009. *See* Securities Exchange Act Release No. 61220 (Dec. 22, 2009), 74 FR 68855 (Dec. 29, 2009) (SR–NYSEArca–2009–94) (order approving ETFS Palladium Trust); Securities Exchange Act Release No. 61219 (Dec. 22, 2009), 74 FR 68886 (Dec. 29, 2009) (SR–NYSEArca–2009–95) (order approving ETFS Platinum Trust).

[24] *See* USBT Order, 85 FR at 12597; ADR Option Order, 59 FR at 5621. The Commission has also recognized that surveillance-sharing agreements provide a necessary deterrent to fraud and manipulation in the context of index options even when (i) all of the underlying index component stocks were either registered with the Commission or exempt from registration under the Exchange Act; (ii) all of the underlying index component stocks were traded in the U.S. either directly or as ADRs on a national securities exchange; and (iii) effective international ADR arbitrage alleviated concerns over the relatively smaller ADR trading volume, helped to ensure that ADR prices reflected the pricing on the home market, and helped to ensure more reliable price determinations for settlement purposes, due to the unique composition of the index and reliance on ADR prices. *See* Securities Exchange Act Release No. 26653 (Mar. 21, 1989), 54 FR 12705, 12708 (Mar. 28, 1989) (SR–Amex–87–25) (stating that "surveillance-sharing agreements between the exchange on which the index option trades and the markets that trade the underlying securities are necessary" and that "[t]he exchange of surveillance data by the exchange trading a stock index option and the markets for the securities comprising the index is important to the detection and deterrence of intermarket manipulation"). And the Commission has explained that surveillance-sharing agreements "ensure the availability of information necessary to detect and deter potential manipulations and other trading abuses" even when approving options based on an index of stocks traded on a national securities exchange. *See* Securities Exchange Act Release No. 30830 (June 18, 1992), 57 FR 28221, 28224 (June 24, 1992) (SR–Amex–91–22).

market is ''uniquely'' and ''inherently'' resistant to fraud and manipulation.[25] In response, the Commission has stated that, if a listing exchange could establish that the underlying market inherently possesses a unique resistance to manipulation beyond the protections that are utilized by traditional commodity or securities markets, the listing market would not necessarily need to enter into a surveillance-sharing agreement with a regulated significant market.[26] Such resistance to fraud and manipulation, however, must be novel and beyond those protections that exist in traditional commodity markets or securities markets for which surveillance-sharing agreements in the context of listing derivative securities products have been consistently present.[27]

Here, NYSE Arca contends that approval of the proposal is consistent with Section 6(b)(5) of the Exchange Act, and, in particular, Section 6(b)(5)'s requirement that the rules of a national securities exchange be designed to prevent fraudulent and manipulative acts and practices and to protect investors and the public interest.[28] As discussed in more detail below, NYSE Arca asserts that the proposal is consistent with Section 6(b)(5) of the Exchange Act because bitcoin offers novel protections beyond those that exist in traditional commodity markets or equity markets and the proposal's use of the Index (as described below)[29] represents an effective means to prevent fraudulent and manipulative acts and practices.[30] In addition, NYSE Arca asserts that the Chicago Mercantile Exchange (''CME'') bitcoin futures market is a significant, surveilled, and regulated market that is ''closely connected'' to the spot bitcoin market, and that the Exchange may obtain information from the CME bitcoin futures market and other entities that are members of the ISG to assist in detecting and deterring potential fraud and manipulation with respect to the Trust and the Shares.[31] In addition, NYSE Arca argues that the proposal would protect investors and the public interest because, among other things,

the Exchange has in place surveillance procedures relating to trading in the Shares and the proposal would promote competition.[32]

In the analysis that follows, the Commission examines whether the proposed rule change, as modified by Amendment No. 1, is consistent with Section 6(b)(5) of the Exchange Act by addressing: in Section III.B.1 assertions that other means besides surveillance-sharing agreements will be sufficient to prevent fraudulent and manipulative acts and practices; in Section III.B.2 assertions that NYSE Arca has entered into a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin; in Section III.B.3 assertions that the Commission must approve the proposal because the Commission has approved the listing and trading of ETFs and ETPs that hold CME bitcoin futures; in Section III.C assertions that the proposal is consistent with the protection of investors and the public interest; and in Section III.D other arguments raised by commenters.

Based on its analysis, the Commission concludes that NYSE Arca has not established that other means to prevent fraudulent and manipulative acts and practices are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. The Commission further concludes that NYSE Arca has not established that it has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin, the underlying bitcoin assets that would be held by the Trust. As a result, the Commission is unable to find that the proposed rule change is consistent with the statutory requirements of Exchange Act Section 6(b)(5).

The Commission emphasizes that its disapproval of this proposed rule change, as modified by Amendment No. 1, does not rest on an evaluation of the relative investment quality of a product holding spot bitcoin versus a product holding CME bitcoin futures, or an assessment of whether bitcoin, or blockchain technology more generally, has utility or value as an innovation or an investment. Rather, the Commission is disapproving this proposed rule change, as modified by Amendment No. 1, because, as discussed below, NYSE Arca has not met its burden to demonstrate that its proposal is

consistent with the requirements of Exchange Act Section 6(b)(5).

## II. Description of the Proposed Rule Change, as Modified by Amendment No. 1

As described in more detail in Amendment No. 1,[33] the Exchange proposes to list and trade the Shares of the Trust under NYSE Arca Rule 8.201–E, which governs the listing and trading of Commodity-Based Trust Shares on the Exchange.

The investment objective of the Trust is for the value of the Shares (based on bitcoin per Share) to reflect the value of the bitcoins held by the Trust, as determined by reference to the ''Index Price,'' less the Trust's expenses and other liabilities.[34] The ''Index Price'' is the U.S. dollar value of a bitcoin represented by the ''Index,'' calculated at 4:00 p.m., New York time, on each business day.[35] According to the Exchange, the Index Provider develops, calculates, and publishes the Index on a continuous basis using the price at certain spot bitcoin trading platforms selected by the Index Provider.[36] As of December 31, 2021, the spot bitcoin trading platforms included in the Index were: Coinbase Pro, Bitstamp, Kraken, and LMAX Digital (''Constituent Platforms'').[37] The Index applies an

---

[25] See USBT Order, 85 FR at 12597.

[26] See Winklevoss Order, 83 FR at 37580, 37582–91 (addressing assertions that ''bitcoin and [spot] bitcoin markets'' generally, as well as one bitcoin trading platform specifically, have unique resistance to fraud and manipulation). See also USBT Order, 85 FR at 12597.

[27] See USBT Order, 85 FR at 12597, 12599.

[28] See Amendment No. 1, 87 FR at 28051–54, 28059–60.

[29] See infra note 35 and accompanying text.

[30] See Amendment No. 1, 87 FR at 28051–53, 28059–60.

[31] See id. at 28054; 28060.

[32] See id. at 28060.

[33] See supra note 8. See also Amendment No. 1 to Registration Statement on Form 10, dated December 31, 2019, filed with the Commission on behalf of the Trust (''Registration Statement''); Annual Report on Form 10–K for the fiscal year ended December 31, 2021, filed with the Commission on the behalf of the Trust (''2021 10–K'').

[34] See Amendment No. 1, 87 FR at 28045. Grayscale Investments, LLC (''Sponsor'') is the sponsor of the Trust and is a wholly-owned subsidiary of Digital Currency Group, Inc. Delaware Trust Company (''Trustee'') is the trustee of the Trust. The custodian for the Trust is Coinbase Custody Trust Company, LLC (''Custodian''). *The administrator of the Trust is BNY Mellon Asset Servicing (''Administrator'').* The distribution and marketing agent for the Trust is Genesis. The Trust operates pursuant to a trust agreement (''Trust Agreement'') between the Sponsor and the Trustee. See id. at 28044.

[35] See id. at 28049. According to the Exchange, the index provider for the Trust is *CoinDesk Indices, Inc., formerly known as* TradeBlock, Inc. (''Index Provider''). See id. at 28044. While the Exchange, in the proposal, does not name the Index that the Trust would use to value the bitcoins held by the Trust, the Exchange does provide that the value of the Index, as well as additional information regarding the Index, may be found at: *https:// tradeblock.com/markets/index/xbx. See id.* at 28058. Further, in its letter to the Commission, the Sponsor states that the Trust values its bitcoin holdings based on the CoinDesk Bitcoin Price Index (XBX) (formerly known as the Tradeblock XBX Index). See Letter from Davis Polk & Wardwell LLP, on behalf of the Sponsor, dated Nov. 29, 2021 (''Grayscale Letter I''), at 5.

[36] See Amendment No. 1, 87 FR at 28049.

[37] See id. at 28047, 28049, 28052 n.35. In its proposal, NYSE Arca uses the term ''U.S.-

algorithm to the price of bitcoin on the Constituent Platforms calculated on a per second basis over a 24-hour period.[38]

The Trust's assets will consist solely of bitcoins; Incidental Rights;[39] IR Virtual Currency;[40] proceeds from the sale of bitcoins, Incidental Rights, and IR Virtual Currency pending use of such cash for payment of Additional Trust Expenses[41] or distribution to the shareholders; and any rights of the Trust pursuant to any agreements, other than the Trust Agreement, to which the Trust is a party. Each Share represents a proportional interest, based on the total number of Shares outstanding, in each of the Trust's assets as determined in the case of bitcoin by reference to the Index Price, less the Trust's expenses and other liabilities (which include accrued but unpaid fees and expenses).[42]

On each business day at 4:00 p.m., New York time, or as soon thereafter as practicable, the Sponsor will evaluate the bitcoin held by the Trust and calculate and publish the "Digital Asset Holdings" of the Trust using the Index Price.[43] The Trust's website, as well as one or more major market data vendors, will provide an intra-day indicative value ("IIV") per Share updated every 15 seconds, as calculated by the Exchange or a third party financial data provider during the Exchange's Core Trading Session (9:30 a.m. to 4:00 p.m., E.T.). The IIV will be calculated using the same methodology as the Digital Asset Holdings of the Trust, specifically by using the prior day's closing Digital Asset Holdings per Share as a base and updating that value during the Exchange's Core Trading Session to reflect changes in the value of the Trust's Digital Asset Holdings during the trading day.[44] In addition, according to the Exchange, "each investor will have access to the current Digital Asset Holdings of the Trust through the Trust's website, as well as from one or more major market data vendors."[45]

The Trust will issue Shares to authorized participants from time to time, but only in one or more Baskets (each "Basket" being a block of 100 Shares). The creation of Baskets will be made only in exchange for the delivery to the Trust of the number of whole and fractional bitcoins represented by each Basket being created.[46] The Trust may redeem Shares from time to time, but only in Baskets. The redemption of Baskets requires the distribution by the Trust of the number of bitcoins represented by the Baskets being redeemed. The redemption of a Basket will be made only in exchange for the distribution by the Trust of the number of whole and fractional bitcoins represented by each Basket being redeemed.[47] Creation and redemption orders may be placed either "in-kind" or "in-cash."[48] Although the Trust will create Baskets only upon the receipt of bitcoins, and will redeem Baskets only by distributing bitcoins, an authorized participant may deposit cash with or receive cash from the Administrator, which will facilitate the purchase or sale of bitcoins through a liquidity provider on behalf of an authorized participant.[49]

According to the Sponsor, shares of the Trust are currently offered to accredited investors within the meaning of Regulation D under the Securities Act, and, once such investors have held their shares for the requisite holding period pursuant to Rule 144 under the Securities Act, they have the ability to resell them through transactions on the OTCQX Best Market ("OTCQX"), an over-the-counter ("OTC") marketplace operated by OTC Markets Group that is not registered with the Commission as a national securities exchange.[50] The Sponsor states that these shares have been quoted on OTCQX since March 2015 and are available to investors through broker transactions.[51] The Sponsor also states that, in the twelve months ended October 31, 2021, trading in these shares accounted for the most transactions by dollar volume of any security traded on OTCQX.[52] The Sponsor further states that the Trust is the largest and most liquid bitcoin investment fund in the world and that the Sponsor is the world's largest digital currency asset manager, with more than $55 billion in assets under management as of October 29, 2021.[53]

## III. Discussion

### A. The Applicable Standard for Review

The Commission must consider whether NYSE Arca's proposal is consistent with the Exchange Act. Section 6(b)(5) of the Exchange Act requires, in relevant part, that the rules of a national securities exchange be designed "to prevent fraudulent and manipulative acts and practices" and "to protect investors and the public interest."[54] Under the Commission's

---

Compliant Exchanges" to describe Constituent Platforms that are "compliant with applicable U.S. federal and state licensing requirements and practices regarding AML and KYC regulations." *Id.* at 28052 n.35. According to NYSE Arca, "[a]ll Constituent [Platforms] are U.S.-Compliant Exchanges." *Id.*

[38] *See id.* at 28049. According to the Exchange, prior to February 1, 2022, the Trust valued its bitcoins for operational purposes by reference to the volume-weighted average Index Price ("Old Index Price"). The Old Index Price was calculated by applying a weighting algorithm to the price and trading volume data for the immediately preceding 24-hour period as of 4:00 p.m., New York time, derived from the Constituent Platforms reflected in the Index on such trade date, and overlaying an averaging mechanism to the price produced. Thus, whereas the Old Index Price reflected the price of a bitcoin at 4:00 p.m., New York time, calculated by taking the average of each price of a bitcoin produced by the Index over the preceding 24-hour period, as of February 1, 2022, the Index Price reflects the price of a bitcoin at 4:00 p.m., New York time, calculated based on the price and trading volume data of the Constituent Platforms over the preceding 24-hour period. According to the Exchange, the Index Price differs from the Old Index Price only in that it does not use an additional averaging mechanism; the Index Price otherwise uses the same methodology as the Old Index Price, and there has been no change to the Index used to determine the Index Price or the criteria used to select the Constituent Platforms. *See id.* at 28053 n.44.

[39] "Incidental Rights" are rights to acquire, or otherwise establish dominion and control over, any virtual currency or other asset or right, which rights are incident to the Trust's ownership of bitcoins and arise without any action of the Trust, or of the Sponsor or Trustee on behalf of the Trust. *See id.* at 28044 n.14.

[40] "IR Virtual Currency" is any virtual currency tokens, or other asset or right, acquired by the Trust through the exercise (subject to the applicable provisions of the Trust Agreement) of any Incidental Right. *See id.* at 28045 n.15.

[41] "Additional Trust Expenses" are any expenses incurred by the Trust in addition to the Sponsor's fee that are not Sponsor-paid expenses. *See id.* at 28045 n.16.

[42] *See id.* at 28045, 28047.

[43] The Exchange does not define the term "Digital Asset Holdings" in the proposed rule change. Additional information about the calculation of the Digital Asset Holdings can be found in Amendment No. 1. *See id.* at 28047. The Trust does not expect to take any Incidental Rights or IR Virtual Currency it may hold into account for purposes of determining the Trust's Digital Asset Holdings. *Id.*

[44] *See id.* at 28058.

[45] *Id.*

[46] *See id.* at 28055.

[47] *See id.* at 28056.

[48] *See id.* at 28056–57.

[49] *See id.* at 28055–57.

[50] *See* Grayscale Letter I, at 2.

[51] *See id.*

[52] *See id.*

[53] *See id.* at 4.

[54] 15 U.S.C. 78f(b)(5). Pursuant to Section 19(b)(2) of the Exchange Act, 15 U.S.C. 78s(b)(2), the Commission must disapprove a proposed rule change filed by a national securities exchange if it does not find that the proposed rule change is consistent with the applicable requirements of the Exchange Act. Exchange Act Section 6(b)(5) states that an exchange shall not be registered as a national securities exchange unless the Commission determines that "[t]he rules of the exchange are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between

Continued

Rules of Practice, the "burden to demonstrate that a proposed rule change is consistent with the Exchange Act and the rules and regulations issued thereunder . . . is on the self-regulatory organization ['SRO'] that proposed the rule change." [55]

The description of a proposed rule change, its purpose and operation, its effect, and a legal analysis of its consistency with applicable requirements must all be sufficiently detailed and specific to support an affirmative Commission finding,[56] and any failure of an SRO to provide this information may result in the Commission not having a sufficient basis to make an affirmative finding that a proposed rule change is consistent with the Exchange Act and the applicable rules and regulations.[57] Moreover, "unquestioning reliance" on an SRO's representations in a proposed rule change is not sufficient to justify Commission approval of a proposed rule change.[58]

*B. Whether NYSE Arca Has Met Its Burden to Demonstrate That the Proposal Is Designed to Prevent Fraudulent and Manipulative Acts and Practices*

(1) Assertions That Other Means Besides Surveillance-Sharing Agreements Will Be Sufficient to Prevent Fraudulent and Manipulative Acts and Practices

(i) Assertions Regarding the Bitcoin Market

As stated above, the Commission has recognized that a listing exchange could demonstrate that other means to prevent fraudulent and manipulative acts and practices are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets, including by demonstrating that the bitcoin market as a whole or the relevant underlying bitcoin market is uniquely and inherently resistant to fraud and manipulation.[59] Such

resistance to fraud and manipulation, however, must be novel and beyond those protections that exist in traditional commodities or securities markets.[60]

(a) Representations Made and Comments Received

NYSE Arca asserts that "the fundamental features of [b]itcoin's fungibility, transportability[,] and exchange tradability offer novel protections beyond those that exist in traditional commodity markets or equity markets when combined with other means." [61]

In addition, some commenters claim that the spot bitcoin market's size and depth of liquidity, as well as the diversity of market participants, limits its susceptibility to manipulation.[62] An affiliate of the Custodian, for example, states that bitcoin's average daily trading volume in 2021 was approximately $45 billion, which, according to this commenter, is significantly higher than that of the largest equity stocks.[63] This commenter also states that the spot bitcoin market is comparably as large and transparent as the silver, palladium, and platinum markets, for which the Commission has

approved spot ETPs.[64] According to this commenter, "[w]hen compared across key market dimensions—trading volume, capitalization, and number of active trading venues—the [b]itcoin spot market is more robust, a sign of lower likelihood of successful market manipulation." [65] Lastly, this commenter states that asset managers, hedge funds, and public companies participate in the bitcoin market and that interest from institutional investors continues to increase.[66]

Some commenters state that active participation by market makers and arbitrageurs across bitcoin-related markets serves to quickly close arbitrage opportunities, including any that may be due to attempted price manipulation.[67] In support of this claim, the affiliate of the Custodian states that it has undertaken empirical research that shows that spot bitcoin prices do not deviate significantly across digital asset platforms.[68] According to this commenter, in a comparison of hour-end prices for bitcoin across the Constituent Platforms, the platforms showed less than 20 basis point deviation 97% of the time over a roughly three-year time horizon.[69] This commenter states that its observations and interpretations are consistent with those expressed previously by the Commission—that a strong convergence

---

[55] Rule 700(b)(3), Commission Rules of Practice, 17 CFR 201.700(b)(3).

[56] *See id.*

[57] *See id.*

[58] *Susquehanna Int'l Group, LLP* v. *Securities and Exchange Commission,* 866 F.3d 442, 447 (D.C. Cir. 2017) ("Susquehanna").

