**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

### No. 22-1142

GRAYSCALE INVESTMENTS, LLC,

*Petitioner,*

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

*On Petition for Review of a Final Order of the
United States Securities and Exchange Commission*

**BRIEF FOR *AMICI CURIAE*, BY CONSENT, OF THE BLOCKCHAIN ASSOCIATION, THE CHAMBER OF DIGITAL COMMERCE, CHAMBER OF PROGRESS AND COIN CENTER IN SUPPORT OF PETITIONER AND REVERSAL**

JONATHAN COOPER
MICHAEL LIFTIK
KURT WOLFE
RACHEL FRANK
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000
jonathancooper@quinnemanuel.com
michaelliftik@quinnemanuel.com
kurtwolfe@quinnemanuel.com
rachelfrank@quinnemanuel.com

*Counsel for Amici Curiae*

October 18, 2022

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and *Amici Curiae*

To counsel's knowledge, except for the *amici curiae* identified in this section, all parties and intervenors appearing before this Court are listed in the Certificate as to Parties, Rulings, and Related Cases filed by Petitioner on August 1, 2022.  The *amici* represented in this brief are the Blockchain Association, the Chamber of Digital Commerce, Chamber of Progress, and Coin Center.

Counsel understands that the following *amici* also intend to submit briefs in support of the Petitioner:  Coinbase Global, Inc. ("Coinbase"), the New York Stock Exchange ("NYSE"), the U.S. Chamber of Commerce, and certain former regulators and academics.

### B.    Ruling Under Review

Petitioner seeks review of the Securities and Exchange Commission's Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to List and Trade Shares of Grayscale Bitcoin Trust Under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares), Release No. 34-95180 (June 29, 2022), 87 Fed. Reg. 40299 (July 6, 2022) (File No. SR-NYSEArca-2021-90).

### C.    Related Cases

Counsel is unaware of any related cases before this Court or any other Court.

### D.    Consent from all Parties

i

In accordance with Federal Rule of Appellate Procedure 29(a)(2) and D.C. Circuit Rule 29(b), undersigned counsel for the *amici curiae* certifies to this Court that counsel for all parties have consented to the filing of this brief.

### E.     Statement Regarding Separate Briefing

Under D.C. Circuit Rule 29(d), *amici* the Blockchain Association, the Chamber of Digital Commerce, Chamber of Progress, and Coin Center state that they are aware of other planned *amicus* briefs in support of Petitioner.  The filing of a separate brief is nonetheless necessary because none of the other *amicus* briefs will set forth the unique business and policy perspectives of the *amici*.

The Blockchain Association is a member organization dedicated to improving the public policy environment for public blockchain networks.  It endeavors to educate policymakers, courts, law enforcement, and the public about blockchain technology and the need for regulatory clarity to allow for a more secure, competitive, and innovative digital marketplace.

The Chamber of Digital Commerce is a member organization that promotes the acceptance and use of digital assets and blockchain-based technologies.  The Chamber works closely with policymakers, regulatory agencies, and the industry to develop an environment that fosters innovation, jobs, and investment.

Chamber of Progress is a new technology industry coalition devoted to a progressive society, economy, workforce, and consumer climate.  Its economic

policy initiatives include working with policymakers to enact a framework for digital assets regulation that values competition, consumer protections, innovation, and environmentally responsible practices.

Coin Center is a leading non-profit research and advocacy center focused on public policy issues facing cryptocurrency and decentralized computing technologies like Bitcoin and Ethereum. Coin Center produces and publishes policy research, educates policymakers and the media about cryptocurrencies, advocates for sound public policy, and engages in litigation to defend digital civil liberties.

As industry representatives focused on regulation, policy, education, and advocacy, the *amici curiae* offer unique and important perspectives that others who intend to submit *amicus* briefs in this case cannot provide.

**F.    Rule 29(a)(4)(E) Statement**

Under Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* states that no counsel for a party authored this brief in whole or in part. No party, counsel for a party, or any person other than *amici* and their counsel made a monetary contribution to fund the brief's preparation or submission.

Dated: October 18, 2022                           */s/ Jonathan Cooper*
                                                   Jonathan Cooper
                                                   Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, *amici curiae* are all nonprofit organizations whose missions involve improving the public policy environment for digital assets and blockchain-based technologies in the United States.  No party to this filing has a parent corporation, and no publicly held corporation owns 10% or more of the stock of any of the parties to this filing.

Dated: October 18, 2022

/s/ *Jonathan Cooper*
Jonathan Cooper
Counsel for *Amici Curiae*

# **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ........................................iv

GLOSSARY................................................................x

INTEREST OF AMICI CURIAE...............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT ..............................................................3

I.    APPROVING A SPOT BITCOIN ETP RECOGNIZES CONSUMER DEMAND AND FURTHERS THE SEC'S INVESTOR PROTECTION MANDATE ...........................................3

    A.    There is Considerable Consumer Demand in the United States for Exposure to Bitcoin; Bitcoin ETPs Provide Safe, Transparent Choices for Investors........................................5

    B.    Exchange-Traded Products are Suitable Vehicles for U.S. Investors to Access Alternative Asset Classes.....................................9

    C.    Spot Bitcoin ETPs are Suitable for More Investors than Existing Bitcoin Futures ETPs. ...........................................11

II.    THE SEC HAS INAPPROPRIATELY APPLIED A DOUBLE STANDARD IN UNIVERSALLY DISAPPROVING PROPOSALS TO LIST SPOT BITCOIN ETPS. ....................................16

    A.    There is no Basis in Law or in Fact to Discriminate Between Bitcoin Futures and Spot Bitcoin ETPs. ...........................................17

    B.    Disapproving Spot Bitcoin ETPs is Inconsistent with the Commission's Approval of Other ETPs. ...........................................22

    C.    The SEC Must Treat Like Cases Alike. ...........................................26

III.    CONCLUSION...............................................29

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

## Cases

*Kirk v. Comm'r SSA*,
    987 F.3d 314 (4th Cir. 2021) ...............................................................26

*Rapoport v. SEC*,
    682 F.3d 98 (D.C. Cir. 2012) ...............................................................27

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)...............................................................................27

*Westar Energy, Inc. v. Fed. Energy Reg. Comm'n*,
    473 F.3d 1239 (D.C. Cir. 2007).................................................... 17, 27

## Administrative Orders

Order Disapproving a Proposed Rule Change, as Modified by Amendment
    No. 1, to List and Trade Shares of Grayscale Bitcoin Trust Under NYSE
    Arca Rule 8.201-E (Commodity-Based Trust Shares), Release No. 34-
    95180 (June 29, 2022), 87 Fed. Reg. 40299 (July 6, 2022) (File No. SR-
    NYSEArca-2021-90) ......................................................................... i, 2

Order Disapproving a Proposed Rule Change to List and Trade Shares of
    the Bitwise Bitcoin ETP Trust, 87 Fed. Reg. 40,282 (July 6, 2022) (SR-
    NYSEArca-2021-89). .......................................................................28

Order Disapproving a Proposed Rule Change To List and Trade the Shares
    of the GraniteShares Bitcoin ETF and the GraniteShares Short Bitcoin
    ETF, 83 Fed. Reg. 43,923 (Aug. 28, 2018) (SR-CboeBZX-2018-001)..............28

