ORAL ARGUMENT NOT YET SCHEDULED

No. 22-1142

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

GRAYSCALE INVESTMENTS, LLC,

*Petitioner,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of an Order of the Securities and Exchange Commission

## BRIEF FOR COINBASE, INC. AS AMICUS CURIAE IN SUPPORT OF PETITIONER

HAIMAVATHI V. MARLIER
MICHAEL D. BIRNBAUM
JUSTIN YOUNG
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

KELLEY A. HOWES
MORRISON & FOERSTER LLP
370 17th Street Suite 4200
Denver, CO 80202

JOSEPH R. PALMORE
ADAM L. SORENSEN
MORRISON & FOERSTER LLP
2100 L St., NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Amicus Curiae*

OCTOBER 18, 2022

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, amicus states as follows:

Coinbase, Inc. is a leading provider of financial infrastructure and technology for the crypto economy, and is one of four digital asset trading platforms that provides pricing data to the index provider for petitioner Grayscale Investments, LLC's Grayscale Bitcoin Trust. Coinbase, Inc. is a Delaware corporation. Coinbase, Inc. is a wholly owned subsidiary of Coinbase Global, Inc., a public company (NASDAQ: COIN). No publicly held company owns 10% or more in Coinbase Global, Inc.'s stock.

Dated:  October 18, 2022                                  /s/ Joseph R. Palmore

                                                                   Joseph R. Palmore

i

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. Rules 27(a)(4) and 28(a)(1), the parties, rulings, and related cases are as follows:

**(A) Parties and Amici.**  All parties appearing before the Securities and Exchange Commission and in this Court are listed in the Brief for Petitioner. Amicus curiae on this brief is Coinbase, Inc.

**(B) Rulings Under Review.**  An accurate reference to the rulings at issue appears in the Brief for Petitioner.

**(C) Related Cases.**  An accurate statement regarding related cases appears in the Brief for Petitioner.

Dated:  October 18, 2022                                  /s/ Joseph R. Palmore
                                                                      Joseph R. Palmore

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), counsel for amicus curiae states that the parties have consented to the filing of this brief.

Pursuant to D.C. Circuit Rule 29(d), counsel for amicus curiae certifies that this separate brief is necessary because of Coinbase's unique role in the cryptocurrency sector and thus its unique perspective. Coinbase is one of four digital asset trading platforms that provides pricing data to the index provider for Petitioner's Grayscale Bitcoin Trust. Coinbase submitted comments to the Securities and Exchange Commission in the proceedings at issue here, and the Commission's order cited those comments 28 times.

Dated: October 18, 2022                          /s/ Joseph R. Palmore
                                                 Joseph R. Palmore

iii

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... ii

STATEMENT REGARDING CONSENT TO FILE  AND SEPARATE BRIEFING ............................................................................................................ iii

TABLE OF AUTHORITIES .......................................................................... v

GLOSSARY ................................................................................................ viii

INTEREST OF AMICUS CURIAE .............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 2

BACKGROUND ......................................................................................... 3

    A.        Cryptocurrency, Bitcoin, and Coinbase ................................. 3
    B.        Exchange Traded Products ..................................................... 5
    C.        The Grayscale Bitcoin Trust Proceedings .............................. 7

ARGUMENT ............................................................................................... 9

    A.   The Commission Disregarded Coinbase's Extensive Protections That Police Fraud And Manipulation Consistent With The Exchange Act ..................... 10

    B.   The Commission Failed To Adequately Consider The Bitcoin Market's Depth And Liquidity ................................................................................ 14

    C.   The Commission Ignored Key Similarities To Other ETP Proposals ......... 18

    D.   The Commission's Rejection Of A Spot Bitcoin ETP Harms Investors And Deters Innovation ................................................................................ 21

CONCLUSION ............................................................................................ 26

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bloomberg L.P. v. SEC*,
    45 F.4th 462 (D.C. Cir. 2022)......................................................................21

*Business Roundtable v. SEC*,
    647 F.3d 1144 (D.C. Cir. 2011)..................................................................25

*Gilbert v. N.L.R.B.*,
    56 F.3d 1438 (D.C. Cir. 1995)....................................................................17

*Hall v. McLaughlin*,
    864 F.2d 868 (D.C. Cir. 1989)....................................................................18

\**Pub. Citizen, Inc. v. FAA*,
    988 F.2d 186 (D.C. Cir. 1993)......................................................................9

## Statutes

15 U.S.C. § 78f(b)(5) ...............................................................5, 14, 15, 18, 19

15 U.S.C. § 78s(b)...............................................................................................5

## Regulatory Authorities

Securities Exchange Act Release No. 5060 (Oct. 28, 2004) ...................................16

Securities Exchange Act Release No. 94620 (Apr. 6, 2022)...................................6

Securities Exchange Act Release No. 50603 (Oct. 28, 2004)
    69 Fed. Reg. 64614 (Nov. 5, 2004) ........................................................6

Securities Exchange Act Release No. 53521 (Mar. 20, 2006)
    71 Fed Reg. 14967 (Mar. 24, 2006).........................................................6

Securities Exchange Act Release No. 61219 (Dec. 22, 2009)
    74 Fed. Reg. 68886 (Dec. 29, 2009).........................................................6

Securities Exchange Act Release No. 61220 (Dec. 22, 2009)
    74 Fed. Reg. 68895 (Dec. 29, 2009).........................................................6

