No. 22-1142

# In the United States Court of Appeals for the District of Columbia Circuit

───────────────

GRAYSCALE INVESTMENTS, LLC,
*Petitioner*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent*.

───────────────

On Petition for Review of an Order of the Securities and Exchange Commission

───────────────

## BRIEF OF *AMICUS CURIAE* THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF PETITIONER

───────────────

JORDAN L. VON BOKERN
TYLER S. BADGLEY
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5747

JUDSON O. LITTLETON
DANIEL J. RICHARDSON
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006-5215
(202) 956-7500
littletonj@sullcrom.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amicus curiae* the Chamber of Commerce of the United States of America certifies as follows:

### A.  Parties and *amici*

The Chamber of Commerce of the United States of America is participating as an *amicus curiae* before this Court.  All other parties appearing to date in this Court are referenced in the Brief of Petitioner Grayscale Investments, LLC, Doc. No. 1968421, filed on October 11, 2022.

### B.  Ruling under review

The ruling under review is the Securities and Exchange Commission's June 29, 2022 final order titled Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to List and Trade Shares of Grayscale Bitcoin Trust Under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares), Release No. 34-95180, 87 Fed. Reg. 40,299 (July 6, 2022).

### C.  Related cases

To *amicus curiae*'s knowledge, there are no related cases pending before this or any other Court.

# TABLE OF CONTENTS

*Page*

Interest of the *amicus curiae* ................................................................1

Introduction..............................................................................................2

Argument...................................................................................................5

I.   The SEC's Disapproval of the NYSE Arca Proposal Violated the
     Exchange Act and the APA...........................................................5

II.  The Commission's Enactment of Policy Without Notice and
     Comment Deprives the Public of Fair Notice and an Opportunity to
     Participate in Policymaking .......................................................14

III. The Commission's Approach Harms U.S. Investors and Businesses.......24

Conclusion................................................................................................28

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Anglers Conservation Network* v. *Pritzker*,
    809 F.3d 664 (D.C. Cir. 2016)............................................................8

*Assoc. of Civ. Technicians* v. *Fed. Labor Relations Auth.*,
    22 F.3d 1150 (D.C. Circ. 1994)..........................................................7

*Azar* v. *Allina Health Servs.*,
    139 S. Ct. 1804 (2019) ...........................................................16, 17

*Bloomberg L.P.* v. *SEC*,
    45 F.4th 462 (D.C. Cir. 2022) ...........................................................7

*Bus. Roundtable* v. *SEC*,
    905 F.2d 406 (D.C. Cir. 1990)............................................................8

*Carlson* v. *Postal Reg. Comm'n*,
    938 F.3d 337 (D.C. Cir. 2019)..........................................................10

*De Niz Robles* v. *Lynch*,
    803 F.3d 1165 (10th Cir. 2015)........................................................19

*Earth Island Inst.* v. *Hogarth*,
    494 F.3d 757 (9th Cir. 2007)..........................................................12

*Envt'l Integrity Project* v. *EPA*,
    425 F.3d 992 (D.C. Cir. 2005)..........................................................17

*Fox* v. *Clinton*,
    684 F.3d 67 (D.C. Cir. 2012)............................................................5

*Judulang* v. *Holder*,
    565 U.S. 42 (2011)........................................................................5

*Kirk* v. *SSA*,
    987 F.3d 314 (4th Cir. 2021)..........................................................12

*Mack Trucks, Inc.* v. *EPA,*
   682 F.3d 87 (D.C. Cir. 2012)..............................................................17

*MCI Telecomms. Corp.* v. *FCC,*
   57 F.3d 1136 (D.C. Cir. 1995)...........................................................17

*Mendoza* v. *Perez,*
   754 F.3d 1002 (D.C. Cir. 2014).........................................................18

*NLRB* v. *Bell Aerospace Co.,*
   416 U.S. 267 (1974)...........................................................................19

*Patel* v. *INS,*
   638 F.3d 1199 (9th Cir. 1980)...........................................................24

*Pub. Citizen* v. *Fed. Motor Carrier Safety Admin.,*
   374 F.3d 1209 (D.C. Cir. 2004)...........................................................6

*SEC* v. *Chenery,*
   332 U.S. 194 (1947)...........................................................................18

*SEC* v. *Telegram Grp. Inc.,*
   448 F. Supp. 3d 352 (S.D.N.Y. 2020)...............................................21

*Susquehanna Int'l Grp. LLP* v. *SEC,*
   866 F.3d 442 (D.C. Cir. 2017).............................................................7

*Westar Energy, Inc.* v. *FERC,*
   473 F.3d 1239 (D.C. Cir. 2007)......................................................6, 12

