**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 22-1142**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

GRAYSCALE INVESTMENTS, LLC,
Petitioner

v.

SECURITIES AND EXCHANGE COMMISSION,
Respondent

On Petition for Review of an Order of the
Securities and Exchange Commission

**JOINT APPENDIX**

Dan M. Berkovitz
  General Counsel
Michael A. Conley
  Solicitor
Tracey A. Hardin
  Assistant General Counsel
David D. Lisitza
  Senior Appellate Counsel
Emily True Parise
  Senior Appellate Counsel
Daniel T. Young
  Attorney
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
(202) 551-3078
youngda@sec.gov

*Counsel for Respondent*

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Sarah E. Weiner
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
  Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Petitioner*

*(Additional counsel listed on inside cover)*

January 20, 2023

Paul S. Mishkin
Joseph A. Hall
Daniel J. Schwartz
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
Paul.Mishkin@davispolk.com

*Counsel for Petitioner*

# TABLE OF CONTENTS

**Page**

Letter from Blockchain Association, RE: NYSE Arca Inc.'s Application to
Convert Grayscale BTC Trust to ETF (Nov. 29, 2021) ...................................... JA1

Letter from Grayscale, RE: Notice of Filing of Proposed Rule Change to List
and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule
8.201-E (Nov. 29, 2021) ...................................................................................... JA5

Letter from Coinbase, RE: Order Instituting Proceedings to Determine
Whether to Approve or Disapprove a Proposed Rule Change to List and
Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule
8.201-E (Mar. 3, 2022)...................................................................................... JA20

Letter from Hunting Hill, RE: Order Instituting Proceedings to Determine
Whether to Approve or Disapprove a Proposed Rule Change to List and
Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule
8.201-E (Mar. 3, 2022)...................................................................................... JA47

Letter from Campbell R. Harvey, RE: Comments on File No. SR-
NYSEArca-2021-90 (Mar. 26, 2022) ................................................................ JA50

Letter from Virtu Financial, RE: Notice of Filing of Proposed Rule Change
to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE
Arca Rule 8.201-E (Apr. 4, 2022)...................................................................... JA55

Letter from Horizon Kinetics, RE: Notice of Filing of Proposed Rule
Change to List and Trade Shares of Grayscale Bitcoin Trust (GBTC) under
NYSE ARCA Rule 8.201-E (Apr. 8, 2022)........................................................ JA59

Letter from James J. Angel, RE: Order Instituting Proceedings to Determine
Whether to Approve or Disapprove a Proposed Rule Change to List and
Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule
8.201-E (Apr. 17, 2022)..................................................................................... JA62

Letter from Hashem Dezhbakhsh, RE: Notice of Filing of Proposed Rule
Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under
NYSE Arca Rule 8.201-E (Apr. 24, 2022)....................................................... JA102

Letter from Donna Redel, RE: Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E (Apr. 25, 2022) .......................................................... JA105

Letter from Fortress Investment Group LLC, RE: Order Instituting Proceedings to Determine Whether to Approve or Disapprove a Proposed Rule\Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E (Apr. 25, 2022) ............................................. JA107

Letter from Robert E. Whaley, RE: Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E (May 25, 2022) ........................................................ JA111

Letter From Flow Traders, RE: Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E (June 6, 2022) ............................................................ JA119

Letter from GTS Securities, LLC, RE: Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E (June 10, 2022) ........................................................ JA121

Petition for Review, No. 22-1142 (D.C. Cir. June 9, 2022) ............................. JA123

Securities and Exchange Commission, Self-Regulatory Organizations; NYSE Arca, Inc.; Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to List and Trade Shares of Grayscale Bitcoin Trust Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares), 87 Fed. Reg. 40299 (July 6, 2022) ................................................................. JA128

Securities and Exchange Commission, Self-Regulatory Organizations; NYSE Arca, Inc.; Notice of Filing of Amendment No. 1 to, and Designation of a Longer Period for Commission Action on Proceedings To Determine Whether To Approve or Disapprove, a Proposed Rule Change To List and Trade Shares of Grayscale Bitcoin Trust (BTC) Under NYSE Arca Rule 8.201–E, 87 Fed. Reg. 28043 (May 10, 2022) .......... JA151



November 29, 2021

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-0609

RE: NYSE Arca Inc.'s Application to Convert Grayscale BTC Trust to ETF

Dear Ms. Countryman:

The Blockchain Association (the "Association") submits these comments in support of the application by NYSE Arca Inc. pursuant to Rule 19b-4 under the Securities Exchange Act of 1934 (as amended, the "Exchange Act") to list shares of BTC under NYSE Arca Rule 8.201-E as an exchange-traded product ("ETP"). The Association strongly urges the Securities and Exchange Commission (the "Commission") to approve NYSE Arca's application.

The Association is a not-for-profit organization dedicated to improving the public policy environment for public blockchain networks to allow them to develop and prosper in the United States. The Association endeavors to educate policymakers, courts, law enforcement, and the public about blockchain technology and the need for regulatory clarity to allow for a more secure, competitive, and innovative digital marketplace. The Association is comprised of industry leaders who are committed to responsibly developing and supporting public blockchain networks fueled by digital assets. Its diverse membership reflects the wide range of this dynamic market and includes digital asset exchanges and custodians, open-source software developers, trading firms, early-stage investors, and others supporting the entire ecosystem. Given our membership, the Association is well-positioned to provide the Commission with compelling reasons as to why NYSE Arca's application should be approved and insight into the importance of this decision.

Recently, the Commission has rightly focused its attention on the crucial mission of protecting investors. Inherent in the goal of investor protection is investor choice: the freedom to make well-informed decisions about investment opportunities that offer Americans the chance to grow and preserve their wealth. In the case of bitcoin, the investing public has clearly demonstrated its desire to invest. According to a survey conducted by the New York Digital Investment Group, 46 million Americans owned bitcoin as of May 2021. While there may be times when it is appropriate for the Commission to prohibit Americans from accessing certain investments, this is not one of those times.

JA 1

Although retail investors can already invest in bitcoin through several methods, such as using a digital asset exchange, participating in a private placement, or investing in an ETP that holds bitcoin futures contracts, these investment methods are not well-suited to every investor. Some lack the knowledge and motivation to register new accounts and manage relationships with digital asset exchanges. Others prefer to invest through brokerages or advisers whom they already trust, or with funds from retirement accounts that cannot be used for spot digital asset purchases. Additionally, many lack the "accredited investor" status they would need to gain exposure to exclusive offerings from venture capital and private equity firms. Approving a spot bitcoin ETP is the best way to protect and serve the interests of these American investors.

We applaud the Commission's recent decision to allow the listing and trading of ETPs that hold bitcoin futures contracts. Yet, while bitcoin futures ETPs have certain useful features, they are inferior investment products for many Americans due to their relatively higher cost and risk profile. Unlike spot ETPs, futures ETPs must roll their positions forward at the end of each month as their underlying futures contracts expire. The process of rolling positions forward can incur an additional cost to investors if later-month contracts are more expensive than near-month contracts, as is typically the case in bitcoin futures markets. These costs can add up quickly, costing investors as much as 10% per year plus fees. Futures ETPs are also subject to additional, unique risks related to position limits, limited liquidity, dilution, and other factors. For these reasons, a spot bitcoin ETP would provide many Americans a better vehicle for investing in bitcoin due to lower costs and less risk than futures ETPs.

In the past, the Commission has rejected spot bitcoin ETP applications due to concerns regarding Exchange Act Section 6(b)(5), which requires that the rules of a national securities exchange be designed to "prevent fraudulent and manipulative acts and practices" and "protect investors and the public interest."[1] According to the Commission, an exchange can satisfy Section 6(b)(5) by "demonstrating that there is a comprehensive surveillance-sharing agreement with a regulated market of significant size relating to the underlying assets" or that "the bitcoin market as a whole or the relevant underlying bitcoin market is 'uniquely' and 'inherently' resistant to manipulation."[2]

To date, no exchange seeking to list a spot bitcoin ETP has been able to demonstrate either surveillance-sharing agreements or inherent resistance to manipulation to the Commission's satisfaction. However, as previously mentioned, the Commission recently permitted the listing of bitcoin futures ETPs registered under the Investment Company Act of 1940 ("1940 Act"), despite the fact that these ETPs are based on the same underlying spot bitcoin markets and pose identical risks of manipulation as spot bitcoin ETPs. The Commission's approval of bitcoin futures ETPs naturally leads to the conclusion that its concerns regarding Section 6(b)(5) have been

---

[1] 15 U.S.C. 78f(b)(5).

[2] Order Disapproving [] the United States Bitcoin and Treasury Investment Trust [], 85 Fed. Reg. 12595 (Mar. 3, 2020), 12596.

satisfied. Yet, the Commission once again invoked Section 6(b)(5) in rejecting a spot bitcoin ETP proposal less than two weeks ago.[3]

In so doing, the Commission has unjustifiably evaluated bitcoin futures and spot ETPs under different standards. For example, the reference rate used to price bitcoin contracts underlying futures ETPs is subject to the same pricing quality risks as the index used to price spot bitcoin and calculate net asset value in spot ETPs; indeed, both pull data from largely-overlapping or identical trading platforms. While the Commission did not conclude that bitcoin futures ETPs use pricing data that is insufficiently protected from fraud and manipulation, it has done so for spot ETPs. There is no valid justification for this double standard.

The Commission has explained that the law allows for approval of bitcoin futures ETPs and denial of spot bitcoin ETPs simultaneously because futures ETPs are registered under the 1940 Act, and because bitcoin futures markets are more established and better regulated than spot markets. This explanation lacks merit for at least two reasons.

First, the 1940 Act was "intended to deter mismanagement of investment companies for the protection of investment company security holders."[4] The added investor protections for 1940 Act funds are designed and intended to protect investors against self-interested managers. This protection does not relate to the risk of fraud and manipulation in ETPs' underlying spot markets. Funds registered under the Securities Act of 1933 and those registered under the 1940 Act provide the same protections for investors regarding fraud and manipulation in the ETPs' underlying markets. Therefore, the Commission's belief that the 1940 Act confers additional investor protections relevant to the requirements of Section 6(b)(5) has no basis in law.

Second, both bitcoin's futures markets and spot markets are well-established and well-regulated. The Commodity Futures Trading Commission ("CFTC") has exercised its anti-manipulation and anti-fraud enforcement authority over bitcoin spot markets since 2014, three years longer than the CFTC has overseen bitcoin futures markets. Moreover, the CFTC's regulation of designated contract markets and other venues where bitcoin futures contracts are traded does not address the prospect of fraud and manipulation in bitcoin spot markets, the very markets that determine the pricing of those futures contracts. Therefore, the Commission's belief that futures ETPs and spot ETPs pose different levels of fraud and manipulation risk to investors is unfounded.

In short, the Commission's use of a double standard to evaluate bitcoin futures ETPs and spot ETPs is not only bad policy, it is in contravention of law. "A fundamental norm of administrative procedure requires an agency to treat like cases alike."[5] The Commission has not established material differences between futures ETPs and spot ETPs to justify different treatment, nor has it provided exchanges with a "principled way" to meet its interpretation of the requirements of

---

[3] *See* Order Disapproving [] VanEck Bitcoin Trust [], 86 Fed. Reg. 64539 (Nov. 12, 2021), 64551-52.
[4] *Herpich v. Wallace*, 430 F.2d 792, 815 (5th Cir. 1970).
[5] *Westar Energy, Inc. v. Fed. Energy Reg. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

Section 6(b)(5).[6] Lawful action under the Administrative Procedures Act demands more. The time has come for the Commission to approve a spot bitcoin ETP.

The Association thanks the Commission for the opportunity to provide comment on this important matter. If the Commission has questions or seeks further input on the benefits of a bitcoin spot ETP and the grounds for its approval, the Association and its members stand ready to devote their energy and expertise to assist the Commission in this critical endeavor.

Sincerely,

Kristin Smith
Executive Director

Jake Chervinsky
Head of Policy

---

[6] *Rapoport v. SEC*, 682 F.3d 98, 107 (D.C. Cir. 2012) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 197 (1947)).



**Davis Polk**  Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
davispolk.com

November 29, 2021

Re: File No. SR-NYSEArca-2021-90
Rel. No. 34-93504
Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC)
under NYSE Arca Rule 8.201-E as an
exchange-traded product ("ETP").[1]

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-0609

Dear Ms. Countryman:

We write on behalf of our client Grayscale Investments, LLC, sponsor of the Grayscale Bitcoin Trust (BTC), in support of the proposal by NYSE Arca Inc. pursuant to Rule 19b-4 under the Securities Exchange Act of 1934 (as amended, the "Exchange Act") to list shares of BTC under NYSE Arca Rule 8.201-E as an exchange-traded product ("ETP").[1]

The Commission has no basis for the position that investing in the derivatives market for an asset is acceptable for investors while investing in the asset itself is not. But having permitted the listing of multiple Bitcoin futures ETPs in the last several weeks, that is the policy decision the Commission would announce were it to deny NYSE Arca's application to list BTC.

\*       \*       \*

BTC holds Bitcoin valued at approximately $39.7 billion as of October 29, 2021,[2] representing approximately 3.4% of outstanding Bitcoin and making BTC the largest Bitcoin investment fund in the world.[3] Since September 2013, BTC has offered direct exposure to the Bitcoin spot market through a familiar and convenient product that does not burden investors with the risk and expense of direct digital asset custody and trading. BTC is a reporting issuer that has been subject to the requirements of Section 13 of the Exchange Act since January 2020.[4] Because Bitcoin is not a "security" for purposes of the

---

[1] In this letter, we use the generic term "ETP" to cover exchange-traded investment vehicles that are required to register under the Investment Company Act of 1940 (as amended, the "1940 Act"), also commonly referred to as "exchange-traded funds" or "ETFs," as well as those, like BTC, that are not subject to the registration requirements of the 1940 Act.

[2] Grayscale Investments, LLC, *Grayscale Bitcoin Trust Fact Sheet* at 2 (Nov. 2021) ("BTC Fact Sheet"), https://grayscale.com/wp-content/uploads/2021/11/GBTC-Trust-Fact-Sheet-November-2021.pdf.

[3] Based on Bloomberg L.P. terminal search for AUM of all "Bitcoin Funds."

[4] *See* BTC Fact Sheet at 1; *see also* Grayscale Bitcoin Trust, Am. No. 1 to Registration Statement on Form 10 (Form 10-12G/A), at 2 (Dec. 31, 2019); Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E, Securities and Exchange Act Release 93504 (Nov. 2, 2021), 86 Fed. Reg. 61,804, 61,805 n.7 (Nov. 8, 2021) (SR-NYSEArca-2021-90) (the "Proposal").

**Davis Polk**

Investment Company Act of 1940 (as amended, the "1940 Act"), BTC is neither required nor eligible to register as an investment company under the 1940 Act.[5]

Shares of BTC are currently offered to accredited investors within the meaning of Regulation D under the Securities Act of 1933 (as amended, the "Securities Act").[6] Once such investors have held their shares for the requisite holding period pursuant to Rule 144 under the Securities Act, they have the ability to resell them through transactions on the OTCQX Best Market ("OTCQX"), an over-the-counter marketplace operated by OTC Markets Group that is not registered with the Commission as a national securities exchange.[7] Shares of BTC have been quoted on OTCQX since March 2015,[8] and in the 12 months ended October 31, 2021, trading in BTC shares accounted for more transactions, by dollar volume, than any other security so quoted.[9] Today, BTC shares are available to investors through broker transactions and are held in more than 600,000 retail and institutional brokerage accounts in all 50 states.[10]

Despite BTC's appeal and wide availability, it is not yet eligible to offer continuous share redemptions and creations, which is the mechanism ETPs employ to align share trading prices with underlying asset prices. As a result, BTC shares usually trade at discounts below or premiums over the net asset value of the Bitcoin it holds, and these discounts and premiums have at times been substantial.[11]

In order to operate BTC as a traditional ETP with minimal variations between share trading prices and the value of its Bitcoin holdings, Grayscale has sought for several years to list its shares on NYSE Arca. NYSE Arca first filed a Rule 19b-4 application for this purpose in 2017, but voluntarily withdrew it after the Commission rejected similar applications on bases that Grayscale and NYSE Arca determined were likely applicable to BTC.[12]

Amid signs of an evolution in the Commission's thinking on Bitcoin-related products, NYSE Arca filed the pending Rule 19b-4 application on October 19, 2021.[13] But three weeks later, on November 12, 2021, the Commission, by the Division of Trading and Markets acting pursuant to delegated authority,[14] disapproved another national securities exchange's Rule 19b-4 application to list shares of a competing spot Bitcoin

---

[5] *See, e.g.,* Letter from Brent J. Fields, Assoc. Dir., Disclosure Rev. and Acct. Off., SEC, to Jacob E. Comer, Cipher Techs. Mgmt. LP, at 1 (Oct. 1, 2019), https://www.sec.gov/Archives/edgar/data/1776589/99999999971900780/filename1.pdf (disagreeing that Bitcoin is a security and stating that "because [the fund] intends to invest substantially all of its assets in bitcoin as currently structured, it does not meet the definition of an 'investment company' under the Investment Company Act and it has inappropriately filed on Form N-2").

[6] Grayscale Bitcoin Trust, Annual Report for the Fiscal Year Ended Dec. 31, 2020 (Form 10-K), at 1 (Mar. 5, 2021) ("BTC 2020 Annual Report").

[7] BTC 2020 Annual Report at 3, 66; *see also Fast Answers, National Securities Exchanges,* SEC (July 14, 2021), https://www.sec.gov/fast-answers/divisionsmarketregmrexchangesshtml.html (last visited Nov. 25, 2021) (not listing OTCQX on list of registered national securities exchanges).

[8] Proposal, 86 Fed. Reg. at 61,805 n.7; BTC 2020 Annual Report at F-7.

[9] *OTCQX Current Market – Most Active,* OTC Markets Group, Inc. (Nov. 26, 2021, 5:25 PM), https://www.otcmarkets.com/market-activity/current-market/QX/active/dollarVolume.

[10] Broadridge Financial Solutions, Inc. share range analysis conducted by Grayscale for BTC, finding approximately 630,000 account holders as of September 30, 2021, as cited in the Letter from Congressmen Tom Emmer and Darren Soto to Chair Gensler (Nov. 3, 2021) https://emmer.house.gov/_cache/files/b/6/b6170d87-c56c-40a3-960a-60a619c02b65/63C9D652A62FF6119A2D0B117D655732.congressional-letter-to-sec-on-bitcoin-etfs.pdf; *see also SDBA Indicators Q3 2021 Report 4,* Charles Schwab (Sept. 30, 2021), https://workplacefinancialservices.schwab.com/resource/sdba-indicators-q3-2021-report.

[11] From May 5, 2015 to October 31, 2021, the maximum single-day premium of the closing price of BTC shares quoted on OTCQX over the value of its Bitcoin holdings was 142% and the average of all daily premiums was 37%; the maximum single-day discount below the value of its Bitcoin holdings was 21% and the average of all daily discounts was 12%; and the average of all single-day premiums and discounts was a premium of 32%. *See* Grayscale Bitcoin Trust, Quarterly Report for the Quarter Ended Oct. 31, 2021 (Form 10-Q), at 19-20 (Nov. 5, 2021).

[12] BTC 2020 Annual Report at 52; *see also, e.g.,* Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, Relating to the Listing and Trading of Shares of the SolidX Bitcoin Trust Under NYSE Arca Equities Rule 8.201, Securities Exchange Act Release No. 80319 (Mar. 28, 2017), 82 Fed. Reg. 16,247 (Apr. 3, 2017) (SR-NYSEArca-2016-101) ("SolidX Order").

[13] Proposal, 86 Fed. Reg. at 61,805.

[14] The Commission has exercised its authority under Rule 431 of the Rules of Practice to review the Division's decision. *See* Letter from J. Matthew DeLesDernier, Assistant Sec'y, Commission, to K. Murray, V.P. & Assoc. Gen. Counsel, Cboe Global Mkts, at 1 (Nov. 12, 2021), https://www.sec.gov/rules/sro/cboebzx/2021/34-93559-20211112-cboebzx-order-disapproving-a-proposed-rule-change.pdf. For the reasons set forth herein, we respectfully urge the Commission to reverse the Division's decision concurrently with its approval of NYSE Arca's pending Proposal.

---

**Davis Polk**

Securities and Exchange Commission

ETP, stating that it had not found the other exchange's proposal to be consistent with the requirements of the Exchange Act and the rules and regulations thereunder.[15] Despite differences between the competing spot Bitcoin ETP and BTC,[16] the rationale laid out in the Commission's November 12, 2021 disapproval order could be applied to BTC. We believe this rationale failed adequately to take account of significant regulatory and competitive developments since 2017 when the Commission first considered, and denied, a national securities exchange's application to list and trade shares of a spot Bitcoin ETP.[17] These developments include, most importantly, the Commission's recent decision to permit trading of ETPs registered under the 1940 Act that provide indirect exposure to Bitcoin through investments in the Bitcoin futures markets—the first of which began trading the same day NYSE Arca filed the pending Rule 19b-4 application.[18]

The Commission's prior disapprovals of Rule 19b-4 applications covering spot Bitcoin ETPs, including the November 12, 2021 disapproval order, were each premised on a conclusion that the listing exchange had not demonstrated that the risks of fraud and market manipulation in the underlying Bitcoin market were sufficiently addressable to permit the exchange to list a spot Bitcoin ETP consistent with its responsibilities under Section 6(b)(5) of the Exchange Act.[19] That section requires that the listing exchange's rules be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . and, in general, to protect investors and the public interest; and . . . not [be] designed to permit unfair discrimination between customers, issuers, brokers, or dealers[.]"[20] Although the Commission has articulated various showings a listing exchange could make, in theory, to meet its Section 6(b)(5) burden, as discussed below no exchange seeking to list a spot Bitcoin ETP has ever been able to satisfy the Commission's criteria.[21]

*        *        *

In the years since the Commission began denying Rule 19b-4 applications for spot Bitcoin ETPs, Bitcoin has exploded in popularity as an investment asset.[22] Yet there remains no way for U.S. investors to gain access to the Bitcoin market through an ETP whose trading prices closely reflect spot Bitcoin trading prices. Until very recently, investors wishing to gain Bitcoin exposure in any form at all have had to invest directly by purchasing Bitcoin through digital asset trading platforms subject to varying degrees of consumer

---

[15] Order Disapproving a Proposed Rule Change to List and Trade Shares of the VanEck Bitcoin Trust under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93559 (Nov. 12, 2021), 86 Fed. Reg. 64,539 (Nov. 18, 2021) (SR–CboeBZX–2021–019) ("VanEck Order").

[16] For example, BTC and the VanEck Bitcoin Trust use different index rates, based on data from differing groups of digital asset trading venues, to value their Bitcoin holdings.

[17] SolidX Order, 82 Fed. Reg. at 16,247.

[18] *See infra* note 49.

[19] *See, e.g.*, SolidX Order, 82 Fed. Reg. at 16,247 ("As discussed further below, the Commission is disapproving this proposed rule change because it does not find the proposal to be consistent with Section 6(b)(5) of the Exchange Act, which requires, among other things, that the rules of a national securities exchange be designed to prevent fraudulent and manipulative acts and practices and to protect investors and the public interest."); Order Setting Aside Action by Delegated Authority and Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, To List and Trade Shares of the Winklevoss Bitcoin Trust, Securities Exchange Act Release No. 83723 (July 26, 2018), 83 Fed. Reg. 37,579, 37,604-05 (Aug. 1, 2018) (SR-BatsBZX-2016-30) ("Winklevoss Order") (similar); Order Disapproving a Proposed Rule Change To List and Trade the Shares of the GraniteShares Bitcoin ETF and the GraniteShares Short Bitcoin ETF, Securities Exchange Act Release No. 83913 (Aug. 22, 2018), 83 Fed. Reg. 43,923, 43,923 (Aug. 28, 2018) (SR-CboeBZX-2018-001) ("GraniteShares Order") (similar); Order Disapproving a Proposed Rule Change To List and Trade the Shares of the ProShares Bitcoin ETF and the ProShares Short Bitcoin ETF, Securities Exchange Act Release No. 83904 (Aug. 22, 2018), 83 Fed. Reg. 43,934, 43,935 (Aug. 28, 2018) (NYSEArca-2017-139) ("ProShares Order") (similar); Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To Amend NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares) And To List and Trade Shares of the United States Bitcoin and Treasury Investment Trust Under NYSE Arca Rule 8.201-E, Securities Exchange Act Release No. 88284 (Feb. 26, 2020), 85 Fed. Reg. 12,595, 12,596 (Mar. 3, 2020) (SR-NYSEArca-2019-39) ("Wilshire-Phoenix Order") (similar); VanEck Order, 86 Fed. Reg. at 64,539 (similar).

[20] 15 U.S.C. § 78f(b)(5).

[21] *See infra* § I.B.

[22] *See* Raynor de Best, *Bitcoin price from October 2013 to November 19, 2021*, Statista (Nov. 19, 2021), https://www.statista.com/statistics/326707/bitcoin-price-index/.

---

November 29, 2021

3

JA 7

**Davis Polk**

protection regulation; to acquire indirect exposure through Bitcoin derivatives markets or perhaps through investing in operating companies active in the cryptocurrency space; or to invest through private placements or over-the-counter purchases of funds holding Bitcoin but whose shares trade at discounts or premiums to spot prices because they are not eligible to operate continuous creation and redemption programs.

In August 2021, the Commission began to signal a newfound willingness to permit Bitcoin futures ETPs registered under the 1940 Act to list shares on national securities exchanges,[23] and to date three ETPs have done so.[24] These ETPs are therefore able to offer retail and other investors indirect access to Bitcoin through the derivatives markets—*despite the derivatives markets' exposure to the identical risks of spot market fraud and manipulation that heretofore have stood in the way of Commission approval of spot Bitcoin ETPs.*

It is of course foundational that the Commission—like any other federal regulatory agency—must treat like situations alike absent reasoned justification;[25] indeed, this principle is reflected in the text of Section 6(b)(5) itself, which forbids exchanges from maintaining rules that unfairly discriminate between issuers. Bitcoin futures ETPs registered under the 1940 Act and spot Bitcoin ETPs that are not required or eligible to be so registered are the same in all relevant respects, but based on the analysis in the November 12, 2021 disapproval order, the Commission is treating them differently. Although the Commission cited investor protections afforded by the 1940 Act as justification for disparate treatment,[26] the 1940 Act's protections do not address and thus are not relevant to the concern the Commission has repeatedly invoked to deny Rule 19b-4 applications for spot Bitcoin ETPs like BTC: market manipulation and fraud in the underlying Bitcoin market.

In view of the Commission's new approach to Bitcoin futures ETPs, we believe that rejecting NYSE Arca's Rule 19b-4 application on grounds similar to those articulated in the November 12, 2021 disapproval order would unfairly discriminate against BTC and its shareholders in violation of Section 6(b)(5) of the Exchange Act and would constitute arbitrary and capricious action within the meaning of Section 706(2)(a) of the Administrative Procedure Act (as amended, the "APA").

We therefore respectfully urge the Commission to approve NYSE Arca's proposal to list and trade BTC.

    **I.    Background**

        **A.   Grayscale Bitcoin Trust**

BTC is the largest and most liquid Bitcoin investment fund in the world.[27] Shares of BTC have been quoted on the OTCQX since 2015.[28] BTC's sponsor, Grayscale Investments, LLC, is the world's largest digital currency asset manager, with more than $55 billion in assets under management as of October 29, 2021 and an operational track record dating to September 2013.[29]

---

[23] Gary Gensler, Chair, SEC, *Remarks Before the Aspen Security Forum*, SEC (Aug. 3, 2021), https://www.sec.gov/news/public-statement/gensler-aspen-security-forum-2021-08-03.

[24] ProShares Bitcoin Strategy ETF (BITO); VanEck Bitcoin Strategy ETF (XBTF); Valkyrie Bitcoin Strategy ETF (BTF).

[25] *See infra* note 57.

[26] *See* VanEck Order 86 Fed. Reg. at 64,552-53; *see also* Gensler, *supra* note 23 ("When combined with the other federal securities laws, the '40 Act provides significant investor protections. Given these important protections, I look forward to the staff's review of such filings, particularly if those are limited to these CME-traded Bitcoin futures.").

[27] Proposal, 86 Fed. Reg. at 61,815.

[28] *Id.* at 61,805 n.7, 61,815; BTC 2020 Annual Report at F-7; *see also* BTC Fact Sheet at 2.

[29] BTC Fact Sheet at 1.

**Davis Polk**

BTC's shares are registered under Section 12(g) of the Exchange Act, and BTC is subject to ongoing public reporting requirements pursuant to Section 13 of the Exchange Act.[30] In accordance with its obligations as a public company, and as required by Commission rules, BTC regularly discloses material information to its investors through Commission filings. Because BTC's assets consist solely of Bitcoin, the proceeds from the sale of Bitcoin, and any related incidental rights arising from its Bitcoin holdings,[31] none of which generally constitutes a security under the 1940 Act, BTC is not required, or even permitted, to register as an investment company under that Act.[32]

BTC values its Bitcoin holdings based on the CoinDesk Bitcoin Price Index (XBX) (formerly known as the Tradeblock XBX Index), which draws price and volume data from multiple digital asset trading platforms satisfying the index provider's minimum standards for reliability and security[33] in order to generate representative pricing for the Bitcoin spot market while minimizing the impact of anomalous, fraudulent or manipulative trading activities occurring on individual platforms.[34] BTC makes available on its website information regarding its holdings and value, the price of its shares, and other quantitative data related to its assets.[35]

BTC's investment objective is for the value of its shares to reflect the value of the underlying Bitcoin it holds, determined by reference to the XBX index, less expenses and other liabilities.[36] However, because BTC shares are not currently listed on a national securities exchange and BTC is therefore not permitted to operate an ongoing creation and redemption program, arbitrage opportunities resulting from differences between the price of the shares and the price of Bitcoin are not available to keep the price of BTC's shares closely linked to the XBX index price for Bitcoin.[37] As a result, BTC's shares are usually quoted on the OTCQX at a premium over, or discount to, the value of BTC's Bitcoin holdings.[38]

### B. The Commission's handling of spot Bitcoin ETP Rule 19b-4 applications

Responding to growing investor demand,[39] industry participants have for years been keenly focused on bringing spot Bitcoin ETPs to market. In order to accomplish this, a national securities exchange proposing to list and trade a spot Bitcoin ETP must obtain the Commission's approval of an application filed pursuant to Rule 19b-4. The NYSE Arca proposal that is the subject of this letter is the latest in a series of Rule 19b-4 applications that national securities exchanges have made to list and trade spot Bitcoin ETPs. However, proposals for spot Bitcoin ETPs have until now faced uniform failure at the Commission.[40]

The Commission has explained its rejection of all prior Rule 19b-4 spot Bitcoin ETP applications as grounded in the requirements of Section 6(b)(5) of the Exchange Act, which "requires in relevant part that the rules of a national securities exchange must be designed 'to prevent fraudulent and manipulative acts

---

[30] *Id.*; *see also supra* note 4.

[31] Proposal, 86 Fed. Reg. at 61,805.

[32] *See supra* note 5.

[33] Proposal, 86 Fed. Reg. at 61,812, 61,819. These exchanges are referred to in the Proposal as "U.S.-Compliant Exchanges," which are defined as exchanges in the global exchange market for the trading of Bitcoins that hold themselves out as compliant with applicable U.S. federal and state licensing requirements and practices regarding AML and KYC regulations. *Id.* at 61,812 n.28.

[34] *Id.* at 61,813.

[35] *Id.* at 61,817.

[36] *Id.* at 61,805.

[37] *See* BTC 2020 Annual Report at 2-3, 21, 53.

[38] *Id.* at 2, 53; *see also id.* at 1-2; *see also supra* note 11.

[39] Telis Demos, *ETFs Could Rock the Bitcoin World*, Wall Street Journal (Apr. 12, 2021), https://www.wsj.com/articles/etfs-could-rock-the-bitcoin-world-11618227019 (noting "indicators of big potential demand" for Bitcoin-linked ETPs).

[40] *See supra* note 19.

---

**Davis Polk**

and practices,' and 'to protect investors and the public interest.'"[41] The Commission has stated that an exchange may demonstrate compliance with this statutory mandate by either:

(1)  entering into "a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets,"[42] or

(2)  "establish[ing] that the underlying market inherently possesses a unique resistance to manipulation beyond the protections that are utilized by traditional commodity or securities markets," although "[s]uch resistance . . . must be novel and beyond those protections that exist in traditional commodity markets or equity markets[.]"[43]

Regarding the first method of demonstrating compliance with Section 6(b)(5), the Commission has not quantified how large a market must be to qualify as "significant," and instead has defined the requirement in such a general and conclusory manner as to leave Rule 19b-4 applicants guessing about what evidence is necessary to gather and present to the Commission. In the Commission's view, a "significant market" would "include a market (or group of markets) as to which (a) there is a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, so that a surveillance-sharing agreement would assist in detecting and deterring misconduct, and (b) it is unlikely that trading in the ETP would be the predominant influence on prices in that market."[44] When presented with evidence, the Commission has repeatedly found that the various spot Bitcoin markets proposed as "significant" do not meet this standard—either because those trading venues do not account for a sufficiently large volume of Bitcoin trading, or are insufficiently regulated, or both.[45] A number of national securities exchanges have proposed that trading in Bitcoin futures on the Chicago Mercantile Exchange ("CME") qualifies as a "significant market" for purposes of a spot Bitcoin ETP. Each time, however, the Commission has rejected the proposition, finding the CME Bitcoin futures market too small or insufficiently linked to pricing in the spot Bitcoin market or the spot Bitcoin ETP the Commission was assessing.[46]

Regarding the second method of demonstrating compliance with Section 6(b)(5), the Commission has consistently rejected showings that the Bitcoin spot market demonstrates inherent resistance to fraud and manipulation. Without ever defining what features would actually satisfy the alternative standard of "inherent," "novel" and "unique" protections that exceed those of more traditional markets, the Commission has repeatedly found that the Bitcoin spot market does not meet these requirements. As the Commission has acknowledged, "[n]o listing exchange" seeking to list a spot Bitcoin ETP ever "has satisfied its burden to make such a demonstration."[47]

While the Commission may have a clear vision of what facts a national securities exchange should adduce to show a "reasonable likelihood" that a malefactor would have to trade in a particular market in order to manipulate the ETP, and simultaneously demonstrate the "unlikelihood" that trading in the ETP would be the "predominant influence" on prices in that market, or to show a market's "inherent," "novel" and "unique" protections that surpass those of other markets, the Commission has not explained what it has in mind. The result, intentionally or not, is that satisfaction of the Section 6(b)(5) standard that the Commission applies to

---

[41] Wilshire-Phoenix Order, 85 Fed. Reg. at 12,598 (quoting Section 6(b)(5)).

[42] VanEck Order, 86 Fed. Reg. at 64,540.

[43] *Id.*

[44] *Id.*

[45] Winklevoss Order, 83 Fed. Reg. at 37,597-598; Wilshire-Phoenix Order, 85 Fed. Reg. at 12,614-15.

[46] *E.g.*, VanEck Order 86 Fed. Reg. at 64,546-47; Wilshire-Phoenix Order, 85 Fed. Reg. at 12,614; Winklevoss Order, 83 Fed. Reg. at 37,601.

[47] VanEck Order, 86 Fed. Reg. at 64,541.

**Davis Polk**

Securities and Exchange Commission

spot Bitcoin Rule 19b-4 applications is a matter to be judged on a case-by-case basis in the simple discretion of the Commission and its staff.

### C. Recent shift in the Commission's approach

In August 2021, the Commission began to signal a shift in approach to Bitcoin-linked ETPs. Speaking at the Aspen Security Forum on the subject of cryptocurrencies, the Commission's Chair stated:

> I anticipate that there will be filings with regard to exchange-traded funds (ETFs) under the Investment Company Act ('40 Act). When combined with the other federal securities laws, the '40 Act provides significant investor protections.

> Given these important protections, I look forward to the staff's review of such filings, particularly if those are limited to these CME-traded Bitcoin futures.[48]

Since the Chair's remarks, three ETPs investing in CME Bitcoin futures contracts have begun trading on national securities exchanges. ProShares Bitcoin Strategy ETF (BITO) began trading on NYSE Arca on October 19, 2021. Next, Valkyrie Bitcoin Strategy ETF (BTF) began trading on The Nasdaq Stock Market on October 22, 2021. Most recently, VanEck Bitcoin Strategy ETF (XBTF) began trading on the Cboe BZX Exchange on November 16, 2021. Because these Bitcoin futures ETFs invest in futures contracts as well as a portfolio of fixed-income securities, each is subject to regulation and registered as an investment company under the 1940 Act.[49]

Each of these Bitcoin futures ETFs invests in futures contracts traded on the CME and priced according to the CME CF Bitcoin Reference Rate.[50] The CME reference rate, in turn, is determined according to pricing data collected from digital asset trading platforms that include all but one of those currently incorporated into the CoinDesk Bitcoin Price Index (XBX) used by BTC, various of which are incorporated as well into indices used by other spot Bitcoin ETPs rejected by the Commission.[51] Because the CME reference rate is based upon substantially the same Bitcoin pricing data from digital asset trading platforms as the XBX index and indices used by other proposed spot Bitcoin ETPs, both the Bitcoin futures ETPs and the spot Bitcoin ETPs, including BTC, are exposed to the same risks relating to pricing data quality from these digital asset trading platforms. Despite being subject to identical risks—*same data, same risks*—none of the Bitcoin futures ETPs was required to satisfy the Section 6(b)(5) hurdle that the Commission has erected for spot Bitcoin ETPs. And as discussed above, just three weeks after the Bitcoin futures ETPs began trading, the Commission once again rejected a Rule 19b-4 application filed by a spot Bitcoin ETP on the now-familiar grounds that the listing exchange had failed to demonstrate satisfaction of the Section 6(b)(5) standard.[52]

---

[48] Gensler, *supra* note 23.

[49] *See* ProShares Trust, Registration Statement (Oct. 15, 2021) at 4-5; Valkyrie Bitcoin Strategy ETF, Registration Statement (Oct. 20, 2021) at 4; VanEck ETF Trust, Registration Statement (Oct. 27, 2021) at 3.

[50] *See* ProShares Trust, Registration Statement (Oct. 15, 2021) at 4; Valkyrie Bitcoin Strategy ETF, Registration Statement (Oct. 20, 2021) at 3; VanEck ETF Trust, Registration Statement (Oct. 27, 2021) at 2, 15.

[51] *Compare* CF Benchmarks, *CME CF Cryptocurrency Pricing Products, Constituent Exchanges List* at 3, https://docs-cfbenchmarks.s3.amazonaws.com/CME+CF+Constituent+Exchanges.pdf (last updated Oct. 28, 2019) (listing Bitstamp, Coinbase, Gemini, and Kraken (and previously itBit) as constituent exchanges) *with* Proposal, 86 Fed. Reg. 61,808 (listing Bitstamp, Coinbase Pro, Kraken and LMAX Digital as constituent exchanges for XBX). The non-overlapping digital asset trading platform used by the CME's index—Gemini—was the reference index utilized by a spot Bitcoin ETP that the Commission disapproved in a prior order on the grounds that the national securities exchange proposing to list that ETP had "not demonstrated that the Gemini Exchange and the Gemini Auction are resistant to manipulation." Winklevoss Order, 83 Fed. Reg. at 37,589. In its most recent disapproval order from earlier this month, the Commission noted that the reference index for the spot Bitcoin ETP at issue were "the same constituent platforms as the CME CF Bitcoin Reference Rate," VanEck Order, 86 Fed. Reg. at 64,541 n.32, yet the Commission still found "no basis to conclude" that these underlying platforms were sufficiently resistant to fraud and manipulation so as to permit listing approval, *id.* at 64,545.

[52] VanEck Order, 86 Fed. Reg. at 64,539.

**Davis Polk**

Securities and Exchange Commission

The only logical explanation for the curious inconsistency afforded these competing products is a bureaucratic artifact. The successful Bitcoin futures ETPs were able to sidestep the heretofore-unattainable Section 6(b)(5) standard applied to spot Bitcoin ETPs because of a series of accommodations made by the Commission beginning in 2016 that permit national securities exchanges to use generic listing standards to list and trade shares of 1940 Act-registered ETPs without having to follow the Rule 19b-4 approval process.[53]

Unsurprisingly, the Bitcoin futures ETPs have been well received by the market for offering a convenient and familiar way for U.S. investors to gain exposure to an emerging asset class.[54] But while permitting the listing and trading of Bitcoin futures ETPs without requiring *any* showing that investors in such products are insulated from the risks of fraud and manipulation in the underlying Bitcoin market, the Commission has continued to apply its vague and discretionary Section 6(b)(5) standard to deny listing approval to the spot Bitcoin ETPs pursuant to Rule 19b-4. The Commission has not offered any meaningful explanation for its differential treatment of these competing products—and the irony that the successful ETPs invest in the very same CME futures market that has failed to qualify as a "significant market" in the Commission's Rule 19b-4 analysis has gone unacknowledged.

The Commission's November 12, 2021 spot Bitcoin ETP disapproval order attempted in a cursory way to address the inconsistency between its decision to permit trading of Bitcoin futures ETPs and its continued denial of listing approval for spot Bitcoin ETPs.[55] Overlooking the proverbial elephant in the room, the order merely stated that it was not evaluating "a product regulated under the 1940 Act" or one with "the same underlying holdings as the Bitcoin Futures ETFs," and therefore did not need to consider those issues in ruling on the application to list a spot Bitcoin ETP.[56]

## II.    The Exchange Act and the APA require the Commission to treat BTC similarly to Bitcoin futures ETPs

Having allowed Bitcoin futures ETPs registered under the 1940 Act to begin trading in recent weeks, the Commission may not deny listing approval for BTC by insisting upon a different, vague and evidently impossible-to-meet standard for spot Bitcoin ETPs. Doing so not only would be fundamentally unfair to BTC

---

[53] *See* 17 C.F.R. § 240.19b-4(e)(1) (providing that "[t]he listing and trading of a new derivative securities product by a self-regulatory organization shall not be deemed a proposed rule change" if the Commission has approved the SRO's rules, procedures and listing standards for the relevant product class and the SRO has a surveillance program for the product class); Notice of Filing of Amendment No. 2 and Order Granting Accelerated Approval of a Proposed Rule Change, as Modified by Amendment No. 2, to Adopt NYSE Arca Rule 5.2–E(j)(8) Governing the Listing and Trading of Exchange-Traded Fund Shares, Securities Exchange Act Release No. 88625 (Apr. 13, 2020), 85 Fed. Reg. 21,479, 21,480, 21,487 (Apr. 17, 2020) (SR–NYSEArca–2019–81) (approving NYSE Arca generic listing rules pursuant to Rule 19b-4(e) for ETFs authorized to operate pursuant to Rule 6c-11 under the 1940 Act, 17 C.F.R. § 270.6c-11); Notice of Filing of Amendment No. 2 and Order Granting Accelerated Approval of a Proposed Rule Change, as Modified by Amendment No. 2, to Adopt BZX Rule 14.11(l) Governing the Listing and Trading of Exchange-Traded Fund Shares, Securities Exchange Act Release No. 88566 (Apr. 6, 2020), 85 Fed. Reg. 20,312, 20,313, 20,320-21 (Apr. 10, 2020) (SR-CboeBZX-2019-097) (same, as to Cboe BZX); Notice of Filing of Amendment No. 4 and Order Granting Accelerated Approval of a Proposed Rule Change, as Modified by Amendment No. 4, to Adopt Nasdaq Rule 5704 Governing the Listing and Trading of Exchange Traded Fund Shares, Securities Exchange Act Release No. 88561 (Apr. 3, 2020), 85 Fed. Reg. 19,984, 19,984-85, 19,991 (Apr. 9, 2020) (SR-NASDAQ-2019-090) (same, as to Nasdaq); *see also* Order Granting Approval of a Proposed Rule Change To Amend Nasdaq Rule 5735 To Adopt Generic Listing Standards for Managed Fund Shares, Securities Exchange Act Release No. 78918 (Sept. 23, 2016), 81 Fed. Reg. 67,033, 67,033, 67,036 (Sept. 29, 2016) (SR-NASDAQ-2016-104) (approving Nasdaq generic listing rules for "Managed Fund Shares" that "are issued by actively managed exchange-traded funds ('ETFs') that do not seek to replicate the performance of a specified index of securities"); Order Approving a Proposed Rule Change, as Modified by Amendment No. 6, To Amend BATS Rule 14.11(i) to Adopt Generic Listing Standards for Managed Fund Shares, Securities Exchange Act Release No. 78396 (July 22, 2016), 81 Fed. Reg. 49,698, 49,699, 49,702 (July 28, 2016) (SR-BATS-2015-100) (same, as to BATS); Order Granting Approval of Proposed Rule Change, as Modified by Amendment No. 7 Thereto, Amending NYSE Arca Equities Rule 8.600 to Adopt Generic Listing Standards for Managed Fund Shares, Securities Exchange Act Release No. 78397 (July 22, 2016), 81 Fed. Reg. 49,320, 49,321, 49,324-25 (July 27, 2016) (SR-NYSEArca-2015-110) (same, as to NYSE Arca).

[54] *See, e.g.*, Michael Wursthorn, *First Bitcoin Futures ETF Rises in Trading Debut*, Wall Street Journal (Oct. 19, 2021, 5:27 PM), https://www.wsj.com/articles/first-bitcoin-futures-etf-rises-in-trading-debut-11634656217?mod=article_inline; Tanaya Macheel, *First bitcoin futures ETF to make its debut Tuesday on the NYSE, ProShares says*, CNBC (Oct. 18, 2021, 8:52 AM), https://www.cnbc.com/2021/10/18/first-bitcoin-futures-etf-to-make-its-debut-on-the-nyse-tuesday-proshares-says.html.

[55] VanEck Order, 86 Fed. Reg. at 64,552.

[56] *Id.*

---

JA 12

**Davis Polk**

Securities and Exchange Commission

and its shareholders, but would violate the Section 6(b)(5) injunction against unfair discrimination among issuers, and constitute arbitrary and capricious administrative action in violation of the APA.

Under the APA, the Commission must treat similarly situated products similarly unless it has a reasonable basis for disparate treatment.[57] "Indeed, a federal agency 'can be said to be at its most arbitrary' when it 'treat[s] similar situations dissimilarly.'"[58] In permitting the listing and trading of 1940 Act-registered Bitcoin futures ETPs, the Commission has explicitly found that the national securities exchange rules authorizing this activity are "designed to prevent fraudulent and manipulative acts and practices" and that allowing trading in these products is consistent with the public interest and investor protection. As discussed below, 1940 Act registration—a status the Commission has determined is not available to BTC[59]—supplies no basis for holding spot Bitcoin ETPs to a standard from which Bitcoin futures ETPs are exempt. The arbitrariness of this difference in treatment is underscored by one simple, indisputable fact: *Bitcoin pricing, whether in the spot or futures market, is determined in the digital asset trading platforms where supply and demand interact*. Indeed, there is almost complete overlap in the underlying Bitcoin digital asset trading platforms that supply pricing information for the reference indices used by both the CME Bitcoin futures market and BTC, as well as other spot Bitcoin ETPs whose listing applications the Commission has disapproved on grounds that the same platforms were insufficiently resistant to fraud and manipulation.[60]

As a result, the risks of fraud and manipulation in the Bitcoin market impacting spot Bitcoin ETPs are indistinguishable from those same risks impacting futures Bitcoin ETPs. While the Commission has cited and relied on these risks as the basis for rejecting spot Bitcoin ETPs, it has found these risks to be irrelevant to its approval of Bitcoin futures ETPs. Explaining this contradiction by reference to Bitcoin futures ETPs' status under the 1940 Act is a red herring. As discussed below, the 1940 Act offers no protections against fraudulent and manipulative trading in the underlying Bitcoin market beyond the salutary disclosure protections of the Securities Act and the Exchange Act, which apply with as much force to BTC as they do to Bitcoin futures ETPs.

Other than 1940 Act status, the Commission has offered no justification for applying a vague and apparently unattainable standard to spot products while applying a different and more relaxed standard—or possibly no standard at all—to competing futures products. And even if the Commission believes that 1940 Act-style regulation of spot Bitcoin ETPs should be in place before a national securities exchange's listing rules can comply with Section 6(b)(5), it is well within the Commission's power to promulgate such regulations. The Commission certainly may not simultaneously insist upon 1940 Act-style regulation for spot Bitcoin ETPs while denying them the ability to submit to such regulation, on an elective basis or otherwise.[61]

A. **Regulation under the 1940 Act does not justify treating Bitcoin-linked ETPs differently from each other**

Regulation of Bitcoin futures ETPs under the 1940 Act provides no basis for treating them differently from competing products such as BTC; registration or non-registration under the 1940 Act simply is not relevant to the question of whether the Commission should authorize a spot Bitcoin ETP. The 1940 Act does not address fraud or manipulation in markets for underlying investments, but instead seeks "to remedy certain

---

[57] *Kirk v. Comm'r SSA*, 987 F.3d 314, 321 (4th Cir. 2021) ("'A fundamental norm of administrative procedure requires an agency to treat like cases alike.'") (quoting *Westar Energy, Inc. v. Fed. Energy Reg. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007)).

[58] *Kirk*, 987 F.3d at 321 (quoting *Steger v. Def. Inv. Serv. Dep't of Def.*, 717 F.2d 1402, 1406 (D.C. Cir. 1983)).

[59] *See supra* note 5.

[60] *See supra* note 51 and accompanying text.

[61] *Id.* For example, while the Commission did not base its November 12, 2021 disapproval order on the fact that 1940 Act ETPs are subject to ongoing examination and inspection, the Commission could if it thought proper propose rules subjecting commodity ETPs to this oversight process. That it has not done so suggests that it perceives no such need for commodity ETPs.

JA 13

**Davis Polk**

Securities and Exchange Commission

abusive practices in the management of investment companies" to protect investors in those companies.[62] Section 1(b) of the 1940 Act identifies the abusive practices at which it is aimed: (1) "failure to provide adequate, accurate information to prospective investors and shareholders in investment companies"; (2) self-interested management at the expense of investors; (3) "use of unsound, misleading, and unsupervised accounting practices"; and (4) "changes in the character of the company's business without the consent of the shareholders."[63]

Such abuses were to be eliminated by achieving five basic objectives: "(1) adequate safeguards for investors in the distribution and sale of investment company securities, (2) honest, unbiased management of investment companies, (3) "greater participation in management" by investors, (4) "creation and maintenance of adequate feasible capital structures of such companies, and (5) transmittal of adequate financial statements and promulgation of uniform accounting rules."[64] To meet these goals, the 1940 Act among other things requires registration of the investment company,[65] limits the number of "interested persons" that can serve on an investment company's board,[66] regulates investment advisory fees,[67] and caps borrowing by the investment company.[68] Notably, the 1940 Act does not seek to regulate the assets in which investment companies invest. As the Fifth Circuit Court of Appeals long ago concluded, "The history and whole pattern of the Investment Company Act convinces us that Congress . . . intended to deter mismanagement of investment companies for the protection of investment company security holders . . . not to regulate the management of companies in which investment companies put their funds."[69]

Thus, regulation provided by the 1940 Act does not address the Commission's rationale for disapproving spot Bitcoin ETPs under its two-pronged Section 6(b)(5) test, which is plainly based on the risks of fraud and manipulation in the underlying Bitcoin market.[70] For example, the 1940 Act's protections against self-interested managers are entirely unrelated to the grounds on which the Commission has rejected prior listing proposals for spot Bitcoin ETPs; the Commission has not suggested that manager-related concerns have played any role in its prior denials. Likewise irrelevant are the 1940 Act's requirements for disclosing financial statements and investment policies. The Commission has never cited a lack of information about a proposed spot Bitcoin ETP's holdings as a basis for denying listing approval; to the contrary, the Commission has acknowledged that spot Bitcoin ETPs provide significant disclosure with respect to their holdings.[71] And reports on fund holdings required by the 1940 Act supply no basis for treating Bitcoin futures ETPs differently from spot Bitcoin ETPs, because the disclosure requirements of the Securities Act and the Exchange Act would be equally applicable to listed shares of a spot Bitcoin ETP.

The absence of any meaningful connection between the 1940 Act and the Commission's stated concerns with spot Bitcoin ETPs was revealed in its November 12, 2021 order rejecting a spot Bitcoin ETP, which noted in passing that the spot Bitcoin ETP was not registered under the 1940 Act and had different

---

[62] *Option Advisory Serv., Inc. v. SEC*, 668 F.2d 120, 121 (2d Cir. 1981).

[63] *Herpich v. Wallace*, 430 F.2d 792, 815 (5th Cir. 1970) (citing 15 U.S.C. § 80a-1(b)).

[64] *Id.* at 816.

[65] 15 U.S.C. § 80a-8(a).

[66] 15 U.S.C. § 80a-10(a).

[67] 15 U.S.C. §§ 80a-35(b), 80a-36.

[68] 15 U.S.C. § 80a-18(f)(1).

[69] *See Herpich*, 430 F.2d at 816-17.

[70] *Infra* § II.B.

[71] *See, e.g.*, Winklevoss Order, 83 Fed. Reg. at 37,584. The Commission has labeled "unpersuasive" arguments that such disclosure would reduce the ability of market participants to manipulate bitcoin prices. *Id.* at 37,584-85. Among other things, the Commission has concluded that because there is no authoritative and accurate source for Bitcoin pricing and trading, and Bitcoin spot market prices already differ from one another, having an additional transparent source for Bitcoin pricing such as an ETP is unlikely to make manipulation of bitcoin prices less likely. *Id.*

---

**Davis Polk**

underlying holdings from Bitcoin futures ETPs, but failed to say *why* those differences mattered.[72] Similarly, when asked whether a lack of "problems with fraud or manipulation" with 1940 Act products linked to Bitcoin futures justified the Commission's approval of futures products while forbidding spot-market products, the Commission's Chair observed that the 1940 Act provides investor protections, but cautioned that a Bitcoin futures ETP is "still a highly speculative asset class and listeners should understand that underneath this, it still has that same aspect of volatility and speculation."[73] The Commission thus has yet to provide a reasoned basis for treating Bitcoin futures ETPs differently from spot Bitcoin ETPs based on 1940 Act registration. Unexplained agency statements, of course, carry no weight under the APA.[74]

### B. Bitcoin futures ETPs and spot Bitcoin ETPs do not present meaningfully different risks of fraud and manipulation

Disparate treatment of competing spot Bitcoin and Bitcoin futures ETPs cannot be justified by differences between spot and futures Bitcoin markets because the Commission has never found there to be any meaningful difference in the risk of fraud or manipulation between the two markets. To the contrary, the Commission has specifically found that the Bitcoin digital asset trading platforms that contribute pricing data to the CME futures market's reference index "have none of the[] requirements" necessary to mitigate the risks of fraud and manipulation.[75] And as the Commission's Division of Investment Management has emphasized, Bitcoin futures are themselves "highly speculative investment[s]," and investors should "consider the volatility of Bitcoin and the Bitcoin futures market, as well as the lack of regulation and potential for fraud and manipulation in the underlying Bitcoin market"[76]—highlighting that both spot Bitcoin and Bitcoin futures present this investment risk. The Commission has, understandably, never before suggested that investing in a futures market for an asset is inherently safer than investing in the asset itself, but that is the position it would be taking in denying NYSE Arca's application to list BTC after having allowed exchange trading in multiple Bitcoin futures ETPs.

If anything, derivatives markets present additional opportunities for manipulation on top of spot markets— which is why the derivatives markets have an additional layer of federal regulation to begin with. Although regulation of the Bitcoin futures market by the Commodity Futures Trading Commission ("CFTC") provides important protections for investors in futures products, it does not justify differential treatment for Bitcoin futures ETPs and spot Bitcoin ETPs. Even with regulation by the CFTC, limiting ETP exposure to Bitcoin futures does not address the risk of manipulation of underlying Bitcoin spot market prices—unless the Commission's view is that CFTC regulation is adequate for all Bitcoin spot markets, including those in which BTC invests. To the contrary, each time an exchange has argued that CFTC approval of CME-traded Bitcoin futures could mitigate the Commission's perceived market manipulation concerns, the Commission has rejected that position.[77] The Commission has instead observed that the CFTC has no authority to oversee underlying Bitcoin spot markets, and that the scope of its regulatory authority to approve futures

---

[72] VanEck Order, 86 Fed. Reg. at 64,552. The Division also questioned whether the amendments to Cboe's proposal raising these concerns had been timely filed, *id.*, an issue not applicable to NYSE Arca's Proposal here.

[73] *CNBC Transcript: SEC Chair Gary Gensler Speaks with CNBC's "Squawk on the Street" Today*, CNBC (Oct. 19, 2021, 11:36 AM), https://www.cnbc.com/2021/10/19/cnbc-transcript-sec-chair-gary-gensler-speaks-with-cnbcs-squawk-on-the-street-today.html. Chair Gensler also referenced obliquely the CFTC regulation of the CME. As discussed below, that is likewise not a basis to distinguish the futures product from the spot product.

[74] *See Ill. Pub. Telecomms. Ass'n v. Fed. Commc'n Comm'n*, 117 F.3d 555, 564 (D.C. Cir. 1997) ("The FCC's *ipse dixit* conclusion, coupled with its failure to respond to contrary arguments resting on solid data, epitomizes arbitrary and capricious decisionmaking.") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46-57 (1983)); *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1155 (D.C. Cir. 2011) (SEC acted arbitrarily in basing decision on *ipse dixit*).

[75] VanEck Order, 86 Fed. Reg. at 64,545; *see also supra* note 51 and accompanying text.

[76] *Staff Statement on Funds Registered Under the Investment Company Act Investing in the Bitcoin Futures Market*, SEC Division of Investment Management Staff (May 11, 2021), https://www.sec.gov/news/public-statement/staff-statement-investing-bitcoin-futures-market#.

[77] *See, e.g.*, Winklevoss Order, 83 Fed. Reg. at 37,587, 37,599.

**Davis Polk**

products is more limited than the Commission's own authority with respect to approving the listing and trading of ETPs.[78] Among other things, the Commission has emphasized that:

- the Bitcoin futures contracts trading on CME were approved through "self-certification";

- although the CFTC provided "heightened review" of the self-certifications, it expressly made no "judgments about the underlying [Bitcoin] spot market;" and

- the CFTC's analysis was limited to the specific products CME had proposed and applied the standard of whether such products "were readily susceptible to manipulation," which is a different standard from that of the Commission: whether the underlying Bitcoin prices are "inherently" or "uniquely" resistant to manipulation.[79]

In short, the Commission has already concluded, when evaluating spot Bitcoin ETPs under Rule 19b-4, that the features of Bitcoin futures trading on CME do *not* provide sufficient assurance against fraud and manipulation, even taking CFTC regulation into account. How the Commission reached a different conclusion in cases of Bitcoin futures ETPs is thus a mystery, but it is clear that any such "internally inconsistent" reasoning violates the APA.[80]

## C. The Commission's standard for approving the listing of spot Bitcoin ETPs is arbitrary and, in practice, impossible to meet

The Commission has never stated what—if any—standard it is applying in its analysis of Bitcoin futures ETPs. But it is evident that the Commission has not required the sponsors of Bitcoin futures ETPs to demonstrate that their products meet the standard that the Commission applies to their competitors. Because if the Commission *did* require futures ETPs to meet the same standard, they too would fail. This is a classic case of treating like cases differently, in violation of the APA,[81] as well as allowing the rules of national securities exchanges to impermissibly discriminate among issuers, in violation of the Exchange Act.

But even putting aside the unfairness of treating spot Bitcoin ETPs differently from their competitors, the standard that the Commission has set for approving the listing of any Bitcoin ETPs under its case-by-case Rule 19b-4 framework is so ill-defined and unachievable as to be arbitrary. As described above, the Commission has set forth two theoretical avenues for listing exchanges to demonstrate compliance with Section 6(b)(5)'s requirement that their rules are designed to prevent fraud and manipulation. First, it has said that an exchange may show that it "has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets."[82] The Commission has never quantified a "significant market" or "market of significant size"; moreover, it has repeatedly found that no "regulated significant market" for Bitcoin exists under its definition—*not even the CME market in which Bitcoins futures ETPs invest*—rendering illusory any supposed option to enter into a suitable surveillance-sharing agreement. Under the APA, agency action cannot be "vague and indecisive" and must

---

[78] *See., e.g., id.*

[79] *See, e.g., id.; see also* Wilshire-Phoenix Order, 85 Fed. Reg. at 12,604.

[80] *Bus. Roundtable*, 647 F.3d at 1153.

[81] *See Kirk*, 987 F.3d at 321.

[82] VanEck Order, 86 Fed. Reg. at 64,540.

**Davis Polk**

Securities and Exchange Commission

afford regulated entities a "principled way" to meet the agency's requirements.[83] But for spot Bitcoin ETPs, the Commission has established a standard that it acknowledges cannot be met.[84]

The Commission's second path for demonstrating compliance with Rule 6(b)(5)—showing "that the underlying [Bitcoin] market inherently possessed a unique resistance to manipulation beyond the protections that are utilized by traditional commodity or securities markets"[85]—has proved equally elusive. The Commission has insisted on proof of market resistance to fraud and manipulation that is "novel and beyond those protections that exist in traditional commodity markets or equity markets for which the Commission has long required surveillance-sharing agreements in the context of listing derivative securities products."[86] The Commission, however, has never defined or specified what would actually constitute "unique resistance to manipulation" that is "beyond the protections of the traditional commodities and equities markets," nor has the Commission explained what it means for resistance to be "inherent" or "novel" in this context.

Multiple exchanges have attempted to meet this standard, arguing among other things that index pricing would be based on the CME's manipulation-resistant CF Bitcoin Reference Rate,[87] that "the geographically diverse and continuous nature of bitcoin trading render it difficult and prohibitively costly to manipulate the price of bitcoin,"[88] and that "[f]ragmentation across bitcoin platforms, the relatively slow speed of transactions, and the capital necessary to maintain a significant presence on each trading platform" make it especially resistant to manipulation.[89] But the Commission has found in every instance that the justifications are insufficient to satisfy Section (6)(b)(5): the Commission's "unique," "inherent" and "novel" protections standard evidently cannot be satisfied. Under the APA, however, "[i]mpossible requirements imposed by an agency are perforce unreasonable: 'Conditions imposed by [the] order are . . . unreasonable by virtue of being impossible to meet.'"[90]

### D. Disparate treatment of Bitcoin futures ETPs and spot Bitcoin ETPs would limit competition and investor choice while harming investors

The Exchange Act tasks the Commission both with promoting open, competitive markets and investor protection.[91] In carrying out this mandate, the Commission has recognized that expansion of investor choice is a factor in determining whether an exchange's proposed rule changes to list a new product would be consistent with the requirements of the Exchange Act.[92] Continued disparate treatment of Bitcoin futures ETPs and spot Bitcoin ETPs would harm—rather than protect—investors by limiting their choices without a

---

[83] *Rapoport v. SEC*, 682 F.3d 98, 107 (D.C. Cir. 2012) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 197 (1947)).

[84] The Commission has acknowledged that its unattainable standard might change in the future, "[o]ver time, [if] regulated bitcoin-related markets . . . continue to grow and develop" or "conditions otherwise change in a manner that affects the Exchange Act analysis." Winklevoss Order, 83 Fed. Reg. at 37,580.

[85] Wilshire-Phoenix Order, 85 Fed. Reg. at 12,597.

[86] *Id.*; Winklevoss Order, 83 Fed. Reg. at 37,582.

[87] Wilshire-Phoenix Order, 85 Fed. Reg. at 12,597.

[88] VanEck Order, 86 Fed. Reg. at 64,542.

[89] *Id.*

[90] *Alliance for Cannabis Therapeutics v. Drug Enforcement Admin.*, 930 F.2d 936, 940 (D.C. Cir. 1991) (quoting *D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n*, 466 F.2d 393, 402 (D.C. Cir. 1972)) (alterations in original).

[91] 15 U.S.C. § 78f(b)(5) ("The rules of the exchange are designed to . . . remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest."); 15 U.S.C. § 78c(f) ("Whenever pursuant to this chapter the Commission is engaged in rulemaking, or in the review of a rule of a self-regulatory organization, and is required to consider or determine whether an action is necessary or appropriate in the public interest, the Commission shall also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.").

[92] *See, e.g.*, Order Granting Approval of a Proposed Rule Change, as Modified by Amendment No. 2, to Amend Certain Rules to Accommodate the Listing and Trading of Micro Flex Index Options and to Make Other Clarifying and Non-Substantive Changes, Securities Exchange Act Release No. 93122 (Sept. 24, 2021), 86 Fed. Reg. 54,269, 54,274 (Sept. 30, 2021), (SR-CBOE-2021-041) ("The Commission believes that the proposed rule change is consistent with the Act because it would provide investors with additional investment choices . . . .").

---

JA 17

**Davis Polk**

Securities and Exchange Commission

reasoned basis. Investors effectively would be limited to futures-based products, even though they face the same risks of fraud and manipulation as spot-based products, while presenting certain structural disadvantages that investors may wish to avoid. For example, Bitcoin futures ETPs are potentially subject to greater costs and additional risks than spot Bitcoin ETPs because futures products are subject to monthly roll-costs, which are incurred when the ETP has to sell the (typically lower-priced) front month contract before expiration and buy the (typically higher-priced) next month's contract. Because of embedded interest or storage costs, each future month's contract is typically more expensive, effectively causing the futures ETP to repeatedly sell low and buy high.[93] One analysis showed that over the last year, a futures ETP would have lost 28% of its value just on roll costs (effectively, fees and expenses being equal, a spot ETP would have performed around 28% better).[94]

Similarly, the CME Bitcoin futures market is subject to position limits that restrict the number of Bitcoin futures positions that a Bitcoin futures ETP can hold.[95] These position limits can cause a Bitcoin futures ETP to experience liquidity problems or losses, or have to halt new creations, denying investors who wish to participate the ability to do so, or increase its fixed-income portfolio and thereby introducing tracking error by diluting its exposure to Bitcoin.[96] Alternatively, the CME may have to raise position limits to accommodate increased demand in the absence of a spot Bitcoin ETP alternative, potentially increasing the concentration of economic power of a few large market participants in the Bitcoin futures markets and reducing the resiliency of those markets against manipulation.[97] These risks—that Bitcoin futures ETPs could be constrained by position limits and that the CME may raise those limits—are not purely speculative; indeed, both have already occurred since the first Bitcoin futures ETP began trading.[98] Restricting investors *only* to Bitcoin futures ETPs while denying access to competing spot Bitcoin ETPs would therefore more likely harm, rather than protect, U.S. investors.

### E.  The Commission is not a merit regulator

Finally, a decision to continue disallowing spot Bitcoin ETPs would enmesh the Commission in merit regulation, contrary to its mandate. The Exchange Act does not authorize the Commission to regulate the

---

[93] Michael J. Casey, *Why a Bitcoin Futures ETF is Bad for Investors*, CoinDesk (last updated Oct. 22, 2021 at 4:29 PM), https://www.coindesk.com/policy/2021/10/22/why-a-bitcoin-futures-etf-is-bad-for-investors/; Omkar Godbole, *Dying for a Bitcoin Futures ETF? Watch Out for 'Contango Bleed'*, CoinDesk (last updated Oct. 20, 2021 at 3:29 PM), https://www.coindesk.com/markets/2021/10/11/dying-for-a-bitcoin-futures-etf-watch-out-for-contango-bleed/ (explaining that futures markets normally experience "contango" dynamic, where "prices on longer-dated contracts . . . trade above those on shorter-dated contracts" due to storage costs and interest rates); Michael Wursthorn, *A Bitcoin ETF Is Here. What Does That Mean for Investors?*, Wall Street Journal (Oct. 19, 2021, 6:59 PM), https://www.wsj.com/articles/a-bitcoin-etf-is-almost-here-what-does-that-mean-for-investors-11634376601?mod=series_cryptobitcoindogecoin ("Some crypto enthusiasts complain that futures-based ETFs won't track bitcoin perfectly because of the costs of buying and selling futures contracts and other concerns. They contend that investors in futures ETFs could be saddled with substandard performance if crypto keeps rising."); *see also, e.g.*, Valkyrie Bitcoin Strategy ETF, Registration Statement (Oct. 20, 2021) at 11 (explaining roll-cost risk applicable to Bitcoin futures ETP and stating that "[t]he costs associated with rolling bitcoin futures typically are substantially higher than the costs associated with other futures contracts and may have a significant adverse impact on the performance of the Fund").

[94] Casey, *supra* note 93; *see also* David Z. Morris, *Contango Conmigo: Why a Bitcoin Futures ETF Could Be a Bloody Ride*, CoinDesk (Oct. 20, 2021, 12:21 PM), https://www.coindesk.com/policy/2021/10/20/contango-conmigo-why-a-bitcoin-futures-etf-could-be-a-bloody-ride/ (stating that current roll cost on Bitcoin futures is 17% according to one analyst and predicting Bitcoin futures to underperform spot Bitcoin by 8.4% annually).

[95] *See CME Bitcoin Futures Frequently Asked Questions*, CME Group (Apr. 1, 2020), https://www.cmegroup.com/education/bitcoin/cme-bitcoin-futures-frequently-asked-questions.html# (noting position limits of 4,000 contracts and position accountability limit of 5,000 contracts).

[96] *See, e.g.*, ProShares Trust, Registration Statement (Oct. 15, 2021), at 6 (noting that if CME position limits prevent fund from obtaining exposure to Bitcoin futures contracts, "the Fund may not be able to achieve its investment objective and may experience significant losses"); *id.* at 13 (noting that "accountability levels [and] position limits . . . may contribute to a lack of liquidity and have a negative impact on Fund performance," and stating that during periods of illiquidity, "it may be difficult or impossible for a Fund to buy or sell futures at desired prices or at all"); Valkyrie Bitcoin Strategy ETF, Registration Statement (Oct. 20, 2021), at 4, 14 (noting that fund's investment in Bitcoin "will be limited by the position limits established by the [CME]," and that position limits may force fund to alter its investment mix or require "commodity contract positions . . . to be liquidated at disadvantageous times or prices"); VanEck ETF Trust, Registration Statement (Oct. 27, 2021) at 2, 5 (same).

[97] *See, e.g.*, VanEck ETF Trust, Registration Statement (Oct. 27, 2021) at 36 (noting that "position limit rules are designed to prevent any one participant from controlling a significant portion of the market").

[98] *See, e.g.*, Shanny Bassar, *CME to Increase Bitcoin Position Limits*, MarketsMedia (Oct. 27, 2021), https://www.marketsmedia.com/cme-to-increase-bitcoin-position-limits/; Jamie Gordon, "ProShares bitcoin ETF risks hitting futures contract limit after breaking record to $1bn," ETF Stream (Oct. 22, 2021), https://www.etfstream.com/news/proshares-bitcoin-etf-risks-hitting-futures-contract-limit-after-breaking-record-to-1bn/.

---

JA 18

**Davis Polk**

Securities and Exchange Commission

suitability of an asset class, such as Bitcoin, or particular securities, such as BTC shares, relative to competing assets and securities.[99] As Commissioner Peirce observed in dissenting from an earlier spot Bitcoin ETP denial, "[t]he concerns underlying the disapproval order go to the merits of bitcoin—and thus the bitcoin-based ETP at issue here—as an investment."[100] With multiple Bitcoin futures ETPs now trading on national securities exchanges, continued adherence to the Commission's previous approach to spot Bitcoin ETPs would appear to reflect a simple preference for one type of investment over another.

\*    \*    \*

For the reasons set forth above, we respectfully request that the Commission approve NYSE Arca's proposal to list and trade BTC.

Very truly yours,

*Davis Polk & Wardwell* LLP

Davis Polk & Wardwell LLP
Joseph A. Hall
Gregory S. Rowland
Paul S. Mishkin
Jai R. Massari
Zachary J. Zweihorn
Daniel J. Schwartz

---

[99] *See, e.g.*, SEC, SEC Submits Report to Congress on Investment Companies, Exchange, Release No. 4766 (Dec. 2, 1966) (noting that the Commission's report "of course, makes no attempt to assess the merits of investment company securities relative to other media of investment"); *accord*, Lynn E. Turner, Chief Accountant, SEC, "Charting a Course for High Quality Financial Reporting," Remarks at the European FASB-SEC Financial Reporting Conference, 2000 WL 307581, at \*1 ("The Securities and Exchange Commission ('SEC') does not regulate by passing on the merits of securities offerings. Rather, SEC regulation aims to maintain fair and orderly markets and to protect investors by requiring securities issuers to make full and fair disclosure of all material information, so that investors have a basis for making informed decisions."); *see also Malack v. BDO Seidman, LLP*, 617 F.3d 743, 752 (3d Cir. 2010) ("The securities laws enacted by Congress in the 1930s were not intended to create a scheme of investors' insurance or to regulate directly the underlying merits of various investments." (citation and alteration omitted)).

[100] Dissent of Commissioner Hester M. Peirce to Release No. 34-83723, File No. SR-BatsBZX-2016-30 (July 26, 2018), https://www.sec.gov/news/public-statement/peirce-dissent-34-83723.

JA 19

**coinbase**

March 3, 2022

Ms. Vanessa Countryman Secretary
Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549-0609

Re: Order Instituting Proceedings to Determine Whether to Approve or Disapprove a
Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under
NYSE Arca Rule 8.201-E
File No. SR-NYSEArca-2021-90
Release No. 34-94151

Dear Ms. Countryman:

Coinbase Global, Inc. ("Coinbase") is submitting this letter in response to the Securities
and Exchange Commission's request for comments on whether to approve the proposed
rule change filed by NYSE Arca, Inc. (the "Exchange") to list and trade shares ("Shares")
of Grayscale Bitcoin Trust (BTC) (the "Trust").[1] As described in the above-referenced
release (the "Release"), the Commission is examining the proposal's consistency with
Section 6(b)(5) of the Securities Exchange Act of 1934, as amended (the "Exchange
Act"), which requires, among other things, that the rules of a national securities
exchange be "designed to prevent fraudulent and manipulative acts and practices" and
"to protect investors and the public interest." In particular, the Commission has asked:

> What are commenters' views on whether the proposed Trust and Shares would
> be susceptible to manipulation? What are commenters' views generally on
> whether the Exchange's proposal is designed to prevent fraudulent and
> manipulative acts and practices? What are commenters' views generally with
> respect to the liquidity and transparency of the Bitcoin markets, the Bitcoin
> markets' susceptibility to manipulation, and thus the suitability of Bitcoin as an
> underlying asset for an exchange-traded product?[2]

Coinbase started in 2012 with the radical idea that anyone, anywhere, should be able to
easily and securely send and receive Bitcoin, the first digital asset. Coinbase built a
trusted platform for accessing Bitcoin and the broader digital asset economy by reducing
the complexity of buying and selling through a simple and intuitive user experience.
Today, Coinbase is a leading provider of end-to-end financial infrastructure and
technology for the crypto economy. Coinbase's platform enables more than 89 million

---

[1] SEC; Release No. 34-94151; File No. SR-NYSEArca-2021-90; Self-Regulatory Organizations;
NYSE Arca, Inc.; Order Instituting Proceedings to Determine Whether to Approve or Disapprove
a Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE
Arca Rule 8.201-E.
[2] *Id*.

verified users, 11,000 institutions, and 210,000 ecosystem partners in more than 100 countries to participate in the digital assets economy.

Coinbase is also one of the three digital asset trading platforms that provides pricing data, through its Coinbase Pro platform, to TradeBlock, Inc. as index provider for the Trust.[3] In addition, Coinbase Custody Trust Company, LLC acts as custodian for the Trust's Bitcoin. We believe that our experience in providing these services, and our broader expertise in digital asset markets generally, is directly relevant to the questions being asked by the Commission in the Release.[4]

For the reasons discussed below, Coinbase believes that the Trust and the Shares would be no more susceptible to manipulation than other exchange-traded products ("ETPs") that the Commission has previously concluded satisfy the requirements of Section 6(b)(5) of the Exchange Act, and therefore believes that the Exchange's proposal is appropriately designed to prevent fraudulent and manipulative acts and practices. Moreover, as our accompanying analysis shows, the Bitcoin markets exhibit characteristics and maturity commensurate with some of the deeply traded markets in commodities and U.S. equities. The liquidity and transparency of the Bitcoin markets limits its susceptibility to manipulation, which we believe further demonstrates the suitability of Bitcoin as an underlying asset for an ETP.

There are numerous barriers to manipulation of the Bitcoin market, which we discuss in more detail below, that serve to improve market integrity and protect public and investor interests. First, the depth of order books, diversity of market participants, and transparency of prices in the Bitcoin market serve to quickly close arbitrage opportunities, including any that may be due to attempted price manipulation. As shown in the analysis below, Bitcoin prices on the Bitcoin exchanges that are included in the Grayscale ETP's pricing algorithm do not, in practice, deviate significantly across the exchanges. Any attempt to materially move the price of Bitcoin would require significant trading volume across several large exchanges.

Second, exchanges such as Coinbase have robust surveillance and monitoring practices in place designed to identify and prevent manipulative or fraudulent trading activity. These practices address, among other things, the Commodity Exchange Act's prohibitions on manipulative and fraudulent trading activity. Coinbase has demonstrated its commitment to these efforts, believes other reputable Bitcoin exchanges have similar capabilities in place, and will continue to share best practices across all digital asset markets with other parties through initiatives such as the Crypto Market Integrity Coalition.[5]

---

[3] SEC; Release No. 34-93504; File No. SR-NYSEArca-2021-90 Self-Regulatory Organizations; NYSE Arca, Inc.; Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E at 16–29, 33–35, 37–42.

[4] Coinbase previously submitted a comment letter in support of the proposed rule change. See letter of Paul Grewal, Chief Legal Officer, Coinbase Global, Inc. (Dec. 14, 2021), https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-20109603-263970.pdf.

[5] Michael Bellusci, *Leading Digital Exchanges Launch Crypto Market Integrity Coalition*, (Feb. 7, 2022),

Third, prices and volumes of Bitcoin futures versus Bitcoin spot markets are highly correlated, indicating very similar market dynamics between the futures market, for which the Commission has approved a Bitcoin ETP, and the spot market.

Fourth, the Bitcoin spot market is comparably large and transparent compared to silver, palladium, and platinum markets, for which spot ETPs have been approved by the Commission. When compared across key market dimensions – trading volume, capitalization, and number of active trading venues – the Bitcoin spot market is more robust, a sign of lower likelihood of successful market manipulation.

Fifth, Bitcoin spot ETPs' performance in other countries confirms the ability of a Bitcoin spot ETP to appropriately reflect the underlying Bitcoin market. At least seven other national jurisdictions[6] have already approved at least one Bitcoin spot ETP, and Germany, Canada, and Jersey have each approved several. As our analysis of Bitcoin ETPs in these markets demonstrates, there is a high correlation between the Bitcoin ETP price changes and those of the underlying Bitcoin market, indicating that Bitcoin ETP pricing algorithms ensure the ETP closely tracks the underlying market prices. The Trust's pricing methodology employs global best practices, including (i) basing price off of multiple exchanges; (ii) weighting by relative volumes, price deviations, and recency of activity; and (iii) filtering inputs to select exchanges and trade datasets that are more resistant to manipulation, and should result in similar tracking of the underlying Bitcoin markets.

### 1.   Market Depth, Liquidity, and Transparency

Bitcoin's average daily trading volume in 2021 was approximately $45 billion **[Figure 1]**, demonstrating the Bitcoin market's depth and liquidity. As a point of comparison, this trading volume is significantly higher than that of the largest national market system stocks **[Figure 2]**, including Apple, Microsoft, and Amazon, which are some of the most liquid trading instruments available. Several institutional investors including asset managers, hedge funds, and public companies participate in the Bitcoin market, and surveys indicate interest from institutional investors continues to increase for Bitcoin and a potential ETP on the Bitcoin spot market.[7]

As the Commission previously recognized in its approval of the streetTRACKS Gold Trust, another commodity market with no direct regulation of spot trading, the depth and

---

https://www.coindesk.com/business/2022/02/07/leading-digital-exchanges-announce-launch-of-crypto-market-integrity-coalition/.

[6] Canada, Germany, Switzerland, Jersey, Liechtenstein, Sweden, and Brazil.

[7] See, e.g., Lawrence Wintermeyer, *Institutional Money Is Pouring Into The Crypto Market And Its Only Going To Grow*, (Aug. 12, 2021), https://www.forbes.com/sites/lawrencewintermeyer/2021/08/12/institutional-money-is-pouring-into-the-crypto-market-and-its-only-going-to-grow/?sh=796cd85a1459 (discussing asset managers' increasing participation in the digital asset market); Stephen Graves, Daniel Phillips, *The 10 Public Companies With the Biggest Bitcoin Portfolios*, (Dec. 2021), https://decrypt.co/47061/public-companies-biggest-bitcoin-portfolios; institutions investing in bitcoin is expected to increase (listing public companies that hold Bitcoin); https://cointelegraph.com/news/62-of-institutions-to-start-investing-in-crypto-within-a-year-survey (discussing institutional investors' increasing participation in the digital asset market).

liquidity of underlying spot markets allay concerns with improper trading practices.[8] The magnitude of the Bitcoin trading market, with greater average trading volume than any single equity security, should provide the Commission with equal comfort that any attempted manipulations would be mitigated through fundamental trading and intermarket trading activity, including the Bitcoin futures market.[9]

Our empirical research supports this conclusion, showing that Bitcoin spot prices do not deviate significantly across digital asset exchanges. In a comparison of hour-end prices for Bitcoin across the four exchanges used as inputs to the Trust's pricing, the exchanges showed less than 20 bps deviation 97% of the time over a roughly three-year time horizon **[Figure 3]**. This deviation is low even when compared to certain liquid markets, including:

- Government and retail money market funds;[10] and

- Dual-listed stocks with equivalent economic interest as shown in **[Figure 4]**.

While there were instances where prices across these Bitcoin exchanges experienced higher deviations than 20 bps, the vast majority (e.g., 90% of deviations greater than 1%) were driven by a single exchange's pricing with less than 5% of the trading volume **[Figure 3]**. Because the TradeBlock index price uses a weighted average of prices based on trading volume, these deviations would have only a de minimis impact on the Trust's pricing. In the remaining instances, price differences quickly closed by intermarket trading, typically within one hour, with the exception of two price deviations that lasted three hours during the onset of the Covid-19 pandemic **[Figure 5]**. Hence, these larger deviations are commensurate with the infrequent occurrence of extreme events that can occasionally impact the trading of any and all financial market assets.

These observations and interpretations are consistent with those expressed previously by the Commission – that a strong convergence of pricing across a broad market is present where spot markets are deep and liquid.[11] Given the significant spot market volume and efficiency of inter-exchange price correction in Bitcoin spot markets, manipulating the price for shares of the Trust by manipulating spot markets would require a prohibitively large amount of trading volume and coordination across several

---

[8] SEC; Release No. 34-50603; File No. SR-NYSE-2004-22; Self-Regulatory Organizations; Order Granting Approval of Proposed Rule Change and Notice of Filing and Order Granting Accelerated Approval to Amendments No. 1 and No. 2 Thereto to the Proposed Rule Change by the New York Stock Exchange, Inc. Regarding Listing and Trading of streetTRACKS® Gold Shares at 65619.
[9] *Id.*
[10] According to Investment Company Act Rule 2a-7, government and retail money market funds can choose a penny rounding approach when listing prices, which can result in up to a 50 bp deviation. 17 CFR § 270.2a-7(c)(1)(i).
[11] SEC; Release No. 34-50603; File No. SR-NYSE-2004-22; Self-Regulatory Organizations; Order Granting Approval of Proposed Rule Change and Notice of Filing and Order Granting Accelerated Approval to Amendments No. 1 and No. 2 Thereto to the Proposed Rule Change by the New York Stock Exchange, Inc. Regarding Listing and Trading of streetTRACKS® Gold Shares.

large exchanges.[12] Further, activity on this scale would be readily detected as a result of surveillance activity covered in the next section.

### 2.  Exchange Surveillance and Monitoring Practices

The market for any commodity is, of course, subject to the risk of manipulation. Addressing this risk is a foundational element of Coinbase's strategy, because the integrity of the Bitcoin market and digital asset markets generally is fundamental to our business and essential to protecting our customers. Coinbase has invested heavily in market surveillance and monitoring, including complying with federal anti-fraud and anti-manipulation rules that apply to digital asset markets under the Commodity Exchange Act and regulations of the Commodity Futures Trading Commission.[13]

In addition to the measures undertaken by Tradeblock, Inc. to address the effect of potentially manipulative or fraudulent trading on the Index,[14] and in addition to measures employed by CFTC-regulated futures exchanges for Bitcoin futures contracts, Coinbase applies surveillance and monitoring measures for its spot digital asset trading platforms designed to identify and address potential manipulative or fraudulent trading activity on those platforms. We believe that the other digital asset exchanges that provide pricing data as inputs to the Index also employ measures to counter potential fraudulent or manipulative trading. In these comments, we describe our own approach.

Coinbase established its current market surveillance and monitoring program in 2018. Its market surveillance and monitoring team currently includes ten professionals, led by a former NYSE executive. As part of this program, Coinbase uses a cutting-edge

---

[12] Given the market complexity, volatility, and evolving landscape, it is not possible to precisely determine the trading volume required to shift market prices. However, an analysis by Bank of America in 2021 indicated $93 MM required to move Bitcoin price by $1. See Samuel Haig, *Bank of America claims it costs just $93 million to move Bitcoin's price by 1%*, (Mar. 19, 2021), https://cointelegraph.com/news/bank-of-america-claims-it-costs-just-93-million-to-move-bitcoin-s-price-by-1. Although it is unclear whether a linear extrapolation of this price impact measure is appropriate, it would correspond to requiring $44 BN to shift the Bitcoin price by 1% when trading at $47,464 (the average close price in 2021 based on data from Yahoo Finance). Coinbase would venture this would be prohibitively expensive, given average daily trading volume in 2021 was $45 BN and the average daily volatility of Bitcoin is greater than 1%.

[13] Section 6(c)(1) of the Commodity Exchange Act, 7 U.S.C. § 9. This authority does not extend to regulation and supervision of these markets. For a summary of this topic, see CFTC Commissioner Stump, *Digital Assets: Clarifying CFTC Regulatory Authority & the Fallacy of the Question, "Is it a Commodity or a Security?,"* (Aug. 23, 2021), https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement082321.

[14] SEC; Release No. 34-93504; File No. SR-NYSEArca-2021-90 Self-Regulatory Organizations; NYSE Arca, Inc.; Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E at 19 ("The Index Price is determined by the Index Provider through a process in which trade data is cleansed and compiled in such a manner as to algorithmically reduce the impact of anomalistic or manipulative trading. This is accomplished by adjusting the weight of each data input based on price deviation relative to the observable set, as well as recent and long-term trading volume at each venue relative to the observable set. To calculate volume weighted price, the weighting algorithm is applied to the price and volume of all inputs for the immediately preceding 24-hour period at 4:00 PM, New York time, on the trade date.").

surveillance technology called Eventus. The program employs machine learning methods to provide 24/7/365 market surveillance and monitoring across all Coinbase digital asset trading platforms. The program monitors for the types of potentially manipulative or fraudulent trading activity that are at times observed in traditional financial markets – spoofing, wash trading, trade layering, front-running, churning, and quote stuffing.[15] While traditional financial market surveillance often relies upon T+1 or T+2 (day) market data, the Coinbase surveillance program issues same-day alerts so that the Coinbase trade surveillance team can investigate and quickly address the triggering activity.

In addition to our surveillance program, Coinbase employs measures similar to circuit breakers and trading limits used in traditional financial markets to address potential manipulative or fraudulent trading activity. For example, Coinbase imposes a trading limit called the market protection point – an order on Coinbase Pro that is large enough to move the price of Bitcoin more than two percent is filled only up to that two-percent amount, with the remainder of the order being canceled to mitigate non-fundamental price impact and avoid undue market swings.[16] Coinbase also monitors digital asset prices on other exchanges, and significant differences between the prices on Coinbase platforms and other exchanges triggers scrutiny and testing by the Coinbase team to assess whether these differences may reflect potential manipulative or fraudulent trading activity that should be addressed.

Coinbase has policies and procedures in place, many of which are available publicly, that describe our trade surveillance program and our practices to address potential market manipulation or fraudulent trading activity.[17] Coinbase employees are subject to trading policies designed to ensure that their trading activities are consistent with applicable federal anti-fraud and anti-manipulation laws.[18] These policies and procedures are subject to annual audits to ensure a strong compliance culture.

Finally, Coinbase participates in industry initiatives meant to further address potential manipulative and fraudulent trading activity in Bitcoin, such as the recently announced Crypto Market Integrity Coalition, which is designed to facilitate cross-exchange surveillance and bolster the integrity and efficiency of digital asset markets.[19] Coinbase

---

[15] The Coinbase Blog, *How Coinbase thinks about market integrity and trade surveillance*, (Oct. 11, 2021), https://blog.coinbase.com/how-coinbase-thinks-about-market-integrity-and-trade-surveillance-f3d4c7a53d0.

[16] Coinbase, *Market Information*, https://pro.coinbase.com/markets.

[17] The Coinbase Blog, *How Coinbase thinks about market integrity and trade surveillance*, (Oct. 11, 2021), https://blog.coinbase.com/how-coinbase-thinks-about-market-integrity-and-trade-surveillance-f3d4c7a53d0; Coinbase, *Market Information*, https://pro.coinbase.com/markets.

[18] The Coinbase Blog, *How Coinbase thinks about market integrity and trade surveillance*, (Oct. 11, 2021), https://blog.coinbase.com/how-coinbase-thinks-about-market-integrity-and-trade-surveillance-f3d4c7a53d0.

[19] See Crypto Market Integrity Coalition, *Enabling a Safer Crypto Ecosystem*, https://www.cryptomarketintegrity.com/.

will continue to seek opportunities to collaborate with other digital asset market participants to improve cross-market surveillance.

### 3. Comparison of Bitcoin Spot and Futures Markets

An important comparison point for the approval of a Bitcoin spot ETP is the recently approved CME Bitcoin futures ETF. Given that the reference price for the CME Bitcoin futures ETF is driven by the same data that underlies the Bitcoin spot market, there is an unsurprisingly high correlation of 99.9% between the price of the futures[20] and spot market **[Figure 6]**.

These data are consistent with arbitrageurs forcing price convergence by selling in one market – spot or futures – and buying in the other. These data are also consistent with the Commission's original determination that manipulation of the underlying Bitcoin market is sufficiently mitigated for approval of ETFs based on Bitcoin futures. Coinbase believes this same logic supports approval of a Bitcoin spot ETP – there is no economic justification for a differential impact on the efficacy of a Bitcoin futures ETF or spot Bitcoin ETP from any potential manipulation of the underlying Bitcoin market.

In fact, given that the Bitcoin spot market shows higher and more stable daily trading volumes than the futures ETF **[Figure 7]**, Coinbase believes the presence of an approved Bitcoin spot ETP may bolster and stabilize the broader Bitcoin derivatives market by encouraging a still greater volume of activity and easier arbitrage between the two markets. This rationale was cited by the Commission in approving previous commodity ETPs.[21]

It should be noted that effects of an existence of a spot ETP on the underlying market is well studied in the literature[22] and the introduction of an ETP can enhance price discovery in the underlying markets by increasing informational efficiency.

---

[20] The Bitcoin futures price in this analysis is represented by the price of the futures contracts listed by CME that is closest to maturity at any point in time, representing a 30-day window. While historical observations of futures contracts farther from settlement date indicate a contango effect (i.e., futures trading at higher prices than the underlying spot), this effect is not observable and the future and spot market converge closer to futures contracts settlement date.

[21] SEC; Release No. 34-50603; File No. SR-NYSE-2004-22; Self-Regulatory Organizations; Order Granting Approval of Proposed Rule Change and Notice of Filing and Order Granting Accelerated Approval to Amendments No. 1 and No. 2 Thereto to the Proposed Rule Change by the New York Stock Exchange, Inc. Regarding Listing and Trading of streetTRACKS® Gold Shares and SEC Release No. 34-68440; File No. SR-NYSEArca-2012-28 Self-Regulatory Organizations; NYSE Arca, Inc.; Notice of Filing of Amendment No. 1 and Order Granting Accelerated Approval of a Proposed Rule Change as Modified by Amendment No. 1 to List and Trade Shares of the JPM XF Physical Copper Trust Pursuant to NYSE Arca Equities Rule 8.201.

[22] Lawrence Glosten, Suresh Nallareddy, Yuan Zou, *ETF Activity and Informational Efficiency of Underlying Securities*, (April 2020); Blackrock, *Lessons from COVID-19: ETFs as a Source of Stability*, (July 2020), https://www.blackrock.com/corporate/literature/whitepaper/viewpoint-lessons-from-covid-19-etfs-as-a-source-of-stability-july-2020.pdf.

7

**4.  Comparison of the Bitcoin Spot Market and Other Commodity Markets**

The Bitcoin spot market is of comparable size to several of the commodity markets for which the SEC has previously approved spot ETPs, with total market capitalization lower than silver and greater than palladium and platinum **[Figure 8]**.

Given the opacity of the commodity OTC market – transparency that is considerably less than the commodity Bitcoin market – Coinbase cannot definitively compare the market depth of the Bitcoin market and those commodity markets. However, Coinbase believes available research and data indicate higher trading volumes in the Bitcoin spot market than the silver OTC market:

- London has a majority share of the global OTC market for silver (estimated at 70% in 2017);[23]

- The London OTC market had an estimated trade reporting weekly turnover of $30.84 BN for silver in the last 12 weeks of 2021; and[24]

- The Bitcoin market had an average weekly trading volume of $233 BN in the same timeframe (last 12 weeks of 2021).[25]

A comparison of non-US Bitcoin spot ETPs to approved commodity ETPs (e.g., ETPs for palladium, platinum, silver, copper) indicate that the ETP's ability to closely track the underlying asset price is comparable between Bitcoin and other commodities **[Figure 9]**. This rationale was cited by the Commission in approving previous commodity ETPs.[26]

**5.  Experience of Non-US Bitcoin Spot ETPs**

.The performance of Bitcoin spot ETPs in other countries is a helpful benchmark in assessing the ability of a US-traded Bitcoin spot ETP to appropriately reflect the underlying Bitcoin market. Coinbase has identified seven countries that have approved a total of 16 Bitcoin spot ETPs **[Figure 10]**, with Germany, Canada, and Jersey each having approved multiple ETPs. Analysis of the German, Canadian, and Jersey ETPs demonstrates a high correlation between the ETP price and that of the underlying Bitcoin market. **[Figure 11-12 and 13-16]**. This indicates that Bitcoin spot ETPs accurately

---

[23] The Silver Institute, *World Silver Survey 2018*, https://www.silverinstitute.org/wp-content/uploads/2018/04/WSS-2018.pdf at 18.

[24] LBMA, *LBMA Trade Data*, https://www.lbma.org.uk/prices-and-data/lbma-trade-data.

[25] Weekly average of data from Yahoo Finance on Bitcoin volumes, sourced from coinmarketcap.com.

[26] See, e.g., SEC; Release No. 34-50603; File No. SR-NYSE-2004-22; Self-Regulatory Organizations; Order Granting Approval of Proposed Rule Change and Notice of Filing and Order Granting Accelerated  Approval to Amendments No. 1 and No. 2 Thereto to the Proposed Rule Change by the New York Stock Exchange, Inc. Regarding Listing and Trading of streetTRACKS® Gold Shares.

reflect the underlying Bitcoin market and provide investors exposure to Bitcoin without the need to trade Bitcoin itself.

There are global best practices that Bitcoin spot ETPs can use to mitigate potential manipulation of their share prices and so that these prices more closely reflect the underlying Bitcoin market. The Trust's pricing methodology employs these best practices including (i) using an index whose price is based upon data from multiple exchanges, (ii) weighting pricing data by relative volumes, price deviations, and recency of activity, and (iii) using an index that filters inputs to select exchanges and trade datasets that are more resistant to manipulation, and should result in similar tracking of the underlying Bitcoin markets.

                        *        *        *

We appreciate the opportunity to provide input to the Commission as it considers the Exchange's proposal. The characteristics of the Bitcoin market, as described in the data and analysis in this letter, support the position that the Trust and the Shares would be no more susceptible to manipulation than other ETPs previously approved by the Commission. For that reason, approval of the Exchange's proposal is the appropriate action for the Commission to take.

We would be pleased to answer any questions the Commission or its staff may have on the data and analysis presented above. We appreciate the Commission's continuing attention to this important matter and for allowing us an opportunity to present our views.

Sincerely,

Paul Grewal
Chief Legal Officer

9

JA 28

# Figure 1: Bitcoin spot market depth mitigates ability to manipulate multiple large exchanges

**Daily dollar trading volume on BTC spot exchanges[1]**
30-day rolling average, 1/1/21-2/14/22



Average daily dollar trading volume for BTC across all exchanges was ~$45BN in 2021, making it prohibitively expensive to manipulate the market

1. Daily volume is in dollars and represents the total spot trading volume reported by all exchanges over the last 24 hours for that cryptoasset
Source: Data pulled from Yahoo Finance, originally sourced from Coinmarketcap.com

# Figure 2: Bitcoin spot market depth is greater than that of the largest individual equities

**Average daily dollar volume across Bitcoin exchanges[1] vs. largest S&P 500 stocks[2]**
$ BN, daily average over 2021



1. Bitcoin volume is pulled from Yahoo Finance, originally sourced from Coinmarketcap.com. Daily volume is in dollars and represents the total spot trading volume reported by all exchanges over the last 24 hours for that cryptoasset
2. Largest stocks by Market Cap as of 1/31/22 according to Statista. Trading volume and price sourced from Yahoo Finance, with dollar volume calculated as the average price * average daily trading volume

# Figure 3: Historical price differential across exchanges

**Frequency of each level of deviation across 4 exchanges[1]**
Close of every trading hour, 12/8/18 – 2/15/22



<0.1% deviation 80% of the time;
<0.2% deviation 97% of the time

X-axis: Max differential across Grayscale exchanges
Y-axis: Frequency (# of hours)

202 instances (i.e., 202 hourly closes over roughly 3-year time horizon) with >1% price deviation across exchanges

- 180 instances were driven by a single exchange (lmax), which contributed <5% of volume across 4 exchanges
  - This has minimal impact given Grayscale ETF price is average weighted by volume

- 16 instances where >1% deviation between exchanges, and price difference reduced to below 1% by the next trading hour close

- 6 instances (i.e., 2 periods of 3 hours) over March 12-13, 2020 during the onset of Covid-19, where price deviation persisted across the trading close of three consecutive hours

1. Exchanges include Coinbase, Bitstamp, Kraken, Lmax
Source: CryptoCompare Data

JA 31

# Figure 4: Price deviation in BTC spot market is lower than that of select dual-listed stocks across exchanges

**Price deviation across exchanges for BTC spot market[1] and select dual-listed stocks[2]**
Close of every trading hour, 1/10/22 – 2/23/22



1. Exchanges include Coinbase, Bitstamp, Kraken, Lmax; data sourced from CryptoCompare
2. Dual-listed stock data sourced from Frankfurt Stock exchange, Euronext Paris, U.S. exchanges and U.S. OTC Markets via Bloomberg; currency conversion rates between exchanges sourced from Bloomberg

# Figure 5: When BTC prices deviated, they closed very quickly

**Bitcoin price across 4 exchanges[1]**
Close of every trading hour, 3/12/20 – 3/13/20



1. Exchanges include Coinbase, Bitstamp, Kraken, Lmax
Source: CryptoCompare Data

# Figure 6: Price is highly correlated between BTC CME futures and BTC spot market

**Daily price for BTC futures[1] and spot markets**
$, 11/4/21 – 2/23/22



1. BTC future price represented by "CME BTC Generic 1st Future" listed on Bloomberg; this price represents the price of the future contract listed by CME that is closest to maturity (e.g., December 2021 prices represented by price of BTCZ1 future contract that matures on the last Friday of December)
Source: Bitcoin CME Futures price sourced from Bloomberg, Bitcoin price listed by Coinbase sourced from CryptoCompare

# Figure 7: Volume is more volatile for BTC CME futures than BTC spot market

**Daily percentage change in trading volume for BTC futures[1] and spot markets**
11/30/21 − 2/23/22



1. BTC futures volume represented by "CME BTC Generic 1st Future" listed on Bloomberg; the "CME BTC Generic 1st Future" represents the future contract listed by CME that is closest to maturity (e.g., for December 2021 it tracks the BTCZ1 future contract that matures on the last Friday of December)
Source: Bitcoin CME Futures volume sourced from Bloomberg, Bitcoin spot volume from CoinMarketCap

JA 35

## Figure 8: Bitcoin is comparable in market size to several commodities for which ETFs have been approved

**Market cap**
$ TN, as of 2/15/22



Source: BTC market capitalization from Coinmarketcap, commodities market capitalization from companiesmarketcap.com

# Figure 9: Ability for ETF to closely track underlying asset price is comparable between Bitcoin and other commodities

**Average absolute difference in daily price change between ETF and underlying asset**
1/14/22 - 2/16/22



Source: Cryptocompare.com for BTC spot price listed on Coinbase, Xetra and TSX exchanges for BTC ETF prices, Bloomberg for commodity spot and ETF prices

JA 37

# Figure 10: Several other countries have recognized these factors and approved select Bitcoin ETFs

| Country | Fund | Exchange |
|---|---|---|
| Canada | 3iQ Coinshares | • TSX |
| | Purpose Bitcoin | |
| | CI Galaxy Bitcoin | |
| | Evolve Bitcoin | |
| | Ninepoint Bitcoin ETF | |
| | Fidelity Advantage Bitcoin ETF | |
| Germany | BTCetc - ETC Group Physical Bitcoin | • Xetra (DE) |
| | Bitpanda Bitcoin ETC | • SIX (CH) |
| | Iconic Funds Physical Bitcoin ETP | |
| | Invesco Physical Bitcoin | |
| Switzerland | 21Shares Bitcoin ETP | • Euronext (NL, FR) |
| Jersey | CoinShares Physical Bitcoin | • Xetra (DE) |
| | WisdomTree Bitcoin | • SIX (CH) |
| Liechtenstein | VanEck Vectors Bitcoin ETN | |
| Sweden | Bitcoin tracker one | • Euronext (SE) |
| Brazil | QBTC11 | • B3 |

JA 38

# Figure 11: German ETFs demonstrate consistent prices with each other and underlying Bitcoin market

**Price of BTC listed on Coinbase vs. Germany ETFs listed on Xetra**
9am CET open prices, normalized for comparison[1], 12/1/21 – 2/16/22



1. Given the value of an individual unit of ETF or BTC varies by pricing methodology (1 ETF share represents a fraction of a BTC), prices are normalized by dividing each price by the respective price as of 2/16/22
Source: Cryptocompare.com for Coinbase price, Xetra exchange for ETF prices

# Figure 12: Price changes are highly correlated between German ETFs and underlying Bitcoin market

**Daily price changes of BTC listed on Coinbase vs. Germany ETFs listed on Xetra**
9am CET open prices, 12/1/21 – 2/16/22



Source: Cryptocompare.com for Coinbase price, Xetra exchange for ETF prices

# Figure 13: Canadian ETFs demonstrate consistent prices with each other and underlying Bitcoin market

**Price of BTC listed on Coinbase vs. Canada ETFs[1] listed on TSX**
8am EST open prices, normalized for comparison[2], 12/1/21 – 2/16/22



99.5% correlation between daily price changes of each ETF price and the underlying BTC price on Coinbase

1. 6 ETFs considered: EBIT, BTCX.B, BTCC, BITC, BTCQ, FBTC; FBTC and BITC excluded given significantly lower volumes (each contributing less than 2% of volume across these 6 exchanges over this timeframe)
2. Value of an individual unit of ETF or bitcoin varies by pricing methodology and underlying fees, prices normalized by setting each price as of 2/16 equal to 1
Source: Cryptocompare.com for Coinbase price, TSX exchange for ETF prices

JA 41

# Figure 14: Price changes are highly correlated between Canadian ETFs and underlying Bitcoin market

**Daily price changes of BTC listed on Coinbase vs. Canada ETFs[1] listed on TSX**
8am EST open prices, 12/1/21 – 2/16/22



~95% correlation between daily price changes of each ETF price and the underlying BTC price on Coinbase

1. 6 ETFs considered: EBIT, BTCX.B, BTCC, BITC, BTCQ, FBTC; FBTC and BITC excluded given significantly lower volumes (each contributing less than 2% of volume across these 6 exchanges over this timeframe)
Source: Cryptocompare.com for Coinbase price, TSX exchange for ETF prices

# Figure 15: Jersey ETFs demonstrate consistent prices with each other and underlying Bitcoin market

**Price of BTC listed on Coinbase vs. Jersey ETFs listed on Xetra**
9am CET open prices, normalized for comparison[1], 12/1/21 – 2/16/22



99.4% correlation between daily price changes of each ETF price and the underlying BTC price on Coinbase

1. Value of an individual unit of ETF or bitcoin varies by pricing methodology and underlying fees, prices normalized by setting each price as of 2/16 equal to 1
Source: Cryptocompare.com for Coinbase price, Xetra exchange for ETF prices

# Figure 16: Price changes are highly correlated between Jersey ETFs and underlying Bitcoin market

**Daily price changes of BTC listed on Coinbase vs. Jersey ETFs listed on Xetra**
9am CET open prices, 12/1/21 – 2/16/22



Source: Cryptocompare.com for Coinbase price, Xetra exchange for ETF prices

# Methodology and sources (1/2)

| Analysis | Figure | Methodology[1] | Data source |
|---|---|---|---|
| Daily dollar trading volume on BTC spot exchanges | 1 | • 30-day rolling average of daily USD trading volume of BTC from exchanges listed on Coinmarketcap, from 1/1/21 to 2/14/22 | • Yahoo Finance, originally from Coinmarketcap |
| Average daily dollar volume across Bitcoin exchanges vs. largest S&P 500 stocks | 2 | • Average daily trading volume of BTC calculated as simple average of daily trading volume over 2021 (quoted in USD)<br>• Average daily USD trading volume of stocks calculated as *average daily price \* average daily trading volume* | • BTC daily volume from Yahoo Finance, originally from Coinmarketcap.com<br>• Stocks daily volume from Yahoo Finance |
| Frequency of each level of deviation across 4 exchanges | 3 | • BTC spot market price deviations calculated as *(max(hourly close price across Coinbase, Bitstamp, Kraken and Lmax) - min(hourly close price across Coinbase, Bitstamp, Kraken and Lmax)) ÷ (volume weighted average BTC price across Coinbase, Bitstamp, Kraken and Lmax)* for each hour from 12/8/18 to 2/15/22 | • BTC spot prices for every exchange from Cryptocompare |
| Price deviation across exchanges for BTC spot market and select dual-listed stocks | 4 | • BTC spot market deviations calculated as defined above<br>• Dual-listed stock price deviations are the hourly USD price difference between securities listed on 2 exchanges, calculated as $abs(price_{t,\,Exchange\,A} - price_{t,\,Exchange\,B} - 1)$ for each hour *t* from 1/10/22 to 2/23/22<br>• Only trading hours during which both exchanges trade are considered within the scope of this analysis<br>• Required currency conversion where exchanges are not originally USD denominated | • BTC spot prices from Cryptocompare<br>• Stock prices and USD conversion rates from Bloomberg |
| Bitcoin price across 4 exchanges | 5 | • BTC hourly closing prices across Coinbase, Bitstamp, Kraken and Lmax from 3/12/20 to 3/13/20 | • BTC spot prices from Cryptocompare |
| Daily price for BTC futures and spot markets | 6 | • Daily closing prices for BTC CME futures and Coinbase spot market, from 11/4/21 to 2/23/22 | • BTC CME futures from Bloomberg<br>• BTC spot prices from Cryptocompare, originally from Coinbase |
| Daily percentage change in trading volume for BTC futures and spot markets | 7 | • Changes in daily volume for BTC CME futures and Coinbase spot market calculated as *(trading volume$_t$ ÷ trading volume$_{t-1}$ − 1)* for each day *t* from 11/30/21 – 2/23/22 | • BTC CME futures from Bloomberg<br>• BTC spot prices from Cryptocompare, originally from Coinbase |

1. Missing data points during the period of analysis are ignored.

# Methodology and sources (2/2)

| Analysis | Figure | Methodology[1] | Data source |
|---|---|---|---|
| Market capitalization of BTC and commodities | 8 | • Total USD market capitalization as of 2/15/22 | • BTC market capitalization from Coinmarketcap<br>• Commodities market capitalization from companiesmarketcap.com |
| Average absolute difference in daily return for commodity and Bitcoin ETFs vs. spot markets | 9 | • Commodity spot and ETFs daily returns for day $t$ calculated as *(close price$_t$ ÷ close price$_{t-1}$ − 1)*<br>• BTC spot and ETFs daily returns for day $t$ calculated as *(open price$_t$ ÷ open price$_{t-1}$ − 1)*. Canadian and German ETF open prices compared with the corresponding spot hourly prices from Coinbase<br>• Average absolute difference in daily returns calculated as the *average$_{Over\ all\ days\ t}$ (abs(daily return$_{t\ ETF}$ − daily return$_{t,\ spot}$))* where $t$ represents each day in the period 1/14/22 to 2/16/22 | • Commodity spot markets and ETF prices from Bloomberg<br>• BTC ETF prices from Toronto Stock Exchange (BTCC) and Frankfurt Stock Exchange (21Shares Bitcoin) |
| Price of BTC listed on Coinbase vs. ETFs | 11, 13, 15 | • Given the value of an individual unit of ETF or BTC varies by pricing methodology (e.g. 1 ETF share represents only a fraction of a BTC), prices are normalized by dividing each price by the respective price as of 2/16/22<br>• As noted above, daily price is based off open prices for the ETF exchange and the corresponding hourly spot price from Coinbase | • BTC prices from Cryptocompare<br>• German and Jersey ETF prices from Frankfurt Stock Exchange (Xetra)<br>• Canadian ETF prices from Toronto Stock Exchange |
| Daily price changes of BTC listed on Coinbase vs. ETFs | 12, 14, 16 | • Daily price changes are calculated as *(price$_t$ ÷ price$_{t-1}$ − 1)* for day $t$ from 12/1/21 to 2/16/22<br>• As noted above, daily price is based off open prices for the ETF exchange and the corresponding hourly spot price from Coinbase | • BTC prices from Cryptocompare<br>• German and Jersey ETF prices from Frankfurt Stock Exchange (Xetra)<br>• Canadian ETF prices from Toronto Stock Exchange |

1. Missing data points during the period of analysis are ignored.

**HUNTING HILL GLOBAL CAPITAL, LLC**
122 EAST 42ND STREET, SUITE 5005
NEW YORK, NEW YORK 10168

March 3, 2022

Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549-0609

Re: Order Instituting Proceedings to Determine Whether to Approve or Disapprove a
Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC)
under NYSE Arca Rule 8.201-E
File No. SR-NYSEArca-2021-90
Release No. 34-94151

Ladies and Gentlemen:

We write in response to your request for comments on NYSE Arca's proposal to
list shares of Grayscale Bitcoin Trust (BTC) as an exchange-traded product, or ETP.
Hunting Hill Global Capital, LLC is an asset manager whose investment strategy seeks to
capitalize on market structure-related arbitrage opportunities, trading globally in ETPs,
stocks, bonds, derivatives and other financial instruments. We hold positions in the
Grayscale ETP from time to time on behalf of our clients.

We are providing our views on the topics raised in question no. 5 of the release
referenced above. As we explain below:

- The CME bitcoin futures market undoubtedly represents a regulated market of
  significant size; and

- Given the significant size of the CME bitcoin futures market, we believe there is
  more than a reasonable likelihood that a person attempting to manipulate the
  Grayscale ETP would also have to trade on the CME bitcoin futures market in
  order to successfully manipulate the Grayscale ETP.

Using Bloomberg trading data for the 365 days ended February 4, 2022 (the date
of the above-referenced release) across all spot (i.e., cash) bitcoin trading venues and all
CME bitcoin futures contract maturities,[1] we find that the CME bitcoin futures market is
more significant than the bitcoin spot market itself.[2]

---

[1] We used a Bloomberg dataset for the analysis and conclusions described in this letter. We trust
the SEC has this dataset available to it but if not, we would be pleased to offer our assistance to the SEC in
obtaining it.

[2] To the extent Bloomberg does not include data from some trading venues in jurisdictions with
comparatively less regulation and market surveillance than the United States, if manipulative activity in
(….continued)

JA 47

Securities and Exchange Commission
p. 2

Over this time period, the aggregate futures volume ($579bn) was 31% higher than aggregate spot volume ($442bn). We do not believe this result is due to a few extraordinary high-volume periods in the futures market; after bucketing the data by week and conducting a paired t-test on the differences in means, we find that the difference is statistically significant with a t-statistic of 4.9. Whatever concerns the SEC may have about the integrity of trading in the bitcoin spot market, if the larger CME bitcoin futures market is not "significant," then proving the existence of a significant market would be by definition impossible, and the SEC would need to formulate a new test for ETP approval.

Looking at the lead-lag relationship between the spot and futures markets and using minute-by-minute last-price data over the same time period, converted to percentage price changes, based on the first lagged term for both markets we conclude that the relationship between spot and futures prices is complex and interrelated with no clear winner. Instead, the results of the test of which market is leading depends on the time period of testing. We therefore find causality between pricing in both markets, which we believe disproves the propositions that futures price changes do not cause spot price changes and that spot price changes do not cause futures price changes. The t-statistics for both tests are above 2.

It would not be reasonable for the SEC to require, as a condition to approving the Grayscale ETP, a demonstration that pricing in the futures market *always* leads the spot market. This would be tantamount to requiring that an obvious statistical arbitrage opportunity exists between two highly liquid and automated markets: if that were the case, any trader would be in a position to profit immensely. While such a requirement might make sense (as a shortcut) in the context of an administrative determination to approve an ETP for a physical commodity where spot markets lack automated intermarket connectivity (with the result that spot/futures arbitrage opportunities would not be so blatant), imposing such a requirement in the context of a bitcoin ETP would be the same as a declaration that bitcoin ETPs will never be approved in the United States, regardless of the structure of the spot market.

We also do not consider it likely that a bad actor would attempt to manipulate the Grayscale ETP through trading on offshore cryptocurrency trading venues. First, offshore trading venues generally do not support fiat trading and instead only support trading between different cryptocurrencies. To the extent such venues support bitcoin trading versus USD (e.g. FTX.com and FTX US), we understand the data has been included by Bloomberg in the dataset for the above analysis. Some offshore trading venues allow for bitcoin to be exchanged to Tether, a stablecoin partially backed by USD-denominated assets; however, Tether often trades at substantial premiums and discounts to USD and we believe it is commonly thought that redemptions of Tether for USD are not guaranteed by full liquid reserves. This makes it unlikely that a trader would use Tether

(continued….)

those jurisdictions is impacting trading venues included in the Bloomberg dataset, the Bloomberg data would of course be influenced by that activity.

Securities and Exchange Commission
p. 3

as a proxy for USD. Because manipulation in the bitcoin/USD exchange pair would likely result in a widening of Tether premiums and discounts, it would not be economically practical for a bad actor to manipulate the Grayscale ETP using Tether-denominated bitcoin prices. Second, offshore trading venues generally offer trading in bitcoin derivatives such as quarterly futures and perpetual futures; however, both would be poor choices for a bad actor seeking to manipulate the Grayscale ETP because both are known to deviate from the bitcoin spot price much more than CME futures. Because of this relationship, any bad actor seeking to manipulate the Grayscale ETP would risk expanding or contracting the premium of the derivative being used as a manipulation tool rather than influencing bitcoin spot prices.

The SEC is focused on whether a bad actor intent on manipulating the Grayscale ETP would need to trade in the regulated CME bitcoin futures market, which would mean that the actor's manipulative activity would be detectable and therefore preventable by a U.S. regulator. Given the relative size of trading volumes of bitcoin futures relative to spot, the strong dependence of spot prices on futures prices and vice versa, and the inefficiency of attempting to manipulate the Grayscale ETP through offshore trading, we believe the dataset shows that such an actor would be unable to manipulate the Grayscale ETP without also trading in the regulated futures markets.

We would be pleased to discuss our analysis with the Commission and its staff in greater detail.

Sincerely yours,

HUNTING HILL GLOBAL CAPITAL, LLC

March 26, 2022 Via e-mail: rule-comments@sec.gov

Vanessa Countryman, Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-0609

Re: Comments on File No. SR-NYSEArca-2021-90

Ms. Countryman,

According to its website, the U.S. Securities and Exchange Commission ("the Commission") has a three-part mission[1] to:

- Protect investors;
- Maintain fair, orderly, and efficient markets; and
- Facilitate capital formation.

In 2017, when Grayscale Bitcoin Trust (BTC) ("GBTC") made its first filing to convert into an ETP, I and several other academics from various universities submitted a letter stating that it was our firm belief that the approval of a Rule Change by the Commission allowing GBTC to list its shares on the NYSE Arca as a bona fide Exchange-Traded Product ("ETP") would be consistent with the Commission's commitment to achieving this mission.

Since that time, several key developments have emerged that make the beliefs I expressed in 2017 even stronger: (1) the Commission has allowed trading to commence for bitcoin futures exchange-traded funds (ETF) that provide exposure to CME-traded bitcoin futures, a decision I commend the Commission for taking, (2) several bitcoin ETPs in jurisdictions with robust securities laws frameworks, including Canada and Europe, have begun trading the underlying bitcoin (not the futures) without issues, (3) Bitcoin has grown to a $800 billion asset class, with digital assets more broadly at $2 trillion, and become a part of the wallet and investment portfolios of approximately 16%, or 40 million, adult Americans according to the White House,[2]and (4) GBTC has become an SEC reporting company[3] and grown to become the largest publicly traded crypto asset fund in the world, with approximately $30 billion in AUM,[4] $100's million in daily trading volume,[5] more than 850,000 investors,[6] holding approximately 3.4% of all Bitcoins outstanding.

In the subsequent sections of this letter, I will provide the logic supporting my belief as to why the Commission should now approve GBTC to convert to an ETP.

### *Protect Investors*

At the moment, investors are forced to take substantial, and in my view unnecessary risks, in order to gain exposure to bitcoin due to (1) the absence of a regulatory regime, (2) the absence of a regulated investment vehicle that can provide passive exposure to "physical" or "spot" bitcoin price movements as intended, resulting in (3) any U.S. investors who do seek bitcoin exposure through regulated investment vehicles to

---

[1] https://www.investor.gov/introduction-investing/basics/role-sec.
[2] White House, "Executive Order on Ensuring Responsible Development of Digital Assets," (March 9, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/03/09/fact-sheet-president-biden-to-sign-executive-order-on-ensuring-responsible-innovation-in-digital-assets/
[3] Grayscale Bitcoin Trust Becomes SEC Reporting Company," (January 21, 2021), https://www.globenewswire.com/news-release/2020/01/21/1973013/0/en/Grayscale-Bitcoin-Trust-Becomes-SEC-Reporting-Company.html
[4] https://grayscale.com/products/grayscale-bitcoin-trust/.
[5] https://www.otcmarkets.com/stock/GBTC/overview.
[6] Based on Broadridge Financial Solutions, Inc. analysis of Grayscale Bitcoin Trust (Symbol: GBTC) as of March 9, 2022.

be forced into a riskier futures-based product simply because it's the only one that exists. These items are interrelated.

To date, the Commission has repeatedly stated in its disapproval orders related to proposals to list shares of various spot bitcoin ETPs, that it has not found such proposals to be consistent with Section 5(b)(5) of the Exchange Act, which requires, among other things, that the rules of a national securities exchange be designed to prevent fraudulent and manipulative acts and practices to protect investors and the public interest.[7] While disapproval of a Rule Change on this basis may have protected investors in prior bitcoin ETP proposals, it ignores an important fact: GBTC is already available for trading on the OTCQX market by anyone with a brokerage account at a substantial discount to its net asset value. Since GBTC first began trading on the OTCQX market on May 4, 2015, the top tier of three marketplaces for trading over-the-counter securities, it has traded at an average premium of 37%, maximum premium of 142%, average discount of 13%, and maximum discount of 21%.[8] As of December 31, 2021, GBTC was trading at a discount of 20%. In its current form, GBTC is not able to most optimally meet its investment objective due to the Commission's reluctance to permit it to convert to an ETP.

It is our belief that investors will continue to demand and obtain bitcoin exposure for a variety of legitimate reasons. However, they will be forced to do so through inefficient product structures (such as GBTC in its current form), riskier CME-futures based bitcoin ETFs (where contracts need to be rolled and investors bear that cost), or by going directly to the bitcoin market, which can be a challenging experience without the regulated, secure and SOC-reporting qualified custodianship like that offered by GBTC.[9] I believe allowing investors to access bitcoin in these manners is inconsistent with the Commission's mission to protect investors. I am requesting that the Commission hold the sponsor of GBTC to a higher standard by approving the proposed Rule Change and granting Regulation M relief to allow GBTC to convert to an ETP structure.[10] As an ETP, GBTC would allow investors to passively gain exposure to the bitcoin market price at net asset value, through a reliable and secure investment vehicle.

As noted above, since 2017, the Commission has also allowed trading to commence for bitcoin futures

---

[7] See Order Setting Aside Action by Delegated Authority and Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, To List and Trade Shares of the Winklevoss Bitcoin Trust, Securities Exchange Act Release No. 83723 (July 26, 2018), 83 FR 37579 (Aug. 1, 2018) (SR-BatsBZX-2016-30) ("Winklevoss Order"); Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To Amend NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares) and To List and Trade Shares of the United States Bitcoin and Treasury Investment Trust Under NYSE Arca Rule 8.201-E, Securities Exchange Act Release No. 88284 (Feb. 26, 2020), 85 FR 12595 (Mar. 3, 2020) (SR-NYSEArca-2019-39) ("USBT Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the WisdomTree Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93700 (Dec. 1, 2021), 86 FR 69322 (Dec. 7, 2021) (SR-CboeBZX-2021-024) ("WisdomTree Order"); Order Disapproving a Proposed Rule Change to List and Trade Shares of the Valkyrie Bitcoin Fund under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 93859 (Dec. 22, 2021), 86 FR 74156 (Dec. 29, 2021) (SR-NYSEArca-2021-31) ("Valkyrie Order"); Order Disapproving a Proposed Rule Change to List and Trade Shares of the Kryptoin Bitcoin ETF Trust under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93860 (Dec. 22, 2021), 86 FR 74166 (Dec. 29, 2021) (SR-CboeBZX-2021-029) ("Kryptoin Order"); Order Disapproving a Proposed Rule Change to List and Trade Shares of the First Trust SkyBridge Bitcoin ETF Trust under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 94006 (Jan. 20, 2022), 87 FR 3869 (Jan. 25, 2022) (SR-NYSEArca-2021-37) ("SkyBridge Order"); and Order Disapproving a Proposed Rule Change to List and Trade Shares of the Wise Origin Bitcoin Trust under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 94080 (Jan. 27 2022), 87 FR 5527 (Feb. 1, 2022) (SRCboeBZX-2021-039) ("Wise Origin Order"). See also Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, Relating to the Listing and Trading of Shares of the SolidX Bitcoin Trust Under NYSE Arca Equities Rule 8.201, Securities Exchange Act Release No. 80319 (Mar. 28, 2017), 82 FR 16247 (Apr. 3, 2017) (SRNYSEArca-2016-101) ("SolidX Order"). The Commission also notes that orders were issued by delegated authority on the following matters: Order Disapproving a Proposed Rule Change To List and Trade the Shares of the ProShares Bitcoin ETF and the ProShares Short Bitcoin ETF, Securities Exchange Act Release No. 83904 (Aug. 22, 2018), 83 FR 43934 (Aug. 28, 2018) (SR-NYSEArca-2017-139) ("ProShares Order"); Order Disapproving a Proposed Rule Change To List and Trade the Shares of the GraniteShares Bitcoin ETF and the GraniteShares Short Bitcoin ETF, Securities Exchange Act Release No. 83913 (Aug. 22, 2018), 83 FR 43923 (Aug. 28, 2018) (SRCboeBZX-2018-001) ("GraniteShares Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the VanEck Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93559 (Nov. 12, 2021), 86 FR 64539 (Nov. 18, 2021) (SR-CboeBZX-2021-019) ("VanEck Order"); Order Disapproving a Proposed Rule Change to List and Trade Shares of the NYDIG Bitcoin ETF under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares) ("NYDIG Order").

[8] GBTC Annual Report on Form 10-K for the year ended December 31, 2021.

[9] See GBTC 10-K sections entitled "The Custodian" and "Custody of the Trust's Bitcoins."

[10] Notably, since 2017, GBTC has voluntarily sought SEC reporting status to further enhance reporting and transparency, and thus investor protections.

ETFs. However, I do not understand why the Commission does not now allow trading of ETPs, like what GBTC is seeking to convert to, that provide exposure to actual bitcoin. CME-futures based bitcoin ETFs are potentially more volatile than a bitcoin spot ETP and may impose substantially higher fees on investors due the premium at which bitcoin futures typically trade, as well as the cost of rolling futures contracts each month.

For instance, according to Bloomberg ETF analysts prior to such approvals: "Bitcoin futures ETFs, if approved by the SEC, could cost investors 5-10 percentage points in annual returns by rolling contracts from one month to the next..., potentially limiting their appeal... Unlike a physically backed bitcoin ETF, one that tracks futures must constantly buy and sell them to maintain exposure. The associated roll costs can vary widely, adding significant costs to a bitcoin futures ETF, on top of a likely 1% expense ratio. Bitcoin's roll costs have averaged 10-11 percentage points of return annually, but that jumped to 45 points in the past 12 months due to upside volatility. Roll costs normally may be closer to 5 points a year." While futures-based ETFs may be more advantageous for "soft" commodities like oil and corn due to storage issues, this is not necessarily the case for "hard" commodities like gold, or bitcoin. These same analysts conclude stating "We believe the SEC should approve physically backed bitcoin ETFs, thereby avoiding futures related costs."[11]

Given that in the context of portfolio construction, bitcoin provides exposure to growth opportunities and real-world applications that are not directly or easily captured by traditional asset classes and currencies, if the Commission is comfortable with bitcoin futures ETFs, then it must also be comfortable with bitcoin spot ETPs like what GBTC is seeking to convert to. American investors should be given the opportunity to invest in this historically uncorrelated, diversifying asset that may play an important role in helping them build more efficient portfolios.[12]

### *Maintain Fair, Orderly, and Efficient Markets*

In addition to my view that an ETP structure is a superior way for investors to efficiently gain exposure to the price movements of bitcoins versus the mechanisms currently available to them, the sponsor of GBTC employs further measures designed to protect investors from manipulation and ensure a fair, orderly, and efficient market.

The Sponsor utilizes the Coindesk XBX Index (the "Index"), which is a U.S. dollar-denominated composite reference rate for the price of bitcoin. The Index is designed to (i) mitigate the effects of fraud, manipulation and other anomalous trading activity from impacting the bitcoin reference rate, (ii) provide a real-time, volume-weighted fair value of bitcoin and (iii) appropriately handle and adjust for non-market related events.

### *Constituent Exchange Selection*

According to GBTC's Annual Report, the spot bitcoin exchanges that are included in the Index are selected by the Index Provider utilizing a methodology that is guided by the International Organization of Securities Commissions ("IOSCO") principles for financial benchmarks. For an exchange to become a spot bitcoin exchange included in the Index (a "Constituent Exchange"), it must satisfy the criteria listed below (the "Inclusion Criteria"):

- Compliance with applicable U.S. federal and state licensing requirements and practices regarding anti-money laundering ("AML") and know-your-customer ("KYC") regulations;
- Publicly known ownership;

---

[11] Eric Balchunas and James Seyffart, "SEC Spurning Ethereum Bolsters Bitcoin Prospects", Bloomberg Intelligence (Aug. 24, 2021).
[12] Don't Forget Diversification, Gary Sanger, PhD, CFA. April 11, 2014. https://blogs.cfainstitute.org/investor/2014/04/11/diversification/

- No restrictions on deposits and/or withdrawals of bitcoin;
- No restrictions on deposits and/or withdrawals of U.S. dollars;
- Reliably displays new trade prices and volumes on a real-time basis through APIs;
- Programmatic trading[13] of the bitcoin/U.S. dollar spot price;
- Liquid market in the bitcoin/U.S. dollar spot price;
- Trading volume must represent a minimum of total bitcoin/U.S. dollar trading volumes (5% for U.S. exchanges and 10% non-U.S. exchanges); and
- Discretion of the Index Provider's analysts[14]

*Determination of the Index Price*

The Index applies an algorithm to the 24-hour volume-weighted average price of bitcoin on the Constituent Exchanges calculated on a per second basis. The Index's algorithm is expected to reflect a four-pronged methodology to calculate the Index Price from the Constituent Exchanges:

- <u>Volume Weighting:</u> Constituent Exchanges with greater liquidity receive a higher weighting in the Index Price, increasing the ability to execute against (i.e., replicate) the Index in the underlying spot markets.

- <u>Price-Variance Weighting:</u> The Index Price reflects data points that are discretely weighted in proportion to their variance from the rest of the other Constituent Exchanges. As the price at a particular exchange diverges from the prices at the rest of the Constituent Exchanges, its weight in the Index Price consequently decreases.

- <u>Inactivity Adjustment:</u> The Index Price algorithm penalizes stale activity from any given Constituent Exchange. When a Constituent Exchange does not have recent trading data, its weighting in the Index Price is gradually reduced until it is de-weighted entirely. Similarly, once trading activity at a Constituent Exchange resumes, the corresponding weighting for that Constituent Exchange is gradually increased until it reaches the appropriate level.

- <u>Manipulation Resistance:</u> In order to mitigate the effects of wash trading and order book spoofing, the Index Price only includes executed trades in its calculation. Additionally, the Index Price only includes Constituent Exchanges that charge trading fees to its users in order to attach a real, quantifiable cost to any manipulation attempts.

Furthermore, the Index Provider has published empirical evidence identifying a number of cases in which the aforementioned Index methodology has successfully shielded the Index from anomalistic or manipulative pricing.[15] It is my view that this is the highest quality benchmark being used in a bitcoin ETP proposal and one that can substantially mitigate price manipulation to ensure a fair, orderly, and efficient market.

Second, the sponsor has developed thorough creation and redemption procedures for their proposed ETP. These procedures minimize the likelihood that large blocks of bitcoins will need to be purchased or

---

[13] Exchanges with programmatic trading offer traders an application programming interface that permits trading by sending programmed commands to the exchange.

[14] This includes additional due diligence conducted by the Index Provider's analysts.

[15] https://tradeblock.com/blog/analysis-of-bitfinex-anomalies-and-xbx-performance https://tradeblock.com/blog/bitfinex-flash-crash-analysis https://tradeblock.com/blog/xbx-update-adding-okcoin-removing-btc-e-and-btcchina https://tradeblock.com/blog/xbx-update-adding-coinbase-removing-kraken https://tradeblock.com/blog/xbx-index-update-removing-okcoin https://tradeblock.com/blog/updates-to-tradeblocks-ecx-and-xbx-indices-2 https://tradeblock.com/blog/bitfinex-bitcoin-premium-reaches-widest-level-in-two-years https://tradeblock.com/blog/bitcoin-futures-flash-crash-occurs-as-exchanges-show-irregular-trading-activity https://tradeblock.com/blog/updates-to-all-tradeblock-indices.

redeemed during predictable times throughout the trading day.[16]

Moreover, financial derivatives, including ETPs, can generally serve to enhance the liquidity and efficiency of the markets for many asset classes and currencies, including bitcoins. Price discovery, and in turn market efficiency, is sensitive to factors such as numbers of buyers and sellers, number of recent sales or purchases, current bids and offers, availability of capital, cost of execution, and cost, availability and transparency of pricing information on trusted execution venues, amongst others. It is difficult to imagine a scenario in which approval of GBTC as a bona fide ETP on the NYSE Arca would not increase the number of market participants, dollar-denominated liquidity, and other competitive forces that would lead to more efficient price discovery than currently exists in a semi-fragmented, global bitcoin spot market that lacks a regulated, centralized trading venue or order book.

We urge the Commission to be part of the solution to further protect investors and maintain a fair, orderly, and efficient Bitcoin market.

### *Facilitate Capital Formation*

Finally, as an ETP on the NYSE Arca, GBTC would continue to serve as a liquid, but even more regulated conduit for capital formation within the bitcoin ecosystem, enhancing the growth and development of this transformative technology as well as the applications built on top of it.  If the White House's recent Executive Order showed anything, it's the US government's commitment to ensuring America leads in this next wave of innovation. GBTC conversion to an ETP will support these efforts by increasing access and exposure to Bitcoin and further bringing it into the regulatory perimeter.

I request that the Commission consider the approval of a Rule Change allowing the GBTC to list its shares on the NYSE Arca within the context of the fundamental reasons outlined in this letter, that I believe are broadly consistent with the Commission's mission. I thank the Commission for considering my request and I am happy to speak further on the subject matter of this letter.

Sincerely,

Campbell R. Harvey, Professor of Finance, Fuqua School of Business, Duke University

---

[16] SR-NYSEArca-2021-90



April 4, 2022

***VIA ELECTRONIC DELIVERY***

Ms. Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

> RE: Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin
> Trust (BTC) under NYSE Arca Rule 8.201-E
> File No.: SR-NYSEArca-2021-90
> Release No.: 34-93504

Dear Ms. Countryman:

Virtu Financial, Inc. ("Virtu") respectfully submits this letter in support of the application by NYSE Arca Inc. pursuant to Rule 19b-4 under the Securities Exchange Act of 1934 (as amended the "Exchange Act") to list shares of Grayscale Bitcoin Trust ("GBTC"[1]) under NYSE Arca Rule 8.201-E as an exchange-traded product ("ETP").   Our purpose in submitting this letter is to provide Virtu's perspective on the marketplace's readiness for a spot Bitcoin ETP and to encourage the Securities and Exchange Commission (the "Commission") to approve NYSE Arca's application.

## Virtu Financial, Inc.

By way of background, Virtu is a leading financial firm that leverages cutting edge technology to deliver liquidity to the global markets and innovative, transparent trading solutions to its clients. Virtu operates as a market maker across numerous exchanges in the U.S. and is a member of all U.S. registered stock exchanges. Virtu's market structure expertise, broad diversification, and execution technology enables it to provide competitive bids and offers in over 25,000 securities, at over 235 venues, in 36 countries worldwide. Virtu's cryptocurrency market making includes spot, perpetuals, futures, and ETPs across more than fifty venues, exchanges and other platforms.  Virtu broadly and consistently supports marketplace innovations which promote and enhance liquidity and efficiency to the benefit of all participants.

## Statement in Support of the Proposal

### GBTC and the Current Marketplace

As a market maker in digital assets across spot, futures and exchange traded products, Virtu has witnessed first-hand the market's evolution and maturation. With total market capitalization in the range of $2 trillion, growing adoption amongst both institutional and retail[2] market participants, and the preponderance of exchanges, platforms, protocols and products offering direct and indirect exposure to the asset class, it is apparent that cryptocurrencies and digital assets are an increasingly important component of the financial

---

[1] We refer to the Grayscale Bitcoin Trust as "GBTC", though we understand that upon an approved listing as sought by the referenced proposal, it would be listed under the symbol "BTC".
[2] https://go.morningconsult.com/rs/850-TAA- 511/images/220120_State_of_Consumer_Banking.pdf



markets landscape. Investors seeking exposure to digital assets, such as Bitcoin, can obtain it directly on a cryptocurrency exchange or platform or indirectly through another financial instrument. Though direct ownership may meet the needs of certain Bitcoin investors, others would benefit from the familiarity, accessibility and convenience of acquiring indirect exposure via a spot Bitcoin ETP. Such products have been approved for listing in other jurisdictions such as Canada, Europe and Brazil, but to the detriment of domestic investors, none has been approved in the US to date.

GBTC is extremely popular with investors – it has been reported that over 850,000 investors hold GBTC[3] and that as of a recent date GBTC held approximately 3.4% of outstanding Bitcoins.[4] Its shares are registered under Section 12(g) of the Securities Exchange Act of 1934 (the "Exchange Act") and it is subject to public reporting requirements under Section 13 of the Exchange Act. However, its accessibility is limited by its unlisted status, as it can only be purchased by an accredited investor in a private placement or else in an exempt secondary transaction on an over-the-counter market place.

Additionally, its usefulness as a tracking investment for Bitcoin has been undermined by periodic dislocations from the value of its underlying holdings less its expenses (i.e., its net-asset value, or "NAV"). GBTC has traded at substantial premiums or discounts which have reached as high as 142% and as low as 79%[5] as a percentage of NAV. These dislocations occur, and persist, because the primary market-based mechanic which links the price of an ETP to its NAV, a continuous creation and redemption program pursuant to which freely tradable shares can be issued or redeemed, is unavailable to GBTC as an unlisted security.

Virtu is an authorized participant ("AP") in numerous ETPs globally and in the United States, enabling it to engage in transactions directly with an ETP issuer which "create" new and freely tradeable ETP shares or redeem ETP shares, in each case in exchange for the ETP's underlying holdings, or in some cases a cash equivalent. We compete with other APs to provide liquidity in a given ETP and its underlying assets with the narrowest spread between the two, and utilize creation and redemption transactions to convert an ETP to its component parts or vice versa in connection with our liquidity provision. Continuous creation and redemption mechanics and the competitive dynamics amongst market making firms drive exceedingly narrow spreads and enables investors in an ETP to realize returns which track very closely those of the underlying basket of assets which can substantially reduce costs upon entry and exit.

In our experience as a market maker and AP in spot cryptocurrency ETPs in Canada, we have observed the positive impact of these dynamics -- as spot cryptocurrency ETP spreads to NAV are compressed to levels observed for non-crypto ETPs. We have observed these outcomes over a wide range of issuers and specific NAV valuation benchmarks and would anticipate similar outcomes for GBTC and its investors upon its listing and implementation of a continuous creation and redemption program for freely tradable shares. Thus, it is apparent that U.S. investors would benefit from the approval of GBTC's listing and conversion to an ETP as it will become both more widely accessible and a more functional and efficient equivalent to direct ownership of Bitcoin.

---

[3] Based on Broadridge Financial Solutions, Inc. analysis of Grayscale Bitcoin Trust (Symbol: GBTC) as of March 9, 2022.
[4] Grayscale Investments, LLC, Grayscale Bitcoin Trust Fact Sheet at 2 (Mar. 2022) ("BTC Fact Sheet")https://grayscale.com/wp-content/uploads/2022/03/GBTC-Trust-Fact-Sheet-March-2022.pdf.
https://emmer.house.gov/_cache/files/b/6/b6170d87-c56c-40a3-960a-60a619c02b65/63C9D652A62FF6119A2D0B1
17D655732.congressional-letter-tosec-on-bitcoin-etfs.pdf
[5] See Grayscale Bitcoin Trust, Annual Report for the Fiscal Year Ended Dec. 31, 2021 (Form 10-K), at 2 (Feb. 25, 2022) ("BTC 2021 Annual Report").



*Applicable Standards of Review and Investor Protection*

We are perplexed by the Commission's steadfast refusal to date to approve the listing of a spot Bitcoin ETP, despite having authorized exchange-traded funds ("ETF") that track Bitcoin futures. The Commission has subjected only the spot-based ETPs to loosely defined and difficult to discharge requirements related to potential fraud and manipulation,[6] consistently concluding that the applications fail to meet the standard. In so doing, the Commission has seemingly arbitrarily applied different standards to two product categories that ultimately track the same underlying asset. From a legal perspective, this disparate treatment of the applications for similarly situated products is inconsistent with both Section 6(b)(5) of the Exchange Act, which prohibits unfair discrimination among issuers, and the Administrative Procedures Act, which precludes arbitrary and capricious administrative action.

As other commenters have noted, the pricing inputs utilized by GBTC for purposes of computing NAV substantially overlaps with the reference price utilized by the futures contracts underlying the approved futures ETFs, with each index including data from 3 of the same 4 constituent exchanges.[7] Hence concerns about manipulation in the underlying market should be of no greater concern for GBTC than a futures-based Bitcoin ETF. In fact, spot markets may be less prone to manipulation given their daily notional volumes in the range of $35 billion, with futures volumes in the range of $1 billion daily notional and other crypto derivatives volumes in excess of $20 billion daily, notably larger than futures markets volumes but of similar size to spot markets volumes. Further, we believe that the active participation by market makers across all of these linked markets – spot, futures, derivatives and ETP –can mitigate the risk of manipulation through competitive liquidity provision, arbitrage and creation / redemption transactions.

Finally, in continuing to apply an ambiguous and possibly unattainable standard to spot Bitcoin ETPs, the Commission fails to meet a fundamental mandate of promoting competitive markets via investor choice. The investing public has resoundingly demonstrated its appetite for exposure to Bitcoin in the convenient and familiar form of a fund product, as evidenced by GBTC's popularity notwithstanding its accessibility challenges and susceptibility to dislocation. While the futures-based ETPs generally benefit from the price harmonizing effects of creation and redemption transactions, these products have their own limitations, which may include a decay in NAV over time due to futures market dynamics and may not meet the needs of all would-be Bitcoin ETP investors. While we do not purport to make a merit-based determination

---

[6] See, e.g., SolidX Order, 82 Fed. Reg. at 16,247 ("As discussed further below, the Commission is disapproving this proposed rule change because it does not find the proposal to be consistent with Section 6(b)(5) of the Exchange Act, which requires, among other things, that the rules of a national securities exchange be designed to prevent fraudulent and manipulative acts and practices and to protect investors and the public interest."); Order Setting Aside Action by Delegated Authority and Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, To List and Trade Shares of the Winklevoss Bitcoin Trust, Securities Exchange Act Release No. 83723 (July 26, 2018), 83 Fed. Reg. 37,579, 37,604-05 (Aug. 1, 2018) (SR-BatsBZX-2016-30) ("Winklevoss Order") (similar); Order Disapproving a Proposed Rule Change To List and Trade the Shares of the GraniteShares Bitcoin ETF and the GraniteShares Short Bitcoin ETF, Securities Exchange Act Release No. 83913 (Aug. 22, 2018), 83 Fed. Reg. 43,923, 43,923 (Aug. 28, 2018) (SR-CboeBZX-2018-001) ("GraniteShares Order") (similar); Order Disapproving a Proposed Rule Change To List and Trade the Shares of the ProShares Bitcoin ETF and the ProShares Short Bitcoin ETF, Securities Exchange Act Release No. 83904 (Aug. 22, 2018), 83 Fed. Reg. 43,934, 43,935 (Aug. 28, 2018) (NYSEArca-2017-139) ("ProShares Order") (similar); Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To Amend NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares) and To List and Trade Shares of the United States Bitcoin and Treasury Investment Trust Under NYSE Arca Rule 8.201-E, Securities Exchange Act Release No. 88284 (Feb. 26, 2020), 85 Fed. Reg. 12,595, 12,596 (Mar. 3, 2020) (SR-NYSEArca-2019-39) ("Wilshire-Phoenix Order") (similar); VanEck Order, 86 Fed. Reg. at 64,539 (similar).

[7] See, e.g., https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-9410842-262990.pdf, comparing CF Benchmarks, CME CF Cryptocurrency Pricing Products, Constituent Exchanges List at 3, https://docscfbenchmarks.s3.amazonaws.com/CME+CF+Constituent+Exchanges.pdf (last updated Oct. 28, 2019) (listing Bitstamp, Coinbase, Gemini, and Kraken (and previously itBit) as constituent exchanges) with Proposal, 86 Fed. Reg. 61,808 (listing Bitstamp, Coinbase Pro, Kraken and LMAX Digital as constituent exchanges for XBX).

3



regarding the benefits or drawbacks of any particular ETP for any particular investor, we share these observations to demonstrate that the investing public would benefit from additional choice and market competition in the form of one or several spot Bitcoin ETPs.

For the reasons set forth above, we respectfully request that the Commission approve NYSE Arca's proposal to list and trade GBTC.

Respectfully submitted,

Douglas A. Cifu
Chief Executive Officer

cc:     The Honorable Gary Gensler, Chair
        The Honorable Hester M. Peirce, Commissioner
        The Honorable Allison H. Lee, Commissioner
        The Honorable Caroline A. Crenshaw, Commissioner

4

## HORIZON KINETICS
### Asset Management

April 08, 2022

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549-0609

*RE*: Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (GBTC) under NYSE ARCA Rule 8.201-E

**File No.**: SR-NYSEArca-2021-90
**Release No.**: 34-93504

Dear Ms. Countryman,

Horizon Kinetics Asset Management LLC ("HKAM") is a U.S. registered investment adviser (SEC No. 801-47515) that manages mutual funds, exchange traded funds, closed-end funds, private funds and separately managed accounts. As of February 28, 2022, we had discretionary management over approximately $6.5 billion in assets, of which approximately $493 million was invested in the Grayscale Bitcoin Trust ("GBTC"), representing approximately 2.00% of the total outstanding shares.

As long-term value investors, we are writing in support of the proposal by NYSE Arca, Inc. ("Arca") pursuant to Rule 19b-4 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), to list shares of GBTC under NYSE Arca Rule 8.201-E as an exchange-traded product ("ETP"). We believe that allowing GBTC to convert to a spot-based ETP would be greatly beneficial to investors for the reasons further outlined below.

### *Considerably More Efficient*

A spot-based Bitcoin ETP would be preferable to investors vis-à-vis a futures-based ETP, such as the existing ProShares Bitcoin ETF (BITO), particularly for long-term investors. The reason for this is that the futures-based ETP, obviously, transacts in the futures market rather than the spot market and with that comes the problem of futures roll. Since the Bitcoin futures market is generally in a state of contango, which means that the near-term future (e.g. the one expiring in April) is priced lower than the next-month future (e.g., the one expiring in May), BITO is forced to buy the higher-priced future and sell the lower-priced future each and every day in order to keep a steady average time to expiration. This mechanism slowly erodes the return of the ETP.

While the contango fluctuates on a daily basis, it has generally been between 0.0% and 1.0%[1]. This may seem low and, therefore, manageable, but it should be noted that this is a monthly figure,

[1] Source: Chicago Mercantile Exchange (CME).

HORIZON KINETICS
*Asset Management*

which means that BITO, at a 1.0% average contango, would experience a roll-friction of approximately 11.4% per annum (that is, 1 - 0.99 powered to 12). Taken a step further, an investor with a five-year investment horizon would experience a return that is 45.3% *lower* than the actual price development in the underlying (spot-bitcoin), simply as a result of a 1.0% monthly roll friction of the futures.[2]

In a real-time actual assessment of this friction, we note that BITO reached a high of $43.95 on October 20, 2021, which was its first day of trading. Spot-Bitcoin reached a day-high of $66,930 on that day.[3] As of this writing[4], BITO trades at $24.38 while Bitcoin trades at $38,810. Consequently, the price of BITO has declined 44.53% from the day-high of October 20, 2021, while Bitcoin itself has 'only' declined by 42.01%. Therefore, in the 146 days[5] since BITO began trading, it has underperformed Bitcoin by more than 2.5%. Annualized, this represents 6.40% of relative underperformance. Extrapolating this performance drag to five years indicate that a long-term investor in BITO would underperform the price development in spot-Bitcoin by 36.39%. This underperformance does not even include the fees and expenses ProShares charges for management and operation of the product.

Therefore, a futures-based Bitcoin ETP is simply not suitable for long-term investors since the performance deviates greatly from the underlying asset, which is perhaps not obvious to many investors in such a product. A spot-based ETP would eliminate such a tracking error. Assuming a 0.50% annual management fee, a spot-based Bitcoin ETP would underperform the underlying by just 2.48% over five years, which is orders of magnitude better than the futures-based ETP. Further, investors are generally familiar with management fees and expenses, which are widely disclosed, and are thus better equipped to understand the departure between fund performance and that of the underlying investment.

*Lower and More Fair Management Fee*

The GBTC management fee, which is currently 2.0% of NAV would likely be reduced considerably should it be allowed to convert to a spot-based ETP. The Bitcoin ETPs trading in Canada have management fees of 0.40%-1.00% while BITO has a 0.95% management fee.

Another important point is that GBTC currently charges management fees on its net asset value ("NAV"), as opposed to on its actual market value That means that investors experience a substantial fluctuation in the management fees they are charged based on their invested capital. For example, as of March 14, 2022, GBTC traded at a discount of 29.43% to its NAV. That means that an investor who invests $1,000 in GBTC actually gets exposure to $1,470 of Bitcoin and is, therefore, charged 2.00% on this amount, or $29.40 per year. **This represents an actual management fee of 2.94%**. Of course, GBTC did not always trade at a discount. At times, it traded at a 100% premium, or more. As recently as December 21, 2020, GBTC traded at a 41.5% premium to its NAV. At that point, an investor who invested $1,000 actually only got exposure to $709 of Bitcoin, and was charged 2.00% on this amount, or $14.19 per year, which equates to a 1.42% management fee. Thus, depending on when one invested over the past 15 months, the actual management fee based on the underlying exposure fluctuated

---

[2] That number represents 1 – 0.886 (the annual roll yield friction) powered to five (years)
[3] Source: Yahoo Finance
[4] March 15, 2022, at 10:08am
[5] Since Bitcoin trades 24 hours per day, 365 days per year, the qualification of 'trading days' is redundant.

HORIZON KINETICS
*Asset Management*

between 1.42% and 2.94%. This is perhaps also not clear to many investors in GBTC. It's worth noting that should GBTC trade at an even greater discount in the future, the management fee an investor would pay could be even greater than what they pay today. In that regard, we question whether an investor could properly and diligently evaluate their investments when the fee they pay is uncertain. A spot-ETP, which trades in line with the value of the underlying asset, would eliminate this problem.

*Investor Liquidity*

GBTC is a unique product whereby Accredited Investors are allowed to subscribe for shares through a private placement, and, after a 6-month "lock-up" period such shares are converted to freely tradeable shares that trade on the OTC markets. Similar to a closed-end fund, investors may only redeem their shares by finding a willing buyer. This has led to GBTC trading at a premium or discount to its NAV; currently, it trades at a substantial discount. With the proliferation of products that provide exposure to Bitcoin outside the U.S., along with an increase in the number of public companies that have direct material exposure to Bitcoin, we believe it likely that GBTC will continue trading at a substantial discount into the future. While investors who invest in closed-end funds are familiar with the intricacies of this structure, we wonder whether, at the time of investment, retail investors that purchased GBTC were truly aware that they would only be able to redeem their shares at a level substantially below their actual pro rata ownership of the fund's NAV. If the Commission does not take action to allow GBTC to convert to an ETP, this will continue to be the reality for its investors.

The aforementioned points are but a few of the issues we wished to highlight to the Commission, but we also agree with many of the items already stated in other submissions on this topic. We appreciate the Commission's attention to this important matter and for allowing us to express our views.

Very truly yours,

Murray Stahl
Chief Investment Officer

JA-61



GEORGETOWN

McDONOUGH
School of Business

UNIVERSITY

James J. Angel, Ph.D., CFP®, CFA
Associate Professor of Finance
Georgetown University[1]
McDonough School of Business
Washington DC 20057
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
Twitter:  @GuFinProf

April 17, 2022

Securities and Exchange Commission
100 F St. NW
Washington, DC 20549-9303
Rule-comments@sec.gov

Re: Order Instituting Proceedings to Determine Whether to Approve or Disapprove
a Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust
(BTC) under NYSE Arca Rule 8.201-E

File No. SR-NYSEArca-2021-90
Also SR-NYSEArca-2021-89, SR-NYSEArca-2021-37

---

[1] All opinions are strictly my own and do not necessarily represent those of Georgetown University or anyone else. I am very grateful to Georgetown University for financial support.  Over the years I have served as a Visiting Academic Fellow at the NASD (predecessor to FINRA), served on the boards of the EDGX and EDGA stock exchanges, served as Chair of the Nasdaq Economic Advisory Board, and performed consulting work for brokerage firms, stock exchanges, other self-regulatory organizations, market makers, industry associations, and law firms.  I am the academic director for the FINRA Certified Regulatory and Compliance Professional (CRCP®) program at Georgetown University.  I've also visited over 75 stock and derivative exchanges around the world.  As a finance professor, I practice what I preach in terms of diversification and own modest and well-diversified holdings in most public companies, including brokers, asset managers, market makers, and exchanges.

1

Dear SEC:

In summary:

- Just Say Yes.
- The SEC looks silly approving bitcoin futures-based ETFs but not a physically-based one.
- Moving more bitcoin activity onto regulated venues will better protect investors and deter manipulation.
- SEC must require entities engaged in crypto to have WSPs to avoid crypto from ransomware and other illegal activities.
- The SEC has the legal authority to apply, and should apply, Regulation BI to all products, including crypto, carried by brokers and investment advisers, not just "security" products.
- Most cryptos really are securities, and the SEC should quickly but gently bring them into the regulated world with a principles-based sandbox approach, not regulation by enforcement.
- The SEC should adopt a Rule 15c2-11 approach to brokers trafficking in cryptos
- It is in the public interest to require entities engaged in crypto to disclose their environmental impact.

**Background**

We are in the midst of an amazing technological revolution in finance. So-called digital assets provide several extremely important innovations over traditional securities. These include

1) Digital assets are bearer assets that trade 24/7 in a low-friction market.
2) Blockchain based settlement creates quasi-immutable records of transfer and simplifies post-trade processing and corporate action processing.
3) Programmability creates the potential for smarter securities far more useful than our traditionally "dumb" stocks and bonds.

2

JA 63

4) Decentralized ("DeFi") protocols provide the opportunity to re-engineer financial services.

This new technology creates many opportunities for valuable new services, and traditional services at lower cost. However, the need for appropriate financial regulation has not gone away. We the people still want to make sure that money is not stolen from our wallets, physical or digital. We want to be protected from fraudsters and manipulators who sell bogus products and manipulate markets. We want to be able to trust that our financial intermediaries, whether they are traditional institutions or defi protocols, will not fail and bring down the economy in a wave of contagion.

There is a pressing need for intelligent regulation that provides enough clarity to promote the useful uses of these innovations while still achieving the objectives of sound financial regulation.

For many years, the backers of the Grayscale Bitcoin Investment Trust (GBTC), among many others, have sought unsuccessfully to list crypto-based ETFs on our national security exchanges. The SEC has repeatedly adopted a "Just Say No" approach, citing fears about manipulation of the cash market. Then the CFTC permitted bitcoin futures to start trading, or, more precisely, looked the other way when the CME self-certified its bitcoin futures contracts. The SEC then permitted the ProShares Bitcoin Strategies Trust (BITO), a product that basically just holds near-month bitcoin futures, to start trading.

The SEC has clear investor protection concerns. The SEC rightfully fears, or should fear, that putting its imprimatur on bitcoin products would open the floodgates to hordes of unsophisticated FOMO-ing at the mouth retail investors mindlessly piling in at the peak of a bubble. Greedy promoters will push "investing" in dubious cryptos when they really are really just pushing speculative trading, not investing.

I share those concerns.

It is quite unclear what fundamental value, if any, bitcoin has in its current incarnation. Is it just a brilliant prototype, destined to be superseded by other superior digital asset technologies? (Remember Netscape? The Altair computer?) Or is it the everlasting foundation of The New Financial World Order destined to be worth millions? Some believe that it will be worth quite a lot and others think it lacks value. In short, it is a lottery ticket. In general, the loudest touts are those

3

who have already made significant investments in bitcoin and have a financial incentive to get others to purchase or trade bitcoin in order to increase the value of their investments. Is this a pyramid scheme, or are they just putting their money where their mouth is?

The fact that bitcoin may ultimately be worthless should not prevent the trading of bitcoin-based products on our highly-regulated and well-surveilled national securities exchanges.  Many startups and biotech companies will ultimately be worthless as well.  Our economic growth requires capital markets that are open to risky ventures.  We need risk takers willing to make risky investments in new and not yet proven technologies, or there would be no new technologies and no economic growth.  It is better to let informed investors decide what risks they want to take, not risk-averse bureaucrats.

It is too late to prevent a speculative frenzy in cryptos.  The crypto cows have left the barn.  Brokers and money transmitters now tout "investing" in cryptos in general advertising.  In addition to trading BITO, brokers such as Robinhood, SoFi and eToro permit trading in spot bitcoin. Brokers are already pushing crypto speculation in retirement accounts:



4

Locking the barn door now will not stop the speculative frenzy in bitcoin or other "coins." The SEC can, however, contain some of the damage through approving Grayscale's application.

## Denying the Grayscale application makes the SEC look either really stupid or completely arbitrary and capricious.

The SEC permits a futures-based ETF such as BITO to be traded on a national securities exchange, but not a physical-based ETF such as GBTC. So let me get this right – the SEC won't let investors purchase an investment product that buys spot bitcoin and is traded on a national securities exchange, but they let investors buy the spot bitcoin from the same brokers that they would use for the ETF???

The SEC's logic is that the futures market is a transparent and regulated market and thus is not too manipulated, but the spot bitcoin market is too sketchy and too prone to manipulation. The SEC is unsuccessfully hiding behind an obviously transparent fig leaf. It may sound plausible within the debating club on F-Street, but it is laughable to anyone who understands markets. The spot and futures markets are so interconnected that actions on one instantly affect the other. Any manipulations in the spot market instantly affect the futures prices and vice versa. To pretend otherwise demonstrates a shocking lack of comprehension of how markets operate.

The optics of this situation are not pretty and do not reflect well upon the SEC. Chair Gensler was formerly chair of the CFTC, the agency that allowed the self-certified bitcoin futures contracts to trade. In other words, it was the regulator that he molded so expertly for many years that did it. For the SEC to say that bitcoin *futures* prices are so manipulated that they cannot be trusted would be to besmirch the reputation of a fellow regulatory agency, one previously chaired by the current SEC Chair. This would cause political problems for relations between the CFTC and the SEC and would be an embarrassment to the current SEC Chair. If that is the true reason for the SEC's decisions, it would truly be arbitrary and capricious.

5

JA 66

**A physical-based ETF is less vulnerable to manipulation than an index-based cash-settled futures contract.**

GBTC is a simple product.  As of this writing, each share of GBTC is equivalent to 0.00092739 BTC.[2]  When converted to an ETF, the creation process will be simple:  Transfer .092739 BTC to the sponsor and get 100 shares of GBTC.[3]  Likewise, the redemption process will be simple:  Submit 100 shares and receive .092739 bitcoin.  An investor who trades this product is getting the exposure to bitcoin that they want.  Note that investors do not have to have any direct involvement with those sketchy exchanges in order to create or redeem the ETF shares.

The CME futures contract is based on the BRR Bitcoin Reference Rate Index.   In the words of the CME:

> "BRR is a daily reference rate of the U.S. dollar price of one bitcoin as of 4 p.m. London time.
>
> Each day, the BRR aggregates the trade flow of major bitcoin spot exchanges during a specific one-hour calculation window. This one-hour window is then partitioned into 12, five-minute intervals, where the BRR is calculated as the equally-weighted average of the volume-weighted medians of all 12 partitions."[4]

Got that?  The CME product is based on the spot price of bitcoin derived from those allegedly too sketchy exchanges that the SEC doesn't trust and where the manipulation allegedly takes place.  One thus has the possibility of manipulation not only on the CME itself, but also on the numerous bitcoin "exchanges" that the CME is using for the calculation of the index used for the ultimate cash settlement of the contract.   A physical-based product in which the fund actually holds the bitcoin is far less vulnerable to manipulation than the futures contracts.

The SEC has a clear mandate to protect investors.  Let's explore how the SEC can better protect investors in this rapidly evolving world:

---

[2] This amount does decay gradually over time as management fees are taken out.

[3] There could also be a cash component to compensate for the cash balance within the trust, if any.

[4] https://www.cmegroup.com/education/courses/introduction-to-bitcoin/introduction-to-bitcoin-reference-rate.html

### **Protect us from the contango and rollover costs in futures-based products!**

Bitcoin futures are generally in "contango", which means that the prices in the back months are generally higher than prices in the front months. Thus, when a futures-based ETF is faced with the looming expiration of its contract, it has to pay a higher price to roll it over into the next month. This imposes continuing losses on investors from the difference in price between the soon-to-expire contract and the new contract. These losses will occur perpetually.

Furthermore, the liquidity on the CME contracts leaves a bit to be desired. They only trade a few thousand contracts a day and the bid-ask spreads are pretty wide. The bid-ask spreads are so wide that I have personally stopped using them. This means that the investors who use the futures-based contracts are also hit with wide bid-ask spreads when they roll over positions in addition to the contango cost.

A simple product like GBTC that merely holds bitcoin will impose far fewer transactions costs upon investors who just want to buy and hold bitcoin.

### **Protect us from the Pink Sheets!**

GBTC is currently traded on the OTC Market, formerly known as the Pink Sheets. With all due respect to the great job that Cromwell Coulson has done to modernize the OTC Market, the fact remains that transactions costs are generally higher in the OTC Market than they are in the listed exchange-based markets. By permitting GBTC to become a standard exchange-listed product, investors will enjoy the lower trading costs and deeper liquidity generally found on exchange-listed products. Moving GBTC to our national securities exchanges will give investors the benefits of the intense competition among our 16 national securities exchange and 30+ ATSs. It will also give investors the additional protection from the heightened surveillance that the exchanges do on their issuers and the trading on exchange platforms.

### **Protect us from steep and random discounts from NAV!**

Under its current structure, there is no arbitrage mechanism to keep the price of GBTC anchored on the value of its holdings. As of this writing, GBTC is selling at a discount of 24.6% from its Net Asset Value (NAV). This discount fluctuates.

Permitting GBTC to become a standard ETF will bring in the arbitrage forces needed to eliminate this discount.

### Protect us from high fees!

It is often said in securities regulation, thanks to Louis Brandeis, that "sunlight is the best disinfectant." To that, I would add "Competition is the best lubricant."

Right now, the shareholders of GBTC pay a 2% annual fee for the privilege of being locked into the product. This fee made sense when bitcoin products were new and required significant marketing, along with extensive regulatory costs. As the product has matured, there is no longer a need for such a steep fee. No wonder it sells at a huge discount! BITO and BTF have an expense ratio of 0.95%.

Approval of an ETF will undoubtedly force GBTC to bring its fee into line with the competition or else face an immediate outflow of virtually all its assets. Additional competition is likely to push fees down even further.

### Protect us from wallet cyber risk!

One of the features of digital assets is that they are bearer assets: Anyone with the private key controls the asset. This means that there is always a huge cybersecurity risk with digital assets. Investors holding digital assets directly have this risk. They face the ever present danger that a cybercriminal will drain their wallet in a heartbeat. When that happens, there is no recourse.

Brokers offering cryptos to their customers also have this custody and hacking risk.

By approving crypto-based ETFs such as GBTC, this custody and cybersecurity risk is thus outsourced to the ETF promotor. This will reduce the cyber and hacking risks stemming from direct holding of ETFs by the investor. To the extent that investors substitute ETFs for direct holdings of cryptos in their brokerage accounts, it will also reduce the cyber risk of the brokers.

### Protect us from ransomware: Require WSPs to prevent acceptance of stolen coins!

8

It is a crime to knowingly possess stolen property.[5] One of the great advantages of blockchain technology is that a public blockchain like that of bitcoin contains a record of every transaction. The SEC should require that all market participants that handle bitcoin have Written Supervisory Procedures (WSPs) in place to prevent acceptance of bitcoin that have been stolen in hacks or involved in ransomware or other illicit operations.

### Protect us from sleazoids pushing cryptos as "investments"!

The technological boom has led to a speculative bubble and the creation of thousands of dodgy coins of dubious value. Channeling investor interest into a regulated space, in which security products are properly registered, trading is surveilled, and brokers held to Reg BI (or better), will make it more likely that investors will trade in legitimate products with some plausible reason to succeed. The "Just Say No" strategy pushes investors into dealing with the dark alley "exchanges" that gleefully profit from trading in dubious coins.

Permitting spot-bitcoin ETFs such as GBTC to be traded on our securities markets will be a step in this direction. The more that the SEC can move crypto trading into the regulated world, the better we investors will be protected.

### Protect us from other products trafficked by BDs and RIAs.

The Commission has gone to great lengths to increase the trust that investors can place in their brokers and advisers. Before they can recommend a security to their retail investors, they must determine that it is in the best interest of the investor under Regulation Best Interest. However, as currently written, Reg BI only applies to *security* transactions.[6] As the Commission well knows, there are many

---

[5] If it has crossed state lines, it is a federal crime. 18 U.S. Code § 2315. States have their own criminal codes as well for intrastate receipt of stolen goods. For example, the Code of Virginia states:

§ 18.2-108. Receiving, etc., stolen goods.
   A. If any person buys or receives from another person, or aids in concealing, any stolen goods or other thing, knowing the same to have been stolen, he shall be deemed guilty of larceny thereof, and may be proceeded against, although the principal offender is not convicted.

   https://law.lis.virginia.gov/vacode/title18.2/chapter5/section18.2-108/#:~:text=Receiving%2C%20etc.%2C%20stolen%20goods.,principal%20offender%20is%20not%20convicted.

[6] The precise wording is as follows:

digital assets that are not currently treated as securities, and many digital assets whose status is, well, uh, subject to judicial interpretation.

Here is an example of what is being promoted by broker dealers:



§ 240.15l–1 Regulation Best Interest.
(a) Best interest obligation.
(1) A broker, dealer, or a natural person who is an associated person of a broker or dealer, when making a recommendation of any securities transaction or investment strategy involving securities (including account recommendations) to a retail customer, shall act in the best interest of the retail customer at the time the recommendation is made, without placing the financial or other interest of the broker, dealer, or natural person who is an associated person of a broker or dealer making the recommendation ahead of the interest of the retail customer

10

Retail investors rightly expect that SEC-regulated advisers and FINRA-regulated brokers have to adhere to a best interest standard when it comes to recommendations of securities transactions.  I would be shocked if any of them realized that this standard does not apply to other financial products sold by advisers and brokers.  This is an appalling gap in investor protection:   A broker or adviser is held to a best interest standard on a security product, but the SEC looks the other way if the broker rips the investor off with a dodgy insurance product or a sketchy crypto coin.  It does not and should not have to be this way.

## Apply appropriate 15c2-11-style rules to purveyors of cryptos.

The SEC has gone to great lengths to force more disclosure in the OTC Market.  The revamped 15c2-11 process has shut off the ability for most retail investors to access some of the real legitimate firms that are not transparent.  An example is the once-NYSE-listed preferred shares of Amtrust Financial Services.  The parent company was taken private, but the preferred shares were left outstanding.[7]  Amtrust deregistered and delisted the preferred shares, which then traded on the OTC Markets.  After the new 15c2-11, brokers have cut off general access to the shares.  Even though Amtrust's insurance operations are highly regulated, with the public disclosures generally required of insurance companies, such disclosures don't fit the specific requirements of 15c2-11.  Hence, its public preferred shares have been relegated to gray market purgatory.  This reduced liquidity has lowered the price, inflicting harm on the existing shareholders when they go to sell their

---

[7] This would not be the first instance of companies going private and harming their preferred shareholders.  Don't forget the infamous saga around W2007 Grace Acquisition I.  See https://www.sec.gov/litigation/admin/2015/34-74782.pdf  Such going dark firms exploit the loophole created by how the SEC defines the number of "shareholders of record" for the purposes of SEC registration requirements.  The beneficial shareholders who hold shares through their brokers in "street name" are not counted.  Thus, many large public companies with literally thousands of not millions of beneficial holders have relatively small number of shareholders "of record" and need not register with the SEC. The only reason for them to remain SEC registrants is to remain listed on our stock exchanges.  See Commissioner Lee's excellent remarks at https://www.sec.gov/news/speech/lee-sec-speaks-2021-10-12

shares. It also provides a juicy opportunity for the insiders to scarf up the shares at a discount.

The following screen shot from Interactive Brokers shows NT, for Not Tradeable, for Amtrust's remaining public securities.

| Company Name | Financial Instrument | |
|---|---|---|
| Financial Instrument | Account | |
| AMTRUST FINANCIAL SERVIC | AFSIA | |
| AMTRUST FINL SVCS INC DEP SH RE... | AFSIB | |
| AMTRUST FINANCIAL SERVIC | AFSIC | |
| AMTRUST FINANCIAL SERVIC | AFSIM | |
| AFSI 6.95 12/31/49 PFD | AFSIN | |
| AMTRUST FINANCIAL SERVIC | AFSIP | |
| AMTRUST FINANCIAL SERVIC | AFFS | |
| AMTRUST FINANCIAL SERVICES, INC ... | AFFT | |

So let me get this straight: the SEC won't let brokers provide general access to a legitimate financial services firm like Amtrust, but at the same time is lets the brokers that it (indirectly) regulates push meme coins??? This makes no sense.

The SEC should require a 15c2-11-like process for US entities that offer participation in crypto tokens. Before offering such a token a form similar to 15c2-11 needs to be filed affirming that there is sufficient available information regarding

- Names and contact information for backers of token
- What the token does, including any legal rights of token holders.
- Appropriate information regarding the financial condition of whatever the token represents.

**Dodd-Frank gave the SEC authority over ALL sales practices of broker-dealers and RIAs, not just securities.**

12

JA 73

§914(h) of Dodd-Frank reads (**emphasis added**) ''
(h) OTHER MATTERS.—The Commission shall—
''(1) facilitate the provision of simple and clear disclosures to investors regarding the terms of their relationships with brokers, dealers, and investment advisers, including any material
conflicts of interest; and
**''(2) examine and, where appropriate, promulgate rules prohibiting or restricting certain sales practices, conflicts of interest, and compensation schemes for brokers, dealers, and investment advisers that the Commission deems contrary to the public interest and the protection of investors.''**

Indeed, Congress felt so strongly about this that it inserted the same language both in the Securities Exchange Act and the Investment Advisers Act. Congress didn't even attempt to customize the language to make the Securities Exchange Act amendment refer to brokers and dealers and the Adviser's Act amendment only to RIAs. Instead, both sections refer to brokers, dealers, and investment advisers.

Note that this is <u>in addition to</u> the grant of authority in §914(f) regarding the standard of care for advice supplied to retail investors about securities. This authority §914(h) is NOT limited to securities. As Congress repeated this in Dodd-Frank, let me repeat this again: This authority is NOT limited to securities. Thus, the Commission has explicit and broad rulemaking authority to deal with ALL sales practices of broker dealers and RIAs, not just those having to do with individualized advice to retail investors about securities. In particular, the Commission has authority over the sales practices of everything that broker dealers and RIAs sell, including crazy cryptos and dodgy annuities. It is in the public interest and the protection of investors for the Commission to exercise this authority. I recommend that the Commission update Regulation BI to clarify that it applies to all sales practices of broker dealers and RIAs.

## Protect us from bad executions! Apply best-ex requirements to crypto.

Brokers are held to very strict best execution requirements for transactions in securities. Most consumers will naturally expect that the same protections apply for cryptos. Brokers should be held to the same best-execution requirements for cryptos, including disclosures for payment for order flow. I suspect that many of

13

JA 74

the brokers and money transmitters trafficking in crypto have execution practices that would not pass muster in the equity space. This is a mass fleecing which should be stopped.

Permitting GBTC to become an exchange-traded ETF will bring its trading into the highly regulated exchange world where the highest best-execution practices are observed and enforced. Investors will be better protected trading crypto-based products on our national securities exchanges than trading them directly with their brokers.

### **Protect us from money transmitters acting like brokers!**

This vital aspect of consumer protection could be a bit harder for the SEC, given our archaic and obsolete regulatory structure. The SEC generally does not regulate money transmitters, who are regulated mostly by the states with a large helping of FINCEN. I suspect that the SEC's instinctive reaction is "We don't regulate them. Go talk to their regulators, if you can figure out who they are." This sort of made sense when all the money transmitters did was send money from one person to another like the old Western Union.

However, some money transmitters such as PayPal have morphed into crypto brokers. They are not really selling the service of moving crypto money from one person to another, but are now pushing speculation in crypto. Here is a screen shot from the PayPal web site:



14

Notice the ad says nothing about using PayPal to transmit crypto from one user to another. PayPal is acting as both a broker and a depository institution, not just a money transmitter.

This brings up numerous investor protection considerations that state money-transmitter regulators are not well equipped to handle. These crypto brokers should be required to adhere to the same rules as other brokers, including FINRA registration, Customer Protection Rule (15c3), Regulation BI, Know Your Customer, and best execution requirements.

In the past the SEC staff has opined that certain cryptos are not securities, creating a loophole for the money transmitters and others to slither through.  The SEC can and should revisit this issue, just as it has revised no-action letters over the years.  I do believe, like former Chair Clayton and current Chair Gensler, that most fungible cryptos are securities.[8]  They can be classified as investment contracts, and thus securities, under the now famous Howey Test as follows:


- *An investment of money.*  People spend money on cryptos, either directly on a fiat-crypto basis or indirectly by exchanging another cryptos with value.
- *In a common enterprise.* Digital assets such as bitcoin are fungible and tradeable. The value of a particular digital asset is commonly determined.
- *With the expectation of profit.* Clearly, people are buying cryptos because they expect to make money.
- *To be derived from the efforts of others.*  Without the crypto miners, there would be no tokens.  Crypto assets clearly get their value from the anticipated actions of the miners, and thus the efforts of others.

Since most tokens are securities, the money transmitters that are trafficking in them are acting as unregistered brokers in securities.  They SEC should bring them into compliance through an explicit but not-too-painful on ramp. It should not rely upon Regulation by Enforcement (RBE), which will result in decades of litigation and regulatory uncertainty.

Furthermore, the SEC can interpret each address holding a crypto token as a shareholder "of record" unless proven otherwise.  Since most major tokens have many thousands if not millions of addresses holding their tokens, most cryptos

---

[8] Even though the IRS treats tokens such as bitcoin as commodities for tax purposes, such tokens could still be securities for the purposes of our securities laws.

15

JA 76

would meet the requirements for registration under Section 12 of the Securities Exchange Act.

## Protect us from regulatory uncertainty!

The point is that there is a crying need for investor protection, and that all financial services should be on a consistent footing. Somebody has to do it! And it makes sense for the SEC to do so. Most of the people and enterprises working within the digital asset industry want to comply with the rules. They just need to know what the rules are. The lack of clarity from regulators creates a Kafka-esque environment in which no one will tell them what the rules are and how they apply.

The SEC need not be embarrassed to update its views on digital assets as we all learned much more over the years of the crypto revolution. The SEC has revised and withdrawn many staff no-action letters over the years. The previous staff comment that Ethereum was not a security should be overturned.[9]

I know that the SEC has suffered serious setbacks as various rules have been thrown out (sometimes rightly so) under judicial review. This may make the SEC extremely cautious, especially while fighting a death match with Ripple in court. My advice is to not fear the courts, but just do the right thing. While I am not now, nor have I ever been, an attorney, my observation is that the courts have generally applied a common sense smell test.[10] If what the Commission did clearly made good sense to the courts, then the courts upheld it in the spirit of Chevron deference. If the Commission's action didn't clearly make good sense, then the courts accepted the arguments of the plaintiffs and threw it out.

What I don't recommend is more Regulation by Enforcement (RBE). RBE will keep the SEC bogged down in litigation such as the Ripple death match.

## Declare an amnesty for token issuers and platforms who agree to comply with a simple principles-based crypto disclosure regime.

Instead of RBE, put out an interpretation that virtually all of those fungible tokens are securities, and declare a no-action amnesty period for those market participants (including issuers, "exchanges," wallet providers, and money transmitters) who

---

[9] See https://www.sec.gov/news/speech/speech-hinman-061418
[10] I have not even played one on TV, either.

16

notify the SEC within 60 days that they are beginning the process of registration and compliance. This should bring the money transmitters and other crypto entities into compliance with the customer protections that US citizens demand.

### New technology requires new rules.

However, don't make the mistake of trying to shoehorn new technologies into old rules. As the economics of some of these tokens are often quite different from traditional brick and mortar enterprises, it does not make sense to require exactly the same rules.

New technology often requires different regulation to achieve regulatory objectives. For example, New York city taxicabs are required to be painted yellow so that riders can identify them, and to have bullet proof screens to protect the drivers from robberies. Ride-sharing services such as Uber and Lyft use technology to show the rider what the car is, along with its license plate number. There is no need for a yellow paint job. Likewise, as cashless operations, there is negligible risk that the known riders will attempt to rob the drivers, eliminating the need for a bullet proof shield.

The SEC needs to focus on how to meet the objectives of our securities laws in light of how this technology is different from traditional securities. For example, most crypto exchanges and their defi brethren are very transparent, so there is little need at this time to impose additional trade reporting rules. Similarly, it would be premature to impose Regulation SCI requirements immediately on the industry, although cyber security is an extremely important issue.

Like other jurisdictions, the SEC should adopt a principles-based sandbox approach. This allows the SEC to learn from experience. The SEC should use its broad exemptive powers under Section 36 of the '34 Act to waive the more onerous requirements of SEC compliance.

### Create a simple token disclosure regime.

Create a sandbox-like super simple registration process for issuers of tokens which makes it easy for legitimate tokens to comply. Don't worry about getting it perfect on the first try. This space is evolving rapidly and the perfectly right rule today

17

JA 78

could be the perfectly wrong rule tomorrow.   Start simple, and only add more requirements later when it is clear they are needed.

Again, create a simple equivalent of 15c2-11 for brokers and exchanges quoting such tokens.  What is really needed is disclosure of the humans behind a token project, their financial interest in the tokens, and a comprehensible description of how it works.   This will make it easier to identify and prosecute the real fraudsters.  Again, the focus should be on making it as simple as possible to get most of the legitimate tokens into our regulated financial system.[11]  Disclosures need not be the same, and indeed should be different, from traditional disclosures.  Again, more disclosure can be added later.

## Let crypto exchanges become a type of ATS.

The current generation of crypto exchanges combine the functions of brokers, custodians, trading platforms, and settlement institutions.  The SEC should start with a simple sandbox approach to bring them into the regulated world as a type of ATS.  Experience over time will tell what types of regulations are best suited for this environment.  Start by promulgating basic principles, and see how it works.

## Rely on brokers, rather than Accredited Investor Apartheid, as gatekeepers.

It is natural to wonder how to protect investors from their own lack of sophistication in the shark-filled waters of the token metaverse. The temptation is to copy the current caste system in which poor investors are prevented from investing in securities to which the accredited rich have access.  The current system incorrectly conflates wealth with financial sophistication, and serves as a barrier preventing the less wealthy from accessing wealth-building investments.

A better approach for the Wild West of tokens is to make the brokers the gatekeepers.  Require brokers to assess the knowledge level of potential crypto investors, perhaps by making them take a test demonstrating that they know what they are investing in as well as how risky those securities are.  This would be similar to, but more stringent than, the approach used in granting option trading permissions.

---

[11] I define "legitimate" tokens as those created by people honestly doing something, versus a clearly fraudulent artifice to deceive.

Furthermore, it would be prudent to have rules requiring brokers to place permission limits on crypto exposure to some fraction, say 5%, of their stated net worth or annual income.  This would be in the public interest in that it would reduce the risk of investors blowing up their IRAs and becoming wards of the state.

## **Protect us from the environmental damage of crypto mining!**

It is no secret that bitcoin 1.0 is an environmental disaster.

Bitcoin in its current incarnation uses a consensus mechanism known as "Proof of Work" (POW), which is really Proof of Waste.[12]  The University of Cambridge publishes the Cambridge Bitcoin Electricity Consumption Index.[13] As of this writing, they estimate that bitcoin mining is consuming approximately 16 Gigawatts of electricity:

---

[12] The processors of bitcoin transactions are known as "miners", which evokes the environmental damage caused by sloppy physical mining activities.  A miner earns bitcoins by gathering a group of bitcoin transactions into a block. In order to be paid in bitcoins, the miner has to be the first to solve a math problem that involves brute force guess work.  In short, they guess a big number that gives the block of transactions a specific mathematical property.  In technogeek terms, they guess a number called a nonce such that the SHA256 hash function of the block header has the right number of zeros at the beginning.  Computers have to do the calculation of this hash function over and over again, which is why the hash rate is a good indication of how much computing effort is going into bitcoin mining.
[13] https://ccaf.io/cbeci/index



I am a former electrical engineer with utility experience.[14]  I have independently made my own calculations that are comparable to the Cambridge calculations.  If anything, the Cambridge estimates are on the low side.[15]

How much electricity is 16GW?   That is 16,000 megawatts of electricity, or 16,000,000 kilowatts.  That is enough to power approximately 16 million homes. A large nuclear power station like the one at Chernobyl is approximately 1 GW. Bitcoin is currently consuming the equivalent of the output of 16 Chernobyls. Here is a graphical representation:

---

[14] I earned my engineering degree from the California Institute of Technology and worked at Pacific Gas and Electric Company after graduation.

[15] It is actually a straightforward calculation.  The hash rate involved in mining bitcoins is easily calculated from the difficulty parameter built into the bitcoin protocol and is widely disseminated on web sites such as blockchain.info. The hashing power and electricity consumption of standard bitcoin mining hardware is also easily determined. Divide the hash rate by the hashing power of industry standard mining computers to determine how many mining computers are in operation.  Then multiply by the energy consumed by the industry standard mining computers to see how much electricity is currently being squandered on mining bitcoins.

20



21



22



23



24



25



26



27



28



29



30



31



32



33



34



35



Of course, the marginal fuel on this planet is not nuclear, it is carbon based. The implications for climate change are clear: Bitcoin mining is adding significantly to the output of greenhouse gas emissions. The electricity consumption of bitcoin is thus the equivalent of 16 large coal or gas fired power plants. All to process only 3-5 transactions per second on the base bitcoin blockchain.

Many bitcoin apologists are in denial about the environmental damage being done by bitcoin mining. They find it hard to believe that their bright shiny crypto child could possibly do any wrong. Just like the tobacco industry, those with an economic interest in bitcoin mining are waging a FUD campaign to try to convince everyone that bitcoin mining is good.[16] Often they will pretend that bitcoin miners are only using moonbeams and good vibes to mine bitcoin. They will claim that their bitcoins are being mined with renewable energy because the power grid they

---

[16] FUD = Fear Uncertainty Doubt. For references on the tobacco industry FUD campaign see
https://www.ucsusa.org/resources/disinformation-playbook See also, *The Cigarette: A Political History*, by Sarah Milov, Harvard University Press, and *Golden Holocaust*, by Robert N. Proctor, University of California Press.

36

are attached to gets part of its energy from renewable sources such as solar and wind. They will claim that their electrical demand is good for the electrical grid because they can turn off their mining rigs when the grid is short of electricity.

The problem with the miners' defense is this: What matters in terms of carbon emissions is not the average generation mix, but the marginal. In an electrical grid, electricity is comingled from all of the generation resources on the grid: Coal, gas, nuclear, hydro, solar, wind, et cetera. Think of it as one big pool of energy. Renewable sources such as solar and wind generally deliver all they can to the grid on a continuous basis. They are generally not dispatchable, and cannot be called upon to put out more energy upon demand.

When an additional load is placed on the grid, the grid has to generate more power to meet the load.[17] On most electrical grids on this planet, that marginal electricity is generated with a fossil fuel. Thus, even if some of the electricity on the grid is from a solar panel, when an additional mining computer is switched on, it is spewing more carbon dioxide into the atmosphere. This is true even if the miner claims to have purchased "green" electricity from another provider on the grid. Again, all of the electricity on a grid is commingled together. It is the marginal load that matters. It's just physics.

Bitcoin apologists will claim that bitcoin is being mined with stranded or waste energy that would otherwise not be used. It is true that there is some of that, but it accounts for a tiny fraction of bitcoin mining. For example, some oil production facilities also produce natural gas as a byproduct in places where there is no pipeline yet to carry the gas to market. That gas is thus flared for safety reasons or, worse yet, just vented into the atmosphere.[18] Thus, there can be some bitcoin mining done with electricity generated by burning natural gas that would otherwise be wasted.[19] Occasionally, a hydro or wind resource may have more capacity than demand and have to curtail generation, but such instances are quite rare. The reality is that most bitcoin mining results in the burning of additional carbon-based fuels.

## Higher bitcoin prices = more CO2 output.

---

[17] If it did not, the frequency would drop and the grid would begin to collapse.
[18] Natural gas (methane) is an even more potent greenhouse gas than carbon dioxide.
[19] Of course, such gas can and should be pumped into the ground for sequestration or later production.

The bitcoin protocol is designed to produce one block approximately every 10 minutes. Each block can hold only about 2,000 to 3,000 transactions, which puts a hard limit on the capacity of the basic bitcoin network under the current protocol. When more miners join the system, their combined computing power makes it possible to produce a block faster. However, when that happens, the protocol then adjusts the difficulty to keep the average block time at about 10 minutes per block. Thus, the capacity of the bitcoin network will not increase unless there is a consensus to change the protocol. Unfortunately, protocol changes to increase the capacity and scalability of the bitcoin network have been very difficult to achieve due to the governance, or more accurately, lack thereof, of the bitcoin protocol.[20] Bitcoin "maximalists" claim that this inability to substantively change the protocol is one of the big advantages of bitcoin.[21]

Bitcoin miners compete to process bitcoin transactions by solving a math puzzle that involves guessing a big number through brute force trial and error. The bitcoin miner who is the first to guess the right number is rewarded with some newly issued bitcoins along with the transaction fees associated with the transactions in the block. Thus, when the price of bitcoin goes up, there is an incentive for more miners (including those with less efficient hardware and more expensive electricity) to mine bitcoin. The addition of more mining capacity will push up the difficulty in order to keep the average block time at ten minutes. Thus, this increased capacity will not increase the transaction handling capacity of the bitcoin blockchain, but just lead to more computers chasing after the now more valuable block reward.

This means that a higher price for bitcoin will lead to more mining and more CO2 output. Anything that increases the price of bitcoin will incentivize more mining, even from those with less efficient computers or more expensive electricity. As the marginal fuel on this planet is carbon-based, that additional mining will result in more CO2 in the atmosphere.

**The SEC should require entities involved in bitcoin and other Proof of Waste cryptos to communicate, not just "disclose" the truth.**

---

[20] See https://medium.com/hackernoon/the-great-bitcoin-scaling-debate-a-timeline-6108081dbada
[21] See https://bitcoinmagazine.com/technical/bitcoin-will-never-change-to-proof-of-stake

The SEC has broad powers to force registrants to disclose information. Unfortunately, such "disclosures" are usually buried in tons of legalese that usually aren't read, let alone understood, by most investors. Furthermore, they are usually written by the best lawyers that money can buy to conform with the letter of the law while blatantly evading the spirit.  Most disclosures are written at such a high level that only those with advanced degrees can understand them.

The SEC should require those pushing crypto products to not only tell the truth about those products, but actually clearly and conspicuously *communicate* those truths.  These include:

- Brokers and advisers must repeatedly communicate in clear and conspicuous language the direct monetary risks, cyber risks, and environmental consequences of crypto products. ALL CAPS DISCLAIMERS BURIED AMONG SEVERAL PAGES OF UPPER CASE MINUTIAE ARE NOT SUFFICIENT.  Indeed, it is actually harder to read stuff in all capital letters.
- Corporate issuers that hold bitcoin should be required to disclose their bitcoin holdings, and include the associated carbon emissions in their calculations of their environmental footprint.
- Bitcoin miners must disclose their electricity consumption, both in terms of capacity (megawatts) and energy usage (megawatt-hours).  In addition, they must disclose the types of generation sources (coal, wind, etc.) for their electricity suppliers, both average and marginal, and disclose this as part of their climate disclosures.

## Summary

The time has come for the SEC to approve spot bitcoin-based ETFs.  Doing so will move more of the crypto activity onto the best regulated market in the world, our national market system.  The SEC should move in a gentle way to create an appropriate regulatory environment for crypto tokens that enhances consumer protection.

Instead of Regulation by Enforcement, offer a no-action period for those crypto purveyors willing to come in from the cold and register with the SEC.  Let crypto exchanges become a type of ATS, and let ATSs trade crypto tokens for which a crypto version of 15c2-11 provides basic information to investors.   Protect the

39

JA 100

unsophisticated investors by making the brokers gatekeepers who restrict crypto trading to small fraction of net worth by investors who understand what they are doing.

Respectfully submitted,


James J. Angel,

Georgetown University

40

DocuSign Envelope ID: CEEF50A0-6B0D-4211-9E4B-BA9664A4CA9F



Emory University          Tel 404.727.6364
Rich Memorial Building    Fax 404.727.4639
1602 Fishburne Drive, Room 306
Atlanta, Georgia 30322
*An equal opportunity, affirmative action university*

April 24, 2022

Re: File No. SR-NYSEArca-2021-90
Rel. No. 34-93504
Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E   (November 2, 2021)

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-0609

Dear Ms. Countryman:

We the undersigned are in favor of approving the Form 19b-4 that NYSE Arca filed with you to convert Grayscale® Bitcoin Trust (OTCQX: GBTC)—the world's largest publicly traded crypto asset fund, with approximately $30 billion in assets under management (AUM),[1] $100's million in daily trading volume,[2] more than 850,000 investors,[3] holding approximately 3.4% of all Bitcoins outstanding—into a Bitcoin Spot ETF.[4]

The GBTC conversion can provide opportunities for average investors to invest in Bitcoin— without the hassles of actual Bitcoin ownership— through the Bitcoin Spot ETF in order to diversify their portfolios, hedge against inflation, and face lower transaction costs for their investment.  SEC's Rejection of the conversion is not a costless act because it deprives the market participants from potential gains from investing in the proposed ETF.  A disproportionate share of lost opportunities falls on average, rather than the high end, investors.  To the extent that

---

[1] https://grayscale.com/products/grayscale-bitcoin-trust/.

[2] https://www.otcmarkets.com/stock/GBTC/overview.

[3] Based on Broadridge Financial Solutions, Inc. analysis of Grayscale Bitcoin Trust (Symbol: GBTC) as of March 9, 2022.

[4] In this letter, we use the generic term "ETF" to cover exchange-traded investment vehicles that are required to register under the Investment Company Act of 1940 (as amended, the "1940 Act"), also commonly referred to as "exchange-traded funds" or "ETFs," as well as those, like what GBTC is seeking to convert to, that would not be subject to the registration requirements of the 1940 Act.

DocuSign Envelope ID: CEEF50A0-6B0D-4211-9E4B-BA9664A4CA9F

market access can produce wealth-enhancing prospects, restricting the less affluent market participants is contrary to the goal of equitable access to means of wealth generation to promote equity, and therefore regressive in spirit and impact.

The following examples are suggestive of the costs that the SEC imposes on U.S. investors by rejecting the GBTC conversion. First, GBTC is currently trading at an approximately 25% discount to its net asset value (NAV), which means the price of GBTC is less than the price of the underlying Bitcoin asset. With approximately $30 billion in AUM, the gap results in approximately $7.5 billion of discount for existing U.S. investors. The wealth reducing differential can be partially attributed to the uncertainty around SEC position *vis-à-vis* GBTC conversion. The conversion would allow authorized participants to close the gap between the market price and NAV through creations and redemptions—a core feature of the ETFs. This would cause shares currently trading at a discount to better reflect NAV, and, therefore, help protect the hundreds of thousands of investors currently holding GBTC as well as provide many more investors the opportunity to invest in the proposed ETF.

Second, the GBTC conversion would bring Bitcoin into the regulatory domain, providing an opportunity for average U.S. investors to invest in Bitcoin through safe and secure methods. Third, while future-based Bitcoin ETFs impose higher fees due to Bitcoin futures premium and the cost of rolling future contracts each month, the spot-based Bitcoin ETF provides investors with structured investment vehicle with a lower cost. Moreover, the competition among spot-based and futures-based Bitcoin ETFs can result in reduced ETF fees, benefiting the investors. Such benefits will dissipate should the SEC reject the conversion proposal.

Fourth, rejecting the spot-based Bitcoin ETF can also lead to the migration of investment opportunities to exchanges outside U.S. that have already approved Bitcoin spot ETFs, like Canada and Germany, therefore, diminishing the U.S. competitive advantage in financial innovation and moving attractive opportunities outside the reach of average U.S. investors.

Importantly, last year and earlier this year you approved several futures-based Bitcoin ETFs. This is significant because the SEC's previously expressed concerns about fraud or manipulation in pricing of the underlying spot/cash Bitcoin markets would have to permeate across both spot-based and futures-based ETFs regardless of the level of regulation imposed on the fund or its underlying assets (*i.e.*, CME bitcoin futures/bitcoin) since both types of products are priced based on the underlying spot/cash Bitcoin markets. Specifically, CME futures are settled based on Bitcoin Reference Rate (BRR), determined based on actual trade prices in major Bitcoin spot exchanges. GBTC executes spot transaction in these very same spot exchanges and GBTC's transactions have identical protections against fraud and manipulation as futures contracts.

JA 103

DocuSign Envelope ID: CEEF50A0-6B0D-4211-9E4B-BA9664A4CA9F

The points we raise here can be substantiated with data analysis. Accordingly, time series methods can be used to demonstrate these pricing similarities statistically, thus providing evidence on cross-market propagation, and refuting the SEC's stated rationale.

It is also noted that the earlier futures-based Bitcoin ETFs were registered under the Investment Company Act of 1940. The most recent approval (April 2022) was registered under the Securities Act of 1933, the act under which the proposed Bitcoin spot ETF would be registered. Considering the above, we do not see a reasonable basis for differential treatment of future-based and spot-based Bitcoin ETFs. Disparate application of regulatory standards can result in uneven playing field for investors as well as management companies.

We, therefore, believe that the SEC should approve GBTC for conversion to an ETF, avoid differential treatment of identical products, and allow investors to choose the product that best meet their investment needs. To do otherwise would go against the SEC's core mission of protecting investors.[5]

Thank you for your time and consideration.

Sincerely,

Hashem Dezhbakhsh
Goodrich C. White Professor
and Chair
Department of Economics
Emory University

Narasimhan Jegadeesh
Dean's Distinguished
Chair of Finance
Goizueta Business School
Emory University

Juan Rubio-Ramirez
Charles Howard Candler
Professor of Economics
Emory University

---

[5] Regarding the SEC's February 4, 2022 Order Instituting Proceedings to Determine Whether to Approve or Disapprove a Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E, I believe that NYSE Arca has provided sufficient support in GBTC's 19b-4 to allow for the SEC to approve GBTC.

**Subject: Spot Bitcoin ETF**
**From: Donna Redel**
**Affiliation:**

May. 02, 2022

April 25,2022

Re: File No. SR-NYSEArca-2021-90
Rel. No. 34-93504
Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under
NYSE Arca Rule 8.201-E
(November 2, 2021)

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-0609

Dear Ms. Countryman:

I am Donna Redel, a Professor of Blockchain-Crypto at Fordham Law and a lecturer at Wharton. I was the
first woman to Chair a USA exchange, COMEX a CFTC regulated commodity exchange. It is my professional
opinion that a spot bitcoin ETF should be available immediately in the US markets. I teach in my courses a
spot Bitcoin ETF is a far superior product than the one based on futures settlement that was approved by
the SEC and available to the retail public.
I am in favor of approving the Form 19b-4 that NYSE Arca filed with you to convert Grayscale® Bitcoin Trust
(OTCQX: GBTC) – the world's largest publicly traded crypto asset fund, with approximately $30 billion in
AUM,[1] $100's million in daily trading volume,[2] more than 850,000 investors,[3] holding approximately
3.4% of all Bitcoins outstanding – into a Bitcoin Spot ETF.[4]
GBTC is currently trading at an approximately 25% discount to its NAV, which means the price of GBTC is
less than the price of the physical asset, Bitcoin. With approximately $30 billion in AUM, that results in
approximately $7.5 billion of trapped value from existing U.S. investors. One of the benefits of converting
GBTC into an ETF is it would allow for shares to be arbitraged by authorized participants through
simultaneous creations and redemptions – a core feature of the ETF wrapper. This would cause shares trading
at a discount to better reflect NAV, and thus protect the hundreds of thousands of investors currently
holding GBTC.
Importantly and impressively, earlier this year you approved several futures-based Bitcoin ETFs. This is
significant because to the extent the SEC had previously been concerned over fraud or manipulation in
pricing of the underlying spot/cash Bitcoin markets, that concern would have to permeate across both spot-
based and futures-based ETFs regardless of the level of regulation to which the fund or its underlying
assets (i.e., CME bitcoin futures/bitcoin) are subject since both types of products are priced based on the
underlying spot/cash Bitcoin markets. However, following approval of several future-based Bitcoin ETFs, you
subsequently disapproved several spot-based Bitcoin ETFs and recently approved a futures-based ETF
regulated under the Securities Exchange Act of 1934 (the "Exchange Act"), the same regulation under which
all spot-based ETFs would be regulated.
This inconsistency creates an unlevel playing field for Bitcoin ETFs without reasonable basis for different
treatment. To that point, Grayscale's attorneys at Davis Polk have filed two letters in the context of this
comment letter period arguing that the approval of Bitcoin Futures ETFs but not Bitcoin Spot ETFs, like
what GBTC would be, is "arbitrary and capricious" and "unfair discrimination" and therefore a potential
violation of the Administrative Procedure Act and Exchange Act.[5] I strongly agree with these new
arguments, as they are reflective of the new market dynamics following the approval of several Bitcoin
Futures ETFs regulated under the Investment Company Act, subsequent rejection of several Bitcoin Spot ETF
applications that would be regulated under the Exchange Act, and subsequent approval of a Bitcoin Futures
ETF regulated under the Exchange Act.
The SEC should approve GBTC for conversion to an ETF, avoid picking winners and losers and allow investors
a choice over which product best meets their investment needs. To do otherwise would go against the SEC's
core mission of protecting investors.[6]
Thank you for your time and consideration.
Sincerely,
Donna Redel

[1] https://grayscale.com/products/grayscale-bitcoin-trust/.

[2] https://www.otcmarkets.com/stock/GBTC/overview.

[3] Based on Broadridge Financial Solutions, Inc. analysis of Grayscale Bitcoin Trust (Symbol: GBTC) as of March 9, 2022.

[4] In this letter, I use the generic term "ETF" to cover exchange-traded investment vehicles that are required to register under the Investment Company Act of 1940 (as amended, the "1940 Act"), also commonly referred to as "exchange-traded funds" or "ETFs," as well as those, like what GBTC is seeking to convert to, that would not be subject to the registration requirements of the 1940 Act.

[5] Letter from Davis Polk & Wardwell LLP, on behalf of Grayscale Investments, LLC, Re: File No. SR-NYSEArca-2021-90 (Nov. 29, 2021), https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-9410842-262990.pdf; Letter from Davis Polk & Wardwell LLP, on behalf of Grayscale Investments, LLC, Re: File No. SR-NYSEArca-2021-90 (Apr. 18, 2022), https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-20123987-280130.pdf.

[6] Regarding the SEC's February 4, 2022 Order Instituting Proceedings to Determine Whether to Approve or Disapprove a Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E, I believe that NYSE Arca has provided sufficient support in GBTC's 19b-4 to allow for the SEC to approve GBTC.

April 25, 2022

Ms. Vanessa Countryman

Secretary

Securities and Exchange Commission

100 F Street NE

Washington, D.C. 20549-0609

Re:    Order Instituting Proceedings to Determine Whether to Approve or Disapprove a Proposed
       Rule\Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule
       8.201-E File No. SR-NYSEArca-2021-90, Release No. 34-04151

Dear Ms. Countryman,

Fortress Investment Group LLC ("Fortress") appreciates the opportunity to comment on the rule change proposed by NYSE Arca (the "Exchange") relating to the listing of Grayscale Bitcoin Trust ("**BTC**").

Fortress is a leading, highly diversified global investment manager with approximately $54.2 billion of assets under management as of September 30, 2021. Founded in 1998, Fortress manages assets on behalf of approximately 1,800 institutional clients and private investors worldwide across a range of credit and real estate, private equity and permanent capital investment strategies.

Fortress supports approval of the BTC application. Fortress has followed with interest the Commission's past denials of other applications for rule changes to list exchange-traded spot Bitcoin products (**"Spot ETPs"**). While we understood the Commission's initial caution in addressing exchange-traded products when digital assets were still new, the Commission's current position is to approve some listed Bitcoin products but not others, thereby inadvertently favoring the needs of some investors over others. We urge the Commission to re-consider these distinctions and evaluate the Exchange's application on its own merit. By that standard, we believe that the application and BTC have made significant progress in addressing past concerns of the Commission and that the application should be approved.

I.      **Fair Competition**

BTC is a popular, well-established spot Bitcoin product with a long track record (it was launched in 2013). During that period, we are aware of no regulatory or operational failures on its part.  Because the Commission has not been able to approve publicly traded spot Bitcoin products, BTC was originally offered through a private placement. Because of limits on private placements, BTC is unable to offer a redemption program. Despite this limitation, investors have still chosen to invest in BTC and we understand that it is now the world's largest Bitcoin investment vehicle.

The Commission recently undertook the major step of allowing the listing of ETFs focused on Bitcoin futures ("**Futures ETFs**"). As registered investment companies ("**1940 Act-Registered Funds**"), the Futures ETFs are (unlike BTC) allowed to accept both creation and redemption baskets, and investors may purchase and sell shares in Futures ETFs on national exchanges. While pent-up demand for Bitcoin-related products is significant enough that the Futures ETFs have been well-received by the market, they do not yet have the wide appeal of BTC: this may be because Futures ETFs are more expensive due to the costs of rolling futures contracts over on a monthly basis, because they are more complicated than spot products and, because of the increased costs, they are likely to underperform spot products.

JA 107

The Commission has explained why it allows Futures ETFs while simultaneously denying rule change applications for Spot ETFs: it notes that Section 6(b)(5) of the Securities Exchange Act of 1934 requires that exchanges' rules be designed to prevent fraud and market manipulation, and any rule changes (evaluated through the Rule 19b-4 rule change procedure) must meet this standard. But Futures ETFs, as 1940 Act-Registered Funds, are permitted to list without meeting this standard because the Commission has already approved generic rules and listing standards for that product class. Therefore, the Commission is not bound by Section 6(b)(5) to consider fraud and market manipulation when allowing the listing of Futures ETFs.

But this explanation sheds light only on why the approval process for Futures ETFs and Spot ETFs is different-- not why the result should be. While the Commission has stated that it considered each Spot ETF rule application "on its own merits and under the standards applicable to it", the Commission has itself devised those standards ambiguously and inconsistently. We do not understand why Futures ETFs-- potentially more expensive, more complicated and at risk of underperforming spot products-- are the type of product that the Commission approves in the name of investor protection. Chairman Gensler has stated that he believes that a 1940 Act-Registered Fund provides greater investor protections than products registered under only the Securities Act of 1933.[1] But it is fair to ask what evidence supports this belief. We urge the Commission to consider how investors have voted for BTC with their investment dollars since 2013. In this bear market for Bitcoin and environment of global crisis, if Bitcoin investors truly benefitted from a 1940 Act wrapper, it should have been evident by now.

## II.    Promoting Investor Protection

Concerns about process aside, we believe the Exchange application is strong and should be approved on its own merits. In past rejections, the Commission has stated that the Section 6(b)(5) standard may be met in one of two ways:

(1)     entering into "a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets," or

(2)     showing "that the underlying market inherently possesses a unique resistance to manipulation beyond the protections that are utilized by traditional commodity or securities markets" that is "novel and beyond those protections that exist in traditional commodity markets or equity markets[.]"[2]

In our view, BTC has strong links to a regulated market of significant size (*i.e.*, the CME). However, BTC has also created a robust approach to managing the risk of manipulation by relying on an index of Bitcoin prices from various exchanges. The application notes that the index uses a systemic methodology that includes only real, executed trades and relies on exchanges that charge trading fees. The underlying data is transparent enough for other retail products (*i.e.*, the Futures ETFs) because the spot exchanges are transparent and largely the same as the pricing sources relied upon by the Futures ETFs.[3] BTC's index is more liquid and transparent than the Futures ETFs' index, which relies solely on CME activity. CME

---

[1] Gary Gensler, Chair, SEC, Remarks Before the Aspen Security Forum, SEC (Aug. 3, 2021), *available at* https://www.sec.gov/news/public-statement/gensler-aspensecurity-forum-2021-08-03.
[2] Order Disapproving a Proposed Rule Change to List and Trade Shares of the VanEck Bitcoin Trust under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93559 (Nov. 12, 2021), 86 Fed. Reg. 64,539, 64,540 (Nov. 18, 2021) (SR–CboeBZX–2021–019)
[3] The CME CF Bitcoin Reference Rate ("BRR"), which determines the settlement price of CME itcoin futures and, therefore, the price of the futures ETFs, uses five spot exchanges: Coinbase, Kraken, Gemini, Bitstamp and itBit.

currently has only one-tenth of the trading volume of Bitcoin futures on Binance alone.[4]  Accordingly, Futures ETFs present investors with a more costly and complex means of gaining exposure to Bitcoin while reflecting only a small portion of the actual market for the digital asset. We note the BTC index's use of a 24-hour VWAP should make any attempt at manipulation prohibitively expensive.  Further, any attempt to manipulate the price of BTC interests would likely also require manipulation of the CME futures markets. Otherwise, arbitrage between the spot and derivative markets would quickly counteract the attempted manipulation. In that case, the CME would undoubtedly assist in monitoring and stopping the misconduct. But finally, we believe that BTC can itself serve an important price discovery purpose. Because of its size, BTC will create additional liquidity and (if approved) regulated status, it will allow for greater transparency and efficiency in the Bitcoin market.[5] Taken together, approving the application will remove an unfair and arbitrary advantage for certain managers, protect BTC investors and create a more transparent market for Bitcoin.

Further, we note that a number of regulated markets outside the U.S. including Brazil, Canada, Sweden, Germany, and Switzerland have already approved similar products investing in individual crypto currencies or baskets of cryptocurrencies.[6] In the next week, an Australian Bitcoin ETF will join them.[7] From our standpoint as a global firm, it is concerning to observe the U.S. lagging far behind such foreign capital market competitors in offering regulated products for an emerging technology like Blockchain. The large and growing AUM of such foreign listed products shows that investor demand is significant and continuously growing.[8]  Furthermore, the smooth functioning of these foreign-listed products, especially during a difficult market environment, shows that the Commission's higher standard for approving a spot Bitcoin ETF is unwarranted.

Fortress is grateful for the opportunity to comment and strongly encourages the approval of the filing. Please feel free to contact the undersigned with any questions you may have on our comments.

---

[4] Volume of Bitcoin Futures (accessed on April 22, 2022), *available at*
https://www.theblockcrypto.com/data/crypto-markets/futures.

[5] These benefits echo the benefits of past innovations; note, in particular, the salutatory effects driven by the introduction of credit ETFs in a previously less liquid and less transparent market. *See e.g.*, Caitlin D. Dannhauser, The impact of innovation: Evidence from corporate bond exchange-traded funds (ETFs), Journal of Financial Economics, Vol. 125, Issue 3 (Sept. 2017), 537-560 (positing that a "one standard deviation increase in ETF ownership reduces high-yield and investment-grade bond spreads by 20.3 and 9.2 basis points, respectively, implying an average monthly price increase of 1.03% and 0.75%) *available*
*at*https://www.sciencedirect.com/science/article/abs/pii/S0304405X17301198);  Kathie O'Donnell "Issuers help turn bond ETFs into 'convenient tools" Pensions & Investments (Mar. 14, 2022) *available at*
https://www.pionline.com/special-report/issuers-help-turn-bond-etfs-convenient-tools (quoting Adam Schenck, a Chicago-based principal and managing director at Milliman Financial Risk Management LLC "There have been concerns that have had to be allayed related to volumes in volatile periods, liquidity and spreads, but those myths have been debunked by action through ETFs' track records as much as any words[.]")
[6] "Fidelity set to launch physical spot bitcoin ETF", Financial Times (Dec. 2, 2021) *available at*
https://www.ft.com/content/f2a6d440-804e-4e32-93f1-a9ee2bbf0715
[7] "Bitcoin ETFs get the green light". Financial Review (Apr. 21, 2022) *available at*
https://www.afr.com/chanticleer/bitcoin-etfs-get-the-green-light-20220419-p5aela.
[8] Id. (citing TrackInsight that Canadian ETFs in Bitcoin and Ether had combined assets of $5.6bn; corresponding products in Sweden, Germany, Switzerland, Jersey and Liechtenstein had an additional $11.4bn in assets),

Sincerely,


Peter L. Briger, Jr.

Chief Executive Officer, Fortress Investment Group LLC

# VANDERBILT UNIVERSITY
## Owen Graduate School of Management

May 25, 2022

*VIA ELECTRONIC DELIVERY*

Ms. Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

> RE: Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E
> File No.: SR-NYSEArca-2021-90
> Release No.: 34-93504

Dear Ms. Countryman:

My name is Professor Robert E. Whaley. I'm an established expert in derivative contract valuation and risk management, and market operation. I've been a consultant for many major investment houses, security (futures, option and stock) exchanges, governmental agencies, and accounting and law firms. I developed the CBOE Market Volatility Index (i.e., the "VIX") for the Chicago Board Options Exchange in 1993, the NASDAQ Market Volatility Index (i.e., the "VXN") in 2000, and the BuyWrite Monthly Index (i.e., the "BXM") in 2001, and co-developed the NASDAQ OMX Alpha Indexes. I'm currently a Valere Blair Potter Professor of Management (Finance) Director, Financial Markets Research Center at the Vanderbilt University Owen Graduate School of Management.

This letter provides my perspective on why the NYSE Arca's application to list and trade shares of Grayscale Bitcoin Trust (BTC) ("GBTC") under NYSE Arca Rule 8.201-E as a spot bitcoin ETP should be approved by the Securities Exchange Commission (the "Commission"). My views are based on 40 years of research and teaching in financial markets.

Bitcoin is a new asset class. Its usefulness arises from the fact that its returns are relatively uncorrelated with traditional asset classes like stocks and bonds, thereby providing more efficient return-risk opportunity. Bitcoin ETPs are an effective mechanism for investing in bitcoin. Public demand for such investment tools is evidenced by the launch of ProShares bitcoin futures-based ETF (BITO) in October 2021. In its first

day of trading, its assets under management (AUM) reached more than $1B,[1] one of the most successful product launches in the 30-year ETP history. However, as further described below, futures-based bitcoin ETFs like BITO are a much more costly and inefficient way for investors to access bitcoin compared to what would be a more transparent and well-designed spot-based bitcoin ETP like GBTC. And because the Commission has already approved futures-based bitcoin ETFs, it must implicitly be comfortable with a spot-based bitcoin ETP like GBTC.

My comments in support of the NYSE Arca application fall into three main categories: (a) index construction, (b) market depth and liquidity, and (c) product design. Wherever possible, I support my opinions using publicly available data.

<u>Index construction</u>

Two bitcoin indexes are relevant to this discussion: the CME CF Bitcoin Reference Rate (BRR) that underlies the CME's bitcoin futures contract and the CoinDesk Bitcoin Price Index (XBX) that underlies GBTC described in the NYSE application. Since the Commission has approved the trading of BITO, BRR has an implicit acceptance as a bitcoin benchmark; and as described further below, so too should XBX from the Commission's perspective.

In my opinion, the key issue is whether XBX performs differently than BRR. Both are based on volume-weighted prices and have overlapping constituent exchanges. XBX has used prices exclusively from select exchanges over its history and currently uses price from Coinbase Pro, Bitstamp, Kraken, and LMAX Corporation. BRR currently uses prices from Coinbase, Bitstamp, itBit, Kraken, and Gemini.[2]

To address this issue, I gathered daily index levels for the period beginning January 4, 2021 (about ten months before the launch of BITO) through present (about six months after product launch. XBX was sourced from CoinDesk Indices, Inc. and BRR was sourced from Bloomberg. Summary statistics for the 338 daily natural logarithm (ln) returns are reported below in Table 1. XBX has a higher daily average return than BRR (0.0382% vs 0.0356%), but the difference is not significant in a statistical sense. Both return distribution are slightly negatively skewed but not different from one another. Both return series show negative first-order autocorrelation, however, the level is not significantly different from 0. In other words, prices have no memory as one expects in an efficient marketplace. XBX has a lower annualized standard deviation of return (i.e., "volatility") than BRR (79.38% vs 80.31%), but the difference is not meaningful economically or statistically. In summary, XBX and BRR are near perfect substitutes for

---

[1] Other futures-based ETFs were also launched, however, BITO has enjoyed a first-mover advantage and dominates other futures-based bitcoin products.
[2] CME CF Cryptocurrency Pricing Products, (undated) *Constituent Exchanges List* (p. 3).

the sample period.

| Table 1: Summary statistics | | |
|---|---|---|
| Description | XBX | BRR |
| $n$ | 338 | 338 |
| Mean (daily) | 0.000382 | 0.000356 |
| StDev (daily) | 0.050007 | 0.050593 |
| Skewness | -0.395406 | -0.273866 |
| Autocorrelation | -0.069047 | -0.061288 |
| Minimum | -0.259781 | -0.231823 |
| Median | -0.001246 | -0.001219 |
| Maximum | 0.165069 | 0.166328 |
| Mean (annual) | 9.63% | 8.96% |
| StDev (annual) | 79.38% | 80.31% |
| | | |
| Correlation | 0.983 | |

Market depth and liquidity

Issues of market depth and liquidity are relevant in discussions of possible market manipulation. BITO is based on the CME's bitcoin futures market and launched in October 2021 based on Commission approval. The application by NYSE Arca for trading of GBTC is based on the bitcoin spot market. Daily data for total USD market cap and trading volume across all bitcoin exchanges worldwide was obtained from Coin Market Cap. Dollar open interest and trading volume for the CME's bitcoin futures was obtained from CME Group Datamine. The investigation period is the same as before—January 4, 2021, through present. The comparison one-sided as Figures 1(a) and 1(b) below show. In terms of USD value, the market cap in the CME's bitcoin futures market averages less than one-quarter of one percent of the bitcoin spot market. The dollar trading volume of bitcoin futures averages about 5.5%. Since the Commission is comfortable with the viability of futures-based ETF investing in an environment in which the spot market dominates (in terms of both dollar value and trading volume), it follows logically that spot-based ETPs are warranted.

JA 113



### Product design

In my view, the financial payoffs of investments need to be well-defined. In the case of futures-based bitcoin ETFs like BITO and spot-based bitcoin ETPs like what GBTC would be, both products should be defined as tracking the price of bitcoin. The GBTC ETP price is inextricably linked to the price of bitcoin because it holds actual bitcoin. The conversion/redemption arbitrage process will ensure it. There is no equivalent claim that can be made for the futures-based bitcoin ETFs, however. ProShares BITO, for example, does not have a stated benchmark index which defines its replication bitcoin trading strategy. In the case of the VIXY ETF, ProShares say

"ProShares VIX Short-Term Futures ETF provides long exposure to the S&P 500 VIX Short-Term Futures Index, which measures the returns of a portfolio of monthly VIX futures contracts with a weighted average of one month to expiration."

This implies that to mimic the index the issuer rolls a small fraction of the nearby futures contract investment into the second nearby contract to maintain a constant one-month maturity.[3] In contrast, the BITO Fact Sheet says only that it is a U.S. bitcoin-linked ETF designed

"… to provide investment results that generally correspond to the performance of bitcoin… primarily through managed exposure to bitcoin futures contracts…",

which provides little guidance on what futures trading occurs.

To learn about ProShares actual futures trading, I examine the daily holdings of BITO published on the ProShares website. Figure 2 was prepared from daily futures holding data for BITO from product launch through May 5, 2022 through present. During the sample period, BITO held only the two nearby bitcoin futures. The nature of the figure suggests that ProShares holds as much as the nearby futures contract that they are

---

[3] The precise calculations are illustrated for VIXY in Colby J. Pessina and Robert E. Whaley, Levered and inverse exchange-traded products, *Financial Analysts Journal* (2021, Table 6, p. 14).

permitted given the CME's position limit of 4,000 contracts. Any residual need to contracts needed with net inflows on a given day are then met with purchases of the second nearby. Once the nearby futures reach a week or so to expiration, ProShares appears to roll out of the nearby into the second nearby over a period of three or four days. Notably, spot-based ETPs have no such roll purchases because they hold the actual underlying asset.

Figure 2



Another way of viewing this trading pattern is to examine the weighted average of the time to maturity of the futures position through time. Recall that for VIXY the time is one month and would be represented by a horizontal in Figure 3 below. Instead, a saw-tooth pattern appears, presumably necessary because of higher liquidity in the nearest term contract.

Figure 3



The BITO holdings data are also useful in addressing the market depth issue discussed earlier. Recall Figures 1(a) and 1(b) demonstrated how deep and liquid the

4

bitcoin spot market was relative to the bitcoin futures market. An interesting question to ask is what proportion of the nearby and second nearby BITO futures open interest is accounted for by BITO's $AUM. Figure 4 below summarizes. BITO appears to hold about 40% of the total open interest of the nearby bitcoin futures at any point in time. The proportion held in the second nearby is higher and has been increasing through time.



Figure 4

The issue of product design also involves understanding any inherent flaws in the replication strategy that inhibit its performance. In futures and spot markets where active arbitrage occurs continuously through time, the cost of carry relation holds. This implies that the return of a fully collateralized bitcoin futures position should be equal to the return of spot bitcoin. The bitcoin futures usually trade above their cost of carry level—a condition called contango. This implies that the rate of return on a fully collateralized futures position like that of BITO will be less than the return on the underlying asset as the futures price converges to the underlying asset price through time. The steeper the futures price curve, the greater the return differential. As previously noted, spot-based ETPs have no such roll costs because they hold the actual underlying asset. As a result, GBTC would not suffer from the additional costs caused by contango.

To see this in action, I consider the hypothetical performance of spot- and futures-based ETFs over our sample period. XBX will represent the return of GBTC before expenses. SPBTCFUT is a bitcoin futures-based index that tracks the total return of a collateralized bitcoin futures strategy very similar to that of BITO before expenses. Specifically, SPBTCFUT holds the nearby futures until five days before expiration and then rolls from the nearby to the second nearby daily in 20% increments.[4] Table 2 contains the summary statistics from the daily return analysis. The effects of contango are immediately evident. Since January 4, 2021, the holding period return (HPR) of XBX has

---

[4] Standard and Poor's, *S&P Futures Indices: Methodology* (May 2022).

been more than 9% higher than SPBTCFUT (15.13% vs 6.11%) at a slightly lower level of risk (72.09% vs 74.15%). The dominance of the spot bitcoin investment on a risk-adjusted performance basis can be expected to persist through time if the bitcoin futures market remains in contango.[5]

| Table 2: Summary statistics | | |
|---|---|---|
| Description | XBX | SPBTCFUT |
| $n$ | 338 | 338 |
| Mean (daily) | 0.0004 | 0.0002 |
| StDev (daily) | 0.0454 | 0.0467 |
| Skewness | 0.0223 | 0.0529 |
| Autocorrelation | -0.0371 | -0.0523 |
| Minimum | -0.1589 | -0.1569 |
| Median | 0.0014 | 0.0012 |
| Maximum | 0.1986 | 0.2015 |
| Mean (annual) | 10.50% | 4.42% |
| StDev (annual) | 72.09% | 74.15% |
| CAGR | 11.08% | 4.52% |
| HPR | 15.13% | 6.11% |
| | | |
| Correlation | 0.999 | |

The reason that SPBTCFUT rather than BITO is used in the analysis of Table 2 is that it has a longer history. Currently, BITO has less than six months of daily return observations. Nevertheless, in the interest of completeness, it is important to document the daily return relation between BITO and SPBTCFUT in the time since BITO launch. Table 3 contains the results. BITO and SPBTCFUT are virtually perfect substitutes. The only meaningful difference is in the CAGR, which is 0.86% lower for BITO. BITO's expense ratio is 0.95%.

---

[5] This effect has also been documented for other futures-based products.

| Table 3: Summary statistics | | |
|---|---|---|
| Description | BITO | SPBTCFUT |
| $n$ | 136 | 136 |
| Mean (daily) | -0.0048 | -0.0047 |
| StDev (daily) | 0.0392 | 0.0391 |
| Skewness | 0.1417 | 0.1265 |
| Autocorrelation | 0.0033 | 0.0004 |
| Minimum | -0.1099 | -0.1112 |
| Median | -0.0042 | -0.0047 |
| Maximum | 0.1125 | 0.1139 |
| Mean (annual) | -120.31% | -117.50% |
| StDev (annual) | 62.24% | 62.03% |
| CAGR | -69.97% | -69.12% |
| HPR | -47.76% | -46.96% |
| | | |
| Correlation | 0.999 | |

## Summary and recommendation

The three key elements that cause me to strongly endorse the NYSE Arca application to list and trade shares of GBTC under NYSE Arca Rule 8.201-E as a spot bitcoin ETP are: (a) the XBX bitcoin index that GBTC is priced on is virtually a perfect substitute for the BRR index that underlies the return-risk exposure for the futures-based ETFs that the Commission has already approved, (b) the bitcoin spot market is vastly deeper and more liquid that the bitcoin futures market, and (c) the product structure is much more transparent and well-designed.

Thank you for your consideration.

Robert E. Whaley
Valere Blair Potter Professor Finance, and
Director, Financial Markets Research Center
Vanderbilt University

7

JA 118

June 6, 2022

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-0609

Re:    **Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E**
       **File No. SR-NYSEArca-2021-90**
       **Rel. No. 34-93504**

Dear Ms. Countryman:

Flow Traders U.S. LLC, a subsidiary of Flow Traders N.V. ("Flow Traders"), respectfully submits this letter in support of the application by NYSE Arca Inc. pursuant to Rule 19b-4 under the Securities Exchange Act of 1934 (as amended the "Exchange Act") to list shares of Grayscale Bitcoin Trust ("GBTC") under NYSE Arca Rule 8.201-E as an exchange-traded product ("ETP"). Flow Traders appreciates the opportunity to share its perspective for a listed spot-based Bitcoin ETP in the marketplace and to encourage the Securities and Exchange Commission (the "Commission") to approve NYSE Arca's application.

Flow Traders is a leading global financial technology-enabled liquidity provider in a wide range of financial products, historically specializing in Exchange Traded Products ("ETPs"). Flow Traders provides liquidity to support the uninterrupted functioning of financial markets using state-of-the-art technology and innovation. Flow Traders' technology driven expertise allows trading desks in Europe, the Americas, and Asia to provide meaningful liquidity across all major exchanges and trading platforms, globally, 24 hours a day.  This allows investors to continue to buy or sell a wide range of financial instruments regardless of prevailing market conditions. Our work continues to make investing cheaper and more accessible for investors across the globe. On a yearly average, our ETP market share in Europe is 34%, in the Americas is 2.3%, and in APAC is 2.7%. In addition, Flow Traders is the number one liquidity provider in crypto ETPs in Europe with a 40% market share.  We strive to achieve a similar presence in a developing North American market, beginning with GBTC, and we would like to share our firsthand experiences in a regulated ecosystem.

As a global market maker in digital assets across spot, futures, and ETPs, Flow Traders is at the center of the market's evolution and maturation. With total market capitalization near $2 trillion, digital assets are a new frontier in the financial markets and have shown growth in acceptance by retail and institutional investors globally.  We have reached a pivotal moment for the adoption of innovative technologies that will improve capital markets by creating verifiable and transparent information and products, higher efficiency of clearing and settlement, and more liquidity. Collectively, this leads to more stability and trust in the financial system.

GBTC is the world's largest publicly traded crypto asset fund, with daily trading volume often exceeding $100 million,[1] over 850,000 investors,[2] and holding approximately 3.4% of all outstanding Bitcoins. However, as an unlisted product, GTBC is prevented from providing a function equivalent to direct ownership in Bitcoin due to periodic price dislocation from its net asset value ("NAV").  These price dislocations cause GBTC to trade at a considerable premium or discount - preventing investors from entering or exiting positions at a fair price.  A benefit of approving GBTC's conversion will be the availability of a creation and redemption facility where freely tradable shares can be issued (redeemed) and investors can enter and exit at fair value in a fair and orderly market.  A continuous creation and redemption facility allows for unobstructed inflows and outflows to the fund that will compress a premium or discount relative to the NAV and return value to investors.  In addition, the competition among liquidity providers to maintain supply and demand equilibrium will improve market depth and liquidity, narrow spreads, and lower the cost to trade.  For these reasons, we believe the investing public

---

[1] https://www.otcmarkets.com/stock/GBTC/overview.
[2] Based on Broadridge Financial Solutions, Inc. analysis of Grayscale Bitcoin Trust (Symbol: GBTC) as of March 9, 2022.

would greatly benefit with the approval of GBTC's conversion as it will provide greater access in a regulated marketplace and a more functional equivalent to direct ownership of Bitcoin.

In our experience as a market maker and authorized participant ("AP") for spot-based Bitcoin ETPs in Europe, Brazil, and Canada, ETPs have made the cryptocurrency markets more secure and accessible for investors, given the publicly traded nature on regulated venues.  In addition, they provide high transparency while transferring the responsibility for crypto asset custody to a trustworthy and regulated entity. Given the added investor protections on regulated markets, an increasing number of professional institutional investors have gained exposure to cryptocurrencies through ETPs.

The Commission's past denial to list a spot-based Bitcoin ETP is confusing given that it recently approved several futures-based Bitcoin exchange-traded funds ("ETF") regulated under the Securities Exchange Act of 1934 (the "Exchange Act") - the same statute under which GBTC would be regulated. This is inconsistent because the Commission was previously concerned over fraud or manipulation in pricing of the underlying spot/cash Bitcoin markets.  However, that concern should permeate across both spot-based and futures-based ETFs regardless of the level of regulation to which the fund or its underlying assets (*i.e.*, CME bitcoin futures or bitcoin spot) are subject since both types of products are priced based on the underlying spot Bitcoin markets. In other words, Bitcoin pricing (future or spot) is determined on the exchanges where Bitcoin trades. Given the overlap in pricing inputs for the reference indices, the Commission's concerns over fraud or manipulation in the underlying market should be agnostic of listed product- whether spot-base or futures-based. This inconsistency creates an unlevel playing field for products like GBTC without a reasonable basis for different treatment.

Despite GBTC's appeal and wide availability, investors are only able to resell through transactions on over-the-counter marketplaces that are not registered with the Commission as a national securities exchange. GBTC's AUM and volumes make it more suitable to be listed as a familiar and convenient product on a national securities exchange in the most liquid, transparent, and regulated markets in the world. It is unclear how the Commission's current subjective position to listing requirements can be reconciled with its core mission of protecting investors; maintaining fair, orderly, and efficient markets; and facilitating capital formation.

The Commission is uniquely positioned to support the growth of the crypto ecosystem and ensure America leads in innovation. Approval of GBTC's conversion allows the Commission to strengthen its oversight and improve the quality of investor protection across financial markets. The U.S. has the greatest capital markets because investors have faith in them. As more investors have access to capital markets, it is increasingly important to dedicate more avenues to protecting them. With the public's growing interest in diversified investments profiles and retail investors bearing the brunt of potential harm, bringing more products onto primary exchanges will keep the Commission at the forefront of protecting investors and ensuring fair and orderly markets.

Flow Traders thanks the Commission for the opportunity to comment on these important issues and respectfully encourages the approval of the filing.  Please feel free to contact us with any questions you may have on our comments.


Sincerely,

Roeland Pot
Managing Director

Aaron Dimitri
Global Head of Compliance and Counsel

JA 120

**GTS**

**Building Better Markets**

June 10, 2022

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-0609

**RE: Notice of Filing of Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E (Release No.: 34-93504; File No.: SR-NYSEArca-2021-90) ("Proposed Rule")**

Dear Ms. Countryman:

GTS Securities, LLC ("GTS") appreciates the opportunity to provide comments in response to the Proposed Rule filed by Grayscale Bitcoin Trust (the "Trust"). GTS is a global electronic market making firm that provides liquidity in U.S. equities, exchange-traded funds ("ETFs"), equity options, derivatives, and foreign exchange. We provide a leading destination for ETF execution and liquidity in all asset classes of ETFs listed in the United States. Our experience reaches back to the inception of the ETF industry in the United States, and many of our ETF traders have over 20 years of trading and market experience.

GTS broadly supports sensible regulation of exchange-traded products ("ETPs") and ETFs that provides for innovation, healthy competition, and investor choice coupled with robust investor protections. ETFs and ETPs are increasingly becoming essential elements of a balanced and diversified portfolio—they provide investors with trading flexibility and liquidity, transparency, cost effectiveness including tax efficiencies, and efficient portfolio diversification. U.S. ETF and ETP markets are leading global hubs with global clients, reaching $7.21 trillion in 2021[1] out of a global ETF and ETP industry that reached $10.27 trillion USD in 2021.[2] U.S. investors currently benefit from historically low costs and increased access to investment opportunities.

We believe that investors benefit most from the ability to make informed decisions, rather than having limited choices and limited information available to them. Regulators' long-standing disclosure-based regime is a bedrock of the federal securities laws because it ensures both the

---

[1] *See* ETFGI Press Release, *ETFGI reports the ETFs industry in the United States ended 2021 with record high assets of US$7.21 trillion and record net inflows of US$919.78 billion*, Jan. 17, 2022, https://etfgi.com/news/press-releases/2022/01/etfgi-reports-etfs-industry-united-states-ended-2021-record-high-assets.
[2] *See* ETFGI Press Release, *ETFGI reports global ETFs industry ended 2021 with a record US$10.27 trillion in assets and record net inflows of US$1.29 trillion*, Jan. 25, 2022, https://etfgi.com/news/press-releases/2022/01/etfgi-reports-global-etfs-industry-ended-2021-record-us1027-trillion.

1

protection of investors and freedom of those investors to make their own independent investment decisions.  A key component of investor protection is investor education, including complete, easy-to-understand disclosures.  The Commission has a long history of successfully working to ensure that these disclosures provide information material to investors' decisions.  Individual investors can then make investment decisions that comport with their own risk tolerances and financial goals.  This system lets innovation and free and fair competitive markets flourish hand-in-hand with investor protection and education.

With these concepts in mind, GTS believes the Trust's bitcoin ETP is an innovative product that would enhance investor choice and product competition, while providing a prudent option for investors to access the spot bitcoin market that affords them the portfolio benefits of ETPs and the protections of our federal securities laws, including robust disclosure requirements.  As the Trust has noted, there are currently at least seven countries that allow bitcoin ETPs.[3]  However, the Commission has only approved bitcoin futures ETPs.  This not only places U.S. markets at a competitive disadvantage, but it also disadvantages ETP investors who would like to access the spot market.  The Trust's proposed product would allow ETP investors to access the spot market efficiently and help promote the global competitiveness of U.S. markets as a destination for ETP investors in the rapidly evolving bitcoin trading landscape.  Ultimately, GTS believes that investor choice and access to a wide range of innovative ETPs and ETFs, such as the Trust's proposed product, broadly benefits U.S. markets, competition, and capital formation.

Thank you for providing the opportunity to comment on the Proposed Rule.


Sincerely yours,

/s/ Reginald M. Browne

Reginald M. Browne
Principal
GTS Securities, LLC

---

[3] *See* Grayscale Presentation, Apr. 26, 2022, https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-20128860-294707.pdf at p. 12 (listing Canada, Sweden, Switzerland, Germany, Brazil, France, and Australia).

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

GRAYSCALE INVESTMENTS, LLC,

        Petitioner,

   v.

SECURITIES AND EXCHANGE
COMMISSION,

        Respondent.

Case No. _____

## PETITION FOR REVIEW

Pursuant to Federal Rule of Appellate Procedure 15(a), D.C. Circuit Rule 15(a), and section 25 of the Securities Exchange Act of 1934, 15 U.S.C. § 78y(a)(1), Grayscale Investments, LLC, respectfully petitions this Court for review of the Securities and Exchange Commission's June 29, 2022 final order titled Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to List and Trade Shares of Grayscale Bitcoin Trust under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares), Release No. 34-95180. A copy of the order is attached as Exhibit A. This Court has jurisdiction and is a proper venue for this action pursuant to 15 U.S.C. § 78y(a)(1).

JA 123

Dated: June 29, 2022                Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Sarah E. Weiner*
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001-5369
Telephone: (202) 220-1100
Email: Donald.Verrilli@mto.com

*Admitted in New York only; Practicing under the supervision of District of Columbia Bar members

Paul S. Mishkin
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Email: Paul.Mishkin@davispolk.com

*Attorneys for Petitioner*

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

GRAYSCALE INVESTMENTS, LLC,

       Petitioner,

  v.

SECURITIES AND EXCHANGE
COMMISSION,

       Respondent.

Case No. _____

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, petitioner Grayscale Investments, LLC states as follows:

Grayscale Investments, LLC ("Grayscale"), is the world's largest digital currency asset manager and the sponsor of Grayscale Bitcoin Trust (BTC) (OTCQX: GBTC). Grayscale is a wholly-owned subsidiary of Digital Currency Group, Inc. No publicly held company has a 10% or greater ownership interest in Grayscale.

Dated:  June 29, 2022

Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Sarah E. Weiner*
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001-5369
Telephone: (202) 220-1100
Email: Donald.Verrilli@mto.com

*Admitted in New York only; Practicing under the
supervision of District of Columbia Bar members

Paul S. Mishkin
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Email: Paul.Mishkin@davispolk.com

*Attorneys for Petitioner*

JA 126

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of June, 2022, I caused copies of the

foregoing Petition for Review and Corporate Disclosure Statement to be served via

U.S. Mail and email on the following:

> Vanessa Countryman, Secretary
> U.S. Securities and Exchange
> Commission
> 100 F Street, NE
> Washington, D.C. 20549-1090
> apfilings@sec.gov

*/s/ Donald B. Verrilli, Jr.*

Donald B. Verrilli, Jr.
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001-5369
Telephone: (202) 220-1100
Email: Donald.Verrilli@mto.com

JA 127

Market Makers a $0.40 per contract rebate when adding liquidity in VOLQ does not impose an undue burden on competition. Maker Makers take on a number of obligations,[39] including quoting obligations,[40] unlike other market participants. Further, the proposed pricing for Lead Market Makers and Market Makers in VOLQ is intended to incentivize them to quote and trade more on the Exchange, thereby providing more trading opportunities for all market participants. As noted above, the $0.40 per contract rebate when adding liquidity in VOLQ is intended to offset the $0.40 per contract VOLQ transaction fee. The Exchange believes the proposed pricing will incentivize Lead Market Makers and Market Makers to provide liquidity in the new product. Additionally, the proposed VOLQ rebate will be applied equally to all Lead Market Makers and Market Makers.

*C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants, or Others*

No written comments were either solicited or received.

## III. Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action

The foregoing rule change has become effective pursuant to Section 19(b)(3)(A)(ii) of the Act.[41]

At any time within 60 days of the filing of the proposed rule change, the Commission summarily may temporarily suspend such rule change if it appears to the Commission that such action is: (i) necessary or appropriate in the public interest; (ii) for the protection of investors; or (iii) otherwise in furtherance of the purposes of the Act. If the Commission takes such action, the Commission shall institute proceedings to determine whether the proposed rule should be approved or disapproved.

## IV. Solicitation of Comments

Interested persons are invited to submit written data, views, and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act. Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*http://www.sec.gov/rules/sro.shtml*); or

• Send an email to *rule-comments@sec.gov*. Please include File Number SR–Phlx–2022–27 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to File Number SR–Phlx–2022–27. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*http://www.sec.gov/rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549 on official business days between the hours of 10:00 a.m. and 3:00 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. All comments received will be posted without change. Persons submitting comments are cautioned that we do not redact or edit personal identifying information from comment submissions. You should submit only information that you wish to make available publicly. All submissions should refer to File Number SR–Phlx–2022–27, and should be submitted on or before July 27, 2022.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[42]

**Jill M. Peterson,**

*Assistant Secretary.*

[FR Doc. 2022–14293 Filed 7–5–22; 8:45 am]

**BILLING CODE 8011–01–P**

## SECURITIES AND EXCHANGE COMMISSION

[Release No. 34–95180; File No. SR–NYSEArca–2021–90]

## Self-Regulatory Organizations; NYSE Arca, Inc.; Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to List and Trade Shares of Grayscale Bitcoin Trust Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares)

June 29, 2022.

### I. Introduction

On October 19, 2021, NYSE Arca, Inc. (''NYSE Arca'' or ''Exchange'') filed with the Securities and Exchange Commission (''Commission''), pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 (''Exchange Act'')[1] and Rule 19b–4 thereunder,[2] a proposed rule change to list and trade shares (''Shares'') of Grayscale Bitcoin Trust (''Trust'') under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares). The proposed rule change was published for comment in the **Federal Register** on November 8, 2021.[3]

On December 15, 2021, pursuant to Section 19(b)(2) of the Exchange Act,[4] the Commission designated a longer period within which to approve the proposed rule change, disapprove the proposed rule change, or institute proceedings to determine whether to disapprove the proposed rule change.[5] On February 4, 2022, the Commission instituted proceedings under Section 19(b)(2)(B) of the Exchange Act[6] to determine whether to approve or disapprove the proposed rule change.[7] On April 21, 2022, the Exchange filed Amendment No. 1, which replaced and superseded the proposed rule change in its entirety, and on May 4, 2022, the Commission provided notice of Amendment No. 1 to the proposed rule change and designated a longer period for Commission action on the proposed rule change, as modified by Amendment No. 1.[8]

---

[39] *See* Options 2, Section 4.

[40] *See* Options 2, Section 5 and Options 3, Section 8.

[41] 15 U.S.C. 78s(b)(3)(A)(ii).

[42] 17 CFR 200.30–3(a)(12).

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

[3] *See* Securities Exchange Act Release No. 93504 (Nov. 2, 2021), 86 FR 61804. Comments received on the proposed rule change are available at: *https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190.htm.*

[4] 15 U.S.C. 78s(b)(2).

[5] *See* Securities Exchange Act Release No. 93788, 86 FR 72291 (Dec. 21, 2021).

[6] 15 U.S.C. 78s(b)(2)(B).

[7] *See* Securities Exchange Act Release No. 94151, 87 FR 7889 (Feb. 10, 2022).

[8] *See* Securities Exchange Act Release No. 94844, 87 FR 28043 (May 10, 2022) (''Amendment No. 1''). Amendment No. 1 to the proposed rule change can

Continued

This order disapproves the proposed rule change, as modified by Amendment No. 1. The Commission concludes that NYSE Arca has not met its burden under the Exchange Act and the Commission's Rules of Practice to demonstrate that its proposal is consistent with the requirements of Exchange Act Section 6(b)(5), which requires, in relevant part, that the rules of a national securities exchange be "designed to prevent fraudulent and manipulative acts and practices" and "to protect investors and the public interest."[9]

When considering whether NYSE Arca's proposal to list and trade the Shares is designed to prevent fraudulent and manipulative acts and practices, the Commission applies the same analytical framework used in its orders considering previous proposals to list bitcoin[10]-based commodity trusts and bitcoin-based trust issued receipts to assess whether a listing exchange of an exchange-traded product ("ETP") can meet its obligations under Exchange Act Section 6(b)(5).[11] As the Commission

be found at: *https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-20125938-286383.pdf.*

[9] 15 U.S.C. 78f(b)(5).

[10] Bitcoins are digital assets that are issued and transferred via a decentralized, open-source protocol used by a peer-to-peer computer network through which transactions are recorded on a public transaction ledger known as the "bitcoin blockchain." The bitcoin protocol governs the creation of new bitcoins and the cryptographic system that secures and verifies bitcoin transactions. *See, e.g.,* Amendment No. 1, 87 FR at 28045.

[11] *See* Order Setting Aside Action by Delegated Authority and Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, To List and Trade Shares of the Winklevoss Bitcoin Trust, Securities Exchange Act Release No. 83723 (July 26, 2018), 83 FR 37579 (Aug. 1, 2018) (SR–BatsBZX–2016–30) ("Winklevoss Order"); Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To Amend NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares) and To List and Trade Shares of the United States Bitcoin and Treasury Investment Trust Under NYSE Arca Rule 8.201–E, Securities Exchange Act Release No. 88284 (Feb. 26, 2020), 85 FR 12595 (Mar. 3, 2020) (SR–NYSEArca–2019–39) ("USBT Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the WisdomTree Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93700 (Dec. 1, 2021), 86 FR 69322 (Dec. 7, 2021) (SR–CboeBZX–2021–024) ("WisdomTree Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Valkyrie Bitcoin Fund Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 93859 (Dec. 22, 2021), 86 FR 74156 (Dec. 29, 2021) (SR–NYSEArca–2021–31) ("Valkyrie Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Kryptoin Bitcoin ETF Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93860 (Dec. 22, 2021), 86 FR 74166 (Dec. 29, 2021) (SR–CboeBZX–2021–029) ("Kryptoin Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the First Trust SkyBridge

has explained, an exchange that lists bitcoin-based ETPs[12] can meet its

Bitcoin ETF Trust Under NYSE Arca Rule 8.201–E, Securities Exchange Act Release No. 94006 (Jan. 20, 2022), 87 FR 3869 (Jan. 25, 2022) (SR–NYSEArca–2021–37) ("SkyBridge Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Wise Origin Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 94080 (Jan. 27, 2022), 87 FR 5527 (Feb. 1, 2022) (SR–CboeBZX–2021–039) ("Wise Origin Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the NYDIG Bitcoin ETF Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 94395 (Mar. 10, 2022), 87 FR 14932 (Mar. 16, 2022) (SR–NYSEArca–2021–57) ("NYDIG Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Global X Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 94396 (Mar. 10, 2022), 87 FR 14912 (Mar. 16, 2022) (SR–CboeBZX–2021–052) ("Global X Order"); Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To List and Trade Shares of the ARK 21Shares Bitcoin ETF Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 94571 (Mar. 31, 2022), 87 FR 20014 (Apr. 6, 2022) (SR–CboeBZX–2021–051) ("ARK 21Shares Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the One River Carbon Neutral Bitcoin Trust Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 94999 (May 27, 2022), 87 FR 33548 (June 2, 2022) (SR–NYSEArca–2021–67) ("One River Order"). In addition, orders were issued by delegated authority on the following matters: Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, Relating to the Listing and Trading of Shares of the SolidX Bitcoin Trust Under NYSE Arca Equities Rule 8.201, Securities Exchange Act Release No. 80319 (Mar. 28, 2017), 82 FR 16247 (Apr. 3, 2017) (SR–NYSEArca–2016–101) ("SolidX Order"); Order Disapproving a Proposed Rule Change To List and Trade the Shares of the ProShares Bitcoin ETF and the ProShares Short Bitcoin ETF, Securities Exchange Act Release No. 83904 (Aug. 22, 2018), 83 FR 43934 (Aug. 28, 2018) (SR–NYSEArca–2017–139) ("ProShares Order"); Order Disapproving a Proposed Rule Change To List and Trade the Shares of the GraniteShares Bitcoin ETF and the GraniteShares Short Bitcoin ETF, Securities Exchange Act Release No. 83913 (Aug. 22, 2018), 83 FR 43923 (Aug. 28, 2018) (SR–CboeBZX–2018–001) ("GraniteShares Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the VanEck Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93559 (Nov. 12, 2021), 86 FR 64539 (Nov. 18, 2021) (SR–CboeBZX–2021–019) ("VanEck Order"); Order Granting Approval of a Proposed Rule Change, as Modified by Amendment Nos. 1 and 2, To List and Trade Shares of the Teucrium Bitcoin Futures Fund Under NYSE Arca Rule 8.200–E, Commentary .02 (Trust Issued Receipts), Securities Exchange Act Release No. 94620 (Apr. 6, 2022), 87 FR 21676 (Apr. 12, 2022) (SR–NYSEArca–2021–53) ("Teucrium Order"); Order Granting Approval of a Proposed Rule Change, as Modified by Amendment Nos. 1 and 2, To List and Trade Shares of the Valkyrie XBTO Bitcoin Futures Fund Under Nasdaq Rule 5711(g), Securities Exchange Act Release No. 94853 (May 5, 2022), 87 FR 28848 (May 11, 2022) (SR–NASDAQ–2021–066) ("Valkyrie XBTO Order").

[12] As used in this order, the term "ETFs" refers to open-end funds that register the offer and sale of their shares under the Securities Act of 1933 ("Securities Act") and are regulated as investment companies under the Investment Company Act of 1940 ("1940 Act"). The term "ETPs" refers to

obligations under Exchange Act Section 6(b)(5) by demonstrating that the exchange has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets.[13]

In this context, the terms "significant market" and "market of significant size" include a market (or group of markets) as to which (a) there is a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, so that a surveillance-sharing agreement would assist in detecting and deterring misconduct, and (b) it is unlikely that trading in the ETP would be the predominant influence on prices in that market.[14] A surveillance-sharing agreement must be entered into with a "significant market" to assist in detecting and deterring manipulation of the ETP, because a person attempting to manipulate the ETP is reasonably likely to also engage in trading activity on that "significant market."[15]

Although surveillance-sharing agreements are not the exclusive means by which a listing exchange of a commodity-trust ETP can meet its obligations under Exchange Act Section 6(b)(5), such agreements have previously provided the basis for the exchanges that list commodity-trust ETPs to meet those obligations, and the Commission has historically recognized their importance. And where, as here, a listing exchange fails to establish that other means to prevent fraudulent and manipulative acts and practices will be sufficient, the listing exchange must enter into a surveillance-sharing agreement with a regulated market of significant size because such agreements detect and deter fraudulent and manipulative activity.[16]

exchange-traded products that register the offer and sale of their shares under the Securities Act but are not regulated under the 1940 Act, such as commodity trusts and trust issued receipts. Commenters have sometimes used these terms interchangeably, and it is not always clear which type of product a commenter is referring to. Accordingly, unless clear from the context, the Commission interprets statements from the Exchange or a commenter to refer to an ETP.

[13] *See* USBT Order, 85 FR at 12596. *See also* Winklevoss Order, 83 FR at 37592 n.202 and accompanying text (discussing previous Commission approvals of commodity-trust ETPs); GraniteShares Order, 83 FR at 43925–27 nn.35–39 and accompanying text (discussing previous Commission approvals of commodity-futures ETPs).

[14] *See* Winklevoss Order, 83 FR at 37594. *See also* USBT Order, 85 FR at 12596–97; WisdomTree Order, 86 FR at 69322.

[15] *See* USBT Order, 85 FR at 12597.

[16] *See* Amendment to Rule Filing Requirements for Self-Regulatory Organizations Regarding New Derivative Securities Products, Securities Exchange

The Commission has long recognized that surveillance-sharing agreements "provide a necessary deterrent to manipulation because they facilitate the availability of information needed to fully investigate a manipulation if it were to occur" and thus "enable the Commission to continue to effectively protect investors and promote the public interest." [17] As the Commission has emphasized, it is essential for an exchange listing a derivative securities product to have the ability that surveillance-sharing agreements provide to obtain information necessary to detect, investigate, and deter fraud and market manipulation, as well as violations of exchange rules and applicable federal securities laws and rules.[18] The hallmarks of a surveillance-sharing agreement are that the agreement provides for the sharing of information about market trading activity, clearing activity, and customer identity; that the parties to the agreement have reasonable ability to obtain access to and produce requested information; and that no existing rules, laws, or practices would impede one party to the agreement from obtaining this information from, or producing it to, the other party.[19]

The Commission has explained that the ability of a national securities exchange to enter into surveillance-sharing agreements "furthers the protection of investors and the public interest because it will enable the [e]xchange to conduct prompt investigations into possible trading violations and other regulatory improprieties." [20] The Commission has

also long taken the position that surveillance-sharing agreements are important in the context of exchange listing of derivative security products, such as equity options, because a surveillance-sharing agreement "permits the sharing of information" that is "necessary to detect" manipulation and "provide[s] an important deterrent to manipulation because [it] facilitate[s] the availability of information needed to fully investigate a potential manipulation if it were to occur." [21] With respect to ETPs, when approving the listing and trading of one of the first commodity-linked ETPs—a commodity-linked exchange-traded note—on a national securities exchange, the Commission continued to emphasize the importance of surveillance-sharing agreements, stating that the listing exchange had entered into surveillance-sharing agreements with each of the futures markets on which pricing of the ETP would be based and stating that "[t]hese agreements should help to ensure the availability of information necessary to detect and deter potential manipulations and other trading abuses, thereby making [the commodity-linked notes] less readily susceptible to manipulation." [22]

Consistent with these statements, for the commodity-trust ETPs approved to date for listing and trading, there has been in *every* case at least one significant, regulated market for trading futures on the underlying commodity and the ETP listing exchange has entered into surveillance-sharing agreements with, or held Intermarket Surveillance Group ("ISG") membership in common with, that market.[23]

Moreover, the surveillance-sharing agreements have been consistently present whenever the Commission has approved the listing and trading of derivative securities, even where the underlying securities were also listed on national securities exchanges—such as options based on an index of stocks traded on a national securities exchange—and were thus subject to the Commission's direct regulatory authority.[24]

Listing exchanges have also attempted to demonstrate that other means besides surveillance-sharing agreements will be sufficient to prevent fraudulent and manipulative acts and practices, including that the bitcoin market as a whole or the relevant underlying bitcoin

Act Release No. 40761 (Dec. 8, 1998), 63 FR 70952, 70954, 70959 (Dec. 22, 1998) (File No. S7–13–98) ("NDSP Adopting Release"). *See also* Winklevoss Order, 83 FR at 37593–94; ProShares Order, 83 FR at 43936; GraniteShares Order, 83 FR at 43924; USBT Order, 85 FR at 12596.

[17] *See* NDSP Adopting Release, 63 FR at 70954, 70959. *See also id.* at 70959 ("It is essential that the SRO [self-regulatory organization] have the ability to obtain the information necessary to detect and deter market manipulation, illegal trading and other abuses involving the new derivative securities product. Specifically, there should be a comprehensive ISA [information-sharing agreement] that covers trading in the new derivative securities product and its underlying securities in place between the SRO listing or trading a derivative product and the markets trading the securities underlying the new derivative securities product.").

[18] *See* NDSP Adopting Release, 63 FR at 70959.

[19] *See* Winklevoss Order, 83 FR at 37592–93 (discussing Letter from Brandon Becker, Director, Division of Market Regulation, Commission, to Gerard D. O'Connell, Chairman, Intermarket Surveillance Group (June 3, 1994), *available at* https://www.sec.gov/divisions/marketreg/mr-noaction/isg060394.htm).

[20] *See* NDSP Adopting Release, 63 FR at 70954. Securities Exchange Act Release No. 27877 (Apr. 4, 1990), 55 FR 13344 (Apr. 10, 1990) (Notice of Filing and Order Granting Accelerated Approval

to Proposed Rule Change Regarding Cooperative Agreements With Domestic and Foreign Self-Regulatory Organizations) (SR–NYSE–90–14).

[21] Securities Exchange Act Release No. 33555 (Jan. 31, 1994), 59 FR 5619, 5621 (Feb. 7, 1994) (SR–Amex–93–28) (order approving listing of options on American Depositary Receipts ("ADR")) ("ADR Option Order"). The Commission further stated that it "generally believes that having a comprehensive surveillance sharing agreement in place, between the exchange where the ADR option trades and the exchange where the foreign security underlying the ADR primarily trades, will ensure the integrity of the marketplace. The Commission further believes that the ability to obtain relevant surveillance information, including, among other things, the identity of the ultimate purchasers and sellers of securities, is an essential and necessary component of a comprehensive surveillance sharing agreement." *Id.*

[22] Securities Exchange Act Release No. 35518 (Mar. 21, 1995), 60 FR 15804, 15807 (Mar. 27, 1995) (SR–Amex–94–30). *See also* Winklevoss Order, 83 FR at 37593 n.206.

[23] *See* Winklevoss Order, 83 FR at 37594. Furthermore, the Commission notes that those cases dealt with a futures market that had been trading for a long period of time before an exchange proposed a commodity-trust ETP based on the asset underlying those futures. For example, silver

futures and gold futures began trading in 1933 and 1974, respectively, *see* https://www.cmegroup.com/media-room/historical-first-trade-dates.html, and the first ETPs based on spot silver and gold were approved for listing and trading in 2006 and 2004. *See* Securities Exchange Act Release No. 53521 (Mar. 20, 2006), 71 FR 14967 (Mar. 24, 2006) (SR–Amex–2005–072) (order approving iShares Silver Trust); Securities Exchange Act Release No. 50603 (Oct. 28, 2004), 69 FR 64614 (Nov. 5, 2004) (SR–NYSE–2004–22) (order approving streetTRACKS Gold Shares). Platinum futures and palladium futures began trading in 1956 and 1968, respectively, *see* https://www.cmegroup.com/media-room/historical-first-trade-dates.html, and the first ETPs based on spot platinum and palladium were approved for listing and trading in 2009. *See* Securities Exchange Act Release No. 61220 (Dec. 22, 2009), 74 FR 68895 (Dec. 29, 2009) (SR–NYSEArca–2009–94) (order approving ETFS Palladium Trust); Securities Exchange Act Release No. 61219 (Dec. 22, 2009), 74 FR 68886 (Dec. 29, 2009) (SR–NYSEArca–2009–95) (order approving ETFS Platinum Trust).

[24] *See* USBT Order, 85 FR at 12597; ADR Option Order, 59 FR at 5621. The Commission has also recognized that surveillance-sharing agreements provide a necessary deterrent to fraud and manipulation in the context of index options even when (i) all of the underlying index component stocks were either registered with the Commission or exempt from registration under the Exchange Act; (ii) all of the underlying index component stocks were traded in the U.S. either directly or as ADRs on a national securities exchange; and (iii) effective international ADR arbitrage alleviated concerns over the relatively smaller ADR trading volume, helped to ensure that ADR prices reflected the pricing on the home market, and helped to ensure more reliable price determinations for settlement purposes, due to the unique composition of the index and reliance on ADR prices. *See* Securities Exchange Act Release No. 26653 (Mar. 21, 1989), 54 FR 12705, 12708 (Mar. 28, 1989) (SR–Amex–87–25) (stating that "surveillance-sharing agreements between the exchange on which the index option trades and the markets that trade the underlying securities are necessary" and that "[t]he exchange of surveillance data by the exchange trading a stock index option and the markets for the securities comprising the index is important to the detection and deterrence of intermarket manipulation"). And the Commission has explained that surveillance-sharing agreements "ensure the availability of information necessary to detect and deter potential manipulations and other trading abuses" even when approving options based on an index of stocks traded on a national securities exchange. *See* Securities Exchange Act Release No. 30830 (June 18, 1992), 57 FR 28221, 28224 (June 24, 1992) (SR–Amex–91–22).

market is "uniquely" and "inherently" resistant to fraud and manipulation.[25] In response, the Commission has stated that, if a listing exchange could establish that the underlying market inherently possesses a unique resistance to manipulation beyond the protections that are utilized by traditional commodity or securities markets, the listing market would not necessarily need to enter into a surveillance-sharing agreement with a regulated significant market.[26] Such resistance to fraud and manipulation, however, must be novel and beyond those protections that exist in traditional commodity markets or securities markets for which surveillance-sharing agreements in the context of listing derivative securities products have been consistently present.[27]

Here, NYSE Arca contends that approval of the proposal is consistent with Section 6(b)(5) of the Exchange Act, and, in particular, Section 6(b)(5)'s requirement that the rules of a national securities exchange be designed to prevent fraudulent and manipulative acts and practices and to protect investors and the public interest.[28] As discussed in more detail below, NYSE Arca asserts that the proposal is consistent with Section 6(b)(5) of the Exchange Act because bitcoin offers novel protections beyond those that exist in traditional commodity or equity markets and the proposal's use of the Index (as described below) [29] represents an effective means to prevent fraudulent and manipulative acts and practices.[30] In addition, NYSE Arca asserts that the Chicago Mercantile Exchange ("CME") bitcoin futures market is a significant, surveilled, and regulated market that is "closely connected" to the spot bitcoin market, and that the Exchange may obtain information from the CME bitcoin futures market and other entities that are members of the ISG to assist in detecting and deterring potential fraud and manipulation with respect to the Trust and the Shares.[31] In addition, NYSE Arca argues that the proposal would protect investors and the public interest because, among other things,

the Exchange has in place surveillance procedures relating to trading in the Shares and the proposal would promote competition.[32]

In the analysis that follows, the Commission examines whether the proposed rule change, as modified by Amendment No. 1, is consistent with Section 6(b)(5) of the Exchange Act by addressing: in Section III.B.1 assertions that other means besides surveillance-sharing agreements will be sufficient to prevent fraudulent and manipulative acts and practices; in Section III.B.2 assertions that NYSE Arca has entered into a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin; in Section III.B.3 assertions that the Commission must approve the proposal because the Commission has approved the listing and trading of ETFs and ETPs that hold CME bitcoin futures; in Section III.C assertions that the proposal is consistent with the protection of investors and the public interest; and in Section III.D other arguments raised by commenters.

Based on its analysis, the Commission concludes that NYSE Arca has not established that other means to prevent fraudulent and manipulative acts and practices are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. The Commission further concludes that NYSE Arca has not established that it has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin, the underlying bitcoin assets that would be held by the Trust. As a result, the Commission is unable to find that the proposed rule change is consistent with the statutory requirements of Exchange Act 6(b)(5).

The Commission emphasizes that its disapproval of this proposed rule change, as modified by Amendment No. 1, does not rest on an evaluation of the relative investment quality of a product holding spot bitcoin versus a product holding CME bitcoin futures, or an assessment of whether bitcoin, or blockchain technology more generally, has utility or value as an innovation or an investment. Rather, the Commission is disapproving this proposed rule change, as modified by Amendment No. 1, because, as discussed below, NYSE Arca has not met its burden to demonstrate that its proposal is

consistent with the requirements of Exchange Act Section 6(b)(5).

**II. Description of the Proposed Rule Change, as Modified by Amendment No. 1**

As described in more detail in Amendment No. 1,[33] the Exchange proposes to list and trade the Shares of the Trust under NYSE Arca Rule 8.201–E, which governs the listing and trading of Commodity-Based Trust Shares on the Exchange.

The investment objective of the Trust is for the value of the Shares (based on bitcoin per Share) to reflect the value of the bitcoins held by the Trust, as determined by reference to the "Index Price," less the Trust's expenses and other liabilities.[34] The "Index Price" is the U.S. dollar value of a bitcoin represented by the "Index," calculated at 4:00 p.m., New York time, on each business day.[35] According to the Exchange, the Index Provider develops, calculates, and publishes the Index on a continuous basis using the price at certain spot bitcoin trading platforms selected by the Index Provider.[36] As of December 31, 2021, the spot bitcoin trading platforms included in the Index were: Coinbase Pro, Bitstamp, Kraken, and LMAX Digital ("Constituent Platforms").[37] The Index applies an

---

[25] See USBT Order, 85 FR at 12597.

[26] See Winklevoss Order, 83 FR at 37580, 37582–91 (addressing assertions that "bitcoin and [spot] bitcoin markets" generally, as well as one bitcoin trading platform specifically, have unique resistance to fraud and manipulation). See also USBT Order, 85 FR at 12597.

[27] See USBT Order, 85 FR at 12597, 12599.

[28] See Amendment No. 1, 87 FR at 28051–54, 28059–60.

[29] See infra note 35 and accompanying text.

[30] See Amendment No. 1, 87 FR at 28051–53, 28059–60.

[31] See id. at 28054; 28060.

[32] See id. at 28060.

[33] See supra note 8. See also Amendment No. 1 to Registration Statement on Form 10, dated December 31, 2019, filed with the Commission on behalf of the Trust ("Registration Statement"); Annual Report on Form 10–K for the fiscal year ended December 31, 2021, filed with the Commission on the behalf of the Trust ("2021 10–K").

[34] See Amendment No. 1, 87 FR at 28045. Grayscale Investments, LLC ("Sponsor") is the sponsor of the Trust and is a wholly-owned subsidiary of Digital Currency Group, Inc. Delaware Trust Company ("Trustee") is the trustee of the Trust. The custodian for the Trust is Coinbase Custody Trust Company, LLC ("Custodian"). The administrator of the Trust is BNY Mellon Asset Servicing ("Administrator"). The distribution and marketing agent for the Trust is Genesis. The Trust operates pursuant to a trust agreement ("Trust Agreement") between the Sponsor and the Trustee. See id. at 28044.

[35] See id. at 28049. According to the Exchange, the index provider for the Trust is CoinDesk Indices, Inc., formerly known as TradeBlock, Inc. ("Index Provider"). See id. at 28044. While the Exchange, in the proposal, does not name the Index that the Trust would use to value the bitcoins held by the Trust, the Exchange does provide that the value of the Index, as well as additional information regarding the Index, may be found at: https://tradeblock.com/markets/index/xbx. See id. at 28058. Further, in its letter to the Commission, the Sponsor states that the Trust values its bitcoin holdings based on the CoinDesk Bitcoin Price Index (XBX) (formerly known as the Tradeblock XBX Index). See Letter from Davis Polk & Wardwell LLP, on behalf of the Sponsor, dated Nov. 29, 2021 ("Grayscale Letter I"), at 5.

[36] See Amendment No. 1, 87 FR at 28049.

[37] See id. at 28047, 28049, 28052 n.35. In its proposal, NYSE Arca uses the term "U.S.-

algorithm to the price of bitcoin on the Constituent Platforms calculated on a per second basis over a 24-hour period.[38]

The Trust's assets will consist solely of bitcoins; Incidental Rights; [39] IR Virtual Currency; [40] proceeds from the sale of bitcoins, Incidental Rights, and IR Virtual Currency pending use of such cash for payment of Additional Trust Expenses [41] or distribution to the shareholders; and any rights of the Trust pursuant to any agreements, other than the Trust Agreement, to which the Trust is a party. Each Share represents a proportional interest, based on the total number of Shares outstanding, in each of the Trust's assets as determined in the case of bitcoin by reference to the Index Price, less the Trust's expenses and other liabilities (which include accrued but unpaid fees and expenses).[42]

On each business day at 4:00 p.m., New York time, or as soon thereafter as

practicable, the Sponsor will evaluate the bitcoin held by the Trust and calculate and publish the "Digital Asset Holdings" of the Trust using the Index Price.[43] The Trust's website, as well as one or more major market data vendors, will provide an intra-day indicative value ("IIV") per Share updated every 15 seconds, as calculated by the Exchange or a third party financial data provider during the Exchange's Core Trading Session (9:30 a.m. to 4:00 p.m., E.T.). The IIV will be calculated using the same methodology as the Digital Asset Holdings of the Trust, specifically by using the prior day's closing Digital Asset Holdings per Share as a base and updating that value during the Exchange's Core Trading Session to reflect changes in the value of the Trust's Digital Asset Holdings during the trading day.[44] In addition, according to the Exchange, "each investor will have access to the current Digital Asset Holdings of the Trust through the Trust's website, as well as from one or more major market data vendors." [45]

The Trust will issue Shares to authorized participants from time to time, but only in one or more Baskets (each "Basket" being a block of 100 Shares). The creation of Baskets will be made only in exchange for the delivery to the Trust of the number of whole and fractional bitcoins represented by each Basket being created.[46] The Trust may redeem Shares from time to time, but only in Baskets. The redemption of Baskets requires the distribution by the Trust of the number of bitcoins represented by the Baskets being redeemed. The redemption of a Basket will be made only in exchange for the distribution by the Trust of the number of whole and fractional bitcoins represented by each Basket being redeemed.[47] Creation and redemption orders may be placed either "in-kind" or "in-cash." [48] Although the Trust will create Baskets only upon the receipt of bitcoins, and will redeem Baskets only by distributing bitcoins, an authorized participant may deposit cash with or receive cash from the Administrator, which will facilitate the purchase or sale of bitcoins through a liquidity

provider on behalf of an authorized participant.[49]

According to the Sponsor, shares of the Trust are currently offered to accredited investors within the meaning of Regulation D under the Securities Act, and, once such investors have held their shares for the requisite holding period pursuant to Rule 144 under the Securities Act, they have the ability to resell them through transactions on the OTCQX Best Market ("OTCQX"), an over-the-counter ("OTC") marketplace operated by OTC Markets Group that is not registered with the Commission as a national securities exchange.[50] The Sponsor states that these shares have been quoted on OTCQX since March 2015 and are available to investors through broker transactions.[51] The Sponsor also states that, in the twelve months ended October 31, 2021, trading in these shares accounted for the most transactions by dollar volume of any security traded on OTCQX.[52] The Sponsor further states that the Trust is the largest and most liquid bitcoin investment fund in the world and that the Sponsor is the world's largest digital currency asset manager, with more than $55 billion in assets under management as of October 29, 2021.[53]

## III. Discussion

### A. The Applicable Standard for Review

The Commission must consider whether NYSE Arca's proposal is consistent with the Exchange Act. Section 6(b)(5) of the Exchange Act requires, in relevant part, that the rules of a national securities exchange be designed "to prevent fraudulent and manipulative acts and practices" and "to protect investors and the public interest." [54] Under the Commission's

---

Compliant Exchanges" to describe Constituent Platforms that are "compliant with applicable U.S. federal and state licensing requirements and practices regarding AML and KYC regulations." *Id.* at 28052 n.35. According to NYSE Arca, "[a]ll Constituent [Platforms] are U.S.-Compliant Exchanges." *Id.*

[38] *See id.* at 28049. According to the Exchange, prior to February 1, 2022, the Trust valued its bitcoins for operational purposes by reference to the volume-weighted average Index Price ("Old Index Price"). The Old Index Price was calculated by applying a weighting algorithm to the price and trading volume data for the immediately preceding 24-hour period as of 4:00 p.m., New York time, derived from the Constituent Platforms reflected in the Index on such trade date, and overlaying an averaging mechanism to the price produced. Thus, whereas the Old Index Price reflected the price of a bitcoin at 4:00 p.m., New York time, calculated by taking the average of each price of a bitcoin produced by the Index over the preceding 24-hour period, as of February 1, 2022, the Index Price reflects the price of a bitcoin at 4:00 p.m., New York time, calculated based on the price and trading volume data of the Constituent Platforms over the preceding 24-hour period. According to the Exchange, the Index Price differs from the Old Index Price only in that it does not use an additional averaging mechanism; the Index Price otherwise uses the same methodology as the Old Index Price, and there has been no change to the Index used to determine the Index Price or the criteria used to select the Constituent Platforms. *See id.* at 28053 n.44.

[39] "Incidental Rights" are rights to acquire, or otherwise establish dominion and control over, any virtual currency or other asset or right, which rights are incident to the Trust's ownership of bitcoins and arise without any action of the Trust, or of the Sponsor or Trustee on behalf of the Trust. *See id.* at 28044 n.14.

[40] "IR Virtual Currency" is any virtual currency tokens, or other asset or right, acquired by the Trust through the exercise (subject to the applicable provisions of the Trust Agreement) of any Incidental Right. *See id.* at 28045 n.15.

[41] "Additional Trust Expenses" are any expenses of the Trust in addition to the Sponsor's fee that are not Sponsor-paid expenses. *See id.* at 28045 n.16.

[42] *See id.* at 28045, 28047.

[43] The Exchange does not define the term "Digital Asset Holdings" in the proposed rule change. Additional information about the calculation of the Digital Asset Holdings can be found in Amendment No. 1. *See id.* at 28047. The Trust does not expect to take any Incidental Rights or IR Virtual Currency it may hold into account for purposes of determining the Trust's Digital Asset Holdings. *Id.*

[44] *See id.* at 28058.

[45] *Id.*

[46] *See id.* at 28055.

[47] *See id.* at 28056.

[48] *See id.* at 28056–57.

[49] *See id.* at 28055–57.

[50] *See* Grayscale Letter I, at 2.

[51] *See id.*

[52] *See id.*

[53] *See id.* at 4.

[54] 15 U.S.C. 78f(b)(5). Pursuant to Section 19(b)(2) of the Exchange Act, 15 U.S.C. 78s(b)(2), the Commission must disapprove a proposed rule change filed by a national securities exchange if it does not find that the proposed rule change is consistent with the applicable requirements of the Exchange Act. Exchange Act Section 6(b)(5) states that an exchange shall not be registered as a national securities exchange unless the Commission determines that "[t]he rules of the exchange are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between

Continued

Rules of Practice, the "burden to demonstrate that a proposed rule change is consistent with the Exchange Act and the rules and regulations issued thereunder . . . is on the self-regulatory organization ['SRO'] that proposed the rule change." [55]

The description of a proposed rule change, its purpose and operation, its effect, and a legal analysis of its consistency with applicable requirements must all be sufficiently detailed and specific to support an affirmative Commission finding,[56] and any failure of an SRO to provide this information may result in the Commission not having a sufficient basis to make an affirmative finding that a proposed rule change is consistent with the Exchange Act and the applicable rules and regulations.[57] Moreover, "unquestioning reliance" on an SRO's representations in a proposed rule change is not sufficient to justify Commission approval of a proposed rule change.[58]

*B. Whether NYSE Arca Has Met Its Burden to Demonstrate That the Proposal Is Designed to Prevent Fraudulent and Manipulative Acts and Practices*

(1) Assertions That Other Means Besides Surveillance-Sharing Agreements Will Be Sufficient to Prevent Fraudulent and Manipulative Acts and Practices

(i) Assertions Regarding the Bitcoin Market

As stated above, the Commission has recognized that a listing exchange could demonstrate that other means to prevent fraudulent and manipulative acts and practices are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets, including by demonstrating that the bitcoin market as a whole or the relevant underlying bitcoin market is uniquely and inherently resistant to fraud and manipulation.[59] Such

resistance to fraud and manipulation, however, must be novel and beyond those protections that exist in traditional commodities or securities markets.[60]

(a) Representations Made and Comments Received

NYSE Arca asserts that "the fundamental features of [b]itcoin's fungibility, transportability[,] and exchange tradability offer novel protections beyond those that exist in traditional commodity markets or equity markets when combined with other means." [61]

In addition, some commenters claim that the spot bitcoin market's size and depth of liquidity, as well as the diversity of market participants, limits its susceptibility to manipulation.[62] An affiliate of the Custodian, for example, states that bitcoin's average daily trading volume in 2021 was approximately $45 billion, which, according to this commenter, is significantly higher than that of the largest equity stocks.[63] This commenter also states that the spot bitcoin market is comparably as large and transparent as the silver, palladium, and platinum markets, for which the Commission has

approved spot ETPs.[64] According to this commenter, "[w]hen compared across key market dimensions—trading volume, capitalization, and number of active trading venues—the [b]itcoin spot market is more robust, a sign of lower likelihood of successful market manipulation." [65] Lastly, this commenter states that asset managers, hedge funds, and public companies participate in the bitcoin market and that interest from institutional investors continues to increase.[66]

Some commenters state that active participation by market makers and arbitrageurs across bitcoin-related markets serves to quickly close arbitrage opportunities, including any that may be due to attempted price manipulation.[67] In support of this claim, the affiliate of the Custodian states that it has undertaken empirical research that shows that spot bitcoin prices do not deviate significantly across digital asset platforms.[68] According to this commenter, in a comparison of hour-end prices for bitcoin across the Constituent Platforms, the platforms showed less than 20 basis point deviation 97% of the time over a roughly three-year time horizon.[69] This commenter states that its observations and interpretations are consistent with those expressed previously by the Commission—that a strong convergence

---

[55] Rule 700(b)(3), Commission Rules of Practice, 17 CFR 201.700(b)(3).

[56] *See id.*

[57] *See id.*

[58] *Susquehanna Int'l Group, LLP* v. *Securities and Exchange Commission,* 866 F.3d 442, 447 (D.C. Cir. 2017) ("Susquehanna").

[59] *See* USBT Order, 85 FR at 12597 n.23. The Commission is not applying a "cannot be manipulated" standard. Instead, the Commission is

examining whether the proposal meets the requirements of the Exchange Act and, pursuant to its Rules of Practice, places the burden on the listing exchange to demonstrate the validity of its contentions and to establish that the requirements of the Exchange Act have been met. *See id.*

[60] *See id.* at 12597.

[61] Amendment No. 1, 87 FR at 28051.

[62] *See, e.g.,* Letter from Paul Grewal, Chief Legal Officer, Coinbase, dated Mar. 3, 2022 ("Coinbase Letter II"), at 2 ("the [b]itcoin markets exhibit characteristics and maturity commensurate with some of the deeply traded markets in commodities and U.S. equities. The liquidity and transparency of the [b]itcoin markets limits its susceptibility to manipulation . . . ."); Letter from Cassandra Lentchner, President and Chairman, BitGo Trust Company, Inc., dated Apr. 18, 2022 ("BitGo Letter"), at 2 ("Bitcoin is a widely-traded asset with a market capital of over $750B and trading volumes of tens of billions daily. The sheer size of this widely held market demonstrates the difficulty of manipulation."); Letter from Mike Cammarata, dated Mar. 31, 2022 ("Cammarata Letter") ("the size of the [b]itcoin market (around $1 Trillion USD) has now reached a level where price manipulation concerns are minor as any attempt at manipulation will simply be arbitraged away by the deep pool of robust market participants"); Letter from Kate McAllister and James Toes, Security Traders Association, dated Apr. 20, 2022 ("STA Letter"), at 2 ("the combination of liquid markets for [b]itcoin and the features within the ETF structure mitigate potential price manipulation"); Letter from Michael D. Moffitt, dated Feb. 7, 2022 ("Moffitt Letter I") (stating that "the [b]itcoin as of 2021/2022 are indeed sufficiently liquid and transparent for the purposes of an ETF" and "it is my belief that widespread manipulation is simply not possible in the same way that it might have been several years ago").

[63] *See* Coinbase Letter II, at 3.

[64] *See id.* at 3, 8. *See also, e.g.,* Letter from Douglas Shultz (Feb. 14, 2022) ("Shultz Letter") ("The cryptocurrency market has passed silver in terms of total market capitalization at various times. If silver can't be manipulated at these levels, neither can [b]itcoin.").

[65] Coinbase Letter II, at 3.

[66] *See id.* at 3.

[67] *See, e.g.,* Coinbase Letter II, at 2; Letter from Douglas A. Cifu, Chief Executive Officer, Virtu Financial, Inc., dated Apr. 4, 2022 ("Virtu Letter"), at 3 ("we believe that the active participation by market makers across all of these linked markets—spot, futures, derivatives and ETP—can mitigate the risk of manipulation through competitive liquidity provision, arbitrage and creation/redemption transactions"); Letter from W. Graham Harper, Head of Public Policy and Market Structure, Cumberland, a subsidiary of DRW Trading Group, dated Apr. 1, 2022 ("Cumberland Letter"), at 2 ("[a]ny narrowly scoped attempt to manipulate the spot [b]itcoin market would be quickly counteracted by the collective activity of arbitrageurs and liquidity providers, ultimately facilitating orderly price discovery potentially causing artificial prices to be perpetuated across all [b]itcoin related products, but in any case, forcing the arbitrage relationships to remain intact").

[68] *See* Coinbase Letter II, at 4.

[69] *See id.* According to this commenter, while there were instances where prices across Constituent Platforms experienced higher deviations than 20 bps, the vast majority (*e.g.,* 90% of deviations greater than 1%) were driven by a single platform's pricing with less than 5% of the trading volume. In the remaining instances, price differences quickly closed by intermarket trading, typically within one hour, with the exception of two price deviations that lasted three hours during the onset of the Covid–19 pandemic. *See id.*

customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by this title matters not related to the purposes of this title or the administration of the exchange." 15 U.S.C. 78f(b)(5).

JA 133

of pricing across a broad market is present where spot markets are deep and liquid.[70] This commenter concludes that, given the spot bitcoin market's significant volume and efficiency of intermarket price correction, manipulating the price of the Shares by manipulating the spot bitcoin market would require a prohibitively large trading volume and coordination across several large trading platforms, and that activity on this scale would be readily detected via surveillance.[71]

A number of commenters, however, take the opposite view, arguing, among other things, that the price of bitcoin is subject to manipulation on the unregulated platforms, and approval of the proposal would invite additional manipulation.[72]

**(b) Analysis**

As with the previous proposals, the Commission here concludes that information in the record regarding the bitcoin market does not support a finding that the Exchange has established other means to prevent fraudulent and manipulative acts and practices sufficient to justify dispensing with the detection and deterrence of fraud and manipulation that is provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. Likewise, the record does not support a finding that the Exchange has demonstrated that the bitcoin market as a whole or the relevant underlying bitcoin market is uniquely and inherently resistant to fraud and manipulation.

The Commission has identified in previous orders possible sources of fraud and manipulation in the spot bitcoin market, including: (1) "wash" trading;[73] (2) persons with a dominant position in bitcoin manipulating bitcoin pricing; (3) hacking of the bitcoin network and trading platforms; (4) malicious control of the bitcoin network; (5) trading based on material, non-public information (for example, plans of market participants to significantly increase or decrease their holdings in bitcoin, new sources of demand for bitcoin, or the decision of a bitcoin-based investment vehicle on how to respond to a "fork" in the bitcoin blockchain, which would create two different, non-interchangeable types of bitcoin) or based on the dissemination of false and misleading information; (6) manipulative activity involving purported "stablecoins," including Tether (USDT); and (7) fraud and manipulation at bitcoin trading platforms.[74]

NYSE Arca concedes that neither bitcoin itself nor the global bitcoin markets are inherently resistant to fraud or manipulation.[75] NYSE Arca acknowledges in its proposal that "fraud and manipulation may exist and that [b]itcoin trading on any given exchange may be no more uniquely resistant to fraud and manipulation than other commodity markets."[76] NYSE Arca also states that "[b]itcoin is not itself inherently resistant to fraud and manipulation"[77] and concedes that "the global exchange market for the trading of [b]itcoins"—which NYSE Arca says consists of transactions on the "electronic marketplace where exchange participants may trade, buy and sell [b]itcoins based on bid-ask trading"—also "is not inherently resistant to fraud and manipulation."[78]

Moreover, the Trust's Registration Statement acknowledges that "[d]ue to the unregulated nature and lack of transparency surrounding the operations of [bitcoin trading platforms], they may experience fraud, security failures or operational problems, which may adversely affect the value of [b]itcoin and, consequently, the value of the Shares"; that the bitcoin network is currently vulnerable to a "51% attack," in which a bad actor or botnet that controls a majority of the processing power dedicated to mining on the bitcoin network may be able to gain full control of the network and the ability to manipulate the bitcoin blockchain; that "in 2019 there were reports claiming that 80–95% of [b]itcoin trading volume on [bitcoin platforms] was false or non-economic in nature"; and that "[o]ver the past several years, some [bitcoin trading platforms] have been closed due to fraud and manipulative activity, business failure or security breaches."[79]

NYSE Arca asserts that bitcoin's fungibility, transportability, and exchange tradability, "when combined with other means," offer novel protections beyond those that exist in traditional commodity markets or equity markets.[80] The Exchange, however, does not explain how bitcoin is fungible, transportable, or tradable; or how bitcoin's fungibility, transportability, and tradability offer novel protections or help to detect and deter potential fraud and manipulation. As stated above, "unquestioning reliance" on an SRO's representations in a proposed rule change is not sufficient to justify the

---

[70] *See id.* (citing to Securities Exchange Act Release No. 50603 (Oct. 28, 2004), 69 FR 64614 (Nov. 5, 2004) (SR–NYSE–2004–22) (Order Granting Approval of Proposed Rule Change by the New York Stock Exchange, Inc. Regarding Listing and Trading of streetTRACKS® Gold Shares).

[71] *See id.* at 4–5.

[72] *See, e.g.,* Letters from David Rosenthal (Apr. 20, 2022); David Golumbia (Apr. 18, 2022); Elliot Kleinfelder (Apr. 19, 2022) ("Kleinfelder Letter"); Scott S. (Feb. 20, 2022); John Carvalho (Feb. 22, 2022); JRL Innovations (Feb. 14, 2022); Anonymous (Feb. 17, 2022); Adan (Feb. 8, 2022). Some commenters that support approval of the proposal nevertheless state that the spot bitcoin market is subject to manipulation. *See, e.g.,* Letter from Noah Dreyfuss, CIO, Dreyfuss Capital Management, dated Feb. 21, 2022 ("Dreyfuss Letter"), at 1 ("Frankly, one would find great difficulty in claiming that the spot [b]itcoin market is free of manipulation."); Letter from Jonas M. Grant (Feb. 6, 2022) ("the [b]itcoin market is no doubt susceptible to some manipulation.").

[73] *See also CFTC v. Gemini Trust Co., LLC,* No. 22–cv–4563 (S.D.N.Y. filed June 2, 2022) (alleging, among other things, failure by Gemini personnel to disclose to the CFTC that Gemini customers could and did engage in collusive or wash trading).

[74] *See* USBT Order, 85 FR at 12600–01 & nn.66–67 (discussing J. Griffin & A. Shams, *Is Bitcoin Really Untethered?* (Oct. 28, 2019), *available at https://ssrn.com/abstract=3195066* and published in 75 J. Finance 1913 (2020)); Winklevoss Order, 83 FR at 37585–86; WisdomTree Order, 86 FR at 69326; Global X Order, 87 FR at 14916; ARK 21Shares Order, 87 FR at 20019; One River Order, 87 FR at 33554.

[75] *See* Amendment No. 1, 87 FR at 28050–51 (where the Exchange states that "[t]he Commission has expressed legitimate concerns about the underlying [spot bitcoin market] due to the potential for fraud and manipulation" and discusses previous Commission orders finding "evidence of potential and actual fraud and manipulation in the historical trading of [b]itcoin on certain marketplaces such as (1) 'wash' trading, (2) trading based on material, non-public information, including the dissemination of false and misleading information, (3) manipulative activity involving Tether, and (4) fraud and manipulation"). *See also id.* at 28049 (where the Exchange asserts that the proposal's use of the Index mitigates the effects of wash trading and order book spoofing).

[76] *Id.* at 28051.

[77] *Id.* at 28054.

[78] *Id.* at 28059 (the "Digital Asset Exchange Market is not inherently resistant to fraud and manipulation"). In its filing, the Exchange uses the term "Digital Asset Exchange Market" as "the global exchange market for the trading of [b]itcoins, which consists of transactions on electronic Digital Asset Exchanges." A "Digital Asset Exchange" is defined by NYSE Arca as "an electronic marketplace where exchange participants may trade, buy and sell [b]itcoins based on bid-ask trading." *Id.* at 28045 n.18.

[79] *See* Exhibit 99.1 of the Registration Statement, at 13–14, 17–18. *See also* 2021 10–K, at 13, 50; *Are Blockchains Decentralized? Unintended Centralities in Distributed Ledgers,* prepared by Trail of Bits based upon work supported by the Defense Advanced Research Projects Agency, June 2022, *available at: https://assets-global.website-files.com/5fd11235b3950c2c1a3b6df4/62af6c641a672b3329b9a480_Unintended_Centralities_in_Distributed_Ledgers.pdf.*

[80] *See* Amendment No. 1, 87 FR at 28051. The Exchange does not explicitly tie the asserted novel aspects of bitcoin to an argument that such market provides sufficient means besides surveillance-sharing agreements to prevent fraud and manipulation.

Commission's approval of a proposed rule change.[81]

Further, contrary to the Exchange's assertion, fungibility, transportability, and tradability are not a novel protection beyond those that exist in traditional commodity or equity markets. Fungible, "transportable," exchange-traded assets, such as securities and exchange-traded derivatives, trade subject to substantial regulatory oversight and surveillance-sharing agreements that would be unnecessary if fungibility, transportability, and tradability were sufficient protection against fraud and manipulation. Moreover, manipulation of asset prices can occur through trading activity, including activity that creates a false impression of supply and demand.[82] Therefore, the Exchange's assertions about fungibility, transportability, and tradability do not inform the Commission's view with respect to the necessity that a listing exchange have the abilities to detect and deter fraud and manipulation that are provided by entering into a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.[83]

Likewise, the Commission is not persuaded by commenters' assertions that the bitcoin market's size, liquidity, market participation, or arbitrage, either individually or together, sufficiently address concerns regarding fraud and manipulation.[84] Although commenters recite various metrics, including market capitalization and average daily trading volume, or make observations concerning the growth of the bitcoin market, including increasing institutional participation, they offer no evidence or analysis of how these metrics or observations serve to detect and deter potential fraud and manipulation. Further, even if the record demonstrates that the bitcoin market's size, liquidity, market participation, or arbitrage makes manipulation more difficult or costly, as the Commission has stated in prior

orders with respect to similar arguments, these attributes speak to providing some resistance to manipulation, rather than establishing a *unique* resistance to manipulation that would justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.[85]

Moreover, commenters do not explain how the bitcoin market's diversity of market participants, widely held nature, or increase in institutional participation help mitigate concerns about fraud and manipulation such that a surveillance-sharing agreement is unnecessary. In addition, commenters' assertions about the diverse, broad, and institutional nature of bitcoin's investor base do not provide any information on the concentration of bitcoin ownership within or among market participants, or take into account that a market participant with a dominant ownership position may not find it prohibitively expensive to overcome the liquidity supplied by arbitrageurs and could use dominant market share to engage in manipulation.[86] Indeed, the Sponsor's own statements cast doubt on assertions that the bitcoin market's attributes sufficiently address concerns about fraud and manipulation. According to the Sponsor, "[a]s of December 31, 2021, the largest 100 [b]itcoin wallets held approximately 15% of the [b]itcoins in circulation. Moreover, it is possible that other persons or entities control multiple wallets that collectively hold a significant number of [b]itcoins, even if they individually only hold a small amount, and it is possible that some of these wallets are controlled by the same person or entity. As a result of this concentration of ownership, large sales or distributions by such holders could have an adverse effect on the market price of [b]itcoin." [87]

The Custodian affiliate's comparison of the spot bitcoin market to the silver, palladium, and platinum markets also does not support the finding that other means to prevent fraudulent and manipulative acts and practices are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a

comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. As discussed above,[88] for the commodity-trust ETPs approved to date for listing and trading, including where the underlying commodity is silver, palladium, or platinum, there has been in *every* case at least one significant, regulated market for trading futures on the underlying commodity, and the ETP listing exchange has entered into surveillance-sharing agreements with, or held ISG membership in common with, that market.

The Commission is also not persuaded by commenters' assertion that efficiency of intermarket price correction in the spot bitcoin markets would make manipulating the spot market prohibitively expensive and readily detectable. The affiliate of the Custodian provides various statistics which purport to show that bitcoin prices are closely and increasingly aligned across markets and that any price disparities are quickly arbitraged away. However, such statistics are based on hour-end bitcoin prices and do not capture intra-hour price disparities or provide intra-hour information on how long price disparities persist. Nor do this commenter's statistics or its assertions provide any insight into what size or duration of price disparities would be needed for a would-be manipulator to have an opportunity to make a profit.[89]

In any event, as the Commission has explained, efficient price arbitrage is not sufficient to support the finding that a market is uniquely or inherently resistant to manipulation such that the Commission can dispense with surveillance-sharing agreements.[90] The Commission has stated, for example,

---

[81] *See supra* note 58.

[82] *See* Winklevoss Order, 83 FR at 37585.

[83] Further, transportation and storage costs for bitcoin are not zero, as bitcoin mining and recording transactions to the blockchain have costs. Bitcoin mining involves significant costs for electrical power and computer hardware. Moreover, bitcoin trading is subject to transaction fees charged by trading platforms, withdrawal fees, expenses for custody arrangements, and other factors that impose frictions on trading.

[84] Although a commenter claims that "transparency" of the bitcoin market assists arbitrage and limits bitcoin's susceptibility to manipulation, the commenter does not explain what is meant by "transparency," how the bitcoin markets are transparent, or why such transparency limits manipulation. *See* Coinbase Letter II, at 2–4.

[85] *See* USBT Order, 85 FR at 12601; Kryptoin Order, 86 FR at 74171; Global X Order, 87 FR at 14916; Wise Origin Order, 87 FR at 5531.

[86] *See, e.g.,* Winklevoss Order, 83 FR at 37584; USBT Order, 85 FR at 12600–01; WisdomTree Order, 86 FR at 69325; Valkyrie Order, 86 FR at 74160; Kryptoin Order, 86 FR at 74170; SkyBridge Order, 87 FR at 3783–84; Wise Origin Order, 87 FR at 5531; ARK 21Shares Order, 87 FR at 20019.

[87] 2021 10–K, at 46.

[88] *See supra* note 23 and accompanying text.

[89] *See* Coinbase Letter II, at 4–5. In addition, the Registration Statement states: "As corresponding increases in throughput lag behind growth in the use of digital asset networks, average fees and settlement times may increase considerably. For example, the Bitcoin Network has been, at times, at capacity, which has led to increased transaction fees . . . . Increased fees and decreased settlement speeds could . . . adversely impact the value of the Shares." Exhibit 99.1 of the Registration Statement, at 13. *See also* 2021 10–K, at 46. The affiliate of the Custodian does not provide data or analysis to address, among other things, whether such risks of increased fees and bitcoin transaction settlement times may affect whether arbitrage is as effective as the commenter asserts. And without such data or analysis, the Commission cannot agree with this commenter's assertions. *See* Susquehanna, 866 F.3d at 447. *See also* ARK 21Shares Order, 87 FR at 20019 n.68.

[90] *See* Winklevoss Order, 83 FR at 37586; SolidX Order, 82 FR at 16256–57; USBT Order, 85 FR at 12601; WisdomTree Order, 86 FR at 69325; Valkyrie Order, 86 FR at 74159–60; Kryptoin Order, 86 FR at 74170; Wise Origin Order, 87 FR at 5531; ARK 21Shares Order, 87 FR at 20019.

that even for equity options based on securities listed on national securities exchanges, the Commission relies on surveillance-sharing agreements to detect and deter fraud and manipulation.[91] Equities that underlie such options trade on U.S. equity markets that are deep, liquid, highly interconnected, and almost entirely automated and operate at high speeds measured in microseconds and even nanoseconds.[92] Here, the affiliate of the Custodian and other commenters provide insufficient evidence to support their assertion of efficient price arbitrage across bitcoin-related platforms, let alone any evidence that price arbitrage in the bitcoin market is novel and beyond those protections that exist in traditional commodity markets or securities markets so as to warrant the Commission dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.

Additionally, even assuming that efficiency of intermarket price correction in the spot bitcoin markets results in bitcoin prices increasingly aligned across markets, such alignment is not sufficient to support the finding that a market is uniquely or inherently resistant to manipulation such that the Commission can dispense with surveillance-sharing agreements.[93] As stated above, as a general matter, the manipulation of asset prices can occur simply through trading activity that creates a false impression of supply and demand, notwithstanding the presence of linkages among markets, whether these linkages be formal (such as those with consolidated quotations or routing requirements) or informal (such as in the context of the global bitcoin markets).[94]

(ii) Assertions Regarding the Index

(a) Representations Made and Comments Received

NYSE Arca asserts that the Index used by the Trust to determine the value of its bitcoin assets "represents an effective alternative means to prevent fraud and manipulation[,] and the Trust's reliance on the Index addresses the Commission's concerns with respect to potential fraud and manipulation." [95] It states that the Trust "has used the Index to price the Shares for more than six years, and the Index has proven its ability to (i) mitigate the effects of fraud, manipulation and other anomalous trading activity from impacting the [b]itcoin reference rate, (ii) provide a real-time, volume-weighted fair value of bitcoin and (iii) appropriately handle and adjust[ ] for non-market related events, such that efforts to manipulate the price of [b]itcoin would have had a negligible effect on the pricing of the Trust, due to the controls embedded in the structure of the Index." [96]

First, NYSE Arca argues that the Index's use of Constituent Platforms that are compliant with applicable U.S. federal and state licensing requirements and practices regarding anti-money laundering ("AML") and know-your-customer ("KYC") regulations reduces the risk of fraud, manipulation, and other anomalous trading activity from impacting the Index. NYSE Arca also states that Constituent Platforms are considered to be Money Services Businesses ("MSBs") and thus subject to certain requirements such as reporting suspicious activities to the U.S. Department of the Treasury's FinCEN division, having customer identification

through KYC procedures, and establishing a formal AML policy.[97] In addition, the Constituent Platforms that are regulated by the New York State Department of Financial Services ("NYSDFS") under the BitLicense program have regulatory requirements (1) to implement measures designed to effectively detect, prevent, and respond to fraud, attempted fraud, market manipulation, and similar wrongdoing; and (2) to monitor, control, investigate, and report back to the NYSDFS regarding any wrongdoing.[98] And according to NYSE Arca, the other non-NYSDFS regulated Constituent Platforms have voluntarily implemented measures to protect against common forms of market manipulation.[99] Moreover, according to NYSE Arca, the Commodity Futures Trading Commission ("CFTC") has the authority to police fraud and manipulation on Constituent Platforms.[100] In addition, certain of the Index's Constituent Platforms "have or have begun to implement market surveillance infrastructure to further detect, prevent, and respond to fraud, attempted fraud, and similar wrongdoing, including market manipulation." [101]

[91] *See, e.g.,* USBT Order, 85 FR at 12601; WisdomTree Order, 86 FR at 69329; Valkyrie Order, 86 FR at 74160; Kryptoin Order, 86 FR at 74170; Wise Origin Order, 87 FR at 5531; ARK 21Shares Order, 87 FR at 20019.

[92] *See* SEC Staff Report on Algorithmic Trading in U.S. Capital Markets (Aug. 5, 2020), *available at: https://www.sec.gov/files/Algo_Trading_Report_2020.pdf;* Market Data Infrastructure Proposing Release, Securities Exchange Act Release No. 88216 (Feb. 14, 2020), 85 FR 16726, 16728 (Mar. 24, 2020). *See also* ARK 21Shares Order, 87 FR at 20019 n.70.

[93] *See* WisdomTree Order, 86 FR at 69325–26; Kryptoin Order, 86 FR at 74170; SkyBridge Order, 87 FR at 3783–84; Wise Origin Order, 87 FR at 5531; ARK 21Shares Order, 87 FR at 20019.

[94] *See* Winklevoss Order, 83 FR at 37585; ARK 21Shares Order, 87 FR at 20019.

[95] Amendment No. 1, 87 FR at 28053. A commenter also states that the "Index is designed to (i) mitigate the effects of fraud, manipulation and other anomalous trading activity from impacting the bitcoin reference rate, (ii) provide a real-time, volume-weighted fair value of bitcoin and (iii) appropriately handle and adjust for non-market related events." Letter from Campbell R. Harvey, Professor of Finance, Duke University, dated Mar. 26, 2022 ("Harvey Letter"), at 3. Another commenter agrees with the Exchange that "[h]aving the Index Price determined through a process in which trade data is cleansed and compiled will sufficiently mitigate the impact of manipulation." Letter from Robert Citrone, Founder, Discovery Capital Management, dated Feb. 23, 2022 ("Discovery Letter"), at 1. *See also, e.g.,* Moffitt Letter I ("the structure of this Index is robust enough to protect investors").

[96] Amendment No. 1, 87 FR at 28059. *See also id.* at 28053 ("Since November 1, 2014, the Trust has consistently priced its Shares at 4:00 p.m., E.T. based on the Index Price. . . . While that pricing would be known to the market, the Sponsor believes that, even if efforts to manipulate the price of [b]itcoin at 4:00 p.m., E.T. were successful on any exchange, such activity would have had a negligible effect on the pricing of the Trust, due to the controls embedded in the structure of the Index.").

[97] *See id.* at 28052.

[98] *See id.* The Exchange also states that these platforms have the following obligations: submission of audited financial statements; compliance with NYSDFS's capitalization requirements; prohibitions against the "sale or encumbrance to protect the full reserves of custodian assets"; fingerprints and photographs of employees with access to customer funds; retention of a qualified Chief Information Security Officer and annual penetration testing/audits; documented business continuity and disaster recovery plan; and participation in an independent exam by NYSDFS. *See id.*

[99] *See id.* The Exchange states that, as of the date of the filing, two of the four Constituent Platforms (Bitstamp and Coinbase Pro) are regulated by NYSDFS. *See id.* at 28052 n.39.

[100] *See id.* at 28052. A commenter states that the CFTC has exercised its anti-manipulation and anti-fraud enforcement authority over spot bitcoin markets since 2014, which is three years longer than the CFTC has overseen bitcoin futures markets. *See* Letter from Kristin Smith, Executive Director, and Jake Chervinsky, Head of Policy, Blockchain Association, dated Nov. 29, 2021 ("Blockchain Association Letter"), at 3. Another commenter states that the Commission should rely on the CFTC to exercise its fraud authority to ensure the underlying bitcoin market is free of manipulation. *See* Letter from Michelle Bond, Chief Executive Officer, Association for Digital Asset Markets, dated Apr. 19, 2022 ("ADAM Letter"), at 6.

[101] Amendment No. 1, 87 FR at 28059–60. The affiliate of the Custodian that operates one of the Constituent Platforms states in a comment letter that it applies surveillance and monitoring measures for its spot digital asset trading platform that are designed to identify and address potential manipulative or fraudulent trading activity, and that it believes that the other Constituent Platforms also employ measures to counter potential fraudulent or manipulative trading. *See* Coinbase Letter II, at 5. This commenter states that, in
Continued

JA 136

Second, NYSE Arca asserts that other aspects of the methodology employed in constructing the Index mitigate the impact of fraud, manipulation, and other anomalous trading activity.[102] The Exchange states that the Index is calculated once every second according to a systematic methodology that relies on observed trading activity on the Constituent Platforms. The key elements of this proprietary methodology are as follows: (i) *volume weighting*—Constituent Platforms with greater liquidity receive a higher weighting in the Index; (ii) *price variance weighting*—the Index reflects data points that are weighted in proportion to their variance from the rest of the Constituent Platforms (*i.e.,* as the price at a particular platform diverges from the prices at the rest of the Constituent Platforms, its weight in the Index Price decreases.); (iii) *inactivity adjustment*—the Index algorithm penalizes stale activity from any given Constituent Platform; and (iv) *manipulation resistance*—the Index only includes executed trades in its calculation in order to mitigate the effects of wash trade and spoofing, and only includes Constituent Platforms that charge trading fees to its users in order to attach a real, quantifiable cost to any manipulation attempts.[103] In addition, the Exchange states that, by referencing multiple trading venues and weighting them based on trade activity, the Index mitigates the impact of any potential fraud, manipulation, or anomalous trading activity occurring on any single

venue.[104] In other words, the effects of fraud, manipulation, or anomalous trading activity occurring on any single venue are de-weighted and consequently diluted by non-anomalous trading activity of other Constituent Platforms.[105]

Third, NYSE Arca asserts that the Index is constructed and maintained by an expert third-party index provider, which would allow for prudent handling of non-market-related events.[106] The Exchange states that in the event that a manual intervention with respect to the Index calculation is necessary in response to "non-market-related events" (*e.g.,* halting of deposits or withdrawals of funds, unannounced closure of platform operations, insolvency, compromise of user funds, etc.), the Index Provider would issue a public announcement.[107] NYSE Arca also asserts that the Index Provider reviews and periodically updates which bitcoin platforms are included in the Index by utilizing a methodology that is guided by the IOSCO principles for financial benchmarks.[108]

**(b) Analysis**

Based on the assertions made and the information provided with respect to the Index, the record is inadequate to conclude that NYSE Arca has articulated other means to prevent fraud and manipulation that are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.

First, NYSE Arca argues that the Index's exclusive use of prices from particular spot bitcoin trading platforms (the Constituent Platforms), which are subject to FinCEN's AML/KYC regulations, as well as NYSDFS's BitLicense program for two Constituent Platforms, helps to reduce the impact of fraud and manipulation on the Index Price. The Exchange acknowledges, however, that it "does not believe the inclusion" of these platforms is "in and

of itself sufficient to prove that the Index is an alternative means to prevent fraud and manipulation such that surveillance sharing agreements are not required" but rather that including only such platforms "in the Index is one significant way in which the Index is protected from the potential impacts of fraud and manipulation." [109]

The Commission does not agree that the inclusion of only certain Constituent Platforms as described provides a significant protection against fraud and manipulation. Any oversight afforded by FinCEN and NYSDFS, including AML/KYC or BitLicense regulation, is not a substitute for a surveillance-sharing agreement between the Exchange and a *regulated* market of significant size related to the underlying bitcoin assets. AML and KYC regulation, for example, do not substitute for the sharing of information about market trading activity or clearing activity that a surveillance-sharing agreement would afford. And although some of the Constituent Platforms may be registered with FinCEN or NYSDFS, these spot bitcoin trading platforms are not comparable to a national securities exchange or futures exchange.[110] As the Commission has explained, there are substantial differences between NYSDFS and FinCEN regulation and the Commission's regulation of national securities exchanges.[111] The Commission's market oversight of national securities exchanges includes substantial requirements, including the requirement to have rules that are "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." [112] Moreover, national securities exchanges must file proposed

addition to its surveillance program, it employs measures similar to circuit breakers and trading limits used in traditional financial markets and participates in industry initiatives meant to facilitate cross-platform surveillance and bolster the integrity and efficiency of digital asset markets. *See id.* at 6.

[102] *See* Amendment No. 1, 87 FR at 28052–53; 28059. A commenter states that the Index Provider has published empirical evidence identifying a number of cases in which the Index methodology has successfully shielded the Index from anomalistic or manipulative pricing. *See* Harvey Letter, at 4 (citing to *https://tradeblock.com/blog/analysis-of-bitfinex-anomalies-and-xbx-performance; https://tradeblock.com/blog/bitfinex-flash-crash-analysis; https://tradeblock.com/blog/xbx-update-adding-okcoin-removing-btc-e-and-btcchina; https://tradeblock.com/blog/xbx-update-adding-coinbase-removing-kraken; https://tradeblock.com/blog/xbx-index-update-removing-okcoin; https://tradeblock.com/blog/updates-to-tradeblocks-ecx-and-xbx-indices-2; https://tradeblock.com/blog/bitfinex-bitcoin-premium-reaches-widest-level-in-two-years; https://tradeblock.com/blog/bitcoin-futures-flash-crash-occurs-as-exchanges-show-irregular-trading-activity, https://tradeblock.com/blog/updates-to-all-tradeblock-indices*). This commenter also states that "this is the highest quality benchmark being used in a bitcoin ETP proposal and one that can substantially mitigate price manipulation to ensure a fair, orderly, and efficient market." *Id.*

[103] *See* Amendment No. 1, 87 FR at 28052–53.

[104] *See id.* at 28053. A commenter states that the Trust has "created a robust approach to managing the risk of manipulation by relying on an index of [b]itcoin prices from various exchanges" and that the Index's "use of a 24-hour VWAP should make any attempt at manipulation prohibitively expensive." Letter from Peter L. Briger, Jr., Chief Executive Officer, Fortress Investment Group LLC, dated Apr. 25, 2022 ("Fortress Letter"), at 2–3. The Exchange states that the Index no longer utilizes a 24-hour VWAP in its methodology. *See supra* note 38.

[105] *See* Amendment No. 1, 87 FR at 28053.

[106] *See id.* at 28053, 28059.

[107] *See id.* at 28053.

[108] *See id.*

[109] *Id.* at 28052.

[110] *See* USBT Order, 85 FR at 12603–05 and n.101; VanEck Order, 86 FR at 64545 and n.89; WisdomTree Order, 86 FR at 69328 and n.95; Kryptoin Order, 86 FR at 74173 and n.98; ARK 21Shares Order, 87 FR at 20021–22 and n.107.

[111] FinCEN and NYSDFS regulation have been referenced in other bitcoin-based ETP proposals as a purportedly alternative means by which such ETPs would be uniquely resistant to manipulation. *See* USBT Order, 85 FR at 12603 n.101 and accompanying text. *See also, e.g.,* WisdomTree Order, 86 FR at 69328 n.95; Kryptoin Order, 86 FR at 74173 n.98; ARK 21Shares Order, 87 FR at 20022 n.107.

[112] 15 U.S.C. 78f(b)(5).

rules with the Commission regarding certain material aspects of their operations,[113] and the Commission has the authority to disapprove any such rule that is not consistent with the requirements of the Exchange Act.[114] Thus, national securities exchanges are subject to Commission oversight of, among other things, their governance, membership qualifications, trading rules, disciplinary procedures, recordkeeping, and fees.[115] The Constituent Platforms have none of these requirements—none are registered as a national securities exchange. In addition, NYSDFS's BitLicense program is "guidance" that is "not intended to limit the scope or applicability of any law or regulation," including the Exchange Act.[116]

Further, neither the Constituent Platforms' voluntary adherence to the BitLicense program, nor the Custodian affiliate's adoption of various surveillance, monitoring, and other measures to address potential manipulative or fraudulent trading activity on its trading platform, is material to the Commission's analysis. The Exchange provides no supporting evidence to substantiate its claims that the Constituent Platforms have voluntarily implemented measures to protect against common forms of market manipulation and that some of the Constituent Platforms have begun to implement market surveillance infrastructure to further detect, prevent, and respond to fraud, attempted fraud, and similar wrongdoing. Moreover, even taken at face value, these measures, unlike the Exchange Act's requirements for national securities exchanges,[117] are

entirely voluntary and therefore have no binding force. The Constituent Platforms, including the platform operated by an affiliate of the Custodian, could change or cease to administer such measures at any time.

NYSE Arca's assertions regarding the CFTC's authority with respect to the Constituent Platforms and the underlying bitcoin market also do not establish a level of oversight sufficient to dispense with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.[118] While the Commission recognizes that the CFTC maintains some jurisdiction over the spot bitcoin market, under the Commodity Exchange Act, the CFTC does not have regulatory authority over spot bitcoin trading platforms, including the Constituent Platforms.[119] Except in certain limited circumstances, spot bitcoin trading platforms are not required to register with the CFTC,[120] and the CFTC does not set standards for, approve the rules of, examine, or otherwise regulate spot bitcoin markets.[121] As the CFTC itself stated, while the CFTC "has an important role to play," U.S. law "does not provide for direct, comprehensive Federal oversight of underlying Bitcoin or virtual currency spot markets." [122]

Second, the record does not demonstrate that the proposed methodology for calculating the Index would make the proposed ETP resistant to fraud or manipulation such that the ability to detect and deter fraud that is provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin is unnecessary. Specifically, NYSE Arca has not assessed the possible influence that spot platforms not included among the Constituent Platforms would have on bitcoin prices used to calculate the Index Price. As discussed above, NYSE Arca does not contest the presence of possible sources of fraud and manipulation in the spot bitcoin market generally.[123] Instead, NYSE Arca focuses its analysis on the attributes of the Constituent Platforms, as well as the Index methodology that calibrates the pricing input generated by the Constituent Platforms (such as volume and price-variance weighting and inactivity adjustment). What the Exchange ignores, however, is that to the extent that trading on spot bitcoin platforms not directly used to calculate the Index Price affects prices on the Constituent Platforms, the activities on those other platforms—where various kinds of fraud and manipulation from a variety of sources may be present and persist—may affect whether the Index is resistant to manipulation. Importantly, the record does not demonstrate that these possible sources of fraud and manipulation in the broader spot bitcoin market do not affect the Constituent Platforms that represent a slice of the spot bitcoin market. To the extent that fraudulent and manipulative trading on the broader bitcoin market could influence prices or trading activity on the Constituent Platforms, the Constituent Platforms (and thus the Index) would not be inherently resistant to manipulation.[124]

[113] 17 CFR 240.19b–4(a)(6)(i).

[114] Section 6 of the Exchange Act, 15 U.S.C. 78f, requires national securities exchanges to register with the Commission and requires an exchange's registration to be approved by the Commission, and Section 19(b) of the Exchange Act, 15 U.S.C. 78s(b), requires national securities exchanges to file proposed rule changes with the Commission and provides the Commission with the authority to disapprove proposed rule changes that are not consistent with the Exchange Act. Designated contract markets ("DCMs") (commonly called "futures markets") registered with and regulated by the CFTC must comply with, among other things, a similarly comprehensive range of regulatory principles and must file rule changes with the CFTC. *See, e.g.,* Designated Contract Markets (DCMs), CFTC, *available at http://www.cftc.gov/IndustryOversight/TradingOrganizations/DCMs/index.htm.*

[115] *See* Winklevoss Order, 83 FR at 37597.

[116] Maria T. Vullo, Superintendent of Financial Services, NYSDFS, *Guidance on Prevention of Market Manipulation and Other Wrongful Activity* (Feb. 7, 2018), *available at https://www.dfs.ny.gov/system/files/documents/2020/03/il180207.pdf. See also, e.g.,* WisdomTree Order, 86 FR at 69328 n.95; Kryptoin Order, 86 FR at 74173 n.98; ARK 21Shares Order, 87 FR at 20022 n.107.

[117] *See* 15 U.S.C. 78e, 78f.

[118] *See* Valkyrie Order, 86 FR at 74162.

[119] *See* USBT Order, 85 FR at 12604.

[120] *See* Winklevoss Order, 83 FR at 37599 ("Spot bitcoin markets are not required to register with the CFTC, unless they offer leveraged, margined, or financed trading to retail customers."). *See* Commodity Exchange Act Sections 2(c)(2)(D), 7 U.S.C. 2(c)(2)(D), and 2(c)(2)(A)(i), 7 U.S.C. 2(c)(2)(A)(i) (defining CFTC jurisdiction to specifically cover contracts of sale of a commodity for future delivery (or options on such contracts), or an option on a commodity (other than foreign currency or a security or a group or index of securities), that is executed or traded on an organized exchange). *See also* Winklevoss Order, 83 FR at 37599 n.286.

[121] *See* USBT Order, 85 FR at 12604; SolidX Order, 82 FR at 16256 (concluding that there is nothing in the record to indicate that there is currently a regulatory framework in the United States for detecting and deterring manipulation in the spot bitcoin markets and that "[a]lthough the CFTC can bring enforcement actions against manipulative conduct in spot markets for a commodity, spot markets are not required to register with the CFTC unless they offer leveraged, margined, or financed trading to retail customers. . . . In all other cases, the CFTC does not set standards for, approve the rules of, examine, or otherwise regulate bitcoin spot markets.").

[122] Winklevoss Order, 83 FR at 37599 (quoting CFTC Backgrounder on Oversight of and Approach to Virtual Currency Futures Markets (Jan. 4, 2018), at 1, *available at: http://www.cftc.gov/idc/groups/public/@newsroom/documents/file/backgrounder_virtualcurrency01.pdf*). *See also* Testimony of Rostin Behnam, Chair, CFTC, Before the Senate Committee on Agriculture, Nutrition, and Forestry (Feb. 9, 2022), *available at: https://*

*www.agriculture.senate.gov/imo/media/doc/Testimony_Behnam_020920225.pdf* ("[W]hile the crystallization of our enforcement authority through judicial interpretation has proven an effective means of uncovering and addressing some of the regulatory gaps presented by innovation and evolution in the financial markets with respect to digital and related assets, it cannot be viewed as a viable substitute for a functional regulatory oversight regime for the cash digital asset market. . . . In fact, there is no one regulator, either state or federal, with sufficient visibility into digital asset commodity trading activity to fully police conflicts of interest and deceptive trading practices impacting retail customers.").

[123] *See supra* notes 75–78 and accompanying text.

[124] *See* USBT Order, 85 FR at 12601; WisdomTree Order, 86 FR at 69327; Kryptoin Order, 86 FR at 74172; Valkyrie Order, 86 FR at 74161; SkyBridge Order, 87 FR at 3873.

In addition, while NYSE Arca asserts that aspects of the Index methodology mitigate the impact of fraud and manipulation on the Shares, the Commission can find no basis to conclude that the Index methodology constitutes a novel means beyond the protections utilized by traditional commodity or securities markets to prevent fraud and manipulation that is sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. For example, while the Index methodology uses an algorithm to discount prices that deviate from the average (*i.e.,* price variance weighting), this automatic discounting could attenuate, but would not eliminate, the effect of manipulative activity on one of the Constituent Platforms—just as it could attenuate, but would not eliminate, the effect of bona fide liquidity demand on one of those platforms.[125]

Moreover, NYSE Arca's assertions that the Trust's use of the Index helps make the Shares resistant to manipulation conflict with the Registration Statement. Specifically, the Registration Statement represents, among other things, that the market price of bitcoin may be subject to "[m]anipulative trading activity on bitcoin [trading platforms], which are largely unregulated," and that, "[d]ue to the unregulated nature and lack of transparency surrounding the operations of bitcoin [trading platforms], they may experience fraud, security failures or operational problems, which may adversely affect the value of [b]itcoin and, consequently, the value of the Shares." [126] Constituent Platforms are a subset of the bitcoin trading platforms that the Registration Statement describes.[127] The Registration Statement also states, specifically with respect to the Index, that "[t]he Index has a limited history and a failure of the [Index Price] could adversely affect the value of the Shares." [128] Although the Sponsor raises concerns regarding fraud on and the security of bitcoin platforms, as well as concerns specific to the Index, the Exchange does not explain how or why such concerns are consistent with its assertion that the

Index is resistant to fraud and manipulation.

Third, although NYSE Arca asserts that the Index Provider's oversight of the Index, which includes updating the Constituent Platforms from time to time and handling non-market-related events, mitigates fraud and manipulation in calculation of the Index, the record does not suggest that the purported oversight represents a unique measure to resist or prevent fraud or manipulation beyond protections that exist in traditional securities or commodities markets.[129] Rather, the oversight performed by the Index Provider appears to be for the purpose of ensuring the accuracy and integrity of the Index. Such Index accuracy and integrity oversight serves a fundamentally different purpose as compared to the regulation of national securities exchanges and the requirements of the Exchange Act. While the Commission recognizes that this may be an important function in ensuring the integrity of the Index, such requirements do not imbue the Index Provider with regulatory authority similar to that which the Exchange Act confers upon SROs such as national securities exchanges.[130] Furthermore, other commodity-based ETPs approved by the Commission for listing and trading utilize reference rates or indices administered by similar benchmark administrators,[131] and the Commission has not, in those instances, dispensed with the need for a surveillance-sharing agreement with a significant regulated market.

Finally, NYSE Arca does not explain the significance of the Index's purported resistance to manipulation to the overall analysis of whether the proposal to list and trade the Shares is designed to prevent fraud and manipulation.[132] Even assuming that NYSE Arca's argument is that the price of the Trust's Shares would be resistant to manipulation if the Index is resistant to manipulation, NYSE Arca has not established in the record a basis for this conclusion because NYSE Arca has not established a link between the price of

the Shares and the Index Price, either in the primary or secondary market. While the Index is used by the Trust to value its bitcoin, the Trust will create or redeem Baskets only upon the receipt or distribution of bitcoins from/to authorized participants, and only for the amount of bitcoin represented by the Shares in such Baskets, without reference to the value of such bitcoin as determined by the Index or otherwise. Furthermore, the Shares would trade in the secondary market at market-based prices, not the Index Price. The Exchange provides no information on the relationship between the Index and secondary market prices generally,[133] or how the use of the Index would mitigate fraud and manipulation of the Shares in the secondary market.[134]

**(2) Assertions That NYSE Arca Has Entered Into a Comprehensive Surveillance-Sharing Agreement With a Regulated Market of Significant Size Related to the Underlying Bitcoin Assets**

As NYSE Arca has not demonstrated that other means besides surveillance-sharing agreements will be sufficient to prevent fraudulent and manipulative acts and practices, the Commission next examines whether the record supports the conclusion that NYSE Arca has entered into a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets. In this context, the term "market of

---

[125] *See* SolidX Order, 82 FR at 16257.

[126] Exhibit 99.1 of the Registration Statement, at 16–17. *See also* 2021 10–K, at 50.

[127] *See* Exhibit 99.1 of the Registration Statement, at 42–43. *See also* 2021 10–K, at 10.

[128] Exhibit 99.1 of the Registration Statement, at 18. *See also* 2021 10–K, at 51.

[129] *See, e.g.,* Valkyrie Order, 86 FR at 74162.

[130] *See* WisdomTree Order, 86 FR at 69329; One River Order, 87 FR at 33556.

[131] *See, e.g.,* Securities Exchange Act Release No. 80840 (June 1, 2017) 82 FR 26534 (June 7, 2017) (SR–NYSEArca–2017–33) (approving the listing and trading of shares of certain trusts seeking to track the Solactive GLD EUR Gold Index, Solactive GLD GBP Gold Index, and the Solactive GLD JPY Gold Index).

[132] The Commission has previously considered and rejected similar arguments about the valuation of bitcoin according to a benchmark or reference price. *See, e.g.,* SolidX Order, 82 FR at 16258; Winklevoss Order, 83 FR at 37587–90; USBT Order, 85 FR at 12599–601; Valkyrie Order, 86 FR at 74162; ARK 21Shares Order, 87 FR at 20022.

[133] For example, as currently traded OTC, the Shares do not reflect the value of the Index but rather trade at a significant discount (or at other times, a significant premium). *See* Exhibit 99.1 of the Registration Statement, at 23 ("the value of the Shares of the Trust may not approximate, and the Shares may trade at a substantial premium over, or substantial discount to, the value of the Trust's Bitcoin Holdings per Share"); 2021 10–K, at 2 ("from May 5, 2015 to December 31, 2021, the maximum premium of the closing price of the Shares quoted on OTCQX over the value of the Trust's Digital Asset Holdings per Share was 142% . . . and the average premium was 37% . . ., and the maximum discount of the closing price of the Shares quoted on OTCQX below the value of the Trust's Digital Asset Holdings was 21% . . . and the average discount was 13% . . . . As of December 31, 2021, the Trust's Shares were quoted on OTCQX at a discount of 20% . . . to the Trust's Digital Asset Holdings per Share."); Grayscale Letter I, at 2 n.11 ("From May 5, 2015 to October 31, 2021, the maximum single-day premium of the closing price of BTC shares quoted on OTCQX over the value of its Bitcoin holdings was 142% and the average of all daily premiums was 37%; the maximum single-day discount below the value of its Bitcoin holdings was 21% and the average of all daily discounts was 12%; and the average of all single-day premiums and discounts was a premium of 32%."); Coinbase Letter I, at 2 ("GBTC has traded over-the-counter at a premium to its net-asset value that has ranged as high as 142% and a discount to its net-asset value of 21%").

[134] *See* WisdomTree Order, 86 FR at 69329 and n.108; Valkyrie Order, 86 FR at 74162; ARK 21Shares Order, 87 FR at 20022.

significant size'' includes a market (or group of markets) as to which (i) there is a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, so that a surveillance-sharing agreement would assist in detecting and deterring misconduct, and (ii) it is unlikely that trading in the ETP would be the predominant influence on prices in that market.[135]

As the Commission has explained, it considers two markets that are members of the ISG to have a comprehensive surveillance-sharing agreement with one another, even if they do not have a separate bilateral surveillance-sharing agreement.[136] Accordingly, based on the common membership of NYSE Arca and the CME in the ISG,[137] NYSE Arca has the equivalent of a comprehensive surveillance-sharing agreement with the CME. However, while the Commission recognizes that the CFTC regulates the CME futures market,[138] including the CME bitcoin futures market, and thus such market is ''regulated,'' in the context of the proposed ETP, the record does not, as explained further below, establish that the CME bitcoin futures market is a ''market of significant size'' related to spot bitcoin, the underlying bitcoin assets that would be held by the Trust.

(i) Whether There is a Reasonable Likelihood That a Person Attempting To Manipulate the ETP Would Also Have To Trade on the CME Bitcoin Futures Market to Successfully Manipulate the ETP

The first prong in establishing whether the CME bitcoin futures market constitutes a ''market of significant size'' related to spot bitcoin is the determination that there is a reasonable likelihood that a person attempting to manipulate the ETP would have to trade on the CME bitcoin futures market to successfully manipulate the ETP. In previous Commission orders, the Commission explained that the lead/lag relationship between the bitcoin futures market and the spot market is ''central'' to understanding this first prong.[139]

(a) Assertions Made and Comments Received

The Exchange asserts in its proposal that the CME bitcoin futures market is a ''large, surveilled and regulated market that is closely connected with the spot market for [b]itcoin and through which the Exchange could obtain information to assist in detecting and deterring potential fraud or manipulation.'' [140] The Exchange, however, concedes that the Sponsor did not find a significant lead/lag relationship between the spot and the CME bitcoin futures markets. Specifically, according to NYSE Arca, the Sponsor ''conducted a lead/lag analysis of per minute data comparing the [b]itcoin futures market, as represented by the CME futures ETP, to the [b]itcoin spot market, as represented by the Index.'' However, for the period of November 1, 2019, to August 31, 2021, the analysis showed that ''there does not appear to be a significant lead/lag relationship between the two instruments.'' [141] The Sponsor's analysis notwithstanding, NYSE Arca states that ''other studies prior to and since such date have found that the CME futures market does lead the [b]itcoin spot market.'' [142]

NYSE Arca goes on to assert that, ''[a]lthough there have been mixed findings regarding the lead/lag relationship between the CME futures and [b]itcoin spot markets, . . . the CME futures market represents a large, surveilled[,] and regulated market.'' [143] As evidence of its assertion that the CME constitutes a market of significant size related to spot bitcoin, the Exchange states that, from November 1, 2019, to August 31, 2021, the CME futures market trading volume was over $432 billion, compared to $624 billion in trading volume across the Constituent Platforms included in the Index.[144] The Exchange also points to the CME futures market trading volume from November 1, 2019, to August 31, 2021, which it states was approximately 50% of the trading volume of certain U.S. dollar-denominated spot bitcoin platforms, including Binance, Coinbase Pro, Bitfinex, Kraken, Bitstamp, BitFlyer, Poloniex, Bittrex, and itBit.[145] The Exchange, therefore, concludes that, ''[g]iven the significant size of the CME futures markets, . . . there is a

---

[135] See Winklevoss Order, 83 FR at 37594.

[136] See id. at 37580 n.19.

[137] See Amendment No. 1, 87 FR at 28054.

[138] While the Commission recognizes that the CFTC regulates the CME, the CFTC is not responsible for direct, comprehensive regulation of the underlying spot bitcoin market. See Winklevoss Order, 83 FR at 37587, 37599. See also WisdomTree Order, 86 FR at 69330 n.118; Kryptoin Order, 86 FR at 74174 n.119; SkyBridge Order, 87 FR at 3874 n.80; Wise Origin Order, 87 FR at 5534 n.93; ARK 21Shares Order, 87 FR at 20023 n.121.

[139] See, e.g., USBT Order, 85 FR at 12612 (''[E]stablishing a lead-lag relationship between the

bitcoin futures market and the spot market is central to understanding whether it is reasonably likely that a would-be manipulator of the ETP would need to trade on the bitcoin futures market to successfully manipulate prices on those spot platforms that feed into the proposed ETP's pricing mechanism. In particular, if the spot market leads the futures market, this would indicate that it would not be necessary to trade on the futures market to manipulate the proposed ETP, even if arbitrage worked efficiently, because the futures price would move to meet the spot price.''). When considering past proposals for spot bitcoin ETPs, the Commission has discussed whether there is a lead/lag relationship between the regulated market (e.g., the CME) and the market on which the assets held by the ETP would have traded (i.e., spot bitcoin platforms), as part of an analysis of whether a would-be manipulator of the spot bitcoin ETP would need to trade on the regulated market to effect such manipulation. See, e.g., USBT Order, 85 FR at 12612. See also VanEck Order, 86 FR at 64547; WisdomTree Order, 86 FR at 69330–31; Kryptoin Order, 86 FR at 74176 n.144; SkyBridge Order, 87 FR at 3876 n.101; Wise Origin Order, 87 FR at 5535 n.107; ARK 21Shares Order, 87 FR at 20024 n.138.

[140] Amendment No. 1, 87 FR at 28060. A commenter also states its belief that the Trust ''has strong links to a regulated market of significant size (i.e., the CME).'' Fortress Letter, at 2. Based on arguments articulated in the proposal, the Commission understands that the Exchange is arguing that CME is the regulated market of significant size with which it has the relevant surveillance-sharing agreement.

[141] Amendment No. 1, 87 FR at 28054.

[142] Id. at 28054 and n.50 (citing Memorandum to File from Neel Maitra, Senior Special Counsel (Fintech & Crypto Specialist), Division of Trading and Markets, U.S. Securities and Exchange Commission re: Meeting with Representatives from Fidelity Digital Assets, et al. and attachment (SR–

CboeBZX–2021–039) (Sept. 8, 2021), available at: https://www.sec.gov/comments/sr-cboebzx-2021-039/srcboebzx2021039-250110.pdf; Letter from Bitwise Asset Management, Inc. re: File Number SR–NYSEArca–2021–89 (Feb. 25, 2022), available at: https://www.sec.gov/comments/sr-nysearca-2021-89/srnysearca202189-20117902-270822.pdf; Letter from Wilson Sonsini Goodrich and Rosati, P.C. and Chapman and Cutler LLP, on behalf of Bitwise Asset Management, Inc. re: File No. SR–NYSEArca–2021–89 (Mar. 7, 2022), available at: https://www.sec.gov/comments/sr-nysearca-2021-89/srnysearca202189-20118794-271630.pdf). See also Submission by the Sponsor to the Commission in connection with a meeting between representatives of the Sponsor, the Sponsor's counsel, Davis Polk & Wardwell LLP, and Commission staff on April 26, 2022 (''Grayscale Submission''), at 21–22, available at: https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-20128860-294707.pdf). A commenter states that ''there is ample historical data to demonstrate how closely the CME futures contracts track the spot market (and in fact as BitWise's research has shown, lead the spot market a majority of the time.).'' Letter from Ben Davenport, dated Feb. 10, 2022 (''Davenport Letter'').

[143] Amendment No. 1, 87 FR at 28054.

[144] See id.

[145] See id. at 28054 and n.51. See also Grayscale Submission, at 16, citing to https://www.bitcointradingvolume.com/ (''CME represents >50% of all [b]itcoin trading volume''). But see Letter from Robert E. Whaley, Professor of Management (Finance), Director, Financial Markets Research Center, Vanderbilt University Owen Graduate School of Management, dated May 25, 2022 (''Whaley Letter''), at 2 (''In terms of USD value, the market cap in the CME's bitcoin futures market averages less than one-quarter of one percent of the bitcoin spot market.''). This commenter nonetheless concludes that, ''[s]ince the Commission is comfortable with the viability of futures-based ETF investing in an environment in which the spot market dominates (in terms of both dollar value and trading volume), it follows logically that spot-based ETPs are warranted.'' Whaley Letter, at 2.

reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, since arbitrage between the derivative and spot markets would tend to counter an attempt to manipulate the spot market alone.[146]

Similar to the Sponsor's analysis, a commenter concludes that the relationship between spot and futures prices is "complex and interrelated with no clear winner."[147] According to the commenter, the "results of the test of which market is leading depends on the time period of testing."[148] Despite the commenter's lead/lag conclusion, the commenter argues that a would-be manipulator would be unable to manipulate the proposed ETP without also trading in the CME bitcoin futures market, "[g]iven the relative size of trading volumes of bitcoin futures relative to spot, the strong dependence of spot prices on futures prices and vice versa, and the inefficiency of attempting to manipulate the [proposed] ETP through offshore trading."[149] Regarding the relative size of trading volumes, the commenter states that it examined Bloomberg trading data for the 365 days ended February 4, 2022, across all spot bitcoin trading venues and all CME bitcoin futures contract maturities, and found that the aggregate futures volume ($579 billion) was 31% higher than aggregate spot volume ($442 billion), a result that the commenter found to be statistically significant.[150] Regarding offshore trading, the commenter states that they believe it unlikely "a bad actor would attempt to manipulate the [proposed] ETP through trading on offshore cryptocurrency trading venues" because "offshore trading venues generally do not support fiat trading and instead only support trading between different cryptocurrencies."[151] The commenter further states that "offshore trading venues generally offer trading in bitcoin derivatives such as quarterly futures and perpetual futures; however, both would be poor choices for a bad actor seeking to manipulate the [proposed] ETP because both are known to deviate from the bitcoin spot price much more than CME futures," and thus any actor seeking to manipulate the proposed ETP "would risk expanding or contracting the premium of the derivative being used as a manipulation tool rather than influencing bitcoin spot prices."[152]

(b) Analysis

The record does not demonstrate that there is a reasonable likelihood that a person attempting to manipulate the proposed ETP would have to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP. The Exchange's and commenters' assertions about the size of the CME bitcoin futures market in comparison to the Constituent Platforms in particular and/or spot bitcoin markets in general do not establish that the CME bitcoin futures market is of significant size related to spot bitcoin. As the Commission has previously stated, the interpretation of the term "market of significant size" or "significant market" depends on the interrelationship between the market with which the listing exchange has a surveillance-sharing agreement and the proposed ETP.[153] Recitations of data reflecting the size of the CME bitcoin futures market and the size of the spot bitcoin market are not sufficient to establish an interrelationship between the CME bitcoin futures market and the proposed ETP.[154]

NYSE Arca asserts that there is a reasonable likelihood that a person would have to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP, because "arbitrage between the derivative and spot markets would tend to counter an attempt to manipulate the spot market alone."[155] However, the record does not demonstrate the existence of efficient price arbitrage across bitcoin-related platforms, either generally or specifically as it relates to the bitcoin derivative and spot markets.[156] The Exchange also does not provide any additional data or analysis to support its conclusion that the arbitrage that may exist between the bitcoin derivatives markets and spot markets would counter an attempt to manipulate the spot market alone, or to demonstrate that such arbitrage would occur quickly enough to prevent a would-be manipulator of the proposed ETP from profiting off of movements in the spot price. Moreover, even assuming that the Commission concurred with the Exchange's premise that efficient arbitrage exists between the bitcoin derivatives markets and spot markets, the Exchange does not explain why the presence of efficient arbitrage implies that a would-be manipulator would be reasonably likely to trade specifically on *the CME* bitcoin futures market rather than on unregulated bitcoin futures markets or other bitcoin derivatives markets.[157]

In addition, while a commenter asserts that it is unlikely a would-be manipulator would use offshore bitcoin futures as their manipulation tool,[158] this commenter has not sufficiently explained or supported its assertions. The commenter provides no data or other evidence to support its assertions that, because Tether often trades at a premium or discount to USD, it is not "economically practical"—and therefore "unlikely"—for a bad actor to manipulate the proposed ETP using Tether-denominated bitcoin prices. The commenter also does not provide any data regarding the deviation of offshore futures prices from spot bitcoin prices, or on how much (or how long) attempted manipulation of offshore futures affects this deviation, that would allow for assessment of whether offshore futures would be a "poor choice" for a manipulation tool.

Finally, the econometric evidence in the record for the proposal does not support the conclusion that an interrelationship exists between the CME bitcoin futures market and the spot bitcoin market such that it is reasonably likely that a person attempting to manipulate the proposed ETP would also have to trade on the CME bitcoin futures market.[159] As the Commission

---

[146] Amendment No. 1, 87 FR at 28054. A commenter also states its belief that "any attempt to manipulate the price of [the Trust] would likely also require manipulation of the CME futures markets"; that "arbitrage between the spot and derivative markets would quickly counteract the attempted manipulation"; and that "the CME would undoubtedly assist in monitoring and stopping the misconduct." Fortress Letter, at 3.

[147] Letter from Hunting Hill Global Capital, LLC, dated Mar. 3, 2022 ("Hunting Hill Letter"), at 2. The commenter makes this conclusion based on its own lead/lag analysis, "using minute-by-minute last-price data over the [365 days ended February 4, 2022], converted to percentage price changes, based on the first lagged term for both markets." *Id.*

[148] *Id.*

[149] *Id.* at 3.

[150] *See id.* at 1–2. Although the observed time periods are different, the Commission observes that the relative trading volume data provided by this commenter is significantly different than the relative trading volume data provided by the Exchange. *See supra* notes 144–145 and accompanying text.

[151] Hunting Hill Letter, at 2–3. To the extent some offshore trading venues allow for bitcoin to be exchanged to Tether, the commenter states that "it would not be economically practical for a bad actor to manipulate the [proposed] ETP using Tether-denominated bitcoin prices" because "manipulation in the bitcoin/USD exchange pair would likely result in a widening of Tether premiums and discounts." *Id.*

[152] *Id.* at 3.

[153] *See* USBT Order, 85 FR at 12611.

[154] *See id.* at 12612; Wise Origin Order, 87 FR at 5534–35.

[155] Amendment No. 1, 87 FR at 28054.

[156] *See also supra* note 89 and accompanying text.

[157] *See* WisdomTree Order, 86 FR at 69332; NYDIG Order, 87 FR at 14939.

[158] *See supra* notes 151–152 and accompanying text.

[159] *See* USBT Order, 85 FR at 12611; Wise Origin Order, 87 FR at 5535; NYDIG Order, 87 FR at 14938;

has stated in previous orders, if the spot market leads the futures market, this would indicate that it would not be necessary to trade on the futures market to manipulate the proposed ETP.[160] But as NYSE Arca concedes, there have been "mixed" findings regarding the lead/lag relationship between the CME futures and spot bitcoin markets.[161] Moreover, based on the Sponsor's own analysis—the data, methodology, results, and statistical significance of which were not described in the filing—"there does not appear to be a significant lead/lag relationship between" the CME bitcoin futures market and the spot bitcoin market.[162] In addition, a commenter's lead/lag analysis purportedly finds "no clear winner" and a bi-directional relationship between spot bitcoin prices and CME futures prices.[163] And while the Exchange and the Sponsor highlight previous papers and analyses submitted to the Commission in connection with other proposals to list and trade spot bitcoin ETPs to support the premise that the CME bitcoin futures market leads the spot bitcoin market,[164] the Commission disapproved the proposals related to these submissions, and the Commission raised issues and criticisms with respect to these submissions that the Exchange does not address. The Exchange does not provide any additional evidence of an interrelationship between the CME bitcoin futures market, which is the

regulated market, and spot bitcoin platforms, which are the markets on which the assets held by the proposed ETP would trade. As in previous disapprovals, because the lead/lag analysis regarding whether the CME bitcoin futures market leads the spot market remains inconclusive,[165] the Commission determines that the evidence in the record is inadequate to conclude that an interrelationship exists between the CME bitcoin futures market and the spot bitcoin market such that it is reasonably likely that a person attempting to manipulate the proposed ETP would have to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP.

The Commission thus concludes that the information that NYSE Arca provides is not sufficient to support a determination that it is reasonably likely that a would-be manipulator of the proposed ETP would have to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP. Therefore, the information in the record also does not establish that the CME bitcoin futures market is a "market of significant size" related to the assets to be held by the proposed ETP.

**(ii) Whether It Is Unlikely That Trading in the Proposed ETP Would Be the Predominant Influence on Prices in the CME Bitcoin Futures Market**

The second prong in establishing whether the CME bitcoin futures market constitutes a "market of significant size" related to spot bitcoin is the determination that it is unlikely that trading in the proposed ETP would be the predominant influence on prices in the CME bitcoin futures market.[166]

*(a) Assertions Made and Comments Received*

NYSE Arca asserts that "it is unlikely that the ETP would become the predominant influence on prices in the market." [167] In support, NYSE Arca states that the Sponsor examined the change in "market capitalization of bitcoin" with net inflows into the Trust, which currently trades OTC,[168] and

found that from November 1, 2019, to August 31, 2021, the market capitalization of bitcoin grew by $721 billion, while the Trust experienced $6.6 billion of inflows over the same period.[169] The Exchange states that the cumulative inflow into the Trust over the stated time period was only 0.9% of the aggregate growth of bitcoin's market capitalization.[170] The Exchange also states that "the Trust experienced approximately $98.5 billion of trading volume from November 1, 2019[,] to August 31, 2021, only 23% of the CME futures market and 16% of the Index over the same period." [171]

*(b) Analysis*

The record does not demonstrate that it is unlikely that trading in the proposed ETP would be the predominant influence on prices in the CME bitcoin futures market. First, the Sponsor's comparison of the Trust's historical inflows to the growth of bitcoin's market capitalization misapplies the second prong of the Commission's analysis. As stated above, the second prong in establishing whether the CME bitcoin futures market constitutes a "market of significant size" is the determination that it is unlikely that trading in the proposed ETP would be the predominant influence on *prices* in the *CME bitcoin futures market*. The Sponsor's analysis of the Trust's historical inflows vis-à-vis the *capitalization* of the *spot* bitcoin market considers neither the CME bitcoin futures market nor the CME bitcoin futures market's prices. Accordingly, such statistics, without more, are not relevant to the Commission's consideration of whether trading in the ETP would be the predominant influence on prices in the CME bitcoin futures market.

Second, putting aside the question of the spot bitcoin market's relevance to the second prong of the analysis, neither the Sponsor nor the Exchange has adequately explained why *historical* inflows into *the OTC* Trust is an appropriate proxy for trading in what would be exchange-listed Shares. There is no limit on the amount of mined bitcoins that the Trust may hold. Yet the Sponsor relies on the Trust's historical inflows and does not provide any information on the expected growth in the size of the Trust if the proposal is approved and the resultant increase in

---

Global X Order, 87 FR at 14920; ARK 21Shares, 87 FR at 20024.

[160] *See, e.g.,* USBT Order, 85 FR at 12612.

[161] *See* Amendment No. 1, 87 FR at 28054.

[162] *Id.*

[163] *See* Hunting Hill Letter, at 2. The Commission considers the lead/lag relationship between the CME bitcoin futures market and the spot bitcoin market to be central to understanding whether it is reasonably likely that a would-be manipulator of a spot bitcoin ETP would need to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP. *See* USBT Order, 85 FR at 12612. This commenter, however, does not explain its data, methodology (such as why using only the first lag for each time series was the appropriate model specification), or results to an extent that can be assessed and/or verified. The commenter also argues that the Commission should not require that the CME bitcoin futures market "always" lead the spot market, as the commenter believes that would be "tantamount to requiring that an obvious statistical arbitrage opportunity exists between two highly liquid and automated markets" from which any trader could "profit immensely," and would "be the same as a declaration that bitcoin ETPs will never be approved in the United States." *See* Hunting Hill Letter, at 2. The Commission disagrees. A lead/lag statistical result that CME bitcoin futures prices "lead" spot prices does *not* mean that CME bitcoin futures prices "always" move before spot prices—which would be the "obvious" and exploitable arbitrage opportunity—or that there would never be a situation where the spot price moves before the CME bitcoin futures price.

[164] *See supra* note *142.*

[165] As the academic literature and listing exchanges' analyses pertaining to the pricing relationship between the CME bitcoin futures market and spot bitcoin market have developed, the Commission has critically reviewed those materials. *See* ARK 21Shares Order, 87 FR at 20024; Global X Order, 87 FR at 14920; Wise Origin Order, 87 FR at 5535–36, 5539–40; Kryptoin Order, 86 FR at 74176; WisdomTree Order, 86 FR at 69330–32; VanEck Order, 86 FR at 64547–48; USBT Order, 85 FR at 12613.

[166] *See* Winklevoss Order, 83 FR at 37594; USBT Order, 85 FR at 12596–97.

[167] Amendment No. 1, 87 FR at 28054.

[168] The Exchange states that, compared with global commodity ETPs, the Trust would rank fourth among global commodity ETPs in assets under management and seventh in notional trading volume for the period from November 1, 2019, to October 31, 2020. *See id.* at 28054 n.52.

[169] *See id.* at 28054.

[170] *See id.*

[171] *Id.*

the amount of bitcoin that may be held by the Trust over time, or on the overall expected number, size, and frequency of creations and redemptions—or how any of the foregoing could (if at all) influence prices in the CME bitcoin futures market. Moreover, the Trust's trading volume cited by the Exchange only relates to the Trust *as it trades OTC* and does not contemplate what may happen if the Trust converts to an ETP.[172] Commenters state that approval of a spot bitcoin ETP would provide a simpler, safer, and more efficient way to obtain exposure to bitcoin than the products that are currently available to retail investors;[173] and converting the Trust into an ETP would allow for daily creations and redemptions.[174] Further, the Sponsor itself acknowledges that converting the Trust into an ETP would allow the Shares to better track the Trust's net asset value ("NAV") and reduce discounts and premiums.[175] Therefore, the Sponsor's use of historical inflow data is questionable as a way to approximate trading that may ensue in the proposed ETP.

Third, NYSE Arca's assertions are general and conclusory. While NYSE Arca recites data relating to the market capitalization of bitcoin and inflows to the Trust, and trading volume of the Trust as compared to the CME bitcoin futures market and the Constituent Platforms, NYSE Arca provides no meaningful analysis of such data to support its conclusion. For example, setting aside the issues with the relevance of the data that the Sponsor chose to consider, the analysis performed on such data is merely a comparison of the size of one data point (*e.g.*, change in market capitalization) to the size of another (*e.g.*, net inflows). Such an analysis is, at best, a simple correlation between the two data points; it provides no information relating to the *impact* of one on the other—*e.g.*, no information on the impact of the Trust's historical inflows on market capitalization, or of the Trust's trading volume on the CME bitcoin futures market (let alone, on the CME bitcoin futures market's prices). In short, the analysis performed provides no information on the *influence* that is central to the second prong.

Fourth, the data that NYSE Arca provides indicate that the Trust's trading volume from November 1, 2019, to August 31, 2021, was "only" 23% of that of the CME bitcoin futures market.[176] Even assuming that this historical data is an accurate predictor of the future percentage, neither the Sponsor nor the Exchange directly addresses why a *single* bitcoin ETP with trading volume close to one-quarter that of the CME bitcoin futures market is not likely to be the predominant influence on prices in that market. Moreover, the Sponsor describes the Trust, as of April 26, 2022, as holding approximately $30 billion in bitcoin, an amount that constitutes 3.4% of all outstanding bitcoin[177] and that far exceeds the value of all open interest in CME bitcoin futures contracts.[178] Yet neither the Sponsor nor the Exchange directly addresses why a spot bitcoin ETP whose assets under management would similarly exceed the value of all open interest in CME bitcoin futures contracts is not likely to be the predominant influence on prices in that market.

Thus, the Commission cannot conclude, based on the assertions in the filing and absent sufficient evidence or analysis in support of these assertions, that it is unlikely that trading in the proposed ETP would be the predominant influence on prices in the CME bitcoin futures market.[179]

Therefore, because NYSE Arca has not provided sufficient information to establish both prongs of the "market of significant size" determination, the Commission cannot conclude that the CME bitcoin futures market is a "market of significant size" related to spot bitcoin such that NYSE Arca would be able to rely on a surveillance-sharing agreement with the CME to provide sufficient protection against fraudulent and manipulative acts and practices.

(3) Assertions That the Proposed Spot Bitcoin ETP Is Comparable to Bitcoin Futures-Based ETFs and ETPs

(i) Assertions Made and Comments Received

The Exchange and the Sponsor argue that it would be inconsistent for the Commission to allow the listing and trading of ETFs and ETPs that provide exposure to bitcoin through CME bitcoin futures while disapproving the current proposal.[180]

The Sponsor asserts that CME bitcoin futures ETFs and ETPs and spot bitcoin ETPs "are the same in all relevant respects."[181] In support of this assertion, the Sponsor claims that CME bitcoin futures ETFs and ETPs are "priced according to the CME CF Bitcoin Reference Rate" ("BRR"), which, "in turn, is determined according to pricing data collected from digital asset trading platforms that include all but one of those currently incorporated into [the Index]."[182] NYSE Arca also states that spot bitcoin ETPs, including the Trust, "would be priced by referencing [spot bitcoin platforms] included in the BRR, such as through the Index."[183]

The Sponsor further asserts that, because the BRR is based upon "substantially the same [b]itcoin pricing data" as the Index, both CME bitcoin futures ETFs and ETPs and spot bitcoin ETPs are exposed to the "same risks relating to pricing data quality" ("same data, same risks").[184] Moreover, because of the "almost complete overlap" in the platforms underlying the BRR and the Index, the Sponsor claims that "the risks of fraud and manipulation in the [b]itcoin market impacting spot [b]itcoin ETPs are indistinguishable from those same risks impacting futures [b]itcoin ETPs."[185] The Exchange also asserts

---

[172] In addition, neither the Exchange nor the Sponsor addresses the likely impact, if any, of the conversion itself on CME bitcoin futures prices, such as whether there may be rapid inflows into, or outflows from, the Trust upon conversion, and how long any such impacts are expected to last.

[173] See infra note 237.

[174] See infra note 245 and accompanying text.

[175] See infra notes 245–246 and accompanying text.

[176] See Amendment No. 1, 87 FR at 28054.

[177] See Grayscale Submission, at 2.

[178] As of May 31, 2022, the value of open interest in the front two month CME BTC contracts was approximately $1.7 billion (source: CME Group).

[179] See VanEck Order, 86 FR at 64548–59; WisdomTree Order, 86 FR at 69332–33; Kryptoin Order, 86 FR at 74177; SkyBridge Order, 87 FR at 3879; Wise Origin Order, 87 FR at 5537; ARK 21Shares Order, 87 FR at 20025.

[180] See Amendment No. 1, 87 FR at 28055; Grayscale Letter I, at 7–13; Letter from Davis Polk & Wardwell LLP, on behalf of the Sponsor, dated Apr. 18, 2022 ("Grayscale Letter II").

[181] Grayscale Letter I, at 4.

[182] Id. at 7. See also Amendment No. 1, 87 FR at 28055; Grayscale Letter II, at 2; Grayscale Submission, at 13–14; STA Letter, at 2 ("both types of products use similar processes for determining price on the underlying spot cash [b]itcoin markets").

[183] Amendment No. 1, 87 FR at 28055. See also Grayscale Letter I, at 7; Grayscale Letter II, at 2; Grayscale Submission, at 13; Fortress Letter, at 2; Virtu Letter, at 3; Letter from Adam Kornfield, dated Feb. 15, 2022 ("Kornfield Letter"), at 1; Letter from Hashem Dezhbakhsh, Narasimhan Jegadeesh, and Juan Rubio-Ramirez, Emory University, dated April 24, 2022, at 2 ("Emory Letter"). The Sponsor states that the BRR and the Index have significant overlap in constituents, resulting in prices that track each other closely, with an average daily price difference over trailing 12 months of 0.04%. See Grayscale Submission, at 13. See also Whaley Letter, at 2–3 (presenting summary data relating to the Index and the BRR and concluding that "XBX and BRR are near perfect substitutes").

[184] See Grayscale Letter I, at 7. See also, e.g., Letter from Paul Grewal, Chief Legal Officer, Coinbase, dated Dec. 14, 2021 ("Coinbase Letter I"), at 4 ("the reference rate used to price [b]itcoin contracts underlying futures-based ETPs is subject to the same pricing data quality risks as the index used to price spot [b]itcoin and calculate net-asset value in spot ETPs."); Letter from James J. Angel, Associate Professor of Finance, Georgetown University, dated Apr. 17, 2022 ("Angel Letter I"), at 6; Blockchain Association Letter, at 3.

[185] Grayscale Letter I, at 9.

that, because of this overlap, any potential fraud or manipulation in the underlying spot bitcoin market would impact both CME bitcoin futures ETFs and ETPs and spot bitcoin ETPs.[186] The Sponsor goes further, asserting that "any" fraud or manipulation in the underlying market "will affect both products in the same way." [187]

Moreover, the Sponsor states that the Commission itself has recognized that "the CME bitcoin futures market is not insulated from potential risks of fraud and manipulation in the underlying [b]itcoin market." [188] The Sponsor even asserts that, "[i]f anything, derivatives markets present additional opportunities for manipulation on top of spot markets—which is why the derivatives markets have an additional layer of federal regulation to begin with." [189] According to the Sponsor, the Commission has never found there to be any meaningful difference in the risk of fraud or manipulation between spot bitcoin and bitcoin futures markets.[190]

The Sponsor further asserts that, "[e]ven with regulation by the CFTC, limiting ETP exposure to [b]itcoin futures does not address the risk of manipulation of underlying [b]itcoin spot market prices—unless the Commission's view is that CFTC regulation is adequate for all [b]itcoin spot markets, including those in which [the Trust] invests." [191]

Given that CME bitcoin futures ETFs currently trade, the Sponsor believes that the Commission's disapproval of the proposal would violate Section 6(b)(5) of the Exchange Act's prohibition against unfair discrimination among issuers, and would constitute an arbitrary and capricious administrative action in violation of the Administrative Procedure Act ("APA").[192] According to the Sponsor, "[t]he Commission has not offered any meaningful explanation for its differential treatment of these competing products." [193] The Sponsor

argues that regulation of bitcoin futures ETFs under the 1940 Act offers no protections against fraudulent and manipulative trading in the underlying bitcoin market and provides no basis for treating bitcoin futures ETFs and spot bitcoin ETPs registered under the Securities Act differently.[194]

The Sponsor also argues that the Commission's standard violates the APA because it is illusory and cannot be satisfied.[195] According to the Sponsor, the framework that the Commission has articulated for assessing whether a proposal to list and trade any bitcoin-based ETP complies with the requirements of Exchange Act Section 6(b)(5) is "so ill-defined and unachievable as to be arbitrary." [196] The Sponsor continues to state that "[t]he Commission has never quantified the 'significant market' or 'market of significant size.' " [197] Moreover, according to the Sponsor, the Commission "has never defined or specified what would actually constitute 'unique resistance to manipulation' that is 'beyond the protections of the traditional commodities and equities markets,' nor has the Commission explained what it

---

[186] *See* Amendment No. 1, 87 FR at 28055. *See also* Grayscale Submission, at 14. Some commenters agree that bitcoin futures ETFs and ETPs pose identical risks of fraud and manipulation as spot bitcoin ETPs given their views that both products are priced based on the spot bitcoin price. *See, e.g.,* Blockchain Association Letter, at 2; Coinbase Letter I, at 3; Coinbase Letter II, at 7; Virtu Letter, at 3; Angel Letter I, at 5; BitGo Letter, at 2; Cumberland Letter, at 2; Letter from Carol R. Goforth, University Professor and Clayton N. Little Professor of Law, University of Arkansas, dated May 3, 2022 ("Goforth Letter"), at 1; Kornfeld Letter, at 2; Letters from Brandon Gunderson (Feb. 4, 2022) ("Gunderson Letter"), at 2; Kenneth L. Keiffer, dated May 3, 2022 ("Keiffer Letter"), at 1; Robert L. DiLonardo and Donna S. DiLonardo, dated May 3, 2022 ("DiLonardo Letter"); Bridget Metzger (May 9, 2022) ("Metzger Letter"); Emory Letter, at 2; Letter from Sigal Mandelker and Jessi Brooks, Ribbit Capital, dated June 20, 2022 ("Ribbit Capital Letter"), at 5. An affiliate of the Custodian also states that prices and volumes in the bitcoin futures and spot bitcoin markets "are highly correlated, indicating very similar market dynamics between the futures market, for which the Commission has approved a [CME bitcoin futures ETF], and the spot market." Coinbase Letter II, at 3.

[187] Grayscale Letter II, at 2.

[188] *Id.* (referring to the Teucrium Order, *supra* note 11). *See also* Grayscale Submission, at 14.

[189] *See* Grayscale Letter I, at 11. Some commenters make similar arguments. For example, a commenter states that "spot markets may be less prone to manipulation given their daily notional volumes in the range of $35 billion, with futures volumes in the range of $1 billion daily notional." Virtu Letter, at 3. Another commenter states that an ETP that actually holds bitcoin would be less vulnerable to manipulation than an ETP that holds futures contracts because, with respect to bitcoin futures, there is the possibility of manipulation on the CME itself in addition to the spot bitcoin trading platforms. *See* Angel Letter I, at 6. Another commenter states that having a bitcoin futures ETF actually makes the derivatives markets more liquid and easy to manipulate than the spot market. *See* Dreyfuss Letter, at 2. *See also, e.g.,* Letter from Mary L. Holsinger, dated May 8, 2022.

[190] *See* Grayscale Letter I, at 11–12; Grayscale Letter II, at 2 ("The Commission's prior

disapprovals of spot bitcoin ETPs have not identified any distinct and significant additional risk of fraud and manipulation that is somehow specific to spot [b]itcoin ETPs, and none exists."). *See also, e.g.,* Blockchain Association Letter, at 3.

[191] Grayscale Letter I, at 11. *See also, e.g.,* Blockchain Association Letter, at 3; Coinbase Letter I, at 3; Ribbit Capital Letter, at 5.

[192] *See* Grayscale Letter I, at 8–9; 12–13; Grayscale Submission, at 23; Grayscale Letter II, at 2–4 (stating, among other things, that if the proposal "were disapproved based on the 'significant market' test, without an independent evaluation of the proposal's compliance with Section 6(b)(5) in light of the [Teucrium Order], we believe the action would be inconsistent with the requirements of both the Exchange Act and the [APA]"). Some commenters agree that the Commission's disparate treatment of bitcoin futures ETFs and ETPs and spot bitcoin ETPs results in unfair discrimination amongst issuers in contravention of the Exchange Act and/or is arbitrary and capricious in violation of the APA. *See, e.g.,* Blockchain Association Letter, at 3–4, Coinbase Letter I, at 4; Virtu Letter, at 3; Angel Letter I, at 5; Fortress Letter, at 3; Kornfeld Letter; Keiffer Letter; Metzger Letter; Goforth Letter, at 2; DiLonardo Letter; Letter from Michael D. Moffitt, dated Mar. 13, 2022 ("Moffitt Letter II) (citing transcript of Joseph Grundfest, former SEC Commissioner); Davenport Letter; Letter from John Carlson, dated Feb. 22, 2022; Ribbit Capital Letter, at 6; Letter from Alan J. Lane, Chief Executive Officer, Silvergate Capital Corporation, dated June 21, 2022. *See also, e.g.,* ADAM Letter, at 6 ("a disapproval of Arca's proposal would lead to the Commission picking winners based on its preferential treatment of one product over another"). A commenter asserts that "it is not within [the Commission's mandate to regulate the spot commodity markets upon which ETPs are based[,]" that "Section 6(b)(5) neither mentions underlying markets, nor an exchange's obligations with respect to fraud within them[,]" and "[t]he Commission's apparent position that an exchange must mitigate fraud and manipulation in an underlying market, or be prohibited from listing a product based on a commodity in an underlying market subject to fraud and manipulation not in the exchange's control, stretches the Commission's authority beyond existing statutory language." *See* Ribbit Capital Letter, at 5.

[193] Grayscale Letter I, at 8. Some commenters agree that the Commission has not articulated a valid justification for treating bitcoin futures ETFs and ETPs and spot bitcoin ETPs differently. *See,*

*e.g.,* Blockchain Association Letter, at 3–4; Coinbase Letter I, at 4; Cumberland Letter, at 2; STA Letter, at 2; Moffitt Letter II (citing transcript of Joseph Grundfest, former SEC Commissioner); Kornfeld Letter; Goforth Letter; Chilson Letter, at 4.

[194] *See* Grayscale Letter I, at 9–11; Grayscale Submission, at 14. *See also, e.g.,* Blockchain Association Letter, at 3; Coinbase Letter I, at 5 n.11. The Sponsor states that the Commission's recent approval of bitcoin futures ETPs registered under the Securities Act "confirms that 1940 Act registration is not a basis for the Commission to approve one product and reject another." *See* Grayscale Letter II, at 1 (referring to the Teucrium Order, *supra* note 11). *See also* Amendment No. 1, 87 FR at 28055; Goforth Letter, at 1–2.

[195] *See* Grayscale Letter I, at 12–13.

[196] *See id.* at 12. For a summary of the Commission's approach to considering proposals to list bitcoin-based ETPs, *see supra* notes 11–27 and accompanying text. Some commenters agree that the Commission's evaluation of spot bitcoin ETPs and bitcoin futures ETFs and ETPs is ambiguous and inconsistent. *See, e.g.,* Coinbase Letter I, at 4 ("when market participants compare the Commission's evaluation and approval of a futures-based [b]itcoin ETP to its treatment of spot [bitcoin] ETP proposals, they will see a lack of well-defined criteria and inconsistent application of the criteria"); Fortress Letter, at 2 ("While the Commission has stated that it considered each [spot bitcoin ETP] rule application 'on its own merits and under the standards applicable to it', the Commission has itself devised those standards ambiguously and inconsistently.").

[197] Grayscale Letter I, at 12. *See also* Grayscale Letter II, at 3 ("the Commission's reluctance to quantify the size a market must achieve to be 'significant', and its reluctance to articulate discernible standards for determining whether the market has the requisite linkage to the ETP's assets, renders this test subjective, arbitrary and effectively unachievable").

means for resistance to be 'inherent' or 'novel' in this context.'' [198]

(ii) Analysis

The Commission disagrees with these assertions and conclusions. The proposed rule change does not relate to the same underlying holdings as either ETFs regulated under the 1940 Act that provide exposure to bitcoin through CME bitcoin futures, or CME bitcoin futures-based ETPs registered under the Securities Act but not regulated under the 1940 Act. The Commission considers the proposed rule change on its own merits and under the standards applicable to it. Namely, with respect to this proposed rule change, the Commission must apply the standards as provided by Section 6(b)(5) of the Exchange Act, which it has applied in connection with its orders considering previous proposals to list bitcoin-based commodity trusts and bitcoin-based trust issued receipts.[199]

In asserting that, for purposes of making a determination to approve or disapprove proposals to list and trade bitcoin futures and spot bitcoin ETPs, the Commission is drawing a distinction about the potential for fraud and manipulation in the CME bitcoin futures market vis-à-vis the spot bitcoin markets, the Exchange, Sponsor, and commenters mischaracterize the framework that the Commission has articulated in the Winklevoss Order. As stated in the Winklevoss Order, the Commission is not applying a ''cannot be manipulated'' standard—either on the CME bitcoin futures market or the spot bitcoin markets. Rather, as the Commission has repeatedly emphasized, and also summarized above, the Commission is examining whether the proposal meets the requirements of the Exchange Act and, pursuant to its Rules of Practice, is

placing the burden on NYSE Arca to demonstrate the validity of its contentions that bitcoin markets ''offer novel protections beyond those that exist in traditional commodity markets or equity markets'' such that the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin is unnecessary,[200] or to establish that it has entered into such a surveillance-sharing agreement.[201]

Consistent with this approach, contrary to the Exchange's, the Sponsor's, and some commenters' assertions, the Commission's consideration (and approval) of proposals to list and trade CME bitcoin futures ETPs, as well as the Commission's consideration (and thus far, disapproval) of proposals to list and trade spot bitcoin ETPs, does not focus on an assessment of the overall risk of fraud and manipulation in the spot bitcoin or futures markets, or on the extent to which such risks are similar.[202] Rather, the Commission's

focus has been consistently on whether the listing exchange has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets of the ETP under consideration, so that it would have the necessary ability to detect and deter manipulative activity. For reasons articulated in the orders approving proposals to list and trade CME bitcoin futures-based ETPs (i.e., the Teucrium Order and the Valkyrie XBTO Order), the Commission found that in each such case the listing exchange has entered into such a surveillance-sharing agreement.[203] Making the same assessment with respect to this proposed spot bitcoin ETP, however, as discussed and explained above, the Commission finds that NYSE Arca has not.

Specifically, for the CME bitcoin futures ETPs under consideration in the Teucrium Order and the Valkyrie XBTO Order, the proposed ''significant'' regulated market (i.e., the CME) with which the listing exchange has a surveillance-sharing agreement is the same market on which the underlying bitcoin assets (i.e., CME bitcoin futures contracts) trade. As explained in those Orders, the CME's surveillance can reasonably be relied upon to capture the effects on the CME bitcoin futures market caused by a person attempting to manipulate the CME bitcoin futures ETP by manipulating the price of CME bitcoin futures contracts, whether that attempt is made by directly trading on the CME bitcoin futures market or indirectly by trading outside of the CME bitcoin futures market.[204] Regarding the approved Teucrium Bitcoin Futures Fund in the Teucrium Order (''Fund''), for example, when the CME shares its surveillance information with NYSE Arca (the listing exchange for the Fund), the information would assist in detecting and deterring fraudulent or manipulative misconduct related to the non-cash assets held by the Fund.[205] Accordingly, the Commission explains in the Teucrium Order and the Valkyrie XBTO Order that it is unnecessary for a listing exchange to establish a

---

[198] Grayscale Letter I, at 13.

[199] See supra note 11 and accompanying text. The Sponsor also mischaracterizes the Teucrium Order. For example, the Sponsor states that the Teucrium Order ''reflects plainly the Commission's recognition that the CME bitcoin futures market is not insulated from potential risks of fraud and manipulation in the underlying [b]itcoin market,'' and that ''the Commission took pains to 'disagree[ ] with much of [NYSE] Arca's reasoning' about the [b]itcoin futures market's separation from the underlying [b]itcoin market.'' Grayscale Letter II, at 2. However, this discussion in the Teucrium Order addresses whether NYSE Arca had supported its claim that it is reasonably likely that a would-be manipulator of the CME bitcoin futures ETP that was the subject of the Teucrium Order would have to trade on the CME to manipulate that ETP. See Teucrium Order, 87 FR at 21679. In that context, NYSE Arca had not sufficiently supported its statements that the CME bitcoin futures market ''stands alone'' or that ''[b]itcoin futures prices are not specifically materially influenced by other [b]itcoin markets'' for the Commission to be persuaded by such statements. See id. at 21680.

[200] See supra note 60 and accompanying text.

[201] Although the Sponsor claims that the Commission has never defined or specified what would constitute ''unique resistance to manipulation'' that is ''beyond the protections of the traditional commodities and equities markets,'' or explained what it means for resistance to be ''inherent'' or ''novel,'' the Sponsor mischaracterizes the premise of its own argument. Listing exchanges, not the Commission, have argued that other means besides surveillance-sharing agreements may be sufficient to prevent fraudulent and manipulative acts and practices, including by asserting that the bitcoin market as a whole or the relevant underlying bitcoin market is ''uniquely'' and ''inherently'' resistant to fraud and manipulation. In response, the Commission has agreed that listing exchanges' posited hypothetical: that, if a listing exchange could establish that the underlying market inherently possesses a unique resistance to manipulation beyond the protections that are utilized by traditional commodity or securities markets—for which surveillance-sharing agreements in the context of listing derivative securities products have been consistently present—the exchange would not necessarily need to enter into a surveillance-sharing agreement with a regulated significant market related to the underlying bitcoin assets. See Winklevoss Order, 83 FR at 37580, 37582–91 (addressing assertions that ''bitcoin and bitcoin [spot] markets'' generally, as well as one bitcoin trading platform specifically, have unique resistance to fraud and manipulation). See also USBT Order, 85 FR at 12597. Furthermore, a listing exchange need not substantiate its claim that the underlying bitcoin market is uniquely and inherently resistant to fraud in addition to demonstrating that the listing exchange has a surveillance-sharing agreement with a regulated significant market related to the underlying bitcoin assets.

[202] The Commission's general discussion on the risk of fraud and manipulation in the spot bitcoin or futures markets is only in response to arguments raised by the proposing listing exchanges (or commenters) that mitigating factors against fraud and manipulation in the spot bitcoin or futures markets should compel the Commission to dispense

with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets. But even in such instance, the central issue is about the necessity of such a surveillance-sharing agreement, not the overall risk of fraud and manipulation in the spot bitcoin or futures markets, or the extent to which such risks are similar.

[203] See Teucrium Order, 87 FR at 21678–81; Valkyrie XBTO Order, 87 FR at 28850–53.

[204] See Teucrium Order, 87 FR at 21679; Valkyrie XBTO Order, 87 FR at 28851.

[205] See Teucrium Order, 87 FR at 21679.

reasonable likelihood that a would-be manipulator would have to trade on the CME itself to manipulate a proposed ETP whose only non-cash holdings would be CME bitcoin futures contracts.[206]

However, as the Commission also states in those Orders, this reasoning does not extend to spot bitcoin ETPs. Spot bitcoin markets are not currently "regulated."[207] If an exchange seeking to list a spot bitcoin ETP relies on the CME as the regulated market with which it has a comprehensive surveillance-sharing agreement, the assets held by the spot bitcoin ETP would not be traded on the CME. Because of this significant difference, with respect to a spot bitcoin ETP, there would be reason to question whether a surveillance-sharing agreement with the CME would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct affecting the price of the spot bitcoin held by that ETP. If, however, an exchange proposing to list and trade a spot bitcoin ETP identifies the CME as the regulated market with which it has a comprehensive surveillance-sharing agreement, the exchange could overcome the Commission's concern by demonstrating that there is a reasonable likelihood that a person attempting to manipulate the spot bitcoin ETP would have to trade on the CME in order to manipulate the ETP, because such demonstration would help establish that the exchange's surveillance-sharing agreement with the CME would have the intended effect of aiding in the detection and deterrence of fraudulent and manipulative misconduct related to the spot bitcoin held by the ETP.[208]

Because, here, NYSE Arca is seeking to list a spot bitcoin ETP that relies on the CME as the purported "significant" regulated market with which it has a comprehensive surveillance-sharing agreement, the assets held by the proposed ETP would *not* be traded on the CME. Thus there is reason to question whether a surveillance-sharing agreement with the CME would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct affecting the price of the spot bitcoin held by the proposed ETP.[209] The Exchange could have

overcome this concern by demonstrating that there is a reasonable likelihood that a person attempting to manipulate the proposed ETP would have to trade on *the CME* in order to manipulate the ETP because such demonstration would help establish that the Exchange's surveillance-sharing agreement with the CME would have the intended effect of aiding in the detection and deterrence of fraudulent and manipulative misconduct related to the spot bitcoin held by the proposed ETP.[210] As discussed and explained above,[211] the Commission finds that NYSE Arca has not made such demonstration.

To the extent that the Sponsor—by way of claiming that, "[b]ecause both spot and futures-based [b]itcoin products face exposure to the same underlying [b]itcoin market, any fraud or manipulation in the underlying market will affect both products in the same way"[212]—is arguing that the CME's surveillance would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct that impacts spot bitcoin ETPs in the same way as it would for misconduct that impacts the CME bitcoin futures ETFs/ ETPs, the information in the record for this filing does not support such a claim. Specifically, the Sponsor claims that (i) CME bitcoin futures ETFs/ETPs are "priced according to the [BRR];" (ii) the proposed spot bitcoin ETP would be priced based on the Index; and (iii) because of the "almost complete overlap" between the spot platforms whose prices are used to calculate the BRR and the Index, bitcoin futures ETFs/ETPs and the proposed ETP are subject to the "same risks relating to pricing data quality."[213] This logic, however, is flawed for the following reasons.

First, there is no evidence in the record that CME bitcoin futures ETFs/ ETPs are "priced according to the [BRR]." The BRR is a once-a-day reference rate of the U.S. dollar price of one bitcoin as of 4 p.m., London time.[214] The BRR aggregates the trade

flow of its constituent spot bitcoin platforms—Coinbase, Gemini, LMAX Digital, itBit, Kraken, and Bitstamp[215]—during a specific one-hour calculation window.[216] While the BRR is used to value the final cash settlement of CME bitcoin futures contracts, it is not generally used for daily cash settlement of such contracts,[217] nor is it claimed to be used for any intra-day trading of such contracts. In addition, CME bitcoin futures ETFs/ETPs do not hold their CME bitcoin futures contracts to final cash settlement; rather, the contracts are rolled prior to their settlement dates. Moreover, the shares of CME bitcoin futures ETFs/ETPs trade in secondary markets, and there is no evidence in the record for this filing that such intra-day, secondary market trading prices are determined by the BRR.

Second, there is no evidence in the record that the Shares' prices would be determined by the Index. The Index is a U.S. dollar-denominated composite reference rate for the price of bitcoin calculated at 4:00 p.m. New York time.[218] As described above, the Index applies an algorithm to the price of bitcoin on the Constituent Platforms— Coinbase Pro, LMAX Digital, Kraken, and Bitstamp—calculated on a per second basis over a 24-hour period. While the Index is used daily to value the bitcoins held by the Trust,[219] as discussed above,[220] the Index would not be used for the creation or redemption of Shares, nor is the Index claimed to be used for any intra-day secondary market trading of the Shares, either currently on the OTC market or in the future on the Exchange. Rather, the Share price is discovered through continuous intra-day, secondary market interactions of buy and sell interests.[221]

---

[206] *See id.*

[207] *See* Teucrium Order, 87 FR at 21679 n.46 (citing USBT Order, 85 FR at 12604; NYDIG Order, 87 FR at 14936 nn.65–67). *See also* Valkyrie XBTO Order, 87 FR at 28851 n.42.

[208] *See* Teucrium Order, 87 FR at 21679 n.46; Valkyrie XBTO Order, 87 FR at 28851 n.42.

[209] *See* Teucrium Order, 87 FR at 21679 n.46; Valkyrie XBTO Order, 87 FR at 28851 n.42. There is reason to question whether the CME's

surveillance would capture manipulation of spot bitcoin that occurs off of the CME, if, for example, off-CME manipulation of spot bitcoin does not also similarly impact CME bitcoin futures contracts. As discussed further below, *see infra* notes 224–225 and accompanying text, the information in the record for this filing does not sufficiently demonstrate that attempted manipulation of spot bitcoin would also similarly impact CME bitcoin futures contracts.

[210] *See* Teucrium Order, 87 FR at 21679 n.46; Valkyrie XBTO Order, 87 FR at 28851 n.42.

[211] *See* Section III.B.2.i, *supra.*

[212] Grayscale Letter II, at 2.

[213] *See id.* at 7, 9.

[214] *See https://docs- cfbenchmarks.s3.amazonaws.com/ CME+CF+Reference+Rates+Methodology.pdf.*

[215] *See https://docs- cfbenchmarks.s3.amazonaws.com/ CME+CF+Constituent+Exchanges.pdf.*

[216] *See https://www.cmegroup.com/education/ courses/introduction-to-bitcoin/introduction-to- bitcoin-reference-rate.html.* This one-hour window is partitioned into 12, five-minute intervals, where the BRR is calculated as the equally-weighted average of the volume-weighted medians of all 12 partitions. *See id.*

[217] Under normal procedures, daily cash settlements are generally based on the volume- weighted average price of trading activity on CME Globex between 2:59 p.m. and 3:00 p.m., Central Time). *See https://www.cmegroup.com/confluence/ display/EPICSANDBOX/Bitcoin* for a description of CME bitcoin futures daily settlement procedures.

[218] *See* Amendment No. 1, 87 FR at 28047.

[219] *See id.* at 28047, 28049.

[220] *See supra* notes 132–133 and accompanying text.

[221] As discussed above, the use of the Index by the Trust to determine the value of its bitcoin does not support the finding that the Exchange has established other means to prevent fraud and manipulation that are sufficient to justify

Continued

Third, despite the Sponsor's claim of "almost complete overlap" between the spot platforms whose prices are used to calculate the BRR and those platforms whose prices are used for the Index, the BRR includes trade flow from Gemini and itBit, neither of which are included as Constituent Platforms of the Index.[222]

In short, and importantly, although the Exchange and the Sponsor focus heavily on the similarities between the BRR and the Index, there is no evidence in the record that the shares of any CME bitcoin futures ETF/ETP, or the Shares of the proposed spot bitcoin ETP, would trade in the secondary market at a price related to (or informed by) the BRR or the Index.[223]

Fourth, the Commission's determination in the Teucrium Order and the Valkyrie XBTO Order to approve the listing and trading of the relevant CME bitcoin futures ETPs was not based on the ETPs' use—or lack of use—of the BRR (or any other similar pricing mechanism) for the calculation of NAV, or on the fact that the BRR is used for the final cash settlement of CME bitcoin futures contracts. Rather, as discussed above, the Commission approved the listing and trading of such CME bitcoin futures ETPs, not because of the BRR, but because the Commission found that the listing exchanges satisfy the requirement pertaining to a surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets—which for such ETPs are CME bitcoin futures contracts, not spot bitcoin.

Fifth, even if the Exchange or the Sponsor had demonstrated a link between the BRR and/or the Index and the prices of CME bitcoin futures ETFs/ETPs and/or the proposed ETP, which they have not, it does not necessarily follow that the CME's surveillance would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct that impacts spot bitcoin ETPs in the same way as it would for misconduct that impacts the CME bitcoin futures ETFs/ETPs—particularly when such misconduct occurs off of the CME itself.[224] For example, even assuming, for the sake of argument, that the BRR and/or the Index is a potential link between prices on certain spot bitcoin platforms and CME bitcoin futures prices, it does not—absent supporting data—necessarily follow that *any* manipulation that impacts spot bitcoin *also similarly* impacts CME bitcoin futures contracts. Neither the Sponsor nor the Exchange has provided any analysis or data that assesses the reaction (if any) of CME bitcoin futures contracts to instances of fraud and manipulation in spot bitcoin markets. Indeed, the only analysis that the Sponsor itself provides is a summary of its lead/lag analysis comparing CME bitcoin futures prices with the Index, from which the Sponsor concludes that "there does not appear to be a significant lead/lag relationship between the two instruments."[225]

In addition, the disapproval of the proposal would not violate the requirement in Section 6(b)(5) of the Exchange Act[226] that the rules of an exchange not be designed to permit unfair discrimination between issuers, nor would it constitute an arbitrary and capricious administrative action in violation of the APA.[227] Importantly, the issuers are not similarly situated. The issuers of CME bitcoin futures-based ETPs propose to hold only CME bitcoin futures contracts (which are traded on the CME itself) as their only non-cash holdings, and the Trust proposes to hold only spot bitcoin (which is not traded on the CME). As explained in detail above and in the Teucrium Order and the Valkyrie XBTO Order, because of this important difference, for a spot bitcoin ETP, there is reason to question whether a surveillance-sharing agreement with the CME would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct affecting the price of the spot bitcoin held by that ETP.[228] And as discussed above, neither the Exchange, nor the Sponsor, nor any other evidence in the record for this filing, sufficiently demonstrates that the CME's surveillance can be reasonably relied upon to capture the effects of manipulation of the *spot* bitcoin assets underlying the proposed ETP when such manipulation is not attempted on the CME itself.

Moreover, the analytical framework for assessing compliance with the requirements of Exchange Act Section 6(b)(5) that the Commission applies here (*i.e.*, comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets) is the same one that the Commission has applied in each of its orders considering previous proposals to list bitcoin-based

---

[222] Although the Sponsor states that the BRR is "determined according to pricing data collected from digital asset trading platforms that include all but one of those currently incorporated into [the Index]" (Grayscale Letter I, at 7), based on information provided on the CME's website, the Sponsor's statement does not appear to be correct. *See https://www.cmegroup.com/markets/cryptocurrencies/cme-cf-cryptocurrency-benchmarks.html?redirect=/trading/cryptocurrency-indices/cf-bitcoin-reference-rate.html*. It is also unclear from the record whether Coinbase (used by the BRR) and Coinbase Pro (used by the Index) are the same platform. Based on recent press articles, it appears that Coinbase Pro will be discontinued. *See, e.g., https://cointelegraph.com/news/coinbase-to-shut-down-coinbase-pro-to-merge-trading-services; https://www.forbesindia.com/article/crypto-made-easy/coinbase-to-shut-down-coinbase-pro-to-merge-trading-services/77585/1#:~:text=Coinbase%20Pro%2C%20the%20professional,them%20into%20a%20single%20platform.*

[223] A commenter provides a correlation analysis, using daily price information between November 2021 and February 2022, which purports to show high correlation (99.9%) between the price of CME bitcoin futures contracts and a Coinbase spot price. *See* Coinbase Letter II, at 7 and Figure 6. The same commenter also provides correlation analysis, using daily price information between December 2021 and February 2022, which purports to show high correlation between the prices of various non-U.S. spot bitcoin ETPs and a Coinbase spot price. *See id.* at 8–9 and Figures 11–16. The commenter, however, does not provide evidence with respect to price correlation between shares of CME bitcoin futures ETFs and the BRR or between the prices of various non-U.S. spot bitcoin ETPs and the Index. Nor does correlation analysis, at daily intervals, provide evidence of the causal economic relationship of interest: namely, whether fraud or manipulation that impacts spot bitcoin would also similarly impact CME bitcoin futures contracts. *See infra* notes 224–225 and accompanying text.

[224] *See also supra* note 209.

[225] *See* Amendment No. 1, 87 FR at 28054.

[226] 15 U.S.C. 78f(b)(5).

[227] The Sponsor argues that disapproval of the proposal would constitute merit regulation, which is not authorized under the Exchange Act. *See* Grayscale Letter I at 14–15. In addition, the affiliate of the Custodian states that "the Commission's role is not to evaluate the characteristics and quality of the underlying [b]itcoin market but instead to evaluate the [proposed] ETP, and the role that [NYSE] Arca would play in monitoring trading in [the Shares]." Coinbase Letter I, at 5. *See also, e.g.,* ADAM Letter, at 6; Ribbit Capital Letter, at 5. As previously stated, the Commission is disapproving this proposed rule change because NYSE Arca has not met its burden to demonstrate that its proposal is consistent with the requirements of Exchange Act Section 6(b)(5). The Commission's disapproval of this proposed rule change does not rest on an evaluation of the relative investment quality of a product holding spot bitcoin versus a product holding CME bitcoin futures, or an assessment of whether bitcoin, or blockchain technology more generally, has utility or value as an innovation or an investment. *See, e.g.,* Winklevoss Order, 83 FR at 37580; USBT Order, 85 FR at 12597; One River Order, 87 FR at 33550.

[228] *See supra* notes 208–209 and accompanying text.

commodity trusts and trust issued receipts.[229] The Commission has applied this framework to each proposal by analyzing the evidence presented by commenters.[230] Although the Sponsor states that the Commission's approach to assessing compliance with Section 6(b)(5) has created a standard that cannot be satisfied and therefore violates the APA, the Commission has in fact recently approved proposals by the Exchange and the Nasdaq Stock Market to list and trade shares of ETPs holding CME bitcoin futures as their only non-cash holdings.[231] And in the orders approving these CME bitcoin futures-based ETPs, the Commission explicitly discussed how an exchange seeking to list and trade a spot bitcoin ETP could overcome the lack of a one-to-one relationship between the regulated market with which it has a surveillance-sharing agreement and the market(s) on which the assets held by a spot bitcoin ETP could be traded: by demonstrating that there is a reasonable likelihood that a person attempting to manipulate the spot bitcoin ETP would have to trade on the regulated market (*i.e.*, on the CME) to manipulate the spot bitcoin ETP.[232]

When considering past proposals for spot bitcoin ETPs, the Commission has, in particular, reviewed the econometric and/or statistical evidence in the record to determine whether the listing exchange's proposal has met the applicable standard.[233] The Commission's assessment fundamentally presents quantitative, empirical questions, but, as discussed above, the Exchange has not provided evidence sufficient to support its arguments. Instead, the Exchange and the Sponsor make various assertions that are not supported by the limited data in the record regarding, among other things, trading volume and bitcoin market capitalization, or the relationship between spot bitcoin prices and CME bitcoin futures prices (including the lead/lag relationship between the spot market and the CME bitcoin futures market), and the record contains insufficient empirical analysis or quantitative evidence of any such

data to support the Exchange's conclusions.[234]

The requirements of Section 6(b)(5) of the Exchange Act apply to the rules of national securities exchanges. Accordingly, the relevant obligation to have a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin, or other means to prevent fraudulent and manipulative acts and practices that are sufficient to justify dispensing with such a surveillance-sharing agreement, resides with the listing exchange. Because there is insufficient evidence in the record demonstrating that NYSE Arca has satisfied this obligation, the Commission cannot approve the proposed ETP for listing and trading on NYSE Arca.

*C. Whether NYSE Arca Has Met Its Burden to Demonstrate That the Proposal Is Designed to Protect Investors and the Public Interest*

NYSE Arca contends that, if approved, the proposed ETP would protect investors and the public interest. However, the Commission must consider these potential benefits in the broader context of whether the proposal meets each of the applicable requirements of the Exchange Act.[235] Because NYSE Arca has not demonstrated that its proposed rule change is designed to prevent fraudulent and manipulative acts and practices, the Commission must disapprove the proposal.

(1) Assertions Made and Comments Received

Commenters argue that the Commission should approve the proposal because doing so would satisfy investor demand for a U.S. regulated investment vehicle with direct exposure to bitcoin.[236] Commenters state that

approval of a spot bitcoin ETP would provide a simpler, safer, and more efficient way to obtain exposure to bitcoin than the products that are currently available to retail investors, such as holding spot bitcoin, OTC bitcoin funds, bitcoin futures funds, or foreign bitcoin funds.[237] Some commenters state that approving a spot bitcoin ETP would reduce the custody and cybersecurity risks to investors of holding physical bitcoin.[238]

Several commenters argue that a spot bitcoin ETP would provide lower costs and less risk than bitcoin futures ETPs.[239] The Sponsor and some

[229] *See supra* notes 11–24 and accompanying text.

[230] *See supra* note 11.

[231] *See* Teucrium Order and Valkyrie XBTO Order, *supra* note 11.

[232] *See supra* note 208 and accompanying text.

[233] *See, e.g.*, USBT Order, 85 FR at 12612–13; VanEck Order, 86 FR at 64547–48; WisdomTree Order, 86 FR at 69330–32; Kryptoin Order, 86 FR at 74175–76; NYDIG Order, 87 FR at 14938–39; Wise Origin Order, 87 FR at 5534–36; Global X Order, 87 FR at 14919–20; ARK 21Shares Order, 87 FR at 20023–24.

[234] *See* Sections III.B.1 & III.B.2, *supra*.

[235] *See* Winklevoss Order, 83 FR at 37602. *See also* GraniteShares Order, 83 FR at 43931; ProShares Order, 83 FR at 43941; USBT Order, 85 FR at 12615; WisdomTree Order, 86 FR at 69333; Valkyrie Order, 86 FR at 74163; Kryptoin Order, 86 FR at 74178; SkyBridge Order, 87 FR at 3880; Wise Origin Order, 87 FR at 5537.

[236] *See, e.g.*, Blockchain Association Letter, at 1–2; Virtu Letter, at 2–4; BitGo Letter, at 1–2; STA Letter, at 2–3; ADAM Letter, at 3–4; Harvey Letter, at 1–3; Shultz Letter; Letter from Neil Chilson and Jonathan M. Zalewski, dated May 31, 2022 ("Chilson Letter"), at 3; Letter from Jody Cryder, dated Apr. 25, 2022; Letter from Rich Seils, dated Apr. 25, 2022 ("Seils Letter"); Letter from Grant Johnson, dated Mar. 4, 2022 ("Johnson Letter"); Letter from Evelyne Dandurand, dated Feb. 18, 2022; Letter from David Brown, dated Apr. 19, 2022; Letter from Mark Reid, dated Feb. 28, 2022; Letter from William McPherson, dated Mar. 1, 2022; Letter from Jalen Rose, dated Mar. 2, 2022; Letter from Brandon Gillet, dated Feb. 22, 2022; Letter

from Clint Jasperson, dated Feb. 18, 2022; Letter from Jason Miller, dated Feb. 17, 2022 ("Miller Letter"); Letter from Michael Bielik, dated Feb. 18, 2022; Letter from Joseph DeFilippis, dated Feb. 15, 2022; Letter from Peter C., dated Feb. 15, 2022; Letter from James P. Scofield, dated Feb. 14, 2022; Letter from Chris Smalley, dated Feb. 10, 2022; Letter from Nico Peruzzi, dated Feb. 5, 2022; Letter from Matt Robins, dated May 10, 2022. *See also* Grayscale Submission, at 10.

[237] *See, e.g.*, ADAM Letter, at 3–4; Harvey Letter, at 1–3; BitGo Letter, at 1–2; Discovery Letter, at 2; Angel Letter, at 6–7; Johnson Letter; Letter from Logan Kane, Writer, Seeking Alpha, dated Feb. 19, 2022 ("Kane Letter"); Letter from Michael Falk, dated Feb. 15, 2022; Letter from Andrew Farinelli, dated Feb. 10, 2022 ("Farinelli Letter"); Letter from Boris Hristov, dated May 18, 2022; Letter from Paul Smith, dated Feb. 28, 2022; Letter from Luke Groom, dated Feb. 22, 2022; Emory Letter, at 2. In addition, some commenters state that a spot bitcoin ETP would be just as, or less risky than, other investments already trading in the U.S. *See, e.g.*, Dreyfuss Letter; Miller Letter; Letter from Derek Serlet, dated Apr. 27, 2022; Letter from Monty Henry, dated Feb. 7, 2022 ("Henry Letter"); Letter from Alexander, dated Feb. 22, 2022; Letter from Martin Baer, dated Feb. 15, 2022; Letter from Gage Gorda, dated Feb. 14, 2022; Letter from Branon White, dated Feb. 10, 2022; Letter from Nikolas Garcia, dated Mar. 4, 2022 ("Garcia Letter").

[238] *See, e.g.*, Angel Letter I, at 8; ADAM Letter; Kane Letter; Henry Letter; Letter from Tim Crick, dated Mar. 21, 2022; Letter from Michael David Spadaccini, dated Feb. 7, 2022; Letter from Michael A. Rheintgen, dated Feb. 24, 2022; Letter from Richard Arrett, dated Feb. 22, 2022 ("Arrett Letter"); Letter from Brian Boerner, dated Feb. 14, 2022; Letter from William Perez, dated Feb. 12, 2022 ("Perez Letter"); Letter from Henry Chen, dated Feb. 26, 2022 ("Chen Letter").

[239] *See, e.g.*, Blockchain Association Letter, at 2 ("while bitcoin futures ETPs have certain useful features, they are inferior investment products for many Americans due to their relatively higher cost and risk profile"); Angel Letter I, at 6–7 (stating that "[a] physical-based product in which the fund actually holds the bitcoin is far less vulnerable to manipulation than the futures contracts" and that CME futures contracts experience roll costs, lack liquidity, and have wide bid-ask spreads); Letter from Murray Stahl, Chief Investment Officer, Horizon Kinetics Asset Management LLC, dated Apr. 8, 2022 ("Horizon Kinetics Letter"), at 1–2 (stating that a futures-based bitcoin ETP is not suitable for long-term investors since the performance deviates greatly from the underlying asset and that a spot bitcoin ETP would eliminate such a tracking error); Fortress Letter, at 2–3 ("Futures ETFs present investors with a more costly and complex means of gaining exposure to [b]itcoin while reflecting only a small portion of the actual market for the digital asset"); Letter from Benjamin

Continued

USCA Case #22-1142    Document #1982404    Filed: 01/20/2023    Page 153 of 174

commenters assert that disapproving spot bitcoin ETPs after approving bitcoin futures ETFs and ETPs harms investors.[240] In addition, the Sponsor states that bitcoin futures ETPs present certain structural disadvantages over spot bitcoin ETPs, such as monthly roll-costs [241] and risks due to position limits.[242]

Commenters also emphasize that conversion of the existing Trust to an ETP structure would be beneficial to its investors. The Sponsor, for example, states that the Trust has grown to become the largest publicly-traded digital asset fund in the world [243] and that approving the Trust to operate as an ETP traded on a national securities exchange "will provide investors with the additional protections of [the Commission] and [NYSE Arca] while unlocking billions of value for investors." [244] Moreover, according to the Sponsor, converting the Trust into an ETP would allow the Shares to better track the Trust's NAV and reduce discounts and premiums, thereby unlocking approximately $8 billion in value for investors.[245] Similarly, commenters state that the proposal would protect investors and help maintain fair and orderly markets by reducing premium and discount volatility with respect to the Shares, thereby allowing investors to gain access to bitcoin through an ETP structure at trading prices that are more closely aligned with spot bitcoin trading prices.[246] Moreover, other commenters state that approving the proposal and allowing the Trust to convert into an ETP would protect investors by, among other things, lowering fees and providing heightened regulation of the Shares.[247]

Several commenters further state that approval of a spot bitcoin ETP would enhance the liquidity, price discovery, and efficiency of the underlying bitcoin markets.[248] The affiliate of the Custodian states that the introduction of a spot bitcoin ETP with a robust create and redeem arbitrage process can improve the price efficiency of an underlying asset and thus further increase the resilience of bitcoin trading in the spot market.[249] This commenter believes the presence of a spot bitcoin ETP "may bolster and stabilize the broader [b]itcoin derivatives market by encouraging a . . . greater volume of activity and easier arbitrage between the two markets." [250]

Finally, some commenters argue that the proposal should be approved because doing so would enhance investor choice,[251] improve market structure and competition for the benefit of investors,[252] and facilitate capital formation.[253]

T. Fulton, CEO, Elkhorn Consulting, LLC, dated Apr. 27, 2022 ("Elkhorn Letter"), at 2–3; Harvey Letter, at 3; Whaley Letter, at 3–7; Letter from Charles Hwang, Jason Albanese, Jock Percy, General Partners, Lightning Capital, dated Mar. 21, 2022 ("Lightning Capital Letter"), at 2–3; Discovery Letter, at 2 ("a spot [b]itcoin ETP would provide a much better vehicle for investors due to the vast liquidity, lower cost, and transparent Index pricing than the current [f]utures based ETPs"); Kane Letter; Letter from Ryan Wilday, dated Feb. 17, 2022; Letter from Michael Douglas Magee, dated Apr. 19, 2022; Letter from Bryan Kelley, dated May 10, 2022.

[240] See, e.g., Grayscale Letter I, at 13–14 ("Continued disparate treatment of [b]itcoin futures ETPs and spot [b]itcoin ETPs would harm—rather than protect—investors by limiting their choices without a reasoned basis."); Cumberland Letter, at 1–2; Harvey Letter, at 2–3; Lightning Capital Letter, at 1–3; ADAM Letter, at 6; Fortress Letter, at 2; Letter from Justin Valdata, dated Apr. 22, 2022 ("Valdata Letter"). A commenter argues that such disparate treatment may undermine confidence in the Commission and stifle innovation in the securities markets. See Coinbase Letter I, at 4.

[241] See Grayscale Letter I, at 14. The Sponsor states that one analysis showed that over the last year, a bitcoin futures ETP would have lost 28% of its value just on roll costs (effectively, fees and expenses being equal, a spot ETP would have performed around 28% better). See id. (citing Michael J. Casey, Why a Bitcoin Futures ETF is Bad for Investors, CoinDesk (last updated Oct. 22, 2021 at 4:29 p.m.), https://www.coindesk.com/policy/2021/10/22/why-a-bitcoin-futures-etf-is-bad-for-investors/). See also, e.g., Blockchain Association Letter, at 2; Angel Letter I, at 7; Harvey Letter, at 3; Elkhorn Letter, at 2; Fortress Letter, at 1–2; BitGo Letter, at 1–2; Horizon Kinetics Letter, at 1–2.

[242] See Grayscale Letter I, at 14. According to the Sponsor, position limits can cause a bitcoin futures ETP to experience liquidity problems or losses, or have to halt new creations and redemptions as fixed-income portfolio, thereby introducing tracking error by diluting its exposure to bitcoin. The Sponsor states that, alternatively, the CME may have to raise position limits to accommodate increased demand in the absence of a spot bitcoin ETP alternative, potentially increasing the concentration of economic power of a few large market participants in the bitcoin futures markets and reducing the resiliency of those markets against manipulation. The Sponsor states that "[t]hese risks—that [b]itcoin futures ETPs could be constrained by position limits and that the CME may raise those limits—are not purely speculative; indeed, both have already occurred since the first [b]itcoin futures ETP began trading." Id. See also, e.g., Blockchain Association Letter, at 2 ("Futures ETPs are also subject to additional, unique risks related to position limits, limited liquidity, dilution and other factors.").

[243] See Grayscale Submission, at 2.

[244] Id. at 17.

[245] See id. at 9. The Sponsor states that, because the Shares are not currently listed on a national securities exchange and the Trust is therefore not permitted to operate an ongoing creation and redemption program, arbitrage opportunities resulting from differences between the price of the Shares and the price of bitcoin are not available to keep the price of the Shares closely linked to the Index Price for bitcoin. As a result, the Shares are usually quoted at a premium over, or discount to, the value of the Trust's bitcoin holdings. See Grayscale Letter I, at 5. See also Coinbase Letter I, at 3.

[246] See, e.g., Coinbase Letter I, at 2–3; Virtu Letter, at 2; Angel Letter I, at 7–8; BitGo Letter, at 1; ADAM Letter, at 4–5; Cumberland Letter, at 1; Lightning Capital Letter, at 1–2; Gunderson Letter; Discovery Letter, at 1; Henry Letter; Keiffer Letter; Perez Letter; DiLonardo Letter; Kornfield Letter; Garcia Letter; Johnson Letter; Arrett Letter; Emory Letter, at 2; Letter from Richard Leo, dated Apr. 22, 2022; Letter from Joseph McDevitt, dated Apr. 22, 2022; Letter from Mitchell J. Brodie, dated Apr. 22, 2022; Letter from Steve Axel, dated Feb. 18, 2022; Letter from Brent Zeigler, dated Feb. 19, 2022; Letter from Jonas Lippuner, dated Apr. 21, 2022; Letter from David Lynch, dated Mar. 3, 2022; Letter from David New, dated Feb. 23, 2022; Letter from Roger A. Rector, dated Feb. 22, 2022; Letter from Michael Charles, dated Feb. 19, 2022; Letter from Scott Egon Roge, dated Feb. 15, 2022; Letter from Ozeir Nassery, dated Feb. 11, 2022; Letter from Raj Lakkundi, dated Feb. 11, 2022. The affiliate of the Custodian states that the performance of spot bitcoin ETPs in other countries confirms the ability of a spot bitcoin ETP to appropriately reflect the underlying bitcoin market. See Coinbase Letter II, at 3, 8. See also Virtu Letter, at 2 ("In our experience as a market maker and AP in spot cryptocurrency ETPs in Canada, we have observed the positive impact of these dynamics—as spot cryptocurrency ETP spreads to NAV are compressed to levels observed for non-crypto ETPs.").

[247] See, e.g., Angel Letter I, at 7–8; Horizon Kinetics Letter, at 2–3; Shultz Letter; Johnson Letter; Arrett Letter; Roge Letter; Perez Letter; Letter from Keith Arvidson, dated Apr. 5, 2022; Letter

from Rick Parker, dated Feb. 22, 2022; Letter from Michael J. Sheslow, dated Feb. 22, 2022; Letter from Omid Jafari, dated Feb. 18, 2022; Letter from Richard Payne, dated Feb. 19, 2022; Letter from Sunjeev Konduru, dated Mar. 16, 2022 ("Konduru Letter").

[248] See, e.g., Cammarata Letter, Coinbase Letter I, at 3; Coinbase Letter II, at 7; Fortress Letter, at 3; Harvey Letter, at 5 (stating "financial derivatives, including ETPs, can generally serve to enhance the liquidity and efficiency of the markets for many asset classes and currencies, including bitcoins" and "[i]t is difficult to imagine a scenario in which approval of [the Trust] as a bona fide ETP on the NYSE Arca would not increase the number of market participants, dollar-denominated liquidity, and other competitive forces that would lead to more efficient price discovery than currently exists in a semi-fragmented, global bitcoin spot market that lacks a regulated, centralized trading venue or order book"); Fortress Letter, at 3 (stating that the Trust can serve an important price discovery purpose and that, because of its size, the Trust will create additional liquidity and will allow for greater transparency and efficiency in the bitcoin market); Dreyfuss Letter, at 2 (stating that "increasing the liquidity of [the spot bitcoin] markets would actually reduce the influence of predatory forces by encouraging long term ownership across a broader spectrum of investors").

[249] See Coinbase Letter I, at 3.

[250] Coinbase Letter II, at 7.

[251] See, e.g., Blockchain Association Letter, at 1; Letter from David Noble, Director, The Werth Institute, University of Connecticut, dated Apr. 26, 2022 ("Noble Letter"); Letter from John Shinkunas, dated Apr. 10, 2022; Letter from Karl J. Randall, dated Feb. 28, 2022; Letter from Reginald M. Browne, Principal, GTS Securities, LLC, dated June 10, 2022 ("GTS Letter"), at 2.

[252] See, e.g., BitGo Letter, at 1;Virtu Letter, at 3–4; Groom Letter; Egan Letter; Angel Letter I; Chilson Letter; GTS Letter, at 2.

[253] See, e.g., Harvey Letter, at 5 ("as an ETP on the NYSE Arca, [the Trust] would continue to serve as a liquid, but even more regulated conduit for capital formation within the bitcoin ecosystem"); ADAM Letter, at 5 (stating that approval of the proposal would facilitate the Commission's mission of promoting capital formation); GTS Letter, at 2; Emory Letter, at 1–2 (stating that disapproval of the proposal would be "contrary to the goal of equitable access to means of wealth generation").

(2) Analysis

The Commission disagrees. Here, even if it were true that, compared to trading in unregulated spot bitcoin markets or OTC bitcoin funds, trading a spot bitcoin-based ETP on a national securities exchange could provide some additional protection to investors, or that the Shares would provide more efficient exposure to bitcoin than other products on the market such as bitcoin futures ETPs, or that approval of a spot bitcoin ETP could enhance competition or strengthen the underlying spot bitcoin and derivatives markets, the Commission must consider this potential benefit in the broader context of whether the proposal meets each of the applicable requirements of the Exchange Act.[254] Pursuant to Section 19(b)(2) of the Exchange Act, the Commission must approve a proposed rule change filed by a national securities exchange if it finds that the proposed rule change is consistent with the applicable requirements of the Exchange Act—including the requirement under Section 6(b)(5) that the rules of a national securities exchange be designed to prevent fraudulent and manipulative acts and practices—and it must disapprove the filing if it does not make such a finding.[255] Thus, even if a proposed rule change purports to protect investors from a particular type of investment risk—such as experiencing a potentially high premium/discount by investing in an OTC bitcoin fund or roll costs by investing in bitcoin futures ETPs—or purports to provide benefits to investors and the public interest—such as enhancing competition and bolstering resiliency in the underlying commodity or futures markets—the proposed rule change may still fail to meet the requirements under the Exchange Act.[256]

For the reasons discussed above, NYSE Arca has not met its burden of demonstrating an adequate basis in the record for the Commission to find that the proposal is consistent with Exchange Act Section 6(b)(5),[257] and,

accordingly, the Commission must disapprove the proposal.[258]

*D. Other Comments*

Comment letters also address, among other things, the general nature and uses of bitcoin and blockchain technology;[259] the state of development of bitcoin as an investment asset;[260] beneficial tax consequences of approval of a spot bitcoin ETP;[261] the merits of an investment in bitcoin;[262] the nature and state of the bitcoin mining network;[263] the current failure, and potential promotion, of U.S. competitiveness in the global marketplace relating to bitcoin;[264] suggestions for improving regulation of bitcoin and other digital assets markets and related market participants and criticisms of the current regulatory approach;[265] increasing education relating to, and accessibility of,

bitcoin;[266] the merits of the Sponsor;[267] and specific concerns relating to the Sponsor and its management of the Trust.[268] Ultimately, however, additional discussion of these topics is unnecessary, as they do not bear on the basis for the Commission's decision to disapprove the proposal.

**IV. Conclusion**

For the reasons set forth above, the Commission does not find, pursuant to Section 19(b)(2) of the Exchange Act, that the proposed rule change, as modified by Amendment No. 1, is consistent with the requirements of the Exchange Act and the rules and regulations thereunder applicable to a national securities exchange, and in particular, with Section 6(b)(5) of the Exchange Act.

*It is therefore ordered,* pursuant to Section 19(b)(2) of the Exchange Act, that proposed rule change SR–NYSEArca-2021–90, as modified by Amendment No. 1, be, and hereby is, disapproved.

By the Commission.

**Jill M. Peterson,**

*Assistant Secretary.*

[FR Doc. 2022–14310 Filed 7–5–22; 8:45 am]

**BILLING CODE 8011–01–P**

---

**SECURITIES AND EXCHANGE COMMISSION**

**[Release No. 34–95174; File No. SR–BOX–2022–19]**

**Self-Regulatory Organizations; BOX Exchange LLC; Notice of Filing of Proposed Rule Change To Amend Article 4 of the Exchange's Bylaws To Establish a Staggered Board**

June 29, 2022.

Pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 (the ''Act''),[1] and Rule 19b–4 thereunder,[2] notice is hereby given that on June 17, 2022, BOX Exchange LLC (the ''Exchange'') filed with the Securities and Exchange Commission (the ''Commission'') the proposed rule change as described in Items I and II below, which Items have been prepared by the self-regulatory organization. The Commission is publishing this notice to

---

[254] *See supra* note 235.

[255] *See* Exchange Act Section 19(b)(2)(C), 15 U.S.C. 78s(b)(2)(C). *See also Affiliated Ute Citizens of Utah* v. *United States,* 406 U.S. 128, 151 (1972) (Congress enacted the Exchange Act largely ''for the purpose of avoiding frauds''); *Gabelli* v. *SEC,* 568 U.S. 442, 451 (2013) (The ''SEC's core purpose'' is to detect and mitigate fraud.).

[256] *See* SolidX Order, 82 FR at 16259; VanEck Order, 86 FR at 54550–51; WisdomTree Order, 86 FR at 69344; Kryptoin Order, 86 FR at 74179; Valkyrie Order, 86 FR at 74163; SkyBridge Order, 87 FR at 3881; Wise Origin Order, 87 FR at 5538; ARK 21Shares Order, 87 FR at 20026–27.

[257] 15 U.S.C. 78f(b)(5).

[258] In disapproving the proposed rule change, the Commission has considered its impact on efficiency, competition, and capital formation. *See* 15 U.S.C. 78c(f). Some commenters state that approval of the proposal would enhance market efficiency and facilitate competition and capital formation. *See supra* notes 248–253 and accompanying text. For the reasons discussed throughout, however (*see supra* notes 56–57), the Commission is disapproving the proposed rule change because it does not find that the proposed rule change is consistent with the Exchange Act. *See also* USBT Order, 85 FR at 12615.

[259] *See, e.g.,* Angel Letter I, at 2–4, Letter from Thomas M. Wynne, dated Apr. 9, 2022 (''Wynne Letter''); Chilson Letter, at 1.

[260] *See, e.g.,* Moffitt Letter I; Letter from Patric Berger, dated Feb. 23, 2022; Letter from Sundeep Bollineni, dated Feb. 22, 2022; Chilson Letter; Letter from James McClave, Jane Street Capital, LLC, dated June 16, 2022.

[261] *See, e.g.,* Chen Letter; Letter from John Berggren, dated Feb. 14, 2022.

[262] *See, e.g.,* Seils Letter; Konduru Letter; Emory Letter.

[263] *See, e.g.,* Letters from David Bush, dated Feb. 22, 2022 (''Bush Letter''); Joseph D. Camp, Ph.D., Professor, Southern Methodist University, dated Feb. 14, 2022.

[264] *See, e.g.,* Elkhorn Letter; Johnson Letter; Valdata Letter; Bush Letter; Letter from Milton W., dated Feb. 23, 2022; Letter from Aaron Fenker, dated Feb. 23, 2022; Letter from Anil Gonania, dated Feb. 18, 2022; Letter from Nirav Trivedi, dated Feb. 11, 2022; Letter from Enrique Rea, Jr., dated Apr. 22, 2022; Chilson Letter, at 3; GTS Letter, at 2; Emory Letter, at 2. The Sponsor states that the U.S. lags global markets with respect to providing bitcoin and other digital asset ETPs and argues that approval of the proposal would support the White House Executive Order on Ensuring Responsible Development of Digital Assets by further bringing bitcoin into the regulatory perimeter. *See* Grayscale Submission, at 11–12. A commenter states that, ''as a global firm, it is concerning to observe the U.S. lagging far behind such foreign capital market competitors in offering regulated products for an emerging technology like Blockchain.'' Fortress Letter, at 3.

[265] *See, e.g.,* Angel Letter I, at 9–40; ADAM Letter, at 5; Dreyfuss Letter; Kane Letter; Boyer Letter; Letter from James J. Angel, Associate Professor of Finance, Georgetown University, dated May 6, 2022 (''Angel Letter II''); Chilson Letter, at 1–2.

[266] *See, e.g.,* Noble Letter; Letter from Julian Rogers, dated Apr. 7, 2022.

[267] *See, e.g.,* Wynne Letter; Henry Letter.

[268] *See, e.g.,* Letter from David B. Hennes, Ropes & Gray LLP, dated March 3, 2022 (expressing concern, on behalf of an unnamed ''interested investor,'' about the Sponsor's potential windfall if the Trust were to be allowed to convert to an ETP); Kleinfelder Letter.

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

ETP Holders are able to leverage existing protocols and specifications. Finally, the Exchange notes that the proposed functionality is not novel, as both the Exchange and other exchanges offer their members functionality whereby an exchange routes orders on behalf of a member to a specified trading center without such order interacting with the exchange's book.[12]

### B. Self-Regulatory Organization's Statement on Burden on Competition

The Exchange does not believe that the proposed rule change will impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act. The Exchange believes that the proposed rules governing Directed Orders they would provide for an order type on the Exchange that would facilitate additional trading opportunities for market participants. The Exchange further believes that the proposed rules would allow it to offer its ETP Holders functionality similar to order types and routing options that exist on other equities exchanges, thereby enabling the Exchange to compete with such exchanges.[13]

### C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants, or Others

No written comments were solicited or received with respect to the proposed rule change.

### III. Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action

Within 45 days of the date of publication of this notice in the **Federal Register** or *up to 90 days* (i) as the Commission may designate if it finds such longer period to be appropriate and publishes its reasons for so finding or (ii) as to which the self-regulatory organization consents, the Commission will:

(A) By order approve or disapprove the proposed rule change, or

(B) institute proceedings to determine whether the proposed rule change should be disapproved.

### IV. Solicitation of Comments

Interested persons are invited to submit written data, views, and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act.

Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*http://www.sec.gov/rules/sro.shtml*); or

• Send an email to *rule-comments@sec.gov*. Please include File Number SR–NYSENAT–2022–06 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to: Secretary, Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549–1090.

All submissions should refer to File Number SR–NYSENAT–2022–06. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*http://www.sec.gov/rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549 on official business days between the hours of 10:00 a.m. and 3:00 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. All comments received will be posted without change. Persons submitting comments are cautioned that we do not redact or edit personal identifying information from comment submissions. You should submit only information that you wish to make available publicly. All submissions should refer to File Number SR–NYSENAT–2022–06 and should be submitted on or before May 31, 2022.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[14]

**J. Matthew DeLesDernier,**
*Assistant Secretary.*

[FR Doc. 2022–09955 Filed 5–9–22; 8:45 am]

**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–94844; File No. SR–NYSEArca–2021–90]**

**Self-Regulatory Organizations; NYSE Arca, Inc.; Notice of Filing of Amendment No. 1 to, and Designation of a Longer Period for Commission Action on Proceedings To Determine Whether To Approve or Disapprove, a Proposed Rule Change To List and Trade Shares of Grayscale Bitcoin Trust (BTC) Under NYSE Arca Rule 8.201–E**

May 4, 2022.

On October 19, 2021, NYSE Arca, Inc. ("NYSE Arca" or "Exchange") filed with the Securities and Exchange Commission ("Commission"), pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act")[1] and Rule 19b–4 thereunder,[2] a proposed rule change to list and trade shares of Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares). The proposed rule change was published for comment in the **Federal Register** on November 8, 2021.[3] On December 15, 2021, pursuant to Section 19(b)(2) of the Act,[4] the Commission designated a longer period within which to approve the proposed rule change, disapprove the proposed rule change, or institute proceedings to determine whether to approve or disapprove the proposed rule change.[5] On February 4, 2022, the Commission instituted proceedings under Section 19(b)(2)(B) of the Act[6] to determine whether to approve or disapprove the proposed rule change.[7]

On April 21, 2022, the Exchange filed Amendment No. 1 to the proposed rule change, which supersedes the original filing in its entirety, and is described in Items I and II below, which Items have been prepared by the Exchange.[8] The Commission is publishing this notice to solicit comments on the proposed rule change, as modified by Amendment No.

---

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

[3] *See* Securities Exchange Act Release No. 93504 (Nov. 2, 2021), 86 FR 61804. Comments on the proposed rule change can be found at: *https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190.htm*.

[4] 15 U.S.C. 78s(b)(2).

[5] *See* Securities Exchange Act Release No. 93788, 86 FR 72291 (Dec. 21, 2021).

[6] 15 U.S.C. 78s(b)(2)(B).

[7] *See* Securities Exchange Act Release No. 94151, 87 FR 7889 (Feb. 10, 2022).

[8] In Amendment No. 1, the Exchange, among other things, provided updates to: (1) Certain statistical data, (2) information on the Index Price (as defined herein), and (3) information on the creation and redemption of Shares (as defined herein).

---

[12] *See* notes 7 & 8, *supra.*

[13] *See* note 8, *supra.*

[14] 17 CFR 200.30–3(a)(12).

1, from interested persons, and is designating a longer period within which to approve or disapprove the proposed rule change, as modified by Amendment No. 1.

## I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

The Exchange proposes to list and trade shares of the following under NYSE Arca Rule 8.201–E: Grayscale Bitcoin Trust (BTC) (the "Trust").[9] This Amendment No. 1 to SR–NYSEArca– 2021–90 replaces SR–NYSEArca–2021– 90 as originally filed and supersedes such filing in its entirety. The proposed change is available on the Exchange's website at *www.nyse.com,* at the principal office of the Exchange, and at the Commission's Public Reference Room.

## II. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the self-regulatory organization included statements concerning the purpose of, and basis for, the proposed rule change and discussed any comments it received on the proposed rule change. The text of those statements may be examined at the places specified in Item IV below. The Exchange has prepared summaries, set forth in sections A, B, and C below, of the most significant parts of such statements.

### A. Self-Regulatory Organization's Statement of the Purpose of, and the Statutory Basis for, the Proposed Rule Change

#### 1. Purpose

Under NYSE Arca Rule 8.201–E, the Exchange may propose to list and/or trade pursuant to unlisted trading privileges "Commodity-Based Trust Shares."[10] The Exchange proposes to list and trade shares ("Shares")[11] of the Trust pursuant to NYSE Arca Rule 8.201–E.[12]

[9] The Trust was previously named Bitcoin Investment Trust, whose name was changed pursuant to a Certificate of Amendment to the Certificate of Trust of Bitcoin Investment Trust filed with the Delaware Secretary of State on January 11, 2019.

[10] Commodity-Based Trust Shares are securities issued by a trust that represent investors' discrete identifiable and undivided beneficial ownership interest in the commodities deposited into the Trust.

[11] The Shares are expected to be listed under the ticker symbol "BTC."

[12] On March 22, 2016, the Trust confidentially filed its draft registration statement on Form 10 under the Securities Act of 1933 (15 U.S.C. 77a) (the "Securities Act" or "'33 Act") (File No. 377–01289)

(the "Draft Registration Statement on Form S–1"). On May 31, 2016, the Trust confidentially filed Amendment No. 1 to the Draft Registration Statement on Form S–1. On July 29, 2016, the Trust confidentially filed Amendment No. 2 to the Draft Registration Statement on Form S–1. On November 2, 2016, the Trust confidentially filed Amendment No. 3 to the Draft Registration Statement on Form S–1. The Jumpstart Our Business Startups Act (the "JOBS Act"), enacted on April 5, 2012, added Section 6(e) to the Securities Act. Section 6(e) of the Securities Act provides that an "emerging growth company" may confidentially submit to the Commission a draft registration statement for confidential, non-public review by the Commission staff prior to public filing, provided that the initial confidential submission and all amendments thereto shall be publicly filed not later than 21 days before the date on which the issuer conducts a road show, as such term is defined in Securities Act Rule 433(h)(4). An emerging growth company is defined in Section 2(a)(19) of the Securities Act as an issuer with less than $1,000,000,000 total annual gross revenues during its most recently completed fiscal year. The Trust meets the definition of an emerging growth company and consequently submitted its Draft Registration Statement on Form S–1 to the Commission on a confidential basis.

On January 20, 2017, the Trust filed its registration statement on Form S–1 under the Securities Act (File No. 333–215627) (the "Registration Statement on Form S–1"). On March 24, 2017, the Trust filed Amendment No. 1 to the Registration Statement on Form S–1. On May 4, 2017, the Trust filed Amendment No. 2 to the Registration Statement on Form S–1. On October 25, 2017, the Trust requested the withdrawal of the Registration Statement on Form S–1.

On October 3, 2018, the Trust confidentially filed its draft registration statement on Form 10 under the Securities Act (File No. 377–02297) (the "Draft Registration Statement on Form 10"). On December 6, 2018, the Trust confidentially filed Amendment No. 1 to the Draft Registration Statement on Form 10. On February 25, 2019, the Trust confidentially filed Amendment No. 2 to the Draft Registration Statement on Form 10. On April 15, 2019, the Trust confidentially filed Amendment No. 3 to the Draft Registration Statement on Form 10. On September 9, 2019, the Trust confidentially filed Amendment No. 4 to the Draft Registration Statement on Form 10. As noted above, the Trust meets the definition of an emerging growth company under the JOBS Act and consequently submitted its Draft Registration Statement on Form 10 to the Commission on a confidential basis.

On November 19, 2019, the Trust filed its registration statement on Form 10 under the Securities Act (File No. 000–56121) (the "Registration Statement on Form 10"). On December 31, 2019, the Trust filed Amendment No. 1 to the Registration Statement on Form 10. On January 21, 2020, the Registration Statement on Form 10 was automatically deemed effective.

On March 20, 2020, the Trust filed its annual report on Form 10–K under the Securities Act (File No. 000–56121). On May 8, 2020, August 7, 2020 and November 6, 2020, the Trust filed its quarterly reports on Form 10–Q under the Securities Act (File No. 000–56121). On March 5, 2021 and February 25, 2022, the Trust filed its annual report on Form 10–K under the Securities Act (File No. 000–56121) (the "Annual Report"). On May 7, 2021, August 6, 2021 and November 5, 2021, the Trust filed its quarterly reports on Form 10–Q under the Securities Act (File No. 000–56121) (the "Quarterly Reports"). The descriptions of the Trust, the Shares, and Bitcoin contained herein are based, in part, on the Annual Report and Quarterly Reports.

On January 17, 2019, the Trust submitted to the Commission an amended Form D as a business trust. Shares of the Trust have been quoted on OTC Market's OTCQX Best Marketplace under the symbol "GBTC" since March 26, 2015. On February

The sponsor of the Trust is Grayscale Investments, LLC ("Sponsor"), a Delaware limited liability company. The Sponsor is a wholly-owned subsidiary of Digital Currency Group, Inc. ("Digital Currency Group"). The trustee for the Trust is Delaware Trust Company ("Trustee"). The custodian for the Trust is Coinbase Custody Trust Company, LLC ("Custodian").[13] The administrator of the Trust is BNY Mellon Asset Servicing, a division of The Bank of New York Mellon (the "Administrator"). The distribution and marketing agent for the Trust is Genesis (the "Marketing Agent"). The index provider for the Trust is CoinDesk Indices, Inc., formerly known as TradeBlock, Inc. (the "Index Provider").

The Trust is a Delaware statutory trust, organized on September 13, 2013, that operates pursuant to a trust agreement between the Sponsor and the Trustee ("Trust Agreement"). The Trust has no fixed termination date.

Operation of the Trust

According to the Annual Report, the Trust's assets consist solely of Bitcoins, Incidental Rights,[14] IR Virtual

22, 2019 and March 20, 2020, the Trust published annual reports for GBTC for the periods ended December 31, 2018 and December 31, 2019, respectively. On May 14, 2019, August 8, 2019, November 14, 2019, May 8, 2020, August 7, 2020 and November 6, 2020, the Trust published quarterly reports for GBTC for the periods ended March 31, 2019, June 30, 2019, September 30, 2019, March 31, 2020, June 30, 2020 and September 30, 2020 respectively. Reports published before January 11, 2020, the date on which the Trust's Shares became registered pursuant to Section 12(g) of the Act, can be found on OTC Market's website (*http://www.otcmarkets.com/stock/GBTC/disclosure*), and reports published on or after January 11, 2020 can be found on OTC Market's website (*http://www.otcmarkets.com/stock/GBTC/disclosure*) and the Commission's website (*https://www.sec.gov/cgi-bin/browse-edgar?CIK=gbtc&owner=exclude&action=getcompany*). The Shares will be of the same class and will have the same rights as shares of GBTC, to which shareholders were permitted to request the redemption of their shares through Genesis Global Trading, Inc. (formerly known as SecondMarket, Inc.), an affiliate of the Sponsor and the Trust ("Genesis"). According to the Sponsor, freely tradeable shares of GBTC will remain freely tradeable Shares on the date of the listing of the Shares that are unregistered under the Securities Act. Restricted shares of GBTC will remain subject to private placement restrictions and the holders of such restricted shares will continue to hold those Shares subject to those restrictions until they become freely tradeable Shares.

[13] According to the Annual Report, Digital Currency Group owns a minority interest in Coinbase, Inc., which is the parent company of the Custodian, representing less than 1.0% of its equity.

[14] "Incidental Rights" are rights to acquire, or otherwise establish dominion and control over, any virtual currency or other asset or right, which rights are incident to the Trust's ownership of Bitcoins and arise without any action of the Trust, or of the Sponsor or Trustee on behalf of the Trust.

Currency,[15] proceeds from the sale of Bitcoins, Incidental Rights, and IR Virtual Currency pending use of such cash for payment of Additional Trust Expenses [16] or distribution to shareholders, and any rights of the Trust pursuant to any agreements, other than the Trust Agreement, to which the Trust is a party. Each Share represents a proportional interest, based on the total number of Shares outstanding, in each of the Trust's assets as determined by reference to the Index Price,[17] less the Trust's expenses and other liabilities (which include accrued but unpaid fees and expenses). The Sponsor expects that the market price of the Shares will fluctuate over time in response to the market prices of Bitcoin. In addition, because the Shares reflect the estimated accrued but unpaid expenses of the Trust, the number of Bitcoins represented by a Share will gradually decrease over time as the Trust's Bitcoins are used to pay the Trust's expenses. The Trust does not expect to take any Incidental Rights or IR Virtual Currency it may hold into account for purposes of determining the Trust's "Digital Asset Holdings" (as described below) or the Digital Asset Holdings per Share.

The activities of the Trust are limited to (i) issuing "Baskets" (as defined below) in exchange for Bitcoins transferred to the Trust as consideration in connection with the creations, (ii) transferring or selling Bitcoins, Incidental Rights, and IR Virtual Currency as necessary to cover the "Sponsor's Fee" and/or certain Trust expenses, (iii) transferring Bitcoins in exchange for Baskets surrendered for redemption (subject to obtaining regulatory approval from the SEC and approval of the Sponsor), (iv) causing the Sponsor to sell Bitcoins, Incidental Rights, and IR Virtual Currency on the termination of the Trust, (v) making distributions of Incidental Rights and/or IR Virtual Currency or cash from the sale thereof, and (vi) engaging in all administrative and security procedures necessary to accomplish such activities in accordance with the provisions of the Trust Agreement, the Custodian Agreement, the Index License Agreement and the Participant Agreements.

In addition, the Trust may engage in any lawful activity necessary or desirable in order to facilitate shareholders' access to Incidental Rights or IR Virtual Currency, provided that such activities do not conflict with the terms of the Trust Agreement. The Trust will not be actively managed. It will not engage in any activities designed to obtain a profit from, or to ameliorate losses caused by, changes in the market prices of Bitcoins.

Investment Objective

According to the Annual Report, and as further described below, the Trust's investment objective is for the value of the Shares (based on Bitcoin per Share) to reflect the value of the Bitcoins held by the Trust, as determined by reference to the Index Price, less the Trust's expenses and other liabilities. While an investment in the Shares is not a direct investment in Bitcoin, the Shares are designed to provide investors with a cost-effective and convenient way to gain investment exposure to Bitcoin. A substantial direct investment in Bitcoin may require expensive and sometimes complicated arrangements in connection with the acquisition, security and safekeeping of the Bitcoin and may involve the payment of substantial fees to acquire such Bitcoin from third-party facilitators through cash payments of U.S. dollars. Because the value of the Shares is correlated with the value of Bitcoin held by the Trust, it is important to understand the investment attributes of, and the market for, Bitcoin.

Bitcoin and the Bitcoin Network

According to the Annual Report, Bitcoin is a digital asset that is created and transmitted through the operations of the peer-to-peer "Bitcoin Network," a decentralized network of computers that operates on cryptographic protocols. No single entity owns or operates the Bitcoin Network, the infrastructure of which is collectively maintained by a decentralized user base. The Bitcoin Network allows people to exchange tokens of value, called Bitcoin, which are recorded on a public transaction ledger known as a Blockchain. Bitcoin can be used to pay for goods and services, or it can be converted to fiat currencies, such as the U.S. dollar, at rates determined on "Digital Asset Markets" [18] that trade Bitcoin or in individual end-user-to-end-user transactions under a barter system.

The Bitcoin Network is decentralized and does not require governmental authorities or financial institution intermediaries to create, transmit, or determine the value of Bitcoin. Rather, Bitcoin is created and allocated by the Bitcoin Network protocol through a "mining" process. The value of Bitcoin is determined by the supply of and demand for Bitcoin on the Digital Asset Markets or in private end-user-to-end-user transactions.

New Bitcoin are created and rewarded to the miners of a block in the Blockchain for verifying transactions. The Blockchain is effectively a decentralized database that includes all blocks that have been solved by miners, and it is updated to include new blocks as they are solved. Each Bitcoin transaction is broadcast to the Bitcoin Network and, when included in a block, recorded in the Blockchain. As each new block records outstanding Bitcoin transactions, and outstanding transactions are settled and validated through such recording, the Blockchain represents a complete, transparent and unbroken history of all transactions of the Bitcoin Network.

Summary of a Bitcoin Transaction

Prior to engaging in Bitcoin transactions directly on the Bitcoin Network, a user generally must first install on its computer or mobile device a Bitcoin Network software program that will allow the user to generate a private and public key pair associated with a Bitcoin address, commonly referred to as a "wallet." The Bitcoin Network software program and the Bitcoin address also enable the user to connect to the Bitcoin Network and transfer

---

[15] "IR Virtual Currency" is any virtual currency tokens, or other asset or right, acquired by the Trust through the exercise (subject to the applicable provisions of the Trust Agreement) of any Incidental Right.

[16] "Additional Trust Expenses" are any expenses incurred by the Trust in addition to the Sponsor's Fee that are not Sponsor-paid Expenses, including, but not limited to, (i) taxes and governmental charges, (ii) expenses and costs of any extraordinary services performed by the Sponsor (or any other service provider) on behalf of the Trust to protect the Trust or the interests of shareholders (including in connection with any Incidental Rights and any IR Virtual Currency), (iii) any indemnification of the Custodian or other agents, service providers or counterparties of the Trust, (iv) the fees and expenses related to the listing, quotation or trading of the Shares on any Secondary Market (including legal, marketing and audit fees and expenses) to the extent exceeding $600,000 in any given fiscal year and (v) extraordinary legal fees and expenses, including any legal fees and expenses incurred in connection with litigation, regulatory enforcement or investigation matters.

[17] The "Index Price" means the U.S. dollar value of a Bitcoin derived from the Digital Asset Exchanges that are reflected in the Index, calculated at 4:00 p.m., New York time, on each business day. For purposes of the Trust Agreement, the term Bitcoin Index Price has the same meaning as the Index Price as defined herein.

[18] A "Digital Asset Market" is a "Brokered Market," "Dealer Market," "Principal-to-Principal Market" or "Exchange Market," as each such term is defined in the Financial Accounting Standards Board Accounting Standards Codification Master Glossary. The "Digital Asset Exchange Market" is the global exchange market for the trading of Bitcoins, which consists of transactions on electronic Digital Asset Exchanges. A "Digital Asset Exchange" is an electronic marketplace where exchange participants may trade, buy and sell Bitcoins based on bid-ask trading. The largest Digital Asset Exchanges are online and typically trade on a 24-hour basis, publishing transaction price and volume data.

Bitcoin to, and receive Bitcoin from, other users.

Each Bitcoin Network address, or wallet, is associated with a unique "public key" and "private key" pair. To receive Bitcoin, the Bitcoin recipient must provide its public key to the party initiating the transfer. This activity is analogous to a recipient for a transaction in U.S. dollars providing a routing address in wire instructions to the payor so that cash may be wired to the recipient's account. The payor approves the transfer to the address provided by the recipient by "signing" a transaction that consists of the recipient's public key with the private key of the address from where the payor is transferring the Bitcoin. The recipient, however, does not make public or provide to the sender its related private key.

Neither the recipient nor the sender reveal their private keys in a transaction, because the private key authorizes transfer of the funds in that address to other users. Therefore, if a user loses his private key, the user may permanently lose access to the Bitcoin contained in the associated address. Likewise, Bitcoin is irretrievably lost if the private key associated with them is deleted and no backup has been made. When sending Bitcoin, a user's Bitcoin Network software program must validate the transaction with the associated private key. In addition, since every computation on the Bitcoin Network requires processing power, there is a transaction fee involved with the transfer that is paid by the payor. The resulting digitally validated transaction is sent by the user's Bitcoin Network software program to the Bitcoin Network miners to allow transaction confirmation.

Bitcoin Network miners record and confirm transactions when they mine and add blocks of information to the Blockchain. When a miner mines a block, it creates that block, which includes data relating to (i) the satisfaction of the consensus mechanism to mine the block, (ii) a reference to the prior block in the Blockchain to which the new block is being added and (iii) transactions that have submitted to the Bitcoin Network but have not yet been added to the Blockchain. The miner becomes aware of outstanding, unrecorded transactions through the data packet transmission and distribution discussed above.

Upon the addition of a block included in the Blockchain, the Bitcoin Network software program of both the spending party and the receiving party will show confirmation of the transaction on the Blockchain and reflect an adjustment to the Bitcoin balance in each party's

Bitcoin Network public key, completing the Bitcoin transaction. Once a transaction is confirmed on the Blockchain, it is irreversible.

Some Bitcoin transactions are conducted "off-blockchain" and are therefore not recorded in the Blockchain. Some "off-blockchain transactions" involve the transfer of control over, or ownership of, a specific digital wallet holding Bitcoin or the reallocation of ownership of certain Bitcoin in a pooled-ownership digital wallet, such as a digital wallet owned by a Digital Asset Exchange. In contrast to on-blockchain transactions, which are publicly recorded on the Blockchain, information and data regarding off-blockchain transactions are generally not publicly available. Therefore, off-blockchain transactions are not truly Bitcoin transactions in that they do not involve the transfer of transaction data on the Bitcoin Network and do not reflect a movement of Bitcoin between addresses recorded in the Blockchain. For these reasons, off-blockchain transactions are subject to risks, as any such transfer of Bitcoin ownership is not protected by the protocol behind the Bitcoin Network or recorded in, and validated through, the blockchain mechanism.

## Custody of the Trust's Bitcoins

Digital assets and digital asset transactions are recorded and validated on blockchains, the public transaction ledgers of a digital asset network. Each digital asset blockchain serves as a record of ownership for all of the units of such digital asset, even in the case of certain privacy-focused digital assets, where the transactions themselves are not publicly viewable. All digital assets recorded on a blockchain are associated with a public blockchain address, also referred to as a digital wallet. Digital assets held at a particular public blockchain address may be accessed and transferred using a corresponding private key.

## Key Generation

Public addresses and their corresponding private keys are generated by the Custodian in secret key generation ceremonies at secure locations inside faraday cages, which are enclosures used to block electromagnetic fields and mitigate attacks. The Custodian uses quantum random number generators to generate the public and private key pairs.

Once generated, private keys are encrypted, separated into "shards," and then further encrypted. After the key generation ceremony, all materials used to generate private keys, including

computers, are destroyed. All key generation ceremonies are performed offline. No party other than the Custodian has access to the private key shards of the Trust.

## Key Storage

Private key shards are distributed geographically in secure vaults around the world, including in the United States. The locations of the secure vaults may change regularly and are kept confidential by the Custodian for security purposes.

The Digital Asset Account [19] uses offline storage, or "cold storage", mechanisms to secure the Trust's private keys. The term cold storage refers to a safeguarding method by which the private keys corresponding to digital assets are disconnected and/or deleted entirely from the internet. Cold storage of private keys may involve keeping such keys on a non-networked (or "airgapped") computer or electronic device or storing the private keys on a storage device (for example, a USB thumb drive) or printed medium (for example, papyrus, paper, or a metallic object). A digital wallet may receive deposits of digital assets but may not send digital assets without use of the digital assets' corresponding private keys. In order to send digital assets from a digital wallet in which the private keys are kept in cold storage, either the private keys must be retrieved from cold storage and entered into an online, or "hot," digital asset software program to sign the transaction, or the unsigned transaction must be transferred to the cold server in which the private keys are held for signature by the private keys and then transferred back to the online digital asset software program. At that point, the user of the digital wallet can transfer its digital assets.

## Security Procedures

The Custodian is the custodian of the Trust's private keys in accordance with the terms and provisions of the Custodian Agreement. Transfers from the Digital Asset Account require certain security procedures, including, but not limited to, multiple encrypted private key shards, usernames, passwords and 2-step verification. Multiple private key shards held by the Custodian must be combined to reconstitute the private key to sign any transaction in order to transfer the Trust's assets. Private key shards are distributed geographically in secure

---

[19] The Digital Asset Account is a segregated custody account controlled and secured by the Custodian to store private keys, which allows for the transfer of ownership or control of the Trust's Bitcoins on the Trust's behalf.

vaults around the world, including in the United States.

As a result, if any one secure vault is ever compromised, this event will have no impact on the ability of the Trust to access its assets, other than a possible delay in operations, while one or more of the other secure vaults is used instead. These security procedures are intended to remove single points of failure in the protection of the Trust's assets.

Transfers of Bitcoins to the Digital Asset Account will be available to the Trust once processed on the Blockchain.

Subject to obtaining regulatory approval to operate a redemption program and authorization of the Sponsor, the process of accessing and withdrawing Bitcoin from the Trust to redeem a Basket by an Authorized Participant will follow the same general procedure as transferring Bitcoins to the Trust to create a Basket by an Authorized Participant, only in reverse.

Digital Asset Holdings

According to the Annual Report, the Trust's assets consist solely of Bitcoins, Incidental Rights, IR Virtual Currency, proceeds from the sale of Bitcoins, Incidental Rights, and IR Virtual Currency pending use of such cash for payment of Additional Trust Expenses or distribution to the shareholders, and any rights of the Trust pursuant to any agreements, other than the Trust Agreement, to which the Trust is a party. Each Share represents a proportional interest, based on the total number of Shares outstanding, in each of the Trust's assets as determined in the case of Bitcoin by reference to the Index Price, less the Trust's expenses and other liabilities (which include accrued but unpaid fees and expenses). The Sponsor expects that the market price of the Shares will fluctuate over time in response to the market prices of Bitcoin. In addition, because the Shares reflect the estimated accrued but unpaid expenses of the Trust, the number of Bitcoin represented by a Share will gradually decrease over time as the Trust's Bitcoin is used to pay the Trust's expenses. The Trust does not expect to take any Incidental Rights or IR Virtual Currency it may hold into account for purposes of determining the Trust's Digital Asset Holdings or the Digital Asset Holdings per Share.

The Sponsor will evaluate the Bitcoin held by the Trust and determine the Digital Asset Holdings of the Trust in accordance with the relevant provisions of the Trust Documents. The following is a description of the material terms of the Trust Documents as they relate to

valuation of the Trust's Bitcoin and the Digital Asset Holdings calculations.

On each business day at 4:00 p.m., New York time, or as soon thereafter as practicable (the "Evaluation Time"), the Sponsor will evaluate the Bitcoin held by the Trust and calculate and publish the Digital Asset Holdings of the Trust. To calculate the Digital Asset Holdings, the Sponsor will:

1. Determine the Index Price as of such business day.

2. Multiply the Index Price by the Trust's aggregate number of Bitcoins owned by the Trust as of 4:00 p.m., E.T. on the immediately preceding day, less the aggregate number of Bitcoins payable as the accrued and unpaid Sponsor's Fee as of 4:00 p.m., E.T. on the immediately preceding day.

3. Add the U.S. dollar value of Bitcoins, calculated using the Index Price, receivable under pending creation orders, if any, determined by multiplying the number of the Baskets represented by such creation orders by the Basket Amount and then multiplying such product by the Index Price.[20]

4. Subtract the U.S. dollar amount of accrued and unpaid Additional Trust Expenses, if any.

5. Subtract the U.S. dollar value of the Bitcoins, calculated using the Index Price, to be distributed under pending redemption orders, if any, determined by multiplying the number of Baskets to be redeemed represented by such redemption orders by the Basket Amount and then multiplying such product by the Index Price (the amount derived from steps 1 through 5 above, the "Digital Asset Holdings Fee Basis Amount").

6. Subtract the U.S. dollar amount of the Sponsor's Fee that accrues for such business day, as calculated based on the Digital Asset Holdings Fee Basis Amount for such business day.

In the event that the Sponsor determines that the primary methodology used to determine the Index Price is not an appropriate basis for valuation of the Trust's Bitcoins, the Sponsor will utilize the cascading set of rules as described in "Trust Valuation of Bitcoin" below. In addition, in the event that the Trust holds any Incidental Rights and/or IR Virtual Currency, the Sponsor may, at its discretion, include the value of such Incidental Rights and/ or IR Virtual Currency in the determination of the Digital Asset Holdings, provided that the Sponsor has determined in good faith a method for assigning an objective value to such

Incidental Rights and/or IR Virtual Currency. At this time, the Trust does not expect to take any Incidental Rights or IR Virtual Currency it may hold into account for the purposes of determining the Digital Asset Holdings or the Digital Asset Holdings per Share.

Limits on Bitcoin Supply

The supply of new Bitcoin is mathematically controlled so that the number of Bitcoin grows at a limited rate pursuant to a pre-set schedule. The number of Bitcoin awarded for solving a new block is automatically halved after every 210,000 blocks are added to the Blockchain. Currently, the fixed reward for solving a new block is 6.25 Bitcoin per block and this is expected to decrease by half to become 3.125 Bitcoin after the next 210,000 blocks have entered the Bitcoin Network, which is expected to be mid-2024. This deliberately controlled rate of Bitcoin creation means that the number of Bitcoin in existence will increase at a controlled rate until the number of Bitcoin in existence reaches the pre-determined 21 million Bitcoin. As of December 31, 2021, approximately 18.9 million Bitcoins were outstanding and the date when the 21 million Bitcoin limitation will be reached is estimated to be the year 2140.

Bitcoin Value

Digital Asset Exchange Valuation

According to the Annual Report, the value of Bitcoin is determined by the value that various market participants place on Bitcoin through their transactions. The most common means of determining the value of a Bitcoin is by surveying one or more Digital Asset Exchanges where Bitcoin is traded publicly (*e.g.*, Coinbase Pro, Bitstamp, Kraken, and LMAX Digital). Additionally, there are over-the-counter dealers or market makers that transact in Bitcoin.

Digital Asset Exchange Public Market Data

On each online Digital Asset Exchange, Bitcoin is traded with publicly disclosed valuations for each executed trade, measured by one or more fiat currencies such as the U.S. dollar or Euro. Over-the-counter dealers or market makers do not typically disclose their trade data.

As of December 31, 2021, the Digital Asset Exchanges included in the Index are Coinbase Pro, Bitstamp, Kraken and LMAX Digital. As further described below, each of these Digital Asset Exchanges are in compliance with applicable U.S. federal and state

---

[20] "Baskets" and "Basket Amount" have the meanings set forth in "Creation of Shares" below.

licensing requirements and practices regarding AML and KYC regulations.

*Coinbase Pro:* A U.S.-based exchange registered as a money services business (''MSB'') with FinCen and licensed as a virtual currency business under the NYDFS BitLicense as well as money transmitter in various U.S. states.

*Bitstamp:* A U.K.-based exchange registered as an MSB with FinCen and licensed as a virtual currency business under the NYDFS BitLicense as well as money transmitter in various U.S. states.

*Kraken:* A U.S.-based exchange registered as an MSB with FinCen and licensed as money transmitter in various U.S. states. Kraken does not hold a BitLicense.

*LMAX Digital:* A U.K.-based exchange registered as a broker with FCA. LMAX Digital does not hold a BitLicense.

Currently, there are several Digital Asset Exchanges operating worldwide, and online Digital Asset Exchanges represent a substantial percentage of Bitcoin buying and selling activity and provide the most data with respect to

prevailing valuations of Bitcoins. These exchanges include established exchanges such as exchanges included in the Index, which provide a number of options for buying and selling Bitcoins. The below table reflects the trading volume in Bitcoins and market share of the BTC–U.S. dollar trading pair of each of the Digital Asset Exchanges included in the Index as of December 31, 2021 using data reported by the Index Provider from May 1, 2015 to December 31, 2021:

| Digital Asset Exchanges included in the Index as of December 31, 2021 [21] | Volume (BTC) | Market share [22] (%) |
|---|---|---|
| Coinbase Pro .................................................................................................................................. | 32,019,298 | 20.76 |
| Bitstamp ......................................................................................................................................... | 22,030,291 | 14.28 |
| Kraken ............................................................................................................................................ | 11,009,299 | 7.14 |
| LMAX Digital .................................................................................................................................. | 6,329,133 | 4.10 |
| Total BTC–U.S. dollar trading pair ........................................................................................... | 71,388,021 | 46.28 |

The domicile, regulation, and legal compliance of the Digital Asset Exchanges included in the Index varies. Information regarding each Digital Asset Exchange may be found, where available, on the websites for such Digital Asset Exchanges, among other places.

The Index and the Index Price

The Index is a U.S. dollar-denominated composite reference rate for the price of Bitcoin. The Index is designed to (i) mitigate the effects of fraud, manipulation and other anomalous trading activity from impacting the Bitcoin reference rate, (ii) provide a real-time, volume-weighted fair value of Bitcoin and (iii) appropriately handle and adjust for non-market related events.

The Index Price is determined by the Index Provider through a process in

which trade data is cleansed and compiled in such a manner as to algorithmically reduce the impact of anomalistic or manipulative trading. This is accomplished by adjusting the weight of each data input based on price deviation relative to the observable set, as well as recent and long-term trading volume at each venue relative to the observable set.

Constituent Exchange Selection

According to the Annual Report, the Digital Asset Exchanges that are included in the Index are selected by the Index Provider utilizing a methodology that is guided by the International Organization of Securities Commissions (''IOSCO'') principles for financial benchmarks. For an exchange to become a Digital Asset Exchange included in the Index (a ''Constituent Exchange''), it must satisfy the criteria listed below (the ''Inclusion Criteria''):

• Compliance with applicable U.S. federal and state licensing requirements and practices regarding anti-money laundering (''AML'') and know-your-customer (''KYC'') regulations;

• Publicly known ownership;

• No restrictions on deposits and/or withdrawals of Bitcoin;

• No restrictions on deposits and/or withdrawals of U.S. dollars;

• Reliably displays new trade prices and volumes on a real-time basis through APIs;

• Programmatic trading [23] of Bitcoin/U.S. dollar spot price;

• Liquid market in the Bitcoin/U.S. dollar spot price;

• Trading volume must represent a minimum of total Bitcoin/U.S. dollar trading volumes (5% for U.S. exchanges and 10% non-U.S. exchanges); and

• Discretion of the Index Provider's analysts [24]

A Digital Asset Exchange is removed from the Index when it no longer satisfies the Inclusion Criteria. The Index Provider does not currently include data from over-the-counter markets or derivatives platforms among the Constituent Exchanges. According to the Annual Report, over-the-counter data is not currently included because of the potential for trades to include a significant premium or discount paid for larger liquidity, which creates an uneven comparison relative to more active markets. There is also a higher potential for over-the-counter transactions to not be arms-length, and thus not be representative of a true market price. Bitcoin derivative markets are also not currently included as the markets remain relatively thin. The Index Provider will consider IOSCO principles for financial benchmarks and the management of trading venues of Bitcoin derivatives when considering inclusion of over-the-counter or derivative platform data in the future.

The Index Provider and the Sponsor have entered into an index license agreement, dated as of February 1, 2022 (the ''Index License Agreement''), governing the Sponsor's use of the Index

---

[21] On January 19, 2020, the Index Provider removed Bittrex due to a lack of trading volume and added LMAX Digital based on the exchange meeting the liquidity thresholds for inclusion in the Index. On April 6, 2020, the Index Provider removed itBit due to a lack of trading volume and did not add any constituents as part of its scheduled quarterly review.

[22] Market share is calculated using trading volume data (in Bitcoins) provided by the Index Provider for certain Digital Asset Exchanges, including Coinbase Pro, Bitstamp, Kraken, and LMAX Digital, as well as certain other large U.S.-dollar denominated Digital Asset Exchanges that are not currently included in the Index, including Binance, US (data included from April 1, 2020), Bitfinex, Bitflyer (data included from December 24, 2018), Bittrex (data included from July 31, 2018), ErisX (data included from October 1, 2020), Gemini, itBit, LakeBTC (data included from May 1, 2015 to June 1, 2018 and from January 27, 2019), HitBTC (data included from April 1, 2019 to March 31, 2020) and OKCoin.

[23] Exchanges with programmatic trading offer traders an application programming interface that permits trading by sending programmed commands to the exchange.

[24] This includes additional due diligence conducted by the Index Provider's analysts.

Price.[25] Pursuant to the terms of the Index License Agreement, the Index Provider may adjust the calculation methodology for the Index Price without notice to, or consent of, the Trust or its shareholders. The Index Provider may decide to change the calculation methodology to maintain the integrity of the Index Price calculation should it identify or become aware of previously unknown variables or issues with the existing methodology that it believes could materially impact its performance and/or reliability. The Index Provider has sole discretion over the determination of Index Price and may change the methodologies for determining the Index Price from time to time. Shareholders will be notified of any material changes to the calculation methodology or the Index Price in the Trust's current reports and will be notified of all other changes that the Sponsor considers significant in the Trust's periodic reports. The Trust will determine the materiality of any changes to the Index Price on a case-by-case basis, in consultation with external counsel.

The Index Provider may change the trading venues that are used to calculate the Index or otherwise change the way in which the Index is calculated at any time. For example, the Index Provider has scheduled quarterly reviews in which it may add or remove Constituent Exchanges that satisfy or fail the Inclusion Criteria. The Index Provider does not have any obligation to consider the interests of the Sponsor, the Trust, the shareholders, or anyone else in connection with such changes. The Index Provider is not required to publicize or explain the changes or to alert the Sponsor to such changes. Although the Index methodology is designed to operate without any manual intervention, rare events would justify manual intervention. Intervention of this kind would be in response to non-market-related events, such as the halting of deposits or withdrawals of funds on a Digital Asset Exchange, the unannounced closure of operations on a Digital Asset Exchange, insolvency or the compromise of user funds. In the event that such an intervention is necessary, the Index Provider would issue a public announcement through its website, API and other established communication channels with its clients.

[25] Upon entering into the Index License Agreement, the Sponsor and the Index Provider terminated the license agreement between the parties dated as of February 28, 2019.

Determination of the Index Price

The Index applies an algorithm to the price of Bitcoin on the Constituent Exchanges calculated on a per second basis over a 24-hour period. The Index's algorithm is expected to reflect a four-pronged methodology to calculate the Index Price from the Constituent Exchanges:

• *Volume Weighting:* Constituent Exchanges with greater liquidity receive a higher weighting in the Index Price, increasing the ability to execute against (*i.e.*, replicate) the Index in the underlying spot markets.

• *Price-Variance Weighting:* The Index Price reflects data points that are discretely weighted in proportion to their variance from the rest of the other Constituent Exchanges. As the price at a particular exchange diverges from the prices at the rest of the Constituent Exchanges, its weight in the Index Price consequently decreases.

• *Inactivity Adjustment:* The Index Price algorithm penalizes stale activity from any given Constituent Exchange. When a Constituent Exchange does not have recent trading data, its weighting in the Index Price is gradually reduced until it is de-weighted entirely. Similarly, once trading activity at a Constituent Exchange resumes, the corresponding weighting for that Constituent Exchange is gradually increased until it reaches the appropriate level.

• *Manipulation Resistance:* In order to mitigate the effects of wash trading and order book spoofing, the Index Price only includes executed trades in its calculation. Additionally, the Index Price only includes Constituent Exchanges that charge trading fees to its users in order to attach a real, quantifiable cost to any manipulation attempts.

The Index Provider formally re-evaluates the weighting algorithm quarterly, but maintains discretion to change the way in which an Index Price is calculated based on its periodic review or in extreme circumstances. The Index is designed to limit exposure to trading or price distortion of any individual Digital Asset Exchange that experiences periods of unusual activity or limited liquidity by discounting, in real-time, anomalous price movements at individual Digital Asset Exchanges.

The Sponsor believes the Index Provider's selection process for Constituent Exchanges as well as the methodology of the Index Price's algorithm provides a more accurate picture of Bitcoin price movements than a simple average of Digital Asset Exchange spot prices, and that the

weighting of Bitcoin prices on the Constituent Exchanges limits the inclusion of data that is influenced by temporary price dislocations that may result from technical problems, limited liquidity or fraudulent activity elsewhere in the Bitcoin spot market. By referencing multiple trading venues and weighting them based on trade activity, the Sponsor believes that the impact of any potential fraud, manipulation or anomalous trading activity occurring on any single venue is reduced.

If the Index Price becomes unavailable, or if the Sponsor determines in good faith that such Index Price does not reflect an accurate price for Bitcoin, then the Sponsor will, on a best efforts basis, contact the Index Provider to obtain the Index Price directly from the Index Provider. If after such contact such Index Price remains unavailable or the Sponsor continues to believe in good faith that such Index Price does not reflect an accurate price for the relevant digital asset, then the Sponsor will employ a cascading set of rules to determine the Index Price, as described below in ''Determination of the Index Price When Index Prices are Unavailable.''

The Trust values its Bitcoin for operational purposes by reference to the Index Price. The Index Price is the value of a Bitcoin as represented by the Index, calculated at 4:00 p.m., New York time, on each business day. The Index Provider develops, calculates and publishes the Index on a continuous basis using the price at the Digital Asset Benchmark Exchanges, as selected by the Index Provider.

Illustrative Example

For the purposes of illustration, outlined below are examples of how the attributes that impact weighting and adjustments in the aforementioned methodology may be utilized to generate the Index Price for a digital asset. For example, the Constituent Exchanges for the Index Price of the digital asset are Coinbase Pro, Kraken, LMAX Digital and Bitstamp.

The Index Price algorithm, as described above, accounts for manipulation at the outset by only including data from executed trades on Constituent Exchanges that charge trading fees. Then, the below-listed elements may impact the weighting of the Constituent Exchanges on the Index price as follows:

• *Volume Weighting:* Each Constituent Exchange will be weighted to appropriately reflect the trading volume share of the Constituent Exchange relative to all the Constituent Exchanges during this same period. For

example, an average hourly weighting of 52.17%, 11.88%, 24.46% and 11.49% for Coinbase Pro, Kraken, LMAX Digital and Bitstamp, respectively, would represent each Constituent Exchange's share of trading volume during the same period.

• *Inactivity Adjustment:* Assume that a Constituent Exchange's trading engine represented a 14% influence on the trading price of the digital asset and then went offline for approximately two hours. The index algorithm automatically recognizes inactivity and de-weights that Constituent Exchange's influence in the Index Price—for example, from 14% to 0%—until trading activity resumes. At which point it would re-weight the Constituent Exchange activity to a weight lower than its original weighting—for example, to 12%.

• *Price-Variance Weighting:* Assume that for a one-hour period, the digital asset's execution prices on one Constituent Exchange were trading more than 7% higher than the average execution prices on another Constituent Exchange. The algorithm will automatically detect the anomaly and reduce that specific Constituent Exchange's weighting to 0% for that one-hour period, ensuring a reliable spot reference unaffected by the localized event.

Determination of the Index Price When Index Price is Unavailable

The Sponsor will use the following cascading set of rules to calculate the Index Price.[26] For the avoidance of doubt, the Sponsor will employ the below rules sequentially and in the order as presented below, should one or more specific rule(s) fail.

1. Index Price = The price set by the Index at 4:00 p.m., New York time, on the valuation date. If the Index becomes unavailable, or if the Sponsor determines in good faith that the Index does not reflect an accurate price, then the Sponsor will, on a best efforts basis, contact the Index Price directly from the Index Provider. If after such contact the Index remains unavailable or the Sponsor continues to believe in good faith that the Index does not reflect an accurate price, then the Sponsor will employ the next rule to determine the Index Price. There are no predefined criteria to make a good faith assessment and it will be made by the Sponsor in its sole discretion.

2. Index Price = The price set by Coin Metrics Real-Time Rate (the ''Secondary

---

[26] The Sponsor updated these rules on January 11, 2022.

Index'') as of 4:00 p.m., New York time, on the valuation date (the ''Secondary Index Price''). The Secondary Index Price is a real-time reference rate price, calculated using trade data from constituent markets selected by Coin Metrics (the ''Secondary Index Provider''). The Secondary Index Price is calculated by applying weighted-median techniques to such trade data where half the weight is derived from the trading volume on each constituent market and half is derived from inverse price variance, where a constituent market with high price variance as a result of outliers or market anomalies compared to other constituent markets is assigned a smaller weight. If the Secondary Index becomes unavailable, or if the Sponsor determines in good faith that the Secondary Index does not reflect an accurate price, then the Sponsor will, on a best efforts basis, contact the Secondary Index Provider to obtain the Secondary Index Price directly from the Secondary Index Provider. If after such contact the Secondary Index remains unavailable or the Sponsor continues to believe in good faith that the Secondary Index does not reflect an accurate price, then the Sponsor will employ the next rule to determine the Index Price. There are no predefined criteria to make a good faith assessment and it will be made by the Sponsor in its sole discretion.

3. Index Price = The price set by the Trust's principal market (the ''Tertiary Pricing Option'') as of 4:00 p.m., New York time, on the valuation date. The Tertiary Pricing Option is a spot price derived from the principal market's public data feed that is believed to be consistently publishing pricing information as of 4:00 p.m., New York time, and is provided to the Sponsor via an application programming interface. If the Tertiary Pricing Option becomes unavailable, or if the Sponsor determines in good faith that the Tertiary Pricing Option does not reflect an accurate price, then the Sponsor will, on a best efforts basis, contact the Tertiary Pricing Provider to obtain the Tertiary Pricing Option directly from the Tertiary Pricing Provider. If after such contact the Tertiary Pricing Option remains unavailable after such contact or the Sponsor continues to believe in good faith that the Tertiary Pricing Option does not reflect an accurate price, then the Sponsor will employ the next rule to determine the Index Price. There are no predefined criteria to make a good faith assessment and it will be made by the Sponsor in its sole discretion.

4. Index Price = The Sponsor will use its best judgment to determine a good

faith estimate of the Index Price. There are no predefined criteria to make a good faith assessment and it will be made by the Sponsor in its sole discretion.

In the event of a fork, the Index Provider may calculate the Index Price based on a virtual currency that the Sponsor does not believe to be the appropriate asset that is held by the Trust.[27] In this event, the Sponsor has full discretion to use a different index provider or calculate the Index Price itself using its best judgment.

The Structure and Operation of the Trust Protects Investors and Satisfies Commission Requirements for Bitcoin-Based Exchange Traded Products

The Commission has expressed legitimate concerns about the underlying Digital Asset Market due to the potential for fraud and manipulation and has clearly outlined the reasons why prior Bitcoin-based ETP proposals have been unable to satisfy these concerns in orders disapproving the proposed listing and trading of the Winklevoss Bitcoin Trust, Bitwise Bitcoin ETF Trust, United States Bitcoin and Treasury Investment Trust, and

---

[27] According to the Annual Report, when a modification is introduced and a substantial majority of users and miners consent to the modification, the change is implemented and the network remains uninterrupted. However, if less than a substantial majority of users and miners consent to the proposed modification, and the modification is not compatible with the software prior to its modification, the consequence would be what is known as a ''hard fork'' of the Bitcoin Network, with one group running the pre-modified software and the other running the modified software. The effect of such a fork would be the existence of two versions of Bitcoin running in parallel, yet lacking interchangeability. For example, in August 2017, Bitcoin ''forked'' into Bitcoin and a new digital asset, Bitcoin Cash, as a result of a several-year dispute over how to increase the rate of transactions that the Bitcoin Network can process. In the event of a hard fork of the Bitcoin Network, the Sponsor will, if permitted by the terms of the Trust Agreement, use its discretion to determine, in good faith, which peer-to-peer network, among a group of incompatible forks of the Bitcoin Network, is generally accepted as the Bitcoin Network and should therefore be considered the appropriate network for the Trust's purposes. The Sponsor will base its determination on a variety of then relevant factors, including, but not limited to, the Sponsor's beliefs regarding expectations of the core developers of Bitcoin, users, services, businesses, miners, and other constituencies, as well as the actual continued acceptance of, mining power on, and community engagement with, the Bitcoin Network. There is no guarantee that the Sponsor will choose the digital asset that is ultimately the most valuable fork, and the Sponsor's decision may adversely affect the value of the Shares as a result. The Sponsor may also disagree with shareholders, security vendors, and the Index Provider on what is generally accepted as Bitcoin and should therefore be considered ''Bitcoin'' for the Trust's purposes, which may also adversely affect the value of the Shares as a result.

various Bitcoin-based trust issued receipts.[28]

In these disapproval orders, the Commission outlined that a proposal relating to a Bitcoin-based ETP could satisfy its concerns regarding potential for fraud and manipulation by demonstrating:

(1) *Inherent Resistance to Fraud and Manipulation:* That the underlying commodity market is inherently resistant to fraud and manipulation;

(2) *Other Means to Prevent Fraud and Manipulation:* That there are other means to prevent fraudulent and manipulative acts and practices that are sufficient; or

(3) *Surveillance Sharing:* That the listing exchange has entered into a surveillance sharing agreement with a regulated market of significant size relating to the underlying or reference assets.

As described below, the Sponsor believes the structure and operation of the Trust are designed to prevent fraudulent and manipulative acts and practices, to protect investors and the public interest, and to respond to the specific concerns that the Commission has identified with respect to potential fraud and manipulation in the context of a Bitcoin-based ETP.

How the Trust Meets Standards in the Winklevoss Order, Bitwise Order and Wilshire Phoenix Order

1. Resistance to or Prevention of Fraud and Manipulation

In the Bitwise Order, the Commission disagreed with the proposition that Bitcoin's fungibility, transportability and exchange tradability combine to provide unique protections against, and allow Bitcoin to be uniquely resistant to, attempts at price manipulation. The Commission reached its conclusion based on concessions by Bitwise that 95% of the reported trading in Bitcoin is "fake" or non-economic, effectively admitting that the properties of Bitcoin do not make it inherently resistant to manipulation. Bitwise's concessions were further compounded by evidence of potential and actual fraud and manipulation in the historical trading of Bitcoin on certain marketplaces such as (1) "wash" trading, (2) trading based on material, non-public information, including the dissemination of false and misleading information, (3) manipulative activity involving Tether, and (4) fraud and manipulation.[29]

The Sponsor acknowledges the possibility that fraud and manipulation may exist and that Bitcoin trading *on any given exchange* may be no more uniquely resistant to fraud and manipulation than other commodity markets.[30] However, the Sponsor believes that the fundamental features of Bitcoin's fungibility, transportability and exchange tradability offer novel protections beyond those that exist in traditional commodity markets or equity markets when combined with other means, as discussed further below.

2. Other Means To Prevent Fraud and Manipulation

The Commission has recognized that a listing exchange could demonstrate that other means to prevent fraudulent and manipulative acts and practices are sufficient to justify dispensing with the requisite surveillance-sharing agreement.[31] In evaluating the effectiveness of this type of resistance, the Commission does not apply a "cannot be manipulated" standard. Instead, the Commission requires that such resistance to fraud and manipulation be novel and beyond those protections that exist in traditional commodity markets or equity markets for which the Commission has long required surveillance-sharing agreements in the context of listing derivative securities products.[32]

The Sponsor believes the Index represents a novel means to prevent fraud and manipulation from impacting a reference price for Bitcoin and that it offers protections beyond those that exist in traditional commodity markets or equity markets. Specifically, Bitcoin is novel and exists outside traditional commodity markets. It therefore stands to reason that the methods in which it trades will be novel and that the market for Bitcoin will have different attributes than traditional commodity markets. Bitcoin was only introduced within the past decade, twenty years after the first U.S. ETFs were offered[33] and 150 years after the first futures were offered.[34] In contrast to older commodities such as gold, silver, platinum, palladium or copper, which the Commission has noted all had at least one significant, regulated market for trading futures on the underlying commodity at the time commodity trust ETPs were approved for listing and trading, the first trading in Bitcoin took place entirely in an open, transparent and online setting where other commodities cannot trade.

The Trust has priced its Shares consistently for more than six years based on the Index. The Sponsor believes the Trust's use of the Index specifically addresses the Commission's concerns in that the Index serves as an alternative means to prevent fraud and manipulation. Specifically, the Index can (i) mitigate the effects of fraud, manipulation and other anomalous trading activity on the Bitcoin reference rate, (ii) provide a real-time, volume-weighted fair value of Bitcoin and (iii) appropriately handle and adjust for non-market related events.

As described in more detail below, the Sponsor believes that the Index

---

[28] *See* Order Setting Aside Action by Delegated Authority and Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, To List and Trade Shares of the Winklevoss Bitcoin Trust, Securities Exchange Act Release No. 83723 (July 26, 2018), 83 FR 37579 (Aug. 1, 2018) (SR–BatsBZX–2016–30) (the "Winklevoss Order"); Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, Relating to the Listing and Trading of Shares of the Bitwise Bitcoin ETF Trust Under NYSE Arca 8.201–E, Securities Exchange Act Release No. 87267 (Oct. 9, 2019), 84 FR 55382 (Oct. 16, 2019) (the "Bitwise Order"); Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to Amend NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares) and to List and Trade Shares of the United States Bitcoin and Treasury Investment Trust Under NYSE Arca Rule 8.201–E, Securities Exchange Act Release No. 88284 (February 26, 2020), 85 FR 12595 (March 3, 2020) (SR–NYSEArca–2019–39) (the "Wilshire Phoenix Order"); Order Disapproving a Proposed Rule Change to List and Trade the Shares of the ProShares Bitcoin ETF and the ProShares Short Bitcoin ETF, Securities Exchange Act Release No. 83904 (Aug. 22, 2018), 83 FR 43934 (Aug. 28, 2018) (SR–NYSEArca–2017–139) (the "ProShares Order"); Order Disapproving a Proposed Rule Change Relating to Listing and Trading of the Direxion Daily Bitcoin Bear 1X Shares, Direxion Daily Bitcoin 1.25X Bull Shares, Direxion Daily Bitcoin 1.5X Bull Shares, Direxion Daily Bitcoin 2X Bull Shares, and Direxion Daily Bitcoin 2X Bear Shares Under NYSE Arca Rule 8.200–E, Securities Exchange Act Release No. 83912 (Aug. 22, 2018), 83 FR 43912 (Aug. 28, 2018) (SR–NYSEArca–2018–02) (the "Direxion Order"); Order Disapproving a Proposed Rule Change to List and Trade the Shares of the GraniteShares Bitcoin ETF and the GraniteShares Short Bitcoin ETF, Securities Exchange Act Release No. 83913 (Aug. 22, 2018), 83 FR 43923 (Aug. 28, 2018) (SR–CboeBZX–2018–01) (the "GraniteShares Order").

[29] *See* Bitwise Order, 84 FR at 55383 (discussing analysis of the Bitcoin spot market that asserts that 95% of the spot market is dominated by fake and non-economic activity, such as wash trades), 55391 (discussing possible sources of fraud and manipulation in the bitcoin spot market). *See also* Winklevoss Order, 83 FR at 37585–86 (discussing pending litigation against a Bitcoin trading platform for fraudulent conduct relating to Tether); Bitwise Order, 84 FR at 55391 n.140, 55402 & n.331 (same); Winklevoss Order, 83 FR at 37584–86 (discussing potential types of manipulation in the Bitcoin spot market). The Commission has also noted that fraud and manipulation in the Bitcoin spot market could persist for a significant duration. *See, e.g.,* Bitwise Order, 84 FR at 55405 & n.379.

[30] *See generally* Bitwise Order.

[31] *See* Winklevoss Order, 84 FR at 37580, 37582–91; Bitwise Order, 84 FR at 55383, 55385–406; Wilshire Phoenix Order, 85 FR at 12597.

[32] *See* Winklevoss Order, 84 FR at 37582; Wilshire Phoenix Order, 85 FR at 12597.

[33] SEC, "Investor Bulletin: Exchange-Traded Funds (ETFs)," August 2012, *https://www.sec.gov/investor/alerts/etfs.pdf.*

[34] CFTC, "History of the CFTC," *https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html.*

accomplishes those objectives in the following ways:

1. The Index tracks the Digital Asset Exchange Market Price through trading activity at "U.S.-Compliant Exchanges"; [35]

2. The Index mitigates the impact of instances of fraud, manipulation and other anomalous trading activity in real-time through systematic adjustments;

3. The Index is constructed and maintained by an expert third-party index provider, allowing for prudent handling of non-market-related events; and

4. The Index mitigates the impact of instances of fraud, manipulation and other anomalous trading activity concentrated on any one specific exchange through a cross-exchange composite index rate.

1. The Index tracks the Digital Asset Exchange Market Price through trading activity at "U.S.-Compliant Exchanges".

To reduce the risk of fraud, manipulation, and other anomalous trading activity from impacting the Index, only U.S.-Compliant Exchanges are eligible to be included in the Index.

The Index maintains a minimum number of three exchanges and a maximum number of five exchanges to track the Digital Asset Exchange Market while offering replicability for traders and market makers. [36]

U.S.-Compliant Exchanges possess safeguards that protect against fraud and manipulation. For example, U.S.-Compliant Exchanges regulated by the New York State Department of Financial Services ("NYDFS") under the BitLicense program have regulatory requirements to implement measures designed to effectively detect, prevent, and respond to fraud, attempted fraud, market manipulation, and similar wrongdoing, and to monitor, control, investigate and report back to the NYDFS regarding any wrongdoing. [37] These exchanges also have the following obligations: [38]

• Submission of audited financial statements including income statements, statement of assets/liabilities, insurance, and banking;

• Compliance with capitalization requirements set at NYDFS's discretion;

• Prohibitions against the sale or encumbrance to protect full reserves of custodian assets;

• Fingerprints and photographs of employees with access to customer funds;

• Retention of a qualified Chief Information Security Officer and annual penetration testing/audits;

• Documented business continuity and disaster recovery plan, independently tested annually; and

• Participation in an independent exam by NYDFS.

Other U.S.-Compliant Exchanges have voluntarily implemented measures to protect against common forms of market manipulation. [39]

Furthermore, all U.S.-Compliant Exchanges are considered Money Services Businesses ("MSBs") that are subject to federal and state reporting requirements of the U.S Department of Treasury's FinCEN division that provide additional safeguards. For example, unscrupulous traders may be less likely to engage in fraudulent or manipulative acts and practices on exchanges that (1) report suspicious activity to FinCEN as money services businesses, (2) report to state regulators as money transmitters, and/or (3) require customer identification through KYC procedures. U.S.-Compliant Exchanges are required to: [40]

• Identify people with ownership stakes or controlling roles in the MSB;

• Establish a formal Anti-Money Laundering (AML) policy in place with documentation, training, independent review, and a named compliance officer;

• Implement strict customer identification and verification policies and procedures;

• File Suspicious Activity Reports (SARs) for suspicious customer transactions;

• File Currency Transaction Reports (CTRs) for cash-in or cash-out transactions greater than $10,000; and

• Maintain a five-year record of currency exchanges greater than $1,000 and money transfers greater than $3,000.

Lastly, because of Bitcoin's classification as a commodity, the CFTC has authority to police fraud and manipulation on U.S.-Compliant Exchanges.

The Sponsor acknowledges that there are substantial differences between FinCEN and New York state regulations and the Commission's regulation of the national securities exchanges. [41] The Sponsor does not believe the inclusion of U.S.-Compliant Exchanges is in and of itself sufficient to prove that the Index is an alternative means to prevent fraud and manipulation such that surveillance sharing agreements are not required, but does believe that the inclusion of only U.S.-Compliant Exchanges in the Index is one significant way in which the Index is protected from the potential impacts of fraud and manipulation.

2. The Index mitigates the impact of instances of fraud, manipulation and other anomalous trading activity in real-time through systematic adjustments.

The Index is calculated once every second according to a systematic methodology that relies on observed trading activity on the Constituent Exchanges. While the precise methodology underlying the Index is currently proprietary, the key elements of the Index are outlined below:

• *Volume Weighting:* Constituent Exchanges with greater liquidity receive a higher weighting in the Index, increasing the ability to execute against (*i.e.,* replicate) the Index in the underlying spot markets.

• *Price-Variance Weighting:* The Index reflects data points that are discretely weighted in proportion to their variance from the rest of the Constituent Exchanges. As the price at a Constituent Exchange diverges from the prices at the rest of the Constituent Exchanges, its weight in the Index consequently decreases.

• *Inactivity Adjustment:* The Index algorithm penalizes stale activity from any given Constituent Exchange. When a Constituent Exchange does not have recent trading data, its weighting in the

---

[35] "U.S.-Compliant Exchanges" are exchanges in the Digital Asset Exchange Market that are compliant with applicable U.S. federal and state licensing requirements and practices regarding AML and KYC regulations. All Constituent Exchanges are U.S.-Compliant Exchanges. "Non-U.S.-Compliant Exchanges" are all other exchanges in the Digital Asset Exchange Market. As of December 31, 2021, the U.S.-Compliant Exchanges that the Index Provider considered for inclusion in the Index were Bitstamp, Coinbase Pro, Kraken and LMAX Digital. From these U.S.-Compliant Exchanges, the Index Provider then applies additional Inclusion Criteria to determine the Constituent Exchange. As of December 31, 2021, the Constituent Exchanges were Bitstamp, Coinbase Pro, Kraken, and LMAX Digital.

[36] According to the Sponsor, the more exchanges included in the Index, the more ability there is for traders and market makers to trade against the Index by arbitraging price differences. For example, in the event of variances between Bitcoin prices on Constituent Exchanges and non-Constituent Exchanges, arbitrage trading opportunities would exist. These discrepancies generally consolidate over time, as price differences across exchanges are realized and capitalized upon by traders and market makers.

[37] *See, e.g.,* "DFS Takes Action to Deter Fraud and Manipulation in Virtual Currency Markets," *available at: https://www.dfs.ny.gov/about/press/pr1802071.htm.*

[38] *See* "New York's Final "BitLicense" Rule: Overview and Changes from July 2014 Proposal," June 5, 2015, Davis Polk, *available at: https://www.davispolk.com/files/new_yorks_final_bitlicense_rule_overview_changes_july_2014_proposal.pdf.*

[39] As of the date of filing, two of the four Constituent Exchanges, Bitstamp and Coinbase Pro, are regulated by NYDFS.

[40] *See* BSA Requirements for MSBs, FinCEN website: *https://www.fincen.gov/bsarequirements-msbs.*

[41] *See* Bitwise Order, 84 FR at 55392; Wilshire Phoenix Order, 85 FR at 12603.

Index is gradually reduced, until it is de-weighted entirely. Similarly, once trading activity at the Constituent Exchange resumes, the corresponding weighting for that Constituent Exchange is gradually increased until it reaches the appropriate level.

• *Manipulation Resistance:* In order to mitigate the effects of wash trading and order book spoofing, the Index only includes executed trades in its calculation. Additionally, the Index only includes Constituent Exchanges that charge trading fees to its users in order to attach a real, quantifiable cost to any manipulation attempts.

The Index Provider reviews and periodically updates the exchanges included in the Index by utilizing a methodology that is guided by the IOSCO principles for financial benchmarks.

3. The Index is constructed and maintained by an expert third-party index provider, allowing for prudent handling of non-market-related events.

The Index Provider reviews and periodically updates which exchanges are included in the Index by utilizing a methodology that is guided by the IOSCO principles for financial benchmarks.

For an exchange to become a Constituent Exchange, it must satisfy the following Inclusion Criteria:

• Compliance with any applicable U.S. federal and state licensing requirements and practices regarding AML and KYC regulations (*i.e.*, the Constituent Exchange must be a U.S.-Compliant Exchange);

• Publicly known ownership entity;

• No restrictions on deposits and/or withdrawals of Bitcoin;

• No restrictions on deposits and/or withdrawals of USD;

• Reliably publish trade prices and volumes on a real-time basis through APIs;

• Charges trading fees to its users in order to attach a real, quantifiable cost to any manipulation attempts;

• Offer programmatic trading of the Bitcoin/USD spot price;

• Liquid market in the Bitcoin/USD pair;

• Trading volume that represents a minimum of total Bitcoin/USD trading volumes (5% for U.S. exchanges and 10% non-U.S. exchanges); and

• Discretion of the Index Provider's analysts.

Although the Index methodology is designed to operate without any human interference, rare events would justify manual intervention. Manual intervention would only be in response to "non-market-related events" (*e.g.*, halting of deposits or withdrawals of

funds, unannounced closure of exchange operations, insolvency, compromise of user funds, etc.). In the event that such an intervention is necessary, the Index Provider would issue a public announcement through its website, API and other established communication channels with its clients.[42]

4. The Index mitigates the impact of instances of fraud, manipulation and other anomalous trading activity concentrated on any one specific exchange through a cross-exchange composite index rate.

The Index is based on the price and volume data of multiple U.S.-Compliant Exchanges that satisfy the Index Provider's Inclusion Criteria. By referencing multiple trading venues and weighting them based on trade activity, the impact of any potential fraud, manipulation, or anomalous trading activity occurring on any single venue is reduced. Specifically, the effects of fraud, manipulation, or anomalous trading activity occurring on any single venue are de-weighted and consequently diluted by non-anomalous trading activity from other Constituent Exchanges.

Although the Index is designed to accurately capture the market price of Bitcoin, third parties may be able to purchase and sell Bitcoin on public or private markets included or not included among the Constituent Exchanges, and such transactions may take place at prices materially higher or lower than the Index Price. For example, based on data provided by the Index Provider, on any given day during the year ended December 31, 2021, the maximum differential between the 4:00 p.m., New York time spot price of any single Digital Asset Exchange included in the Index and the Index Price was 0.64% and the average of the maximum differentials of the 4:00 p.m., New York time spot price of each Digital Asset Exchange included in the Index and the Index Price was 0.32%. During this same period, the average differential between the 4:00 p.m., New York time spot prices of all the Digital Asset Exchanges included in the Index and the Index Price was 0.0003%.[43]

Since November 1, 2014, the Trust has consistently priced its Shares at 4:00 p.m., E.T. based on the Index Price.[44]

While that pricing would be known to the market, the Sponsor believes that, even if efforts to manipulate the price of Bitcoin at 4:00 p.m., E.T. were successful on any exchange, such activity would have had a negligible effect on the pricing of the Trust, due to the controls embedded in the structure of the Index.

Accordingly, the Sponsor believes that the Index has proven its ability to (i) mitigate the effects of fraud, manipulation and other anomalous trading activity on the Bitcoin reference rate, (ii) provide a real-time, volume-weighted fair value of Bitcoin and (iii) appropriately handle and adjust for non-market related events. For these reasons, the Sponsor believes that the Index represents an effective alternative means to prevent fraud and manipulation and the Trust's reliance on the Index addresses the Commission's concerns with respect to potential fraud and manipulation.

**3. A Significant, Regulated and Surveilled Market Exists and Is Closely Connected With Spot Market for Bitcoin**

In the Winklevoss Order, Bitwise Order and Wilshire Phoenix Order, the Commission described both the need for and the definition of a surveilled market of significant size for commodity-trust ETPs like the Trust to date.[45] Specifically, the Commission explained that:

for the commodity-trust ETPs approved to date for listing and trading, there has been in every case at least one significant, regulated market for trading futures on the underlying commodity—whether gold, silver, platinum, palladium, or copper—and the ETP listing exchange has entered into surveillance-sharing agreements with, or held Intermarket Surveillance Group membership in common with, that market.[46]

---

[42] To the extent any such intervention has a material impact on the Trust, the Sponsor will also issue a public announcement.

[43] All Digital Asset Exchanges that were included in the Index throughout the period were considered in this analysis.

[44] Prior to February 1, 2022, the Trust valued its Bitcoins for operational purposes by reference to the volume-weighted average Index Price (the "Old Index Price"). The Old Index Price was calculated by applying a weighting algorithm to the price and trading volume data for the immediately preceding 24-hour period as of 4:00 p.m., New York time, derived from the Constituent Exchanges reflected in the Index on such trade date, and overlaying an averaging mechanism to the price produced. Thus, whereas the Old Index Price reflected the price of a Bitcoin at 4:00 p.m., New York time, calculated by taking the average of each price of a Bitcoin produced by the Index over the preceding 24-hour period, the Index Price now is the price of a Bitcoin at 4:00 p.m., New York time, calculated based on the price and trading volume data of the Digital Asset Exchanges included in the Index over the preceding 24-hour period. The Index Price differs from the Old Index Price only in that it does not use an additional averaging mechanism; the Index Price otherwise uses the same methodology as the Old Index Price, and there has been no change to the Index used to determine the Index Price or the criteria used to select the Constituent Exchanges.

[45] *See* Winklevoss Order, 83 FR at 37593–94; Bitwise Order, 84 FR at 55383, 55410; Wilshire Phoenix Order, 85 FR at 12609.

[46] *See* Winklevoss Order, 83 FR at 37594.

Further, the Commission stated that its interpretation of the term ''market of significant size'' depends on the interrelationship between the market with which the listing exchange has a surveillance-sharing agreement and the proposed ETP.[47] Accordingly, the terms ''significant market'' and ''market of significant size'' could mean:

a market (or group of markets) as to which (a) there is a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, so that a surveillance-sharing agreement would assist in detecting and deterring misconduct, and (b) it is unlikely that trading in the ETP would be the predominant influence on prices in that market.[48]

In the context of Bitcoin-based ETPs specifically, the Commission has stated that establishing a lead-lag relationship between the Bitcoin futures market and the spot market is central to understanding whether it is reasonably likely that a would-be manipulator of the ETP would need to trade on the Bitcoin futures market to successfully manipulate prices on those spot platforms that feed into the proposed ETP's pricing mechanism such that a surveillance-sharing agreement would assist the ETP listing market in detecting and deterring misconduct.[49] In particular, if the spot market leads the futures market, this would indicate that it would not be necessary to trade on the futures market to manipulate the proposed ETP, even if arbitrage worked efficiently, because the futures price would move to meet the spot price.

The Sponsor has conducted a lead/lag analysis of per minute data comparing the Bitcoin futures market, as represented by the CME futures market, to the Bitcoin spot market, as represented by the Index. Based on this analysis, the Sponsor has concluded that there does not appear to be a significant lead/lag relationship between the two instruments for the period of November 1, 2019 to August 31, 2021. However, the Sponsor notes that other studies prior to and since such date have found that the CME

futures market does lead the Bitcoin spot market.[50]

Although there have been mixed findings regarding the lead/lag relationship between the CME futures and Bitcoin spot markets, the Sponsor believes that the CME futures market represents a large, surveilled and regulated market. For example, from November 1, 2019 to August 31, 2021, the CME futures market trading volume was over $432 billion, compared to $624 billion in trading volume across the Constituent Exchanges included in the Index. With over 69% of the Index trading volume, the CME futures market represents significant coverage of U.S.-Compliant Exchanges in the Bitcoin market. In addition, the CME futures market trading volume from November 1, 2019 to August 31, 2021 was approximately 50% of the trading volume of the U.S. dollar-denominated Bitcoin spot markets referenced in the Bitwise Order.[51]

Given the significant size of the CME futures markets, the Sponsor believes there is a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, since arbitrage between the derivative and spot markets would tend to counter an attempt to manipulate the spot market alone. As a result, the Exchange's ability to obtain information regarding trading in the Shares and futures from markets and other entities that are members of the Intermarket Trading Group (''ISG''), including the CME, would assist the Exchange in detecting and deterring misconduct.

The Sponsor also believes it is unlikely that the ETP would become the predominant influence on prices in the market.

While future inflows to the proposed Trust cannot be predicted, to provide comparable data, the Sponsor examined the change in market capitalization of

Bitcoin with net inflows into the Trust, which currently trades on OTC Markets and is largest and most liquid Bitcoin investment product in the world.[52] From November 1, 2019 to August 31, 2021, the market capitalization of Bitcoin grew from $166 billion to $888 billion, a $721 billion increase. Over the same period, the Trust experienced $6.6 billion of inflows. The cumulative inflow into the Trust over the stated time period was only 0.9% of the aggregate growth of Bitcoin's market capitalization.

Additionally, the Trust experienced approximately $98.5 billion of trading volume from November 1, 2019 to August 31, 2021, only 23% of the CME futures market and 16% of the Index over the same period.

\*    \*    \*    \*    \*

In summary, the Sponsor believes that the foregoing responds to the Commission's articulated concerns with respect to potential fraud and manipulation in Bitcoin-based ETPs. Specifically, the Sponsor believes that, although Bitcoin is not itself inherently resistant to fraud and manipulation, the Index represents an effective means to prevent fraudulent and manipulative acts and practices. As discussed above, the Trust has used the Index to price the Shares for more than six years, and the Index has proven its ability to (i) mitigate the effects of fraud, manipulation and other anomalous trading activity on the Bitcoin reference rate, (ii) provide a real-time, volume-weighted fair value of bitcoin and (iii) appropriately handle and adjusts for non-market related events. The Sponsor also believes that the CME futures market is a significant, surveilled and regulated market that is closely connected with the spot market for Bitcoin and may fulfill the requirements for surveillance sharing given the Exchange's ability to obtain information from markets and other entities that are members of the ISG to assist in detecting and deterring misconduct.

**The Approval of Bitcoin-Based ETFs Registered Under the Investment Company Act of 1940 and Bitcoin Based ETPs Registered Under the Securities Act of 1933 and Securities Exchange Act 1934**

In an August 3, 2021 speech at the Aspen Security Forum, the Chair stated that he looked forward to the Commission's review of Bitcoin-based

---

[47] *See* Winklevoss Order, 83 FR at 37594; Bitwise Order, 84 FR at 55410; ProShares Order, 83 FR at 43936; GraniteShares Order, 83 FR at 43925; Direxion Order, 83 FR at 43914; Wilshire Phoenix Order, 85 FR at 12609.

[48] *See* Winklevoss Order, 83 FR at 37594. This definition is illustrative and not exclusive. There could be other types of ''significant markets'' and ''markets of significant size,'' but this definition is an example that will provide guidance to market participants.

[49] *See* Bitwise Order, 84 FR at 55411; Wilshire Phoenix Order, 85 FR at 12612.

[50] *See* Memorandum to File from Neel Maitra, Senior Special Counsel (Fintech & Crypto Specialist), Division of Trading and Markets, U.S. Securities and Exchange Commission re: Meeting with Representatives from Fidelity Digital Assets, et al. and attachment (SR–CboeBZX–2021–039) (September 8, 2021), *available at: https:// www.sec.gov/comments/sr-cboebzx-2021-039/ srcboebzx2021039-250110.pdf;* Letter from Bitwise Asset Management, Inc. re: File Number SR–NYSEArca–2021–89 (February 25, 2022), *available at: https://www.sec.gov/comments/sr-nysearca-2021-89/srnysearca202189-20117902-270822.pdf;* Letter from Wilson Sonsini Goodrich and Rosati, P.C. and Chapman and Cutler LLP, on behalf of Bitwise Asset Management, Inc. re: File No. SR–NYSEArca–2021–89 (March 7, 2022), *available at: https://www.sec.gov/comments/sr-nysearca-2021-89/srnysearca202189-20118794-271630.pdf.*

[51] These Bitcoin spot markets include Binance, Coinbase Pro, Bitfinex, Kraken, Bitstamp, BitFlyer, Poloniex, Bittrex and itBit.

[52] To further illustrate the size and liquidity of the Trust, as of October 31, 2020, compared with global commodity ETPs, the Trust would rank fourth in assets under management and seventh in notional trading volume from November 1, 2019 to October 31, 2020.

ETF proposals registered under the Investment Company Act of 1940 (the "'40 Act"), "particularly if those are limited to [the] CME-traded Bitcoin futures," noting the "significant investor protection" offered by the '40 Act.[53] In this same speech, the Chair specifically identified the Trust in the context of existing investment vehicles that provide exposure to Bitcoin, noting that the Trust, which is a Bitcoin-based ETP proposal that would be registered under the '33 Act and '34 Act, rather than the '40 Act, is "the largest among them having been around for eight years and worth more than $20 billion." [54] Since that speech, the first Bitcoin-based ETFs registered under the '40 Act were approved for trading,[55] subsequent Bitcoin-based ETPs that would be registered under the '33 Act and '34 Act were disapproved [56] and a subsequent Bitcoin-based ETP that will be registered under the '33 Act and '34 Act was approved for trading.[57]

As described above, the Commission has outlined the reasons why prior Bitcoin-based ETF and ETP proposals registered under both the '40 Act and '33 Act and '34 Act, respectively, have been unable to satisfy its concerns about pricing in the underlying Digital Asset Market due to the potential for fraud and manipulation and described how such concerns could be addressed. It has been the Sponsor's understanding that none of the stated requirements have indicated a preference for Bitcoin-based ETF and ETP proposals registered under the '40 Act versus the '33 Act and '34 Act, respectively. Nor does the Sponsor believe that such requirements

can be addressed by gaining exposure to Bitcoin through Bitcoin futures in an ETF registered under the '40 Act rather than physical Bitcoin in an ETP registered under the '33 Act because both products would be reliant on Bitcoin's underlying price in the spot markets.

For instance, Bitcoin-based ETFs registered under the '40 Act that hold Bitcoin futures are priced by referencing the CME CF Bitcoin Reference Rate ("BRR"), which itself references the Digital Asset Markets: Bitstamp, Coinbase, Gemini, itBit, and Kraken. Similarly, Bitcoin-based ETPs that would be registered under the '33 Act and '34 Act, like the Trust, would be priced by referencing Digital Asset Markets included in the BRR, such as through the Index. As a result, the Sponsor believes that any potential fraud or manipulation in the underlying Digital Asset Market would impact both types of ETP proposals. Thus, in light of the Commission's recent approval of a futures-based ETP registered under the '33 Act and '34 Act,[58] which suggests that the Commission believes that both Bitcoin-based ETFs registered under the '40 Act and Bitcoin-based ETPs registered under the '33 Act and '34 Act could meet the requirements of the Exchange Act, the Sponsor believes that the Commission should take the same view towards both types of proposals and that differences between the '40 Act on the one hand, and the '33 Act and '34 Act on the other, should not form the basis for denial of proposed Bitcoin-based ETPs registered under the '33 Act and '34 Act, like the Trust.

*Creation of Shares*

According to the Annual Report, the Trust will issue Shares to Authorized Participants from time to time, but only in one or more Baskets (with a Basket being a block of 100 Shares). The Trust will not issue fractions of a Basket. The creation of Baskets will be made only in exchange for the delivery to the Trust, or the distribution by the Trust, of the number of whole and fractional Bitcoins represented by each Basket being created, which is determined by dividing (x) the number of Bitcoins owned by the Trust at 4:00 p.m., E.T., on the trade date of a creation order, after deducting the number of Bitcoins representing the U.S. dollar value of accrued but unpaid fees and expenses of the Trust (converted using the Index Price at such time, and carried to the eighth decimal place), by (y) the number of Shares outstanding at such time (with the quotient so obtained calculated to

one one-hundred-millionth of one Bitcoin (*i.e.,* carried to the eighth decimal place), and multiplying such quotient by 100 (the "Basket Amount"). All questions as to the calculation of the Basket Amount will be conclusively determined by the Sponsor and will be final and binding on all persons interested in the Trust. The Basket Amount multiplied by the number of Baskets being created is the "Total Basket Amount." The number of Bitcoins represented by a Share will gradually decrease over time as the Trust's Bitcoins are used to pay the Trust's expenses. As of December 31, 2021, each Share represented approximately 0.0009 of one Bitcoin.

Authorized Participants are the only persons that may place orders to create Baskets. Each Authorized Participant must (i) be a registered broker-dealer, (ii) enter into an agreement with the Sponsor and the Liquidity Provider (as defined below), if applicable, that provides the procedures for the creation and redemption of Baskets and for the delivery of Bitcoins required for Creation Baskets and Redemption Baskets (each, a "Participant Agreement") and (iii) in the case of creation or redemption in-kind, own a Bitcoin wallet address that is known to the Custodian as belonging to the Authorized Participant. An Authorized Participant may act for its own account or as agent for broker-dealers, custodians and other securities market participants that wish to create or redeem Baskets. Shareholders who are not Authorized Participants will only be able to redeem their Shares through an Authorized Participant.

Although the creation of Baskets requires the delivery to the Trust of the Total Basket Amount, an Authorized Participant may deposit cash with the Administrator, which will facilitate the purchase or sale of Bitcoins on behalf of the Authorized Participant through one or more eligible companies (each, a "Liquidity Provider") that have entered into a Participant Agreement with the Sponsor, the Administrator, the Marketing Agent and the relevant Authorized Participant.

The Participant Agreement provides the procedures for the creation of Baskets and for the delivery of the whole and fractional Bitcoins required for such creations. The Participant Agreement and the related procedures attached thereto may be amended by the Sponsor and the relevant Authorized Participant. Under the Participant Agreement, the Sponsor has agreed to indemnify each Authorized Participant against certain liabilities, including liabilities under the Securities Act.

[53] Chair Gary Gensler Public Statement, "Remarks Before the Aspen Security Forum," (August 3, 2021), *https://www.sec.gov/news/public-statement/gensler-aspen-security-forum-2021-08-03.*

[54] *Id.*

[55] ProShares Bitcoin Strategy ETF (BITO); VanEck Bitcoin Strategy ETF (XBTF); Valkyrie Bitcoin Strategy ETF (BTF).

[56] *See, e.g.,* Securities Exchange Act Release Nos. 93559 (November 12, 2021), 86 FR 64539 (November 18, 2021) (SR-CboeBZX–2021–019) (Order Disapproving a Proposed Rule Change To List and Trade Shares of the VanEck Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares); 94080 (January 27, 2022), 87 FR 5527 (February 1, 2022) (SR-CboeBZX–2021–029) (Order Disapproving a Proposed Rule Change To List and Trade Shares of the Wise Origin Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares); 94571 (March 31, 2022), 87 FR 20014 (April 6, 2022) (SR-CboeBZX–2021–051) (Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To List and Trade Shares of the ARK 21Shares Bitcoin ETF Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares).

[57] *See* Securities Exchange Act Release No. 94620 (April 6, 2022), 87 FR 21676 (April 12, 2022) (SR–NYSEArca–2021–53) (Order Granting Approval of a Proposed Rule Change, as Modified by Amendment No. 2, to List and Trade Shares of the Teucrium Bitcoin Futures Fund under NYSE Arca Rule 8.200–E, Commentary .02 (Trust Issued Receipts)).

[58] *See id.*

Authorized Participants do not pay a transaction fee to the Trust in connection with the creation of Baskets, but there are transaction fees associated with the validation of the transfer of Bitcoins by the Bitcoin Network. Authorized Participants who deposit Bitcoins with the Trust in exchange for Baskets will receive no fees, commissions or other form of compensation or inducement of any kind from either the Sponsor or the Trust, and no such person has any obligation or responsibility to the Sponsor or the Trust to effect any sale or resale of Shares.

Creation Procedures

On any business day, an Authorized Participant may place an order with the Administrator to create one or more Baskets. Orders for creations may be placed either "in-kind" or "in-cash." Orders for creation in-kind must be placed with the Administrator no later than 3:59:59 p.m., New York time, and no later than 4:59:59 p.m., New York time, for creations in-cash (in each case, the "Order Cutoff Time").

In-kind creations will take place as follows, where "T" is the trade date and each day in the sequence must be a business day:

| T | T+1 |
| --- | --- |
| • The Authorized Participant places a creation order with the Administrator.<br>• The Marketing Agent accepts (or rejects) the creation order, which is communicated to the Authorized Participant by the Administrator.<br>• The Total Basket Amount is determined as soon as practicable after 4:00 p.m., New York time. | • The Authorized Participant transfers the Total Basket Amount to the Custodian no later than 4:00 p.m., New York time.<br>• Once the Total Basket Amount is received by the Custodian, the Administrator directs the Transfer Agent to credit the number of Baskets created to the Authorized Participant's DTC account. |

In-cash creations will take place as follows, where "T" is the trade date and each day in the sequence must be a business day:

| T−1 | T | T+1 |
| --- | --- | --- |
| • The Authorized Participant places a creation order with the Administrator.<br>• The Marketing Agent accepts (or rejects) the creation order, which is communicated to the Authorized Participant by the Administrator.<br>• The Authorized Participant sends 110% of the U.S. dollar value of the number of baskets ordered pursuant to such creation order, as calculated using the Index Price as of the order date (the "Cash Collateral Amount") to the Administrator. | • The Sponsor notifies the Liquidity Provider of the creation order and the Liquidity Provider may begin purchasing Bitcoin to deliver the Total Basket Amount.<br>• The Total Basket Amount is determined as soon as practicable after 4:00 p.m., New York time. | • The Liquidity Provider delivers the Total Basket Amount to the Custodian no later than 4:00 p.m., New York time.<br>• Once the Total Basket Amount is received by the Custodian, the Administrator directs the Transfer Agent to credit the number of Baskets created to the Authorized Participant's DTC account.<br>• The Administrator sends the Liquidity Provider cash equal to the U.S. dollar value of the Total Basket Amount, as determined on the trade date, plus the Variable Fee, and returns the remaining amount of the Cash Collateral Amount (if any) to the Authorized Participant. |

Redemption of Shares

The Trust may redeem Shares from time to time but only in Baskets. A Basket equals a block of 100 Shares. The number of outstanding Shares is expected to decrease from time to time as a result of the redemption of Baskets. The redemption of Baskets requires the distribution by the Trust of the number of Bitcoins represented by the Baskets being redeemed. The redemption of a Basket will be made only in exchange for the distribution by the Trust of the number of whole and fractional Bitcoins represented by each Basket being redeemed, the number of which is determined by dividing (x) the number of Bitcoins owned by the Trust at 4:00 p.m., New York time, on the relevant trade date of a redemption order, after deducting the number of Bitcoins representing the U.S. dollar value of accrued but unpaid fees and expenses of the Trust (converted using the Index Price at such time, and carried to the eighth decimal place) by (y) the number of Shares outstanding at such time (with the quotient so obtained calculated to one one-hundred-millionth of one Bitcoin (i.e., carried to the eighth decimal place)), and multiplying such quotient by 100.

Authorized Participants are the only persons that may place orders to redeem Baskets. Shareholders who are not Authorized Participants will be able to redeem their Shares only through an Authorized Participant.

Each Participant Agreement provides the procedures for the redemption of Baskets and for the delivery of the whole and fractional Bitcoins required for such redemption. The Participant Agreement and the related procedures attached thereto may be amended by the

Sponsor and the relevant Authorized Participant.

Authorized Participants do not pay a transaction fee to the Trust in connection with the redemption of Baskets, but there may be transaction fees associated with the validation of the transfer of Bitcoins by the Bitcoin Network.

### Redemption Procedures

The Trust will also redeem Shares on a continuous basis but only in Baskets of 100 Shares. The procedures by which an Authorized Participant can redeem one or more Baskets mirror the procedures for the creation of Baskets. On any business day, an Authorized Participant may place an order with the Administrator to redeem one or more Baskets. Redemption orders must be placed with the Administrator no later than the Order Cutoff Time.

In-kind redemptions will take place as follows, where "T" is the trade date and each day in the sequence must be a business day:

| T | T+2 |
|---|---|
| • The Authorized Participant places a redemption order with the Administrator.<br>• The Marketing Agent accepts (or rejects) the redemption order, which is communicated to the Authorized Participant by the Administrator.<br>• The Total Basket Amount is determined as soon as practicable after 4:00 p.m., New York time. | • The Authorized Participant delivers Baskets from its DTC account to the Transfer Agent no later than 4:00 p.m., New York time.<br>• Once the Baskets are received by the Transfer Agent, the Custodian transfers the Total Basket Amount to the Authorized Participant and the Transfer Agent cancels the Shares. |

In-cash redemptions will take place as follows, where "T" is the trade date and each day in the sequence must be a business day:

| T−1 | T | T+2 |
|---|---|---|
| • The Authorized Participant places a redemption order with the Administrator.<br>• The Marketing Agent accepts (or rejects) the redemption order, which is communicated to the Authorized Participant by the Administrator. | • The Sponsor notifies the Liquidity Provider of the redemption order and the Liquidity Provider may begin selling Bitcoin to deliver the Total Basket Amount.<br>• The Total Basket Amount is determined as soon as practicable after 4:00 p.m., New York time. | • The Authorized Participant delivers Baskets to be redeemed to the Transfer Agent no later than 4:00 p.m., New York time.<br>• The Liquidity Provider deposits with the Administrator cash equal to the U.S. dollar value of the Total Basket Amount, as determined on the trade date.<br>• Once the Baskets are received by the Transfer Agent and the Administrator sends the above-mentioned cash equal to the U.S. dollar value of the Total Basket Amount less the Transaction Fee, the Variable Fee and all other charges and fees payable in connection with the redemption order to the Authorized Participant, the Transfer Agent cancels the Shares.<br>• The Custodian sends the Liquidity Provider the number of Bitcoins equal to the Total Basket Amount and the Administrator sends the Variable Fee to the Liquidity Provider. |

### Suspension of Orders

The creation or redemption of Shares may be suspended generally, or refused with respect to particular requested creations or redemptions, during any period when the transfer books of the Transfer Agent are closed or if circumstances outside the control of the Sponsor or its delegates make it for all practical purposes not feasible to process creation orders or redemption orders. The Administrator may reject an order or, after accepting an order, may cancel such order by rejecting the Total Basket Amount if: (i) Such order is not presented in proper form as described in the Participant Agreement, (ii) the transfer of the Total Basket Amount comes from an account other than a Bitcoin wallet address that is known to the Custodian as belonging to the Authorized Participant or (iii) the fulfillment of the order, in the opinion of counsel, might be unlawful, among other reasons. None of the Sponsor or its delegates will be liable for the suspension, rejection or acceptance of any creation order or redemption order.

In particular, upon the Trust's receipt of any Incidental Rights and/or IR Virtual Currency in connection with a fork, airdrop or similar event, the Sponsor may suspend redemptions until it is able to cause the Trust to sell or distribute such Incidental Rights and/or IR Virtual Currency.

### Availability of Information

The Trust's website (*https://grayscale.com/products/grayscale-bitcoin-trust/*) will include quantitative information on a per Share basis updated on a daily basis, including, (i) the current Digital Asset Holdings per Share daily and the prior business day's Digital Asset Holdings and the reported closing price; (ii) the mid-point of the bid-ask price [59] in relation to the Digital Asset Holdings as of the time the Digital Asset Holdings is calculated ("Bid-Ask Price") and a calculation of the

---

[59] The bid-ask price of the Trust is determined using the highest bid and lowest offer on the Consolidated Tape as of the time of calculation of the closing day Digital Asset Holdings.

premium or discount of such price against such Digital Asset Holdings; and (iii) data in chart format displaying the frequency distribution of discounts and premiums of the daily Bid-Ask Price against the Digital Asset Holdings, within appropriate ranges, for each of the four previous calendar quarters (or for the life of the Trust, if shorter). In addition, on each business day the Trust's website will provide pricing information for the Shares.

The Trust's website, as well as one or more major market data vendors, will provide an intra-day indicative value ("IIV") per Share updated every 15 seconds, as calculated by the Exchange or a third party financial data provider during the Exchange's Core Trading Session (9:30 a.m. to 4:00 p.m., E.T.).[60] The IIV will be calculated using the same methodology as the Digital Asset Holdings of the Trust (as described above), specifically by using the prior day's closing Digital Asset Holdings per Share as a base and updating that value during the NYSE Arca Core Trading Session to reflect changes in the value of the Trust's Digital Asset Holdings during the trading day.

The IIV disseminated during the NYSE Arca Core Trading Session should not be viewed as an actual real-time update of the Digital Asset Holdings, which will be calculated only once at the end of each trading day. The IIV will be widely disseminated on a per Share basis every 15 seconds during the NYSE Arca Core Trading Session by one or more major market data vendors. In addition, the IIV will be available through on-line information services.

The Digital Asset Holdings for the Trust will be calculated by the Sponsor once a day and will be disseminated daily to all market participants at the same time. To the extent that the Sponsor has utilized the cascading set of rules described in "Index Price" above, the Trust's website will note the valuation methodology used and the price per Bitcoin resulting from such calculation. Quotation and last-sale information regarding the Shares will be disseminated through the facilities of the Consolidated Tape Association ("CTA").

Quotation and last sale information for Bitcoin will be widely disseminated through a variety of major market data vendors, including Bloomberg and Reuters. In addition, the complete real-time price (and volume) data for Bitcoin is available by subscription from Reuters and Bloomberg. The spot price of Bitcoin is available on a 24-hour basis from major market data vendors, including Bloomberg and Reuters. Information relating to trading, including price and volume information, in Bitcoin will be available from major market data vendors and from the exchanges on which Bitcoin are traded. The normal trading hours for Digital Asset Exchanges are 24-hours per day, 365-days per year.

The Sponsor will publish the Index Price, the Trust's Digital Asset Holdings, and the Digital Asset Holdings per Share on the Trust's website as soon as practicable after its determination. If the Digital Asset Holdings and Digital Asset Holdings per Share have been calculated using a price per Bitcoin other than the Index Price for such Evaluation Time, the publication on the Trust's website will note the valuation methodology used and the price per Bitcoin resulting from such calculation.

The Trust will provide website disclosure of its Digital Asset Holdings daily. The website disclosure of the Trust's Digital Asset Holdings will occur at the same time as the disclosure by the Sponsor of the Digital Asset Holdings to Authorized Participants so that all market participants are provided such portfolio information at the same time. Therefore, the same portfolio information will be provided on the public website as well as in electronic files provided to Authorized Participants. Accordingly, each investor will have access to the current Digital Asset Holdings of the Trust through the Trust's website, as well as from one or more major market data vendors.

The value of the Index, as well as additional information regarding the Index, may be found at *https://tradeblock.com/markets/index/xbx.*

Trading Rules

The Exchange deems the Shares to be equity securities, thus rendering trading in the Shares subject to the Exchange's existing rules governing the trading of equity securities. Shares will trade on the NYSE Arca Marketplace from 4:00 a.m. to 8:00 p.m., E.T. in accordance with NYSE Arca Rule 7.34–E (Early, Core, and Late Trading Sessions). The Exchange has appropriate rules to facilitate transactions in the Shares during all trading sessions. As provided in NYSE Arca Rule 7.6–E, the minimum price variation ("MPV") for quoting and entry of orders in equity securities traded on the NYSE Arca Marketplace is $0.01, with the exception of securities that are priced less than $1.00, for which the MPV for order entry is $0.0001.

The Shares will conform to the initial and continued listing criteria under NYSE Arca Rule 8.201–E. The trading of the Shares will be subject to NYSE Arca Rule 8.201–E(g), which sets forth certain restrictions on Equity Trading Permit ("ETP") Holders acting as registered Market Makers in Commodity-Based Trust Shares to facilitate surveillance. The Exchange represents that, for initial and continued listing, the Trust will be in compliance with Rule 10A–3 [61] under the Act, as provided by NYSE Arca Rule 5.3–E. A minimum of 100,000 Shares of the Trust will be outstanding at the commencement of trading on the Exchange.

Trading Halts

With respect to trading halts, the Exchange may consider all relevant factors in exercising its discretion to halt or suspend trading in the Shares of the Trust.[62] Trading in Shares of the Trust will be halted if the circuit breaker parameters in NYSE Arca Rule 7.12–E have been reached. Trading also may be halted because of market conditions or for reasons that, in the view of the Exchange, make trading in the Shares inadvisable.

The Exchange may halt trading during the day in which an interruption to the dissemination of the IIV or the value of the Index occurs. If the interruption to the dissemination of the IIV or the value of the Index persists past the trading day in which it occurred, the Exchange will halt trading no later than the beginning of the trading day following the interruption. In addition, if the Exchange becomes aware that the Digital Asset Holdings per Share is not disseminated to all market participants at the same time, it will halt trading in the Shares until such time as the Digital Asset Holdings per Share is available to all market participants.

Surveillance

The Exchange represents that trading in the Shares of the Trust will be subject to the existing trading surveillances administered by the Exchange, as well as cross-market surveillances administered by FINRA on behalf of the Exchange, which are designed to detect violations of Exchange rules and applicable federal securities laws.[63] The Exchange represents that these procedures are adequate to properly monitor Exchange trading of the Shares

---

[60] The IIV on a per Share basis disseminated during the Core Trading Session should not be viewed as a real-time update of the Digital Asset Holdings, which is calculated once a day.

[61] 17 CFR 240.10A–3.

[62] *See* NYSE Arca Rule 7.12–E.

[63] FINRA conducts cross-market surveillances on behalf of the Exchange pursuant to a regulatory services agreement. The Exchange is responsible for FINRA's performance under this regulatory services agreement.

in all trading sessions and to deter and detect violations of Exchange rules and federal securities laws applicable to trading on the Exchange.

The surveillances referred to above generally focus on detecting securities trading outside their normal patterns, which could be indicative of manipulative or other violative activity. When such situations are detected, surveillance analysis follows and investigations are opened, where appropriate, to review the behavior of all relevant parties for all relevant trading violations.

The Exchange or FINRA, on behalf of the Exchange, or both, will communicate as needed regarding trading in the Shares with other markets and other entities that are members of the ISG, and the Exchange or FINRA, on behalf of the Exchange, or both, may obtain trading information regarding trading in the Shares from such markets and other entities. In addition, the Exchange may obtain information regarding trading in the Shares from markets and other entities that are members of ISG or with which the Exchange has in place a comprehensive surveillance sharing agreement (''CSSA'').[64] The Exchange is also able to obtain information regarding trading in the Shares in connection with such ETP Holders' proprietary or customer trades which they effect through ETP Holders on any relevant market.

In addition, the Exchange also has a general policy prohibiting the distribution of material, non-public information by its employees.

All statements and representations made in this filing regarding (a) the description of the portfolios of the Trust, (b) limitations on portfolio holdings or reference assets, or (c) the applicability of Exchange listing rules specified in this rule filing shall constitute continued listing requirements for listing the Shares on the Exchange.

The Sponsor has represented to the Exchange that it will advise the Exchange of any failure by the Trust to comply with the continued listing requirements, and, pursuant to its obligations under Section 19(g)(1) of the Act, the Exchange will monitor for compliance with the continued listing requirements. If the Trust is not in compliance with the applicable listing requirements, the Exchange will commence delisting procedures under NYSE Arca Rule 5.5–E(m).

## Information Bulletin

Prior to the commencement of trading, the Exchange will inform its ETP Holders in an ''Information Bulletin'' of the special characteristics and risks associated with trading the Shares. Specifically, the Information Bulletin will discuss the following: (1) The procedures for creations of Shares in Baskets; (2) NYSE Arca Rule 9.2–E(a), which imposes a duty of due diligence on its ETP Holders to learn the essential facts relating to every customer prior to trading the Shares; (3) information regarding how the value of the Index and the IIV are disseminated; (4) the possibility that trading spreads and the resulting premium or discount on the Shares may widen during the Opening and Late Trading Sessions, when an updated IIV will not be calculated or publicly disseminated; and (5) trading information. The Exchange notes that investors purchasing Shares directly from the Trust will receive a prospectus.

In addition, the Information Bulletin will reference that the Trust is subject to various fees and expenses as described in the Annual Report. The Information Bulletin will disclose that information about the Shares of the Trust is publicly available on the Trust's website.

The Information Bulletin will also discuss any relief, if granted, by the Commission or the staff from any rules under the Act.

### 2. Statutory Basis

The basis under the Act for this proposed rule change is the requirement under Section 6(b)(5)[65] that an exchange have rules that are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to remove impediments to, and perfect the mechanism of a free and open market and, in general, to protect investors and the public interest.

The Exchange believes that the proposed rule change is designed to prevent fraudulent and manipulative acts and practices in that the Shares will be listed and traded on the Exchange pursuant to the initial and continued listing criteria in NYSE Arca Rule 8.201–E. The Exchange has in place surveillance procedures that are adequate to properly monitor trading in the Shares in all trading sessions and to deter and detect violations of Exchange rules and applicable federal securities laws. The Exchange or FINRA, on behalf of the Exchange, or both, will communicate as needed regarding

trading in the Shares with other markets that are members of the ISG, and the Exchange or FINRA, on behalf of the Exchange, or both, may obtain trading information regarding trading in the Shares from such markets. In addition, the Exchange may obtain information regarding trading in the Shares from markets that are members of ISG or with which the Exchange has in place a CSSA. Also, pursuant to NYSE Arca Rule 8.201–E(g), the Exchange is able to obtain information regarding trading in the Shares and the underlying Bitcoin or any Bitcoin derivative through ETP Holders acting as registered Market Makers, in connection with such ETP Holders' proprietary or customer trades through ETP Holders which they effect on any relevant market.

The proposed rule change is also designed to prevent fraudulent and manipulative acts and practices because, although the Digital Asset Exchange Market is not inherently resistant to fraud and manipulation, the Index serves as a means sufficient to mitigate the impact of instances of fraud and manipulation on a reference price for Bitcoin. Specifically, the Index provides a better benchmark for the price of Bitcoin than the Digital Asset Exchange Market Price because it (1) tracks the Digital Asset Exchange Market Price through trading activity at U.S.-Compliant Exchanges; (2) mitigates the impact of instances of fraud, manipulation and other anomalous trading activity in real-time through systematic adjustments; (3) is constructed and maintained by an expert third-party index provider, allowing for prudent handling of non-market-related events; and (4) mitigates the impact of instances of fraud, manipulation and other anomalous trading activity concentrated on any one specific exchange through a cross-exchange composite index rate. The Trust has used the Index to price the Shares for more than six years, and the Index has proven its ability to (i) mitigate the effects of fraud, manipulation and other anomalous trading activity from impacting the Bitcoin reference rate, (ii) provide a real-time, volume-weighted fair value of bitcoin and (iii) appropriately handle and adjusts for non-market related events, such that efforts to manipulate the price of Bitcoin would have had a negligible effect on the pricing of the Trust, due to the controls embedded in the structure of the Index. In addition, certain of the Index's Constituent Exchanges also have or have begun to implement market surveillance infrastructure to further detect, prevent,

[64] For a list of the current members of ISG, *see* *www.isgportal.org*. The Exchange notes that not all components of the Trust may trade on markets that are members of ISG or with which the Exchange has in place a CSSA.

[65] 15 U.S.C. 78f(b)(5).

and respond to fraud, attempted fraud, and similar wrongdoing, including market manipulation. The proposed rule change is also designed to prevent fraudulent and manipulative acts and practices based on the existence of the CME futures market as a large, surveilled and regulated market that is closely connected with the spot market for Bitcoin and through which the Exchange could obtain information to assist in detecting and deterring potential fraud or manipulation.

The proposed rule change is designed to promote just and equitable principles of trade and to protect investors and the public interest in that there is a considerable amount of Bitcoin price and market information available on public websites and through professional and subscription services. Investors may obtain, on a 24-hour basis, Bitcoin pricing information based on the spot price for Bitcoin from various financial information service providers. The closing price and settlement prices of Bitcoin are readily available from the Digital Asset Exchanges and other publicly available websites. In addition, such prices are published in public sources, or on-line information services such as Bloomberg and Reuters. The Digital Asset Holdings per Share will be calculated daily and made available to all market participants at the same time. The Trust will provide website disclosure of its Digital Asset Holdings daily. One or more major market data vendors will disseminate for the Trust on a daily basis information with respect to the most recent Digital Asset Holdings per Share and Shares outstanding. In addition, if the Exchange becomes aware that the Digital Asset Holdings per Share is not disseminated to all market participants at the same time, it will halt trading in the Shares until such time as the Digital Asset Holdings is available to all market participants. Quotation and last-sale information regarding the Shares will be disseminated through the facilities of the CTA. The IIV will be widely disseminated on a per Share basis every 15 seconds during the NYSE Arca Core Trading Session (normally 9:30 a.m., E.T., to 4:00 p.m., E.T.) by one or more major market data vendors. In addition, the IIV will be available on the Trust's website through on-line information services. The Exchange represents that the Exchange may halt trading during the day in which an interruption to the dissemination of the IIV or the value of the Index occurs. If the interruption to the dissemination of the IIV or the value of the Index persists past the trading day

in which it occurred, the Exchange will halt trading no later than the beginning of the trading day following the interruption.

The proposed rule change is designed to perfect the mechanism of a free and open market and, in general, to protect investors and the public interest in that it will facilitate the listing and trading of an additional type of exchange-traded product that will enhance competition among market participants, to the benefit of investors and the marketplace. As noted above, the Exchange has in place surveillance procedures relating to trading in the Shares and may obtain information via ISG from other exchanges that are members of ISG or with which the Exchange has entered into a CSSA. In addition, as noted above, investors will have ready access to information regarding the Trust's Digital Asset Holdings, IIV, and quotation and last sale information for the Shares.

*B. Self-Regulatory Organization's Statement on Burden on Competition*

The Exchange does not believe that the proposed rule change will impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act. The Exchange notes that the proposed rule change will facilitate the listing and trading of an additional type of exchange-traded product, and the first such product based on Bitcoin, which will enhance competition among market participants, to the benefit of investors and the marketplace.

*C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants, or Others*

No written comments were solicited or received with respect to the proposed rule change.

**III. Notice of Designation of a Longer Period for Commission Action on Proceedings To Determine Whether To Approve or Disapprove a Proposed Rule Change, as Modified by Amendment No. 1**

Section 19(b)(2) of the Act[66] provides that, after initiating proceedings, the Commission shall issue an order approving or disapproving the proposed rule change not later than 180 days after the date of publication of notice of filing of the proposed rule change. The Commission may extend the period for issuing an order approving or disapproving the proposed rule change, however, by not more than 60 days if

the Commission determines that a longer period is appropriate and publishes the reasons for such determination. The proposed rule change was published for comment in the **Federal Register** on November 8, 2021.[67] The 180th day after publication of the proposed rule change is May 7, 2022. The Commission is extending the time period for approving or disapproving the proposed rule change for an additional 60 days.

The Commission finds that it is appropriate to designate a longer period within which to issue an order approving or disapproving the proposed rule change so that it has sufficient time to consider the proposed rule change, as modified by Amendment No. 1, and the issues raised in the comments that have been submitted in connection therewith. Accordingly, the Commission, pursuant to Section 19(b)(2) of the Act,[68] designates July 6, 2022, as the date by which the Commission shall either approve or disapprove the proposed rule change, as modified by Amendment No. 1 (File No. SR–NYSEArca–2021–90).

**IV. Solicitation of Comments on Amendment No. 1 to the Proposed Rule Change**

Interested persons are invited to submit written data, views, and arguments concerning whether the proposed rule change, as modified by Amendment No. 1, is consistent with the Act. Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*http://www.sec.gov/ rules/sro.shtml*); or

• Send an email to *rule-comments@ sec.gov.* Please include File No. SR–NYSEArca–2021–90 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to File No. SR–NYSEArca–2021–90. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*http://www.sec.gov/ rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements

---

[66] 15 U.S.C. 78s(b)(2).

[67] *See supra* note 3.

[68] 15 U.S.C. 78s(b)(2).

with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549 on official business days between the hours of 10:00 a.m. and 3:00 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. All comments received will be posted without change. Persons submitting comments are cautioned that we do not redact or edit personal identifying information from comment submissions. You should submit only information that you wish to make available publicly. All submissions should refer to File No. SR–NYSEArca–2021–90 and should be submitted on or before May 31, 2022.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[69]

**J. Matthew DeLesDernier,**
*Assistant Secretary.*

[FR Doc. 2022–09957 Filed 5–9–22; 8:45 am]

**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–94848; File No. SR–CBOE–2022–022]**

**Self-Regulatory Organizations; Cboe Exchange, Inc.; Notice of Filing and Immediate Effectiveness of a Proposed Rule Change To Update Its Fees Schedule in Connection With the Launch of the Curb Trading Hours Session**

May 4, 2022.

Pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 (the "Act"),[1] and Rule 19b–4 thereunder,[2] notice is hereby given that on April 25, 2022, Cboe Exchange, Inc. (the "Exchange" or "Cboe Options") filed with the Securities and Exchange Commission (the "Commission") the proposed rule change as described in Items I, II, and III below, which Items have been prepared by the Exchange. The Commission is publishing this notice to solicit comments on the proposed rule change from interested persons.

## I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

Cboe Exchange, Inc. (the "Exchange" or "Cboe Options") proposes to update its Fees Schedule in connection with the launch of the Curb Trading Hours Session. The text of the proposed rule change is provided in Exhibit 5.

The text of the proposed rule change is also available on the Exchange's website (*http://www.cboe.com/AboutCBOE/CBOELegalRegulatoryHome.aspx*), at the Exchange's Office of the Secretary, and at the Commission's Public Reference Room.

## II. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the Exchange included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change. The text of these statements may be examined at the places specified in Item IV below. The Exchange has prepared summaries, set forth in sections A, B, and C below, of the most significant aspects of such statements.

### A. Self-Regulatory Organization's Statement of the Purpose of, and the Statutory Basis for, the Proposed Rule Change

#### 1. Purpose

The Exchange proposes to amend its Fees Schedule in connection with its plans to launch the Curb Trading Hours ("Curb") session, effective April 25, 2022.

By way of background, the Exchange currently offers two trading sessions, the Regular Trading Hours session ("RTH")[3] and the Global Trading Hours session ("GTH").[4] Beginning Monday, April 25, 2022, the Exchange will operate an additional trading session

following RTH called the "Curb Trading Hours" or "Curb" session. The Curb session will provide an extra forty-five-minute electronic only session for trading between 4:15 p.m. and 5:00 p.m. ET for designated classes, which will be added Monday through Friday. Currently, only SPX (including SPXW) and VIX options will be available for trading on the Exchange during the Curb session. FLEX Options with the same underlying index will also be deemed eligible for trading during the Curb session. Transactions effected during the Curb session will have the same trade date as the immediately preceding RTH session (*i.e.,* the day on which the transactions were effected), whereas transactions effected during a GTH session have a different trade date than the immediately preceding RTH session (*i.e.,* the trading day following the RTH session that immediately preceded it).

In connection with the launch of the Curb session, the Exchange proposes to update its Fees Schedule to reflect and incorporate references to the Curb session and make clear which fees, surcharges and programs also apply during Curb. Specifically, the fees (including surcharges)[5] and programs[6] applicable during RTH for SPX, SPXW and VIX will apply in the same manner during Curb. To make clear that such fees, surcharges and programs also apply during Curb, the Exchange proposes to adopt and append Footnote 42 to all applicable fees, surcharges and programs.[7] Footnote 42 would also make clear that Curb is a separate trading session from RTH and GTH for VIX, SPX and SPW and commences at 3:15PM CST and terminates at 4:00PM CST,[8] and is conducted on an all-electronic trading model with no open outcry capability.

The Exchange also proposes to update the notes sections of certain tables in the Fees Schedule to incorporate references to the Curb session. First, the Exchange

---

[69] 17 CFR 200.30–3(a)(12) and (57).

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

[3] RTH for transactions in equity options (including options on individual stocks, ETFs, ETNs, and other securities) are the normal business days and hours set forth in the rules of the primary market currently trading the securities underlying the options, except for options on ETFs, ETNs, Index Portfolio Shares, Index Portfolio Receipts, and Trust Issued Receipts the Exchange designates to remain open for trading beyond 4:00 p.m. Eastern Time (ET) but in no case later than 4:15 p.m. ET. RTH for transactions in index options are from 9:30 a.m. to 4:15 p.m. ET, subject to certain exceptions.

[4] The GTH session currently begins at 8:15 p.m. (previous day) and goes until 9:15 a.m. ET on Monday through Friday.

[5] *See* Cboe Options Fees Schedule, Rate Table—Underlying Symbol List A (including all surcharges), Electronic Trading Permit Fees, Trade Processing Services fee and Regulatory Fees.

[6] *See* Cboe Options Fees Schedule, SPX/SPXW and SPESG Liquidity Provider Sliding Scale, Cboe Options Clearing Trading Permit Holder Proprietary Products Sliding Scale, Cboe Options Clearing Trading Permit Holder VIX Sliding Scale, Select Customer Options Reduction ("SCORe") Program, Customer Large Trade Discount, Large Trade Discount, Trading Permit Holder Transaction Fee Policies and Rebate Programs, and Frequent Trader Program.

[7] Only applicable RTH fees, surcharges and programs will apply during Curb. For example, since Curb will operate as an all-electronic trading session, no floor related fees such as floor brokerage fees will apply during Curb.

[8] The Exchange notes that although its rulebook references time in Eastern Time, its Fees Schedule uses Central Standard Time ("CST").

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of January, 2023, I caused copies of the

foregoing to be served via U.S. Mail and email on the following:

Vanessa Countryman, Secretary
U.S. Securities and Exchange
Commission
100 F Street, NE
Washington, D.C. 20549-1090
apfilings@sec.gov

*/s/ Donald B. Verrilli, Jr.*

Donald B. Verrilli, Jr.
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001-5369
Telephone: (202) 220-1100
Email: Donald.Verrilli@mto.com