# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 7, 2023            Decided August 29, 2023

No. 22-1142

GRAYSCALE INVESTMENTS, LLC,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

On Petition for Review of an Order
of the Securities and Exchange Commission

———

*Donald B. Verrilli, Jr.* argued the cause for petitioner. With him on the briefs were *Paul Mishkin*, *Joseph A. Hall*, *Daniel J. Schwartz*, *Elaine J. Goldenberg*, and *Sarah E. Weiner*.

*Jonathan Cooper* and *Rachel Frank* were on the brief for *amici curiae* Blockchain Association, et al. in support of petitioner.

*Joseph R. Palmore* and *Adam L. Sorensen* were on the brief for *amicus curiae* Coinbase, Inc. in support of petitioner.

*Robert A. Long, Jr.* and *Kevin King* were on the brief for *amicus curiae* NYSE Arca, Inc. in support of petitioner.

2

*Stephen B. Kinnaird* was on the brief for *amici curiae* Investor Choice Advocates Network, et al. in support of petitioner.

*Jordan L. Von Bokern*, *Tyler S. Badgley*, and *Judson O. Littleton* were on the brief for *amicus curiae* The Chamber of Commerce of the United States of America in support of petitioner.

*Emily True Parise*, Senior Appellate Counsel, U.S. Securities and Exchange Commission, argued the cause for respondent. With her on the brief were *Megan Barbero*, General Counsel, *Michael A. Conley*, Solicitor, *Tracey A. Hardin*, Assistant General Counsel, *David D. Lisitza*, Senior Appellate Counsel, and *Daniel T. Young*, Attorney.

Before: Srinivasan, *Chief Judge*, Rao, *Circuit Judge*, and Edwards, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* Rao.

Rao, *Circuit Judge*: It is a fundamental principle of administrative law that agencies must treat like cases alike. The Securities and Exchange Commission recently approved the trading of two bitcoin futures funds on national exchanges but denied approval of Grayscale's bitcoin fund. Petitioning for review of the Commission's denial order, Grayscale maintains its proposed bitcoin exchange-traded product is materially similar to the bitcoin futures exchange-traded products and should have been approved to trade on NYSE Arca.

We agree. The denial of Grayscale's proposal was arbitrary and capricious because the Commission failed to explain its different treatment of similar products. We therefore grant Grayscale's petition and vacate the order.

3

## I.

Before listing a new product for trading, a securities exchange generally must file a rule change with the SEC. *See* Securities Act Amendments of 1975, Pub. L. No. 94-29, sec. 16, § 19(b), 89 Stat. 147–48 (codified at 15 U.S.C. § 78s(b)). The Commission "shall approve" a new rule if it "finds that such proposed rule change is consistent with the requirements" of the Exchange Act and any SEC regulations. 15 U.S.C. § 78s(b)(2)(C)(i).

Under the Exchange Act, the rules of an exchange must be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination …, to remove impediments to … a free and open market …, and, in general, to protect investors and the public interest." *Id.* § 78f(b)(5). The rules of an exchange may not be "designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate … matters not related to the … administration of the exchange." *Id.* The Commission has not promulgated a regulation interpreting and implementing these standards. Rather, it approves rule changes on a case-by-case basis. The "burden to demonstrate that a proposed rule change is consistent with the Exchange Act" is on the securities exchange proposing the new rule. 17 C.F.R. § 201.700(b)(3).

## A.

This case involves two kinds of exchange-traded products ("ETPs")—those holding bitcoins and those holding bitcoin futures. Grayscale's primary claim is that the Commission failed to treat like cases alike by denying the listing of Grayscale's proposed bitcoin ETP and approving two bitcoin futures ETPs. Because assessing this claim requires an understanding of how the products work, we briefly explain

4

bitcoin, the spot and futures markets, and exchange-traded products.

