ORAL ARGUMENT NOT YET SCHEDULED
No. 22-1142

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

GRAYSCALE INVESTMENTS, LLC,

Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent,

_____

On Petition for Review of an Order
of the Securities and Exchange Commission

_____

**BRIEF OF *AMICUS CURIAE* NYSE ARCA, INC.
IN SUPPORT OF PETITIONER**

_____

Robert A. Long, Jr.
Kevin King
  *Counsel of Record*
Matthew C. Quallen
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for NYSE Arca, Inc.*

October 18, 2022

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for *amicus curiae* NYSE Arca, Inc. ("NYSE Arca") hereby certify as follows:

**A.    Parties and Amici.**    Petitioner before this Court is Grayscale Investments, LLC.  Respondent is the Securities and Exchange Commission.  There are no intervenors at this time.  In addition to those parties, counsel for NYSA Arca are aware of the following entities participating as *amici curiae* in this Court: NYSE Arca, Inc.

**B.    Ruling Under Review.**  The ruling under review is the Commission's June 29, 2022 final order titled *Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to List and Trade Shares of Grayscale Bitcoin Trust under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares)*, Release No. 34-95180, *reproduced at* 87 Fed. Reg. 40,299 (July 6, 2022) ("Disapproval Order").

**C.    Related Cases**.  NYSE Arca is not aware of any related cases pending before this Court or any other court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rules 26.1 and 29(b), *amicus curiae* NYSE Arca discloses that (1) it is an indirect, wholly owned subsidiary of Intercontinental Exchange, Inc. and (2) Intercontinental Exchange, Inc. has no parent corporation and, as of the date hereof, no publicly held company owns 10 percent or more of its stock.

## CIRCUIT RULE 29(d) CERTIFICATE

Pursuant to Circuit Rule 29(d), counsel for *amicus curiae* NYSE Arca certifies that a separate brief is necessary. NYSE Arca was the movant in the underlying proceedings before the Commission and is the exchange upon which Petitioner's exchange-traded product would be listed if approved. As a result, NYSE Arca has an interest in the outcome of this litigation and a knowledge of the record before the agency shared by no other potential amicus.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ......................................... ii

CIRCUIT RULE 29(d) CERTIFICATE .................................................. iii

TABLE OF AUTHORITIES ................................................................. vi

GLOSSARY ...................................................................................... ix

STATEMENT OF AMICUS CURIAE ..................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................2

ARGUMENT ...................................................................................5

I.   The Index Is a Novel and Effective Means to Prevent Fraud and
     Manipulation from Affecting the Index Price for Bitcoin.............................5

     A.   The Index Provides an Accurate and Resilient Picture of
          Bitcoin Price Movements. ........................................................5

     B.   The Structure of the Index Protects the Index Price from
          Specific Forms of Fraud and Manipulation Raised by the
          Commission.............................................................................8

          1.   Wash Trading............................................................ 9

          2.   Spoofing ................................................................. 10

          3.   Manipulation of a Single Trading Platform............................ 10

          4.   Failure of a Trading Platform .................................. 11

II.  The Chicago Mercantile Exchange Futures Market Is Regulated,
     Surveilled, and Closely Connected to the Spot Market for Bitcoin.............12

     A.   A Person Attempting to Manipulate the Trust Would Also Have
          to Trade on the Futures Market to Do So Successfully. ....................13

B.    It Is Unlikely that the Trust Would Be the Predominant
Influence on Prices in the Bitcoin Futures Market. ............................17

III.   Allowing Shares of the Trust to Trade on a National Securities Market
Would Benefit Investors. ....................................................................19

A.    Investors Who Directly Acquire Bitcoin Face Costs and Risks
that the Trust Helps Alleviate...............................................20

B.    Conversion of the Trust to an Exchange-Traded Product Would
Improve Pricing Efficiency by Creating Arbitrage
Opportunities. ......................................................................23

C.    A Spot Bitcoin Product Like the Trust Would Promote
Competition by Making an Additional Type of Exchange-
Traded Product Available to Investors................................24

CONCLUSION ..........................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Coburn v. Evercore Tr. Co.*,
  844 F.3d 965 (D.C. Cir. 2016)................................................................25

*In re Drexel Burnham Lambert Grp., Inc.*,
  995 F.2d 1138 (2d Cir. 1993) ..............................................................26

*Reddy v. Commodity Futures Trading Comm'n*,
  191 F.3d 109 (2d Cir. 1999) ................................................................10

*Sec. Indus. Ass'n v. Bd. of Governors*,
  468 U.S. 137 (1984).............................................................................20

*Sw. Airlines Co. v. FERC*,
  926 F.3d 851 (D.C. Cir. 2019)..............................................................17

*Tex. Tin Corp. v. EPA*,
  992 F.2d 353 (D.C. Cir. 1993) .............................................................19

*United States v. Coscia*,
  866 F.3d 782 (7th Cir. 2017) ...............................................................11

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)..............................................................................13

## Statutes and Regulations

7 U.S.C. § 6c ........................................................................................11

15 U.S.C. § 78c .............................................................................20, 26

15 U.S.C. § 78f.....................................................................4, 5, 13, 20

15 U.S.C. § 78s ......................................................................................4

17 C.F.R. § 240.19b-4.............................................................................4

## Regulatory Materials

Bitwise Order,
  84 Fed. Reg. 55,382 (Oct. 9, 2019) ......................................................9

Disapproval Order,
87 Fed. Reg. 40,299 (July 6, 2022)........................ 4, 9, 13, 14, 16, 18, 19, 20, 26

Notice of Filing of Amendment No. 2 and Order Granting Accelerated
Approval of a Proposed Rule Change, as Modified by Amendment No. 2,
Amending the NYSE Arca Equities Rule 5 and Rule 8 Series, Release No.
34-80189 (S.E.C. Mar. 9, 2017), 82 Fed. Reg. 13,889 (Mar. 15, 2017) ............23

