**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 22-1142**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

GRAYSCALE INVESTMENTS, LLC,
Petitioner

v.

SECURITIES AND EXCHANGE COMMISSION,
Respondent

On Petition for Review of an Order of the
Securities and Exchange Commission

**REPLY BRIEF OF PETITIONER GRAYSCALE INVESTMENTS, LLC**

Paul S. Mishkin
Joseph A. Hall
Daniel J. Schwartz
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
Paul.Mishkin@davispolk.com

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Sarah E. Weiner
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
  Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Petitioner*

January 13, 2023

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ....................................................................... iii

GLOSSARY OF ABBREVIATIONS ..........................................................vi

STATUTES AND REGULATIONS........................................................1

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT ............................................................................................4

    I.    The Commission's Denial Of The Rule-Change Proposal Rests On An Arbitrary Distinction .................................................4

        A.    Fraud Or Manipulation In The Spot Bitcoin Market Would Similarly Affect Both Spot Bitcoin ETPs And Bitcoin Futures ETPs .......................................................4

            1.    Fraud Or Manipulation In The Spot Bitcoin Market Would Affect The Price Of Bitcoin Futures And Thus The Net Asset Value Of A Bitcoin Futures ETP .....................................................4

            2.    Fraud Or Manipulation In The Spot Bitcoin Market Would Affect The Price Paid By Investors For Shares Of An ETP Holding Bitcoin or Bitcoin Futures ..........................................................8

        B.    The Commission Fails To Justify Its Arbitrary Distinction.............................................................10

        C.    The Commission's Arbitrary Distinction Violates The APA And The Exchange Act...................................16

    II.    The Commission Arbitrarily Relaxed the Significant-Market Test for Bitcoin Futures ETPs Only...................................17

    III.    The Significant-Market Test Exceeds The Commission's Statutory Authority And Is Arbitrary................................21

    IV.    The Proposed ETP Is Resistant To Fraud And Manipulation And Protective Of Investors And The Public Interest ........28

CONCLUSION ...................................................................................31

i

CERTIFICATE OF COMPLIANCE .......................................................................32

CERTIFICATE OF SERVICE .................................................................................33

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*AHA v. Becerra*,
142 S. Ct. 1896 (2022)........................................................................24

*All. for Cannabis Therapeutics v. DEA*,
930 F.2d 936 (D.C. Cir. 1991)......................................................20, 27

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018).........................................................15

*Appalachian Power Co. v. EPA*,
251 F.3d 1026 (D.C. Cir. 2001).........................................................15

*\*Baltimore Gas & Elec. Co. v. FERC*,
954 F.3d 279 (D.C. Cir. 2020)........................................................4, 18

*Chamber of Commerce v. FEC*,
76 F.3d 1234 (D.C. Cir. 1996)...........................................................24

*Citadel Sec. LLC v. SEC*,
45 F.4th 27 (D.C. Cir. 2022)........................................................15, 16

*City of Vernon v. FERC*,
845 F.2d 1042 (D.C. Cir. 1988).........................................................10

*Council for Urological Ints. v. Burwell*,
790 F.3d 212 (D.C. Cir. 2015)...........................................................24

*Domestic Sec., Inc. v. SEC*,
333 F.3d 239 (D.C. Cir. 2003)...........................................................16

*NetCoalition v. SEC*,
615 F.3d 525 (D.C. Cir. 2010)...........................................................15

*Pereira v. Sessions*,
138 S. Ct. 2105 (2018)......................................................................24

*Authorities upon which we chiefly rely are marked with asterisks.

*Rapoport v. SEC*,
  682 F.3d 98 (D.C. Cir. 2012) ........................................................27

*Select Specialty Hosp.-Bloomington v. Burwell*,
  757 F.3d 308 (D.C. Cir. 2014) ......................................................21

*Stereo Broadcasters v. FCC*,
  652 F.2d 1026 (D.C. Cir. 1981) ....................................................21

*Sw. Airlines v. FERC*,
  926 F.3d 851 (D.C. Cir. 2019) ........................................................9

*Timpinaro v. SEC*,
  2 F.3d 453 (D.C. Cir. 1993) ..........................................................16

*\*Westar Energy v. FERC*,
  473 F.3d 1239 (D.C. Cir. 2007) ..............................................15, 18

**FEDERAL STATUTES**

7 U.S.C. § 9(1) ..............................................................................13

*\*15 U.S.C. § 78f(b)(5) ............................... 12, 16, 20, 23, 24, 28

15 U.S.C. § 78s(b)(2)(C) .....................................................12, 16, 20

**FEDERAL REGULATIONS AND OTHER FEDERAL REGULATORY AUTHORITIES**

17 C.F.R. § 180.1(a) ......................................................................13

54 Fed. Reg. 12705 (Mar. 28, 1989) ............................................23

59 Fed. Reg. 5619 (Feb. 7, 1994) .................................................23

77 Fed. Reg. 75468 (Dec. 20, 2012) ............................................22

86 Fed. Reg. 44062 (Aug. 11, 2021) ..............................................7

*\*87 Fed. Reg. 21676 (Apr. 12, 2022) ................... 3, 4, 7, 8, 11, 12, 17, 26

*\*87 Fed. Reg. 28043 (May 10, 2022) ...................................19, 26

*\*87 Fed. Reg. 40299 (July 6, 2022) ................... 3, 17, 18, 22, 25, 26, 27

2004 WL 2723611 (Oct. 28, 2004) .........................................22, 23

iv

SEC Release No. 34-88284, 2020 WL 927446 (Feb. 26, 2020) ..............................5

*Exchange-Traded Funds*,
    2019 WL 4727253 (SEC Sept. 25, 2019) .......................................................8, 9

**OTHER AUTHORITIES**

CFTC, *The CFTC's Role in Monitoring Virtual Currencies*,
    https://www.cftc.gov/media/4636/VirtualCurrencyMonitoring
    ReportFY2020/download...................................................................................13

Henry Ordower, *Revisiting Realization*, 13 Va. Tax Rev. 1, 65 (1993)....................5