[59] *See* USBT Order, 85 FR at 12597 n.23. The Commission is not applying a "cannot be manipulated" standard. Instead, the Commission is

examining whether the proposal meets the requirements of the Exchange Act and, pursuant to its Rules of Practice, places the burden on the listing exchange to demonstrate the validity of its contentions and to establish that the requirements of the Exchange Act have been met. *See id.*

[60] *See id.* at 12597.

[61] Amendment No. 1, 87 FR at 28051.

[62] *See, e.g.,* Letter from Paul Grewal, Chief Legal Officer, Coinbase, dated Mar. 3, 2022 ("Coinbase Letter II"), at 2 ("the [b]itcoin markets exhibit characteristics and maturity commensurate with some of the deeply traded markets in commodities and U.S. equities. The liquidity and transparency of the [b]itcoin markets limits its susceptibility to manipulation . . . ."); Letter from Cassandra Lentchner, President and Chairman, BitGo Trust Company, Inc., dated Apr. 18, 2022 ("BitGo Letter"), at 2 ("Bitcoin is a widely-traded asset with a market capital of over $750B and trading volumes of tens of billions daily. The sheer size of this widely held market demonstrates the difficulty of manipulation."); Letter from Mike Cammarata, dated Mar. 31, 2022 ("Cammarata Letter") ("the size of the [b]itcoin market (around $1 Trillion USD) has now reached a level where price manipulation concerns are minor as any attempt at manipulation will simply be arbitraged away by the deep pool of robust market participants"); Letter from Kate McAllister and James Toes, Security Traders Association, dated Apr. 20, 2022 ("STA Letter"), at 2 ("the combination of liquid markets for [b]itcoin and the features within the ETF structure mitigate potential price manipulation"); Letter from Michael D. Moffitt, dated Feb. 7, 2022 ("Moffitt Letter I") (stating that "the [b]itcoin as of 2021/2022 are indeed sufficiently liquid and transparent for the purposes of an ETF" and "it is my belief that widespread manipulation is simply not possible in the same way that it might have been several years ago").

[63] *See* Coinbase Letter II, at 3.

[64] *See id.* at 3, 8. *See also, e.g.,* Letter from Douglas Shultz (Feb. 14, 2022) ("Shultz Letter") ("The cryptocurrency market has passed silver in terms of total market capitalization at various times. If silver can't be manipulated at these levels, neither can [b]itcoin.").

[65] Coinbase Letter II, at 3.

[66] *See id.* at 3.

[67] *See, e.g.,* Coinbase Letter II, at 2; Letter from Douglas A. Cifu, Chief Executive Officer, Virtu Financial, Inc., dated Apr. 4, 2022 ("Virtu Letter"), at 3 ("we believe that the active participation by market makers across all of these linked markets—spot, futures, derivatives and ETP—can mitigate the risk of manipulation through competitive liquidity provision, arbitrage and creation/redemption transactions"); Letter from W. Graham Harper, Head of Public Policy and Market Structure, Cumberland, a subsidiary of DRW Trading Group, dated Apr. 1, 2022 ("Cumberland Letter"), at 2 ("[a]ny narrowly scoped attempt to manipulate the spot [b]itcoin market would be quickly counteracted by the collective activity of arbitrageurs and liquidity providers, ultimately facilitating orderly price discovery potentially causing artificial prices to be perpetuated across all [b]itcoin related products, but in any case, forcing the arbitrage relationships to remain intact").

[68] *See* Coinbase Letter II, at 4.

[69] *See id.* According to this commenter, while there were instances where prices across Constituent Platforms experienced higher deviations than 20 bps, the vast majority (*e.g.,* 90% of deviations greater than 1%) were driven by a single platform's pricing with less than 5% of the trading volume. In the remaining instances, price differences quickly closed by intermarket trading, typically within one hour, with the exception of two price deviations that lasted three hours during the onset of the Covid–19 pandemic. *See id.*

of pricing across a broad market is present where spot markets are deep and liquid.[70] This commenter concludes that, given the spot bitcoin market's significant volume and efficiency of intermarket price correction, manipulating the price of the Shares by manipulating the spot bitcoin market would require a prohibitively large trading volume and coordination across several large trading platforms, and that activity on this scale would be readily detected via surveillance.[71]

A number of commenters, however, take the opposite view, arguing, among other things, that the price of bitcoin is subject to manipulation on the unregulated platforms, and approval of the proposal would invite additional manipulation.[72]

(b) Analysis

As with the previous proposals, the Commission here concludes that information in the record regarding the bitcoin market does not support a finding that the Exchange has established other means to prevent fraudulent and manipulative acts and practices sufficient to justify dispensing with the detection and deterrence of fraud and manipulation that is provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. Likewise, the record does not support a finding that the Exchange has demonstrated that the bitcoin market as a whole or the relevant underlying bitcoin market is uniquely and inherently resistant to fraud and manipulation.

The Commission has identified in previous orders possible sources of fraud and manipulation in the spot bitcoin market, including: (1) "wash" trading;[73] (2) persons with a dominant position in bitcoin manipulating bitcoin pricing; (3) hacking of the bitcoin network and trading platforms; (4) malicious control of the bitcoin network; (5) trading based on material, non-public information (for example, plans of market participants to significantly increase or decrease their holdings in bitcoin, new sources of demand for bitcoin, or the decision of a bitcoin-based investment vehicle on how to respond to a "fork" in the bitcoin blockchain, which would create two different, non-interchangeable types of bitcoin) or based on the dissemination of false and misleading information; (6) manipulative activity involving purported "stablecoins," including Tether (USDT); and (7) fraud and manipulation at bitcoin trading platforms.[74]

NYSE Arca concedes that neither bitcoin itself nor the global bitcoin markets are inherently resistant to fraud or manipulation.[75] NYSE Arca acknowledges in its proposal that "fraud and manipulation may exist and that [b]itcoin trading on any given exchange may be no more uniquely resistant to fraud and manipulation than other commodity markets." [76] NYSE Arca also states that "[b]itcoin is not itself inherently resistant to fraud and manipulation" [77] and concedes that "the global exchange market for the trading of [b]itcoins"—which NYSE Arca says consists of transactions on the "electronic marketplace where exchange participants may trade, buy and sell [b]itcoins based on bid-ask trading"— also "is not inherently resistant to fraud and manipulation." [78]

Moreover, the Trust's Registration Statement acknowledges that "[d]ue to the unregulated nature and lack of transparency surrounding the operations of [bitcoin trading platforms], they may experience fraud, security failures or operational problems, which may adversely affect the value of [b]itcoin and, consequently, the value of the Shares"; that the bitcoin network is currently vulnerable to a "51% attack," in which a bad actor or botnet that controls a majority of the processing power dedicated to mining on the bitcoin network may be able to gain full control of the network and the ability to manipulate the bitcoin blockchain; that "in 2019 there were reports claiming that 80–95% of [b]itcoin trading volume on [bitcoin platforms] was false or non-economic in nature"; and that "[o]ver the past several years, some [bitcoin trading platforms] have been closed due to fraud and manipulative activity, business failure or security breaches." [79]

NYSE Arca asserts that bitcoin's fungibility, transportability, and exchange tradability, "when combined with other means," offer novel protections beyond those that exist in traditional commodity markets or equity markets.[80] The Exchange, however, does not explain how bitcoin is fungible, transportable, or tradable; or how bitcoin's fungibility, transportability, and tradability offer novel protections or help to detect and deter potential fraud and manipulation. As stated above, "unquestioning reliance" on an SRO's representations in a proposed rule change is not sufficient to justify the

---

[70] See id. (citing to Securities Exchange Act Release No. 50603 (Oct. 28, 2004), 69 FR 64614 (Nov. 5, 2004) (SR–NYSE–2004–22) (Order Granting Approval of Proposed Rule Change by the New York Stock Exchange, Inc. Regarding Listing and Trading of streetTRACKS® Gold Shares).

[71] See id. at 4–5.

[72] See, e.g., Letters from David Rosenthal (Apr. 20, 2022); David Golumbia (Apr. 18, 2022); Elliot Kleinfelder (Apr. 19, 2022) ("Kleinfelder Letter"); Scott S. (Feb. 20, 2022); John Carvalho (Feb. 22, 2022); JRL Innovations (Feb. 14, 2022); Anonymous (Feb. 17, 2022); Adan (Feb. 8, 2022). Some commenters that support approval of the proposal nevertheless state that the spot bitcoin market is subject to manipulation. See, e.g., Letter from Noah Dreyfuss, CIO, Dreyfuss Capital Management, dated Feb. 21, 2022 ("Dreyfuss Letter") at 1 ("Frankly, one would find great difficulty in claiming that the spot [b]itcoin market is free of manipulation."); Letter from Jonas M. Grant (Feb. 6, 2022) ("the [b]itcoin market is no doubt susceptible to some manipulation").

[73] See also CFTC v. Gemini Trust Co., LLC, No. 22–cv–4563 (S.D.N.Y. filed June 2, 2022) (alleging, among other things, failure by Gemini personnel to disclose to the CFTC that Gemini customers could and did engage in collusive or wash trading).

[74] See USBT Order, 85 FR at 12600–01 & nn.66–67 (discussing J. Griffin & A. Shams, Is Bitcoin Really Untethered? (Oct. 28, 2019), available at https://ssrn.com/abstract=3195066 and published in 75 J. Finance 1913 (2020)); Winklevoss Order, 83 FR at 37585–86; WisdomTree Order, 86 FR at 69326; Global X Order, 87 FR at 14916; ARK 21Shares Order, 87 FR at 20019; One River Order, 87 FR at 33554.

[75] See Amendment No. 1, 87 FR at 38050–51 (where the Exchange states that "[t]he Commission has expressed legitimate concerns about the underlying [spot bitcoin market] due to the potential for fraud and manipulation" and discusses previous Commission orders finding "evidence of potential and actual fraud and manipulation in the historical trading of [b]itcoin on certain marketplaces such as (1) 'wash' trading, (2) trading based on material, non-public information, including the dissemination of false and misleading information, (3) manipulative activity involving Tether, and (4) fraud and manipulation"). See also id. at 38049 (where the Exchange asserts that the proposal's use of the Index mitigates the effects of wash trading and order book spoofing).

[76] Id. at 38051.

[77] Id. at 38054.

[78] Id. at 38059 (the "Digital Asset Exchange Market is not inherently resistant to fraud and manipulation"). In its filing, the Exchange uses the term "Digital Asset Exchange Market" as "the global exchange market for the trading of [b]itcoins, which consists of transactions on electronic Digital Asset Exchanges." A "Digital Asset Exchange" is defined by NYSE Arca as "an electronic marketplace where exchange participants may trade, buy and sell [b]itcoins based on bid-ask trading." Id. at 38045 n.18.

[79] See Exhibit 99.1 of the Registration Statement, at 13–14, 17–18. See also 2021 10–K, at 13, 50; Are Blockchains Decentralized? Unintended Centralities in Distributed Ledgers, prepared by Trail of Bits based upon work supported by the Defense Advanced Research Projects Agency, June 2022, available at: https://assets-global.website-files.com/5fd11235b3950c2c1a3b6df4/62af6c641a672b3329b9a480_Unintended_Centralities_in_Distributed_Ledgers.pdf.

[80] See Amendment No. 1, 87 FR at 38051. The Exchange does not explicitly tie the asserted novel aspects of bitcoin to an argument that such market provides sufficient means besides surveillance-sharing agreements to prevent fraud and manipulation.

Commission's approval of a proposed rule change.[81]

Further, contrary to the Exchange's assertion, fungibility, transportability, and tradability are not a novel protection beyond those that exist in traditional commodity or equity markets. Fungible, ''transportable,'' exchange-traded assets, such as securities and exchange-traded derivatives, trade subject to substantial regulatory oversight and surveillance-sharing agreements that would be unnecessary if fungibility, transportability, and tradability were sufficient protection against fraud and manipulation. Moreover, manipulation of asset prices can occur through trading activity, including activity that creates a false impression of supply and demand.[82] Therefore, the Exchange's assertions about fungibility, transportability, and tradability do not inform the Commission's view with respect to the necessity that a listing exchange have the abilities to detect and deter fraud and manipulation that are provided by entering into a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.[83]

Likewise, the Commission is not persuaded by commenters' assertions that the bitcoin market's size, liquidity, market participation, or arbitrage, either individually or together, sufficiently address concerns regarding fraud and manipulation.[84] Although commenters recite various metrics, including market capitalization and average daily trading volume, or make observations concerning the growth of the bitcoin market, including increasing institutional participation, they offer no evidence or analysis of how these metrics or observations serve to detect and deter potential fraud and manipulation. Further, even if the record demonstrates that the bitcoin market's size, liquidity, market participation, or arbitrage makes manipulation more difficult or costly, as the Commission has stated in prior

orders with respect to similar arguments, these attributes speak to providing some resistance to manipulation, rather than establishing a *unique* resistance to manipulation that would justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.[85]

Moreover, commenters do not explain how the bitcoin market's diversity of market participants, widely held nature, or increase in institutional participation help mitigate concerns about fraud and manipulation such that a surveillance-sharing agreement is unnecessary. In addition, commenters' assertions about the diverse, broad, and institutional nature of bitcoin's investor base do not provide any information on the concentration of bitcoin ownership within or among market participants, or take into account that a market participant with a dominant ownership position may not find it prohibitively expensive to overcome the liquidity supplied by arbitrageurs and could use dominant market share to engage in manipulation.[86] Indeed, the Sponsor's own statements cast doubt on assertions that the bitcoin market's attributes sufficiently address concerns about fraud and manipulation. According to the Sponsor, ''[a]s of December 31, 2021, the largest 100 [b]itcoin wallets held approximately 15% of the [b]itcoins in circulation. Moreover, it is possible that other persons or entities control multiple wallets that collectively hold a significant number of [b]itcoins, even if they individually only hold a small amount, and it is possible that some of these wallets are controlled by the same person or entity. As a result of this concentration of ownership, large sales or distributions by such holders could have an adverse effect on the market price of [b]itcoin.'' [87]

The Custodian affiliate's comparison of the spot bitcoin market to the silver, palladium, and platinum markets also does not support the finding that other means to prevent fraudulent and manipulative acts and practices are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a

comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. As discussed above,[88] for the commodity-trust ETPs approved to date for listing and trading, including where the underlying commodity is silver, palladium, or platinum, there has been in *every* case at least one significant, regulated market for trading futures on the underlying commodity, and the ETP listing exchange has entered into surveillance-sharing agreements with, or held ISG membership in common with, that market.

The Commission is also not persuaded by commenters' assertion that efficiency of intermarket price correction in the spot bitcoin markets would make manipulating the spot market prohibitively expensive and readily detectable. The affiliate of the Custodian provides various statistics which purport to show that bitcoin prices are closely and increasingly aligned across markets and that any price disparities are quickly arbitraged away. However, such statistics are based on hour-end bitcoin prices and do not capture intra-hour price disparities or provide intra-hour information on how long price disparities persist. Nor do this commenter's statistics or its assertions provide any insight into what size or duration of price disparities would be needed for a would-be manipulator to have an opportunity to make a profit.[89]

In any event, as the Commission has explained, efficient price arbitrage is not sufficient to support the finding that a market is uniquely or inherently resistant to manipulation such that the Commission can dispense with surveillance-sharing agreements.[90] The Commission has stated, for example,

---

[81] *See supra* note 58.

[82] *See* Winklevoss Order, 83 FR at 37585.

[83] Further, transportation and storage costs for bitcoin are not zero, as bitcoin mining and recording transactions to the blockchain have costs. Bitcoin mining involves significant costs for electrical power and computer hardware. Moreover, bitcoin trading is subject to transaction fees charged by trading platforms, withdrawal fees, expenses for custody arrangements, and other factors that impose frictions on trading.

[84] Although a commenter claims that ''transparency'' of the bitcoin market assists arbitrage and limits bitcoin's susceptibility to manipulation, the commenter does not explain what is meant by ''transparency,'' how the bitcoin markets are transparent, or why such transparency limits manipulation. *See* Coinbase Letter II, at 2–4.

[85] *See* USBT Order, 85 FR at 12601; Kryptoin Order, 86 FR at 74171; Global X Order, 87 FR at 14916; Wise Origin Order, 87 FR at 5531.

[86] *See, e.g.,* Winklevoss Order, 83 FR at 37584; USBT Order, 85 FR at 12600–01; WisdomTree Order, 86 FR at 69325; Valkyrie Order, 86 FR at 74160; Kryptoin Order, 86 FR at 74170; SkyBridge Order, 87 FR at 3783–84; Wise Origin Order, 87 FR at 5531; ARK 21Shares Order, 87 FR at 20019.

[87] 2021 10–K, at 46.

[88] *See supra* note 23 and accompanying text.

[89] *See* Coinbase Letter II, at 4–5. In addition, the Registration Statement states: ''As corresponding increases in throughput lag behind growth in the use of digital asset networks, average fees and settlement times may increase considerably. For example, the Bitcoin Network has been, at times, at capacity, which has led to increased transaction fees . . . . Increased fees and decreased settlement speeds could . . . adversely impact the value of the Shares.'' Exhibit 99.1 of the Registration Statement, at 13. *See also* 2021 10–K, at 46. The affiliate of the Custodian does not provide data or analysis to address, among other things, whether such risks of increased fees and bitcoin transaction settlement times may affect whether arbitrage is as effective as the commenter asserts. And without such data or analysis, the Commission cannot agree with this commenter's assertions. *See* Susquehanna, 866 F.3d at 447. *See also* ARK 21Shares Order, 87 FR at 20019 n.68.

[90] *See* Winklevoss Order, 83 FR at 37586; SolidX Order, 82 FR at 16256–57; USBT Order, 85 FR at 12601; WisdomTree Order, 86 FR at 69325; Valkyrie Order, 86 FR at 74159–60; Kryptoin Order, 86 FR at 74170; Wise Origin Order, 87 FR at 5531; ARK 21Shares Order, 87 FR at 20019.

that even for equity options based on securities listed on national securities exchanges, the Commission relies on surveillance-sharing agreements to detect and deter fraud and manipulation.[91] Equities that underlie such options trade on U.S. equity markets that are deep, liquid, highly interconnected, and almost entirely automated and operate at high speeds measured in microseconds and even nanoseconds.[92] Here, the affiliate of the Custodian and other commenters provide insufficient evidence to support their assertion of efficient price arbitrage across bitcoin-related platforms, let alone any evidence that price arbitrage in the bitcoin market is novel and beyond those protections that exist in traditional commodity markets or securities markets so as to warrant the Commission dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.