Order Disapproving a Proposed Rule Change to List and Trade Shares of
    the Valkyrie Bitcoin Fund, 86 Fed. Reg. 74,156 (Dec. 29, 2021) (SR–
    NYSEArca–2021–31) .......................................................................28

Order Disapproving a Proposed Rule Change to List and Trade Shares of
    the VanEck Bitcoin Trust, 86 Fed. Reg. 64,539 (Nov. 18, 2021) (SR-
    CboeBZX-2021-019) .......................................................................18

Order Disapproving a Proposed Rule Change to List and Trade Shares of the WisdomTree Bitcoin Trust, 86 Fed. Reg. 69,322 (Dec. 7, 2021), (SR-CboeBZX-2021-024) ...................................................................................28

Order Granting Approval of a Proposed Rule Change, as Modified by Amendment No. 2, to List and Trade Shares of the Teucrium Bitcoin Futures, 87 Fed. Reg. 21,676 (April 12, 2022) (SR-NYSEArca-2021-53) ........18

Order Granting Approval of a Proposed Rule Change, as Modified by Amendment Nos. 1 and 2, to List and Trade Shares of the Valkyrie XBTO Bitcoin Futures Fund, 87 Fed. Reg. 28,848 (May 11, 2022) (SR-NASDAQ-2021-066) ...................................................................................22

Order Granting Approval of Proposed Rule Change Relating to Listing and Trading Shares of the ETPS Palladium Trust, Release No. 34-61,220 (Dec. 22, 2009) .......................................................................................23

Order Setting Aside Action by Delegated Authority and Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, To List and Trade Shares of the Winklevoss Bitcoin Trust, 83 Fed. Reg. 37,579 (Aug. 1, 2018) (SR-BatsBZX-2016-30) .................................................27

## Additional Authorities

ADAM, *ADAM Treasury RFC Response: Digital Asset Adoption, Opportunities, and Risks* (Aug. 8, 2022), https://www.theadam.io/adam-treasury-rfc-digital-asset-adoption-opportunities-and-risks/ .............................10

Andrew Perrin, *16% of Americans Say They Have Ever Invested In, Traded or Used Cryptocurrency*, Pew Res. Ctr. (Nov. 11, 2021), https://www.pewresearch.org/fact-tank/2021/11/11/16-of-americans-say-they-have-ever-invested-in-traded-or-used-cryptocurrency ................................7

Antony Lewis, *The Basics of Bitcoins and Blockchains: An Introduction to Cryptocurrencies and the Technology that Powers Them* 17 (2018) ...................6

Campbell & Company, *Deconstructing Futures Returns: The Role of Roll Yield* (Feb. 2014), https://www.cmegroup.com/education/files/deconstructing-futures-returns-the-role-of-roll-yield.pdf .......................................................................15

Chamber of Digital Commerce, *The Crypto Conundrum: Why Won't the SEC Approve a Bitcoin ETF?* (Sept. 12, 2022), https://www.digitalchamber.org/crypto-conundrum/ .........................................16

Dissenting Statement of Hester M. Peirce in Response to Release No. 34-88,284; File No. SR-NYSEArca-2019-39 (Feb. 26, 2020), https://www.sec.gov/news/public-statement/peirce-dissenting-statement-34-88284. ...................................................................................................20

Exec. Order 14,067, 87 Fed. Reg. 40,881 (March 9, 2022) ......................................7

*Grayscale Investments, LLC, Re: File No. SR-NYSEArca-*, https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-9410842-262990.pdf (Nov. 29, 2021) ................................................................26

Grayscale Investments Study Reveals More than a Quarter of U.S. Investors Currently Own Bitcoin, GlobeNewswire (Dec. 6, 2021, 8:00 AM), https://www.globenewswire.com/news-release/2021/12/06/2346525/0/en/Grayscale-Investments-Study-Reveals-More-than-a-Quarter-of-U-S-InvestorsCurrently-Own-Bitcoin.html. ..................7

Jay Clayton, Chairman, SEC, Dalia Blass, Director, Division of Inv. Mgmt., William Hinman, Director, Div. of Corp. Fin., and Brett Redfearn, Director, Div, of Trading and Markets, Joint Statement Regarding Complex Financial Products and Retail Investors (Oct. 28, 2020), https://www.sec.gov/news/public-statement/clayton-blass-hinman-redfearn-complex-financial-products-2020-10-28. ...............................................25

Letter from Davis Polk & Wardwell LLP, on behalf of Grayscale Investments, LLC, Re: File No. SR-NYSEArca-2021-90 (Nov. 29, 2021), https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-9410842-262990.pdf.......................................................................................26

Letter from Robert Baldwin, Head of Policy, Ass'n for Digital Asset Markets, to Dan Harty, Director, Off. of Capital Markets, U.S. Dep't Treas. (Aug. 8, 2022), https://www.theadam.io/adam-treasury-rfc-digital-asset-adoption-opportunities-and-risks/...............................................................12

Letter from W. Graham Harper, Head of Pub. Pol. & Market Structure, DRW, to Vanessa A. Countryman, Sec'y, U.S. Sec. & Exch. Comm. (April 1, 2022), https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-20122309-278362.pdf .......................................................14

Michael J. Casey, *Opinion: Why a Bitcoin Futures ETF Is Bad for Investors*, Coindesk (Oct. 22, 2021), https://www.coindesk.com/policy/2021/10/22/why-a-Bitcoin-futures-etf-is-bad-for-investors/................................................................................14

Michael Wursthorn, *Another Bitcoin Futures ETF Bites the Dust, Wall St. J.*, https://www.wsj (Nov. 11, 2021), https://www.wsj.com/articles/another-Bitcoin-futures-etf-bites-the-dust-11636663692 ..................................................14

MobileCoin XandY Study, How U.S. Adults Perceive Cryptocurrency (2022), https://mobilecoinwp.wpengine.com/wp-content/uploads/2022/03/How-U.S.-Adults-Perceive-Cryptocurrency_MobileCoin-XY-Study-2022-1.pdf ..........................................3

ProShares, *ProShares to Launch the First U.S. Short Bitcoin-Linked ETF on June 21*, (June 20, 2022), https://www.proshares.com/press-releases/proshares-to-launch-the-first-u.s.-short-Bitcoin-linked-etf-on-june-21/. ......................................................................................................25

Request for Comment on Exchange-Traded Products, Exchange Act Release No. 34-75,165, 80 Fed. Reg. 34,729 (June 12, 2015), https://www.sec.gov/rules/other/2015/34-75165.pdf. ...........................9

Sam Bouri, *Crypto funds attracted $9.3 billion in inflows in 2021 as institutional adoption grew*, Cointelegraph (Jan. 4, 2022), https://cointelegraph.com/news/crypto-funds-attracted-9-3b-in-inflows-in-2021-as-institutional-adoption-grew ..............................................7

Scott Reeves, *46 Million Americans Now Own Bitcoin, as Crypto Goes Mainstream, Newsweek* (May 11, 2021), https://www.newsweek.com/46-million-americans-now-own-Bitcoin-crypto-goes-mainstream-1590639 ............7