Securities Exchange Act Release No. 93504 (Nov. 2, 2021)
86 Fed. Reg. 61804 (Nov. 8, 2021) ....................................................7

Securities Exchange Act Release No. 94151 (Feb. 10, 2022)
87 Fed. Reg. 7889 .............................................................................7

Securities Exchange Act Release No. 94844
87 Fed. Reg. 28043 (May 10, 2022) ..................................................7

**Other Authorities**

Brian Armstrong, *Coinbase is a mission focused company,* COINBASE
BLOG (Sept. 27, 2020) ........................................................................4

Chamber of Digital Commerce, *The Crypto Conundrum: Why Won't
the SEC Approve a Bitcoin ETF* (Sept. 12, 2022) .............................23

Jesse Coghlan, *Two more spot crypto ETFs launch on Australian
markets*, COIN TELEGRAPH (June 7, 2022) .......................................22

Coinbase Trade Surveillance Team, *How Coinbase thinks about
market integrity and trade surveillance*, COINBASE BLOG (Oct. 11,
2021) ..............................................................................................8, 14

Ruben Gordon, *Crypto is Probably the Most Mature Investment Asset,
Says Mastercard Exec*, COINSTACK NEWS (April 21, 2022) ................3

Letter from Coinbase to Shareholders, Q2 2022 Shareholder Letter ......................12

*Order Disapproving a Proposed Rule Change, as Modified by
Amendment No. 1, to List and Trade Shares of Grayscale Bitcoin
Trust under NYSE Arca Rule 8.201-E (Commodity-Based Trust
Shares)*, Securities and Exchange Commission Release No. 95180,
File No. SR-NYSEArca-2021-90 (June 29, 2022) ...............................9

Helen Partz, *New spot Bitcoin ETF launches at Euronext Amsterdam
Exchange*, COIN TELEGRAPH (June 30, 2022) ...................................22

Commissioner Hester M. Peirce, *On the Spot: Remarks at
"Regulatory Transparency Project Conference on Regulating the
New Crypto Ecosystem: Necessary Regulation or Crippling Future
Innovation?"* SEC (June 14, 2022) ..................................................23

SEC, *Dissent of Commissioner Hester M. Peirce to Release No. 34-83723; File No. SR-BatsBZX-2016-30* (July 26, 2018)................................13, 25

SEC, *Request for Comment on Exchange-Traded Products, Exchange Act Release No, 75165,* File No. S7-11-15 (June 12, 2015)..................................5

Fayar Shirzad, *Unlocked. But First We Need Workable Rules*, COINBASE BLOG (July 21, 2022)........................................................................25

# GLOSSARY

"Coinbase" means amicus curiae Coinbase, Inc.

"Commission" means the Securities and Exchange Commission.

"ETF" means exchange-traded fund, a type of exchange traded product registered under the Investment Company Act of 1940, as amended.

"ETP" means exchange traded product.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Order" means the Commission's June 29, 2022 order denying NYSE Arca, Inc.'s proposed rule change to list and trade shares of the Trust.

"Petitioner" means Grayscale Investments, LLC.

"SEC" means the Securities and Exchange Commission.

"Trust" means the Grayscale Bitcoin Trust.

## INTEREST OF AMICUS CURIAE[1]

Coinbase, Inc. ("Coinbase") is a leading provider of financial infrastructure and technology for the crypto economy, built on the idea that anyone, anywhere, should be able to easily and securely send and receive cryptocurrency. Coinbase's platform serves more than nine million monthly transacting retail users, 14,500 institutions, and 245,000 ecosystem partners participating in the digital asset economy. Coinbase is one of four digital asset trading platforms that provides pricing data to the index provider for petitioner Grayscale Investments, LLC's Grayscale Bitcoin Trust ("the Trust"). Coinbase submitted comments to the Securities and Exchange Commission ("Commission" or the "SEC") in the proceedings at issue here. Coinbase is part of the broader crypto-economy that will be harmed by the Commission's disapproval order.

---

[1] No person other than amicus curiae or its counsel authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief. All parties have consented to the filing of this brief.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

Over the last decade, Coinbase has built the largest U.S. platform for trading cryptocurrencies based on the radical idea that anyone, anywhere, should be able to easily and securely send and receive Bitcoin, the world's first digital asset.  Coinbase has tirelessly advanced innovation, leveraging new technology to promote economic freedom worldwide and endeavoring to share its hard-won knowledge with industry collaborators and regulators alike.  Because of Coinbase's unique understanding of the economic realities of cryptocurrency markets—knowledge the Commission needed to consider to evaluate the proposed rule change at issue here—Coinbase submitted a detailed comment letter supporting the proposal.

As Coinbase explained to the Commission, Bitcoin exchanges like Coinbase employ a variety of policies and procedures that adequately safeguard market integrity.  Bitcoin markets are deep, liquid, and inherently resistant to potential attempts at price manipulation.  The Commission has previously approved comparable products based in large part on those same factors.  And denying investors the benefits of a spot Bitcoin "exchange traded product," which would have allowed investors to gain exposure to Bitcoin without purchasing it directly, needlessly hampers innovation, causing the U.S. to fall behind well-regulated markets around the globe that have already adopted such products.