**STATUTES**

5 U.S.C. § 553 ...................................................................................16

15 U.S.C. § 78f ....................................................................................9

15 U.S.C. § 78mm.................................................................................8

15 U.S.C. § 78s.............................................................................7, 8, 9

**REGULATIONS**

17 C.F.R. 240.19b-4.........................................................................9, 12

70 Fed. Reg. 3,749 (Jan. 26, 2005)................................................................14

71 Fed. Reg. 14,967 (Mar. 24, 2006)............................................................14

85 Fed. Reg. 68,124 (Oct. 27, 2020) ............................................................22

86 Fed. Reg. 61,804 (Nov. 8, 2021) .............................................................13

86 Fed. Reg. 64,539 (Nov. 18, 2021) ...........................................................15

87 Fed. Reg. 21,676 (Apr. 12, 2022) ...........................................................15

87 Fed. Reg. 8,686 (Feb. 15, 2022)..............................................................23

## OTHER AUTHORITIES

Bloomberg Professional Services, *SEC Fixed Income Quotation Rule 15c2-11* (July 26, 2022) ..............................................................26

Coinbase, Petition for Rulemaking – Digital Asset Securities Regulation (July 21, 2022) .......................................................21

Dissenting Statement of Hester M. Peirce in Response to SEC Release No. 34-88284 (Feb. 28, 2020)....................................20

Gensler, Chair, *Remarks to the Investor Advisory Committee* (Sept. 21, 2022) ...........................................................................25

Hinman, Dir. of Corp. Fin., *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018) ...................................20

*In re Fu & Ming*, SEC Release No. 11104 (Sept. 21, 2022) ...........................23

Letter from Josephine Tao, Ass. Dir., Office of Trading Practices, Re: Amended Rule 15c2-11 in Relation to Fixed Income Securities (Sept. 24, 2021)....................................................22

Letter from SIFMA to Chair Gensler Re: SEC Rule 15c2-11 (June 10, 2022)..................................................................................22

Testimony Before the House of Representatives Committee on Financial Services (Oct. 5, 2021) .....................................................26

Tinianow, *First Approved Brazilian Bitcoin ETF Seeks to Raise*
    *500 Million BRL ($90,000,000 USD)*, Forbes (Mar. 22, 2022)....................27

## RULE 29 STATEMENTS

The parties have consented to the filing of this *amicus* brief.

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Circuit Rule 29(b), undersigned counsel states that the Chamber of Commerce of the United States of America ("Chamber") is a non-profit, tax-exempt organization incorporated in the District of Columbia.  The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

Pursuant to Circuit Rule 29(d), *amicus* is unaware of other entities or individuals intending to participate as *amici* to represent the concerns of the U.S. business community and address how the order under review here reflects a concerning broader trend in the Securities and Exchange Commission's recent enforcement practices.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* certifies that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## INTEREST OF THE *AMICUS CURIAE*

The Chamber is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community. Many of the Chamber's members are companies subject to U.S. securities laws and may be adversely affected by the Securities and Exchange Commission's regulatory actions.

## INTRODUCTION

This case represents one of a number of recent instances where the Securities and Exchange Commission ("Commission") appears to be making major policy decisions in the shadows, depriving regulated entities of notice and the opportunity to comment. These policy decisions often rely on considerations that have no basis in the relevant statutory text or depart drastically from established agency precedent. This approach has enabled the Commission to pick winners and losers without having to account for its reasoning to the interested public or to the courts, thereby depriving investors of the freedom to make their own investment choices and businesses of the certainty they need to innovate and meet investor demand.

In this instance, the Commission's freewheeling private policymaking occurred in the context of determining which high-demand digital asset investments may trade on national securities exchanges. The Securities Exchange Act of 1934 directs that the Commission "shall approve" national security exchanges' proposed rule changes so long as they are "designed to prevent fraud and manipulation" and "protect[] investors and the public interest." NYSE Arca, a national securities exchange regulated by the Commission, submitted a proposal to list and trade shares of Grayscale

Bitcoin Trust ("Trust"), which is operated by the world's largest manager of digital currency assets and currently has 850,000 investors. Because the Trust holds bitcoins, the price of Trust securities is tied to the underlying value of bitcoins in the spot market.

This was not the first time the Commission was asked to approve the listing of securities relating to bitcoin. While NYSE Arca's proposal was pending, the Commission approved the listing of securities tied to bitcoin *futures* contracts. And NYSE Arca had argued that, because bitcoin futures contracts rely on the same pricing data and present the same risk of fraud as securities tied directly to bitcoins, the Commission should approve its proposal for the same reasons.