Bitcoins are cryptocurrency, a kind of digital "token" that can be used to pay for goods and services directly or exchanged for traditional currencies. Bitcoin is not tracked through bank ledgers like traditional currencies. Instead, bitcoin transactions are recorded on a blockchain maintained by a decentralized computer network. Grayscale Order, 87 Fed. Reg. 40,299, 40,300 (July 6, 2022). One bitcoin was worth less than a penny in 2009 and by mid-2023 was worth about $30,000. John Edwards, *Bitcoin's Price History*, Investopedia.com (2023), https://perma.cc/98H5-T9MV.

As with commodities, there are spot and futures markets for bitcoin. A spot market is another term for the cash market of a commodity or financial instrument. In the bitcoin spot market, cash is exchanged for bitcoin, with delivery expected immediately. In a derivatives market, by contrast, the financial instrument being traded derives its value from the underlying spot market but is not traded on that market. One such derivative is a future, which is a contract to buy or sell an asset at a predetermined price on a specific later date. Futures contracts, which enable investors to hedge against risk, trade on commodity futures exchanges, like the Chicago Mercantile Exchange ("CME"), a global derivatives market. The CME is regulated by the Commodity Futures Trading Commission ("CFTC").

At issue in this case are bitcoin investment funds that hold either bitcoin or bitcoin futures contracts. Many bitcoin and bitcoin futures funds have sought to be listed and traded on a national exchange—that is to become exchange-traded products. *See, e.g.*, Winklevoss Order, 83 Fed. Reg. 37,579, 37,579 (Aug. 1, 2018); Teucrium Order, 87 Fed. Reg. 21,676,

5

21,676 (Apr. 12, 2022). An exchange-traded product may offer continuous share redemption and creation, allowing arbitrage to prevent the product's price from deviating too far from the value of its underlying assets. Products not traded on an exchange cannot offer this, so rather than tracking the value of the underlying assets, they often trade at a discount. Listing on an exchange is desirable because it helps eliminate this discount.

Over the last several years, the Commission received numerous proposals to list bitcoin investment products on national exchanges. The Commission denied every proposal to list a bitcoin ETP. For example, in 2018, the SEC denied Bats BZX Exchange's proposal to list the Winklevoss Bitcoin Trust. Winklevoss Order, 83 Fed. Reg. at 37,579. And in 2020, the SEC denied NYSE Arca's proposal to list the United States Bitcoin and Treasury Investment Trust.[1] USBTIT Order, 85 Fed. Reg. 12,595, 12,596 (Mar. 3, 2020). In each of these orders, the SEC denied the listing of the proposed bitcoin ETP for the same reason: the products were not "designed to prevent fraudulent and manipulative acts and practices" as required by the Exchange Act. *See, e.g.*, Winklevoss Order, 83 Fed. Reg. at 37,580. Specifically, the SEC found that protections inherent to bitcoin—like the blockchain and the size and liquidity of the bitcoin market—were insufficient to prevent fraud. *See* Grayscale Order, 87 Fed. Reg. at 40,305–06. The Commission instead required a surveillance sharing agreement with a related and regulated market of significant size. But every proposed

---

[1] These are just two examples among many. *See, e.g.*, NYDIG Order, 87 Fed. Reg. 14,932, 14,932 (Mar. 16, 2022) (denying the listing of a bitcoin fund); One River Order, 87 Fed. Reg. 33,548, 33,549 (June 2, 2022) (same); Bitwise Order, 87 Fed. Reg. 40,282, 40,282 (July 6, 2022) (same).

6

bitcoin ETP failed the Commission's significant market test. *See id.* at 40,302.

Two bitcoin *futures* ETPs, however, were recently approved by the Commission. In April 2022, the Commission approved NYSE Arca's proposal to list the Teucrium Bitcoin Futures Fund. Teucrium Order, 87 Fed. Reg. at 21,676. A month later, the Nasdaq's proposal to list the Valkyrie XBTO Bitcoin Futures Fund was approved. Valkyrie Order, 87 Fed. Reg. 28,848, 28,848 (May 11, 2022). For both products, the listing exchange had a surveillance sharing agreement with the CME that the Commission found satisfied the significant market test. *Id.* at 28,850; Teucrium Order, 87 Fed. Reg. at 21,682. In both orders, the Commission explicitly stated that approval of bitcoin futures ETPs did not mean approval of bitcoin ETPs was imminent. *See* Teucrium Order, 87 Fed. Reg. at 21,678 n.31; Valkyrie Order, 87 Fed. Reg. at 28,850 n.29.