NYSE Arca Rule 4.5-E .........................................................................................23

NYSE Arca Rule 4.13-E .......................................................................................23

NYSE Arca Rule 8.201-E ......................................................................................16

Proposal,
87 Fed. Reg. 28,043 (May 10, 2022)............................. 6, 7, 8, 9, 10, 11, 12, 13,
14, 15, 18, 21, 22, 24

SEC v. Edgar E. Chapman, Litigation Release No. 20616,
2008 WL 2387312 (S.E.C. June 12, 2008).........................................................10

Teucrium Order,
87 Fed. Reg. 21,676 (Apr. 12, 2022)................................................15, 17, 19, 20

Valkyrie Order,
87 Fed. Reg. 28,848 (May 11, 2022).....................................................................19

Winklevoss Order,
83 Fed. Reg. 37,579 (July 26, 2018)......................................................................9

**Other Authorities**

*Bitcoin Price Data*, Coinmarketcap.com.............................................................3, 18

Justin Baer, *America's Oldest Bank, BNY Mellon, Will Hold That
Crypto Now*, Wall St. J. (Oct. 11, 2022)................................................................3

Robert Engle & Debojyoti Sarkar, *Premiums-Discounts and Exchange
Traded Funds*, 13 J. Derivatives 27 (2006).........................................................25

Emma Fletcher, *Report Shows Scammers Cashing in on Crypto
Craze*, Fed. Trade Comm'n (June 3, 2022).........................................................21

Merritt Fox, Lawrence Glosten & Sue S. Guan, *Spoofing and its Regulation*, Harv. L. Sch. Forum on Corp. Governance (Feb. 2, 2022) ...........11

*Grayscale® Bitcoin Trust*, Grayscale .........................................................4, 18, 24

Daniel J. Grimm, *A Process of Natural Correction: Arbitrage and the Regulation of Exchange-Traded Funds Under the Investment Company Act*, 11 Univ. Pa. J. Bus. L. 95 (2008)................................................25

*Institutional Bitcoin Provider NYDIG Announces Minority Stake Purchase by MassMutual*, MassMutual (Dec. 10, 2020) ....................................3

Letter from Paul Grewal, Chief Legal Officer, Coinbase, to Vanessa A. Countryman, Secretary, SEC (Mar. 3, 2022)...................................15

Letter from Robert E. Whaley, Director, Fin. Mkts. Rsch. Ctr., Vanderbilt Univ., to Vanessa A. Countryman, Secretary, SEC (May 25, 2022) .................15

D. T. Max, *Half a Billion in Bitcoin, Lost in the Dump*, New Yorker (Dec. 6, 2021) ........................................................................22

Joanna Ossinger, *Harvard and Yale Endowments Among Those Reportedly Buying Crypto*, Bloomberg (Jan. 25, 2021) ......................................3

Nathaniel Popper, *Lost Passwords Lock Millionaires Out of Their Bitcoin Fortunes*, N.Y. Times (Jan. 12, 2021) ...................................22

Public Members, Intermarket Surveillance Group .................................16

RBC Global Asset Management, *What Is the Role of the Market Maker for ETFs?* (Oct. 2017) ..........................................................17

Kevin Stankiewicz, *BlackRock's Rick Rieder Says the World's Largest Asset Manager Has 'Started to Dabble' in Bitcoin*, CNBC (Feb. 17, 2021)................3

# GLOSSARY

| | |
|---|---|
| Commission | Securities and Exchange Commission |
| Bitwise Order | Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, Relating to the Listing and Trading of Shares of the Bitwise Bitcoin ETF Trust Under NYSE Arca Rule 8.201–E, Release No. 34-87267 (S.E.C. Oct. 9, 2019), 84 Fed. Reg. 55,382 (Oct. 16, 2019) |
| Disapproval Order | Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to List and Trade Share of Grayscale Bitcoin Trust under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares), Release No. 34-95180 (S.E.C. June 29, 2022), 87 Fed. Reg. 40,299 (July 6, 2022) |
| ETF | Exchange-Traded Fund |
| Petitioner Brief | Opening Brief of Petitioner Grayscale Investments, LLC, Doc. No. 1968421 (Oct. 11, 2022) |
| Proposal | Notice of Filing of Amendment No. 1 to Proposed Rule Change to List and Trade Shares of Grayscale Bitcoin Trust under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares), Release No. 34-94844 (amended Apr. 21, 2022), 87 Fed. Reg. 28,043 (May 10, 2022) |
| Teucrium Order | Order Granting Approval of a Proposed Rule Change, as Modified by Amendment No. 2, to List and Trade Shares of the Teucrium Bitcoin Futures Fund under NYSE Arca Rule 8.200–E, Commentary .02 (Trust Issued Receipts), Release No. 34-94620 (S.E.C. Apr. 6, 2022), 87 Fed. Reg. 21,676 (Apr. 12, 2022) |
| Valkyrie Order | Order Granting Approval of a Proposed Rule Change, as Modified by Amendment Nos. 1 and 2, |

|                   | to List and Trade Shares of the Valkyrie XBTO Bitcoin Futures Fund under Nasdaq Rule 5711(g), Release No. 34-94853 (S.E.C. May 5, 2022), 87 Fed. Reg. 28,848 (May 11, 2022) |
|-------------------|---|
| Winklevoss Order  | Order Setting Aside Action by Delegated Authority and Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, to List and Trade Shares of the Winklevoss Bitcoin Trust, Release No. 34-83723 (S.E.C. July 26, 2018), 83 Fed. Reg. 37,579 (Aug. 1, 2018) |

## STATEMENT OF AMICUS CURIAE[1]

NYSE Arca is a national securities exchange and the top U.S. exchange for the trading and listing of exchange-traded funds, also known as ETFs. As of 2022, NYSE Arca's listed exchange-traded funds had over $6 trillion in assets under management, representing nearly 75 percent of asset share of all U.S. listed exchange-traded funds. NYSE Arca offers investors access to fast, transparent, and efficient markets, with the lowest bid/ask spreads and greatest trading volume of any U.S. market for the broader category of exchange-traded products.