Reuters, *Factbox: Ten Years of Bitcoin* (Oct. 31, 2018),
    https://www.reuters.com/article/us-crypto-currencies-bitcoin-
    factbox/factbox-ten-years-of-bitcoin-idUKKCN1N50GE ..........................19, 26

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| Bitcoin Reference Rate | CME CF Bitcoin Reference Rate |
| CFTC | Commodity Futures Trading Commission |
| CME | Chicago Mercantile Exchange |
| Commission | Securities and Exchange Commission |
| ETF | Exchange-Traded Fund |
| ETP | Exchange-Traded Product |
| Exchange | NYSE Arca, Inc. |
| Exchange Act | The Securities Exchange Act of 1934 (codified at 15 U.S.C. § 78a *et seq.*) |
| Grayscale | Grayscale Investments, LLC |
| Index | CoinDesk Bitcoin Price Index |
| JA | Joint Appendix |
| NAV | Net Asset Value |
| Order | 87 Fed. Reg. 40299 (July 6, 2022) |
| Proposal | 87 Fed. Reg. 28043 (May 10, 2022) |
| SEC | Securities and Exchange Commission |
| Teucrium Futures ETP | Teucrium Bitcoin Futures Fund |
| Teucrium Order | 87 Fed. Reg. 21676 (Apr. 12, 2022) |

| Trust | Grayscale Bitcoin Trust |
|-------|-------------------------|

**STATUTES AND REGULATIONS**

All applicable statutes, etc., are contained in the Brief for Petitioner.

## SUMMARY OF ARGUMENT

The Order in this case is arbitrary to its core. Its central premise—that the Exchange's surveillance-sharing agreement with the CME provides adequate protection against fraud and manipulation in the bitcoin futures market but not the spot bitcoin market—is illogical. Any fraud or manipulation in the spot market would necessarily affect the price of bitcoin futures, thereby affecting the net asset value of an ETP holding either spot bitcoin or bitcoin futures as well as the price investors pay for such an ETP's shares. Either CME surveillance can detect spot-market fraud that affects *both* futures and spot ETPs, or that surveillance cannot do so for *either* type of ETP. Accordingly, the fact that the Exchange has a surveillance-sharing agreement with the CME futures market cannot justify treating the two types of ETPs differently.

There is thus no reasonable basis for concluding that CME surveillance adequately protects holders of one kind of ETP but not the other. Yet the Order rests on that very conclusion. Even worse, in so concluding, the Order contradicts prior Commission decisions approving bitcoin futures ETPs, all of which necessarily rested on the premise that the CME surveillance-sharing agreement sufficed to detect fraud or manipulation in the spot bitcoin market that would affect bitcoin futures ETPs.

2

That core illogic runs throughout the Order. It is reflected in the result-driven way that the Commission relaxed its invented significant-market test to approve bitcoin futures ETPs but promptly toughened it up again to disapprove proposed spot bitcoin ETPs. It is also reflected in the Commission's arbitrary decision to elevate its significant-market test to the level of a statutory requirement (at least for spot bitcoin ETPs), even though the text of the Exchange Act requires no such thing and the Commission has for decades approved spot ETPs for other commodities (such as gold) without requiring a surveillance-sharing agreement that meets the significant-market test.

The Commission's brief never comes to terms with the Order's arbitrary premise and the discriminatory result it has produced. Instead, the Commission goes on for page after obfuscatory page pointing out differences between the spot bitcoin and bitcoin futures markets that have no bearing on the issue before this Court. At bottom, the Order violates both the reasoned decision-making requirements of the APA and the Exchange Act's prohibition on unfairly discriminatory treatment. It should be held unlawful and set aside.

## ARGUMENT

**I.    The Commission's Denial Of The Rule-Change Proposal Rests On An Arbitrary Distinction**

    **A.    Fraud Or Manipulation In The Spot Bitcoin Market Would Similarly Affect Both Spot Bitcoin ETPs And Bitcoin Futures ETPs**

        **1.    Fraud Or Manipulation In The Spot Bitcoin Market Would Affect The Price Of Bitcoin Futures And Thus The Net Asset Value Of A Bitcoin Futures ETP**

As Grayscale's opening brief explains, a successful manipulation of prices in the spot bitcoin market would necessarily affect the price of bitcoin futures as well—and, therefore, the value of bitcoin futures ETPs' holdings.  Opening.Br.27-30, 32. The Commission offers scant rebuttal beyond parroting the Order's blithe assertion that "the record [does not] 'sufficiently demonstrate that attempted manipulation of spot bitcoin would also similarly impact CME bitcoin futures contracts.'" SEC.Br.43 (quoting 87 Fed. Reg. 40299, 40317 n.209 (July 6, 2022) (JA__)).  That assertion is wrong.

First, it contradicts the Commission's own order approving the Teucrium bitcoin futures ETP.  Opening.Br.26-27; 87 Fed. Reg. 21676 (Apr. 12, 2022) ("Teucrium Order").  There, the Commission (i) "disagree[d]" that there is a "'lack of connection' between the CME bitcoin futures contracts and spot bitcoin trading platforms"; (ii) stated that it was "not persuaded that the market for CME bitcoin futures contracts . . . is 'not specifically materially influenced' by . . . other bitcoin

4

markets"; and (iii) found that "nothing . . . prevents the trade prices that contribute to the daily settlement price" of futures contracts "from themselves being influenced by activity in other bitcoin markets."  Teucrium Order, 87 Fed. Reg. at 21679-80.

The Commission now suggests that the Teucrium Order merely speculated about "what *might be possible*."    SEC.Br.43 n.29.    But there was nothing hypothetical about that analysis; the Commission's approval of the Teucrium Futures ETP rested on it.  The Commission could not properly have relied on mere *possibilities* to conclude (as it did) that there was no reasonable *likelihood* that attempted manipulation of a futures ETP would necessarily take place on the CME futures market.  Teucrium Order, 87 Fed. Reg. at 21679-80.  Having previously concluded in the Teucrium Order that prices on the bitcoin futures market *are* influenced by prices in the bitcoin spot market, the Commission acted arbitrarily in reaching the opposite conclusion here. *See Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020).