Additionally, even assuming that efficiency of intermarket price correction in the spot bitcoin markets results in bitcoin prices increasingly aligned across markets, such alignment is not sufficient to support the finding that a market is uniquely or inherently resistant to manipulation such that the Commission can dispense with surveillance-sharing agreements.[93] As stated above, as a general matter, the manipulation of asset prices can occur simply through trading activity that creates a false impression of supply and demand, notwithstanding the presence of linkages among markets, whether these linkages be formal (such as those with consolidated quotations or routing requirements) or informal (such as in the context of the global bitcoin markets).[94]

(ii) Assertions Regarding the Index

(a) Representations Made and Comments Received

NYSE Arca asserts that the Index used by the Trust to determine the value of its bitcoin assets "represents an effective alternative means to prevent fraud and manipulation[,] and the Trust's reliance on the Index addresses the Commission's concerns with respect to potential fraud and manipulation." [95] It states that the Trust "has used the Index to price the Shares for more than six years, and the Index has proven its ability to (i) mitigate the effects of fraud, manipulation and other anomalous trading activity from impacting the [b]itcoin reference rate, (ii) provide a real-time, volume-weighted fair value of bitcoin and (iii) appropriately handle and adjust[ ] for non-market related events, such that efforts to manipulate the price of [b]itcoin would have had a negligible effect on the pricing of the Trust, due to the controls embedded in the structure of the Index." [96]

First, NYSE Arca argues that the Index's use of Constituent Platforms that are compliant with applicable U.S. federal and state licensing requirements and practices regarding anti-money laundering ("AML") and know-your-customer ("KYC") regulations reduces the risk of fraud, manipulation, and other anomalous trading activity from impacting the Index. NYSE Arca also states that Constituent Platforms are considered to be Money Services Businesses ("MSBs") and thus subject to certain requirements such as reporting suspicious activities to the U.S. Department of the Treasury's FinCEN division, having customer identification

through KYC procedures, and establishing a formal AML policy.[97] In addition, the Constituent Platforms that are regulated by the New York State Department of Financial Services ("NYSDFS") under the BitLicense program have regulatory requirements (1) to implement measures designed to effectively detect, prevent, and respond to fraud, attempted fraud, market manipulation, and similar wrongdoing; and (2) to monitor, control, investigate, and report back to the NYSDFS regarding any wrongdoing.[98] And according to NYSE Arca, the other non-NYSDFS regulated Constituent Platforms have voluntarily implemented measures to protect against common forms of market manipulation.[99] Moreover, according to NYSE Arca, the Commodity Futures Trading Commission ("CFTC") has the authority to police fraud and manipulation on Constituent Platforms.[100] In addition, certain of the Index's Constituent Platforms "have or have begun to implement market surveillance infrastructure to further detect, prevent, and respond to fraud, attempted fraud, and similar wrongdoing, including market manipulation." [101]

[91] *See, e.g.,* USBT Order, 85 FR at 12601; WisdomTree Order, 86 FR at 69329; Valkyrie Order, 86 FR at 74160; Kryptoin Order, 86 FR at 74170; Wise Origin Order, 87 FR at 5531; ARK 21Shares Order, 87 FR at 20019.

[92] *See* SEC Staff Report on Algorithmic Trading in U.S. Capital Markets (Aug. 5, 2020), *available at: https://www.sec.gov/files/Algo_Trading_Report_2020.pdf;* Market Data Infrastructure Proposing Release, Securities Exchange Act Release No. 88216 (Feb. 14, 2020), 85 FR 16726, 16728 (Mar. 24, 2020). *See also* ARK 21Shares Order, 87 FR at 20019 n.70.

[93] *See* WisdomTree Order, 86 FR at 69325–26; Kryptoin Order, 86 FR at 74170; SkyBridge Order, 87 FR at 3783–84; Wise Origin Order, 87 FR at 5531; ARK 21Shares Order, 87 FR at 20019.

[94] *See* Winklevoss Order, 83 FR at 37585; ARK 21Shares Order, 87 FR at 20019.

[95] Amendment No. 1, 87 FR at 28053. A commenter also states that the "Index is designed to (i) mitigate the effects of fraud, manipulation and other anomalous trading activity from impacting the bitcoin reference rate, (ii) provide a real-time, volume-weighted fair value of bitcoin and (iii) appropriately handle and adjust for non-market related events." Letter from Campbell R. Harvey, Professor of Finance, Duke University, dated Mar. 26, 2022 ("Harvey Letter"), at 3. Another commenter agrees with the Exchange that "[h]aving the Index Price determined through a process in which trade data is cleansed and compiled will sufficiently mitigate the impact of manipulation." Letter from Robert Citrone, Founder, Discovery Capital Management, dated Feb. 23, 2022 ("Discovery Letter"), at 1. *See also, e.g.,* Moffitt Letter I ("the structure of this Index is robust enough to protect investors").

[96] Amendment No. 1, 87 FR at 28059. *See also id.* at 28053 ("Since November 1, 2014, the Trust has consistently priced its Shares at 4:00 p.m., E.T. based on the Index Price. . . . While that pricing would be known to the market, the Sponsor believes that, even if efforts to manipulate the price of [b]itcoin at 4:00 p.m., E.T. were successful on any exchange, such activity would have had a negligible effect on the pricing of the Trust, due to the controls embedded in the structure of the Index.").

[97] *See id.* at 28052.

[98] *See id.* The Exchange also states that these platforms have the following obligations: submission of audited financial statements; compliance with NYSDFS's capitalization requirements; prohibitions against the "sale or encumbrance to protect the full reserves of custodian assets"; fingerprints and photographs of employees with access to customer funds; retention of a qualified Chief Information Security Officer and annual penetration testing/audits; documented business continuity and disaster recovery plan; and participation in an independent exam by NYSDFS. *See id.*

[99] *See id.* The Exchange states that, as of the date of the filing, two of the four Constituent Platforms (Bitstamp and Coinbase Pro) are regulated by NYSDFS. *See id.* at 28052 n.39.

[100] *See id.* at 28052. A commenter states that the CFTC has exercised its anti-manipulation and anti-fraud enforcement authority over spot bitcoin markets since 2014, which is three years longer than the CFTC has overseen bitcoin futures markets. *See* Letter from Kristin Smith, Executive Director, and Jake Chervinsky, Head of Policy, Blockchain Association, dated Nov. 29, 2021 ("Blockchain Association Letter"), at 3. Another commenter states that the Commission should rely on the CFTC to exercise its fraud authority to ensure the underlying bitcoin market is free of manipulation. *See* Letter from Michelle Bond, Chief Executive Officer, Association for Digital Asset Markets, dated Apr. 19, 2022 ("ADAM Letter"), at 6.

[101] Amendment No. 1, 87 FR at 28059–60. The affiliate of the Custodian that operates one of the Constituent Platforms states in a comment letter that it applies surveillance and monitoring measures for its spot digital asset trading platform that are designed to identify and address potential manipulative or fraudulent trading activity, and that it believes that the other Constituent Platforms also employ measures to counter potential fraudulent or manipulative trading. *See* Coinbase Letter II, at 5. This commenter states that, in

Continued

Second, NYSE Arca asserts that other aspects of the methodology employed in constructing the Index mitigate the impact of fraud, manipulation, and other anomalous trading activity.[102] The Exchange states that the Index is calculated once every second according to a systematic methodology that relies on observed trading activity on the Constituent Platforms. The key elements of this proprietary methodology are as follows: (i) *volume weighting*—Constituent Platforms with greater liquidity receive a higher weighting in the Index; (ii) *price variance weighting*—the Index reflects data points that are weighted in proportion to their variance from the rest of the Constituent Platforms (*i.e.*, as the price at a particular platform diverges from the prices at the rest of the Constituent Platforms, its weight in the Index Price decreases.); (iii) *inactivity adjustment*—the Index algorithm penalizes stale activity from any given Constituent Platform; and (iv) *manipulation resistance*—the Index only includes executed trades in its calculation in order to mitigate the effects of wash trade and spoofing, and only includes Constituent Platforms that charge trading fees to its users in order to attach a real, quantifiable cost to any manipulation attempts.[103] In addition, the Exchange states that, by referencing multiple trading venues and weighting them based on trade activity, the Index mitigates the impact of any potential fraud, manipulation, or anomalous trading activity occurring on any single

venue.[104] In other words, the effects of fraud, manipulation, or anomalous trading activity occurring on any single venue are de-weighted and consequently diluted by non-anomalous trading activity of other Constituent Platforms.[105]

Third, NYSE Arca asserts that the Index is constructed and maintained by an expert third-party index provider, which would allow for prudent handling of non-market-related events.[106] The Exchange states that in the event that a manual intervention with respect to the Index calculation is necessary in response to "non-market-related events" (*e.g.*, halting of deposits or withdrawals of funds, unannounced closure of platform operations, insolvency, compromise of user funds, etc.), the Index Provider would issue a public announcement.[107] NYSE Arca also asserts that the Index Provider reviews and periodically updates which bitcoin platforms are included in the Index by utilizing a methodology that is guided by the IOSCO principles for financial benchmarks.[108]

(b) Analysis

Based on the assertions made and the information provided with respect to the Index, the record is inadequate to conclude that NYSE Arca has articulated other means to prevent fraud and manipulation that are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.

First, NYSE Arca argues that the Index's exclusive use of prices from particular spot bitcoin trading platforms (the Constituent Platforms), which are subject to FinCEN's AML/KYC regulations, as well as NYSDFS's BitLicense program for two Constituent Platforms, helps to reduce the impact of fraud and manipulation on the Index Price. The Exchange acknowledges, however, that it "does not believe the inclusion" of these platforms is "in and

of itself sufficient to prove that the Index is an alternative means to prevent fraud and manipulation such that surveillance sharing agreements are not required" but rather that including only such platforms "in the Index is one significant way in which the Index is protected from the potential impacts of fraud and manipulation." [109]

The Commission does not agree that the inclusion of only certain Constituent Platforms as described provides a significant protection against fraud and manipulation. Any oversight afforded by FinCEN and NYSDFS, including AML/KYC or BitLicense regulation, is not a substitute for a surveillance-sharing agreement between the Exchange and a *regulated* market of significant size related to the underlying bitcoin assets. AML and KYC regulation, for example, do not substitute for the sharing of information about market trading activity or clearing activity that a surveillance-sharing agreement would afford. And although some of the Constituent Platforms may be registered with FinCEN or NYSDFS, these spot bitcoin trading platforms are not comparable to a national securities exchange or futures exchange.[110] As the Commission has explained, there are substantial differences between NYSDFS and FinCEN regulation and the Commission's regulation of national securities exchanges.[111] The Commission's market oversight of national securities exchanges includes substantial requirements, including the requirement to have rules that are "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." [112] Moreover, national securities exchanges must file proposed

---

addition to its surveillance program, it employs measures similar to circuit breakers and trading limits used in traditional financial markets and participates in industry initiatives meant to facilitate cross-platform surveillance and bolster the integrity and efficiency of digital asset markets. *See id.* at 6.

[102] *See* Amendment No. 1, 87 FR at 28052–53; 28059. A commenter states that the Index Provider has published empirical evidence identifying a number of cases in which the Index methodology has successfully shielded the Index from anomalistic or manipulative pricing. *See* Harvey Letter, at 4 (citing to *https://tradeblock.com/blog/analysis-of-bitfinex-anomalies-and-xbx-performance; https://tradeblock.com/blog/bitfinex-flash-crash-anomalies; https://tradeblock.com/blog/xbx-update-adding-okcoin-removing-btc-e-and-btcchina; https://tradeblock.com/blog/xbx-update-adding-coinbase-removing-kraken; https://tradeblock.com/blog/xbx-index-update-removing-okcoin; https://tradeblock.com/blog/updates-to-tradeblocks-ecx-and-xbx-indices-2; https://tradeblock.com/blog/bitfinex-bitcoin-premium-reaches-widest-level-in-two-years; https://tradeblock.com/blog/bitcoin-futures-flash-crash-occurs-as-exchanges-show-irregular-trading-activity, https://tradeblock.com/blog/updates-to-all-tradeblock-indices*). This commenter also states that "this is the highest quality benchmark being used in a bitcoin ETP proposal and one that can substantially mitigate price manipulation to ensure a fair, orderly, and efficient market." *Id.*

[103] *See* Amendment No. 1, 87 FR at 28052–53.

[104] *See id.* at 28053. A commenter states that the Trust was "created a robust approach to managing the risk of manipulation by relying on an index of [b]itcoin prices from various exchanges" and that the Index's "use of a 24-hour VWAP should make any attempt at manipulation prohibitively expensive." Letter from Peter L. Briger, Jr., Chief Executive Officer, Fortress Investment Group LLC, dated Apr. 25, 2022 ("Fortress Letter"), at 2–3. The Exchange states that the Index no longer utilizes a 24-hour VWAP in its methodology. *See supra* note 38.

[105] *See* Amendment No. 1, 87 FR at 28053.

[106] *See id.* at 28053, 28059.

[107] *See id.* at 28053.

[108] *See id.*

[109] *Id.* at 28052.

[110] *See* USBT Order, 85 FR at 12603–05 and n.101; VanEck Order, 86 FR at 64545 and n.89; WisdomTree Order, 86 FR at 69328 and n.95; Kryptoin Order, 86 FR at 74173 and n.98; ARK 21Shares Order, 87 FR at 20021–22 and n.107.

[111] FinCEN and NYSDFS regulation have been referenced in other bitcoin-based ETP proposals as a purportedly alternative means by which such ETPs would be uniquely resistant to manipulation. *See* USBT Order, 85 FR at 12603 n.101 and accompanying text. *See also, e.g.,* WisdomTree Order, 86 FR at 69328 n.95; Kryptoin Order, 86 FR at 74173 n.98; ARK 21Shares Order, 87 FR at 20022 n.107.

[112] 15 U.S.C. 78f(b)(5).

rules with the Commission regarding certain material aspects of their operations,[113] and the Commission has the authority to disapprove any such rule that is not consistent with the requirements of the Exchange Act.[114] Thus, national securities exchanges are subject to Commission oversight of, among other things, their governance, membership qualifications, trading rules, disciplinary procedures, recordkeeping, and fees.[115] The Constituent Platforms have none of these requirements—none are registered as a national securities exchange. In addition, NYSDFS's BitLicense program is "guidance" that is "not intended to limit the scope or applicability of any law or regulation," including the Exchange Act.[116]

Further, neither the Constituent Platforms' voluntary adherence to the BitLicense program, nor the Custodian affiliate's adoption of various surveillance, monitoring, and other measures to address potential manipulative or fraudulent trading activity on its trading platform, is material to the Commission's analysis. The Exchange provides no supporting evidence to substantiate its claims that the Constituent Platforms have voluntarily implemented measures to protect against common forms of market manipulation and that some of the Constituent Platforms have begun to implement market surveillance infrastructure to further detect, prevent, and respond to fraud, attempted fraud, and similar wrongdoing. Moreover, even taken at face value, these measures, unlike the Exchange Act's requirements for national securities exchanges,[117] are entirely voluntary and therefore have no binding force. The Constituent Platforms, including the platform operated by an affiliate of the Custodian, could change or cease to administer such measures at any time.

NYSE Arca's assertions regarding the CFTC's authority with respect to the Constituent Platforms and the underlying bitcoin market also do not establish a level of oversight sufficient to dispense with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.[118] While the Commission recognizes that the CFTC maintains some jurisdiction over the spot bitcoin market, under the Commodity Exchange Act, the CFTC does not have regulatory authority over spot bitcoin trading platforms, including the Constituent Platforms.[119] Except in certain limited circumstances, spot bitcoin trading platforms are not required to register with the CFTC,[120] and the CFTC does not set standards for, approve the rules of, examine, or otherwise regulate spot bitcoin markets.[121] As the CFTC itself stated, while the CFTC "has an important role to play," U.S. law "does not provide for direct, comprehensive Federal oversight of underlying Bitcoin or virtual currency spot markets." [122]

Second, the record does not demonstrate that the proposed methodology for calculating the Index would make the proposed ETP resistant to fraud or manipulation such that the ability to detect and deter fraud that is provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin is unnecessary. Specifically, NYSE Arca has not assessed the possible influence that spot platforms not included among the Constituent Platforms would have on bitcoin prices used to calculate the Index Price. As discussed above, NYSE Arca does not contest the presence of possible sources of fraud and manipulation in the spot bitcoin market generally.[123] Instead, NYSE Arca focuses its analysis on the attributes of the Constituent Platforms, as well as the Index methodology that calibrates the pricing input generated by the Constituent Platforms (such as volume and price-variance weighting and inactivity adjustment). What the Exchange ignores, however, is that to the extent that trading on spot bitcoin platforms not directly used to calculate the Index Price affects prices on the Constituent Platforms, the activities on those other platforms—where various kinds of fraud and manipulation from a variety of sources may be present and persist—may affect whether the Index is resistant to manipulation. Importantly, the record does not demonstrate that these possible sources of fraud and manipulation in the broader spot bitcoin market do not affect the Constituent Platforms that represent a slice of the spot bitcoin market. To the extent that fraudulent and manipulative trading on the broader bitcoin market could influence prices or trading activity on the Constituent Platforms, the Constituent Platforms (and thus the Index) would not be inherently resistant to manipulation.[124]

---

[113] 17 CFR 240.19b–4(a)(6)(i).

[114] Section 6 of the Exchange Act, 15 U.S.C. 78f, requires national securities exchanges to register with the Commission and requires an exchange's registration to be approved by the Commission, and Section 19(b) of the Exchange Act, 15 U.S.C. 78s(b), requires national securities exchanges to file proposed rule changes with the Commission and provides the Commission with the authority to disapprove proposed rule changes that are not consistent with the Exchange Act. Designated contract markets ("DCMs") (commonly called "futures markets") registered with and regulated by the CFTC must comply with, among other things, a similarly comprehensive range of regulatory principles and must file rule changes with the CFTC. *See, e.g.,* Designated Contract Markets (DCMs), CFTC, *available at http://www.cftc.gov/IndustryOversight/TradingOrganizations/DCMs/index.htm.*

[115] *See* Winklevoss Order, 83 FR at 37597.

[116] Maria T. Vullo, Superintendent of Financial Services, NYSDFS, *Guidance on Prevention of Market Manipulation and Other Wrongful Activity* (Feb. 7, 2018), *available at https://www.dfs.ny.gov/system/files/documents/2020/03/il180207.pdf. See also, e.g.,* WisdomTree Order, 86 FR at 69328 n.95; Kryptoin Order, 86 FR at 74173 n.98; ARK 21Shares Order, 87 FR at 20022 n.107.

[117] *See* 15 U.S.C. 78e, 78f.

[118] *See* Valkyrie Order, 86 FR at 74162.

[119] *See* USBT Order, 85 FR at 12604.

[120] *See* Winklevoss Order, 83 FR at 37599 ("Spot bitcoin markets are not required to register with the CFTC, unless they offer leveraged, margined, or financed trading to retail customers."). *See* Commodity Exchange Act Sections 2(c)(2)(D), 7 U.S.C. 2(c)(2)(D), and 2(c)(2)(A)(i), 7 U.S.C. 2(c)(2)(A)(i) (defining CFTC jurisdiction to specifically cover contracts of sale of a commodity for future delivery (or options on such contracts), or an option on a commodity (other than foreign currency or a security or a group or index of securities), that is executed or traded on an organized exchange). *See also* Winklevoss Order, 83 FR at 37599 n.286.

[121] *See* USBT Order, 85 FR at 12604; SolidX Order, 82 FR at 16256 (concluding that there is nothing in the record to indicate that there is currently a regulatory framework in the United States for detecting and deterring manipulation in the spot bitcoin markets and that "[a]lthough the CFTC can bring enforcement actions against manipulative conduct in spot markets for a commodity, spot markets are not required to register with the CFTC unless they offer leveraged, margined, or financed trading to retail customers. . . . In all other cases, the CFTC does not set standards for, approve the rules of, examine, or otherwise regulate bitcoin spot markets.").