Statista, *Total net asset under management (AUM) of Exchange Traded Funds (ETFs) in the United States from 2002 to 2021*, https://www.statista.com/statistics/295632/etf-us-net-assets/ ..............................9

Tom Lombardi (@tomlombardi), Twitter (June 30, 2022), https://twitter.com/tomlombardi/status/1542667295314522112.........................23

## GLOSSARY

| | |
|---|---|
| **CFTC** | Commodity Futures Trading Commission |
| **CME** | Chicago Mercantile Exchange |
| **Commission** | The U.S. Securities and Exchange Commission |
| **ETF** | Exchange-Traded Fund |
| **ETP** | Exchange-Traded Product |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **Grayscale Order** | 87 Fed. Reg. 40299 (July 6, 2022) |
| **Grayscale Trust** | Grayscale Bitcoin Trust |
| **Investment Company Act** | Investment Company Act of 1940 |
| **NYSE** | New York Stock Exchange |
| **OTC** | Over-the-counter |
| **SEC** | The U.S. Securities and Exchange Commission |
| **Securities Act** | Securities Act of 1933 |
| **TSX** | Toronto Stock Exchange |

## INTEREST OF AMICI CURIAE

*Amici curiae*, the Blockchain Association, the Chamber of Digital Commerce, Chamber of Progress, and Coin Center, are non-profit memberships organizations dedicated to improving the public policy environment for digital assets and blockchain-based technologies in the United States. The *amici* advocate for a dynamic, broad, and diverse set of actors in the digital asset and blockchain ecosystem that include digital asset exchanges and custodians, open-source software developers, trading firms, investors, asset managers, and others supporting the entire ecosystem. This matter implicates critical regulatory and policy issues that may have wide-ranging implications for the digital assets and blockchain ecosystem. Thus, *amici curiae* have particular interests in elucidating areas where there is considerable need for greater regulatory clarity or consistency.

## INTRODUCTION AND SUMMARY OF ARGUMENT

At issue in this matter is a proposal to list and trade on a national securities exchange an exchange-traded product ("ETP"), the Grayscale Bitcoin Trust (the "Grayscale Trust"), which tracks movements in the price of an underlying commodity—Bitcoin.[1] To date, the U.S. Securities and Exchange Commission (the "Commission" or "SEC") has categorically denied every proposal to list an ETP

---

[1] Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to List and Trade Shares of Grayscale Bitcoin Trust, 87 Fed. Reg. 40299 (July 6, 2022) (SR-NYSEArca-2021-90) (the "Grayscale Order").

that seeks to track the "spot price" of Bitcoin, despite recently approving several Bitcoin "futures" ETPs.  The Commission's "thumb on the scale" approach to Bitcoin ETPs does not withstand scrutiny.[2]  Bitcoin spot ETPs like the Grayscale Trust are ideally suited for investors that desire exposure to Bitcoin; the Commission has allowed similar, and riskier, products to enter the market; and spot Bitcoin ETPs plainly satisfy regulatory requirements for listing on a national securities exchange, just like Bitcoin future ETPs do.

Both spot and future ETPs, whether tied to Bitcoin or other commodities like gold, platinum, or palladium, create the same investment exposure for investors: both products are designed to track the price of the underlying commodity, Bitcoin. However, instead of actually buying Bitcoin, future ETPs replicate the value of Bitcoin by building a portfolio of futures, forwards, and swap contracts; in contrast, spot ETPs acquire and hold Bitcoin directly.

In the face of these similarities, and considering certain advantages spot Bitcoin ETPs have over Bitcoin futures ETPs, the Commission's refusal to approve a spot Bitcoin ETP unjustifiably limits investor choice.  In so doing, the Commission has abandoned its investor protection mandate, and it has abused its discretion, by

---

[2] *See* Brief of Petitioner at 2 ("[T]he Commission has treated them as categorically different—a result that violates the bedrock requirements of the Administrative Procedure Act ('APA') as well as the express statutory command that a national securities exchange's rules not discriminate among securities issuers.").

engaging in an arbitrary and capricious practice of picking winners and losers among investment products.

## ARGUMENT

### I.   APPROVING A SPOT BITCOIN ETP RECOGNIZES CONSUMER DEMAND AND FURTHERS THE SEC'S INVESTOR PROTECTION MANDATE.

Investor protection is at the heart of the SEC's mission. Protecting investors involves preserving access and choice for American investors. To that end, the Commission must ensure that investors have freedom to choose products or strategies that are best suited to their investing goals, and information necessary to make well-informed investment decisions.

Americans have demonstrated enormous interest in owning Bitcoin or investing in products or strategies that offer exposure to Bitcoin.[3] Yet, the Commission has unreasonably curtailed investors' ability to access spot Bitcoin ETPs: products that are demonstrably safer and easier to understand than available Bitcoin futures ETPs. While there surely are times when it is appropriate for the Commission to restrict Americans' access to certain investment products, the

---

[3] *See, e.g.*, MobileCoin XandY Study, How U.S. Adults Perceive Cryptocurrency (2022), https://mobilecoinwp.wpengine.com/wp-content/uploads/2022/03/How-U.S.-Adults-Perceive-Cryptocurrency_MobileCoin-XY-Study-2022-1.pdf ("[B]etween 100 and 130 million Americans will seek to buy cryptocurrency in the future. Americans who have already owned crypto appear to be happy with this decision, since 78% say they are likely to purchase more in the future").

3

proposal to list the Grayscale Trust does not present such an occasion. The Commission's refusal to approve the Grayscale Trust—and, indeed, *any* spot Bitcoin ETP—runs contrary to its mission.

There are, of course, alternative options for consumers to acquire or invest in Bitcoin, such as purchasing Bitcoin on a digital asset exchange or participating in a private placement, but these methods are not well-suited to every investor. Many would prefer not to register new accounts with digital asset exchanges; they would prefer to invest through SEC-registered brokerages or advisers whom they trust, or with funds from retirement accounts that cannot acquire digital assets directly. Many are also not allowed to participate in private placements due to Commission regulations that, among other things, restrict such opportunities to "accredited investors" who have seven figures in net worth. And while the SEC has allowed the listing and trading of ETPs that hold Bitcoin futures contracts, many Americans may prefer the lower cost and risk profile spot Bitcoin ETPs offer.

Approving a spot Bitcoin ETP offers investors a simple, safe, and inexpensive option by bringing to the market a highly regulated product that trades on SEC-regulated exchanges and is subject to SEC oversight. Thus, approving a spot Bitcoin ETP advances the important goal of increasing investor choice, while ensuring that retail investors benefit from the risk disclosures and investor protections that SEC-registered products provide. Indeed, approving a spot Bitcoin ETP is the best way

4

to protect and serve the interests of these American investors.  Moreover, there is no basis for the Commission to continually deny American investors access to spot Bitcoin ETPs—particularly here, where the Grayscale Trust clearly satisfies the Commission's standards and is demonstrably less risky than a wide range of Commission-approved products on the market.

### a. There is Considerable Consumer Demand in the United States for Exposure to Bitcoin; Bitcoin ETPs Provide Safe, Transparent Choices for Investors.