The Commission's decision disregarded these fundamental economic realities. And it effectively disqualified national securities exchanges from listing shares of a spot Bitcoin ETP. That decision is not the product of the reasoned decision-making required by law. Coinbase thus agrees with Petitioner that the Commission's order should be set aside.

## BACKGROUND

### A.     Cryptocurrency, Bitcoin, and Coinbase

Cryptocurrency is "a digital representation of a stored value secured through cryptography." FINRA, *Cryptocurrencies* (last accessed Oct. 16, 2022).[2] Bitcoin is the largest and most traded cryptocurrency. Coinbase, *What is Bitcoin?* (last accessed Oct. 16, 2022).[3] More than $7 trillion worth of Bitcoin has been traded since 2009, and Bitcoin's average daily trading volume in 2021 was approximately $45 billion. *Id.*; Letter from Paul Grewal, Chief Legal Officer, Coinbase, dated Mar. 3, 2022 ("Coinbase Letter") at 3 & Fig. 1. Major institutional investors have increasingly recognized cryptocurrency's maturity as an asset. Ruben Gordon,

---

[2] https://www.finra.org/investors/learn-to-invest/types-investments/initial-coin-offerings-and-cryptocurrencies/cryptocurrencies.

[3] https://www.coinbase.com/learn/crypto-basics/what-is-bitcoin.

*Crypto is Probably the Most Mature Investment Asset, Says Mastercard Exec*, COINSTACK NEWS (April 21, 2022).[4]

Investors buy, sell, and trade cryptocurrencies—including Bitcoin—on digital asset exchanges like Coinbase. "Coinbase's mission is to create an open financial system" that "use[s] cryptocurrency to bring economic freedom to people all over the world." Brian Armstrong, *Coinbase is a mission focused company*, COINBASE BLOG (Sept. 27, 2020).[5] Today, Coinbase serves approximately nine million monthly transacting retail users, 14,500 institutions, and 245,000 ecosystem partners, with some $96 billion in assets on its platform and $217 billion in quarterly trading volume. Coinbase, *About Coinbase* (last accessed Oct. 16, 2022).[6] Coinbase is the largest U.S. cryptocurrency exchange by trading volume. CoinMarketCap, *Top Cryptocurrency Spot Exchanges* (last accessed Oct. 13, 2022).[7] Bitcoin was the first cryptocurrency traded on Coinbase's platform, and remains the exchange's most popular asset by market capitalization.[8]

---

[4] https://www.coinstacknews.com/news/crypto-is-probably-the-most-mature-investment-asset-says-mastercard-exec/.

[5] https://www.coinbase.com/blog/coinbase-is-a-mission-focused-company.

[6] https://www.coinbase.com/about.

[7] https://coinmarketcap.com/rankings/exchanges/.

[8] https://www.coinbase.com/price/bitcoin.

## B.    Exchange Traded Products

Exchange Traded Products ("ETPs") are "a diverse class of financial products that seek to provide investors with exposure to financial instruments, financial benchmarks, or investment strategies" by investing in an underlying asset and issuing shares that are traded on a national exchange.  SEC, *Request for Comment on Exchange-Traded Products, Exchange Act Release No. 75165,* File No. S7-11-15 at 3 ("ETP Request") (June 12, 2015).[9]

Bitcoin is a commodity, not a security. SEC, *Funds Trading in Bitcoin Futures – Investor Bulletin* (June 10, 2021).[10]  ETPs, however, are securities falling under the Commission's jurisdiction.  U.S. securities exchanges seeking to list and trade a new type of ETP security must "file proposed rule changes under Section 19(b)(1) of the Exchange Act and Rule 19b-4."  ETP Request at 28 (citing 15 U.S.C. § 78s(b); 17 C.F.R. § 240.19b-4).  "To approve an exchange's proposed rule change, the Commission must find that the proposed rule change is consistent with the applicable requirements of the Exchange Act," including its requirement that "[t]he rules of the exchange are designed to . . . prevent fraudulent and manipulative acts and practices."  *Id* at 29; 15 U.S.C. § 78f(b)(5).

---

[9] https://www.sec.gov/rules/other/2015/34-75165.pdf.

[10] https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_fundstrading.

Applying these standards, the Commission has approved a wide variety of spot ETPs that hold non-digital assets, including physical commodities such as gold, silver, palladium, and platinum.[11]   In doing so, the Commission has approved rule changes to allow listing of some ETPs on the basis of the exchange's ability to obtain information from the regulated markets and, thereby, prevent fraud and manipulation. *See supra*, n.11.

More recently, the Commission has also approved ETPs that hold Bitcoin futures contracts for trading on an exchange.  *See, e.g.,* Securities Exchange Act Release No. 94620 (Apr. 6, 2022) (SR-NYSEArca-2021-53) (order approving Teucrium Bitcoin Futures Fund).  But despite the significant and growing Bitcoin spot market, *supra* at 3-4, the Commission has not yet approved an ETP that tracks the Bitcoin spot market directly.

---

[11] *See, e.g.*, Securities Exchange Act Release No. 50603 (Oct. 28, 2004), 69 Fed. Reg. 64614 (Nov. 5, 2004) (SR-NYSE-2004-22) (order approving streetTRACKS Gold Shares); Securities Exchange Act Release No. 53521 (Mar. 20, 2006), 71 Fed Reg. 14967 (Mar. 24, 2006) (SR-Amex-2005-072) (order approving iShares Silver Trust); Securities Exchange Act Release No. 61220 (Dec. 22, 2009), 74 Fed. Reg. 68895 (Dec. 29, 2009) (SR-NYSEArca-2009-94) (order approving ETFS Palladium Trust); Securities Exchange Act Release No. 61219 (Dec. 22, 2009), 74 Fed. Reg. 68886 (Dec. 29, 2009) (SR-NYSEArca-2009-95) (order approving ETFS Platinum Trust).