The Commission nonetheless disapproved NYSE Arca's proposal in the order now under review. That disapproval was expressly not grounded in the Exchange Act, which requires the Commission to approve rule changes that comport with the Act's requirements. Nor did the Commission provide an adequate justification for why it is treating bitcoin spot market securities differently than bitcoin futures, despite arguments that the investments pose materially similar risks of fraud or manipulation. Without an adequate justification, the public can have no assurance that the

Commission's apparent policy determination—that securities tied to the bitcoin spot market should not be made available to retail investors on national securities exchanges—is the product of reasoned, non-arbitrary agency decisionmaking.

Agency policy judgments affecting an innovative industry that meets high consumer demand should be made transparently. The APA instructs agencies to make broadly applicable and significant policy decisions through the notice-and-comment process, which provides the public with a chance to weigh in and requires the agency to seriously consider and respond to the comments it receives. Yet the Commission has recently avoided those procedures on numerous occasions, opting instead to announce new and highly consequential policies through ad hoc enforcement actions and supposedly "non-final" guidance documents. These actions stifle the public's ability to comment on or challenge the agency's decisions and allow the Commission to coerce parties into compliance.

The Commission's actions, both in issuing a decision without adequate explanation and in avoiding rulemaking on this issue, ultimately harm investors and businesses. The Commission has repeatedly espoused the importance of investor choice and clear rules to the health of the U.S.

securities markets.  But its unexplained actions with respect to digital assets reflect a paternalistic belief that the agency knows better than investors. And the Commission's decision not to transparently announce its policy views through the APA's rulemaking process wreaks havoc on businesses making a concerted effort to adhere to U.S. law and has driven capital to foreign markets that have embraced the need to constructively address the treatment of digital assets within their regulatory frameworks.

The APA undoubtedly affords administrative agencies leeway when making policy judgments entrusted to them by Congress.  But the APA does not give an agency a blank check to make decisions that affect large sectors of the economy through orders that ignore statutory mandates, draw arbitrary distinctions, and rest on broadly applicable policy judgments made in the shadows.

## ARGUMENT

### I.   The SEC's Disapproval of the NYSE Arca Proposal Violated the Exchange Act and the APA

The APA requires agencies to "engage[] in reasoned decisionmaking," *Judulang* v. *Holder*, 565 U.S. 42, 53 (2011), and to proceed in a "logical and rational" manner from one decision to the next.  *Fox* v. *Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012).  Although the APA does not invite courts to second-guess

agency judgments, it does require setting aside decisions that fail to account for "a factor the agency must consider under its organic statute," *Pub. Citizen* v. *Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004), or that treat similar cases differently without identifying any "*relevant* distinction between" them. *Westar Energy, Inc.* v. *FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) (emphasis added).

In disapproving NYSE Arca's proposal to allow the listing of Trust securities, the Commission contravened both of those principles. First, the Exchange Act requires the Commission to approve proposed rule changes that are consistent with the Exchange Act and the Commission's regulations. Yet the Commission *admittedly* disregarded the statutory text in disapproving NYSE Arca's proposed rule change, relying instead on its own policy judgments and non-statutory criteria that it did not adopt in any Commission rule or regulation. Second, the Commission's decision disapproves the listing of securities tied to the bitcoin spot market based on an impossible-to-meet standard that it has relaxed when considering other securities—including securities tied to bitcoin *futures* contracts, which NYSE Arca explained are tied to the same pricing data. If reasoned decisionmaking means anything, it requires an agency to apply statutorily

mandated factors and forbids the agency from drawing arbitrary distinctions between similar proposals.

1.     Section 19(b) of the Exchange Act governs the Commission's review of rule changes proposed by national securities exchanges:  "The Commission *shall approve* a proposed rule change . . . if it finds that such proposed rule change is consistent with the requirements of [the Exchange Act] and the rules and regulations issued under [the Act] that are applicable to such organization."  15 U.S.C. § 78s(b)(2)(c)(i) (emphasis added).  Two features of that statute are important to understanding the scope of the authority Congress granted the Commission, and why the Commission exceeded that authority here.

*First*, Section 19(b) uses mandatory terms.  The Commission *must* approve a proposed rule change if it finds that the proposal meets the requirements of the Act.  *See Bloomberg L.P.* v. *SEC*, 45 F.4th 462, 470 (D.C. Cir. 2022); *Susquehanna Int'l Grp. LLP* v. *SEC*, 866 F.3d 442, 445-46 (D.C. Cir. 2017); *see also Assoc. of Civilian Technicians* v. *Federal Labor Relations Auth.*, 22 F.3d 1150, 1153 (D.C. Cir. 1994).   That mandatory language stands in notable contrast to other parts of the Exchange Act— including an adjacent provision of Section 19.  In Section 19(c), Congress