B.

The Grayscale Bitcoin Trust is a would-be bitcoin ETP. Grayscale currently owns 3.4 percent of outstanding bitcoins, worth tens of billions of dollars. Grayscale Order, 87 Fed. Reg. at 40,314. If Grayscale traded on an exchange, it would be worth roughly the value of the assets in the Trust. Because Grayscale does not have SEC approval to trade on an exchange, however, its shares are restricted securities, with trading limited to accredited investors and over-the-counter markets not registered with the SEC. As Grayscale explains, it cannot offer the continuous share redemptions and creations that are permissible for ETPs and add enormous value. Accordingly, Grayscale's shares trade at a discount—as much as 30 percent. Grayscale estimates this leaves over $4 billion on the table for its investors.

7

NYSE Arca, an affiliate of the New York Stock Exchange, proposed listing shares of the Grayscale Bitcoin Trust. *See* Grayscale Proposal, 86 Fed. Reg. 61,804, 61,804 (Nov. 8, 2021). Of the thousands of public comments, nearly all favored listing Grayscale. Nonetheless, the Commission denied the rule change, finding "NYSE Arca ha[d] not met its burden to demonstrate that its proposal [was] consistent with the requirements of [the] Exchange Act." Grayscale Order, 87 Fed. Reg. at 40,302. As with every other proposed bitcoin ETP, the Commission found Grayscale was not "designed to prevent fraudulent and manipulative acts and practices" and failed to satisfy the significant market test. *Id.* Grayscale petitions for review.

II.

We have jurisdiction over Grayscale's petition under the Exchange Act, which provides that a "person aggrieved by a final order of the Commission … may obtain review of the order in the United States Court of Appeals for the … District of Columbia Circuit, by filing in such court, within sixty days." 15 U.S.C. § 78y(a)(1). The Administrative Procedure Act ("APA") requires the reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). When assessing an arbitrary and capricious claim, we consider whether the agency's decision was "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). We will not substitute our policy judgments for that of the agency. Instead, we ensure the agency "considered the relevant issues" and adequately "explained the decision." *Id.*

8

III.

Grayscale's primary argument is straightforward: the Commission acted arbitrarily and capriciously by denying the listing of Grayscale's proposed bitcoin ETP and approving the listing of materially similar bitcoin futures ETPs.[2]

To evaluate Grayscale's petition, we first must consider whether Grayscale demonstrated its investment product was similar across the relevant regulatory factors to the Teucrium and Valkyrie ETPs that were approved by the Commission. "[T]he great principle that like cases must receive like treatment is … black letter administrative law." *Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020) (cleaned up); *see also Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) ("A fundamental norm of administrative procedure requires an agency to treat like cases alike."). In fact, "dissimilar treatment of evidently identical cases" is "the quintessence of arbitrariness and caprice." *See Colo. Interstate Gas Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988). Failing to distinguish "prior orders in similar cases … fails to satisfy the APA's reasoned decisionmaking requirement." *Baltimore Gas*, 954 F.3d at 285. Particularly when agencies articulate legal standards on a case-by-case basis, they must justify different results reached on similar facts

---

[2] Grayscale also maintains the significant market test is contrary to law because it imposes requirements beyond the Exchange Act. The Act requires rule changes be "designed to prevent fraudulent and manipulative acts." 15 U.S.C. § 78f(b)(5). A surveillance sharing agreement might be one way to protect against fraud, but Grayscale argues it is not the only way. By effectively requiring a surveillance sharing agreement, Grayscale maintains the Commission displaced the Exchange Act with a stricter, standalone surveillance requirement. We do not reach this argument because we set aside the SEC's order as arbitrary and capricious.