NYSE Arca has an interest in bringing exchange-traded products to market and providing diverse, competitive options to investors. NYSE Arca was the movant before the Securities and Exchange Commission in this matter and is the exchange on which shares of Petitioner's proposed exchange-traded product would trade. Because Petitioner's proposed exchange-traded product is a novel investment product that offers accurate pricing of the spot bitcoin market and resistance to fraud and manipulation, NYSE Arca has a definite interest in facilitating investor access to Petitioner's product.

---

[1] No party's counsel authored this brief in whole or in part. Moreover, no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than *amicus curiae*, its members, or its counsel made such a monetary contribution. All parties have consented to the filing of this amicus brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In the last decade, individual and institutional investors have shown increasing appetite for investment in digital assets, including cryptocurrencies—media of exchange created and maintained by decentralized computer networks. Bitcoin is the largest and most mature such currency, accounting for a total market capitalization of nearly $400 billion within the broader cryptocurrency market of nearly $1 trillion.[2] Bitcoin is held by individual investors, university endowments, asset managers, and insurance companies, among others.[3] And national financial institutions, including Bank of New York Mellon, have begun offering custodial services (such as storing account keys) to bitcoin owners.[4]

Among the largest holders of bitcoin is Petitioner's Grayscale Bitcoin Trust. The Trust manages approximately $12 billion in assets and its sole investment is

---

[2] *See Bitcoin Price Data*, Coinmarketcap.com, https://coinmarketcap.com/currencies/bitcoin/ (last visited Oct. 17, 2022).

[3] *See, e.g.*, Joanna Ossinger, *Harvard and Yale Endowments Among Those Reportedly Buying Crypto*, Bloomberg (Jan. 25, 2021), https://www.bloomberg.com/news/articles/2021-01-26/harvard-and-yale-endowments-among-those-reportedly-buying-crypto; Kevin Stankiewicz, *BlackRock's Rick Rieder Says the World's Largest Asset Manager Has 'Started to Dabble' in Bitcoin*, CNBC (Feb. 17, 2021), https://www.cnbc.com/2021/02/17/blackrock-has-started-to-dabble-in-bitcoin-says-rick-rieder.html; *Institutional Bitcoin Provider NYDIG Announces Minority Stake Purchase by MassMutual*, MassMutual (Dec. 10, 2020), https://www.massmutual.com/about-us/news-and-press-releases/press-releases/2020/12/institutional-bitcoin-provider-nydig-announces-minority-stake-purchase-by-massmutual.

[4] Justin Baer, *America's Oldest Bank, BNY Mellon, Will Hold That Crypto Now*, Wall St. J. (Oct. 11, 2022), https://www.wsj.com/articles/americas-oldest-bank-bny-mellon-will-hold-that-crypto-now-11665460354.

bitcoin—allowing shareholders in the Trust to gain investment exposure to bitcoin without holding the currency directly.[5]  In order to permit investors to accurately price the Trust's holdings, the Trust employs an index price for bitcoin, based on a novel weighing of various spot markets for bitcoin.

On April 21, 2022, NYSE Arca filed the operative version of a proposed rule change before the Commission, seeking to convert the Trust to an exchange-traded product to be listed on NYSE Arca's exchange.[6]  The Commission disapproved that proposal, finding that it did not satisfy the Exchange Act's requirement that an exchange's rules be "'designed to prevent fraudulent and manipulative acts and practices' and 'to protect investors and the public interest.'"  Disapproval Order, 87 Fed. Reg. 40,299, 40,300 (July 6, 2022) (quoting 15 U.S.C. § 78f(b)(5)); *see also id.* at 40,319.  In reaching that conclusion, the Commission analyzed whether (1) "the exchange has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets" or (2) the proposed product incorporates "other means to prevent fraudulent and manipulative acts and practices."  *Id.* at 40,300, 40,304.

---

[5] *Grayscale® Bitcoin Trust*, Grayscale, https://grayscale.com/products/grayscale-bitcoin-trust/ (last visited Oct. 17, 2022).

[6] NYSE Arca proposed the rule change—which we refer to throughout this brief as the Proposal—to comply with the requirements of section 19(b)(1) of the Exchange Act and Rule 19b-4 thereunder.  *See* 15 U.S.C. § 78s(b)(1); 17 C.F.R. § 240.19b-4.

This *amicus* brief provides details regarding the safeguards built into the Proposal, as well as the reasons why the Proposal satisfies both prongs of that test. *First*, the Index employed by the Trust is a novel and effective means to prevent fraud and manipulation from harming investors. The Index's design counteracts forms of manipulation previously identified by the Commission as of concern, such as spoofing and wash trades, thus advancing the Exchange Act's objectives. *Second*, NYSE Arca has surveillance sharing agreements with the Chicago Mercantile Exchange, which operates a major regulated bitcoin futures market that is closely linked to the spot market for bitcoin, as well as other sources of relevant trading data—thus satisfying the Commission's significant-market test. *See also* Petitioner Brief at 8–9 (describing the elements of that test).

This *amicus* brief also elaborates on why converting the Trust to an exchange-traded product would "protect investors and the public interest." 15 U.S.C. § 78f(b)(5). Investors who seek to make bitcoin a part of their portfolio currently must look beyond national securities exchanges to do so—thus exposing themselves to higher costs, lower liquidity, and meaningful risks related to trading and maintaining custody of bitcoin. Allowing shares of the Trust to be traded on a national exchange would alleviate those problems by providing a secure, highly-regulated, and transparent platform for investors to gain exposure to the spot bitcoin market. Authorizing exchange trading would also promote competition in the

market for bitcoin-based investment products and reward innovation. Finally, exchange trading would allow the market to more effectively value the underlying Trust assets, offering greater protection to the nearly one million investors who already hold shares of the Trust.