Second, the close connection between bitcoin spot prices and bitcoin futures prices is self-evident.  A bitcoin futures contract is an agreement to buy (or sell) bitcoin at a specific price in the future.  Futures contracts for financial assets like bitcoin are priced based on the current spot price of the underlying asset plus carrying costs.  Accordingly, the present value of bitcoin heavily influences the price at which a bitcoin futures contract trades.  The Commission's contrary assertion

contradicts settled economic principles. *See* Henry Ordower, *Revisiting Realization*, 13 Va. Tax Rev. 1, 65 (1993). Indeed, the CME calculates the cash settlement value for bitcoin futures contracts using the CME CF Bitcoin Reference Rate, which is based on data from essentially the same spot markets that go into the Index that the Trust uses to value its bitcoin holdings. Opening.Br.25; *see* SEC Release No. 34-88284, 2020 WL 927446 (Feb. 26, 2020). Every bitcoin futures ETP currently trading on a U.S. exchange—all of which hold CME futures contracts—thus relies on the Bitcoin Reference Rate and, by extension, the same spot prices as the Trust. *See* Opening.Br.26 & n.7.

Not surprisingly, there is a 99.9% correlation between prices in the bitcoin futures market and the spot bitcoin market:



Coinbase Ltr.fig.6 (JA__), *cited in* Opening.Br.27; *see* Coinbase.Br.18-19; Whaley.Ltr.5-6 & tbl.2 (JA__-__).  And if a mismatch between the futures and spot markets ever arises, arbitrageurs will buy the under-valued asset and sell the over-valued asset until prices converge.  *See* Coinbase.Ltr.7 (JA__); *see also* ICAN.Br.6.

The Commission does not dispute most of that analysis, including that spot bitcoin and bitcoin futures prices are tightly correlated.  SEC.Br.42.  The Commission does try to draw a distinction between the Index and the Bitcoin Reference Rate, noting that the latter includes trading data from two additional spot platforms.  SEC.Br.48.  But the Commission's brief does not explain why that fact matters, let alone how it suggests that the price of bitcoin futures ETPs would be unaffected by fraud or manipulation in the spot bitcoin market.  SEC.Br.49.  Certainly, the Commission comes nowhere close to refuting statistical record evidence demonstrating that the Index and the Bitcoin Reference Rate are "near perfect substitutes."  Whaley.Ltr.1 & tbl.1 (JA__-__); *see* Opening.Br.27, 31; *see also* ICAN.Br.3-6.

The Commission also suggests that the Bitcoin Reference Rate is not ultimately relevant to the net asset value of a bitcoin futures ETP, on the ground that the Bitcoin Reference Rate is used to value the final cash settlement of futures contracts instead of their daily cash settlement.  SEC.Br.31, 37.  The Commission makes little attempt to explain the significance of that distinction, much less to

explain the Commission's apparent (and incorrect) belief that the final cash settlement price—*i.e.*, the price needed to settle a futures contract at the time of performance—is not closely linked to the daily settlement price. In all events, the Commission has *already rejected* the distinction it now seeks to assert. The sponsor of the Teucrium bitcoin futures ETP had argued that "the [ETP] will only price off of . . . daily settlement price" and would not "directly price off of the [Bitcoin Reference Rate]," because the ETP would "roll its futures holdings prior to settlement." 86 Fed. Reg. 44062, 44071 (Aug. 11, 2021). Dismissing that argument, the Commission explained that it was "[not] persuaded that the [ETP's] calculation of NAV based on the daily settlement price insulates the NAV from activity in other bitcoin markets,"[1] Teucrium Order, 87 Fed. Reg. at 21680—which include the very same spot bitcoin markets that supply data used in the Bitcoin Reference Rate.

### 2. Fraud Or Manipulation In The Spot Bitcoin Market Would Affect The Price Paid By Investors For Shares Of An ETP Holding Bitcoin or Bitcoin Futures

The Commission also tries to break the connection between what happens in the bitcoin spot markets and the functioning of bitcoin futures ETPs in another way: it claims that the value of the commodity held by a bitcoin-related ETP has no direct bearing on the price that investors will pay for shares of such an ETP, on the ground

---

[1] The Commission's anti-spot-bitcoin ETP stance all but compelled that conclusion, as a contrary finding would have amounted to a determination that the CME is a "significant" market vis-à-vis spot bitcoin ETPs. *See* SEC.Br.27.

that those shares trade in a separate "secondary market." SEC.Br.46; *see id.* at 47. That argument borders on the frivolous.

The whole point of an ETP is that the price of an ETP share reflects the value of the ETP's underlying holdings—and to the extent that any gap does open between the two, arbitrage will quickly close that gap. Opening.Br.6, 27-28, 30. For that reason, any fraud or manipulation in the spot bitcoin market would inevitably affect not only the price of spot bitcoin and bitcoin futures themselves, and thus the NAV of any ETP holding either of those commodities, but also the share price of any such ETP. *Id.*

That the Commission would so casually question that premise is nothing short of remarkable. The premise is, as the Commission itself has said many times, the "foundation[al]" arbitrage mechanism that allows every ETP to function. *Exchange-Traded Funds*, 2019 WL 4727253, at *17 (SEC Sept. 25, 2019); *see* Opening.Br.27-28, 30-31. Such arbitrage "provides a means to maintain a close tie between market price and NAV per share" of an ETP. 2019 WL 4727253, at *5; Teucrium Order, 87 Fed. Reg. at 21676-79. As the Commission has stated, "the Commission has relied on this close tie between what retail investors pay (or receive) in the secondary market and [an] ETF's approximate NAV" to grant "over 300 . . . orders over the last quarter century" allowing ETPs to operate as investment companies. 2019 WL 4727253 at *2, *5.