[122] Winklevoss Order, 83 FR at 37599 (quoting CFTC Backgrounder on Oversight of and Approach to Virtual Currency Futures Markets (Jan. 4, 2018), at 1, *available at: http://www.cftc.gov/idc/groups/public/@newsroom/documents/file/backgrounder_virtualcurrency01.pdf). See also* Testimony of Rostin Behnam, Chair, CFTC, Before the Senate Committee on Agriculture, Nutrition, and Forestry (Feb. 9, 2022), *available at: https://*

*www.agriculture.senate.gov/imo/media/doc/Testimony_Behnam_020920225.pdf* ("[W]hile the crystallization of our enforcement authority through judicial interpretation has proven an effective means of uncovering and addressing some of the regulatory gaps presented by innovation and evolution in the financial markets with respect to digital and related assets, it cannot be viewed as a viable substitute for a functional regulatory oversight regime for the cash digital asset market. . . . In fact, there is no one regulator, either state or federal, with sufficient visibility into digital asset commodity trading activity to fully police conflicts of interest and deceptive trading practices impacting retail customers.").

[123] *See supra* notes 75–78 and accompanying text.

[124] *See* USBT Order, 85 FR at 12601; WisdomTree Order, 86 FR at 69327; Kryptoin Order, 86 FR at 74172; Valkyrie Order, 86 FR at 74161; SkyBridge Order, 87 FR at 3873.

In addition, while NYSE Arca asserts that aspects of the Index methodology mitigate the impact of fraud and manipulation on the Shares, the Commission can find no basis to conclude that the Index methodology constitutes a novel means beyond the protections utilized by traditional commodity or securities markets to prevent fraud and manipulation that is sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. For example, while the Index methodology uses an algorithm to discount prices that deviate from the average (*i.e.,* price variance weighting), this automatic discounting could attenuate, but would not eliminate, the effect of manipulative activity on one of the Constituent Platforms—just as it could attenuate, but would not eliminate, the effect of bona fide liquidity demand on one of those platforms.[125]

Moreover, NYSE Arca's assertions that the Trust's use of the Index helps make the Shares resistant to manipulation conflict with the Registration Statement. Specifically, the Registration Statement represents, among other things, that the market price of bitcoin may be subject to "[m]anipulative trading activity on bitcoin [trading platforms], which are largely unregulated," and that, "[d]ue to the unregulated nature and lack of transparency surrounding the operations of bitcoin [trading platforms], they may experience fraud, security failures or operational problems, which may adversely affect the value of [b]itcoin and, consequently, the value of the Shares."[126] Constituent Platforms are a subset of the bitcoin trading platforms that the Registration Statement describes.[127] The Registration Statement also states, specifically with respect to the Index, that "[t]he Index has a limited history and a failure of the [Index Price] could adversely affect the value of the Shares."[128] Although the Sponsor raises concerns regarding fraud on and the security of bitcoin platforms, as well as concerns specific to the Index, the Exchange does not explain how or why such concerns are consistent with its assertion that the

Index is resistant to fraud and manipulation.

Third, although NYSE Arca asserts that the Index Provider's oversight of the Index, which includes updating the Constituent Platforms from time to time and handling non-market-related events, mitigates fraud and manipulation in calculation of the Index, the record does not suggest that the purported oversight represents a unique measure to resist or prevent fraud or manipulation beyond protections that exist in traditional securities or commodities markets.[129] Rather, the oversight performed by the Index Provider appears to be for the purpose of ensuring the accuracy and integrity of the Index. Such Index accuracy and integrity oversight serves a fundamentally different purpose as compared to the regulation of national securities exchanges and the requirements of the Exchange Act. While the Commission recognizes that this may be an important function in ensuring the integrity of the Index, such requirements do not imbue the Index Provider with regulatory authority similar to that which the Exchange Act confers upon SROs such as national securities exchanges.[130] Furthermore, other commodity-based ETPs approved by the Commission for listing and trading utilize reference rates or indices administered by similar benchmark administrators,[131] and the Commission has not, in those instances, dispensed with the need for a surveillance-sharing agreement with a significant regulated market.

Finally, NYSE Arca does not explain the significance of the Index's purported resistance to manipulation to the overall analysis of whether the proposal to list and trade the Shares is designed to prevent fraud and manipulation.[132] Even assuming that NYSE Arca's argument is that the price of the Trust's Shares would be resistant to manipulation if the Index is resistant to manipulation, NYSE Arca has not established in the record a basis for this conclusion because NYSE Arca has not established a link between the price of

the Shares and the Index Price, either in the primary or secondary market. While the Index is used by the Trust to value its bitcoin, the Trust will create or redeem Baskets only upon the receipt or distribution of bitcoins from/to authorized participants, and only for the amount of bitcoin represented by the Shares in such Baskets, without reference to the value of such bitcoin as determined by the Index or otherwise. Furthermore, the Shares would trade in the secondary market at market-based prices, not the Index Price. The Exchange provides no information on the relationship between the Index and secondary market prices generally,[133] or how the use of the Index would mitigate fraud and manipulation of the Shares in the secondary market.[134]

*(2) Assertions That NYSE Arca Has Entered Into a Comprehensive Surveillance-Sharing Agreement With a Regulated Market of Significant Size Related to the Underlying Bitcoin Assets*

As NYSE Arca has not demonstrated that other means besides surveillance-sharing agreements will be sufficient to prevent fraudulent and manipulative acts and practices, the Commission next examines whether the record supports the conclusion that NYSE Arca has entered into a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets. In this context, the term "market of

---

[125] *See* SolidX Order, 82 FR at 16257.

[126] Exhibit 99.1 of the Registration Statement, at 16–17. *See also* 2021 10–K, at 50.

[127] *See* Exhibit 99.1 of the Registration Statement, at 42–43. *See also* 2021 10–K, at 10.

[128] Exhibit 99.1 of the Registration Statement, at 18. *See also* 2021 10–K, at 51.

[129] *See, e.g.,* Valkyrie Order, 86 FR at 74162.

[130] *See* WisdomTree Order, 86 FR at 69329; One River Order, 87 FR at 33556.

[131] *See, e.g.,* Securities Exchange Act Release No. 80840 (June 1, 2017) 82 FR 26534 (June 7, 2017) (SR–NYSEArca–2017–33) (approving the listing and trading of shares of certain trusts seeking to track the Solactive GLD EUR Gold Index, Solactive GLD GBP Gold Index, and the Solactive GLD JPY Gold Index).

[132] The Commission has previously considered and rejected similar arguments about the valuation of bitcoin according to a benchmark or reference price. *See, e.g.,* SolidX Order, 82 FR at 16258; Winklevoss Order, 83 FR at 37587–90; USBT Order, 85 FR at 12599–601; Valkyrie Order, 86 FR at 74162; ARK 21Shares Order, 87 FR at 20022.

[133] For example, as currently traded OTC, the Shares do not reflect the value of the Index but rather trade at a significant discount (or at other times, a significant premium). *See* Exhibit 99.1 of the Registration Statement, at 23 ("the value of the Shares of the Trust may not approximate, and the Shares may trade at a substantial premium over, or substantial discount to, the value of the Trust's Bitcoin Holdings per Share"); 2021 10–K, at 2 ("from May 5, 2015 to December 31, 2021, the maximum premium of the closing price of the Shares quoted on OTCQX over the value of the Trust's Digital Asset Holdings per Share was 142% . . . and the average premium was 37% . . ., and the maximum discount of the closing price of the Shares quoted on OTCQX below the value of the Trust's Digital Asset Holdings was 21% . . . and the average discount was 13% . . . . As of December 31, 2021, the Trust's Shares were quoted on OTCQX at a discount of 20% . . . to the Trust's Digital Asset Holdings per Share."); Grayscale Letter I, at 2 n.11 ("From May 5, 2015 to October 31, 2021, the maximum single-day premium of the closing price of BTC shares quoted on OTCQX over the value of its Bitcoin holdings was 142% and the average of all daily premiums was 37%; the maximum single-day discount below the value of its Bitcoin holdings was 21% and the average of all daily discounts was 12%; and the average of all single-day premiums and discounts was a premium of 32%."); Coinbase Letter I, at 2 ("GBTC has traded over-the-counter at a premium to its net-asset value that has ranged as high as 142% and a discount to its net-asset value of 21%").

[134] *See* WisdomTree Order, 86 FR at 69329 and n.108; Valkyrie Order, 86 FR at 74162; ARK 21Shares Order, 87 FR at 20022.

significant size'' includes a market (or group of markets) as to which (i) there is a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, so that a surveillance-sharing agreement would assist in detecting and deterring misconduct, and (ii) it is unlikely that trading in the ETP would be the predominant influence on prices in that market.[135]

As the Commission has explained, it considers two markets that are members of the ISG to have a comprehensive surveillance-sharing agreement with one another, even if they do not have a separate bilateral surveillance-sharing agreement.[136] Accordingly, based on the common membership of NYSE Arca and the CME in the ISG,[137] NYSE Arca has the equivalent of a comprehensive surveillance-sharing agreement with the CME. However, while the Commission recognizes that the CFTC regulates the CME futures market,[138] including the CME bitcoin futures market, and thus such market is ''regulated,'' in the context of the proposed ETP, the record does not, as explained further below, establish that the CME bitcoin futures market is a ''market of significant size'' related to spot bitcoin, the underlying bitcoin assets that would be held by the Trust.

(i) Whether There is a Reasonable Likelihood That a Person Attempting To Manipulate the ETP Would Also Have To Trade on the CME Bitcoin Futures Market to Successfully Manipulate the ETP

The first prong in establishing whether the CME bitcoin futures market constitutes a ''market of significant size'' related to spot bitcoin is the determination that there is a reasonable likelihood that a person attempting to manipulate the ETP would have to trade on the CME bitcoin futures market to successfully manipulate the ETP. In previous Commission orders, the Commission explained that the lead/lag relationship between the bitcoin futures market and the spot market is ''central'' to understanding this first prong.[139]

(a) Assertions Made and Comments Received

The Exchange asserts in its proposal that the CME bitcoin futures market is a ''large, surveilled and regulated market that is closely connected with the spot market for [b]itcoin and through which the Exchange could obtain information to assist in detecting and deterring potential fraud or manipulation.'' [140] The Exchange, however, concedes that the Sponsor did not find a significant lead/lag relationship between the spot and the CME bitcoin futures markets. Specifically, according to NYSE Arca, the Sponsor ''conducted a lead/lag analysis of per minute data comparing the [b]itcoin futures market, as represented by the CME futures market, to the [b]itcoin spot market, as represented by the Index.'' However, for the period of November 1, 2019, to August 31, 2021, the analysis showed that ''there does not appear to be a significant lead/lag relationship between the two instruments.'' [141] The Sponsor's analysis notwithstanding, NYSE Arca states that ''other studies prior to and since such date have found that the CME futures market does lead the [b]itcoin spot market.'' [142]

bitcoin futures market and the spot market is central to understanding whether it is reasonably likely that a would-be manipulator of the ETP would need to trade on the bitcoin futures market to successfully manipulate prices on those spot platforms that feed into the proposed ETP's pricing mechanism. In particular, if the spot market leads the futures market, this would indicate that it would not be necessary to trade on the futures market to manipulate the proposed ETP, even if arbitrage worked efficiently, because the futures price would move to meet the spot price.''). When considering past proposals for spot bitcoin ETPs, the Commission has discussed whether there is a lead/lag relationship between the regulated market (*e.g.*, the CME) and the market on which the assets held by the ETP would have traded (*i.e.*, spot bitcoin platforms), as part of an analysis of whether a would-be manipulator of the spot bitcoin ETP would need to trade on the regulated market to effect such manipulation. *See, e.g.*, USBT Order, 85 FR at 12612. *See also* VanEck Order, 86 FR at 64547; WisdomTree Order, 86 FR at 69330–31; Kryptoin Order, 86 FR at 74176 n.144; SkyBridge Order, 87 FR at 3876 n.101; Wise Origin Order, 87 FR at 5535 n.107; ARK 21Shares Order, 87 FR at 20024 n.138.

NYSE Arca goes on to assert that, ''[a]lthough there have been mixed findings regarding the lead/lag relationship between the CME futures and [b]itcoin spot markets, . . . the CME futures market represents a large, surveilled[,] and regulated market.'' [143] As evidence of its assertion that the CME constitutes a market of significant size related to spot bitcoin, the Exchange states that, from November 1, 2019, to August 31, 2021, the CME futures market trading volume was over $432 billion, compared to $624 billion in trading volume across the Constituent Platforms included in the Index.[144] The Exchange also points to the CME futures market trading volume from November 1, 2019, to August 31, 2021, which it states was approximately 50% of the trading volume of certain U.S. dollar-denominated spot bitcoin platforms, including Binance, Coinbase Pro, Bitfinex, Kraken, Bitstamp, BitFlyer, Poloniex, Bittrex, and itBit.[145] The Exchange, therefore, concludes that, ''[g]iven the significant size of the CME futures markets, . . . there is a

CboeBZX–2021–039) (Sept. 8, 2021), *available at: https://www.sec.gov/comments/sr-cboebzx-2021-039/srcboebzx2021039-250110.pdf*; Letter from Bitwise Asset Management, Inc. re: File Number SR–NYSEArca–2021–89 (Feb. 25, 2022), *available at: https://www.sec.gov/comments/sr-nysearca-2021-89/srnysearca202189-20117902-270822.pdf*; Letter from Wilson Sonsini Goodrich and Rosati, P.C. and Chapman and Cutler LLP, on behalf of Bitwise Asset Management, Inc. re: File No. SR–NYSEArca–2021–89 (Mar. 7, 2022), *available at: https://www.sec.gov/comments/sr-nysearca-2021-89/srnysearca202189-20118794-271630.pdf*). *See also* Submission by the Sponsor to the Commission in connection with a meeting between representatives of the Sponsor, the Sponsor's counsel, Davis Polk & Wardwell LLP, and Commission staff on April 26, 2022 (''Grayscale Submission''), at 21–22, *available at: https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-20128860-294707.pdf*). A commenter states that ''there is ample historical data to demonstrate how closely the CME futures contracts track the spot market (and in fact as BitWise's research has shown, lead the spot market a majority of the time.).'' Letter from Ben Davenport, dated Feb. 10, 2022 (''Davenport Letter'').

[143] Amendment No. 1, 87 FR at 28054.

[144] *See id.*

[145] *See id.* at 28054 and n.51. *See also* Grayscale Submission, at 16, citing to *https://www.bitcointradingvolume.com/* (''CME represents >50% of all [b]itcoin trade volume''). *But see* Letter from Robert E. Whaley, Professor of Management (Finance), Director, Financial Markets Research Center, Vanderbilt University Owen Graduate School of Management, dated May 25, 2022 (''Whaley Letter''), at 2 (''In terms of USD value, the market cap in the CME's bitcoin futures market averages less than one-quarter of one percent of the bitcoin spot market.''). This commenter nonetheless concludes that, ''[s]ince the Commission is comfortable with the viability of futures-based ETF investing in an environment in which the spot market dominates (in terms of both dollar value and trading volume), it follows logically that spot-based ETPs are warranted.'' Whaley Letter, at 2.

---

[135] *See* Winklevoss Order, 83 FR at 37594.

[136] *See id.* at 37580 n.19.

[137] *See* Amendment No. 1, 87 FR at 28054.

[138] While the Commission recognizes that the CFTC regulates the CME, the CFTC is not responsible for direct, comprehensive regulation of the underlying spot bitcoin market. *See* Winklevoss Order, 83 FR at 37587, 37599. *See also* WisdomTree Order, 86 FR at 69330 n.118; Kryptoin Order, 86 FR at 74174 n.119; SkyBridge Order, 87 FR at 5534 n.93; ARK 21Shares Order, 87 FR at 20023 n.121.

[139] *See, e.g.*, USBT Order, 85 FR at 12612 (''[E]stablishing a lead-lag relationship between the

[140] Amendment No. 1, 87 FR at 28060. A commenter also states its belief that the Trust ''has strong links to a regulated market of significant size (*i.e.*, the CME).'' Fortress Letter, at 2. Based on arguments articulated in the proposal, the Commission understands that the Exchange is arguing that CME is the regulated market of significant size with which it has the relevant surveillance-sharing agreement.

[141] Amendment No. 1, 87 FR at 28054.

[142] *Id.* at 28054 and n.50 (citing Memorandum to File from Neel Maitra, Senior Special Counsel (Fintech & Crypto Specialist), Division of Trading and Markets, U.S. Securities and Exchange Commission re: Meeting with Representatives from Fidelity Digital Assets, et al. and attachment (SR–

reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, since arbitrage between the derivative and spot markets would tend to counter an attempt to manipulate the spot market alone.''[146]

Similar to the Sponsor's analysis, a commenter concludes that the relationship between spot and futures prices is ''complex and interrelated with no clear winner.''[147] According to the commenter, the ''results of the test of which market is leading depends on the time period of testing.''[148] Despite the commenter's lead/lag conclusion, the commenter argues that a would-be manipulator would be unable to manipulate the proposed ETP without also trading in the CME bitcoin futures market, ''[g]iven the relative size of trading volumes of bitcoin futures relative to spot, the strong dependence of spot prices on futures prices and vice versa, and the inefficiency of attempting to manipulate the [proposed] ETP through offshore trading.''[149] Regarding the relative size of trading volumes, the commenter states that it examined Bloomberg trading data for the 365 days ended February 4, 2022, across all spot bitcoin trading venues and all CME bitcoin futures contract maturities, and found that the aggregate futures volume ($579 billion) was 31% higher than aggregate spot volume ($442 billion), a result that the commenter found to be statistically significant.[150] Regarding offshore trading, the commenter states that they believe it unlikely ''a bad actor would attempt to manipulate the [proposed] ETP through trading on offshore cryptocurrency trading venues'' because ''offshore trading venues generally do not support fiat trading and instead only support trading between different cryptocurrencies.''[151] The commenter further states that ''offshore trading venues generally offer trading in bitcoin derivatives such as quarterly futures and perpetual futures; however, both would be poor choices for a bad actor seeking to manipulate the [proposed] ETP because both are known to deviate from the bitcoin spot price much more than CME futures,'' and thus any actor seeking to manipulate the proposed ETP ''would risk expanding or contracting the premium of the derivative being used as a manipulation tool rather than influencing bitcoin spot prices.''[152]

(b) Analysis

The record does not demonstrate that there is a reasonable likelihood that a person attempting to manipulate the proposed ETP would have to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP. The Exchange's and commenters' assertions about the size of the CME bitcoin futures market in comparison to the Constituent Platforms in particular and/or spot bitcoin markets in general do not establish that the CME bitcoin futures market is of significant size related to spot bitcoin. As the Commission has previously stated, the interpretation of the term ''market of significant size'' or ''significant market'' depends on the interrelationship between the market with which the listing exchange has a surveillance-sharing agreement and the proposed ETP.[153] Recitations of data reflecting the size of the CME bitcoin futures market and the size of the spot bitcoin market are not sufficient to establish an interrelationship between the CME bitcoin futures market and the proposed ETP.[154]

NYSE Arca asserts that there is a reasonable likelihood that a person would have to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP, because ''arbitrage between the derivative and spot markets would tend to counter an attempt to manipulate the spot market alone.''[155] However, the record does not demonstrate the existence of efficient price arbitrage across bitcoin-related platforms, either generally or specifically as it relates to the bitcoin derivative and spot markets.[156] The Exchange also does not provide any additional data or analysis to support its conclusion that the arbitrage that may exist between the bitcoin derivatives markets and spot markets would counter an attempt to manipulate the spot market alone, or to demonstrate that such arbitrage would occur quickly enough to prevent a would-be manipulator of the proposed ETP from profiting off of movements in the spot price. Moreover, even assuming that the Commission concurred with the Exchange's premise that efficient arbitrage exists between the bitcoin derivatives markets and spot markets, the Exchange does not explain why the presence of efficient arbitrage implies that a would-be manipulator would be reasonably likely to trade specifically on *the CME* bitcoin futures market rather than on unregulated bitcoin futures markets or other bitcoin derivatives markets.[157]

In addition, while a commenter asserts that it is unlikely a would-be manipulator would use offshore bitcoin futures as their manipulation tool,[158] this commenter has not sufficiently explained or supported its assertions. The commenter provides no data or other evidence to support its assertions that, because Tether often trades at a premium or discount to USD, it is not ''economically practical''—and therefore ''unlikely''—for a bad actor to manipulate the proposed ETP using Tether-denominated bitcoin prices. The commenter also does not provide any data regarding the deviation of offshore futures prices from spot bitcoin prices, or on how much (or how long) attempted manipulation of offshore futures affects this deviation, that would allow for assessment of whether offshore futures would be a ''poor choice'' for a manipulation tool.