Bitcoin is the oldest and best-known "cryptocurrency."[4]  Bitcoins are digital assets created via a decentralized, open-source protocol;[5] they have no issuer and they are not backed by any person, company, or government.  "Like physical gold, cryptocurrencies simply exist, and are created or destroyed according to the rules articulated in the code that creates and governs them."[6]

---

[4] Cryptocurrencies may also be referred to as "digital currencies," "virtual currencies," "coins," "tokens," or "digital assets."  For consistency, herein we refer to "digital assets."

[5] "Decentralization," in the context of the Bitcoin blockchain, means copies of the digital ledger that records Bitcoin transactions that are stored on a distributed network of computers rather than stored by one centralized party; no single party has control over the ledger (like a bank might in other contexts).

"Open-source protocol" refers to publicly available software, built from code, that functions as a set of rules "that define and characterize Bitcoin itself."  It determines what constitutes a valid transaction and how transactions are recorded.  Antony Lewis, *The Basics of Bitcoins and Blockchains: An Introduction to Cryptocurrencies and the Technology that Powers Them* 17 (2018).

[6] *Id*. at 14.

One purpose of digital assets like Bitcoin is to facilitate the operation of electronic payment systems that allow for secure peer-to-peer transactions without reliance on financial intermediaries. These peer-to-peer transactions are recorded on a digital ledger, or "blockchain," that is continually updated and verified by a distributed network of computers (called "nodes"). The blockchain may be compared to a bank ledger that logs customers' transactions, and it may be helpful to envisage every "page" in the bank ledger as a "block" in the blockchain. Each block reflects a number of transactions and must be verified before another block is added to the chain.

The blockchain, therefore, depends on the continual creation and validation of new "blocks" of transactions. To incentivize participants to create and validate blocks on the Bitcoin blockchain (known colloquially as "mining"), the Bitcoin protocol provides "block rewards" to "miners" that create new verified blocks of transactions. The "reward" is a prescribed number or fraction of Bitcoins, which may be held, sold, traded, or used as the "native currency" on the Bitcoin blockchain.

Demand for Bitcoin and other digital assets is on the rise in the United States.[7] As of March 2021, 46 million Americans reported owning at least a fraction of a

---

[7] The Pew Research Center found in 2021 that 16% of Americans already use cryptocurrencies, including 31% of Americans between the ages of 18 to 29. *See* Andrew Perrin, *16% of Americans Say They Have Ever Invested In, Traded or Used Cryptocurrency*, Pew Res. Ctr. (Nov. 11, 2021), https://www.pewresearch.org/fact-tank/2021/11/11/16-of-americans-say-they-have-ever-invested-in-traded-or-used-

Bitcoin.[8]  In 2021 alone, investors allocated $9.3 billion to investment products that offer exposure to digital assets—$6.3 billion (68%) of which went into Bitcoin-oriented funds.[9]  As of December 2021, most consumers who owned or invested in Bitcoin-related products had acquired those positions over the past 12 months.[10] Thus, there is little doubt that U.S. consumers increasingly want access to Bitcoin.

There are several ways a consumer might acquire, or gain exposure to, Bitcoin.  A consumer might purchase Bitcoin through a digital asset exchange.  In that case, retail consumers must open new accounts and establish new relationships with firms that offer and sell digital assets, disclosing sensitive personal information that could be compromised in a data breach, and making choices regarding how to hold custody of the assets.  Alternatively, investors may gain indirect exposure to

---

cryptocurrency.  According to The White House, approximately 16% of adult Americans have invested-in, traded, or used cryptocurrencies.  *See* Exec. Order 14,067, 87 Fed. Reg. 40,881 (March 9, 2022).

[8]  Scott Reeves, *46 Million Americans Now Own Bitcoin, as Crypto Goes Mainstream*, Newsweek (May 11, 2021), https://www.newsweek.com/46-million-americans-now-own-Bitcoin-crypto-goes-mainstream-1590639.

[9]  Sam Bouri, *Crypto funds attracted $9.3 billion in inflows in 2021 as institutional adoption grew*, Cointelegraph (Jan. 4, 2022), https://cointelegraph.com/news/crypto-funds-attracted-9-3b-in-inflows-in-2021-as-institutional-adoption-grew.

[10]  Grayscale Investments Study Reveals More than a Quarter of U.S. Investors Currently Own Bitcoin, GlobeNewswire (Dec. 6, 2021, 8:00 AM), https://www.globenewswire.com/news-release/2021/12/06/2346525/0/en/Grayscale-Investments-Study-Reveals-More-than-a-Quarter-of-U-S-InvestorsCurrently-Own-Bitcoin.html.

Bitcoin by investing in a trust that trades on an over-the-counter ("OTC") marketplace that is not registered with the Commission.

Investors also may purchase shares in a narrow band of Commission-approved Bitcoin futures ETPs that, for reasons explained below, may be widely unsuitable for retail investors.[11]   Still, investing in an ETP that tracks the performance of Bitcoin is the most appealing option to many retail investors.  Some cannot afford to acquire Bitcoin itself; some find the structure and risks of ETPs easier to understand; some appreciate the familiarity of SEC-regulated products; and others simply prefer to invest through existing brokerage accounts rather than establish a new relationship with a platform that specializes in the sale of digital assets.

### b. Exchange-Traded Products are Suitable Vehicles for U.S. Investors to Access Alternative Asset Classes.

Exchange-Traded Products are publicly traded, SEC-registered investment vehicles that offer investors a way to pool their money in funds that provide exposure to various financial instruments, benchmarks, or strategies.  ETPs trade on national securities exchanges that are regulated by the Commission under the Securities

---

[11] High-net-worth and other so-called "accredited investors" may also participate in exclusive offerings from venture capital and private equity firms, but these opportunities are not available to most retail investors.

Exchange Act of 1934 ("Exchange Act").[12]  Since the first Commission-approved ETP—the SPDR S&P 500 ETF—began trading in 1993, there has been enormous growth in the number and total market capitalization of ETPs.  ETPs are now widely available to retail investors.[13]  Indeed, as of December 31, 2021, the U.S. ETP market had grown to nearly $7.2 trillion.[14]

There has also been significant expansion in the range of investment strategies that ETPs pursue.  These strategies have expanded from traditional exchange-traded funds ("ETFs") that track equity indices, like the S&P 500 or the Russell 1000, to include:  (i) passive ETPs that seek to track the performance of the equities market or a market segment by mirroring the holdings of a designated index; (ii) actively managed ETPs that hold bespoke portfolios of securities, commodities, currencies, futures, options, or other derivatives; (iii) complex ETPs that provide leveraged, inverse, or inverse-leveraged exposure to a benchmark or index; and (iv) ETPs that employ market volatility, hedging, or options-based strategies.[15]

---

[12]  Request for Comment on Exchange-Traded Products, Exchange Act Release No. 34-75,165, 80 Fed. Reg. 34,729 (June 12, 2015) (hereinafter, "Request for Comment on ETPs"), https://www.sec.gov/rules/other/2015/34-75165.pdf.

[13]  *Id.*

[14]  Statista, *Total net asset under management (AUM) of Exchange Traded Funds (ETFs) in the United States from 2002 to 2021*, https://www.statista.com/statistics/295632/etf-us-net-assets/.