### C.    The Grayscale Bitcoin Trust Proceedings

In 2021, NYSE Arca, Inc. filed with the Commission a proposed rule change that would permit it to list and trade shares of a spot Bitcoin ETP. *See* Securities Exchange Act Release No. 93504 (Nov. 2, 2021), 86 Fed. Reg. 61804 (Nov. 8, 2021). The Commission initiated proceedings under Section 19(b)(2)(B) of the Exchange Act to determine whether to approve the proposal and solicited public comments. Securities Exchange Act Release No. 94151 (Feb. 10, 2022), 87 Fed. Reg. 7889.[12] It received thousands of such comments, most of them strongly urging the Commission to greenlight the proposed rule change. SEC, *Comments on NYSE Arca Rulemaking* (last accessed Oct. 16, 2022).[13]

Coinbase participated vigorously in this process. As operator of the largest U.S. Bitcoin exchange and one of the suppliers of pricing data for the Grayscale Trust's index, Coinbase had a significant stake in the outcome of the proceeding and unique insight to share with the Commission. In a letter from its Chief Legal Officer Paul Grewal, Coinbase presented a detailed analysis showing that a spot Bitcoin ETP "would be no more susceptible to manipulation than other exchange-traded products . . . the Commission has previously" approved, and explained that NYSE

---

[12] NYSE Arca later filed an amended proposal. *See* Securities Exchange Act Release No. 94844, 87 Fed. Reg. 28043 (May 10, 2022).

[13] https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190.htm.

Arca's "proposal is appropriately designed to prevent fraudulent and manipulative acts and practices" consistent with the requirements of the Exchange Act. Coinbase Letter at 2. Bitcoin markets prohibit the same types of market manipulation as traditional financial markets: wash trading (simultaneously buying and selling to create artificial market activity), trade spoofing and layering (placing fake orders that are later cancelled), front-running (trading with knowledge of later trades), churning (trading just to generate a commission), and quote stuffing (quickly entering and withdrawing a large number of orders in an attempt to flood the market). Coinbase Letter at 6 & n.15; Coinbase Trade Surveillance Team, *How Coinbase thinks about market integrity and trade surveillance*, COINBASE BLOG (Oct. 11, 2021).[14]

Coinbase also explained that: (1) the spot market for Bitcoin is sufficiently deep and liquid to limit potential price manipulation, Coinbase Letter at 3-5; (2) digital asset exchanges like Coinbase have robust self-surveillance and monitoring practices that prevent manipulation and fraud, Coinbase Letter at 5-7; (3) the spot market for Bitcoin is larger and more stable than the Bitcoin futures market and comparable commodity markets for which spot ETPs have been

---

[14] https://www.coinbase.com/blog/how-coinbase-thinks-about-market-integrity-and-trade-surveillance.

approved, Coinbase Letter at 7-8; and (4) spot Bitcoin ETPs have been successfully adopted in other countries to the benefit of investors, Coinbase Letter at 8-9.

But despite Coinbase's showing (and those submitted by other interested parties), the Commission disapproved the proposed rule change. *Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to List and Trade Shares of Grayscale Bitcoin Trust under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares)*, Securities and Exchange Commission Release No. 95180, File No. SR-NYSEArca-2021-90 (June 29, 2022) ("Order"). The Commission effectively read into Exchange Act Section 6(b)(5)'s anti-fraud and manipulation requirement a mandate that an exchange have in place "a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets." Order at 3-4. And it disregarded the facts and analysis shared by Coinbase showing the robust protections against fraud and manipulation in the underlying spot Bitcoin market.

## ARGUMENT

"The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result [] and respond to 'relevant' and 'significant' public comments." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). The Commission here failed that obligation by disregarding the "significant" expertise and analysis Coinbase offered in its public comments.

9

Despite a robust showing that the Commission's concerns about market manipulation were unfounded, the Commission adhered to a novel and reflexive policy of rejecting spot Bitcoin ETPs. In doing so, the Commission made at least four fundamental errors, any one of which is sufficient to require that the Order be set aside.

### A.     The Commission Disregarded Coinbase's Extensive Protections That Police Fraud And Manipulation Consistent With The Exchange Act

In denying the proposed rule change, the Commission placed undue weight on the absence of a surveillance-sharing agreement. The Commission mentioned surveillance-sharing agreements *more than 80 times* in its order, employing it as a reflexive response to practically every argument in favor of the proposed rule change and effectively treating such agreements as mandatory. *See, e.g.*, Order at 25 (invoking surveillance-sharing agreement in response to fungibility, transportability, and tradability), 26 (spot market liquidity and participation), 27 (comparison to other commodity markets); 28-29 (arbitrage and price correction). But the Commission was wrong to conclude that existing surveillance measures within a regulated industry cannot satisfy Section 6(b)(5). By taking that approach here, the Commission effectively imposed an extra-statutory requirement and improperly disregarded the ample surveillance measures that Coinbase and others use to police fraud and manipulation in the Bitcoin spot market.