provided that the Commission "*may* abrogate, add to, or delete from . . . the rules of a self-regulatory organization . . . as the Commission deems necessary and appropriate . . . in furtherance of the purposes of" the Exchange Act.  15 U.S.C. §78s(c) (emphasis added); *see Bus. Roundtable* v. *SEC*, 905 F.2d 406, 408–09 (D.C. Cir. 1990) (noting the differences between the mandatory review authority of Section 19(b) and the discretionary authority of Section 19(c)).  Similarly, Section 36 of the Exchange Act affords the Commission broad discretion to exempt regulated parties from the Act's requirements as it sees fit:   "The Commission . . . *may* conditionally or unconditionally exempt any person, security or transaction . . . from any provision [of the Act] or any rule or regulation thereunder, to the extent such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors."  15 U.S.C. § 78mm (emphasis added).

"Ordinarily, legislation using 'shall' indicates a mandatory duty while legislation using 'may' grants discretion."  *Anglers Conservation Network* v. *Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016).  "[W]hen a statutory provision uses both 'shall' and 'may'"—as Section 19 does—"it is a fair inference that the writers intended the ordinary distinction."   *Id.*  By purposefully using mandatory language in Section 19(b), Congress *directed* the Commission to

approve proposed rules that comport with the statute. The provision does not give the Commission discretion to substitute its own policy preferences for what the statutory text requires.

*Second*, Section 19(b) constrains what the Commission may consider when evaluating a proposed rule change. It must consider only whether proposed rule changes comport with (1) "requirements of the [Exchange Act]"; and (2) applicable "rules and regulations issued under the [Exchange Act]." 15 U.S.C. § 78s(b)(2)(C)(i). As relevant to this case, the Exchange Act simply requires that the rules of national securities exchanges be "designed to prevent fraudulent and manipulative acts and practices." 15 U.S.C. § 78f(b)(5). And although the Commission has promulgated a rule setting forth the process for reviewing and implementing proposed rule changes submitted by national securities exchanges, *see* 17 C.F.R. 240.19b-4, that regulation does *not* identify criteria the Commission will consider when evaluating whether proposed rule changes meet that requirement.

Taken together, Section 19(b) both (i) *requires* the Commission to approve an exchange's proposed rule whenever it finds that the proposal is consistent with the Exchange Act and (ii) *bars* the Commission from

-9-

considering any factors other than those identified in the statute or in duly promulgated agency regulations in making that determination.

2.    The Commission's disapproval of the NYSE Arca Proposal ventured well outside the guardrails Congress set in Section 19(b). Rather than confine its review to determining whether the Proposal complied with the statutory text, the Commission's analysis turned on a single agency-created factor—an information-sharing agreement between the exchange and a regulated market for the underlying commodity—that appears nowhere in the Exchange Act or rules promulgated thereunder. As this Court has long recognized, an agency's action "is arbitrary and capricious" where—as here—it elevates its own policy judgments over "statutory objectives and factors." *Carlson* v. *Postal Reg. Comm'n*, 938 F.3d 337, 345 (D.C. Cir. 2019).

In evaluating the NYSE Arca Proposal, the Commission claimed that, under a test created by the Commission (but not in any rulemaking), there were only two ways NYSE Arca could demonstrate that its proposed rule change was designed to prevent fraud and manipulation. First, the exchange could demonstrate that it "has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the

underlying or reference bitcoin assets." Order 3-4. Second, it could show that the spot bitcoin market was "uniquely and inherently resistant to fraud and manipulation." *Id.* at 18.

This test finds no basis whatsoever in the text of the Exchange Act. In fact, the Commission openly admitted that it was *not* evaluating NYSE Arca's Proposal according to the statute's terms, stating that its "assessment" of the proposal "*d[id] not focus on* . . . the overall risk of fraud and manipulation." Order 65–66 (emphasis added). Instead, the Commission defined "the necessity of . . . a surveillance-sharing arrangement" with a regulated market of significant size as the "*central issue*" for its consideration. Order 65, n.202 (emphasis added). The agency then went on to articulate brand new, and even more specific and restrictive, standards for what counts as a "regulated market" of "significant size" than it had previously adopted under its agency-created test. And as the only alternative to such an agreement, the Commission announced an insurmountable standard requiring NYSE Arca to point to "novel" means of deterring fraud that go "beyond those protections that exist in traditional commodity markets." *Id.* at 9–10.