9

"to lend predictability and intelligibility" to agency actions, "promote fair treatment, and facilitate judicial review." *Id.* at 286. These principles are especially salient here, as the Commission must ensure the rules of an exchange "are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers." 15 U.S.C. § 78f(b)(5). Treating similarly situated parties differently is at the core of "unfair discrimination."

If we find that Grayscale is similar to the bitcoin futures ETPs across the relevant regulatory factors, we must determine whether the Commission provided an adequate explanation for approving the two bitcoin futures ETPs but denying Grayscale's bitcoin ETP. "If a party plausibly alleges it has received inconsistent treatment under the same rule or standard, we must consider whether the agency has offered a reasonable and coherent explanation for the seemingly inconsistent results." *Baltimore Gas*, 954 F.3d at 286; *see also Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) ("We have long held that an agency must provide adequate explanation before it treats similarly situated parties differently."). The distinctions made by the agency must be relevant to the action at issue and "rationally explain[ed]." *See Consol. Edison Co. of N.Y., Inc. v. FERC*, 45 F.4th 265, 280 (D.C. Cir. 2022) (per curiam).

## A.

Grayscale advanced substantial evidence that its proposed bitcoin ETP was similar to the Teucrium and Valkyrie bitcoin futures ETPs and therefore should have received the same regulatory treatment.

Grayscale's proposed bitcoin ETP and the approved bitcoin futures ETPs all track the bitcoin market price, i.e., the spot market price. Grayscale's link is direct: it holds bitcoins.

10

Grayscale calculates the value of its bitcoin assets using the CoinDesk Bitcoin Price Index, which is based on spot trading across four major bitcoin platforms. *See* Grayscale Order, 87 Fed. Reg. at 40,302 & n.35, 40,317–18. The bitcoin futures ETPs hold CME futures contracts, but their exposure to the spot market price is nearly identical to Grayscale's proposed ETP. Grayscale presented uncontested evidence that there is a 99.9 percent correlation between bitcoin's spot market and CME futures contract prices. *See id.* at 40,318 n.223. This tight correlation is not a coincidence: bitcoin futures prices are ultimately based on spot market prices. Bitcoin futures trade based on predicted settlement prices that are in turn calculated using the Bitcoin Reference Rate. The Reference Rate, like the CoinDesk Index, aggregates spot prices from multiple exchanges. *Id.* at 40,317. Four of the six exchanges are shared between the indexes. *See id.* at 40,318. A study conducted by a finance professor and expert on derivative contract valuation found the CoinDesk Index and the Reference Rate are "near perfect substitutes." Robert E. Whaley, Comment Letter on Proposed Rule to List Grayscale 1 (May 25, 2022).

Moreover, the listing exchanges for Grayscale and the bitcoin futures ETPs have identical surveillance sharing agreements with the CME, on which bitcoin futures trade. *Compare* Grayscale Order, 87 Fed. Reg. at 40,317, *with* Teucrium Order, 87 Fed. Reg. at 21,678, *and* Valkyrie Order, 87 Fed. Reg. at 28,850. Because the spot and futures markets for bitcoin are highly related, it stands to reason that manipulation in either market will affect the price of bitcoin futures. The Commission acknowledged this connection when approving the Teucrium and Valkyrie ETPs. The Commission found "CME's surveillance can reasonably be relied upon to capture the effects on the CME bitcoin futures market caused by a person attempting to manipulate the proposed futures ETP … whether that attempt is made by directly trading on the

11

CME bitcoin futures market or indirectly by trading outside of the CME bitcoin futures market." Teucrium Order, 87 Fed. Reg. at 21,679; Valkyrie Order, 87 Fed. Reg. at 28,851. To the extent that the price of bitcoin futures might be affected by trading in both the futures and spot markets, the Commission concluded fraud in *either market* could be detected by surveillance of the CME futures market.