## ARGUMENT

## I. The Index Is a Novel and Effective Means to Prevent Fraud and Manipulation from Affecting the Index Price for Bitcoin.

### A. The Index Provides an Accurate and Resilient Picture of Bitcoin Price Movements.

Because the sole investment activity of the Trust is to hold bitcoin, shares of the Trust can be accurately valued so long as the current market price for bitcoin— the spot price—can be ascertained by investors. The Index employed by the Trust fulfills this valuation role and has done so successfully for more than six years. *See* Proposal, 87 Fed. Reg. 28,043, 28,051 (May 10, 2022). Rather than a simple average of bitcoin spot prices in various markets, the Index weighs bitcoin prices on different exchanges and limits the inclusion of data that may result from technical problems, limited liquidity, or fraudulent activity in the bitcoin spot market. The Index is designed to (1) mitigate the effects of fraud, manipulation, and other anomalous trading activity on the bitcoin index price, (2) provide a real-time, volume-weighted market price for bitcoin, and (3) appropriately handle and adjust for non-market related events.

The Index accomplishes those objectives in part through careful selection of the markets used as inputs. Markets may be included in the Index only if they meet a robust set of criteria, including handling at least 5 percent of the total bitcoin to dollar trading volume for U.S.-based markets or 10 percent for a foreign market; reliably providing real-time price and volume data; and allowing deposits and withdrawals of bitcoin and U.S. dollars without restriction. Proposal, 87 Fed. Reg. at 28,048. These markets must also comply with applicable federal, state, and international licensing requirements, such as anti-money laundering policies, strict know-your-customer identification policies, five-year transaction record-keeping, and reporting of suspicious and large currency transactions. *See id.* at 28,048, 28,052; *see also id.* at 28,047, 28,052 (showing that all four constituent markets are subject to one or more of the following oversight regimes: the Treasury Department's Financial Crimes Enforcement Network regulations; the New York State Department of Financial Services' BitLicense program, which requires measures to detect, prevent, and respond to fraud and manipulation; or regulation by the United Kingdom's Financial Conduct Authority). These characteristics make fraud and manipulation in the constituent markets less attractive by increasing the probability that unscrupulous traders will be identified and punished. *See id.* at 28,052. Further, the Index includes only markets that charge trading fees, in order to attach a cost to any manipulation attempts.

– 6 –

But the Index does more than select markets that are less likely to be the subject of fraud and manipulation: it adjusts its data inputs in real time to counteract any instances of actual fraud and manipulation, as well as anomalous events. At any given time, the Index incorporates price data from between three and five constituent markets, whose relative importance to the calculation of the index price the Index regularly adjusts. *See id.* The Index dynamically assigns greater weight to markets with a larger trading volume, thus increasing the likelihood that a holder or buyer of bitcoin could transact in the spot market at the index price and preventing illiquid exchanges (which can be easier to manipulate) from having an outsize effect on the index price. *See id.* The Index decreases the weight of a market if its price diverges from the price of bitcoin in other spot markets; the greater the price difference, the lesser the weight of the outlier market. *See id.* If a market provides stale price and volume data and is not reporting real-time trading activity, its weight likewise decreases (eventually reaching a point where the market has no effect on the index price)—thereby preventing a market experiencing an interruption from improperly influencing the index price. *See id.* at 28,052–53. And the Index excludes trades that are proposed but not actually executed (i.e., unmatched offers to buy or sell bitcoin on the spot market) from its calculation of the index price. *See id.* at 28,053.

While the structure of the Index itself responds to market events, the Index is also constructed and maintained by an expert third-party provider, allowing for

prudent manual handling of non-market-related events.  For example, if a constituent market were compromised in a fundamental way (e.g., through a hack of its computer systems) or experienced an unannounced closure, the index provider is empowered to respond to these events, altering the composition of the Index and issuing a prompt announcement to investors.  *See id.*

Together, these mechanisms have caused the Index to provide an accurate, broadly representative index price for the Trust's bitcoin holdings.  For example, in calendar year 2021 the maximum differential between the index price and the spot price on any single constituent exchange averaged just 0.32 percent over the course of the year, demonstrating that investors could consistently obtain bitcoin on the spot market at a cost nearly identical to the index price.  *See id.*

### B.    The Structure of the Index Protects the Index Price from Specific Forms of Fraud and Manipulation Raised by the Commission.

The design of the Index protects the index price of bitcoin from manipulation and addresses concerns raised by the Commission with respect to prior proposals for spot bitcoin exchange-traded products.  The Commission has previously asserted that manipulation of the spot market for bitcoin may occur through "spoofing," "wash" transactions, manipulation of the price of bitcoin on a single platform, or failure of a platform.  *See*, *e.g.*, Winklevoss Order, 83 Fed. Reg. 37,579, 37,585–86 (July 26, 2018) (asserting high level of wash trading in bitcoin spot market); Bitwise Order, 84 Fed. Reg. 55,382, 55,383 (Oct. 9, 2019) (same); *see also* Disapproval

Order, 87 Fed. Reg. at 40,305.  The novel design of the Index responds to each of these concerns.