To say the least, the Commission's newly announced skepticism about the core premise underlying all ETPs is a change of course that requires a reasoned explanation. *See Sw. Airlines v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019) ("full and rational explanation becomes especially important" when agency changes approach) (citation omitted). The Commission has provided none.

### B. The Commission Fails To Justify Its Arbitrary Distinction

Given that any fraud or manipulation in the bitcoin spot market would affect the price of bitcoin futures—and thus the assets held by bitcoin futures ETPs and the price investors pay for those ETPs' shares—it is arbitrary to allow the Exchange to list shares of bitcoin futures ETPs while prohibiting the Exchange from listing shares of the Trust. Bitcoin futures ETPs are exposed to two risks: fraud or manipulation in the bitcoin futures market, *and* fraud or manipulation in the bitcoin spot market. If the Exchange's surveillance-sharing agreement with the CME provides an adequate means to detect fraud or manipulation in the spot market as to bitcoin futures ETPs, the agreement must also do so as to spot bitcoin ETPs, which are exposed only to the risk of fraud or manipulation in the spot market. In substance, the Commission is penalizing spot bitcoin ETPs because they are subject to only one risk, not two. The Commission struggles to avoid that conclusion, but offers only irrelevant distinctions and non sequiturs.

10

First, the Commission points out distinctions between bitcoin futures ETPs and spot ETPs—*e.g.*, that they "hold different underlying assets" that "trade in different markets." SEC.Br.36. But those are distinctions without a difference, given that the prices at which bitcoin futures trade tightly correlate with the prices at which spot bitcoin trades on the same spot-bitcoin trading platforms that determine the Trust's value and share price. The Commission fails to explain why the differences are salient given that a bitcoin futures ETP and a spot bitcoin ETP would be similarly affected by fraud or manipulation in the spot market and that the same fraud-detection mechanism that the Commission found sufficient as to the former type of ETP is equally applicable to the latter. *See, e.g.*, *City of Vernon v. FERC*, 845 F.2d 1042, 1047-48 (D.C. Cir. 1988) (agency must "explain why particular distinctions are relevant").

Second, and relatedly, the Commission points to the "one-to-one relationship" between bitcoin futures and the market with which the Exchange has a surveillance-sharing agreement, the CME. SEC.Br.40-41. That, too, is beside the point because the price of bitcoin futures can be affected by activity outside the CME futures market. Indeed, the Commission dismissed the importance of that very same "one-to-one relationship" in its Teucrium Order, rejecting the suggestion that "a would-be manipulator would choose to use a regulated futures market" like the CME "to perpetrate its fraud or manipulation." Teucrium Order, 87 Fed. Reg. at 21680. That

11

is why, before approving that bitcoin futures ETP, the Commission found it necessary to conclude that the CME's surveillance could "capture the effects" of someone "manipulating the price of CME bitcoin futures contracts, whether that attempt is made by directly trading on the CME bitcoin futures market *or indirectly by trading outside of the CME bitcoin futures market*."  *Id.* at 21679 (emphasis added).

The Commission now implies that CME surveillance could detect off-market fraud only if it occurs on bitcoin *futures* platforms other than the CME and that "an attempt to manipulate the price of a futures-based bitcoin ETP would likely require manipulation of the bitcoin futures price itself."  SEC.Br.40-41.  But the Commission's unsupported implications make no sense.  The Teucrium Order explained that CME surveillance can "detect and prevent price distortions" by surveilling "price movements" in real time.  87 Fed. Reg. at 21679.  The CME will therefore detect manipulated "price movements" whether activity producing fraudulent prices occurs in the futures or the spot market.  The Commission's statement that manipulation of the price of a bitcoin futures ETP would "*require* manipulation of the bitcoin futures price itself," SEC.Br.41 (emphasis added), is similarly nonsensical because spot and futures prices are tightly correlated, *see* pp.3-7, *supra*.  The reality is that manipulation on *either* the spot or futures market will affect the price of bitcoin futures.

12

Third, the Commission argues that its prior orders approving bitcoin futures ETPs "did not decide" whether the CME's surveillance is "sufficient to detect any fraud and manipulation on the spot market." SEC.Br.40. But the Commission cannot retroactively reinterpret those orders to mean something other than what their text plainly says. *See, e.g.*, Teucrium Order, 87 Fed. Reg. at 21680 ("[T]he Commission is not persuaded that the market for CME bitcoin futures contracts 'stands alone;' has a 'lack of connection' with, and is 'not specifically materially influenced' by, other bitcoin markets; nor that it is 'the primary, if not the lone determinant, of its valuation.'"); *id.* at 21679 ("CME's surveillance" can be relied upon to detect manipulation of "CME bitcoin futures contracts, whether that attempt is made by directly trading on the CME bitcoin futures market or indirectly by trading outside of" that market). Text aside, the Exchange Act requires that exchanges' rules be "designed to prevent fraudulent and manipulative acts and practices," 15 U.S.C. § 78f(b)(5), after the listing and trading of a new ETP. If so, then the Commission "shall approve" the rule change; if not, then the Commission "shall disapprove" the same. *Id.* § 78s(b)(2)(C). Thus, the Commission's orders approving rule changes for bitcoin futures ETPs necessarily determined that the CME's ability to detect fraud in the spot bitcoin market is sufficiently high to satisfy the statute.

Fourth, the Commission suggests that bitcoin futures ETPs have greater protection against fraud or manipulation than would a spot bitcoin ETP because the CFTC regulates futures markets but lacks authority to "conduct regulatory oversight over spot virtual currency platforms." SEC.Br.9. But even if the CFTC's authority to issue regulations provides some protection against the risk of direct manipulation of the bitcoin futures market (a risk that does not apply to spot bitcoin ETPs), it does not address the risk that someone would manipulate the price of a bitcoin futures ETP by manipulating the underlying spot market—and the problem in this case is that the Commission has arbitrarily treated bitcoin futures ETPs and the Trust differently as to *that particular risk*. Moreover, Congress *did* provide the CFTC with anti-fraud and anti-manipulation *enforcement* authority over spot commodity markets, including spot bitcoin, and the CFTC's use of that authority would equally benefit bitcoin futures ETPs and spot bitcoin ETPs. *See* 7 U.S.C. § 9(1); 17 C.F.R. § 180.1(a); CFTC, *The CFTC's Role in Monitoring Virtual Currencies*, https://www.cftc.gov/media/4636/VirtualCurrencyMonitoringReportFY2020/ download.