Finally, the econometric evidence in the record for the proposal does not support the conclusion that an interrelationship exists between the CME bitcoin futures market and the spot bitcoin market such that it is reasonably likely that a person attempting to manipulate the proposed ETP would also have to trade on the CME bitcoin futures market.[159] As the Commission

---

[146] Amendment No. 1, 87 FR at 28054. A commenter also states its belief that ''any attempt to manipulate the price of [the Trust] would likely also require manipulation of the CME futures markets''; that ''arbitrage between the spot and derivative markets would quickly counteract the attempted manipulation''; and that ''the CME would undoubtedly assist in monitoring and stopping the misconduct.'' Fortress Letter, at 3.

[147] Letter from Hunting Hill Global Capital, LLC, dated Mar. 3, 2022 (''Hunting Hill Letter''), at 2. The commenter makes this conclusion based on its own lead/lag analysis, ''using minute-by-minute last-price data over the [365 days ended February 4, 2022], converted to percentage price changes, based on the first lagged term for both markets.'' *Id.*

[148] *Id.*

[149] *Id.* at 3.

[150] *See id.* at 1–2. Although the observed time periods are different, the Commission observes that the relative trading volume data provided by this commenter is significantly different than the relative trading volume data provided by the Exchange. *See supra* notes 144–145 and accompanying text.

[151] Hunting Hill Letter, at 2–3. To the extent some offshore trading venues allow for bitcoin to be exchanged to Tether, the commenter states that ''it would not be economically practical for a bad actor to manipulate the [proposed] ETP using Tether-denominated bitcoin prices'' because ''manipulation in the bitcoin/USD exchange pair would likely result in a widening of Tether premiums and discounts.'' *Id.*

[152] *Id.* at 3.

[153] *See* USBT Order, 85 FR at 12611.

[154] *See id.* at 12612; Wise Origin Order, 87 FR at 5534–35.

[155] Amendment No. 1, 87 FR at 28054.

[156] *See also supra* note 89 and accompanying text.

[157] *See* WisdomTree Order, 86 FR at 69332; NYDIG Order, 87 FR at 14939.

[158] *See supra* notes 151–152 and accompanying text.

[159] *See* USBT Order, 85 FR at 12611; Wise Origin Order, 87 FR at 5535; NYDIG Order, 87 FR at 14938;

has stated in previous orders, if the spot market leads the futures market, this would indicate that it would not be necessary to trade on the futures market to manipulate the proposed ETP.[160] But as NYSE Arca concedes, there have been "mixed" findings regarding the lead/lag relationship between the CME futures and spot bitcoin markets.[161] Moreover, based on the Sponsor's own analysis—the data, methodology, results, and statistical significance of which were not described in the filing—"there does not appear to be a significant lead/lag relationship between" the CME bitcoin futures market and the spot bitcoin market.[162] In addition, a commenter's lead/lag analysis purportedly finds "no clear winner" and a bi-directional relationship between spot bitcoin prices and CME futures prices.[163] And while the Exchange and the Sponsor highlight previous papers and analyses submitted to the Commission in connection with other proposals to list and trade spot bitcoin ETPs to support the premise that the CME bitcoin futures market leads the spot bitcoin market,[164] the Commission disapproved the proposals related to these submissions, and the Commission raised issues and criticisms with respect to these submissions that the Exchange does not address. The Exchange does not provide any additional evidence of an interrelationship between the CME bitcoin futures market, which is the

regulated market, and spot bitcoin platforms, which are the markets on which the assets held by the proposed ETP would trade. As in previous disapprovals, because the lead/lag analysis regarding whether the CME bitcoin futures market leads the spot market remains inconclusive,[165] the Commission determines that the evidence in the record is inadequate to conclude that an interrelationship exists between the CME bitcoin futures market and the spot bitcoin market such that it is reasonably likely that a person attempting to manipulate the proposed ETP would have to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP.

The Commission thus concludes that the information that NYSE Arca provides is not sufficient to support a determination that it is reasonably likely that a would-be manipulator of the proposed ETP would have to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP. Therefore, the information in the record also does not establish that the CME bitcoin futures market is a "market of significant size" related to the assets to be held by the proposed ETP.

(ii) Whether It Is Unlikely That Trading in the Proposed ETP Would Be the Predominant Influence on Prices in the CME Bitcoin Futures Market

The second prong in establishing whether the CME bitcoin futures market constitutes a "market of significant size" related to spot bitcoin is the determination that it is unlikely that trading in the proposed ETP would be the predominant influence on prices in the CME bitcoin futures market.[166]

(a) Assertions Made and Comments Received

NYSE Arca asserts that "it is unlikely that the ETP would become the predominant influence on prices in the market." [167] In support, NYSE Arca states that the Sponsor examined the change in "market capitalization of bitcoin" with net inflows into the Trust, which currently trades OTC,[168] and

found that from November 1, 2019, to August 31, 2021, the market capitalization of bitcoin grew by $721 billion, while the Trust experienced $6.6 billion of inflows over the same period.[169] The Exchange states that the cumulative inflow into the Trust over the stated time period was only 0.9% of the aggregate growth of bitcoin's market capitalization.[170] The Exchange also states that "the Trust experienced approximately $98.5 billion of trading volume from November 1, 2019[,] to August 31, 2021, only 23% of the CME futures market and 16% of the Index over the same period." [171]

(b) Analysis

The record does not demonstrate that it is unlikely that trading in the proposed ETP would be the predominant influence on prices in the CME bitcoin futures market. First, the Sponsor's comparison of the Trust's historical inflows to the growth of bitcoin's market capitalization misapplies the second prong of the Commission's analysis. As stated above, the second prong in establishing whether the CME bitcoin futures market constitutes a "market of significant size" is the determination that it is unlikely that trading in the proposed ETP would be the predominant influence on *prices* in the *CME bitcoin futures market.* The Sponsor's analysis of the Trust's historical inflows vis-à-vis the *capitalization* of the *spot* bitcoin market considers neither the CME bitcoin futures market nor the CME bitcoin futures market's prices. Accordingly, such statistics, without more, are not relevant to the Commission's consideration of whether trading in the ETP would be the predominant influence on prices in the CME bitcoin futures market.

Second, putting aside the question of the spot bitcoin market's relevance to the second prong of the analysis, neither the Sponsor nor the Exchange has adequately explained why *historical* inflows into *the OTC* Trust is an appropriate proxy for trading in what would be exchange-listed Shares. There is no limit on the amount of mined bitcoins that the Trust may hold. Yet the Sponsor relies on the Trust's historical inflows and does not provide any information on the expected growth in the size of the Trust if the proposal is approved and the resultant increase in

---

Global X Order, 87 FR at 14920; ARK 21Shares, 87 FR at 20024.

[160] *See, e.g.,* USBT Order, 85 FR at 12612.

[161] *See* Amendment No. 1, 87 FR at 28054.

[162] *Id.*

[163] *See* Hunting Hill Letter, at 2. The Commission considers the lead/lag relationship between the CME bitcoin futures market and the spot bitcoin market to be central to understanding whether it is reasonably likely that a would-be manipulator of a spot bitcoin ETP would need to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP. *See* USBT Order, 85 FR at 12612. This commenter, however, does not explain its data, methodology (such as why using only the first lag for each time series was the appropriate model specification), or results to an extent that can be assessed and/or verified. The commenter also argues that the Commission should not require that the CME bitcoin futures market "always" lead the spot market, as the commenter believes that would be "tantamount to requiring that an obvious statistical arbitrage opportunity exists between two highly liquid and automated markets" from which any trader could "profit immensely," and would "be the same as a declaration that bitcoin ETPs will never be approved in the United States." *See* Hunting Hill Letter, at 2. The Commission disagrees. A lead/lag statistical result that CME bitcoin futures prices "lead" spot prices does *not* mean that CME bitcoin futures prices "always" move before spot prices—which would be the "obvious" and exploitable arbitrage opportunity—or that there would never be a situation where the spot price moves before the CME bitcoin futures price.

[164] *See supra* note *142.*

[165] As the academic literature and listing exchanges' analyses pertaining to the pricing relationship between the CME bitcoin futures market and spot bitcoin market have developed, the Commission has critically reviewed those materials. *See* ARK 21Shares Order, 87 FR at 20024; Global X Order, 87 FR at 14920; Wise Origin Order, 87 FR at 5535–36, 5539–40; Kryptoin Order, 86 FR at 74176; WisdomTree Order, 86 FR at 69330–32; VanEck Order, 86 FR at 64547–48; USBT Order, 85 FR at 12613.

[166] *See* Winklevoss Order, 83 FR at 37594; USBT Order, 85 FR at 12596–97.

[167] Amendment No. 1, 87 FR at 28054.

[168] The Exchange states that, compared with global commodity ETPs, the Trust would rank fourth among global commodity ETPs in assets under management and seventh in notional trading volume for the period from November 1, 2019, to October 31, 2020. *See id.* at 28054 n.52.

[169] *See id.* at 28054.

[170] *See id.*

[171] *Id.*

the amount of bitcoin that may be held by the Trust over time, or on the overall expected number, size, and frequency of creations and redemptions—or how any of the foregoing could (if at all) influence prices in the CME bitcoin futures market. Moreover, the Trust's trading volume cited by the Exchange only relates to the Trust *as it trades OTC* and does not contemplate what may happen if the Trust converts to an ETP.[172] Commenters state that approval of a spot bitcoin ETP would provide a simpler, safer, and more efficient way to obtain exposure to bitcoin than the products that are currently available to retail investors;[173] and converting the Trust into an ETP would allow for daily creations and redemptions.[174] Further, the Sponsor itself acknowledges that converting the Trust into an ETP would allow the Shares to better track the Trust's net asset value ("NAV") and reduce discounts and premiums.[175] Therefore, the Sponsor's use of historical inflow data is questionable as a way to approximate trading that may ensue in the proposed ETP.

Third, NYSE Arca's assertions are general and conclusory. While NYSE Arca recites data relating to the market capitalization of bitcoin and inflows to the Trust, and trading volume of the Trust as compared to the CME bitcoin futures market and the Constituent Platforms, NYSE Arca provides no meaningful analysis of such data to support its conclusion. For example, setting aside the issues with the relevance of the data that the Sponsor chose to consider, the analysis performed on such data is merely a comparison of the size of one data point (*e.g.*, change in market capitalization) to the size of another (*e.g.*, net inflows). Such an analysis is, at best, a simple correlation between the two data points; it provides no information relating to the *impact* of one on the other—*e.g.*, no information on the impact of the Trust's historical inflows on market capitalization, or of the Trust's trading volume on the CME bitcoin futures market (let alone, on the CME bitcoin futures market's prices). In short, the analysis performed provides no information on the *influence* that is central to the second prong.

Fourth, the data that NYSE Arca provides indicate that the Trust's trading volume from November 1, 2019, to August 31, 2021, was "only" 23% of that of the CME bitcoin futures market.[176] Even assuming that this historical data is an accurate predictor of the future percentage, neither the Sponsor nor the Exchange directly addresses why a *single* bitcoin ETP with trading volume close to one-quarter that of the CME bitcoin futures market is not likely to be the predominant influence on prices in that market. Moreover, the Sponsor describes the Trust, as of April 26, 2022, as holding approximately $30 billion in bitcoin, an amount that constitutes 3.4% of all outstanding bitcoin[177] and that far exceeds the value of all open interest in CME bitcoin futures contracts.[178] Yet neither the Sponsor nor the Exchange directly addresses why a spot bitcoin ETP whose assets under management would similarly exceed the value of all open interest in CME bitcoin futures contracts is not likely to be the predominant influence on prices in that market.

Thus, the Commission cannot conclude, based on the assertions in the filing and absent sufficient evidence or analysis in support of these assertions, that it is unlikely that trading in the proposed ETP would be the predominant influence on prices in the CME bitcoin futures market.[179]

Therefore, because NYSE Arca has not provided sufficient information to establish both prongs of the "market of significant size" determination, the Commission cannot conclude that the CME bitcoin futures market is a "market of significant size" related to spot bitcoin such that NYSE Arca would be able to rely on a surveillance-sharing agreement with the CME to provide sufficient protection against fraudulent and manipulative acts and practices.

(3) Assertions That the Proposed Spot Bitcoin ETP Is Comparable to Bitcoin Futures-Based ETFs and ETPs

(i) Assertions Made and Comments Received

The Exchange and the Sponsor argue that it would be inconsistent for the Commission to allow the listing and trading of ETFs and ETPs that provide exposure to bitcoin through CME bitcoin futures while disapproving the current proposal.[180]

The Sponsor asserts that CME bitcoin futures ETFs and ETPs and spot bitcoin ETPs "are the same in all relevant respects."[181] In support of this assertion, the Sponsor claims that CME bitcoin futures ETFs and ETPs are "priced according to the CME CF Bitcoin Reference Rate" ("BRR"), which, "in turn, is determined according to pricing data collected from digital asset trading platforms that include all but one of those currently incorporated into [the Index]."[182] NYSE Arca also states that spot bitcoin ETPs, including the Trust, "would be priced by referencing [spot bitcoin platforms] included in the BRR, such as through the Index."[183]

The Sponsor further asserts that, because the BRR is based upon "substantially the same [b]itcoin pricing data" as the Index, both CME bitcoin futures ETFs and ETPs and spot bitcoin ETPs are exposed to the "same risks relating to pricing data quality" ("same data, same risks").[184] Moreover, because of the "almost complete overlap" in the platforms underlying the BRR and the Index, the Sponsor claims that "the risks of fraud and manipulation in the [b]itcoin market impacting spot [b]itcoin ETPs are indistinguishable from those same risks impacting futures [b]itcoin ETPs."[185] The Exchange also asserts

---

[172] In addition, neither the Exchange nor the Sponsor addresses the likely impact, if any, of the conversion itself on CME bitcoin futures prices, such as whether there may be rapid inflows into, or outflows from, the Trust upon conversion, and how long any such impacts are expected to last.

[173] *See infra* note 237.

[174] *See infra* note 245 and accompanying text.

[175] *See infra* notes 245–246 and accompanying text.

[176] *See* Amendment No. 1, 87 FR at 28054.

[177] *See* Grayscale Submission, at 2.

[178] As of May 31, 2022, the value of open interest in the front two month CME BTC contracts was approximately $1.7 billion (source: CME Group).

[179] *See* VanEck Order, 86 FR at 64548–59; WisdomTree Order, 86 FR at 69332–33; Kryptoin Order, 86 FR at 74177; SkyBridge Order, 87 FR at 3879; Wise Origin Order, 87 FR at 5537; ARK 21Shares Order, 87 FR at 20025.

[180] *See* Amendment No. 1, 87 FR at 28055; Grayscale Letter I, at 7–13; Letter from Davis Polk & Wardwell LLP, on behalf of the Sponsor, dated Apr. 18, 2022 ("Grayscale Letter II").

[181] Grayscale Letter I, at 4.

[182] *Id.* at 7. *See also* Amendment No. 1, 87 FR at 28055; Grayscale Letter II, at 2; Grayscale Submission, at 13–14; STA Letter, at 2 ("both types of products use similar processes for determining price on the underlying spot cash [b]itcoin markets").

[183] Amendment No. 1, 87 FR at 28055. *See also* Grayscale Letter I, at 7; Grayscale Letter II, at 2; Grayscale Submission, at 13; Fortress Letter, at 2; Virtu Letter, at 3; Letter from Adam Kornfield, dated Feb. 15, 2022 ("Kornfield Letter"), at 1; Letter from Hashem Dezhbakhsh, Narasimhan Jegadeesh, and Juan Rubio-Ramirez, Emory University, dated April 24, 2022, at 2 ("Emory Letter"). The Sponsor states that the BRR and the Index have significant overlap in constituents, resulting in prices that track each other closely, with an average daily price difference over trailing 12 months of 0.04%. *See* Grayscale Submission, at 13. *See also* Whaley Letter, at 2–3 (presenting summary data relating to the Index and the BRR and concluding that "XBX and BRR are near perfect substitutes").

[184] *See* Grayscale Letter I, at 7. *See also, e.g.,* Letter from Paul Grewal, Chief Legal Officer, Coinbase, dated Dec. 14, 2021 ("Coinbase Letter I"), at 4 ("the reference rate used to price [b]itcoin contracts underlying futures-based ETPs is subject to the same pricing data quality risks as the index used to price spot [b]itcoin and calculate net-asset value in spot ETPs."); Letter from James J. Angel, Associate Professor of Finance, Georgetown University, dated Apr. 17, 2022 ("Angel Letter I"), at 6; Blockchain Association Letter, at 3.