[15]  ADAM, *ADAM Treasury RFC Response: Digital Asset Adoption, Opportunities, and Risks* (Aug. 8, 2022), https://www.theadam.io/adam-treasury-rfc-digital-asset-adoption-opportunities-and-risks/.

ETPs may be registered under the Investment Company Act of 1940 (the "Investment Company Act") or the Securities Act of 1933 (the "Securities Act"). Funds registered under the Investment Company Act employ a range of investment objectives and strategies, while ETPs registered under the Securities Act tend to hold commodities (like gold, platinum, or palladium), currencies, or a portfolio of futures contracts or other derivatives. The Investment Company Act and Securities Act impose different procedures for listing and trading ETPs on a U.S. exchange. But, before an ETP registered under either act may be listed and traded on a national securities exchange, the issuer must comply with, or obtain exemptions from, certain provisions of the federal securities laws. In the case of products registered under the Securities Act, the Commission must approve the product before it may list and trade on a national securities exchange.

The unique structure of ETPs significantly enhances accessibility, security, transparency, and liquidity—all significant features from an investor protection perspective. ETPs allow retail investors to gain cost-effective exposure to both traditional assets like stocks and bonds, and hard assets like gold and platinum, without having to acquire the underlying asset (*e.g.*, a bar of gold). Thus, ETPs make an array of investment options accessible to retail investors through their existing broker.

### c. Spot Bitcoin ETPs are Suitable for More Investors than Existing Bitcoin Futures ETPs.

10

Since August 2021, the Commission has permitted several ETPs that track Bitcoin futures prices to list and trade shares on national securities exchanges. These include ETPs registered under both the Investment Company Act and, recently, Bitcoin futures ETPs registered under the Securities Act. The Commission has, however, categorically denied proposals to make available to U.S. investors *spot* Bitcoin ETPs registered under the Securities Act.

By approving only Bitcoin futures ETPs, the Commission has imprudently limited investors' choice to a narrow band of investment products. This curtailment of investor choice is not in step with investor demand and, regrettably, is driving U.S. investors to trading venues outside the Commission's regulatory purview, including to offshore markets where a wider variety of Bitcoin products are available. Indeed, spot Bitcoin ETPs have been approved in Australia, Brazil, Canada, Dubai, Germany, and Switzerland,[16] and estimates hold that roughly 90% of trading in digital assets markets now takes place outside the U.S.—without the benefits and safeguards of ETPs subject to SEC oversight.[17]

---

[16] When the first Bitcoin ETP began trading on the Toronto Stock Exchange ("TSX"), the reception was immediate. Within one month, $1 billion flowed into the ETP. Similar ETPs later listed on the TSX, including a Fidelity Investments ETP, which listed after the Commission denied its application to list a spot Bitcoin ETP in the U.S.

[17] *See* Letter from Robert Baldwin, Head of Policy, Ass'n for Digital Asset Markets, to Dan Harty, Director, Off. of Capital Markets, U.S. Dep't Treas. (Aug. 8, 2022), https://www.theadam.io/adam-treasury-rfc-digital-asset-adoption-opportunities-and-risks/.

At the same time, investors who prefer to invest in SEC-registered funds must choose from a limited pool of similar Bitcoin futures products, all of which may be unsuitable for retail investors. Bitcoin futures ETPs involve complex investing strategies, they are riskier and more susceptible to performance erosion than spot Bitcoin ETPs, and they are more expensive than spot-oriented products.[18]

Bitcoin futures ETPs are more difficult for an average retail investor to understand than spot Bitcoin ETPs. In the case of a spot Bitcoin ETP, the fund actually owns Bitcoin, and the value of the fund derives from the price at which Bitcoin trades. In that respect, a spot Bitcoin ETP functions like existing currency ETPs that track single currencies or commodity ETFs that hold a precious metal. This is conceptually simple: investors purchase shares in a "fund" that owns Bitcoin, and the value of their shares in the fund functionally track the price of Bitcoin.

A Bitcoin futures ETP, on the other hand, is far more complex. A Bitcoin futures ETP owns futures contracts, which are agreements to buy or sell Bitcoin at a predetermined price at a specified time in the future. Generally, Bitcoin futures ETPs acquire short-term (*e.g.*, one month) Bitcoin futures contracts that trade on the Chicago Mercantile Exchange ("CME"). As these contracts near expiration, the

---

[18] Bitcoin futures ETPs are undoubtedly suitable for certain investors and may be preferable to purchasing Bitcoin directly. In this section, however, we explain that spot Bitcoin ETPs have several advantages over Bitcoin futures ETPs and, therefore, the Commission should not arbitrarily limit investor choice to a single class of investment products.

Bitcoin futures ETP sells the contracts and repurchases new, longer-dated contracts. This process of continually buying and selling futures contracts is called "rolling" the contracts. This strategy of rolling futures contracts is more complex, and more expensive, than a simple strategy of buying and holding Bitcoin.

In addition to the inherent complexity of Bitcoin futures ETPs, these products have other characteristics that may make them unsuitable for many retail investors. Bitcoin futures ETPs are generally riskier investments than spot Bitcoin ETPs. They are inherently speculative investment vehicles that, essentially, bet on the future price of Bitcoin. Because futures ETPs do not own the underlying asset that the products seek to track, they add market and counterparty risk and cannot offer the same stability as asset-backed ETPs. As a result, an investor who purchases shares in a futures ETP might see the value of Bitcoin increase after their purchase and nonetheless lose money on their investment due to unrelated—and perhaps unexpected—changes in the value of Bitcoin futures contracts.

Further, Bitcoin futures ETPs suffer performance erosion that spot Bitcoin products do not. The price of shorter-term futures contracts is generally lower than that of longer-term contracts—meaning every time a Bitcoin futures ETP rolls its contracts, it must sell low and (re)buy high. This pricing inefficiency erodes the

fund's performance by 5-10% per year.[19]  In fact, the two most liquid CME futures-based Bitcoin ETPs, on average, pay a premium of 8.4% over the spot price of Bitcoin.  The premium, at times, exceeds 25%.[20]  A spot Bitcoin ETP would not suffer from performance erosion because it actually holds Bitcoin and does not need to "roll" its holdings.

These inefficiencies are not unique to Bitcoin ETPs.  Typically, a futures-based gold ETP, for instance, would underperform a spot-based gold ETP over time.[21]  These performance issues are known to the market and the Commission and may count among the reasons that, in other contexts, the Commission allows American investors to choose among both futures- and spot-based ETPs.  The same should hold true with respect to Bitcoin.

---

[19] Michael Wursthorn, *Another Bitcoin Futures ETF Bites the Dust*, Wall St. J. (Nov. 11, 2021), https://www.wsj.com/articles/another-Bitcoin-futures-etf-bites-the-dust-11636663692; *see also* Michael J. Casey, *Opinion: Why a Bitcoin Futures ETF Is Bad for Investors*, Coindesk (Oct. 22, 2021), https://www.coindesk.com/policy/2021/10/22/why-a-Bitcoin-futures-etf-is-bad-for-investors/.