10

As Coinbase detailed in its comment letter, "digital asset exchanges that provide pricing data as inputs" for proposed spot Bitcoin ETPs employ a variety of "measures to counter potential fraudulent or manipulative trading." Coinbase Letter at 5. And Coinbase's own exhaustive policies well-illustrate the extent of such protections. "[B]ecause the integrity of the Bitcoin market and digital asset markets generally is fundamental to [its] business and essential to protecting [its] customers," Coinbase has implemented extensive market surveillance and monitoring measures to address the risk of manipulation. *Id.* Coinbase's market surveillance and monitoring group consists of ten professionals, led by a former New York Stock Exchange executive. *Id*. That team uses state-of-the-art surveillance technology to continuously monitor all Coinbase digital asset trading platforms 24 hours a day for the same types of potentially manipulative or fraudulent practices observed in any financial market: "spoofing, wash trading, trade layering, front-running, churning, and quote stuffing." Coinbase Letter at 5-6. That surveillance program is actually faster and more responsive than most traditional financial market surveillance because same-day alerts allow Coinbase's surveillance team to quickly investigate any suspicious activity. Coinbase Letter at 6.

Beyond self-surveillance, Coinbase also uses a number of self-executing measures designed to prevent potential manipulative or fraudulent trading activity. Like traditional financial markets, "Coinbase employs measures similar to circuit

11

breakers and trading limits" that can stop potential manipulation before it has any significant effect on the market. *Id*. For example, any order on Coinbase's trading platform that is large enough to move the price of Bitcoin more than two percent is filled only up to the two-percent mark, and the rest is automatically canceled to avoid market swings. *Id*. Coinbase also constantly monitors Bitcoin prices on other exchanges to look for any price discrepancies that could reflect market manipulation. *Id.* Coinbase also regularly collaborates with regulators, sharing its "views on the development of the cryptoeconomy, [its] products, and [its] operations," as well as facilitating investigations into any alleged market fraud. Letter from Coinbase to Shareholders, Q2 2022 Shareholder Letter pp. 19-20.[15]

Taken together, these extensive measures show how the largest players in the Bitcoin market protect it from the very harms contemplated in Section 6(b)(5). As Coinbase explained in its comment letter, "[t]hese practices address . . . the Commodity Exchange Act's prohibitions on manipulative and fraudulent trading activity." Coinbase Letter at 2. Coinbase's "demonstrated . . . commitment to these efforts" and to "shar[ing] best practices across all digital asset markets" also provide ample assurances of continued market integrity. Coinbase Letter at 2.

---

[15] https://s27.q4cdn.com/397450999/files/doc_financials/2022/q2/Q2-2022-Shareholder-Letter.pdf.

12

Yet in response to all this, the Commission simply repeated its mantra that other protections against fraud and manipulation are "not a substitute for a surveillance-sharing agreement between the Exchange and a <u>regulated</u> market of significant size related to the underlying [B]itcoin assets." Order at 35 (emphasis in original). The Commission dismissed Coinbase's extensive surveillance measures as "[im]material to the Commission's analysis" because they are "voluntary and therefore have no binding force." *Id* at 37. But the Commission did not explain why voluntary surveillance measures categorically cannot satisfy Section 6(b)(5)— nothing in the statute excludes them from consideration. As Commissioner Peirce has pointed out, "[i]t is well established that privately generated regulation can be effective at achieving well-functioning markets even absent government regulation." SEC, *Dissent of Commissioner Hester M. Peirce to Release No. 34-83723; File No. SR-BatsBZX-2016-30* (July 26, 2018) ("BatsBZX Dissent") & n.14 (citing Edward Peter Stringham, *Private Governance: Creating Order in Economic and Social Life* chs. 4-6 (2015)).[16] Coinbase demonstrated just that in its comment letter, showing how major digital asset exchanges have built robust means of self-regulation into the Bitcoin spot market.

---

[16] https://www.sec.gov/news/public-statement/peirce-dissent-34-83723.

13

And in reality, "Coinbase is overseen by more than 50 regulators in the U.S. alone," and its robust internal policies and extensive collaboration with third parties offers significant, well-documented protection against bad actors.  Coinbase Trade Surveillance Team, *How Coinbase thinks about market integrity and trade surveillance,* COINBASE BLOG (Oct. 11, 2021).[17]  By insisting exclusively on only one way of achieving the statutory objective "to prevent fraudulent and manipulative acts and practices," the Commission acted arbitrarily.  15 U.S.C. § 78f(b)(5).

### B.     The Commission Failed To Adequately Consider The Bitcoin Market's Depth And Liquidity

In denying the proposed rule change, the Commission also disregarded evidence shared by Coinbase and others that the underlying Bitcoin market is inherently resistant to manipulation.  Bitcoin is the most traded cryptocurrency in the world.  As of October 2022, it had a global market capitalization of more than $370 billion.  Nasdaq, Bitcoin Market Capitalization (last accessed Oct. 18, 2022).[18] The spot market for Bitcoin is both deep and liquid.  Bitcoin's average daily trading volume in 2021 was approximately $45 billion.  Coinbase Letter at 3 & Fig. 1. Indeed, Bitcoin's trading volume—a key metric in determining the liquidity of an asset—dwarfs that of the largest U.S. stocks, including Apple, Microsoft, Amazon,

---

[17] https://www.coinbase.com/blog/how-coinbase-thinks-about-market-integrity-and-trade-surveillance.