Nothing in the Exchange Act suggests that Congress empowered the Commission to make surveillance-sharing agreements the singular criterion for approval under Section 19(b).  Nor has the Commission promulgated any "rule or regulation" explaining (and subjecting to scrutiny) its view that surveillance-sharing agreements are the exclusive way of demonstrating compliance with the Exchange Act.[1]  On the contrary, the statute simply instructs the agency to consider the "overall risk of fraud and manipulation" that the agency here expressly chose to ignore.  The Commission's elevation of its own agency-made criteria above those Congress provided in the Act is a sufficient basis to reject the Commission's decision.  *See Earth Island Inst.* v. *Hogarth*, 494 F.3d 757, 765 (9th Cir. 2007) ("An agency may not ignore factors Congress explicitly required to be taken into account.").

3.    A "fundamental norm of administrative procedure requires an agency to treat like cases alike."  *Kirk* v. *SSA*, 987 F.3d 314, 321 (4th Cir. 2021) (quoting *Westar Energy*, 473 F.3d at 1241).  Therefore, even on the

---

[1] The only regulation cited by the Commission to support its exclusive focus on surveillance sharing was Rule 19b-4.  *See* Order 5 n.16.  That Rule discusses "surveillance program[s]" only in the context of describing "new derivative securities products" that *do not* require approval by the Commission under Section 19(b).  *See* 17 C.F.R. § 240.19b-4(e).  It does not purport to adopt a rule requiring a surveillance-sharing agreement in order to show that commodity-trust ETPs are resistant to fraud and manipulation.

Commission's own terms—requiring a surveillance-sharing agreement as effectively the only way to show resistance to fraud and manipulation—the Commission still would need to apply this requirement consistently.  It has not done so here.

*First*, the Commission has not sufficiently explained why it draws a line between securities tied to bitcoin's spot markets versus futures markets. The Commission has previously approved the listing of securities invested in bitcoin futures contracts, and NYSE Arca argued that those contracts are priced according to a reference rate that is itself pegged to the trading price of bitcoins on the spot market.  In other words, NYSE Arca's proposal contended that because both the futures-based bitcoin securities the Commission has approved and the Trust securities at issue here are tied to the price of bitcoins in the spot market, both should be treated the same. *See* NYSE Arca Proposal, 86 Fed. Reg. 61,804, 61,815 (Nov. 8, 2021).  Yet as Grayscale has explained at length (*see* Petr. Br. at 28-34), the Commission has never satisfactorily explained why one security should be available to retail investors why the other is not.

*Second*, the Commission has approved the listing of securities tied to the spot market for traditional commodities, and NYSE Arca argued that

those securities too present comparable risks to securities tied to the spot price of bitcoin.  *See, e.g.*, SEC, Order Approving iShares Silver Trust, 71 Fed. Reg. 14,967 (Mar. 24, 2006); Comex Gold Trust Order, 70 Fed. Reg. 3,749, 3,751 n.21 (Jan. 26, 2005).  The Commission's only attempt to distinguish these prior orders appears in a footnote, observing that the futures markets for these commodities were active "for a long period of time" before the Commission approved a security pegged to the spot market. Order at 8 n.23.  But the Commission never explained why it believes that fact has anything to do with the risk of "fraud and manipulation" involved in the proposed investment.

Notwithstanding NYSE Arca's arguments that these investments are materially comparable, the Commission's Order gives no reasoned explanation for why it treats spot-market bitcoin securities differently. Regardless of whether the agency is applying the correct standards in the first place, that outcome runs afoul of the APA.

## II. The Commission's Enactment of Policy Without Notice and Comment Deprives the Public of Fair Notice and an Opportunity to Participate in Policymaking

The Commission's disapproval of the Proposal on non-statutory and arbitrary grounds is the agency's 13th disapproval of a request to allow

listing of these high-demand investment products on national securities exchanges.    And those disapprovals have been grounded in shifting rationales.[2]  This history, when viewed against the Commission's unreasoned analysis here, suggests a single conclusion:  The Commission simply believes that securities tied to the bitcoin spot market, as a class, are too dangerous to be made available to retail investors, or are in some other way inconsistent with the Commission's current policy preferences.    But rather than announcing this position and soliciting input through notice-and-comment rulemaking, the Commission has apparently chosen to implement this policy determination through ad hoc orders that are not subject to the rigorous public scrutiny and other requirements associated with rulemaking. Unfortunately, this is not the only context in which the current Commission has employed that approach.    Even while undertaking an aggressive rulemaking agenda on certain matters, the Commission is at the same time

---

[2] For example, a prior proposal to list a security tied to bitcoin argued that it would be arbitrary to deny the proposal given that the Commission has already approved bitcoin-based exchange-traded funds tied to bitcoin futures registered under the 1940 Investment Company Act.  *See* 86 Fed. Reg. 64,539, 64,552 (Nov. 18, 2021) ("VanEck Order").  The Commission rejected that argument on the ground that the Exchange Act and 1940 Act are different regulatory regimes.  *Id.*    But now that the Commission has approved securities tied to bitcoin futures under the Exchange Act, *see*  87 Fed. Reg. 21,676 (Apr. 12, 2022) ("Teucrium Order"), that rationale was not a viable basis to reject the NYSE Arca Proposal.

increasingly announcing major decisions through no-action letters, individual orders, and informal guidance documents, rather than the APA's notice-and-comment process.