Grayscale has demonstrated its proposed bitcoin ETP is materially similar, across relevant regulatory factors, to the approved bitcoin futures ETPs. First, the underlying assets— bitcoin and bitcoin futures—are closely correlated. And second, the surveillance sharing agreements with the CME are identical and should have the same likelihood of detecting fraudulent or manipulative conduct in the market for bitcoin and bitcoin futures.

B.

Despite these salient similarities, the Commission rejected Grayscale's proposed bitcoin ETP and approved two bitcoin futures ETPs. The Commission distinguished the two products solely through the application of the significant market test.

The Commission requires bitcoin-based ETPs to address concerns of fraud and manipulation by having their listing exchanges enter into surveillance sharing agreements with markets that are (1) related to the listing exchange, (2) regulated, and (3) of significant size. *See* Grayscale Order, 87 Fed. Reg. at 40,300. If fraud or manipulation occurs, the surveillance sharing agreement, in theory, should identify the problem. Surveillance sharing agreements "provide a necessary deterrent to manipulation because they facilitate the availability of information needed to fully investigate a manipulation if it were to occur." *Id.* at 40,301.

12

The Commission acknowledges NYSE Arca has a surveillance sharing agreement with the CME; the CME bitcoin futures market is related to Grayscale's proposed ETP; and the CME is adequately regulated by the CFTC. *See id.* The only dispute is whether the CME market for bitcoin futures is a market of significant size. *Id.*

Despite its name, the "significant market" or "market of significant size" requirement implicates more than the size of the surveilled market. *See id.* at 40,300. To allow the Commission to assess whether market manipulation will be detected in the surveilled market, the significant market test has two prongs. First, there must be "a reasonable likelihood that a person attempting to manipulate the ETP would … have to trade on [the related] market to successfully manipulate the ETP." *Id.* In other words, the Commission will consider whether a person attempting to manipulate the ETP could simply bypass the related market and thus circumvent the surveillance. Second, it must be "unlikely that trading in the ETP would be the predominant influence on prices in [the surveilled] market." *Id.* If trading in the ETP dominated prices in the surveilled market, that market might be unable to pick up price discrepancies between the ETP and its underlying assets.[3]

The Commission concluded that Grayscale, like every other proposed bitcoin ETP, failed to meet both prongs of the significant market test. By contrast, the Commission found the significant market test satisfied for the Valkyrie and Teucrium bitcoin futures ETPs. This differential application of the

---

[3] The SEC indicated these prongs are "illustrative and not exclusive." Wise Origin Order, 87 Fed. Reg. 5,527, 5,528 n.16 (Feb. 1, 2022). "There could be other types of 'significant markets' and 'markets of significant size.'" *Id.* With respect to bitcoin ETPs, however, the Commission applied only these prongs.

13

significant market requirement is at the core of Grayscale's arbitrary and capricious challenge. We take each prong in turn.

C.

The Commission found Grayscale failed the first prong of the significant market requirement because there was not "a reasonable likelihood that a person attempting to manipulate [Grayscale] would have to trade on the CME." *Id.* at 40,311. On the other hand, the Commission found it was "unnecessary" for the bitcoin futures ETPs to establish a "would-be manipulator would have to trade on the CME." Teucrium Order, 87 Fed. Reg. at 21,679; *see also* Valkyrie Order, 87 Fed. Reg. at 28,852 (explaining "deficiencies" in Nasdaq's evidence of whether there was "a reasonable likelihood that a would-be manipulator of the proposed ETP would have to trade on the CME" did not prevent approval). According to the Commission, this showing was unnecessary for the bitcoin futures ETPs because their only holdings are securities traded directly on the surveilled exchange. Grayscale maintains it should be treated the same as the bitcoin futures ETPs, despite the fact that its holdings do not trade on the CME. Grayscale has the same economic risks as the futures ETPs, and so a surveillance sharing agreement with the CME should have similar fraud prevention capabilities. Therefore, Grayscale reasons, it should also be exempted from the first prong.

Under the first prong of the significant market test, the Commission failed to provide the necessary "reasonable and coherent explanation" for its inconsistent treatment of similar products. *Baltimore Gas*, 954 F.3d at 286.