### 1.    Wash Trading

Wash trading occurs when market participants transact in a market with no change in beneficial ownership—such as by buying and selling the same investment in equal amounts, or transacting between colluding accounts.  *See Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 115 (2d Cir. 1999).  Wash trading artificially increases trading volume and gives the false impression of demand for an investment, potentially raising prices, especially for investments that otherwise tend to have low trading volume.  *See*, *e.g.*, *SEC v. Edgar E. Chapman*, Litigation Release No. 20616, 2008 WL 2387312, at *1 (S.E.C. June 12, 2008) ("Because the shares were thinly traded, . . . wash trades significantly inflated both the price and volume . . . .").  The Index, however, includes only trades for which a transaction fee is paid*. See* Proposal, 87 Fed. Reg. at 28,049.  This limitation attaches a "real, quantifiable cost to any manipulation attempt[]" through wash trading, which often involves a large number of trades.  Further, the Index gives greater weight to more liquid, higher volume markets that are more difficult to move through artificial trading, further increasing the cost of manipulation.  *See id.* at 28,053.

### 2.  Spoofing

Spoofing occurs when a trader places an order to buy or sell an investment but then cancels the order before it is fulfilled.  *See United States v. Coscia*, 866 F.3d 782, 786–87 (7th Cir. 2017); *see also* 7 U.S.C. § 6c(a)(5)(C) (defining spoofing as "bidding or offering with the intent to cancel the bid or offer before execution").  The purpose of spoofing is to influence the price of an investment by giving the false impression that demand or supply exists at a given price point.[7]  In order to mitigate the effects of spoofing, the Index includes only executed trades in its calculation of the index price.  *See* Proposal, 87 Fed. Reg. at 28,049.  Spoofed orders as a result are not considered by the Index in the calculation of bitcoin's spot price.

### 3.  Manipulation of a Single Trading Platform

Crucially, manipulation or another anomalous event must occur simultaneously across multiple trading platforms in order to have a significant effect on the Index, because the Index automatically reduces the weight of markets that report outlier spot prices.  *See id.*  For example, if the average spot price of bitcoin were 7 percent higher on one constituent market than the others, the Index would automatically reduce the weight of the higher-priced market to zero percent of the Index.  *See id.* at 28,050.  Manipulation of multiple constituent markets is likely to

---

[7] *See, e.g.*, Merritt Fox, Lawrence Glosten & Sue S. Guan, *Spoofing and its Regulation*, Harv. L. Sch. Forum on Corp. Governance (Feb. 2, 2022), https://corpgov.law.harvard.edu/2022/02/02/spoofing-and-its-regulation/.

be costly to a would-be manipulator because (as noted above) the Index includes only executed trades from markets that charge transaction fees. *See id.* at 28,052. Markets are required to carry a high volume of the dollar to bitcoin market to qualify for inclusion in the Index, in turn requiring a high volume of manipulative trading to have a measurable effect on the index price. *See id.* at 28,048; *see also id*. at 28,054 (from November 1, 2019 to August 31, 2021, trading volume on the markets that comprise the Index was $624 billion).

### 4.    Failure of a Trading Platform

The Index is likewise protected from the temporary or permanent failure of a single market.  If trading activity halts or significantly slows on a constituent market, locking in place a stale price, the Index will automatically reduce the weight of that market in computing the index price (or eliminate that platform from consideration altogether).  *See* Proposal, 87 Fed. Reg. at 28,049.  For example, if a trading market went offline for roughly two hours, the Index would recognize that inactivity and temporarily adjust the market's influence on the index price to zero percent during that period of inactivity.  *See id.* at 28,050.  When the market came back online, the Index would resume including the market's data in the index, albeit at an initially lower weight level in light of the temporary inactivity.  *See id.*  In the event of a more significant or lasting failure, such as the suspension of withdrawals and bankruptcy

of a market, the index provider retains authority to remove a market from the Index altogether. *See id.* at 28,053.

## II. The Chicago Mercantile Exchange Futures Market Is Regulated, Surveilled, and Closely Connected to the Spot Market for Bitcoin.

The Commission correctly recognized that the Index's design could "attenuate . . . the effect of manipulative activity on one of the Constituent Platforms." Disapproval Order, 87 Fed. Reg. at 40,310. However, while the Exchange Act requires only that an exchange's rules be "designed to prevent fraudulent and manipulative acts and practices" and "to protect investors and the public interest," 15 U.S.C. § 78f(b)(5), the Commission has additionally required that a party seeking to list a spot bitcoin exchange-traded product show that "the exchange has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets," Disapproval Order, 87 Fed. Reg. at 40,300. Petitioner challenges the validity of that additional requirement, *see* Petitioner Brief at 40–51, invoking the "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). But even if the Exchange Act did require the existence of an agreement with a regulated and surveilled market closely connected to the spot market for bitcoin, that requirement is satisfied here.

The Commission found that NYSE Arca has a comprehensive surveillance-sharing agreement with the Chicago Mercantile Exchange—an exchange where bitcoin futures trade. *See* Disapproval Order, 87 Fed. Reg. at 40,311. The Commission likewise found that the Chicago Mercantile Exchange bitcoin futures market is regulated, because the Commodity Futures Trading Commission oversees that market. *See id.* But the Commission nevertheless incorrectly concluded that the bitcoin futures market is not a market of significant size related to spot bitcoin—that is, "a market . . . as to which (i) there is a reasonable likelihood that a person attempting to manipulate the [Trust] would also have to trade on that market . . . and (ii) it is unlikely that trading in the [Trust] would be the predominant influence on prices in that market." *Id*. at 40,310–11.