Fifth, the Commission quibbles about whether the bitcoin futures market "leads" the spot bitcoin market or vice-versa. SEC.Br.27-28, 42. But the lead/lag question is irrelevant. As the Commission explains, if a would-be manipulator were to attempt to manipulate either a spot bitcoin ETP or bitcoin futures ETP by trading

14

bitcoin futures on the CME, then the surveillance-sharing agreement with the CME would detect that activity. SEC.Br.27. If, on the other hand, a would-be manipulator were to attempt to manipulate either a spot bitcoin ETP or a bitcoin futures ETP by trading on the spot bitcoin market, then either the Exchange's surveillance-sharing agreement with the CME will be capable of detecting that manipulation attempt, or it will not. If the former is true, then the Commission arbitrarily disapproved the Exchange's proposed rule change as to the Trust, even though the Trust is just as protected from fraud as previously approved bitcoin futures ETPs. If the latter is true, then the Commission arbitrarily treated the Trust differently than previously approved bitcoin futures ETPs, even though the CME's surveillance is inadequate to detect an attempt made on the spot market to manipulate either ETP.

Finally, the Commission contends that Grayscale has improperly focused on the *risk* of fraud and manipulation even though the Exchange Act is concerned only with the *detection* of fraud or manipulation. SEC.Br.39. That too is wrong. Whether an Exchange's rules are adequate to detect fraud or manipulation depends in part on what the risk of fraud or manipulation actually is. Even more to the point, Grayscale's argument *is* about whether the Exchange's surveillance-sharing agreement with the CME is adequate to detect spot-market fraud or manipulation. A surveillance mechanism cannot be adequate to detect manipulation of bitcoin

futures prices unless it can detect attempts to manipulate bitcoin futures prices *via the bitcoin spot market*.

### C.    The Commission's Arbitrary Distinction Violates The APA And The Exchange Act

The Commission's failure to "treat like cases alike," *Westar Energy v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007), is a textbook APA violation.  There is no reasonable basis for approving bitcoin futures ETPs on the ground that the Exchange has a surveillance-sharing agreement with the CME futures market while disapproving the proposal here *despite* the existence of that very same agreement. And the Commission has not provided any "'reasoned analysis' to justify the disparate treatment."  *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (citation omitted).

Unable to defend the Order's reasoning on its own terms, the Commission pleads for "great" deference, asserting that this case involves "highly complex and technical matters."  SEC.Br.33 (quoting *Citadel Sec. LLC v. SEC*, 45 F.4th 27, 34 (D.C. Cir. 2022)).  But no amount of deference can "excuse" an agency's "reliance upon a methodology that generates apparently arbitrary results."  *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1035 (D.C. Cir. 2001); *see NetCoalition v. SEC*, 615 F.3d 525, 539 (D.C. Cir. 2010).  In all events, no special deference is warranted. This appeal does not turn on the predictive scientific judgment or granular technological expertise to which this Court has sometimes afforded special

16

deference.  *See, e.g.*, *Citadel*, 45 F.4th at 33 (deferring as to whether "crumbling quote indicator" addresses milliseconds-long price-update delay); *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 241, 249 (D.C. Cir. 2003) (deferring as to whether one computer-trading system was "technologically capable" of replacing another).

The Order also violates the Exchange Act provision stating that "[t]he rules of [an] exchange" may not be "designed to permit unfair discrimination between . . . issuers."  15 U.S.C. § 78f(b)(5).  The discrimination here is "unfair," *Timpinaro v. SEC*, 2 F.3d 453, 457 (D.C. Cir. 1993), *cited in* SEC.Br.38-39, for the same reasons that the APA has been violated.  The Commission asserts that the provision is "focused on the exchange's proposed rules themselves, not the impact of the Commission's approval or disapproval decisions."  SEC.Br.38.  That is incorrect.  The statute obligates the *Commission* to *ensure* that an Exchange's rules are not "designed to permit unfair discrimination."   15 U.S.C. § 78f(b)(5); *see id.* § 78s(b)(2)(C).  Thus, if the Commission's approval or disapproval decisions result, as here, in a set of rules "designed to permit unfair discrimination," the Commission has violated its statutory mandate.

## II.     The Commission Arbitrarily Relaxed the Significant-Market Test for Bitcoin Futures ETPs Only

Vacatur is also warranted for a second reason:  the Commission arbitrarily applies the significant-market test far more leniently to proposed bitcoin futures ETPs than to spot bitcoin ETP proposals.  Opening.Br.34-39.

17

The Commission all but concedes as much.  The first prong of the significant-market test requires "a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on" the market with which a surveillance-sharing agreement exists "to successfully manipulate the ETP."  87 Fed. Reg. at 40300 (JA__).  But the Commission approved bitcoin futures ETPs *even though the Commission recognized that they did not satisfy* that requirement.  Here, in contrast, the Commission denied approval on the ground that the very same requirement was not satisfied.  Opening.Br.35-36.  And the Commission does not meaningfully contest that the orders approving the bitcoin futures ETPs and the order here directly contradict each other on whether the Exchange's surveillance-sharing agreement with the CME futures market is sufficient to detect manipulation attempts occurring "outside of [that] market," Teucrium Order, 87 Fed. Reg. at 21679, such as in "unregulated bitcoin futures markets," 87 Fed. Reg. at 40312 (JA__); *see* Opening.Br.36-37.