[185] Grayscale Letter I, at 9.

that, because of this overlap, any potential fraud or manipulation in the underlying spot bitcoin market would impact both CME bitcoin futures ETFs and ETPs and spot bitcoin ETPs.[186] The Sponsor goes further, asserting that "any" fraud or manipulation in the underlying market "will affect both products in the same way." [187]

Moreover, the Sponsor states that the Commission itself has recognized that "the CME bitcoin futures market is not insulated from potential risks of fraud and manipulation in the underlying [b]itcoin market." [188] The Sponsor even asserts that, "[i]f anything, derivatives markets present additional opportunities for manipulation on top of spot markets—which is why the derivatives markets have an additional layer of federal regulation to begin with." [189] According to the Sponsor, the Commission has never found there to be any meaningful difference in the risk of fraud or manipulation between spot bitcoin and bitcoin futures markets.[190]

The Sponsor further asserts that, "[e]ven with regulation by the CFTC, limiting ETP exposure to [b]itcoin futures does not address the risk of manipulation of underlying [b]itcoin spot market prices—unless the Commission's view is that CFTC regulation is adequate for all [b]itcoin spot markets, including those in which [the Trust] invests." [191]

Given that CME bitcoin futures ETFs currently trade, the Sponsor believes that the Commission's disapproval of the proposal would violate Section 6(b)(5) of the Exchange Act's prohibition against unfair discrimination among issuers, and would constitute an arbitrary and capricious administrative action in violation of the Administrative Procedure Act ("APA").[192] According to the Sponsor, "[t]he Commission has not offered any meaningful explanation for its differential treatment of these competing products." [193] These

argues that regulation of bitcoin futures ETFs under the 1940 Act offers no protections against fraudulent and manipulative trading in the underlying bitcoin market and provides no basis for treating bitcoin futures ETFs and spot bitcoin ETPs registered under the Securities Act differently.[194]

The Sponsor also argues that the Commission's standard violates the APA because it is illusory and cannot be satisfied.[195] According to the Sponsor, the framework that the Commission has articulated for assessing whether a proposal to list and trade any bitcoin-based ETP complies with the requirements of Exchange Act Section 6(b)(5) is "so ill-defined and unachievable as to be arbitrary." [196] The Sponsor continues to state that "[t]he Commission has never quantified the 'significant market' or 'market of significant size.' " [197] Moreover, according to the Sponsor, the Commission "has never defined or specified what would actually constitute 'unique resistance to manipulation' that is 'beyond the protections of the traditional commodities and equities markets,' nor has the Commission explained what it

[186] *See* Amendment No. 1, 87 FR at 28055. *See also* Grayscale Submission, at 14. Some commenters agree that bitcoin futures ETFs and ETPs pose identical risks of fraud and manipulation as spot bitcoin ETPs given their views that both products are priced based on the spot bitcoin price. *See, e.g.,* Blockchain Association Letter, at 2; Coinbase Letter I, at 3; Coinbase Letter II, at 7; Virtu Letter, at 3; Angel Letter I, at 5; BitGo Letter, at 2; Cumberland Letter, at 2; Letter from Carol R. Goforth, University Professor and Clayton N. Little Professor of Law, University of Arkansas, dated May 3, 2022 ("Goforth Letter"), at 1; Kornfield Letter, at 2; Letters from Brandon Gunderson (Feb. 4, 2022) ("Gunderson Letter"), at 2; Kenneth L. Keiffer, dated May 3, 2022 ("Keiffer Letter"), at 1; Robert L. DiLonardo and Donna S. DiLonardo, dated May 3, 2022 ("DiLonardo Letter"); Bridget Metzger (May 9, 2022) ("Metzger Letter"); Emory Letter, at 2; Letter from Sigal Mandelker and Jessi Brooks, Ribbit Capital, dated June 20, 2022 ("Ribbit Capital Letter"), at 5. An affiliate of the Custodian also states that prices and volumes in the bitcoin futures and spot bitcoin markets "are highly correlated, indicating very similar market dynamics between the futures market, for which the Commission has approved a [CME bitcoin futures ETF], and the spot market." Coinbase Letter II, at 3.

[187] Grayscale Letter II, at 2.

[188] *Id.* (referring to the Teucrium Order, *supra* note 11). *See also* Grayscale Submission, at 14.

[189] *See* Grayscale Letter I, at 11. Some commenters make similar arguments. For example, a commenter states that "spot markets may be less prone to manipulation given their daily notional volumes in the range of $35 billion, with futures volumes in the range of $1 billion daily notional." Virtu Letter, at 3. Another commenter states that an ETP that actually holds bitcoin would be less vulnerable to manipulation than an ETP that holds futures contracts because, with respect to bitcoin futures, there is the possibility of manipulation on the CME itself in addition to the spot bitcoin trading platforms. *See* Angel Letter I, at 6. Another commenter states that having a bitcoin futures ETF actually makes the derivatives markets more liquid and easy to manipulate than the spot market. *See* Dreyfuss Letter, 2. *See also, e.g.,* Letter from Mary L. Holsinger, dated May 8, 2022.

[190] *See* Grayscale Letter I, at 11–12; Grayscale Letter II, at 2 ("The Commission's prior

disapprovals of spot bitcoin ETPs have not identified any distinct and significant additional risk of fraud and manipulation that is somehow specific to spot [b]itcoin ETPs, and none exists."). *See also, e.g.,* Blockchain Association Letter, at 3.

[191] Grayscale Letter I, at 11. *See also, e.g.,* Blockchain Association Letter, at 3; Coinbase Letter I, at 3; Ribbit Capital Letter, at 5.

[192] *See* Grayscale Letter I, at 8–9; 12–13; Grayscale Submission, at 23; Grayscale Letter II, at 2–4 (stating, among other things, that if the proposal "were disapproved based on the 'significant market' test, without an independent evaluation of the proposal's compliance with Section 6(b)(5) in light of the [Teucrium Order], we believe the action would be inconsistent with the requirements of both the Exchange Act and the [APA]"). Some commenters agree that the Commission's disparate treatment of bitcoin futures ETFs and ETPs and spot bitcoin ETPs results in unfair discrimination amongst issuers in contravention of the Exchange Act and/or is arbitrary and capricious in violation of the APA. *See, e.g.,* Blockchain Association Letter, at 3–4, Coinbase Letter I, at 4; Virtu Letter, at 3; Angel Letter I, at 5; Fortress Letter, at 3; Kornfield Letter; Keiffer Letter; Metzger Letter; Goforth Letter, at 2; DiLonardo Letter; Letter from Michael D. Moffitt, dated Mar. 13, 2022 ("Moffitt Letter II") (citing transcript of Joseph Grundfest, former SEC Commissioner); Davenport Letter; Letter from John Carlson, dated Feb. 22, 2022; Ribbit Capital Letter, at 6; Letter from Alan J. Lane, Chief Executive Officer, Silvergate Capital Corporation, dated June 21, 2022. *See also, e.g.,* ADAM Letter, at 6 ("a disapproval of Arca's proposal would lead to the Commission picking winners based on its preferential treatment of one product over another"). A commenter asserts that "it is not within [the Commission's mandate to regulate the spot commodity markets upon which ETPs are based[,]" that "Section 6(b)(5) neither mentions underlying markets, nor an exchange's obligations with respect to fraud within them[,]" and "[t]he Commission's apparent position that an exchange must mitigate fraud and manipulation in an underlying market, or be prohibited from listing a product based on a commodity in an underlying market subject to fraud and manipulation not in the exchange's control, stretches the Commission's authority beyond existing statutory language." *See* Ribbit Capital Letter, at 5.

[193] Grayscale Letter I, at 8. Some commenters agree that the Commission has not articulated a valid justification for treating bitcoin futures ETFs and ETPs and spot bitcoin ETPs differently. *See,*

*e.g.,* Blockchain Association Letter, at 3–4; Coinbase Letter I, at 4; Cumberland Letter, at 2; STA Letter, at 2; Moffitt Letter II (citing transcript of Joseph Grundfest, former SEC Commissioner); Kornfield Letter; Goforth Letter; Chilson Letter, at 4.

[194] *See* Grayscale Letter I, at 9–11; Grayscale Submission, at 14. *See also, e.g.,* Blockchain Association Letter, at 3; Coinbase Letter I, at 5 n.11. The Sponsor states that the Commission's recent approval of bitcoin futures ETFs registered under the Securities Act "confirms that 1940 Act registration is not a basis for the Commission to approve one product and reject another." *See* Grayscale Letter II, at 1 (referring to the Teucrium Order, *supra* note 11). *See also* Amendment No. 1, 87 FR at 28055; Goforth Letter, at 1–2.

[195] *See* Grayscale Letter I, at 12–13.

[196] *See id.* at 12. For a summary of the Commission's approach to considering proposals to list bitcoin-based ETPs, *see supra* notes 11–27 and accompanying text. Some commenters agree that the Commission's evaluation of spot bitcoin ETPs and bitcoin futures ETFs and ETPs is ambiguous and inconsistent. *See, e.g.,* Coinbase Letter I, at 4 ("when market participants compare the Commission's evaluation and approval of a futures-based [b]itcoin ETP to its treatment of spot [bitcoin] ETP proposals, they will see a lack of well-defined criteria and inconsistent application of the criteria"); Fortress Letter, at 2 ("While the Commission has stated that it considered each [spot bitcoin ETP] rule application 'on its own merits and under the standards applicable to it', the Commission has itself devised those standards ambiguously and inconsistently.").

[197] Grayscale Letter I, at 12. *See also* Grayscale Letter II, at 3 ("the Commission's reluctance to quantify the size a market must achieve to be 'significant', and its reluctance to articulate discernible standards for determining whether the market has the requisite linkage to the ETP's assets, renders this test subjective, arbitrary and effectively unachievable").

means for resistance to be 'inherent' or 'novel' in this context.'' [198]

(ii) Analysis

The Commission disagrees with these assertions and conclusions. The proposed rule change does not relate to the same underlying holdings as either ETFs regulated under the 1940 Act that provide exposure to bitcoin through CME bitcoin futures, or CME bitcoin futures-based ETPs registered under the Securities Act but not regulated under the 1940 Act. The Commission considers the proposed rule change on its own merits and under the standards applicable to it. Namely, with respect to this proposed rule change, the Commission must apply the standards as provided by Section 6(b)(5) of the Exchange Act, which it has applied in connection with its orders considering previous proposals to list bitcoin-based commodity trusts and bitcoin-based trust issued receipts.[199]

In asserting that, for purposes of making a determination to approve or disapprove proposals to list and trade bitcoin futures and spot bitcoin ETPs, the Commission is drawing a distinction about the potential for fraud and manipulation in the CME bitcoin futures market vis-à-vis the spot bitcoin markets, the Exchange, Sponsor, and commenters mischaracterize the framework that the Commission has articulated in the Winklevoss Order. As stated in the Winklevoss Order, the Commission is not applying a "cannot be manipulated" standard—either on the CME bitcoin futures market or the spot bitcoin markets. Rather, as the Commission has repeatedly emphasized, and also summarized above, the Commission is examining whether the proposal meets the requirements of the Exchange Act and, pursuant to its Rules of Practice, is

placing the burden on NYSE Arca to demonstrate the validity of its contentions that bitcoin markets "offer novel protections beyond those that exist in traditional commodity markets or equity markets" such that the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin is unnecessary,[200] or to establish that it has entered into such a surveillance-sharing agreement.[201]

Consistent with this approach, contrary to the Exchange's, the Sponsor's, and some commenters' assertions, the Commission's consideration (and approval) of proposals to list and trade CME bitcoin futures ETPs, as well as the Commission's consideration (and thus far, disapproval) of proposals to list and trade spot bitcoin ETPs, does not focus on an assessment of the overall risk of fraud and manipulation in the spot bitcoin or futures markets, or on the extent to which such risks are similar.[202] Rather, the Commission's

focus has been consistently on whether the listing exchange has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets of the ETP under consideration, so that it would have the necessary ability to detect and deter manipulative activity. For reasons articulated in the orders approving proposals to list and trade CME bitcoin futures-based ETPs (i.e., the Teucrium Order and the Valkyrie XBTO Order), the Commission found that in each such case the listing exchange has entered into such a surveillance-sharing agreement.[203] Making the same assessment with respect to this proposed spot bitcoin ETP, however, as discussed and explained above, the Commission finds that NYSE Arca has not.

Specifically, for the CME bitcoin futures ETPs under consideration in the Teucrium Order and the Valkyrie XBTO Order, the proposed "significant" regulated market (i.e., the CME) with which the listing exchange has a surveillance-sharing agreement is the same market on which the underlying bitcoin assets (i.e., CME bitcoin futures contracts) trade. As explained in those Orders, the CME's surveillance can reasonably be relied upon to capture the effects on the CME bitcoin futures market caused by a person attempting to manipulate the CME bitcoin futures ETP by manipulating the price of CME bitcoin futures contracts, whether that attempt is made by directly trading on the CME bitcoin futures market or indirectly by trading outside of the CME bitcoin futures market.[204] Regarding the approved Teucrium Bitcoin Futures Fund in the Teucrium Order ("Fund"), for example, when the CME shares its surveillance information with NYSE Arca (the listing exchange for the Fund), the information would assist in detecting and deterring fraudulent or manipulative misconduct related to the non-cash assets held by the Fund.[205] Accordingly, the Commission explains in the Teucrium Order and the Valkyrie XBTO Order that it is unnecessary for a listing exchange to establish a

---

[198] Grayscale Letter I, at 13.

[199] See supra note 11 and accompanying text. The Sponsor also mischaracterizes the Teucrium Order. For example, the Sponsor states that the Teucrium Order "reflects plainly the Commission's recognition that the CME bitcoin futures market is not insulated from potential risks of fraud and manipulation in the underlying [b]itcoin market," and that "the Commission took pains to 'disagree[ ] with much of [NYSE] Arca's reasoning' about the [b]itcoin futures market's separation from the underlying [b]itcoin market.'' Grayscale Letter II, at 2. However, this discussion in the Teucrium Order addresses whether NYSE Arca had supported its claim that it is reasonably likely that a would-be manipulator of the CME bitcoin futures ETP that was the subject of the Teucrium Order would have to trade on the CME to manipulate that ETP. See Teucrium Order, 87 FR at 21679. In that context, NYSE Arca had not sufficiently supported its statements that the CME bitcoin futures market "stands alone" or that "[b]itcoin futures prices are not specifically materially influenced by other [b]itcoin markets'' for the Commission to be persuaded by such statements. See id. at 21680.

[200] See supra note 60 and accompanying text.

[201] Although the Sponsor claims that the Commission has never defined or specified what would constitute "unique resistance to manipulation" that is "beyond the protections of the traditional commodities and equities markets," or explained what it means for resistance to be "inherent" or "novel," the Sponsor mischaracterizes the premise of its own argument. Listing exchanges, not the Commission, have argued that other means besides surveillance-sharing agreements may be sufficient to prevent fraudulent and manipulative acts and practices, including by asserting that the bitcoin market as a whole or the relevant underlying bitcoin market is "uniquely" and "inherently" resistant to fraud and manipulation. In response, the Commission has agreed with listing exchanges' posited hypothetical: that, if a listing exchange could establish that the underlying market inherently possesses a unique resistance to manipulation beyond the protections that are utilized by traditional commodity or securities markets—for which surveillance-sharing agreements in the context of listing derivative securities products have been consistently present—the exchange would not necessarily need to enter into a surveillance-sharing agreement with a regulated significant market related to the underlying bitcoin assets. See Winklevoss Order, 83 FR at 37580, 37582–91 (addressing assertions that "bitcoin and bitcoin [spot] markets" generally, as well as one bitcoin trading platform specifically, have unique resistance to fraud and manipulation). See also USBT Order, 85 FR at 12597. Furthermore, a listing exchange need not substantiate its claim that the underlying bitcoin market is uniquely and inherently resistant to fraud in addition to demonstrating that the listing exchange has a surveillance-sharing agreement with a regulated significant market related to the underlying bitcoin assets.

[202] The Commission's general discussion on the risk of fraud and manipulation in the spot bitcoin or futures markets is only in response to arguments raised by the proposing listing exchanges (or commenters) that mitigating factors against fraud and manipulation in the spot bitcoin or futures markets should compel the Commission to dispense

with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets. But even in such instance, the central issue is about the necessity of such a surveillance-sharing agreement, not the overall risk of fraud and manipulation in the spot bitcoin or futures markets, or the extent to which such risks are similar.

[203] See Teucrium Order, 87 FR at 21678–81; Valkyrie XBTO Order, 87 FR at 28850–53.

[204] See Teucrium Order, 87 FR at 21679; Valkyrie XBTO Order, 87 FR at 28851.

[205] See Teucrium Order, 87 FR at 21679.

reasonable likelihood that a would-be manipulator would have to trade on the CME itself to manipulate a proposed ETP whose only non-cash holdings would be CME bitcoin futures contracts.[206]

However, as the Commission also states in those Orders, this reasoning does not extend to spot bitcoin ETPs. Spot bitcoin markets are not currently "regulated." [207] If an exchange seeking to list a spot bitcoin ETP relies on the CME as the regulated market with which it has a comprehensive surveillance-sharing agreement, the assets held by the spot bitcoin ETP would not be traded on the CME. Because of this significant difference, with respect to a spot bitcoin ETP, there would be reason to question whether a surveillance-sharing agreement with the CME would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct affecting the price of the spot bitcoin held by that ETP. If, however, an exchange proposing to list and trade a spot bitcoin ETP identifies the CME as the regulated market with which it has a comprehensive surveillance-sharing agreement, the exchange could overcome the Commission's concern by demonstrating that there is a reasonable likelihood that a person attempting to manipulate the spot bitcoin ETP would have to trade on the CME in order to manipulate the ETP, because such demonstration would help establish that the exchange's surveillance-sharing agreement with the CME would have the intended effect of aiding in the detection and deterrence of fraudulent and manipulative misconduct related to the spot bitcoin held by the ETP.[208]

Because, here, NYSE Arca is seeking to list a spot bitcoin ETP that relies on the CME as the purported "significant" regulated market with which it has a comprehensive surveillance-sharing agreement, the assets held by the proposed ETP would *not* be traded on the CME. Thus there is reason to question whether a surveillance-sharing agreement with the CME would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct affecting the price of the spot bitcoin held by the proposed ETP.[209] The Exchange could have

overcome this concern by demonstrating that there is a reasonable likelihood that a person attempting to manipulate the proposed ETP would have to trade on *the CME* in order to manipulate the ETP because such demonstration would help establish that the Exchange's surveillance-sharing agreement with the CME would have the intended effect of aiding in the detection and deterrence of fraudulent and manipulative misconduct related to the spot bitcoin held by the proposed ETP.[210] As discussed and explained above,[211] the Commission finds that NYSE Arca has not made such demonstration.

To the extent that the Sponsor—by way of claiming that, "[b]ecause both spot and futures-based [b]itcoin products face exposure to the same underlying [b]itcoin market, any fraud or manipulation in the underlying market will affect both products in the same way" [212]—is arguing that the CME's surveillance would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct that impacts spot bitcoin ETPs in the same way as it would for misconduct that impacts the CME bitcoin futures ETFs/ ETPs, the information in the record for this filing does not support such a claim. Specifically, the Sponsor claims that (i) CME bitcoin futures ETFs/ETPs are "priced according to the [BRR];" (ii) the proposed spot bitcoin ETP would be priced based on the Index; and (iii) because of the "almost complete overlap" between the spot platforms whose prices are used to calculate the BRR and the Index, bitcoin futures ETFs/ETPs and the proposed ETP are subject to the "same risks relating to pricing data quality." [213] This logic, however, is flawed for the following reasons.