[20] Letter from W. Graham Harper, Head of Pub. Pol. & Market Structure, DRW, to Vanessa A. Countryman, Sec'y, U.S. Sec. & Exch. Comm. (April 1, 2022), https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-20122309-278362.pdf.

[21] Campbell & Company, *Deconstructing Futures Returns: The Role of Roll Yield* (Feb. 2014), https://www.cmegroup.com/education/files/deconstructing-futures-returns-the-role-of-roll-yield.pdf ("Futures and spot returns on the same underlying asset often diverge, and the magnitude of this divergence is known as the futures 'roll yield.'").

In addition to the complexity, risk profile, and performance issues that plague Bitcoin futures ETPs, there are several practical factors that recommend spot Bitcoin ETPs over futures-based products.  First, if the Commission approved a spot Bitcoin ETP, it would alleviate the need for retail investors to open new accounts, establish relationships with new financial intermediaries, or transfer assets to acquire Bitcoin.  Second, retail investors could rely on the representations of the issuers of the spot Bitcoin ETP itself, who are experts in the space, as well as the recommendations of their registered broker-dealer.  Finally, and most fundamentally, an approved spot Bitcoin ETP would be bound by the various disclosure and investor protection requirements under the federal securities laws and be subject to the Commission's oversight.

## II.   THE SEC HAS INAPPROPRIATELY APPLIED A DOUBLE STANDARD IN UNIVERSALLY DISAPPROVING PROPOSALS TO LIST SPOT BITCOIN ETPs.

To date, the Commission has categorically denied every proposal to list and trade a spot Bitcoin ETP on a national securities exchange.  As explained in the preceding section, there is considerable demand for products that offer exposure to Bitcoin, and an SEC-regulated spot Bitcoin ETP, like the Grayscale Trust, presents an accessible entry point for retail investors.[22]  Still, the Commission should approve

---

[22] Indeed, the Grayscale Trust "has over $12 billion in assets under management, millions of dollars in daily trading volume, and more than 850,000 investor accounts."  Brief of Petitioner at 1.

15

spot Bitcoin ETPs not only because retail investors might prefer them, but because there no longer exist reasonable justifications to systematically deny exchanges' proposals to list and trade spot Bitcoin ETPs.[23]

Continuing to deny proposals to list spot Bitcoin ETPs ignores the exchanges' existing fraud surveillance apparatus, as well as the robust anti-fraud and anti-manipulation features of the spot Bitcoin ETPs, including unique features of the Grayscale Trust.  Moreover, categorically denying those proposals is inconsistent with the Commission's treatment of similar products, and it cuts against SEC regulatory and policy imperatives.

The Commission's use of a double standard to evaluate Bitcoin futures ETPs and spot ETPs is not only bad policy, but also in contravention of law.  The Commission must treat like cases alike.[24]  Because the Commission has not established material differences between Bitcoin futures ETPs and spot Bitcoin ETPs that warrant disparate treatment, its decision not to approve the Grayscale Trust is arbitrary and capricious and inconsistent with the Commission's regulatory remit.[25]

---

[23] *See generally* Chamber of Digital Commerce, *The Crypto Conundrum: Why Won't the SEC Approve a Bitcoin ETF?* (Sept. 12, 2022), https://www.digitalchamber.org/crypto-conundrum/.

[24] *See Westar Energy, Inc. v. Fed. Energy Reg. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

[25] *See* Brief for Petitioner at 19-20 ("Even apart from that fundamental arbitrariness, the Commission has applied its own test for approval of bitcoin-related ETPs—the

### a. There is No Basis in Law or in Fact to Discriminate Between Bitcoin Futures and Spot Bitcoin ETPs.

A national securities exchange proposing to list and trade Bitcoin ETPs registered under the Securities Act must seek approval from the Commission in the form of an application filed pursuant to Rule 19b-4 under the Exchange Act. In rejecting all prior Rule 19b-4 spot Bitcoin ETP applications, the Commission has grounded its reasoning in Section 6(b)(5) of the Exchange Act, which requires that the national securities exchange must have in place rules designed to "prevent fraudulent and manipulative acts and practices," to "promote just and equitable principles of trade," to "remove impediments to and perfect the mechanism of a free and open market and a national market system," and, "in general, to protect investors and the public interest."[26]

An exchange that proposes to list Bitcoin-based ETPs can meet its obligations under Exchange Act Section 6(b)(5) by demonstrating that the exchange has a "comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference Bitcoin assets" or establishing that "the underlying market inherently possesses a unique resistance to manipulation

---

significant-market test—very differently to bitcoin futures ETPs than to the proposed spot bitcoin ETP in this case, without any reasoned explanation for the vast difference in treatment.").

[26] *See* Order Granting Approval of a Proposed Rule Change, as Modified by Amendment No. 2, to List and Trade Shares of the Teucrium Bitcoin Futures, 87 Fed. Reg. 21,676 (April 12, 2022) (SR-NYSEArca-2021-53) ("Teucrium Order").

beyond the protections that are utilized by traditional commodity or securities markets."[27]   The Commission has applied this standard both to proposals to list Bitcoin futures ETPs and proposals to list spot Bitcoin ETPs.   In so doing, the Commission has found that the listing exchanges have the equivalent of a comprehensive surveillance-sharing agreement with the CME, and that the CME Bitcoin futures market is a "regulated" market.[28]   Confoundingly, however, the Commission has capriciously determined that the CME counts as a "market of significant size" only with respect to Bitcoin futures products and *not* with respect to spot Bitcoin ETPs.

The Commission has explained that its "interpretation of the term 'market of significant size' … depends on the interrelationship between the market with which the listing exchange has a surveillance-sharing agreement and the proposed ETP."[29]   In determining whether a market is of "significant size," the Commission will consider whether there is a reasonable likelihood that a person attempting to manipulate the ETP would have to trade on that market to successfully manipulate the ETP, and whether the listing exchange can rely on its surveillance-sharing

---

[27] Order Disapproving a Proposed Rule Change to List and Trade Shares of the VanEck Bitcoin Trust, 86 Fed. Reg. 64,539 (Nov. 18, 2021) (SR-CboeBZX-2021-019) ("VanEck Order").

[28] *See* Teucrium Order.

[29] Grayscale Order.

agreement with the regulated market to help detect and deter such fraudulent or manipulative misconduct.[30]

Exchanges' proposals to list spot Bitcoin ETPs, as well as numerous third-parties' comment letters on those proposals, have argued persuasively that the CME Bitcoin futures market is a "large, surveilled and regulated market that is closely connected with the spot market for Bitcoin and through which [a listing exchange] could obtain information to assist in detecting and deterring potential fraud or manipulation."[31]  The proposals and comment letters point to statistical correlations in pricing (so-called "lead/lag" analyses), market size, liquidity, and trading volumes, among other things, all of which suggest the CME Bitcoin futures market and spot Bitcoin markets are sufficiently interrelated for purposes of the Commission's Section 6(b)(5) analysis.  The Commission, nevertheless, steadfastly insists that it is "not persuaded" by the evidence, concluding that the relationship between the CME Bitcoin futures and spot Bitcoin markets is not significant *enough*.