[18] https://data.nasdaq.com/data/BCHAIN/MKTCP.

14

and Tesla.  Coinbase Letter at 3 & Fig. 2; Nasdaq, Most Active Shares by Dollar Volume (last accessed Oct. 16, 2022).[19]  Coinbase is a key part of this picture— Bitcoin accounted for roughly 31% of its $217 billion quarterly trading volume.  Coinbase Q2 2022 Shareholder Letter at 5.

As Coinbase and others explained, empirical evidence shows the depth and liquidity of the Bitcoin spot market would protect against manipulation of a spot Bitcoin ETP.  Coinbase Letter at 4-5.[20]  Price discrepancies are exceedingly rare: 97% of the time over a roughly three-year period, the price of Bitcoin deviated by less than 0.2% among the four major exchanges used as price inputs for the Trust.  Coinbase Letter at 4 & Fig. 3.  That is less than major stocks like Nestle experience when listed on multiple exchanges.  Coinbase Letter at 4 & Fig. 4.  And the exceedingly rare price deviations that did occur would have had a negligible effect on the Trust because they resulted from a single exchange with less than 5% trading volume.  Coinbase Letter at 4 (explaining that the Trust's pricing index uses a weighted average based on trading volume).  Moreover, Coinbase's data showed arbitrage rapidly corrected price discrepancies "typically within one hour."  *Id.*

---

[19] https://www.nasdaq.com/market-activity/most-active.

[20] *See also, e.g.*, Letter from Security Traders Association, dated April 20, 2022; Letter from Mike Cammarata, dated March 31, 2022; Letter from Michael D. Moffit, dated Feb. 7, 2022.

When approving other spot commodity ETPs, the Commission has recognized that "[t]he depth and liquidity of [an] underlying spot market allay[s] . . . concerns with improper trading practices" because high levels of trading and "inter-market trading activity" makes price manipulation of the underlying asset exceedingly difficult. *See* streetTRACKS Gold Shares Order, Securities Exchange Act Release No. 5060 at 21-22 (Oct. 28, 2004). When an asset is sold frequently across a broad market, "the arbitrage process, which in general provides investors the opportunity to profit from differences in prices of assets, increases the efficiency of the markets," quickly closing any price discrepancies and thus "serves to prevent potentially manipulative efforts." *Id*. at 8.

This is exactly what Coinbase and others explained to the Commission about the spot Bitcoin market's resistance to manipulation. Indeed, any attempt to manipulate the share price of the Trust "would require a prohibitively large amount of trading volume and coordination across several large exchanges." Coinbase Letter at 4-5. A 2021 analysis by Bank of America indicated it would cost $93 million to move Bitcoin's price by just a *single* percentage point. *See* Coinbase Letter at 5 n.12 (citing Samuel Haig, *Bank of America claims it costs just $93 million to move Bitcoin's price by 1%*, Coin Telegraph (Mar. 19, 2021)).

In response, the Commission acknowledged its "prior orders" finding that market liquidity and depth "speak to providing some resistance to manipulation."

16

Order at 26. But it nonetheless chose to disregard those metrics because commenters supposedly "offer[ed] no evidence or analysis of how these metrics or observations serve to detect and deter potential fraud and manipulation." *Id*. That is incorrect. Coinbase used the same kind of "evidence [and] analysis" the Commission itself has previously used in approving ETPs to show that the arbitrage process in a deep and liquid market is a "basis . . . to monitor for fraudulent and manipulative practices." streetTRACKS Gold Shares Order at 21; *cf.* Coinbase Letter at 4-5 & n.8-11.

"It is, of course, elementary that an agency must conform to its prior decisions or explain the reason for its departure from such precedent." *Gilbert v. N.L.R.B.*, 56 F.3d 1438, 1445 (D.C. Cir. 1995). Yet the Commission provided no such explanation, nor did it analyze its streetTRACKS Gold Shares decision. Instead of meaningfully engaging with Coinbase's specific expert evidence or grappling with its past reliance on spot market liquidity and depth, the Commission ignored these economic realities in favor of a standard that the Commission seemingly believes can never be attained. It faulted commenters for not showing "a <u>unique</u> resistance to manipulation that would justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement." Order 26 (emphasis in original). As discussed above, the Commission's single-minded focus on surveillance-sharing agreements was itself error. But ignoring substantial evidence that the underlying Bitcoin market is

inherently resistant to manipulation was an additional, independent error.  This failure also requires that the Commission's disapproval order be vacated.

### C.     The Commission Ignored Key Similarities To Other ETP Proposals

The Commission's disapproval order was arbitrary for yet another reason—it failed to adequately distinguish past decisions Coinbase identified approving rule changes to list ETPs based on similar products.  One hallmark of adequately reasoned agency action is consistency with past decisions.  "Reasoned decisionmaking requires treating like cases alike."  *Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989).  That principle is particularly important in the context of the Exchange Act, which does not "permit unfair discrimination between customers, issuers, brokers, or dealers."  15 U.S.C. § 78f(b)(5).  The Commission here failed to meet these obligations.