By enacting highly significant and broadly applicable policy through one-off orders and unreviewable policy statements, the Commission improperly exercises power without having to fully articulate and defend the general principles it is applying.  This approach cannot be squared with the APA or fundamental principles of agency accountability.

1.  Before an agency issues a new rule, the APA requires that a "general notice of proposed rulemaking shall be published in the Federal Register" and that "the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments."  5 U.S.C.  § 553(b) and (c).  Those notice-and-comment procedures provide an important check on bureaucratic power and improve government decision-making.  "Notice and comment gives affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes—and it affords the agency a chance to avoid errors and make a more informed decision."  *Azar* v. *Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019).  By providing citizens with an opportunity to raise

concerns and requiring agencies to take seriously the feedback they receive, this process improves accountability and the quality of government policy— "benefits" that are "especially valuable when it comes to a [decision that] can impact millions of people and billions of dollars in ways that are not always easy for regulators to anticipate." *Id.*; *see also MCI Telecomms. Corp.* v. *FCC*, 57 F.3d 1136, 1143 (D.C. Cir. 1995) ("[T]he conclusory manner in which the Commission dealt with . . . important issues only points [to] the importance of providing the public with adequate notice and an opportunity to comment.").

The APA's commitment to open and deliberative rulemaking is pervasive.  While the statute contains a "good cause exception" to notice-and-comment procedures, that exception is limited to truly "emergency situations," such as those involving "imminent hazards" or other matters of "life-saving importance."  *See Mack Trucks, Inc.* v. *EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).  The APA also bars agencies from adopting final regulations that depart considerably from the earlier proposals submitted to the public for comment.  *See Envt'l Integrity Project* v. *EPA*, 425 F.3d 992 (D.C. Cir. 2005).  And as this Court has recognized, the APA prohibits agencies from end-running the rulemaking process altogether by creating binding rules

through informal guidance documents and policy statements. *See Mendoza* v. *Perez*, 754 F.3d 1002, 1025 (D.C. Cir. 2014) (rejecting an agency's attempt to make policy through guidance and letters not published for notice and comment).

As especially relevant here, the Supreme Court has previously instructed the Commission that "[t]he function of filling in the interstices of the [securities laws] should be performed, as much as possible, through the quasi-legislative promulgation of rules to be applied in the future." *SEC* v. *Chenery*, 332 U.S. 194, 202 (1947). Although *Chenery* also recognized that agencies are not foreclosed from announcing and applying a new rule in the context of an adjudicative order rather than rulemaking, the Court cautioned that, because the Commission has "the ability to make new law prospectively through the exercise of its rule-making powers, it has less reason to rely upon ad hoc adjudication to formulate new standards of conduct." *Id.* In particular, whereas orders are well-suited to "problem[s] . . . so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule," rulemakings are the appropriate way to announce significant policy decisions that will apply broadly and guide the agency's determinations in future cases. *Id.* at 203.

-18-

To the extent the Commission has made a policy determination that securities tied to the bitcoin spot market categorically present too much of a risk to be made available to everyday investors on national securities exchanges—as appears to be the case based on the Commission's inability or unwillingness to adequately explain its rationale—that is a rule the APA requires the agency to make in the context of a rulemaking, not seriatim one-off adjudicative orders. *See NLRB* v. *Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("[T]here may be situations where [an agency's] reliance on adjudication" over rulemaking "would amount to an abuse of discretion."); *see also De Niz Robles* v. *Lynch*, 803 F.3d 1165, 1173 (10th Cir. 2015) (Gorsuch, J.) ("While the Court has granted agencies a fair amount of flexibility in choosing between rulemaking and adjudication, it has long encouraged the former route because rulemaking offers more notice (due process) and better protects against invidious discrimination (equal protection).").

2.      Despite the importance of notice-and-comment rulemaking, the Commission has recently tried to avoid it in numerous important areas. This trend is prevalent in the Commission's treatment of digital assets, but also extends well beyond that context, as the Commission is increasingly relying

on staff letters and enforcement actions to adopt positions that substantially impact U.S. financial markets.