1.

The Commission never explained why Grayscale owning bitcoins rather than bitcoin futures affects the CME's ability to

14

detect fraud. While the Commission asserted that owning assets not traded on the surveilled exchange was a "significant difference" and proclaimed that there was "reason to question whether a surveillance-sharing agreement with the CME would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct affecting the price of the spot bitcoin held by that ETP," it provided no support for these claims. Grayscale Order, 87 Fed. Reg. at 40,317. Grayscale, however, provided evidence that CME bitcoin futures prices are 99.9 percent correlated with spot market prices. Based on that data, fraud in the spot market would present identical problems for a bitcoin ETP and a bitcoin futures ETP. Bitcoin futures are derivatives of bitcoin and, as long as the market is efficient, arbitrage will drive the prices together.

The Commission neither disputed Grayscale's evidence that the spot and futures markets for bitcoin are 99.9 percent correlated, nor suggested that market inefficiencies or other factors would undermine the correlation. The Commission faults Grayscale for failing to provide other types of evidence. Without further explanation, however, the Commission's assertion that "information in the record for this filing does not support [the] claim" that "any fraud or manipulation in the underlying [spot] market will affect both products in the same way" is unreasonable. *See id.* The Commission's unexplained discounting of the obvious financial and mathematical relationship between the spot and futures markets falls short of the standard for reasoned decisionmaking. *See Menkes v. DHS*, 486 F.3d 1307, 1313 (D.C. Cir. 2007) ("[I]t would be presumably arbitrary and capricious … to ignore an obvious [fact].").

15

2.

Even if the spot and futures markets are highly correlated and the respective ETPs are functionally identical, the Commission maintained Grayscale would not pass the first prong of the significant market test. Why? The Commission claimed "correlation analysis" does not "provide evidence of the causal economic relationship of interest: namely, whether fraud or manipulation that impacts spot bitcoin would also similarly impact CME bitcoin futures contracts." Grayscale Order, 87 Fed. Reg. at 40,318 n.224. The Commission's explanation is insufficient.

When approving the bitcoin futures ETPs, the Commission acknowledged the risk of fraud to bitcoin futures from "trading outside of the CME bitcoin futures market," such as trading in the spot market. Teucrium Order, 87 Fed. Reg. at 21,679; Valkyrie Order, 87 Fed. Reg. at 28,851. This was an important problem to address for the futures ETPs because futures markets "are hard to manipulate … because of actual and potential competition from the cash commodity," so the primary risk is often in the spot market. *See* Frank H. Easterbrook, *Monopoly, Manipulation, and the Regulation of Futures Markets*, 59 J. Bus. S103, S103 (1986). Fraud and manipulation in the bitcoin spot market pose a similar risk to both futures and spot products. Because the spot bitcoin market and the CME bitcoin futures market are so tightly correlated, a price distortion in the spot market will be reflected in the price of the futures market. After all, futures are derivatives of the spot market.

The SEC did not suggest the 99.9 percent correlation was coincidence or caused by some third variable. We recognize the basic principle that mere correlation does not equal causation. But here the correlation was based on the logical and

16

mathematical connection between the spot and futures markets. In this context, the almost perfect correlation was at least strong evidence of causation. And the Commission failed to explain why a surveillance sharing agreement with the CME was sufficient to protect bitcoin futures ETPs from potential fraud, but not Grayscale's proposed bitcoin ETP.