## A. A Person Attempting to Manipulate the Trust Would Also Have to Trade on the Futures Market to Do So Successfully.

The Chicago Mercantile Exchange bitcoin futures market is a large market. From November 1, 2019 to August 31, 2021, trading volume on that market was more than $432 billion, compared to $624 billion in bitcoin trading volume across the four spot markets that make up the Index. *See* Proposal, 87 Fed. Reg. at 28,054. Commenters analyzing more recent data determined that the Chicago futures market is even larger than the spot market. *See* Disapproval Order, 87 Fed. Reg. at 40,312. And the Chicago futures market is closely connected to the spot market for bitcoin for the intuitive reason that the price of an asset in the future is affected by its price

in the present.  Indeed, record evidence establishes that there is a 99.9 percent correlation between the movement of bitcoin spot prices and bitcoin futures prices, and that the two are "near perfect substitutes."[8]

Consistent with that understanding, the Commission has previously concluded that surveillance of the Chicago Mercantile Exchange "can reasonably be relied upon to capture the effects on the CME bitcoin futures market caused by . . . attempt[ed] . . . manipulat[ion] . . . whether that attempt is made by directly trading on the CME bitcoin futures market *or indirectly by trading outside of the CME bitcoin futures market*."  Teucrium Order, 87 Fed. Reg. 21,676, 21,679 (Apr. 12, 2022) (emphasis added).  As the Proposal explained, it is a commonsense conclusion that arbitrage between the futures and spot markets for bitcoin "would tend to counter an attempt to manipulate the spot market alone."  Proposal, 87 Fed. Reg. at 28,054.  And by virtue of the Index's design, a manipulator would likely have to manipulate a broad cross section of the total bitcoin market—not just a single platform in the spot market—to affect the index price.  As a result, it is reasonably likely that in order to *successfully* manipulate the Trust and the Index, a would-be

---

[8] *See* Letter from Paul Grewal, Chief Legal Officer, Coinbase, to Vanessa A. Countryman, Secretary, SEC at 7 & fig. 6 (Mar. 3, 2022), https://www.sec.gov/ comments/sr-nysearca-2021-90/srnysearca202190-20118548-271429.pdf; Letter from Robert E. Whaley, Director, Fin. Mkts. Rsch. Ctr., Vanderbilt Univ., to Vanessa A. Countryman, Secretary, SEC at 1–7 (May 25, 2022), https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-20130009-296497.pdf.

manipulator would have to manipulate the Chicago Mercantile Exchange futures market as well.

NYSE Arca also has broad information-sharing agreements beyond its agreement with the Chicago Mercantile Exchange, and these partnerships serve as a further means of detecting attempted manipulation. As the Commission has acknowledged, NYSE Arca has the ability to communicate with and obtain trading information from other markets that are members of the Intermarket Surveillance Group, an organization comprising dozens of major U.S. exchanges and exchanges from throughout the world. *See* Disapproval Order, 87 Fed. Reg. at 40,311.[9] Moreover, the rules of the exchange permit NYSE Arca to obtain information regarding trading in the shares, the underlying bitcoin, or any bitcoin derivative from a subset of key market participants known as market makers.[10] Market makers, who are available to buy and sell exchange-traded product shares on a regular basis,

---

[9]    *See also* Public Members, Intermarket Surveillance Group, https://isgportal.org/public-members (last visited Oct. 17, 2022).

[10]    *See* NYSE Arca Rule 8.201-E(g), *available at* https://nysearcaguide.srorules.com/rules/document?treeNodeId=csh-da-filter!WKUS-TAL-DOCS-PHC-%7B57E4C5DB-A9B6-48EB-964A-3E2CA5EDB8C6%7D--WKUS_TAL_18878%23teid-616 (last visited Oct. 17, 2022).

– 15 –

frequently redeem and create shares and therefore are critical players in the functioning of exchange-traded products.[11]

Given the broad informational access available to NYSE Arca, the inherent difficulty in manipulating the Index without manipulating multiple components of the overall market for bitcoin, and the Commission's prior conclusion that surveillance by the Chicago Mercantile Exchange is likely to capture manipulation in the futures market, it is reasonable to conclude that attempts to manipulate the Index would be detectable by NYSE Arca or its partners.  Indeed, the Commission previously concluded that surveillance of the Chicago Mercantile Exchange futures market would also detect indirect attempts to influence that market, including through the manipulation of other markets.  *See* Teucrium Order, 87 Fed. Reg. at 21,679.  The Commission may not implicitly abandon that prior position without saying so and providing a reasoned explanation for the change in course.  *See, e.g.*, *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019) ("[H]owever the agency justifies its new position, what it may not do is gloss over or swerve from prior precedents without discussion." (cleaned up)).

---

[11] *See* RBC Global Asset Management, *What Is the Role of the Market Maker for ETFs?* (Oct. 2017), https://www.rbcgam.com/documents/en/articles/what-is-the-role-of-the-market-maker-for-etfs.pdf.

### B.    It Is Unlikely that the Trust Would Be the Predominant Influence on Prices in the Bitcoin Futures Market.

The Trust does not trade in the bitcoin futures market.  Thus, the only way in which the Trust could conceivably be the predominant influence on prices in that market is by virtue of its effect on prices in the bitcoin spot market.  But the Trust only holds roughly 3 percent of circulating bitcoin,[12] far below the amount necessary to predominate the spot market—much less predominate the futures market *by proxy*.  The Trust's past growth does not suggest that position is likely to change.  From November 1, 2019 to August 31, 2021, the market capitalization of bitcoin grew by $721 billion, from $166 billion to $888 billion.  Proposal, 87 Fed. Reg. at 28,054.  Over the same period, the Trust experienced $6.6 billion of inflows, representing only 0.9 percent of the aggregate growth of bitcoin's market capitalization.  *See id*.

It is certainly true, as the Commission stated in the Disapproval Order, that the future is difficult to predict.  *See* Disapproval Order, 87 Fed. Reg. at 40,313.  NYSE Arca admitted as much in the Proposal.  87 Fed. Reg. at 28,054.  But that baseline uncertainty is not an adequate justification for concluding that trading in the

---

[12]    *Compare      Grayscale®      Bitcoin      Trust*,      Grayscale, https://grayscale.com/products/grayscale-bitcoin-trust/ (last visited Oct. 17, 2022) (showing approximately $12 billion in bitcoin holdings), *with Bitcoin Price Data*, Coinmarketcap.com,  https://coinmarketcap.com/currencies/bitcoin/  (last visited Oct. 17, 2022) (showing market capitalization of circulating bitcoin supply of roughly $375 billion).