The Commission's approach to the second prong of the significant-market test is more of the same.  That prong asks whether "it is unlikely that trading in the ETP would be the predominant influence on prices" in the market with which the surveillance-sharing agreement exists.  87 Fed. Reg. at 40300 (JA__).  The Commission refused approval here based on the purported absence of specific "information on the expected growth in the size of the Trust if the proposal is

18

approved." 87 Fed. Reg. at 40313-14 (JA__).  Yet the Commission required no such

showing for the bitcoin futures ETPs.  Opening.Br.37-39.  In like manner, the Order

criticizes the Trust for imposing "no limit on the amount of mined bitcoins that the

Trust may hold" and questions whether the Trust's "trading volume" (which is less

than one-quarter of the CME bitcoin futures market) is too large, 87 Fed. Reg. at

40313-40314 (JA__), even though orders approving the bitcoin futures ETPs said

nothing about limits on the value of those ETPs' assets or about relative trading

volumes.

    The Commission tries to justify that disparate treatment by pointing to factual

differences between spot and futures ETPs.  SEC.Br.43, 45.  For example, the

Commission contends that "the evidence in the record was insufficient to" satisfy

prong one with respect to the Trust alone.  SEC.Br.43.  But the Commission cannot

justify dissimilar treatment of similarly situated ETPs by arguing that the challenged

decision is reasonable considered in isolation.  Rather, "an agency applying existing

policy" must "explain how an outcome coheres with previous decisions." *Baltimore

Gas*, 954 F.3d at 286.  The Order did not point to a "relevant distinction," *Westar

Energy*, 473 F.3d at 1241; it simply asserted the opposite of what its previous orders

had said.  And any justification not found in the Order comes too late.

    As to prong two, the Commission has only one response:  it asserts that an

assessment of the price influence of bitcoin futures ETPs (but not spot bitcoin ETPs)

19

could be based on real-world experience, rather than on data about future growth and trading volume, because when the assessment was made three bitcoin futures ETPs registered under the 1940 Act had already been trading for six months under an exception to the Commission's rule-change approval process. Opening.Br.10 n.4; *see* SEC.Br.45. But the Trust has already been publicly traded for seven years, and public spot bitcoin markets have existed for a decade. *See* 87 Fed. Reg. 28043, 28044 n.12 (May 10, 2022) (JA__) ("Proposal"); Reuters, *Factbox: Ten Years of Bitcoin* (Oct. 31, 2018) ("*Factbox*"), https://www.reuters.com/article/us-crypto-currencies-bitcoin-factbox/factbox-ten-years-of-bitcoin-idUKKCN1N50GE. If anything, that empirical experience is *more* relevant than the much shorter period of experience with bitcoin futures ETPs on which the Commission's orders approving those ETPs relied. Yet the Commission refused to credit it, once again demanding a stringent showing here that it was happy to dispense with as to the bitcoin futures ETP proposals.

That discrimination is especially stark given that spot bitcoin ETPs cannot register under the 1940 Act and therefore cannot begin trading unless the Commission approves a rule change. Opening.Br.10-12 & nn.4-6. If the Commission will not approve a rule-change proposal as to a spot bitcoin ETP unless an *existing* spot bitcoin ETP has some "observable market history," SEC.Br.45, then a Catch-22 exists—because there will never *be* any such "observable history." Such

"[i]mpossible requirements imposed by an agency are perforce unreasonable." *All. for Cannabis Therapeutics v. DEA*, 930 F.2d 936, 940 (D.C. Cir. 1991).

## III.    The Significant-Market Test Exceeds The Commission's Statutory Authority And Is Arbitrary

The Order also violates the APA for a third reason: the significant-market test on which the Commission relied exceeds the agency's statutory authority and is arbitrary.

1. *Exceeds statutory authority.* The Exchange Act *requires* the Commission to approve a proposed rule change if the rules of the exchange would thereby be "designed to prevent fraudulent and manipulative acts and practices." 15 U.S.C. § 78f(b)(5); *see id.* § 78s(b)(2)(C)(i). In evaluating bitcoin-related ETPs, the Commission treats the significant-market test as the be-all and end-all of the statutory analysis. *E.g.*, SEC.Br. 39, 53-54, 58. Yet it is, of course, possible for a proposed rule change to be designed to prevent fraud and manipulation even in the absence of a surveillance-sharing agreement that meets that test—as the Commission has acknowledged by approving numerous rule changes regarding other commodity-based trusts without applying the test. Opening.Br.45-46 & n.9. Accordingly, as to bitcoin alone, the Commission has impermissibly replaced Congress's enactment with a more crabbed requirement of the Commission's own invention.

The Commission's defense lacks merit. First, the Commission argues that surveillance-sharing agreements are "*an* established method of detecting and

21

deterring fraud and manipulation." SEC.Br.50 (emphasis added). That may well be—but it does nothing to show that other methods do not exist or that Congress intended to bar rule changes not involving the very particular kind of surveillance-sharing the significant-market test requires.

Second, the Commission argues (SEC.Br.53) that the significant-market test provides a "structured" and "consistent analytical framework" for applying the statutory test. That post-hoc justification holds no water. *See Select Specialty Hosp.-Bloomington v. Burwell*, 757 F.3d 308, 314 (D.C. Cir. 2014). The Commission cannot narrow the range of rule-change proposals that satisfy the statute's plain language, or discriminate among similarly situated parties, simply "on the basis of [the agency's] own convenience." *Stereo Broadcasters v. FCC*, 652 F.2d 1026, 1029 n.5 (D.C. Cir. 1981).

Third, the Commission contends that a "focus on surveillance-sharing agreements" is "consistent with over three decades of agency practice" in orders involving commodities other than bitcoin. SEC.Br.50-52 & n.34; *see* SEC.Br.14 n.11. That argument is deeply misleading. None of those orders treated the surveillance-sharing agreement as a "necessity," 87 Fed. Reg. at 40316 n.202 (JA__), or applied the two-pronged significant-market test. To the contrary, the Commission has often merely noted the existence of a surveillance-sharing agreement in passing, while focusing its approval decision on other factors. *See,*

22

*e.g.*, 77 Fed. Reg. 75468, 75474-75486 (Dec. 20, 2012) (approving copper ETP after considering the ETP's effect on copper supply, copper prices, copper price volatility, and the potential to manipulate copper prices, in addition to the exchange's "surveillance procedures"); *see also* Opening.Br.46 n.9.