First, there is no evidence in the record that CME bitcoin futures ETFs/ ETPs are "priced according to the [BRR]." The BRR is a once-a-day reference rate of the U.S. dollar price of one bitcoin as of 4 p.m., London time.[214] The BRR aggregates the trade

flow of its constituent spot bitcoin platforms—Coinbase, Gemini, LMAX Digital, itBit, Kraken, and Bitstamp [215]—during a specific one-hour calculation window.[216] While the BRR is used to value the final cash settlement of CME bitcoin futures contracts, it is not generally used for daily cash settlement of such contracts,[217] nor is it claimed to be used for any intra-day trading of such contracts. In addition, CME bitcoin futures ETFs/ETPs do not hold their CME bitcoin futures contracts to final cash settlement; rather, the contracts are rolled prior to their settlement dates. Moreover, the shares of CME bitcoin futures ETFs/ETPs trade in secondary markets, and there is no evidence in the record for this filing that such intra-day, secondary market trading prices are determined by the BRR.

Second, there is no evidence in the record that the Shares' prices would be determined by the Index. The Index is a U.S. dollar-denominated composite reference rate for the price of bitcoin calculated at 4:00 p.m. New York time.[218] As described above, the Index applies an algorithm to the price of bitcoin on the Constituent Platforms— Coinbase Pro, LMAX Digital, Kraken, and Bitstamp—calculated on a per second basis over a 24-hour period. While the Index is used daily to value the bitcoins held by the Trust,[219] as discussed above,[220] the Index would not be used for the creation or redemption of Shares, nor is the Index claimed to be used for any intra-day secondary market trading of the Shares, either currently on the OTC market or in the future on the Exchange. Rather, the Share price is discovered through continuous intra-day, secondary market interactions of buy and sell interests.[221]

---

[206] *See id.*

[207] *See* Teucrium Order, 87 FR at 21679 n.46 (citing USBT Order, 85 FR at 12604; NYDIG Order, 87 FR at 14936 nn.65–67). *See also* Valkyrie XBTO Order, 87 FR at 28851 n.42.

[208] *See* Teucrium Order, 87 FR at 21679 n.46; Valkyrie XBTO Order, 87 FR at 28851 n.42.

[209] *See* Teucrium Order, 87 FR at 21679 n.46; Valkyrie XBTO Order, 87 FR at 28851 n.42. There is reason to question whether the CME's

surveillance would capture manipulation of spot bitcoin that occurs off of the CME, if, for example, off-CME manipulation of spot bitcoin does not also similarly impact CME bitcoin futures contracts. As discussed further below, *see infra* notes 224–225 and accompanying text, the information in the record for this filing does not sufficiently demonstrate that attempted manipulation of spot bitcoin would also similarly impact CME bitcoin futures contracts.

[210] *See* Teucrium Order, 87 FR at 21679 n.46; Valkyrie XBTO Order, 87 FR at 28851 n.42.

[211] *See* Section III.B.2.i, *supra.*

[212] Grayscale Letter II, at 2.

[213] *See id.* at 7, 9.

[214] *See https://docs-cfbenchmarks.s3.amazonaws.com/ CME+CF+Reference+Rates+Methodology.pdf.*

[215] *See https://docs-cfbenchmarks.s3.amazonaws.com/ CME+CF+Constituent+Exchanges.pdf.*

[216] *See https://www.cmegroup.com/education/ courses/introduction-to-bitcoin/introduction-to-bitcoin-reference-rate.html.* This one-hour window is partitioned into 12, five-minute intervals, where the BRR is calculated as the equally-weighted average of the volume-weighted medians of all 12 partitions. *See id.*

[217] Under normal procedures, daily cash settlements are generally based on the volume-weighted average price of trading activity on CME Globex between 2:59 p.m. and 3:00 p.m., Central Time). *See https://www.cmegroup.com/confluence/ display/EPICSANDBOX/Bitcoin* for a description of CME bitcoin futures daily settlement procedures.

[218] *See* Amendment No. 1, 87 FR at 28047.

[219] *See id.* at 28047, 28049.

[220] *See supra* notes 132–133 and accompanying text.

[221] As discussed above, the use of the Index by the Trust to determine the value of its bitcoin does not support the finding that the Exchange has established other means to prevent fraud and manipulation that are sufficient to justify

Continued

Third, despite the Sponsor's claim of "almost complete overlap" between the spot platforms whose prices are used to calculate the BRR and those platforms whose prices are used for the Index, the BRR includes trade flow from Gemini and itBit, neither of which are included as Constituent Platforms of the Index.[222]

In short, and importantly, although the Exchange and the Sponsor focus heavily on the similarities between the BRR and the Index, there is no evidence in the record that the shares of any CME bitcoin futures ETF/ETP, or the Shares of the proposed spot bitcoin ETP, would trade in the secondary market at a price related to (or informed by) the BRR or the Index.[223]

dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. *See* Section III.B.1.ii, *supra.* Likewise, the Commission has previously rejected arguments by listing exchanges that the use of a reference rate similar to the BRR to value bitcoin held by proposed spot bitcoin ETPs provides other means to prevent fraud and manipulation that are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. *See* Wise Origin Order, 87 FR at 5532–33; SkyBridge Order, 87 FR at 3877. Accordingly, the Index and the BRR, and the similarities between the BRR and the Index, are not informative in the Commission's determination of whether the Exchange has established other means to prevent fraud and manipulation.

[222] Although the Sponsor states that the BRR is "determined according to pricing data collected from digital asset trading platforms that include all but one of those currently incorporated into [the Index]" (Grayscale Letter I, at 7), based on information provided on the CME's website, the Sponsor's statement does not appear to be correct. *See https://www.cmegroup.com/markets/cryptocurrencies/cme-cf-cryptocurrency-benchmarks.html?redirect=/trading/cryptocurrency-indices/cf-bitcoin-reference-rate.html.* It is also unclear from the record whether Coinbase (used by the BRR) and Coinbase Pro (used by the Index) are the same platform. Based on recent press articles, it appears that Coinbase Pro will be discontinued. *See, e.g., https://cointelegraph.com/news/coinbase-to-shut-down-coinbase-pro-to-merge-trading-services; https://www.forbesindia.com/article/crypto-made-easy/coinbase-to-shut-down-coinbase-pro-to-merge-trading-services/77585/1#:~:text=Coinbase %20Pro%2C%20the%20professional, them%20into%20a%20single%20platform.*

[223] A commenter provides a correlation analysis, using daily price information between November 2021 and February 2022, which purports to show high correlation (99.9%) between the price of CME bitcoin futures contracts and a Coinbase price. *See* Coinbase Letter II, at 7 and Figure 6. The same commenter also provides correlation analysis, using daily price information between December 2021 and February 2022, which purports to show high correlation between the prices of various non-U.S. spot bitcoin ETPs and a Coinbase spot price. *See id.* at 8–9 and Figures 11–16. The commenter, however, does not provide evidence with respect to price correlation between shares of CME bitcoin futures ETFs and the BRR or between the prices of various non-U.S. spot bitcoin ETPs and the Index. Nor does correlation analysis, at daily intervals, provide evidence of the causal economic

Fourth, the Commission's determination in the Teucrium Order and the Valkyrie XBTO Order to approve the listing and trading of the relevant CME bitcoin futures ETPs was not based on the ETPs' use—or lack of use—of the BRR (or any other similar pricing mechanism) for the calculation of NAV, or on the fact that the BRR is used for the final cash settlement of CME bitcoin futures contracts. Rather, as discussed above, the Commission approved the listing and trading of such CME bitcoin futures ETPs, not because of the BRR, but because the Commission found that the listing exchanges satisfy the requirement pertaining to a surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets—which for such ETPs are CME bitcoin futures contracts, not spot bitcoin.

Fifth, even if the Exchange or the Sponsor had demonstrated a link between the BRR and/or the Index and the prices of CME bitcoin futures ETFs/ETPs and/or the proposed ETP, which they have not, it does not necessarily follow that the CME's surveillance would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct that impacts spot bitcoin ETPs in the same way as it would for misconduct that impacts the CME bitcoin futures ETFs/ETPs—particularly when such misconduct occurs off of the CME itself.[224] For example, even assuming, for the sake of argument, that the BRR and/or the Index is a potential link between prices on certain spot bitcoin platforms and CME bitcoin futures prices, it does not—absent supporting data—necessarily follow that *any* manipulation that impacts spot bitcoin *also similarly* impacts CME bitcoin futures contracts. Neither the Sponsor nor the Exchange has provided any analysis or data that assesses the reaction (if any) of CME bitcoin futures contracts to instances of fraud and manipulation in spot bitcoin markets. Indeed, the only analysis that the Sponsor itself provides is a summary of its lead/lag analysis comparing CME bitcoin futures prices with the Index, from which the Sponsor concludes that "there does not appear to be a significant lead/lag relationship between the two instruments."[225]

In addition, the disapproval of the proposal would not violate the requirement in Section 6(b)(5) of the

relationship of interest: namely, whether fraud or manipulation that impacts spot bitcoin would also similarly impact CME bitcoin futures contracts. *See infra* notes 224–225 and accompanying text.

[224] *See also supra* note 209.

[225] *See* Amendment No. 1, 87 FR at 28054.

Exchange Act[226] that the rules of an exchange be not designed to permit unfair discrimination between issuers, nor would it constitute an arbitrary and capricious administrative action in violation of the APA.[227] Importantly, the issuers are not similarly situated. The issuers of CME bitcoin futures-based ETPs propose to hold only CME bitcoin futures contracts (which are traded on the CME itself) as their only non-cash holdings, and the Trust proposes to hold only spot bitcoin (which is not traded on the CME). As explained in detail above and in the Teucrium Order and the Valkyrie XBTO Order, because of this important difference, for a spot bitcoin ETP, there is reason to question whether a surveillance-sharing agreement with the CME would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct affecting the price of the spot bitcoin held by that ETP.[228] And as discussed above, neither the Exchange, nor the Sponsor, nor any other evidence in the record for this filing, sufficiently demonstrates that the CME's surveillance can be reasonably relied upon to capture the effects of manipulation of the *spot* bitcoin assets underlying the proposed ETP when such manipulation is not attempted on the CME itself.

Moreover, the analytical framework for assessing compliance with the requirements of Exchange Act Section 6(b)(5) that the Commission applies here (*i.e.,* comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets) is the same one that the Commission has applied in each of its orders considering previous proposals to list bitcoin-based

[226] 15 U.S.C. 78f(b)(5).

[227] The Sponsor argues that disapproval of the proposal would constitute merit regulation, which is not authorized under the Exchange Act. *See* Grayscale Letter I at 14–15. In addition, the affiliate of the Custodian states that "the Commission's role is not to evaluate the characteristics and quality of the underlying [b]itcoin market but instead to evaluate the [proposed] ETP, and the role that [NYSE] Arca would play in monitoring trading in [the Shares]." Coinbase Letter I, at 5. *See also, e.g.,* ADAM Letter, at 6; Ribbit Capital Letter, at 5. As previously stated, the Commission is disapproving this proposed rule change because NYSE Arca has not met its burden to demonstrate that its proposal is consistent with the requirements of Exchange Act Section 6(b)(5). The Commission's disapproval of this proposed rule change does not rest on an evaluation of the relative investment quality of a product holding spot bitcoin versus a product holding CME bitcoin futures, or an assessment of whether bitcoin, or blockchain technology more generally, has utility or value as an innovation or an investment. *See, e.g.,* Winklevoss Order, 83 FR at 37580; USBT Order, 85 FR at 12597; One River Order, 87 FR at 33550.

[228] *See supra* notes 208–209 and accompanying text.

commodity trusts and trust issued receipts.[229] The Commission has applied this framework to each proposal by analyzing the evidence presented by the listing exchange and statements made by commenters.[230] Although the Sponsor states that the Commission's approach to assessing compliance with Section 6(b)(5) has created a standard that cannot be satisfied and therefore violates the APA, the Commission has in fact recently approved proposals by the Exchange and the Nasdaq Stock Market to list and trade shares of ETPs holding CME bitcoin futures as their only non-cash holdings.[231] And in the orders approving these CME bitcoin futures-based ETPs, the Commission explicitly discussed how an exchange seeking to list and trade a spot bitcoin ETP could overcome the lack of a one-to-one relationship between the regulated market with which it has a surveillance-sharing agreement and the market(s) on which the assets held by a spot bitcoin ETP could be traded: by demonstrating that there is a reasonable likelihood that a person attempting to manipulate the spot bitcoin ETP would have to trade on the regulated market (*i.e.*, on the CME) to manipulate the spot bitcoin ETP.[232]

When considering past proposals for spot bitcoin ETPs, the Commission has, in particular, reviewed the econometric and/or statistical evidence in the record to determine whether the listing exchange's proposal has met the applicable standard.[233] The Commission's assessment fundamentally presents quantitative, empirical questions, but, as discussed above, the Exchange has not provided evidence sufficient to support its arguments. Instead, the Exchange and the Sponsor make various assertions that are not supported by the limited data in the record regarding, among other things, trading volume and bitcoin market capitalization, or the relationship between spot bitcoin prices and CME bitcoin futures prices (including the lead/lag relationship between the spot market and the CME bitcoin futures market), and the record contains insufficient empirical analysis or quantitative evidence of any such

data to support the Exchange's conclusions.[234]

The requirements of Section 6(b)(5) of the Exchange Act apply to the rules of national securities exchanges. Accordingly, the relevant obligation to have a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin, or other means to prevent fraudulent and manipulative acts and practices that are sufficient to justify dispensing with such a surveillance-sharing agreement, resides with the listing exchange. Because there is insufficient evidence in the record demonstrating that NYSE Arca has satisfied this obligation, the Commission cannot approve the proposed ETP for listing and trading on NYSE Arca.

*C. Whether NYSE Arca Has Met Its Burden to Demonstrate That the Proposal Is Designed to Protect Investors and the Public Interest*

NYSE Arca contends that, if approved, the proposed ETP would protect investors and the public interest. However, the Commission must consider these potential benefits in the broader context of whether the proposal meets each of the applicable requirements of the Exchange Act.[235] Because NYSE Arca has not demonstrated that its proposed rule change is designed to prevent fraudulent and manipulative acts and practices, the Commission must disapprove the proposal.

(1) Assertions Made and Comments Received

Commenters argue that the Commission should approve the proposal because doing so would satisfy investor demand for a U.S. regulated investment vehicle with direct exposure to bitcoin.[236] Commenters state that

approval of a spot bitcoin ETP would provide a simpler, safer, and more efficient way to obtain exposure to bitcoin than the products that are currently available to retail investors, such as holding spot bitcoin, OTC bitcoin funds, bitcoin futures funds, or foreign bitcoin funds.[237] Some commenters state that approving a spot bitcoin ETP would reduce the custody and cybersecurity risks to investors of holding physical bitcoin.[238]

Several commenters argue that a spot bitcoin ETP would provide lower costs and less risk than bitcoin futures ETPs.[239] The Sponsor and some

---

[229] *See supra* notes 11–24 and accompanying text.

[230] *See supra* note 11.

[231] *See* Teucrium Order and Valkyrie XBTO Order, *supra* note 11.

[232] *See supra* note 208 and accompanying text.

[233] *See, e.g.*, USBT Order, 85 FR at 12612–13; VanEck Order, 86 FR at 64547–48; WisdomTree Order, 86 FR at 69330–32; Kryptoin Order, 86 FR at 74175–76; NYDIG Order, 87 FR at 14938–39; Wise Origin Order, 87 FR at 5534–36; Global X Order, 87 FR at 14919–20; ARK 21Shares Order, 87 FR at 20023–24.

[234] *See* Sections III.B.1 & III.B.2., *supra.*

[235] *See* Winklevoss Order, 83 FR at 37602. *See also* GraniteShares Order, 83 FR at 43931; ProShares Order, 83 FR at 43941; USBT Order, 85 FR at 12615; WisdomTree Order, 86 FR at 69333; Valkyrie Order, 86 FR at 74163; Kryptoin Order, 86 FR at 74178; SkyBridge Order, 87 FR at 3880; Wise Origin Order, 87 FR at 5537.

[236] *See, e.g.*, Blockchain Association Letter, at 1–2; Virtu Letter, at 2–4; BitGo Letter, at 1–2; STA Letter, at 2–3; ADAM Letter, at 3–4; Harvey Letter, at 1–3; Shultz Letter; Letter from Neil Chilson and Jonathan M. Zalewski, dated May 31, 2022 ("Chilson Letter"), at 3; Letter from Jody Cryder, dated Apr. 25, 2022; Letter from Rich Seils, dated Apr. 25, 2022 ("Seils Letter"); Letter from Grant Johnson, dated Mar. 4, 2022 ("Johnson Letter"); Letter from Evelyne Dandurand, dated Feb. 18, 2022; Letter from David Brown, dated Apr. 19, 2022; Letter from Mark Reid, dated Feb. 28, 2022; Letter from William McPherson, dated Mar. 1, 2022; Letter from Jalen Rose, dated Mar. 2, 2022; Letter from Brandon Gillet, dated Feb. 22, 2022; Letter

[237] *See, e.g.*, ADAM Letter, at 3–4; Harvey Letter, at 1–3; BitGo Letter, at 1–2; Discovery Letter, at 2; Angel Letter, at 6–7; Johnson Letter; Letter from Logan Kane, Writer, Seeking Alpha, dated Feb. 19, 2022 ("Kane Letter"); Letter from Michael Falk, dated Feb. 15, 2022; Letter from Andrew Farinelli, dated Feb. 10, 2022 ("Farinelli Letter"); Letter from Boris Hristov, dated May 18, 2022; Letter from Paul Smith, dated Feb. 28, 2022; Letter from Luke Groom, dated Feb. 22, 2022; Emory Letter, at 2. In addition, some commenters state that a spot bitcoin ETP would be just as, or less risky than, other investments already trading in the U.S. *See, e.g.*, Dreyfuss Letter; Miller Letter; Letter from Derek Serlet, dated Apr. 27, 2022; Letter from Monty Henry, dated Feb. 7, 2022 ("Henry Letter"); Letter from Alexander, dated Feb. 22, 2022; Letter from Martin Baer, dated Feb. 15, 2022; Letter from Gage Gorda, dated Feb. 14, 2022; Letter from Branon White, dated Feb. 10, 2022; Letter from Nikolas Garcia, dated Mar. 4, 2022 ("Garcia Letter").

[238] *See, e.g.*, Angel Letter I, at 8; ADAM Letter; Kane Letter; Henry Letter; Letter from Tim Crick, dated Mar. 21, 2022; Letter from Michael David Spadaccini, dated Feb. 7, 2022; Letter from Michael A. Rheintgen, dated Feb. 24, 2022; Letter from Richard Arrett, dated Feb. 22, 2022 ("Arrett Letter"); Letter from Brian Boerner, dated Feb. 14, 2022; Letter from William Perez, dated Feb. 12, 2022 ("Perez Letter"); Letter from Henry Chen, dated Feb. 26, 2022 ("Chen Letter").