Not only has a majority of the Commission cast aside evidence that the Bitcoin futures and spot markets are sufficiently interrelated, in so doing it has relied on entirely new criteria.  Indeed, SEC Commissioner Hester Peirce has explained:

> Prior to these Bitcoin-related filings, the Commission also did not require an exchange to establish any relationship between pricing on the regulated market and the underlying futures or spot markets. Nor has the Commission

---

[30] *Id.*

[31] *Id.*

previously demanded a lead-lag analysis, which considers the relationship between pricing in the markets with which the exchange has a surveillance-sharing arrangement or that will be used to price the listed product, and all other markets. The Commission has not established that this test is consistent with, or reasonable in light of, its prior approval orders, and it is unclear whether this pricing relationship could ever be established to the Commission's satisfaction for any product, including those previously approved.[32]

The Commission should not continue to apply these custom-made criteria to deny *only* proposals to list spot Bitcoin ETPs. To the extent there *ever* existed a reasonable basis to distinguish between Bitcoin futures and spot Bitcoin ETPs, now that the Commission has approved Bitcoin futures products under the Securities Act (and Section 6(b)(5) of the Exchange Act), there no longer exists any basis in law or in fact to discriminate between Bitcoin futures and spot Bitcoin ETPs. Bitcoin futures and spot Bitcoin products are both ultimately tied to the underlying Bitcoin market and, therefore, face similar risks of fraud and manipulation on the markets where Bitcoin trades. Those markets are well-established and well-regulated: Bitcoin futures and spot markets are subject to the jurisdiction of the Commodity Futures Trading Commission ("CFTC"); the CME, including the CME Bitcoin futures market, is regulated by the CFTC; and the exchanges that propose to list Bitcoin futures and spot Bitcoin ETPs have surveillance-sharing arrangements with

---

[32] Dissenting Statement of Hester M. Peirce in Response to Release No. 34-88,284; File No. SR-NYSEArca-2019-39 (Feb. 26, 2020), https://www.sec.gov/news/public-statement/peirce-dissenting-statement-34-88284.

the CME, which the Commission recognizes as "a regulated market of significant size."

In this environment, any attempt to distinguish between Bitcoin futures and spot Bitcoin products can only be regarded as arbitrary and capricious—an impermissible effort by the Commission to pick investment product winners and losers, in violation of the Administrative Procedure Act and the Exchange Act.

### b. Disapproving Spot Bitcoin ETPs is Inconsistent with the Commission's Approval of Other ETPs.

The Commission's refusal to grant proposals to list the Grayscale Trust and other spot Bitcoin ETPs is plainly inconsistent with its approval of other ETPs, including other Bitcoin-related ETPs that are registered under the Securities Act, commodities ETPs that bear similar hallmarks to the spot Bitcoin ETPs at issue here, and certain complex products offering leveraged or inverse exposure to certain currencies or commodities, *including Bitcoin*.

This year, the Commission approved proposals by NYSE Arca and Nasdaq to list and trade two Bitcoin futures ETPs registered under the Securities Act.[33]  Weeks later, the Commission blocked the NYSE's proposal to list the Grayscale Trust, another proposed Securities Act ETP.  As explained above, now that the

---

[33] *See* Teucrium Order; Order Granting Approval of a Proposed Rule Change, as Modified by Amendment Nos. 1 and 2, to List and Trade Shares of the Valkyrie XBTO Bitcoin Futures Fund, 87 Fed. Reg. 28,848 (May 11, 2022) (SR-NASDAQ-2021-066) ("XBTO Order").

Commission has approved Bitcoin futures products under the Securities Act (and Section 6(b)(5) of the Exchange Act), there no longer exists any basis in law or in fact to discriminate between Bitcoin futures and spot Bitcoin products.

Besides the disparate treatment of futures and spot Bitcoin ETPs, the Commission's denial of the Grayscale Trust makes little sense in light of the agency's approval of other ETPs holding analogous commodities. The SEC's order approving the Aberdeen Standard Palladium Trust ETP illustrates these discrepancies.[34] Bitcoin and palladium share a number of important similarities: the commodities have similar market capitalization; the commodities exist under a similar regulatory framework; they each traditionally have relatively high price volatility; scarcity of the commodities sometimes leads to price increases; and both trade on markets all over the world. Moreover, like spot Bitcoin ETPs, the Aberdeen Standard Palladium ETP traded only in the underlying physical commodity; it did not hold futures contracts.[35]

Yet, in approving the palladium ETP, the Commission did not apply the test that it now applies to spot Bitcoin ETPs. The Commission did not, for example, probe potential dislocation between spot and futures prices for the underlying

---

[34] *See* Order Granting Approval of Proposed Rule Change Relating to Listing and Trading Shares of the ETPS Palladium Trust ("Palladium Trust Order"), Release No. 34-61,220 (Dec. 22, 2009).

[35] *See generally* Tom Lombardi (@tomlombardi), Twitter (June 30, 2022), https://twitter.com/tomlombardi/status/1542667295314522112.

commodity, nor did it test whether the exchange that proposed to list the palladium ETP had in place surveillance agreements with a "regulated market of significant size."  Indeed, the standard to which the Commission held the palladium ETP is not nearly as burdensome as the standard it now applies to spot Bitcoin ETPs.[36]  Thus, the longstanding test applied to spot Bitcoin ETPs appears to deviate meaningfully from the standard traditionally applied to proposed commodities ETPs registered under the Securities Act.

The Commission's expressed concerns about the risks of fraud or manipulation impacting spot Bitcoin ETPs are overstated.  Indeed, the Commission allows hundreds of ETPs to list and trade that are demonstrably riskier or more complex than the proposed spot Bitcoin ETP.  But the Commission allows these products to trade on the U.S. markets because of risk disclosures and investor protections associated with SEC-registered ETPs.  For example, the Commission has allowed numerous ETPs to list and trade that hold assets not regulated in the United States, like EWJ (the iShares MSCI Japan ETF that seeks to track the investment results of an index composed of Japanese equities), HYG (an iShares High Yield Corporate Bond ETF that seeks to track the results of an index composed

---

[36] The Commission's treatment of platinum ETPs reveals similar differences from the standard applied to the spot Bitcoin ETP.  *See* Order Granting Approval of Proposed Rule Change Relating to Listing and Trading Shares of the ETPS Platinum Trust, Release No. 34-61,219 (Dec. 22, 2009).

of U.S. dollar-denominated, high yield corporate bonds), or FXE (an Invesco ETF that seeks to track the price of the euro, a fiat currency).

Similarly, the Commission has allowed numerous complex and higher-risk products to list and trade on national exchanges, including products that may be particularly susceptible to fraud and manipulation.  For example, dozens of ETPs trade on national securities exchanges that provide exposure to "penny stocks" (so-called "microcap" or "low cap" ETPs), a market that is famous for its susceptibility to manipulation.