As Coinbase explained, one "important comparison point for the approval of a Bitcoin spot ETP" is the Commission's prior approval of a Bitcoin futures ETF.[21] Coinbase Letter at 7.  While a futures ETF tracks futures contracts, not the underlying commodity itself, there is little practical difference in the potential for

---

[21] Since the Commission's order in this proceeding, it has approved the listing of additional Bitcoin futures ETFs.  *See, e.g.*, SEC Release No. 34-94853, File No. SR-NASDAQ-2021-066 (May 5, 2022) (Approving Valkyrie XBTO Bitcoin Futures Fund); SEC Release No. 34-94620, File No. SR-NYSEArca-2021-53 (Apr. 6, 2022) (approving Teucrium Bitcoin Futures Fund).

price manipulation.  Coinbase showed there was a 99.9% correlation between the prices of Bitcoin futures on the Chicago Mercantile Exchange and Bitcoin on the spot market between November 2021 and February 2022.  Coinbase Letter at 7 & Fig. 6.

These data established two important points relevant to the approval of a spot Bitcoin ETP.  First, the data "are consistent with arbitrageurs forcing price convergence by selling in one market—spot or futures—and buying in the other." Coinbase Letter at 7.  Second, and relatedly, "these data are also consistent with the Commission's original determination that manipulation of the underlying Bitcoin market is sufficiently mitigated for approval of ETFs based on Bitcoin futures."  *Id.* As Coinbase explained, given the price correlation between futures and spot Bitcoin, "there is no economic justification" for believing that a spot Bitcoin ETP would be any less resistant to potential manipulation of the underlying Bitcoin market than a Bitcoin futures ETF.  *Id*.

The Commission dismissed Coinbase's price correlation analysis in a footnote, faulting it for not including data showing other particular kinds of price correlation, and for supposedly not showing "whether fraud or manipulation that impacts spot [B]itcoin would also similarly impact CME [B]itcoin futures contracts."  Order at 72 n.223.  But it gave no reason to doubt the data Coinbase provided, and the bottom line remained the same—the Commission failed to

19

meaningfully respond to Coinbase's strong case that the same economic justifications underlying the Commission's prior approval of Bitcoin futures ETFs also supported approval of a spot Bitcoin ETP.

The same was true of another relevant comparison that Coinbase identified in its submission: the Commission's previous decisions approving ETPs based on other commodities. As Coinbase explained, Bitcoin has similar market capitalization to other commodities—such as silver, palladium, and platinum—all of which have spot ETPs approved by the Commission. Coinbase Letter at 8 & Fig. 8. And while those markets are not sufficiently transparent to support a direct comparison of trading volume, available data indicate a higher trading volume in the Bitcoin spot market than in even the largest of those three commodity markets—silver. Coinbase Letter at 8.

As discussed above, liquidity and depth of a commodity market are key factors in approving an ETP. *Supra* at 14-18. But Coinbase pointed to an additional (and important) similarity between Bitcoin and these other commodities: the fact that spot Bitcoin ETPs can track underlying asset prices just as well as ETPs based on other commodities—another rationale previously cited by the Commission in approving spot commodity ETPs. Coinbase Letter 8 & n.26 (citing streetTRACKS Gold Shares Order) & Fig. 9. By comparing spot Bitcoin ETPs approved in other countries to ETPs for other commodities (palladium, platinum, silver, and copper),

20

Coinbase showed that the average difference in daily price changes was largely consistent across the different assets, all at less than 1.2% for a month-long period. Coinbase Letter at Fig. 9.

Once again, the Commission did not meaningfully engage with these data or analysis. Instead, it resorted to its default answer: "surveillance-sharing agreements." Order at 27. For all the reasons explained above, that answer is insufficient. *Supra* at 10-14.

### D. The Commission's Rejection Of A Spot Bitcoin ETP Harms Investors And Deters Innovation

Coinbase's support for approving a spot Bitcoin ETP is based not only on its view of the law, but also on its foundational commitment to the idea that "[e]veryone deserves access to financial services that can help empower them to create a better life for themselves and their families." Coinbase, *Mission Statement* (last accessed Oct. 16, 2022).[22] That mission is fully consistent with Section 6(b)(5)'s command to promote "a free and open market," and the Commission's obligation "to consider the effects of proposed rules and regulations on the market as a whole." *Bloomberg L.P. v. SEC*, 45 F.4th 462, 470, 474 (D.C. Cir. 2022). The Commission fell short in that duty here by insufficiently considering the implications of its rejection of a spot Bitcoin ETP.

---

[22] https://www.coinbase.com/mission.

21

As Coinbase explained, spot Bitcoin ETPs are already part of a stable, and well-established, market abroad. Coinbase Letter at 8-9. At the time of Coinbase's letter, at least seven other countries had approved Bitcoin spot ETPs, with major market players such as Germany and Canada approving multiple such products. Coinbase Letter 8 & Fig. 10. Other countries, including Australia, have followed suit since. *See, e.g.*, Jesse Coghlan, *Two more spot crypto ETFs launch on Australian markets*, COIN TELEGRAPH (June 7, 2022);[23] Helen Partz, *New spot Bitcoin ETF launches at Euronext Amsterdam Exchange*, COIN TELEGRAPH (June 30, 2022).[24]

This global trend supports the approval of U.S. spot Bitcoin ETPs in several important ways. To start, it provides further evidence that the underlying spot Bitcoin market can support ETPs. A Coinbase analysis of ETPs in Germany, Canada, and Jersey showed a high correlation between prices of the ETPs and the underlying Bitcoin spot market, Coinbase Letter at 8 & Figs. 11-16—a metric that has favored approval of ETPs in the past. *Supra* at 16. And other countries' experiences with spot Bitcoin ETPs have been instructive. As Coinbase explained, the Trust proposal incorporates a number of "global best practices that Bitcoin spot

---

[23] https://cointelegraph.com/news/two-more-spot-crypto-etfs-launch-on-australian-markets.