The NYSE Arca Proposal is the 13th proposal to list a spot bitcoin security that the Commission has rejected. Although the Commission has purported to resolve each proposal on its own facts, its shifting and unpersuasive rationales between these various orders evince an "unwilling[ness] to approve the listing of any product that would provide access to the market for bitcoin." Dissenting Statement of Hester M. Peirce in Response to SEC Release No. 34-88284 (Feb. 28, 2020) (U.S. Bitcoin and Treasury Investment Fund disapproval) ("Pierce Dissent"). Yet the agency has declined to initiate a rulemaking that would offer "a rational justification for subjecting bitcoin to a standard different from that in prior orders." *Id.*

The Commission has adopted a similarly ad hoc approach to the arguably more fundamental issue of whether and under what circumstances digital assets are "securities." In recent years, Commission leadership has spoken openly about the difficulty of applying traditional tests for determining a "security" to emerging cryptocurrencies. *See, e.g.*, William Hinman, Dir. of Corp. Fin., *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018). Yet rather than adopt a generally applicable,

prospective rule about the proper treatment of digital assets under the securities laws—which would provide much-needed clarity and an opportunity for input to investors, promotors, and platform operators—the Commission has instead decided to announce its positions through individual enforcement actions. *See SEC* v. *Telegram Grp. Inc.*, 448 F. Supp.3d 352, 358 (S.D.N.Y. 2020) (granting SEC motion for preliminary injunction in enforcement action alleging that transactions in cryptocurrencies reflected "a sale of securities without a registration statement").

Those enforcement actions have greatly disrupted firms that facilitate the trading of digital assets, which cannot be easily shoe-horned into a securities law regime built for very different kinds of investments. *See* Coinbase, Petition for Rulemaking – Digital Asset Securities Regulation 5–7 (July 21, 2022). Had the Commission instead pursued rulemaking as the APA envisions, that issue could have been examined in a transparent way with public input from all interested parties. But under the Commission's enforcement-first approach, regulated parties are put to the choice of either litigating with their backs to the wall in court or pleading with the agency for relief from novel requirements that may not be lawful in the first place. Rather than relying on enforcement actions, the Commission should provide

clear rules of the road delineating where the Commission believes its authority starts and stops.

The problem is not confined to the digital asset sector.  For example, the Commission similarly sought to avoid the notice-and-comment process when it recently announced a novel interpretation of Rule 15c2-11, which requires issuers to make certain information publicly available before engaging in over-the-counter securities transactions.  For decades, that regulation has been applied exclusively to equity securities to protect ordinary investors (*e.g.*, from "penny stocks").  Yet in a sudden shift, the Commission recently announced that the rule would also apply to fixed-income securities offered exclusively to large institutional investors (called 144A bonds).  *See* Letter from SIFMA to Chair Gensler Re: SEC Rule 15c2-11 (June 10, 2022).

Here again, the Commission did not proceed through a rulemaking.  Instead, it rolled out its new policy in a letter from agency staff.  *See* Letter from Josephine Tao, Ass. Dir., Office of Trading Practices, Re: Amended Rule 15c2-11 in Relation to Fixed Income Securities (Sept. 24, 2021).  That letter departed from a rule *the Commission itself* had promulgated through the notice-and-comment process only a few months prior, which amended

Rule 15c2-11 without once mentioning fixed-income securities. *See* SEC, *Publication or Submission of Quotations Without Specified Information*, 85 Fed. Reg. 68,124 (Oct. 27, 2020). By evading the notice-and-comment process, the Commission was able to avoid grappling with the substantial and destabilizing consequences of this new interpretation on the more-than-$5 trillion market for 144A bonds.

Yet another example of the Commission's enforcement-first strategy arose only a month ago with the Commission's approach to insider trading. So-called "10b5-1 trading plans" enable company insiders to engage in securities transactions without running afoul of insider trading laws. To prevent insiders from abusing those trading plans, the Commission proposed a rule late last year that would require, among other changes, increased public disclosure of trading plans and a mandatory 120-day "cooling off" period between when a plan is established and when trading may begin. *See* SEC, *Rule 10b5-1 and Insider Trading*, 87 Fed. Reg. 8,686 (Feb. 15, 2022). Yet before that rule was finalized, the Commission in an enforcement action required an individual found liable for insider trading to comply with the 120-day cooling off period that was in the proposed rule. *See In re Fu & Ming*, SEC Release No. 11104, ¶ 41 (Sept. 21, 2022). In other words, the

Commission forced a policy into place through enforcement that it had not yet implemented through notice-and-comment rulemaking. *See Patel* v. *INS*, 638 F.2d 1199, 1204 (9th Cir. 1980) (holding that an agency violated the APA by implementing a policy through an order that it had earlier tried and failed to implement through a rule).

In short, the Commission's unsubstantiated disapproval of the NYSE Arca Proposal cannot withstand APA scrutiny on its own terms, and instead appears to reflect a broader determination that bitcoin-based securities should not trade on national securities exchanges. Whether or not that policy judgment is wise, it should be made transparently in the context of a rulemaking, not in the background of seriatim one-off orders.