The Commission also faulted NYSE Arca for failing to demonstrate the futures market leads the spot market. Grayscale Order, 87 Fed. Reg. at 40,313. Because evidence of the lead/lag relationship between the two markets was "inconclusive," the Commission doubted the connection between the two markets. *Id.* Whatever the reality of the lead/lag relationship, however, by requiring this evidence from Grayscale, the Commission failed to treat like cases alike. When approving the bitcoin futures ETPs, the Commission found evidence of a lead/lag relationship to be "unnecessary." *See* Teucrium Order, 87 Fed. Reg. at 21,679 n.47; Valkyrie Order, 87 Fed. Reg. at 28,851 n.43. Yet when rejecting Grayscale's bitcoin ETP, the Commission said it considered "the lead/lag relationship … to be *central* to understanding whether it is reasonably likely that a would-be manipulator of a spot bitcoin ETP would need to trade on the … futures market." Grayscale Order, 87 Fed. Reg. at 40,313 n.163 (emphasis added). The Commission offered no compelling reason why the lead/lag relationship between spot and futures bitcoin markets was central for assessing the potential for fraud and manipulation of bitcoin ETPs and yet unnecessary for assessing bitcoin futures ETPs.

When denying Grayscale under the first prong of the significant market test, the Commission failed to reasonably explain why it approved the listing of two bitcoin futures ETPs but not Grayscale's similar proposed bitcoin ETP. Without

17

such an explanation, inconsistent treatment of similar products is arbitrary and capricious.

D.

The Commission also applied the second prong of the significant market test unreasonably. The Commission concluded there was a risk that trading in Grayscale would be "the predominant influence on prices" in the CME bitcoin futures market and therefore that Grayscale could not meet the second prong of the significant market test. *Id.* at 40,313. We conclude the Commission's reasons for differentiating Grayscale from the bitcoin futures ETPs again fall short.

1.

First, the Commission failed to explain how the proposed Grayscale bitcoin ETP would be the predominant influence on the price of bitcoin futures traded on the CME. The Commission's primary argument appears to be that because Grayscale had substantial assets, valued at "approximately $30 billion," with potential for further growth, Grayscale might dwarf the CME market for bitcoin futures, which had "approximately $1.7 billion" of open contracts. *Id.* at 40,314. The Commission also expressed concern about the relative trading volume between Grayscale and the CME bitcoin futures market. According to the Commission, Grayscale provided no explanation for "why a single bitcoin ETP with trading volume close to one-quarter that of the CME bitcoin futures market [was] not likely to be the predominant influence on prices in that market." *Id.*

The Commission, however, did not adequately connect the value of Grayscale's assets to the conclusion that those assets would influence prices in the CME futures market. Because Grayscale owns no futures contracts, trading in Grayscale can

18

affect the futures market only through the spot market. *See* Brief of Amicus Curiae NYSE Arca for Petitioner 17 ("[T]he only way in which the Trust could conceivably be the predominant influence on prices in that market is by virtue of its effect on prices in the bitcoin spot market."). But Grayscale holds just 3.4 percent of outstanding bitcoin, and the Commission did not suggest Grayscale can dominate the price of bitcoin. In light of these economic realities, the Commission should have explained why it considered the relevant comparison to be the value of Grayscale's assets as a percentage of the total value of the CME bitcoin futures market. Simply faulting NYSE Arca for not directly addressing that ratio was neither "reasonable" nor "reasonably explained." *See Prometheus Radio Project*, 141 S. Ct. at 1158. An agency may ask a regulated party for further information, but such requests must be reasonably related to the relevant regulatory standards.

The Commission also expressed concern that Grayscale underestimated its potential for growth if approved as an ETP, and that if such growth occurred the ETP could overwhelm the futures market. Grayscale Order, 87 Fed. Reg. at 40,313–14. Yet the Commission did not adequately justify this concern in light of the record before it. As the Commission acknowledged, Grayscale owns only 3.4 percent of outstanding bitcoin. *Id.* at 40,314. And bitcoin is a deep and liquid market. One comment included evidence that bitcoin had an average daily trading volume of "approximately $45 billion, which … is significantly higher than that of the largest equity stocks." *Id.* at 40,304. This is the kind of evidence the Commission has repeatedly relied on to approve other ETPs. *See, e.g.*, Gold Order, 69 Fed. Reg. 64,614, 64,619 (Nov. 5, 2004) (approving a gold ETP in part because the spot market was "extremely deep and liquid"). The Commission did not explain why Grayscale underestimating the growth potential of its *spot*

19

assets posed a threat to the CME's bitcoin *futures* market, which is the market under surveillance.