Trust would likely become the predominant influence on the price of bitcoin futures. Although approval of the Proposal could allow the Trust to gain market share, making past growth figures unreliable, *see* Disapproval Order, 87 Fed. Reg. at 40,313–14, the Commission did not even mention—let alone consider—the existence of competing bitcoin-based exchange-traded products.    As the Commission is no doubt aware, many entities have applied (albeit unsuccessfully) to create exchange-traded products that offer exposure to the bitcoin spot market. *See id*. at 40,300 n.11 (collecting numerous prior Commission orders).  It makes little sense to assume that, if the Commission were to approve exchange trading of the Trust's shares, competitors would not invoke that approval as a basis to seek authorization to market their own competing products, as occurred with respect to exchange-traded products tied to the bitcoin futures market.   *Compare*, *e.g.*, Teucrium Order, 87 Fed. Reg. 21,676 (approving bitcoin futures exchange-traded product), *with* Valkyrie Order, 87 Fed. Reg. 28,848 (May 11, 2022) (approving another bitcoin futures exchange-traded product shortly thereafter for similar reasons); *see also Tex. Tin Corp. v. EPA*, 992 F.2d 353, 355 (D.C. Cir. 1993) ("[T]he Agency may not base . . . [its] decision on unsupported assumptions." (citation and quotation marks omitted)).

### III. Allowing Shares of the Trust to Trade on a National Securities Market Would Benefit Investors.

"The securities laws were designed . . . to protect investors and the general public." *Sec. Indus. Ass'n v. Bd. of Governors*, 468 U.S. 137, 175 (1984). Moreover, where, as here, the Commission considers the protection of investors and the promotion of public interest in the context of a proposed exchange rule, *see* 15 U.S.C. § 78f(b)(5), it must take into account "whether the [proposed] action will promote efficiency, competition, and capital formation," 15 U.S.C. § 78c(f). The Commission mentioned these aspects of the Proposal only in passing, without providing a substantive response to arguments that allowing shares of the Trust to be traded on a national exchange "would enhance market efficiency and facilitate competition and capital formation." Disapproval Order, 87 Fed. Reg. at 40,321 n.258. Those arguments in favor of the Proposal are well-founded, making it particularly problematic for the Commission to bypass them. Indeed, there is significant record evidence for the proposition that approving the Proposal would benefit investors and the market at large, as described below. The Commission recently acknowledged that point in a related proceeding, reasoning that "compared to trading in unregulated spot bitcoin markets, trading . . . on a national securities exchange may provide some additional protection to investors." Teucrium Order, 87 Fed. Reg. at 21,682 n.109. Common sense, the record evidence, and bedrock

administrative-law principles dictate that the Commission should have reached the same conclusion here.  *See also* Petitioner Brief at 23–34.

### A.    Investors Who Directly Acquire Bitcoin Face Costs and Risks that the Trust Helps Alleviate.

Shares of the Trust are designed to provide investors with a cost-effective and convenient way to gain investment exposure to bitcoin without having to address the costs and risks associated with direct investment in bitcoin.  As the Proposal explains, investing directly in bitcoin often requires payment of substantial fees, technologically complex arrangements relating to acquisition and sale transactions, and security measures associated with safekeeping bitcoin once it is acquired.  *See* Proposal, 87 Fed. Reg. at 28,045–47.

There is a considerable body of evidence documenting the risks investors can face when directly holding bitcoin.  From January 2021 through March 2022, individuals reported 46,000 instances of cryptocurrency fraud—implicating more than $1 billion in holdings—to the Federal Trade Commission, primarily in the form of fake bitcoin investment offerings by disreputable sources.[13]  Individual investors

---

[13] *See, e.g.*, Emma Fletcher, *Report Shows Scammers Cashing in on Crypto Craze*, Fed. Trade Comm'n (June 3, 2022), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze; *see also* Proposal, 87 Fed. Reg. at 28,046 (explaining that "off-blockchain transactions," such as the offline sale of a digital wallet by the owner to a third party, "are subject to risks" because the "transfer of Bitcoin ownership is not recorded in" or "validated through the blockchain mechanism" (cleaned up)).

who take custody of bitcoins also run the risk of losing access to passwords known as private keys, without which access to bitcoin protected by the key may be lost irretrievably. *See* Proposal, 87 Fed. Reg. at 28,046 (noting that users "may permanently lose access to the[ir] Bitcoin" when they lose the corresponding private key, for example when the key "is deleted and no backup has been made").[14] Individual investors have lost millions of dollars as a result of forgotten passwords, reformatted laptops, and misplaced hard drives.[15] Recent analyses suggest that as much as 20 percent of the circulating supply of bitcoin may be lost.[16]

The Trust largely eliminates these risks, through measures that would not be cost effective for individual investors. The Trust generates multiple private keys in secure facilities and stores those keys offline in secure vaults located throughout the world, preventing both hacking of the Trust's private keys and interference with the Trust's assets due to loss of a single key. Proposal, 87 Fed. Reg. at 28,046–47. In addition, individual investors who purchase shares in the Trust do not hold custody of (or otherwise have responsibility for maintaining) the underlying bitcoin assets.

---

[14] *See also* Nathaniel Popper, *Lost Passwords Lock Millionaires Out of Their Bitcoin Fortunes*, N.Y. Times (Jan. 12, 2021), https://www.nytimes.com/2021/01/12/technology/bitcoin-passwords-wallets-fortunes.html ("*Lost Passwords*").

[15] *Id.*; *see also* D. T. Max, *Half a Billion in Bitcoin, Lost in the Dump*, New Yorker (Dec. 6, 2021), https://www.newyorker.com/magazine/2021/12/13/half-a-billion-in-bitcoin-lost-in-the-dump.

[16] *See* Popper, *Lost Passwords*, *supra*.