Equally to the point, many Commission orders approved commodity-based ETPs after finding that a surveillance-sharing agreement with a *futures* market was sufficient to protect against fraud and manipulation as to an ETP holding the *spot* commodity—exactly the situation here. The Commission's order approving the first commodity-trust ETP, which involved an ETP holding gold, is representative. There, contrary to the Commission's mischaracterization (SEC.Br.51), the Commission recognized that it was "*not possible*" for the listing exchange "to enter into an information sharing agreement" with the spot gold market in which the ETP's underlying holdings traded. 2004 WL 2723611, at *10 (Oct. 28, 2004) (emphasis added). Instead, the Commission found the statute satisfied by various factors that included an information-sharing arrangement with a "market that trades gold *futures* and *options on such futures*." *Id.* at *10-11 (emphasis added).[2] The situation here is no different. Opening.Br.45-46.

---

[2] *See, e.g.*, 59 Fed. Reg. 5619, 5621 (Feb. 7, 1994) (approving listing a derivative despite lack of "comprehensive surveillance sharing agreement" with market where "underlying security traded"); 54 Fed. Reg. 12705, 12706 (Mar. 28, 1989) (approving market-index option even though "execution of surveillance sharing

Fourth, the Commission insists that the significant-market test focuses on *detecting* fraud and that Grayscale incorrectly focuses on the risk that fraud will occur. *E.g.*, SEC.Br.39. As noted above, however, whether an exchange's rules are "designed to prevent fraudulent and manipulative acts and practices," 15 U.S.C. § 78f(b)(5), depends on an analysis of how likely it is that fraud will occur. *See* p.14, *supra*. In any event, there is no reason to believe that a surveillance-sharing agreement with a significant market is the only means of detection that meets the statutory standard—indeed, the commodity-related orders discussed above prove that that it is not.

Finally, the Commission says that its focus on the significant-market test is entitled to *Chevron* deference. But the Commission made no attempt in the Order (or its previous orders, or its brief here) to explain why the Order's focus on the significant-market test reasonably interprets the statute's plain text. The *Chenery* principle applies in the *Chevron* context—so the Commission cannot claim deference for a purported statutory "interpretation" that appears nowhere in the Order. *See, e.g.*, *Council for Urological Ints. v. Burwell*, 790 F.3d 212, 222 (D.C. Cir. 2015); *see also* Chamber.Br.14-24.

---

agreements" with "exchanges on which [index] stocks principally trade would be difficult").

Quite apart from that problem, no deference is warranted.  Even under the strong form of *Chevron* deference that the agency espouses (*e.g.*, SEC.Br.49), the agency loses:  the statute unambiguously requires approval of rules designed to prevent fraud and manipulation without regard to the *specific* "design[]" the rules employ to satisfy that requirement, 15 U.S.C. § 78f(b)(5), and the Commission's conclusion that only *one* design will ever suffice is not a reasonable interpretation of Congress's words.   Opening.Br.44-48; *see* pp.20-23, *supra*.   This Court should straightforwardly "employ[] the traditional tools of statutory interpretation" to reject the Commission's interpretation of the Exchange Act.  *AHA v. Becerra*, 142 S. Ct. 1896, 1906 (2022).[3]

2.  *Arbitrary and unreasoned*.  For many of the reasons discussed above, the Commission's overweening focus on the significant-market test is also arbitrary and capricious.  *See Chamber of Commerce v. FEC*, 76 F.3d 1234, 1235 (D.C. Cir. 1996) ("second step of *Chevron* . . . overlaps with the arbitrary and capricious standard").

Although the Commission may have explained why entering into "a comprehensive surveillance-sharing agreement with a regulated market of significant size" is *sufficient* to satisfy the Exchange Act, the Commission has never

---

[3] Grayscale respectfully preserves for Supreme Court review the argument that *Chevron* should be further limited or overruled.  *See, e.g.*, *Pereira v. Sessions*, 138 S. Ct. 2105, 2120 (2018) (Kennedy, J., concurring); *id.* at 2121 (Alito, J., dissenting).

explained why such an agreement is "necessary," "essential," and "the central issue." 87 Fed. Reg. at 40300-01, 40316 n.202 (JA__-__, __).  Nor has the Commission explained why bitcoin-based ETPs *alone* must satisfy the significant-market test. Opening.Br.45, 49.

In addition, the Commission's approach is fundamentally unreasonable—as underscored by the fact that the Commission has made it impossible for any spot bitcoin ETP to satisfy the significant-market test, since there is no spot bitcoin market that the Commission considers "significant."  87 Fed. Reg. at 40308-09 (JA__-__).  At the very least, a mechanism that provides fraud protection *similar to* that provided by surveillance-sharing agreements with "significant" markets surely ought to satisfy the statutory standard—but the Commission disagrees.  SEC.Br.53-55; 87 Fed. Reg. at 40302 (JA__).  The Commission's only response is to attack the mechanisms raised in these proceedings (SEC.Br.54), but the question before this Court is whether the Commission applied the correct *legal* test, and the Commission plainly erred when it stated that only a mechanism providing protection "beyond" that afforded by a surveillance-sharing agreement meeting the significant-market test could even potentially suffice.  87 Fed. Reg. at 40302 (JA__).