[239] *See, e.g.*, Blockchain Association Letter, at 2 ("while bitcoin futures ETPs have certain useful features, they are inferior investment products for many Americans due to their relatively higher cost and risk profile"); Angel Letter I, at 6–7 (stating that "[a] physical-based product in which the fund actually holds the bitcoin is far less vulnerable to manipulation than the futures contracts" and that CME futures contracts experience roll costs, lack liquidity, and have wide bid-ask spreads); Letter from Murray Stahl, Chief Investment Officer, Horizon Kinetics Asset Management LLC, dated Apr. 8, 2022 ("Horizon Kinetics Letter"), at 1–2 (stating that a futures-based bitcoin ETP is not suitable for long-term investors since the performance deviates greatly from the underlying asset and that a spot bitcoin ETP would eliminate such a tracking error); Fortress Letter, at 2–3 ("Futures ETFs present investors with a more costly and complex means of gaining exposure to [b]itcoin while reflecting only a small portion of the actual market for the digital asset"); Letter from Benjamin

Continued

commenters assert that disapproving spot bitcoin ETPs after approving bitcoin futures ETFs and ETPs harms investors.[240] In addition, the Sponsor states that bitcoin futures ETPs present certain structural disadvantages over spot bitcoin ETPs, such as monthly roll-costs [241] and risks due to position limits.[242]

Commenters also emphasize that conversion of the existing Trust to an ETP structure would be beneficial to its investors. The Sponsor, for example, states that the Trust has grown to become the largest publicly-traded digital asset fund in the world [243] and that approving the Trust to operate as an

ETP traded on a national securities exchange "will provide investors with the additional protections of [the Commission] and [NYSE Arca] while unlocking billions of value for investors." [244] Moreover, according to the Sponsor, converting the Trust into an ETP would allow the Shares to better track the Trust's NAV and reduce discounts and premiums, thereby unlocking approximately $8 billion in value for investors.[245] Similarly, commenters state that the proposal would protect investors and help maintain fair and orderly markets by reducing premium and discount volatility with respect to the Shares, thereby allowing investors to gain access to bitcoin through an ETP structure at trading prices that are more closely aligned with spot bitcoin trading prices.[246] Moreover, other commenters state that approving the proposal and allowing the Trust to convert into an ETP would protect investors by, among other things, lowering fees and providing heightened regulation of the Shares.[247]

Several commenters further state that approval of a spot bitcoin ETP would enhance the liquidity, price discovery, and efficiency of the underlying bitcoin markets.[248] The affiliate of the Custodian states that the introduction of a spot bitcoin ETP with a robust create and redeem arbitrage process can improve the price efficiency of an underlying asset and thus further increase the resilience of bitcoin trading in the spot market.[249] This commenter believes the presence of a spot bitcoin ETP "may bolster and stabilize the broader [b]itcoin derivatives market by encouraging a . . . greater volume of activity and easier arbitrage between the two markets." [250]

Finally, some commenters argue that the proposal should be approved because doing so would enhance investor choice,[251] improve market structure and competition for the benefit of investors,[252] and facilitate capital formation.[253]

T. Fulton, CEO, Elkhorn Consulting, LLC, dated Apr. 27, 2022 ("Elkhorn Letter"), at 2–3; Harvey Letter, at 3; Whaley Letter, at 3–7; Letter from Charles Hwang, Jason Albanese, Jock Percy, General Partners, Lightning Capital, dated Mar. 21, 2022 ("Lightning Capital Letter"), at 2–3; Discovery Letter, at 2 ("a spot [b]itcoin ETP would provide a much better vehicle for investors due to the vast liquidity, lower cost, and transparent Index pricing than the current [f]utures based ETPs"); Kane Letter; Letter from Ryan Wilday, dated Feb. 17, 2022; Letter from Michael Douglas Magee, dated Apr. 19, 2022; Letter from Bryan Kelley, dated May 10, 2022.

[240] See, e.g., Grayscale Letter I, at 13–14 ("Continued disparate treatment of [b]itcoin futures ETPs and spot [b]itcoin ETPs would harm—rather than protect—investors by limiting their choices without a reasoned basis."); Cumberland Letter, at 1–2; Harvey Letter, at 2–3; Lightning Capital Letter, at 1–3; ADAM Letter, at 6; Fortress Letter, at 2; Letter from Justin Valdata, dated Apr. 22, 2022 ("Valdata Letter"). A commenter argues that such disparate treatment may undermine confidence in the Commission and stifle innovation in the bitcoin and securities markets. See Coinbase Letter I, at 4.

[241] See Grayscale Letter I, at 14. The Sponsor states that one analysis showed that over the last year, a bitcoin futures ETP would have lost 28% of its value just on roll costs (effectively, fees and expenses being equal, a spot ETP would have performed around 28% better). See id. (citing Michael J. Casey, Why a Bitcoin Futures ETF is Bad for Investors, CoinDesk (last updated Oct. 22, 2021 at 4:29 p.m.), https://www.coindesk.com/policy/2021/10/22/why-a-bitcoin-futures-etf-is-bad-for-investors/). See also, e.g., Blockchain Association Letter, at 2; Angel Letter I, at 7; Harvey Letter, at 3; Elkhorn Letter, at 2; Fortress Letter, at 1–2; BitGo Letter, at 1–2; Horizon Kinetics Letter, at 1–2.

[242] See Grayscale Letter I, at 14. According to the Sponsor, position limits can cause a bitcoin futures ETP to experience liquidity problems or losses, or have to halt new creations or increase its fixed-income portfolio, thereby introducing tracking error by diluting its exposure to bitcoin. The Sponsor states that, alternatively, the CME may have to raise position limits to accommodate increased demand in the absence of a spot bitcoin ETP alternative, potentially increasing the concentration of economic power of a few large market participants in the bitcoin futures markets and reducing the resiliency of those markets against manipulation. The Sponsor states that "[t]hese risks—that [b]itcoin futures ETPs could be constrained by position limits and that the CME may raise those limits—are not purely speculative; indeed, both have already occurred since the first [b]itcoin futures ETP began trading." Id. See also, e.g., Blockchain Association Letter, at 2 ("Futures ETPs are also subject to additional, unique risks related to position limits, limited liquidity, dilution and other factors.").

[243] See Grayscale Submission, at 2.

[244] Id. at 17.

[245] See id. at 9. The Sponsor states that, because the Shares are not currently listed on a national securities exchange and the Trust is therefore not permitted to operate an ongoing creation and redemption program, arbitrage opportunities resulting from differences between the price of the Shares and the price of bitcoin are not available to keep the price of the Shares closely linked to the Index Price for bitcoin. As a result, the Shares are usually quoted at a premium over, or discount to, the value of the Trust's bitcoin holdings. See Grayscale Letter I, at 5. See also Coinbase Letter I, at 2.

[246] See, e.g., Coinbase Letter I, at 2–3; Virtu Letter, at 2; Angel Letter I, at 7–8; BitGo Letter, at 1; ADAM Letter, at 4–5; Cumberland Letter, at 1; Lightning Capital Letter, at 1–2; Gunderson Letter; Discovery Letter, at 1; Henry Letter; Keiffer Letter; Perez Letter; DiLonardo Letter; Kornfield Letter; Garcia Letter; Johnson Letter; Arrett Letter; Emory Letter, at 2; Letter from Richard Leo, dated Apr. 22, 2022; Letter from Joseph McDevitt, dated Apr. 22, 2022; Letter from Mitchell J. Brodie, dated Apr. 22, 2022; Letter from Steve Axel, dated Feb. 18, 2022; Letter from Brent Zeigler, dated Feb. 19, 2022; Letter from Jonas Lippuner, dated Apr. 21, 2022; Letter from David Lynch, dated Mar. 3, 2022; Letter from David New, dated Feb. 23, 2022; Letter from Roger A. Rector, dated Feb. 22, 2022; Letter from Michael Charles, dated Feb. 19, 2022; Letter from Scott Egon Roge, dated Feb. 15, 2022; Letter from Ozeir Nassery, dated Feb. 11, 2022; Letter from Raj Lakkundi, dated Feb. 11, 2022. The affiliate of the Custodian states that the performance of spot bitcoin ETPs in other countries confirms the ability of a spot bitcoin ETP to appropriately reflect the underlying bitcoin market. See Coinbase Letter II, at 3, 8. See also Virtu Letter, at 2 ("In our experience as a market maker and AP in spot cryptocurrency ETPs in Canada, we have observed the positive impact of these dynamics—as spot cryptocurrency ETP spreads to NAV are compressed to levels observed for non-crypto ETPs.").

[247] See, e.g., Angel Letter I, at 7–8; Horizon Kinetics Letter, at 2–3; Shultz Letter; Johnson Letter; Arrett Letter; Roge Letter; Perez Letter; Letter from Keith Arvidson, dated Apr. 5, 2022; Letter

from Rick Parker, dated Feb. 22, 2022; Letter from Michael J. Sheslow, dated Feb. 22, 2022; Letter from Omid Jafari, dated Feb. 18, 2022; Letter from Richard Payne, dated Feb. 19, 2022; Letter from Sunjeev Konduru, dated Mar. 16, 2022 ("Konduru Letter").

[248] See, e.g., Cammarata Letter, Coinbase Letter I, at 3; Coinbase Letter II, at 7; Fortress Letter, at 3; Harvey Letter, at 5 (stating "financial derivatives, including ETPs, can generally serve to enhance the liquidity and efficiency of the markets for many asset classes and currencies, including bitcoins" and "[i]t is difficult to imagine a scenario in which approval of [the Trust] as a bona fide ETP on the NYSE Arca would not increase the number of market participants, dollar-denominated liquidity, and other competitive forces that would lead to more efficient price discovery than currently exists in a semi-fragmented, global bitcoin spot market that lacks a regulated, centralized trading venue or order book"); Fortress Letter, at 3 (stating that the Trust can serve an important price discovery purpose and that, because of its size, the Trust will create additional liquidity and will allow for greater transparency and efficiency in the bitcoin market); Dreyfuss Letter, at 2 (stating that "increasing the liquidity of [the spot bitcoin] markets would actually reduce the influence of predatory forces by encouraging long term ownership across a broader spectrum of investors").

[249] See Coinbase Letter II, at 3.

[250] Coinbase Letter II, at 7.

[251] See, e.g., Blockchain Association Letter, at 1; Letter from David Noble, Director, The Werth Institute, University of Connecticut, dated Apr. 26, 2022 ("Noble Letter"); Letter from John Shinkunas, dated Apr. 10, 2022; Letter from Karl J. Randall, dated Feb. 28, 2022; Letter from Reginald M. Browne, Principal, GTS Securities, LLC, dated June 10, 2022 ("GTS Letter"), at 2.

[252] See, e.g., BitGo Letter, at 1; Virtu Letter, at 3–4; Groom Letter; Egan Letter; Angel Letter I; Chilson Letter; GTS Letter, at 2.

[253] See, e.g., Harvey Letter, at 5 ("as an ETP on the NYSE Arca, [the Trust] would continue to serve as a liquid, but even more regulated conduit for capital formation within the bitcoin ecosystem"); ADAM Letter, at 5 (stating that approval of the proposal would facilitate the Commission's mission of promoting capital formation); GTS Letter, at 2; Emory Letter, at 1–2 (stating that disapproval of the proposal would be "contrary to the goal of equitable access to means of wealth generation").

## (2) Analysis

The Commission disagrees. Here, even if it were true that, compared to trading in unregulated spot bitcoin markets or OTC bitcoin funds, trading a spot bitcoin-based ETP on a national securities exchange could provide some additional protection to investors, or that the Shares would provide more efficient exposure to bitcoin than other products on the market such as bitcoin futures ETPs, or that approval of a spot bitcoin ETP could enhance competition or strengthen the underlying spot bitcoin and derivatives markets, the Commission must consider this potential benefit in the broader context of whether the proposal meets each of the applicable requirements of the Exchange Act.[254] Pursuant to Section 19(b)(2) of the Exchange Act, the Commission must approve a proposed rule change filed by a national securities exchange if it finds that the proposed rule change is consistent with the applicable requirements of the Exchange Act—including the requirement under Section 6(b)(5) that the rules of a national securities exchange be designed to prevent fraudulent and manipulative acts and practices—and it must disapprove the filing if it does not make such a finding.[255] Thus, even if a proposed rule change purports to protect investors from a particular type of investment risk—such as experiencing a potentially high premium/discount by investing in an OTC bitcoin fund or roll costs by investing in bitcoin futures ETPs—or purports to provide benefits to investors and the public interest—such as enhancing competition and bolstering resiliency in the underlying commodity or futures markets—the proposed rule change may still fail to meet the requirements under the Exchange Act.[256]

For the reasons discussed above, NYSE Arca has not met its burden of demonstrating an adequate basis in the record for the Commission to find that the proposal is consistent with Exchange Act Section 6(b)(5),[257] and,

accordingly, the Commission must disapprove the proposal.[258]

### D. Other Comments

Comment letters also address, among other things, the general nature and uses of bitcoin and blockchain technology;[259] the state of development of bitcoin as an investment asset;[260] beneficial tax consequences of approval of a spot bitcoin ETP;[261] the merits of an investment in bitcoin;[262] the nature and state of the bitcoin mining network;[263] the current failure, and potential promotion of, U.S. competitiveness in the global marketplace relating to bitcoin;[264] suggestions for improving regulation of bitcoin and other digital assets markets and related market participants and criticisms of the current regulatory approach;[265] increasing education relating to, and accessibility of,

bitcoin;[266] the merits of the Sponsor;[267] and specific concerns relating to the Sponsor and its management of the Trust.[268] Ultimately, however, additional discussion of these topics is unnecessary, as they do not bear on the basis for the Commission's decision to disapprove the proposal.

### IV. Conclusion

For the reasons set forth above, the Commission does not find, pursuant to Section 19(b)(2) of the Exchange Act, that the proposed rule change, as modified by Amendment No. 1, is consistent with the requirements of the Exchange Act and the rules and regulations thereunder applicable to a national securities exchange, and in particular, with Section 6(b)(5) of the Exchange Act.

*It is therefore ordered,* pursuant to Section 19(b)(2) of the Exchange Act, that proposed rule change SR–NYSEArca-2021–90, as modified by Amendment No. 1, be, and hereby is, disapproved.

By the Commission.

**Jill M. Peterson,**
*Assistant Secretary.*
[FR Doc. 2022–14310 Filed 7–5–22; 8:45 am]
**BILLING CODE 8011–01–P**

## SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–95174; File No. SR–BOX–2022–19]**

**Self-Regulatory Organizations; BOX Exchange LLC; Notice of Filing of Proposed Rule Change To Amend Article 4 of the Exchange's Bylaws To Establish a Staggered Board**

June 29, 2022.

Pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 (the ''Act''),[1] and Rule 19b–4 thereunder,[2] notice is hereby given that on June 17, 2022, BOX Exchange LLC (the ''Exchange'') filed with the Securities and Exchange Commission (the ''Commission'') the proposed rule change as described in Items I and II below, which Items have been prepared by the self-regulatory organization. The Commission is publishing this notice to

---

[254] *See supra* note 235.

[255] *See* Exchange Act Section 19(b)(2)(C), 15 U.S.C. 78s(b)(2)(C). *See also Affiliated Ute Citizens of Utah* v. *United States,* 406 U.S. 128, 151 (1972) (Congress enacted the Exchange Act largely ''for the purpose of avoiding frauds''); *Gabelli* v. *SEC,* 568 U.S. 442, 451 (2013) (The ''SEC's very purpose'' is to detect and mitigate fraud.).

[256] *See* SolidX Order, 82 FR at 16259; VanEck Order, 86 FR at 54550–51; WisdomTree Order, 86 FR at 69344; Kryptoin Order, 86 FR at 74179; Valkyrie Order, 86 FR at 74163; SkyBridge Order, 87 FR at 3881; Wise Origin Order, 87 FR at 5538; ARK 21Shares Order, 87 FR at 20026–27.

[257] 15 U.S.C. 78f(b)(5).

[258] In disapproving the proposed rule change, the Commission has considered its impact on efficiency, competition, and capital formation. *See* 15 U.S.C. 78c(f). Some commenters state that approval of the proposal would enhance market efficiency and facilitate competition and capital formation. *See supra* notes 248–253 and accompanying text. For the reasons discussed throughout, however (*see supra* notes 56–57), the Commission is disapproving the proposed rule change because it does not find that the proposed rule change is consistent with the Exchange Act. *See also* USBT Order, 85 FR at 12615.

[259] *See, e.g.,* Angel Letter I, at 2–4, Letter from Thomas M. Wynne, dated Apr. 9, 2022 (''Wynne Letter''); Chilson Letter, at 1.

[260] *See, e.g.,* Moffitt Letter I; Letter from Patric Berger, dated Feb. 23, 2022; Letter from Sundeep Bollineni, dated Feb. 22, 2022; Chilson Letter; Letter from James McClave, Jane Street Capital, LLC, dated June 16, 2022.

[261] *See, e.g.,* Chen Letter; Letter from John Berggren, dated Feb. 14, 2022.

[262] *See, e.g.,* Seils Letter; Konduru Letter; Emory Letter.

[263] *See, e.g.,* Letters from David Bush, dated Feb. 22, 2022 (''Bush Letter''); Joseph D. Camp, Ph.D., Professor, Southern Methodist University, dated Feb. 14, 2022.

[264] *See, e.g.,* Elkhorn Letter; Johnson Letter; Valdata Letter; Bush Letter; Letter from Milton W., dated Feb. 23, 2022; Letter from Aaron Fenker, dated Feb. 23, 2022; Letter from Anil Gonania, dated Feb. 18, 2022; Letter from Nirav Trivedi, dated Feb. 11, 2022; Letter from Enrique Rea, Jr., dated Apr. 22, 2022; Chilson Letter, at 3; GTS Letter, at 2; Emory Letter, at 2. The Sponsor states that the U.S. lags global markets with respect to providing bitcoin and other digital asset ETPs and argues that approval of the proposal would support the White House Executive Order on Ensuring Responsible Development of Digital Assets by further bringing bitcoin into the regulatory perimeter. *See* Grayscale Submission, at 11–12. A commenter states that, ''as a global firm, it is concerning to observe the U.S. lagging far behind such foreign capital market competitors in offering regulated products for an emerging technology like Blockchain.'' Fortress Letter, at 3.

[265] *See, e.g.,* Angel Letter I, at 9–40; ADAM Letter, at 5; Dreyfuss Letter; Kane Letter; Boyer Letter; Letter from James J. Angel, Associate Professor of Finance, Georgetown University, dated May 6, 2022 (''Angel Letter II''); Chilson Letter, at 1–2.

[266] *See, e.g.,* Noble Letter; Letter from Julian Rogers, dated Apr. 7, 2022.

[267] *See, e.g.,* Wynne Letter; Henry Letter.

[268] *See, e.g.,* Letter from David B. Hennes, Ropes & Gray LLP, dated March 3, 2022 (expressing concern, on behalf of an unnamed ''interested investor,'' about the Sponsor's potential windfall if the Trust were to be allowed to convert to an ETP); Kleinfelder Letter.

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of August, 2022, I caused copies of the
foregoing document to be served on counsel for all parties of record via the
Electronic Case Filing (ECF) service.

Dated: August 1, 2022                    */s/ Donald B. Verrilli, Jr.*

Donald B. Verrilli, Jr.
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001-5369
Telephone: (202) 220-1100
Email: Donald.Verrilli@mto.com