Relatedly, dozens of ETPs trade on national exchanges that offer retail investors leveraged or inverse exposure to underlying indexes.  Such products are notoriously difficult to understand, are not broadly suitable for retail investors yet they routinely buy them, and have features that deliberately degrade their performance over time.  Yet, the Commission allows these products to be listed under the SEC's familiar disclosure regime—the risks are disclosed and then investors (not the Commission) may decide whether they want to take on those risks.  Recently, the Commission even allowed an ETP to be listed that offers *inverse* exposure to the performance of Bitcoin futures contracts.[37]

---

[37] ProShares, *ProShares to Launch the First U.S. Short Bitcoin-Linked ETF on June 21*, (June 20, 2022), https://www.proshares.com/press-releases/proshares-to-launch-the-first-u.s.-short-Bitcoin-linked-etf-on-june-21/.

The Commission and the staff have recognized that retail investors "may not fully appreciate the particular characteristics or risks of such investments" and, indeed, that the products may suffer from volatility, market stress, or other outside factors more than other ETPs.[38]  Still, in allowing those products to trade on national exchanges, the Commission takes comfort in "long-standing Commission rules and legal requirements—including the disclosure requirements and other protections mentioned above as well as the antifraud provisions of the federal securities laws— that operate to mitigate the investor protection concerns raised by leveraged/inverse products and other complex products."[39]  The same rationale amply applies to spot Bitcoin ETPs.  The Commission should not pick winners and losers among complex products, or products with exposure to risky or non-conventional asset classes.

### c.  The SEC Must Treat Like Cases Alike.

As discussed, in every key respect the Commission has manufactured false distinctions between Bitcoin futures ETPs and spot Bitcoin ETPs, like the Grayscale Trust.  But the Commission must treat like cases alike.  It cannot discriminate

---

[38] Jay Clayton, Chairman, SEC, Dalia Blass, Director, Division of Inv. Mgmt., William Hinman, Director, Div. of Corp. Fin., and Brett Redfearn, Director, Div, of Trading and Markets, Joint Statement Regarding Complex Financial Products and Retail Investors (Oct. 28, 2020), https://www.sec.gov/news/public-statement/clayton-blass-hinman-redfearn-complex-financial-products-2020-10-28.
[39] *Id.*

between issuers, absent reasoned justification.[40]  In light of the Commission's recent approvals of Bitcoin futures ETPs registered under the Securities Act, it is clear that there exists no basis for treating spot Bitcoin products differently from Bitcoin futures products.

The Commission's use of a double standard to evaluate Bitcoin futures ETPs and spot ETPs is not only bad policy, it contravenes well-settled law.  "A fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc.*, 473 F.3d at 1241.  The Commission has not established material differences between Bitcoin futures ETPs and spot Bitcoin products that would justify different treatment.

Importantly, the Commission has yet to provide exchanges that propose to list and trade spot Bitcoin ETPs a "principled way" to meet its interpretation of the requirements of Section 6(b)(5). *Rapoport v. SEC*, 682 F.3d 98, 107 (D.C. Cir. 2012) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 197 (1947)).  Indeed, the SEC's requirements for an applicant to satisfy Section 6(b)(5) have shifted through their decisions denying the various spot Bitcoin ETP applications.  For example, in 2017,

---

[40] Letter from Davis Polk & Wardwell LLP, on behalf of Grayscale Investments, LLC, Re: File No. SR-NYSEArca-2021-90 (Nov. 29, 2021), https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-9410842-262990.pdf ("A fundamental norm of administrative procedure requires an agency to treat like cases alike.") (*citing Kirk v. Comm'r SSA*, 987 F.3d 314, 321 (4th Cir. 2021)).

26

the Commission denied a proposal to list the Winklevoss Bitcoin ETP, reasoning that the spot Bitcoin market was so small that it could be easily manipulated.[41]  In 2018, the Commission denied a proposal to list the GraniteShares ETP because the CME and CFE's Bitcoin futures markets were not of a sufficiently "significant size."[42]  In 2019, the Commission denied a proposal to list the Bitwise Bitcoin ETP, citing for the first time, among other reasons, its belief that Bitcoin is not inherently resistant to fraud and manipulation.[43]  In 2020, the Commission denied a proposal to list the United States Bitcoin Treasury Investment ETP, reasoning that CFTC oversight of the Bitcoin spot market does not satisfy the "sufficiently regulated" prong.[44]   In December 2021, the Commission denied proposals to list the WisdomTree Bitcoin ETP and the Valkyrie Bitcoin Fund, finding that the CME is not a "regulated market of significant size" because its regulatory requirements are not equivalent to those for national security exchanges.[45]

---

[41] *See* Order Setting Aside Action by Delegated Authority and Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, To List and Trade Shares of the Winklevoss Bitcoin Trust, 83 Fed. Reg. 37,579 (Aug. 1, 2018) (SR-BatsBZX-2016-30).

[42] *See* Order Disapproving a Proposed Rule Change To List and Trade the Shares of the GraniteShares Bitcoin ETF and the GraniteShares Short Bitcoin ETF, 83 Fed. Reg. 43,923 (Aug. 28, 2018) (SR-CboeBZX-2018-001).

[43] *See* Order Disapproving a Proposed Rule Change to List and Trade Shares of the Bitwise Bitcoin ETP Trust, 87 Fed. Reg. 40,282 (July 6, 2022) (SR-NYSEArca-2021-89).

[44] *See* VanEck Order.

[45] *See* Order Disapproving a Proposed Rule Change to List and Trade Shares of the WisdomTree Bitcoin Trust, 86 Fed. Reg. 69,322 (Dec. 7, 2021), (SR-CboeBZX-

Thus, from case to case, the Commission shifts from one argument to another, arbitrarily shaping and reshaping the Section 6(b)(5) standard to deny every proposal to list a spot Bitcoin ETP.  Now, the Commission has moved the goalposts again, finding that the CME is a "regulated market of significant size" when it comes to futures ETPs, but not when it comes to spot ETPs involving the exact same asset. To the extent the Commission repeats the same words in its orders—"a regulated market of significant size"—it has not adequately defined what they mean, such that an exchange or an issuer could comply with its demands.  The Administrative Procedure Act requires more.

## III.    CONCLUSION

For the reasons above, and the reasons submitted by Petitioner, the Commission's Grayscale Order should be vacated.

---

2021-024); Order Disapproving a Proposed Rule Change to List and Trade Shares of the Valkyrie Bitcoin Fund, 86 Fed. Reg. 74,156 (Dec. 29, 2021) (SR–NYSEArca–2021–31).

Dated: October 18, 2022

Respectfully submitted,

/s/ *Jonathan Cooper*

Jonathan Cooper
Michael Liftik
Kurt Wolfe
Rachel Frank
Quinn Emanuel Urquhart & Sullivan LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
202-538-8146
jonathancooper@quinnemanuel.com

Counsel for *Amici Curiae*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the typeface requirement of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it is written in 14-point Times New Roman font, a proportionately spaced font.

I further certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure Rule 29(a)(5) (referencing Federal Rule of Appellate Procedure Rule 32(a)(7)(B)) because it contains 6,476 words, excluding the parts exempted from length limits by Federal Rule of Appellate Procedure 32(f).

/s/ *Jonathan Cooper*
Jonathan Cooper
Counsel for *Amici Curiae*

## **CERTIFICATE OF SERVICE**

I certify that, on October 18, 2022, I electronically filed the foregoing brief with the Clerk of the Court by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


/s/ *Jonathan Cooper*
Jonathan Cooper
Counsel for *Amici Curiae*