[24] https://cointelegraph.com/news/new-spot-bitcoin-etf-launched-at-euronext-amsterdam-exchange.

ETPs can use to mitigate potential manipulation of their share prices"—using data from multiple exchanges to inform the index, weighting pricing data by trading volume, and relying on datasets that are more resistant to manipulation. Coinbase Letter at 9.

More fundamentally, the flourishing global trend toward spot Bitcoin ETPs illustrates that these products serve a vital and in-demand role in the market by "provid[ing] investors exposure to Bitcoin without the need to trade Bitcoin itself." *Id*. If the Commission categorically refuses to consider approving a spot Bitcoin ETP, it forces U.S. investors either to invest abroad or to participate only through individual purchases. Such a choice harms investors. "It is often said that ETFs have 'democratized' investing by allowing retail investors to gain cost-effective exposure, not only to traditional asset classes like equities and bonds, but also to assets" that might otherwise be "too expensive and impractical to own." Chamber of Digital Commerce, *The Crypto Conundrum: Why Won't the SEC Approve a Bitcoin ETF* 6 (Sept. 12, 2022). "[M]any investors want to get exposure to [B]itcoin through US securities markets," Commissioner Hester M. Peirce, *On the Spot: Remarks at "Regulatory Transparency Project Conference on Regulating the New Crypto Ecosystem: Necessary Regulation or Crippling Future Innovation?"* SEC

(June 14, 2022),[25] and the SEC's decision here denies them all the benefits of doing so through an ETP.

Indeed, many commenters told the Commission just that. One investment management group "urge[d] the Commission to consider how investors have voted for [Bitcoin] with their investment dollars since 2013." SEC, *Comment Letter on NYSE Arca Rulemaking*, Fortress Investment Group (Apr. 25, 2022).[26] Another explained that "a spot ETP . . . will enable retail and institutional investors to properly build exposure in Bitcoin at more accurate prices while removing the penalty" associated with futures-based instruments arising from the premium at which Bitcoin futures trade above the spot market. SEC, *Comment Letter on NYSE Arca Rulemaking*, Lightning Capital (Mar. 21, 2022).[27] And a Duke finance professor observed that "American investors should be given the opportunity to invest in this historically uncorrelated, diversifying asset that may play an important

---

[25] https://www.sec.gov/news/speech/peirce-remarks-regulatory-transparency-project-conference.

[26] https://www.sec.gov/news/speech/peirce-remarks-regulatory-transparency-project-conference.

[27] https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-20126500-287142.pdf.

role in helping them build more efficient portfolios." SEC, *Comment Letter on NYSE Arca Rulemaking*, Campbell R. Harvey (Mar. 26, 2022).[28]

Even more troubling, "[b]y suggesting that [B]itcoin . . . cannot be the basis of an ETP, the Commission signals an aversion to innovation that may convince entrepreneurs that they should take their ingenuity to other sectors of our economy, or to foreign markets, where their talents will be welcomed with more enthusiasm." BatsBZX Dissent at Sec. III. As Coinbase has explained, "[c]rypto represents the next wave of innovation within the markets themselves—and whatever country encourages that innovation while also keeping investors safe will reap enormous benefits." Faryar Shirzad, *The Crypto Securities Market is Waiting to be Unlocked. But First We Need Workable Rules*, COINBASE BLOG (July 21, 2022).[29] The Commission's disapproval order here deters such vital innovation, and is fundamentally at odds with the agency's "unique obligation to consider the effect of a new rule upon 'efficiency, competition, and capital formation'" as well as "its economic consequences." *Business Roundtable v. SEC,* 647 F.3d 1144, 1148 (D.C. Cir. 2011) (citation omitted).

---

[28] https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-20121464-273430.pdf.

[29] https://www.coinbase.com/blog/the-crypto-securities-market-is-waiting-to-be-unlocked-but-first-we-need-workable-rules?.

## CONCLUSION

The petition for review should be granted and the Commission's Order vacated.

Dated:  October 18, 2022

Respectfully submitted,

HAIMAVATHI V. MARLIER
MICHAEL D. BIRNBAUM
JUSTIN YOUNG
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

KELLEY A. HOWES
MORRISON & FOERSTER LLP
370 17th Street Suite 4200
Denver, CO 80202

/s/ Joseph R. Palmore
JOSEPH R. PALMORE
ADAM L. SORENSEN
MORRISON & FOERSTER LLP
2100 L St., NW, Suite 900
Washington, DC 20037
Telephone:  (202) 887-6940
JPalmore@mofo.com

*Counsel for Amicus Curiae*

26

## CERTIFICATE OF COMPLIANCE

In accordance with Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and D.C. Circuit Rule 29 because it contains 5,084 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), as determined by the word-counting feature of Microsoft Word 2016.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

Dated:  October 18, 2022                      /s/ Joseph R. Palmore
                                                     Joseph R. Palmore

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system on October 18, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  October 18, 2022

/s/ Joseph R. Palmore
Joseph R. Palmore

NY:2450156