## III.    The Commission's Approach Harms U.S. Investors and Businesses

As discussed above, the Commission's disapproval of the NYSE Arca Proposal and a dozen other proposed rule changes involving bitcoin-based securities appears to reflect a policy determination that ordinary investors need to be shielded from the risks of investing in bitcoin. Because the Commission has implemented that judgment not through rulemakings that would provide clarity across the board, but through one-off orders that offer no meaningful guidance for the future, the Commission has left regulated

parties in limbo, causing American businesses to suffer at the expense of foreign competitors.

The Commission has often explained that the markets function best when investors are free to make well-informed choices. *See, e.g.*, SEC Release No. 93122 (Sept. 24, 2021) ("The Commission believes that the proposed rule change is consistent with the Act because it would provide investors with additional investment choices."). Chair Gensler himself recently explained the "basic bargain" underlying U.S. capital markets as one where "[i]nvestors get to decide which risks to take as long as companies provide full, fair, and truthful disclosures." Gary Gensler, Chair, *Remarks to the Investor Advisory Committee* (Sept. 21, 2022).

Despite those pronouncements, the Commission's actions in this case deprive retail investors of the ability to choose a security tied to the bitcoin spot market. And paradoxically, while the Commission has repeatedly suggested that investors in cryptocurrency markets would benefit from its oversight, its decision here disapproves a proposal that would bring about that very result. A competitive and workable regulatory framework for digital assets is critical to the ability of the United States to attract the

capital to fund this growing industry and for the promise of the technology to be realized.

The Commission has likewise acknowledged that "companies and investors alike benefit" when the "rules of the road" are clearly defined. Testimony Before the House of Representatives Committee on Financial Services, (Oct. 5, 2021). Notice-and-comment rulemaking facilitates that objective by giving private parties a hand in shaping public policy and by building in time for businesses and investors to adjust to new requirements.

Predictably, the Commission's recent approach has had the opposite effect. By springing new legal interpretations on parties through enforcement actions or unexpected guidance documents, businesses are left scrambling to learn the latest rules and guessing at what might come next. The staff letter applying Rule 15c2-11 to fixed-income securities destabilized a well-functioning market and led to "fears that unintentional noncompliance could spell trouble for firms or keep them from the market altogether." Bloomberg Professional Services, *SEC Fixed-Income Quotation Rule 15c2-11: Industry Impact and Unanswered Questions* (July 26, 2022), https://tinyurl.com/SECFixed-IncomeQuotationRule. Similarly, the Commission's recent enforcement actions classifying certain digital assets as

securities raised more questions than they answered. Following those actions, it is unclear what approach the agency will apply to other digital assets going forward and how that approach will affect other market participants, such as the platforms that trade digital assets. In each case, American businesses are left to navigate an uncertain legal landscape, even as regulators around the world take steps to lay down clear rules. *See* Andrea Tinianow, *First Approved Brazilian Bitcoin ETF Seeks to Raise 500 Million BRL ($90,000,000 USD)*, Forbes (Mar. 22, 2021), https://tinyurl.com/BrazilianBitcoinETF (Annemarie Tierney, former SEC regulator, explained that "the growing regulatory acceptance for publicly traded crypto ETFs in other jurisdictions highlights the competitive disadvantage facing issuers seeking to launch a similar product in the U.S. public markets").

## CONCLUSION

For the foregoing reasons, and in light of the Commission's arbitrary and capricious decision to reject the NYSE Arca Proposal, this Court should grant Grayscale's petition and set aside the Commission's Order.

Respectfully submitted,

/s/ *Judson O. Littleton*

JORDAN L. VON BOKERN
TYLER S. BADGLEY
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C.  20062
(202) 463-5747

JUDSON O. LITTLETON
DANIEL J. RICHARDSON
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006-5215
(202) 956-7500
littletonj@sullcrom.com

OCTOBER 18, 2022

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD COUNT LIMITATIONS

I, Judson O. Littleton, counsel for *amicus curiae* the Chamber of Commerce of the United States of America and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief is proportionately spaced, has a typeface of 14 points or more, and contains 5,338 words.

/s/ *Judson O. Littleton*
JUDSON O. LITTLETON

OCTOBER 18, 2022

## CERTIFICATE OF SERVICE

I, Judson O. Littleton, counsel for *amicus curiae* the Chamber of Commerce of the United States of America and a member of the Bar of this Court, certify that, on October 18, 2022, a copy of the attached brief was filed electronically through the CM/ECF system with the Clerk of this Court. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

s/ *Judson O. Littleton*
JUDSON O. LITTLETON

OCTOBER 18, 2022