Moreover, the Commission dismissed evidence that could have mitigated concerns about Grayscale growing to have the predominant influence on bitcoin prices. Because future inflows cannot be predicted, NYSE Arca compared the "historical inflows" of bitcoins into Grayscale to bitcoin's "market capitalization." Grayscale Order, 87 Fed. Reg. at 40,313. The comparison showed that while Grayscale experienced nearly $7 billion of inflows over a two-year period, "the market capitalization of bitcoin grew by $721 billion" during the same time period. *Id.* This evidence suggested Grayscale was unlikely to dominate prices because the spot bitcoin market was huge and growing faster than Grayscale. In addition, the record included evidence that, among "global commodity ETPs," Grayscale would "rank fourth … in assets under management and seventh in … trading volume," so its size was not unusually large. *See id.* at 40,313 n.168. By presenting this evidence, Grayscale and NYSE Arca sought to demonstrate that Grayscale's ETP would have a minimal impact on the bitcoin spot price because of its relatively small share of the large and fast-growing bitcoin market.

Grayscale's evidence directly addressed the Commission's concerns—if trading in Grayscale has a minimal impact on the price of bitcoin, it necessarily follows that trading in Grayscale will have a minimal impact on bitcoin futures. If the Commission thought these economic realities do not hold true for the bitcoin market such that trading in Grayscale would be the predominant influence on the CME futures market, it failed to sufficiently explain this conclusion in light of the record.

20

2.

The Commission also failed to treat like cases alike under the second prong of the significant market test. With respect to the bitcoin futures ETPs, the Commission found the second prong was satisfied because "the CME bitcoin futures market ha[d] progressed and matured significantly," so trading on a single ETP was unlikely to be the predominant influence on the CME. Teucrium Order, 87 Fed. Reg. at 21,680 (cleaned up); *see also* Valkyrie Order, 87 Fed. Reg. at 28,853 (recognizing "the maturation of the CME bitcoin futures market"). This reason, however, applies equally to Grayscale.

The Teucrium and Valkyrie bitcoin futures ETPs hold assets that trade on the CME, namely bitcoin futures contracts. When explaining why trading in these ETPs would not predominantly influence prices in the CME futures market, the Commission focused on the robustness of that market. The Commission emphasized the size and liquidity of the CME futures market, finding that "nearly every measurable metric related to" bitcoin futures had "trended consistently up." Teucrium Order, 87 Fed. Reg. at 21,680. Trading in bitcoin futures increased from $737 million in December 2017 to $44.6 billion in December 2021. *Id.* at 21,680–81. As the Commission concluded, the CME was a "large futures market," and so there was little reason to think trading of a single ETP would be the predominant influence on prices in that market. *Id.* at 21,680.

The Commission failed to explain why this reasoning does not similarly apply to Grayscale. NYSE Arca has the same surveillance sharing agreement with the CME, and the CME bitcoin futures market is robust, as the Commission recognized in its previous orders. Because the spot market is deeper and more liquid than the futures market, manipulation should be

21

more difficult, not less. The Commission's reasons for approving the Teucrium and Valkyrie ETPs seem to apply equally to Grayscale, but Grayscale's listing was denied. Lacking a "reasonable and coherent explanation for the[se] seemingly inconsistent results," the Commission's order in this case is arbitrary and capricious. *Baltimore Gas*, 954 F.3d at 286; *see also Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) ("An agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.") (cleaned up).

\* \* \*

To avoid arbitrariness and caprice, administrative adjudication must be consistent and predictable, following the basic principle that similar cases should be treated similarly. NYSE Arca presented substantial evidence that Grayscale is similar, across the relevant regulatory factors, to bitcoin futures ETPs. The Commission failed to adequately explain why it approved the listing of two bitcoin futures ETPs but not Grayscale's proposed bitcoin ETP. In the absence of a coherent explanation, this unlike regulatory treatment of like products is unlawful. We therefore grant Grayscale's petition for review and vacate the Commission's order.

*So ordered.*