Allowing shares of the Trust to be traded on a national exchange would further enhance these benefits for investors, by making it possible to gain investment exposure to bitcoin without having to trade over-the-counter or directly on bitcoin markets, which can involve less oversight and greater risks for investors than trading on a national exchange.   For example, relative to over-the-counter trading, transacting on a national exchange provides investors with greater liquidity, increased price transparency, and additional protections afforded by the exchange's listing standards.[17]

The Commission's approach, contrary to the interest in protecting investors, makes access to cost-effective and secure ways to gain access to bitcoin more difficult, even though individuals already seek out investment exposure to bitcoin through a variety of less-protected means.

---

[17] *See*, *e.g.*, Notice of Filing of Amendment No. 2 and Order Granting Accelerated Approval of a Proposed Rule Change, as Modified by Amendment No. 2, Amending the NYSE Arca Equities Rule 5 and Rule 8 Series, Release No. 34-80189 (S.E.C. Mar. 9, 2017), 82 Fed. Reg. 13,889 (Mar. 15, 2017) (approving listing standards for exchange-traded products traded on NYSE Arca's exchange); NYSE Arca Rules 4.5-E-4.13-E, https://nysearcaguide.srorules.com/rules/document?treeNodeId=csh-da-filter!WKUS-TAL-DOCS-PHC-%7B57E4C5DB-A9B6-48EB-964A-3E2CA5EDB8C6%7D--WKUS_TAL_18878%23teid-0 (last visited Oct. 18, 2022) (requiring various financial reports).

### B.    Conversion of the Trust to an Exchange-Traded Product Would Improve Pricing Efficiency by Creating Arbitrage Opportunities.

Conversion of the Trust to an exchange-traded product would also improve market efficiency.  Absent Commission approval, the Trust is unable to operate a share-redemption program—a dynamic that artificially depresses the trading price of the Trust's shares.  As of October 17, a share of the Trust trades for $11.46, while the Trust holds $17.90 worth of bitcoin per share—a discount of roughly 36 percent—and shares of the Trust have previously traded at large premiums as well.[18] Such substantial differences between the value of a share and the value of the assets it represents do not occur with exchange-traded products due to arbitrage.  As the Proposal lays out, were the Trust converted to an exchange-traded product, certain large market participants would have the ability to redeem shares for a corresponding proportion of the Trust's underlying bitcoin and create additional shares by providing bitcoin to the Trust.  *See* Proposal, 87 Fed. Reg. at 28,055–57.  When the shares are undervalued relative to the bitcoin they represent, arbitrageurs will redeem undervalued shares of the Trust for the more valuable bitcoin, reducing the supply of shares and increasing the price until parity is achieved.  Where the reverse is true, arbitrageurs will exchange the less valuable bitcoin for the more valuable shares.

---

[18] *Grayscale® Bitcoin Trust*, Grayscale, https://grayscale.com/products/grayscale-bitcoin-trust/ (last visited Oct. 17, 2022).

This dynamic is well-established and a foundational premise of exchange-traded products.[19]

For the roughly 850,000 investors currently invested in the Trust, *see* Petitioner Brief at 1, the current discount on the Trust's assets represents significant unrealized value. And "a security price in an *efficient* market represents the market's most accurate estimate of the value of a particular security." *Coburn v. Evercore Tr. Co.*, 844 F.3d 965, 969 (D.C. Cir. 2016) (quotation marks omitted; emphasis added). Allowing shares of the Trust to trade as exchange-traded products, and therefore in closer proximity to the actual value of the Trust's holdings, would markedly improve the efficiency of this market.

### C. A Spot Bitcoin Product Like the Trust Would Promote Competition by Making an Additional Type of Exchange-Traded Product Available to Investors.

Finally, by introducing a new type of exchange-traded product—the first based on spot bitcoin—approval of the Proposal would promote competition, permitting a broader cross section of investors to weigh in on the value of bitcoin. It is a "fundamental notion that public securities markets . . . should be 'free and

---

[19] *See*, *e.g.*, Daniel J. Grimm, *A Process of Natural Correction: Arbitrage and the Regulation of Exchange-Traded Funds Under the Investment Company Act*, 11 Univ. Pa. J. Bus. L. 95, 102–08 (2008); *see also id.* at 106 (noting that "U.S. domestic ETFs 'are priced very close to their true [underlying asset values] with only brief excursions any significant distance away'" (quoting Robert Engle & Debojyoti Sarkar, *Premiums-Discounts and Exchange Traded Funds*, 13 J. Derivatives 27, 41 (2006))).

open' to competition." *In re Drexel Burnham Lambert Grp., Inc.*, 995 F.2d 1138, 1141 (2d Cir. 1993). As the Commission acknowledged, various commenters put forth ways in which the Proposal would promote competition. *See* Disapproval Order, 87 Fed. Reg. at 40,319–20. These commenters explained that approval of the Proposal would enhance investor choice; diminish manipulability by increasing liquidity in the bitcoin spot market; and, by increasing the number of market participants, lead to more efficient price discovery. Because the Commission concluded the proposed rule change was inconsistent with its interpretation of the Exchange Act, the Commission gave no weight to these important, statutorily-mandated considerations. *See* Disapproval Order, 87 Fed. Reg. at 40,321 n.258; 15 U.S.C. § 78c(f).

## CONCLUSION

For the foregoing reasons, the Petition for Review should be granted.

Respectfully submitted,

/s/ *Kevin King*

Robert A. Long, Jr.
Kevin King
  *Counsel of Record*
Matthew C. Quallen
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for Amicus Curiae*
*NYSE Arca, Inc.*

October 18, 2022

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because this brief contains 5,744 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word using 14-point Times New Roman font.

*/s/  Kevin King*
*Counsel for Amicus Curiae*

October 18, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2022, a copy of the attached brief was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ Kevin King
*Counsel for Amicus Curiae*

October 18, 2022