The Commission protests that its approach is not fatal in fact because bitcoin futures ETPs were able to win Commission approval under the significant-market test after "years of market development."  SEC.Br.53.  But that is true only because

26

the Commission *relaxed* the significant-market test when it approved rule changes for bitcoin futures ETPs, *see* pp.16-20, *supra*, which the Commission has refused to do so for proposed spot bitcoin ETPs.  The spot bitcoin market is and has always been larger, older, and more developed than the CME bitcoin futures market. *Compare Factbox* (spot bitcoin began trading publicly in 2010), *and* Proposal, 87 Fed. Reg. at 28044 n.12 (the Trust's shares began trading in 2015), *with* Teucrium Order, 87 Fed. Reg. at 21680-81 (CME began trading bitcoin futures in 2017 and bitcoin futures ETPs began trading in 2021); *see also* Coinbase.Br.14-15.  And it is apparent that the Commission approved rule changes for bitcoin futures ETPs only because, at that point, several bitcoin futures ETPs that qualified for an exemption from the rule-change approval requirement were *already operating* with no ill effects, leaving the Commission's hands essentially tied.  Opening.Br.10 n.4.  Spot bitcoin ETPs like the one proposed here do not qualify for that exemption, and the Commission has denied rule changes for seventeen of them in the last five years.

Last, the Commission barely addresses the argument (Opening.Br.50-51) that its supposed back-stop to the significant-market test—a showing that the bitcoin market has "unique resistance" to fraud and manipulation, SEC.Br.54 (quoting 87 Fed. Reg. at 40302 (JA__))—is illusory and standardless.  The Commission makes only the extraordinary argument that the agency is not responsible for the "uniqueness" standard because that formulation initially appeared in long-ago rule-

change proposals that have nothing to do with Grayscale. SEC.Br.55. Whatever the language's origin, the Commission has embraced the uniqueness standard, deploying it in the Order and in other orders disapproving rule-change proposals for spot bitcoin ETPs. *E.g.*, 87 Fed. Reg. at 40304 (JA__) ("[s]uch resistance to fraud and manipulation . . . *must be novel and beyond those protections that exist in traditional commodities or securities markets*" (emphasis added)). The Commission's failure to defend that standard, tie it to the statutory language, describe what it actually means, or explain how it could ever be satisfied confirms that the standard is "vague and indecisive," *Rapoport v. SEC*, 682 F.3d 98, 107 (D.C. Cir. 2012) (citation omitted), as well as "impossible to meet," *All. for Cannabis*, 930 F.2d at 940 (citation omitted). That is the epitome of arbitrariness.

## IV. The Proposed ETP Is Resistant To Fraud And Manipulation And Protective Of Investors And The Public Interest

This Court need not apply the statutory standard to the rule-change proposal here, let alone pass on the merits of bitcoin as an investment, to vacate the Order. But under the correct legal standard, if the Exchange were permitted to list and trade shares of the Trust, the Exchange's rules would continue to be "designed to prevent fraudulent and manipulative acts and practices" as well as to "promote just and equitable principles of trade, . . . remove impediments to . . . a free and open market," and "protect investors and the public interest." 15 U.S.C. § 78f(b)(5). The Commission makes little effort to address the reasons why that is so—including that

28

the Index used to value the Trust's assets mitigates any fraud or manipulation in the spot markets, that the markets the Index draws upon have robust antifraud safeguards (so much so that the CME has chosen to rely on them in pricing its own bitcoin futures, *see* pp.5-6, *supra*), and that bitcoin prices on those markets deviate from each other only rarely and minimally (less than many dual-listed stocks). Opening.Br.52-53; *see* NYSE.Arca.Br.5-12. The Commission also does nothing to dispute the significant benefits that its arbitrary and unlawful Order has withheld from investors. Opening.Br.54-55; *see* Blockchain.Br.3-15.

The arguments that the Commission does make fare no better. The Commission suggests that Grayscale is arguing that the Commission should ignore the statute's fraud-prevention factor purely on the ground that the other statutory factors point toward rule-change approval. But Grayscale's argument is quite different: it is that the Commission has *distorted* the statutory fraud factor such that it is now at cross-purposes with other factors with which it should work in tandem, such as "protect[ing] investors and the public interest." 15 U.S.C. § 78f(b)(5). That helps illustrate the perverseness of the Commission's discriminatory approach. It also helps show that, under the proper statutory test, there is no obstacle to approval of the rule-change proposal here.

Last, the Commission insists that this Court must take at face value the Commission's assertion that it is not basing its decision on an impermissible

assessment of the merits of a spot-bitcoin-related investment.  SEC.Br.58.  But such an assessment is the only evident explanation for the Commission's *actions*, including its discriminatory treatment of proposed spot bitcoin ETPs, its repeated denials of spot-bitcoin ETP proposals under shifting rationales (*e.g.*, Chamber.Br.14-15 & n.2), and the lack of reasoning underlying its approach.  The Commission is not permitted to decide for investors whether certain investments have merit—yet the Commission has done just that, to the detriment of the investors and potential investors it is charged to protect.

## CONCLUSION

This Court should hold unlawful and set aside the Order.

DATED:  January 13, 2023                  Respectfully submitted,

                                          */s/ Donald B. Verrilli, Jr.*

Paul S. Mishkin                           Donald B. Verrilli, Jr.
Joseph A. Hall                            Elaine J. Goldenberg
Daniel J. Schwartz                        Sarah E. Weiner
DAVIS POLK & WARDWELL LLP                 MUNGER, TOLLES & OLSON LLP
450 Lexington Avenue                      601 Massachusetts Avenue NW
New York, NY 10017                          Suite 500E
(212) 450-4000                            Washington, DC 20001-5369
Paul.Mishkin@davispolk.com                (202) 220-1100
                                          Donald.Verrilli@mto.com

*Counsel for Petitioner*

31

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,480 words, excluding the parts of the brief exempted from the word count by Federal Rule of Appellate Procedure 32(f) and this Court's Rule 32(e)(1).

I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman.

Dated:  January 13, 2023                    */s/ Donald B. Verrilli, Jr.*
                                            Donald B. Verrilli, Jr.

## CERTIFICATE OF SERVICE

I certify that on January 13, 2023, a true and correct copy of this Petitioner's Brief was filed via the Court's electronic filing system, which will forward a copy to all counsel of record.  I certify that all participants in this case are registered CM/ECF users.

Dated:  January 13, 2023                          */s/ Donald B. Verrilli, Jr.*
                                                 Donald B. Verrilli, Jr.