**[ORAL ARGUMENT SCHEDULED MARCH 7, 2023]**

No. 22-1142

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Grayscale Investments, LLC,

Petitioner,

v.

Securities and Exchange Commission,

Respondent.

---

On Petition for Review of an
Order of the Securities and Exchange Commission

---

FINAL BRIEF FOR RESPONDENT
SECURITIES AND EXCHANGE COMMISSION

---

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
Assistant General Counsel

DAVID D. LISITZA
Senior Appellate Counsel

EMILY TRUE PARISE
Senior Appellate Counsel

DANIEL T. YOUNG
Attorney

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-5169 (Parise)
parisee@sec.gov

## Certificate as to Parties, Rulings, and Related Cases

**A.     Parties**

The parties are petitioner Grayscale Investments, LLC, and respondent Securities and Exchange Commission. *Amici curiae* have filed five briefs in support of the petitioner.  They include:

- The Blockchain Association, the Chamber of Digital Commerce, Chamber of Progress, and Coin Center

- Coinbase, Inc.

- The Chamber of Commerce of the United States of America

- NYSE Arca, Inc.

- The Investor Choice Advocates Network, James J. Angel, Brian Brooks, Hashem Dezhbakhsh, Carol Goforth, Joseph A. Grundfest, Campbell R. Harvey, Narasimhan Jegadeesh, David Noble, Harvey Pitt, Brian Quintenz, Juan Rubio-Ramirez, Mark Wetjen, and Robert E. Whaley

**B.     Ruling under Review**

Petitioner seeks review of the following final order of the Commission:

*Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To List and Trade Shares of Grayscale Bitcoin Trust under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares)*, Release No. 34-95180 (June 29, 2022), 87 Fed. Reg. 40299 (July 6, 2022).

**C.     Related Cases**

The Commission is not aware of any other related cases.

i

## Table of Contents

Certificate as to Parties, Rulings, and Related Cases ................................. i

Table of Authorities ..................................................................... iv

Glossary....................................................................................x

Introduction ..............................................................................1

Jurisdictional Statement .................................................................3

Issues Presented ..........................................................................3

Statutes and Regulations .................................................................4

Counterstatement of the Case ...........................................................4

    A.   The Grayscale Bitcoin Trust .................................................4

    B.   Governing Statutory Regime................................................6

    C.   Relevant Market Background ..............................................7

    D.   Commission Treatment of Bitcoin-Related Products ..........................15

    E.   Disapproval of the Proposed Rule Change ...........................20

Standard of Review.......................................................................33

Summary of Argument....................................................................34

Argument.................................................................................36

I.    The Commission reasonably treated two different products—bitcoin futures ETPs and spot bitcoin ETPs—differently. ........................................36

    A.   The Commission reasonably found that the ability to detect fraud and manipulation differs across the CME bitcoin futures market and the bitcoin spot market. ...................................................39

B.    The Commission has consistently applied the requirements of the Exchange Act to spot and futures ETPs. .................................................. 43

C.    Grayscale's focus on the effect of spot-bitcoin pricing data on bitcoin futures misstates key market mechanics and is inapposite. ........ 46

II.    The Commission reasonably interpreted the Exchange Act by focusing on adequate surveillance when evaluating proposed bitcoin ETPs. .............. 49

III.    The Commission acted reasonably under the Exchange Act by disapproving the proposed rule change. ......................................................... 55

Conclusion ....................................................................................................... 60

Certificate of Compliance ....................................................................... 61

# Table of Authorities

**Cases**                                                                                            **Page(s)**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972) ........................................................................................ 57

*AT&T Corp. v. FCC*,
    220 F.3d 607 (D.C. Cir. 2000) ................................................................... 33

\* *Citadel Sec. LLC v. SEC*,
    45 F.4th 27 (D.C. Cir. 2022) ............................................................ 33, 38

*CFTC v. UForex Consulting*,
    551 F. Supp. 2d 513 (W.D. La. 2007) ..................................................... 8

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ........................................................................................ 21

*Falco v. Donner Found., Inc.*,
    208 F.2d 600 (2d Cir. 1953) .................................................................. 11–12

*Gabelli v. SEC*,
    568 U.S. 442 (2013) ............................................................................... 56–57

*McClatchy Newspapers v. NLRB*,
    131 F.3d 1026 (D.C. Cir. 1997) ............................................................. 59

\* *NetCoalition v. SEC*,
    615 F.3d 525 (D.C. Cir. 2010) ........................................................... 6, 55

*Pierce v. Underwood*,
    487 U.S. 552 (1988) ........................................................................................ 33

*Reddy v. CFTC*,
    191 F.3d 109 (2d Cir. 1999) ..................................................................... 21

*Salomon Forex, Inc. v. Tauber*,
    8 F.3d 966 (4th Cir. 1993) ............................................................................ 8

*Santa Fe Indus. v. Green*,
    430 U.S. 462 (1977) ........................................................................................ 21

*SEC v. Cap. Gains Rsch. Bureau, Inc.*,
    375 U.S. 180 (1963) ........................................................................................ 57

*SEC v. Commodity Options Int'l, Inc.*,
  553 F.2d 628 (9th Cir. 1977) ............................................................. 8–9

*Silver v. NYSE*,
  373 U.S. 341 (1963) ............................................................................... 58

*Steadman v. SEC*,
  450 U.S. 91 (1981) ................................................................................. 33

\* *Susquehanna Int'l Grp., LLP v. SEC*,
  866 F.3d 442 (D.C. Cir. 2017) ...................................................... 7, 23, 56

*Timpinaro v. SEC*,
  2 F.3d 453 (D.C. Cir. 1993) ................................................................... 39

*United States v. Gratkowski*,
  964 F.3d 307 (5th Cir. 2020) .................................................................... 5

*Vill. of Barrington v. Surface Transp. Bd.*,
  636 F.3d 650 (D.C. Cir. 2011) ............................................................... 49

**Statutes**

5 U.S.C. 706(2)(A) ...................................................................................... 33
7 U.S.C. 1(a)(9) ............................................................................................. 8

Securities Act of 1933, 15 U.S.C. 77a, et seq.
  Section 2(a)(1), 15 U.S.C. 77b(a)(1) .................................................... 10
  Section 11, 15 U.S.C. 77k .................................................................... 23

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.
  Section 2, 15 U.S.C. 78b .................................................................. 6, 56
  Section 3(a)(10), 15 U.S.C. 78c(a)(10) ............................................... 10
  Section 3(a)(26), 15 U.S.C. 78c(a)(26) ................................................. 6
  Section 5, 15 U.S.C. 78e .................................................................... 10
  Section 6, 15 U.S.C. 78f ................................................................... 6, 10
  \* Section 6(b)(5), 15 U.S.C. 78f(b)(5) ...................... 7, 16, 35, 38, 48–49, 53, 56
  Section 19(b)(1), 15 U.S.C. 78s(b)(1) .................................................... 6
  \* Section 19(b)(2), 15 U.S.C. 78s(b)(2) .............................. 3, 6–7, 32, 49–50, 56
  Section 25(a), 15 U.S.C. § 78y(a) .................................................. 3, 33

Investment Company Act of 1940

    15 U.S.C. 80a-3(a)(1) ........................................................ 11, 18

    15 U.S.C. 80a-3(a)(2) ........................................................ 18

**Regulations**

17 C.F.R. 201.700(b)(3)(i) ...................................................... 7

17 C.F.R. 230.144 ................................................................. 5

**Administrative Materials**

*In re Silseth*, Release No. 34-7317,
    1996 WL 427988 (July 30, 1996) ................................... 21

*In re Application for Stay of Order Approving Rule Change of the Chicago
    Board Options Exchange, Inc.*, Release No. 34-13869,
    1977 WL 190350 (Aug. 18, 1977) .................................. 39

54 Fed. Reg. 12705 (Mar. 28, 1989) .................................... 14

55 Fed. Reg. 13344 (Apr. 10, 1990) ..................................... 14

57 Fed. Reg. 28221 (June 24, 1992)
    ("Index Options Order") .............................................. 14–15, 24

59 Fed. Reg. 5619 (Feb. 7, 1994)
    ("ADR Options Order") ................................................ 14, 24

60 Fed. Reg. 15804 (Mar. 27, 1995) .................................... 14

60 Fed. Reg. 46660 (Sept. 7, 1995) ..................................... 14

61 Fed. Reg. 8315 (Mar. 4, 1996) ........................................ 14

63 Fed. Reg. 70952 (Dec. 22, 1998)
    ("Derivatives Order") ................................................. 14, 19

69 Fed. Reg. 64614 (Nov. 5, 2004)
    ("Gold Order") ........................................................... 51

77 Fed. Reg. 75468 (Dec. 20, 2012) .................................... 52

80 Fed. Reg. 34729 (June 17, 2015)
    ("Request for Comment on ETPs") .............................. 10, 12

82 Fed. Reg. 16247 (Apr. 3, 2017)
  ("SolidX Order") ................................................................ 17, 52

82 Fed. Reg. 61625 (Dec. 22, 2017)
  ("Dry Bulk Shipping Order") ............................................... 14, 50

* 83 Fed. Reg. 37579 (Aug. 1, 2018)
  ("Winklevoss Order") .................................... 8–9, 14–15, 22, 51–52, 55, 58–59

83 Fed. Reg. 43923 (Aug. 28, 2018)
  ("GraniteShares Order") ...................................................... 12, 17, 51

83 Fed. Reg. 43934 (Aug. 28, 2018)
  ("ProShares Order") ........................................................... 17, 53

84 Fed. Reg. 57162 (Oct. 24, 2019)
  ("ETF Rule") ...................................................................... 10–11, 18

85 Fed. Reg. 12595 (Mar. 3, 2020)
  ("USBT Order") .................................................................. 27–28

86 Fed. Reg. 44062 (Aug. 5, 2021)
  ("Teucrium Proposal") ......................................................... 19, 37

86 Fed. Reg. 61804 (Nov. 8, 2021) ....................................... 20

87 Fed. Reg. 14932 (Mar. 16, 2022)
  ("NYDIG Order") ................................................................ 41

87 Fed. Reg. 20014 (Apr. 6, 2022)
  ("ARK 21Shares Order") ...................................................... 28

* 87 Fed. Reg. 21676 (Apr. 12, 2022)
  ("Teucrium Order") ....................... 18–20, 30–31, 36–38, 41, 43, 45, 47–48, 54

87 Fed. Reg. 28848 (May 11, 2022)
  ("Valkyrie Order") ................................................. 18, 20, 28, 30, 36–38

87 Fed. Reg. 28043 (May 10, 2022)
  ("Amendment 1") ................................................... 5, 21, 23-24, 28, 46

* 87 Fed. Reg. 40299 (July 6, 2022)
  ("Grayscale Order") .............. 3–6, 8–9, 11–17, 21–33, 36–39, 41–50, 52, 54–58

## Other Authorities

*CFTC Backgrounder on Oversight of and Approach to Virtual Currency Futures Markets* (Jan. 4, 2018), http://www.cftc.gov/idc/groups/public/@newsroom/ documents/file/backgrounder_virtualcurrency01.pdf........................................ 10

Complaint, *CFTC v. Gemini Trust Co., LLC*, No. 22-cv-4563 (S.D.N.Y. filed June 2, 2022), ECF No. 1 .......................................................... 22

Ex. 99.1 to Registration Statement filed on behalf of Grayscale Bitcoin Trust (Dec. 30, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1588489/ 000119312519326175/d845671dex991.htm ................................. 5, 8, 23, 26, 37

Wenjun Feng, Yiming Wang & Zhengjun Zhang, *Informed Trading in the Bitcoin Market*, 26 Fin. Res. Ltrs. 63 (Sept. 2018), *available at* https://www.sciencedirect.com/science/article/pii/ S1544612317306992 ...................................................................................... 22

General Accounting Office, *CFTC and SEC: Issues Related to the Shad-Johnson Jurisdictional Accord*, GAO Report No. 00-89 (Apr. 6, 2000), *available at* https://www.gao.gov/assets/ggd-00-89.pdf .................................... 9

John M. Griffin & Amin Shams, *Is Bitcoin Really Untethered?*, 75 J. Fin. 1913 (2020), *available at* https://onlinelibrary.wiley.com/doi/10.1111/jofi.12903.................................. 22

Intermarket Surveillance Grp., *Overview*, https://isgportal.org/overview ...................................................................... 20

Ltr. from Brandon Becker, Dir., SEC Div. of Mkt. Regul., to Gerard D. O'Connell, Chairman, Intermarket Surveillance Grp. (June 3, 1994), *available at* https://www.sec.gov/divisions/ marketreg/mr-noaction/isg060394.htm .............................................................. 13

*Over-The-Counter (OTC) Securities*, SEC, https://www.investor.gov/introduction-investing/ investing-basics/glossary ................................................................................. 11

Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (2008), *available at* https://bitcoin.org/bitcoin.pdf ...................................................... 5, 22

*Spot Trading*, Black's Law Dictionary (6th ed. 1991) .......................................... 8

*Virtual Currencies: The Oversight Role of the SEC and the CFTC*,
   *Hearing Before the Senate Banking Committee*,
   115th Cong. (Feb. 6, 2018) (written testimony of J. Christopher
   Giancarlo, Chairman, CFTC), *available at*
   https://cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo37................ 9–10

Maria T. Vullo, N.Y. State Dep't of Fin. Servs., *Guidance on Prevention of
   Market Manipulation and Other Wrongful Activity* (Feb. 7, 2018),
   *available at* https://www.dfs.ny.gov/system/files/
   documents/2020/03/il180207.pdf. ..................................................................... 25

## Glossary

| | |
|---|---|
| Amendment 1 | Amendment 1 to Proposed Rule Change, 87 Fed. Reg. 28043 (May 10, 2022) |
| Br. | Petitioner's Brief |
| CFTC | Commodity Futures Trading Commission |
| Commission | Securities and Exchange Commission |
| CME | Chicago Mercantile Exchange |
| Exchange Act | Securities Exchange Act of 1934 |
| ETF | Exchange-Traded Fund |
| ETP | Exchange-Traded Product |
| Ex. 99.1 | Ex. 99.1 to Registration Statement filed on behalf of Grayscale Bitcoin Trust (Dec. 30, 2019) |
| JA | Joint Appendix |
| SEC | Securities and Exchange Commission |
| SRO | Self-Regulatory Organization |
| Grayscale Order | *Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To List and Trade Shares of Grayscale Bitcoin Trust under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares)*, Release No. 34-95180 (June 29, 2022), 87 Fed. Reg. 40299 (July 6, 2022) |
| ADR Options Order | 59 Fed. Reg. 5619 (Feb. 7, 1994) |
| Derivatives Order | 63 Fed. Reg. 70952 (Dec. 22, 1998) |
| Dry Bulk Shipping Order | 82 Fed. Reg. 61625 (Dec. 28, 2017) |

x

ETF Rule                        84 Fed. Reg. 57162 (Oct. 24, 2019)

Gold Order                      69 Fed. Reg. 64614 (Nov. 5, 2004)

GraniteShares Order             83 Fed. Reg. 43923 (Aug. 1, 2018)

Index Options Order             57 Fed. Reg. 28221 (June 24, 1992)

ProShares Order                 83 Fed. Reg. 43934 (Aug. 28, 2018)

Request for Comment             80 Fed. Reg. 34729 (June 17, 2015)
on ETPs

SolidX Order                    82 Fed. Reg. 16247 (Apr. 3, 2017)

Teucrium Order                  87 Fed. Reg. 21676 (Apr. 12, 2022)

Teucrium Proposal               86 Fed. Reg. 44062 (Aug. 5, 2021)

Valkyrie Order                  87 Fed. Reg. 28848 (May 11, 2022)

USBT Order                      85 Fed. Reg. 12595 (Mar. 3, 2020)

Winklevoss Order                83 Fed. Reg. 37579 (Aug. 1, 2018)

## Introduction

Under the Securities Exchange Act of 1934, when an exchange wishes to list a new type of product for trading, it must submit a proposed change in its rules to the Securities and Exchange Commission.  The Commission must then determine whether the proposal is consistent with certain statutory requirements, including that the exchange's new rule be designed to prevent fraudulent and manipulative acts and practices.  In this case, the Commission reasonably applied these requirements in disapproving a proposal to list and trade a product that would hold bitcoins traded in the spot market.  This case is thus about the law governing the listing and trading of new instruments on national securities exchanges, not whether investors can or should purchase bitcoin products.

The petitioner, Grayscale Investments, LLC, argues that the Commission's disapproval order violated the Administrative Procedure Act because the Commission has previously approved proposals to list and trade another type of product which holds bitcoin futures contracts.  But the two products are not the same.  The approved products hold futures contracts tradable only on the Chicago Mercantile Exchange, which is overseen by federal regulators and which performs extensive surveillance of the trading activity on its market.  Approval of those products was therefore consistent with the Exchange Act's requirements with respect to preventing fraud and manipulation.  In contrast, Grayscale's product

would hold assets—bitcoins—that trade in *unregulated* spot markets for which there is no adequate surveillance, such that the Commission was unable to make the same statutory finding. Grayscale elides this distinction, making a series of arguments with respect to the risk of fraud in the assets underlying the two types of products. But those arguments fail to grapple with the Commission's core conclusion that the fundamental differences in the ability to detect and deter fraud and manipulation reasonably support treating the two products differently.

Grayscale's arguments also rest on faulty assumptions regarding the Commission's analysis. Grayscale asserts that, in approving futures-based products, the Commission "necessarily" determined that the risk of fraud and manipulation in the spot bitcoin market was acceptably low. But that is not the case; for each type of product, the Commission's analysis reasonably focused on the ability to *detect* and *deter* fraud and manipulation of the assets underlying that type of product. With respect to the approved futures-based products, those underlying assets trade on the Chicago Mercantile Exchange and investors are protected by direct regulation of that market as well as an agreement between the Chicago Mercantile Exchange and the national securities exchanges listing the products to share surveillance information. By contrast, all of the markets for the spot bitcoin underlying Grayscale's product are unregulated, and Grayscale failed

to show that surveillance of the CME bitcoin *futures market* would detect and deter fraud and manipulation targeting those *spot markets*.

Because differing treatment in these circumstances was reasonable, adequately explained, and consistent with the requirements of the Exchange Act, the Commission did not err and the Court should affirm the order under review.

## Jurisdictional Statement

The Commission entered the final order under review pursuant to Section 19(b)(2) of the Exchange Act, 15 U.S.C. 78s(b)(2), on June 29, 2022. JA153–175 [87FR40299–321]. Grayscale timely filed a petition for review. 15 U.S.C. 78y(a)(1). This Court has jurisdiction under Exchange Act Section 25(a)(3), 15 U.S.C. 78y(a)(3).

## Issues Presented

1.     Whether the Commission reasonably disapproved the listing of Grayscale's proposed product, which holds bitcoins that trade on unregulated platforms lacking adequate fraud-surveillance measures, while reasonably distinguishing its prior approvals of products holding bitcoin futures contracts, which trade exclusively on the regulated Chicago Mercantile Exchange and are protected by robust surveillance measures.

2.     Whether the Commission reasonably evaluated whether Grayscale's proposed product was consistent with the Exchange Act's requirement that the

rules of a national securities exchange be designed to prevent fraudulent and manipulative acts and practices by examining whether there were adequate market-surveillance measures in place—a question it has asked in analogous circumstances for over three decades.

3.      Whether the Exchange Act required the Commission to disapprove Grayscale's proposed product once the Commission reasonably concluded that its listing would be inconsistent with the Exchange Act's requirements regarding fraud prevention.

### Statutes and Regulations

The applicable statutes and regulations are reproduced in the addendum to petitioner's opening brief.

### Counterstatement of the Case

**A.      The Grayscale Bitcoin Trust**

This case arises from a June 29, 2022 final order of the Commission denying a proposal by NYSE Arca, Inc., a national securities exchange, to change its rules to permit the listing and trading of shares of the Grayscale Bitcoin Trust.[1] Grayscale is the Trust's sponsor.  The Trust holds bitcoins, which are "digital

---

[1] *Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To List and Trade Shares of Grayscale Bitcoin Trust under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares)*, Release No. 34-95180 (June 29, 2022), 87 Fed. Reg. 40299 (July 6, 2022) ("Grayscale Order").

assets that are issued and transferred via a decentralized, open-source protocol used by a peer-to-peer computer network through which transactions are recorded on a public transaction ledger known as the 'bitcoin blockchain.' The bitcoin protocol governs the creation of new bitcoins and the cryptographic system that secures and verifies bitcoin transactions." JA154 & n.10 [87FR40300 & n.10], citing *Amendment 1 to Proposed Rule Change*, 87 Fed. Reg. 28043, 28045 (May 10, 2022) ("Amendment 1," JA176–194).[2]

Investors in the Trust purchase shares, which represent a fractional interest in the Trust's underlying bitcoin holdings. As currently structured, those shares are subject to certain regulatory restrictions on their trading that would not apply to Grayscale's product if its proposal to list the shares on NYSE Arca as an exchange-traded product were approved.[3] As of April 2022, the Trust's bitcoin

---

[2] *See also United States v. Gratkowski*, 964 F.3d 307, 309, 311–12 & n.5 (5th Cir. 2020) (citing Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (2008), *available at* https://bitcoin.org/bitcoin.pdf).

[3] Currently, "[s]hares purchased directly from the [T]rust are restricted securities that may not be resold except in transactions exempt from registration under the Securities Act and state securities laws and any such transaction must be approved by [Grayscale]." Ex. 99.1 to Grayscale Bitcoin Trust Registration Statement, at 82–83 (Dec. 30, 2019) ("Ex. 99.1"), *available at* https://www.sec.gov/Archives/edgar/data/1588489/000119312519326175/d845671 dex991.htm. After certain holding periods have passed and other requirements have been satisfied, *see* 17 C.F.R. 230.144, Trust shares can "be resold without restriction, including" over-the-counter. Ex. 99.1 at 83.

5

holdings were valued at approximately $30 billion.  JA168 [87FR40314].[4]  The

investment objective of the Trust is for the value of its shares to reflect the value of

the bitcoins it holds, less expenses and other liabilities.  JA156 [87FR40302].

### B.    Governing Statutory Regime

Congress found in passing the Exchange Act that transactions "conducted

upon securities exchanges" are "effected with a national public interest" which

makes it "necessary to provide for regulation and control of such transactions" in

order to, among other things, "insure the maintenance of fair and honest markets."

15 U.S.C. 78b.  Congress found such oversight necessary in part because

"[f]requently the prices of securities of such exchanges" are "susceptible to

manipulation and control."  *Id.* at (3).

NYSE Arca is registered with the SEC as a national securities exchange, *see*

15 U.S.C. 78f, and thus is a securities industry "self-regulatory organization," or

SRO, *see id.* 78c(a)(26).  SROs are "subject to comprehensive SEC oversight and

control" and must obtain SEC approval for any proposed rule change, including

rules relating to the listing of a new product.  *NetCoalition v. SEC*, 615 F.3d 525,

528 (D.C. Cir. 2010) (citing 15 U.S.C. 78s(b)(1)–(2)).

---

[4] Those bitcoins were worth $12 billion in October 2022.  NYSE Arca Br. 17
n.12.

6

Under Section 19 of the Exchange Act, the Commission "shall approve" an SRO's proposed rule change only if it finds that the proposed rule change "is consistent with" those provisions of the Exchange Act and rules and regulations thereunder applicable to the SRO. 15 U.S.C. 78s(b)(2)(C)(i). Absent such a finding, the Commission "shall disapprove" the proposed rule change. 15 U.S.C. 78s(b)(2)(C)(ii); *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 445 (D.C. Cir. 2017). Under Exchange Act Section 6(b)(5)—one of the provisions applicable to exchanges—a proposed rule must, among other things, be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade," and "to protect investors and the public interest," and it cannot be "designed to permit unfair discrimination between customers, issuers, brokers, or dealers." 15 U.S.C. 78f(b)(5).

Under the Commission's Rules of Practice, the "burden to demonstrate that a proposed rule change is consistent with the Exchange Act ... is on the [SRO] that proposed [it]." 17 C.F.R. 201.700(b)(3)(i).

### C.    Relevant Market Background

1.    This case touches on three kinds of markets: the spot market for a commodity, the futures market for that commodity, and securities in the form of shares of trusts and other investment vehicles holding commodities and futures.

7

a.      The spot market involves "cash sales for immediate delivery." *CFTC v. UForex Consulting, LLC*, 551 F. Supp. 2d 513, 515 n.5 (W.D. La. 2008) (quoting *Spot Trading*, Black's Law Dictionary (6th ed. 1991)).  Commodities like gold, silver, and oil are sold on spot markets.  "There is a current or spot market for virtually any type of commodity item for which there is sufficient interest and, therefore, trading volume." *SEC v. Commodity Options Int'l, Inc.*, 553 F.2d 628, 629 (9th Cir. 1977).

While the Commodities Futures Trading Commission ("CFTC") has treated bitcoin as a "commodity" under the Commodity Exchange Act's broad definition of that term (*see* 7 U.S.C. 1(a)(9)), the CFTC does not have regulatory authority over platforms used for spot bitcoin trading (such as Coinbase).  *See Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993) (explaining that the CFTC does not regulate spot-commodity transactions).  Rather, bitcoin spot-trading platforms remain "largely unregulated." *See* Ex. 99.1 at 16; *see also* Winklevoss Order, 83 Fed. Reg. 37579, 37580, 37587 (Aug. 1, 2018) (describing CFTC regulatory authority and finding "that a substantial majority of bitcoin trading occurs on unregulated venues overseas that are relatively new"); JA163 n.114 [87FR40309 n.114].  And because no bitcoin spot-trading platforms are registered as national securities exchanges, they are not "subject to [SEC] oversight of, among other things, their governance, membership qualifications,

8

trading rules, disciplinary procedures, recordkeeping, and fees." JA163 [87FR40309].

      b.    Futures contracts "obligate the holder to buy or sell a specific amount or value of an underlying asset, reference rate, or index at a specified price on a specified date" in the future. General Accounting Office, *CFTC and SEC: Issues Related to the Shad-Johnson Jurisdictional Accord*, GAO Report No. 00-89, at 1 n.2 (Apr. 6, 2000).[5] The futures market thus "involves various commodities due to be grown, produced or otherwise made available at some later point in time." *Commodity Options*, 553 F.2d at 629.

      The CFTC regulates futures and derivatives on bitcoin, such as bitcoin futures contracts traded on the Chicago Mercantile Exchange ("CME"). Grayscale Order, JA163 [87FR40309]; *see infra* at 19. In permitting the CME to trade bitcoin futures contracts, the CFTC addressed whether the CME's particular bitcoin futures product and specific cash-settlement processes were "readily susceptible to manipulation." But "the CFTC does not have authority to conduct regulatory oversight over spot virtual currency platforms or other cash commodities," including "surveillance and monitoring." *Virtual Currencies: The Oversight Role of the SEC and the CFTC*, *Hearing Before the Senate Banking*

---

      [5] *Available at* https://www.gao.gov/assets/ggd-00-89.pdf.

*Committee*, 115th Cong. (Feb. 6, 2018) (written testimony of J. Christopher Giancarlo, Chairman, CFTC, text accompanying n.17).[6]  The CFTC has also explained that its permission to trade bitcoin futures "does NOT provide for … value judgments about the underlying spot market," and U.S. law "does not provide for direct, comprehensive Federal oversight of underlying Bitcoin or virtual currency spot markets." *CFTC Backgrounder on Oversight of and Approach to Virtual Currency Futures Markets* (Jan. 4, 2018) at 1–2.[7]

As it relates to this matter, the SEC regulates securities exchanges (15 U.S.C. 78e, 78f), and the offer and sale of securities, including interests in trusts and other investment vehicles holding commodities and futures (such as shares of the Grayscale Bitcoin Trust). *See* 15 U.S.C. 77b(a)(1); 15 U.S.C. 78c(a)(10).

c.     The third market relevant here involves the offer and sale of securities in the form of shares of trusts or investment vehicles holding commodities or futures, with each share representing an undivided interest in the vehicle's underlying assets. *See* 84 Fed. Reg. 57162, 57164 (Oct. 24, 2019) ("ETF Rule"); *accord* 80 Fed. Reg. 34729, 34731 (June 17, 2015) ("Request for Comment on

---

[6] *Available at* https://cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo37.

[7] *Available at* http://www.cftc.gov/idc/groups/public/@newsroom/documents/file/backgrounder_virtualcurrency01.pdf.

ETPs").  Such shares may trade in secondary markets, including over-the-counter markets or (with Commission approval, if necessary) national securities exchanges registered under the Exchange Act.  *See Over-The-Counter (OTC) Securities*, SEC, https://www.investor.gov/introduction-investing/investing-basics/glossary; *see also* ETF Rule, 84FR57201 n.483.

Two such tradable instruments are exchange-traded products ("ETPs") and exchange-traded funds ("ETFs").  ETPs "are pooled investment vehicles with shares that trade on a securities exchange," but "they do not invest primarily in securities."  Rather, "ETPs may invest primarily in assets other than securities, such as futures, currencies, or physical commodities (*e.g.*, precious metals)."  ETF Rule, 84FR57164 n.16.  ETFs are a particular type of ETP "registered under the Investment Company Act [of 1940]" which do "invest primarily in securities."  *Id.* (citing 15 U.S.C. 80a-3(a)(1)).  Both ETFs and ETPs register the offer and sale of their shares under the Securities Act of 1933, but only ETFs are separately regulated under the Investment Company Act.  JA154 n.12 [87FR40300 n.12].

An ETP does not automatically track the price of its underlying investments.  Rather, investors purchase and sell individual ETP shares in a secondary market at a price that can fluctuate throughout the day.  ETP markets thus present opportunities for arbitrage—*i.e.*, the ability to profit from a "disparity in quoted prices of the same or equivalent commodities, securities, or bills of exchange."

*Falco v. Donner Found., Inc.*, 208 F.2d 600, 603 (2d Cir. 1953).  Arbitrage as between the price of an ETP's shares and the price of its underlying reference assets "applies market pressure that may bring the prices of the ETP Security and those assets closer together."  Request for Comment on ETPs, 80FR34733.[8]  An ETP can thus sometimes trade at a premium or discount relative to the value of its underlying assets.  *See* JA164 n.133 [87FR40310 n.133].

    2.    Markets involving commodities, futures, and ETPs and ETFs have evolved over time.  For example, silver and gold have traded in the spot market since time immemorial; silver futures and gold futures began trading in 1933 and 1974, respectively; and the first securities exchange-traded products based on spot silver and gold (commodity-trust ETPs) as well as silver and gold futures contracts (commodity-futures ETPs) were approved by the Commission in the mid-2000s.[9]

---

[8] While retail investors can buy or sell individual ETP shares only in the secondary market through a broker-dealer, certain large market participants are "authorized participants" who purchase and redeem ETP shares directly from the issuer in large blocks called "creation units" or "baskets."  When the secondary market price of an ETP begins to deviate from the value of the ETP's underlying assets, these authorized participants can engage in arbitrage by purchasing or redeeming creation units.  Other investors can effectuate arbitrage by purchasing and/or selling ETP shares and underlying reference assets.  *See* Request for Comment on ETPs, 80FR34732–33 (explaining ETP arbitrage mechanisms).

[9] *See* GraniteShares Order, 83 Fed. Reg. 43923, 43925–27 nn.35–37 (Aug. 1, 2018), cited at Grayscale Order, JA154 n.13 [87FR40300 n.13] (collecting orders regarding commodity-futures ETPs).

In assessing whether proposals to list and trade these newer commodity-trust and commodity-futures ETPs meet the Exchange Act's requirement that an exchange's rules be designed to prevent fraudulent and manipulative acts and practices, the Commission has consistently focused on the presence of adequate measures to detect and deter fraud and manipulation. *See* JA154 & n.13 [87FR40300 & n.13]. In particular, the Commission has long recognized the value of a comprehensive surveillance-sharing agreement between two markets relating to a tradable asset.

A surveillance-sharing agreement "provides for the sharing of information about market trading activity, clearing activity, and customer identity," creates a "reasonable ability [for the parties] to obtain access to and produce requested information," and ensures "that no existing rules, laws, or practices would impede one party to the agreement from obtaining this information from, or producing it to, the other party." JA155 & n.19 [87FR40301 & n.19], citing Ltr. from Brandon Becker, Dir., SEC Div. of Mkt. Regul., to Gerard D. O'Connell, Chairman, Intermarket Surveillance Grp. (June 3, 1994).[10]

In addition, a surveillance-sharing agreement contains procedures for alerting exchanges and regulators about abnormal trading patterns and other

---

[10] *Available at* https://www.sec.gov/divisions/marketreg/mr-noaction/isg060394.htm.

13

evidence indicative of fraud and manipulation.  Such surveillance measures "focus on detecting securities trading outside their normal patterns, which could be indicative of manipulative or other violative activity," and "[w]hen such situations are detected, surveillance analysis follows and investigations are opened, where appropriate, to review the behavior of all relevant parties for all relevant trading violations."  82 Fed. Reg. 61625, 61631 (Dec. 22, 2017) ("Dry Bulk Shipping Order").  Such agreements "provide a necessary deterrent to manipulation because they facilitate the availability of information needed to fully investigate a manipulation if it were to occur."  63 Fed. Reg. 70952, 70959 (Dec. 22, 1998) ("Derivatives Order").

Over the years, the Commission has consistently emphasized the importance of surveillance-sharing agreements in detecting and deterring fraudulent and manipulative conduct regarding a wide variety of exchange-traded products,[11]

---

[11] *See* 54 Fed. Reg. 12705 (Mar. 28, 1989) (index options); 55 Fed. Reg. 13344 (Apr. 10, 1990) (relationships between domestic and foreign SROs); 57 Fed. Reg. 28221 (June 24, 1992) ("Index Options Order") (index options based on domestic stocks); 59 Fed. Reg. 5619 (Feb. 7, 1994) ("ADR Options Order") (options based on American Depositary Receipts); 60 Fed. Reg. 15804 (Mar. 27, 1995) (approval of one of the first commodity-based ETPs, a commodity-linked exchange-traded note); 60 Fed. Reg. 46660 (Sept. 7, 1995) (proposal to adopt uniform listing and trading guidelines for stock-index, currency, and currency-index warrants); 61 Fed. Reg. 8315 (Mar. 4, 1996) (commodity indexed securities); Derivatives Order, 63FR70952 (listing of new derivative securities products).

14

including commodity-trust ETPs with underlying assets like gold, silver, and platinum.[12]  Likewise, "surveillance-sharing agreements have been consistently present whenever the Commission has approved the listing and trading of derivative securities, even where the underlying securities were also listed on national securities exchanges."  JA155 [87FR40301].  The Commission has repeatedly emphasized that "[s]uch agreements ensure the availability of information necessary to detect and deter potential manipulations and other trading abuses, thereby making [exchange-traded] product[s] less readily susceptible to manipulation."  Index Options Order, 57FR28224.

## D.    Commission Treatment of Bitcoin-Related Products

Between 2017 and June 2022, the Commission issued a series of orders regarding numerous proposed rule changes submitted by exchanges seeking to list bitcoin-related securities products.  JA154 n.11 [87FR40300 n.11].  Consistent with the history discussed above, the Commission applied a surveillance-based framework (referred to by Grayscale as the "significant-market test," Br. 4) for evaluating ETPs that seek to hold either spot bitcoins or bitcoin futures in order to

---

These orders are referenced at JA154–155 nn.16, 20–22, 24 [87FR40300–01 nn.16, 20–22, 24], in turn citing Winklevoss Order, 83FR37593 n.206.

[12] *See* Winklevoss Order, 83FR37592 n.202, cited at JA154 n.13 [87FR40300 n.13] (collecting orders regarding commodity-trust ETPs); JA164 & n.131 [87FR40310 & n.131].

assess whether the proposals meet the Exchange Act's requirement that an exchange's rules be designed to prevent fraudulent and manipulative acts and practices.

The Commission explained that one way an exchange that lists bitcoin-based ETPs can meet its obligations under Exchange Act Section 6(b)(5) is by "demonstrating that the exchange has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets." JA154 [87FR40300] (internal footnote omitted). "[T]he terms 'significant market' and 'market of significant size' include a market (or group of markets) as to which (a) there is a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, so that a surveillance-sharing agreement would assist in detecting and deterring misconduct, and (b) it is unlikely that trading in the ETP would be the predominant influence on prices in that market." *Id.*

Listing exchanges proposing bitcoin-related products have argued that properties of bitcoin made it inherently resistant to manipulation and, therefore, establishment of a surveillance-sharing agreement to detect manipulation was unnecessary. JA160 & n.85 [87FR40306 & n.85]. In response, the Commission has acknowledged that "if a listing exchange could establish that the underlying market inherently possesses a unique resistance to manipulation beyond the

protections that are utilized by traditional commodity or securities markets, the

listing market would not necessarily need to enter into a surveillance-sharing

agreement with a regulated significant market."  JA156 [87FR40302].  "Such

resistance to fraud and manipulation, however, must be novel and beyond those

protections that exist in traditional commodity markets or securities markets for

which surveillance-sharing agreements in the context of listing derivative securities

products have been consistently present."  *Id.*

The Commission applied this analytical framework in disapproving a

proposed spot-bitcoin ETP in spring of 2017.  SolidX Order, 82 Fed. Reg. 16247

(Apr. 3, 2017).  In subsequent orders, the Commission further developed its

framework for assessing spot-bitcoin ETPs.  *See, e.g.*, Winklevoss Order, 83 Fed.

Reg. 37579 (Aug. 1, 2018).  In August 2018, the Commission also disapproved

two proposals relating to ETPs designed to hold bitcoin futures contracts.

ProShares Order, 83 Fed. Reg. 43934 (Aug. 28, 2018); GraniteShares Order,

83 Fed Reg. 43923 (Aug. 28, 2018).

In October 2021, the ProShares Bitcoin Strategy ETF, registered under the

Investment Company Act of 1940, first launched.  Since then, two additional

1940 Act products—the Valkyrie Bitcoin Strategy ETF and VanEck Bitcoin

Strategy ETF—have come onto the market.  Because these futures-based bitcoin

ETFs are registered under the Investment Company Act, and trade pursuant to

generic listing standards, their introduction to the market—unlike the listing of bitcoin futures ETPs on a national securities exchange—did not require Commission approval.  *See* ETF Rule, 84FR57162–238.[13]

Thereafter, in April and May 2022, the Commission approved for the first time the listing and trading on national securities exchanges of two bitcoin futures ETPs: the Teucrium Bitcoin Futures Fund (listed on NYSE Arca) and the Valkyrie XBTO Bitcoin Futures Fund (listed on Nasdaq).  *See* Teucrium Order, 87 Fed. Reg. 21676 (Apr. 12, 2022); Valkyrie Order, 87 Fed. Reg. 28848 (May 11, 2022).

In approving these products, the Commission explained that beyond cash and cash-equivalents, the Teucrium and Valkyrie XBTO ETPs contain only bitcoin futures that trade exclusively on the CME.  Teucrium Order, 87FR21676; Valkyrie Order, 87FR28847–48.  And the CME itself is subject to federal regulation by the CFTC, which has the "requisite oversight, controls, and regulatory scrutiny necessary to maintain, promote, and effectuate fair and transparent trading of [CME's] listed products, including [CME bitcoin futures contracts]."  Teucrium Order, 87FR21679.[14]

---

[13] At least 40% of an ETF's holdings must be in investment securities (as opposed to commodities).  *See* 15 U.S.C. 80a-3(a)(1)(C), (a)(2).

[14] Because the Commission reasoned similarly in both instances, the discussion here focuses on the Teucrium Order.

In particular, the CME is registered with the CFTC and has extensive surveillance procedures in place.  "CME's Department of Market Regulation comprehensively surveils futures market conditions and price movements on a real-time and ongoing basis in order to detect and prevent price distortions, including price distortions caused by manipulative efforts."  Teucrium Proposal, 86 Fed. Reg. 44062, 44072 n.85 (Aug. 5, 2021), cited at Teucrium Order, 87FR21679 & n.45.  Moreover, "CME's market surveillance program and its related self-regulatory responsibilities are implemented pursuant to the Commodity Exchange Act and CFTC regulations thereunder.  The relevant requirements require CME to (i) only list contracts that are not readily susceptible to manipulation, (ii) prevent market disruptions, and (iii) establish tailored position limits or position accountability rules for each futures contract."  *Id.*

Against this background, the Commission concluded that "when the CME shares its surveillance information with [NYSE] Arca, the information would assist in detecting and deterring fraudulent or manipulative misconduct related to the non-cash assets held by the proposed ETP."  Teucrium Order, 87FR21679; *see also* Derivatives Order, 63FR70959 (with respect to a derivative instrument based on an underlying security, a surveillance-sharing agreement should cover "the SRO

19

listing or trading a derivative product and the markets trading the securities underlying the new derivative securities product").[15]

The Commission explained, however, that similar reasoning did not apply to ETPs holding spot bitcoins. That was because "[s]pot bitcoin markets are not currently 'regulated,'" and "there would be reason to question whether a surveillance-sharing agreement with the CME would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct affecting the price of the spot bitcoin held by that ETP." Teucrium Order, 87FR21679 n.46 (internal citations omitted); *accord* Valkyrie Order, 87FR28851 n.42.

### E.    Disapproval of the Proposed Rule Change

In November 2021, the Commission published notice of NYSE Arca's proposed rule change to list shares of the Grayscale Bitcoin Trust. 86 Fed. Reg. 61804 (Nov. 8, 2021). Nearly 8,000 unique comments on the proposal were received, including from *amici* the Blockchain Association, Coinbase, and several academics. The Commission ultimately disapproved the proposed rule change

---

[15] The Commission considers NYSE Arca and Nasdaq to have surveillance-sharing agreements with the CME by virtue of common membership in the Intermarket Surveillance Group (*see* Teucrium Order, 87FR21678; Valkyrie Order, 87FR28850), which is "a global network for the sharing of information and the coordination of regulatory efforts among exchanges trading securities and other products to address potential intermarket manipulation and trading abuses." *See* https://isgportal.org/overview.

because it concluded that "NYSE Arca ha[d] not met its burden to demonstrate that its proposal is consistent with the requirements of Exchange Act Section 6(b)(5)." JA156 [87FR40302].

1.    In arguing that its proposal was consistent with the requirements of the Exchange Act, NYSE Arca initially sought to avoid consideration of surveillance-sharing agreements altogether by arguing that "the fundamental features of [b]itcoin" offer "novel protections beyond those that exist in traditional commodity markets or equity markets," rendering such agreements unnecessary. JA158 [87FR40304], quoting JA184 [Amendment 1, 87FR28051].

The Commission disagreed, as it had in prior orders.  JA170 nn.201–02 [87FR40316 nn.201–02].  To the contrary, the Commission identified several risks of fraud and manipulation facing investors in spot bitcoin.  JA159 [87FR40305]. These include "wash" trading[16]; persons with a dominant position in bitcoin manipulating bitcoin pricing[17]; hacking of the bitcoin network and trading

---

[16] A "wash trade" is a transaction (such as a purchase and sale simultaneously or within a short period of time) that involves no changes in beneficial ownership; such a trade is a means of creating an artificial appearance of market activity.  *See In re Silseth*, Release No. 34-7317, 1996 WL 427988, at *1 & n.3 (July 30, 1996); *Reddy v. CFTC*, 191 F.3d 109, 115 (2d Cir. 1999).  Wash trading is manipulative and defrauds investors.  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476–77 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976).

[17] According to Grayscale, "[a]s of December 31, 2021, the largest 100 [b]itcoin wallets held approximately 15% of the [b]itcoins in circulation."

platforms[18]; malicious control of the bitcoin network[19]; trading based on material, non-public information or based on the dissemination of false and misleading information[20]; manipulative activity involving purported "stablecoins"[21]; and fraud and manipulation at bitcoin trading platforms.[22]

In addition, the Commission pointed out that NYSE Arca and Grayscale had each made statements undermining the claim that bitcoin is uniquely resistant to

---

JA160 [87FR40306] (citing Grayscale 2021 10-K at 46). *See also generally* Winklevoss Order, 83FR37587 & n.115.

[18] *See* Winklevoss Order, 83FR37585 & n.97, 83FR37601 n.317 (citing news articles and academic papers about past bitcoin hacks).

[19] *See* Winklevoss Order, 83FR37585 n.99 (a malicious actor could exploit his or her control of the bitcoin network by "using it to generate new coins" (quoting Nakamoto, *supra* note 2, at 4)).

[20] *See* Winklevoss Order, 83FR37585 n.95 (citing Wenjun Feng, Yiming Wang & Zhengjun Zhang, *Informed Trading in the Bitcoin Market*, 26 Fin. Res. Ltrs. 63 (Sept. 2018), *available at* https://www.sciencedirect.com/science/article/pii/ S1544612317306992).

[21] *See* Winklevoss Order, 83FR37585–86 & nn.101–04 (citing findings in an academic paper indicating that a particular stablecoin—a digital asset purportedly backed by the U.S. dollar—was involved in "price manipulation" of bitcoin); *see also* JA159 n.74 [87FR40305 n.74] (citing the same paper, later published as John M. Griffin & Amin Shams, *Is Bitcoin Really Untethered?*, 75 J. Fin. 1913 (2020), *available at* https://onlinelibrary.wiley.com/doi/10.1111/jofi.12903).

[22] *See, e.g.*, Complaint, *CFTC v. Gemini Trust Co., LLC*, No. 22-cv-4563 (S.D.N.Y. filed June 2, 2022), ECF No. 1 (alleging, among other things, failure by Gemini personnel to disclose to the CFTC that Gemini customers could and did engage in collusive or wash trading), cited at JA159 n.73 [87FR40305 n.73].

22

fraud.  For example, NYSE Arca stated that "fraud and manipulation may exist and that [b]itcoin trading on any given exchange may be no more uniquely resistant to fraud and manipulation than other commodity markets."  JA159 [87FR40305], citing JA184 [Amendment 1, 87FR28051].  And the Trust's own registration statement similarly acknowledges "the unregulated nature and lack of transparency surrounding the operations of" spot-trading platforms; the risk of hacking of the bitcoin network; reports that as much as 95% of bitcoin trading volume is "false or non-economic in nature"; and the risk of "fraud and manipulative activity" at bitcoin trading platforms.  JA159 & n.79 [87FR40305 n.79], citing Ex. 99.1 at 13–14, 17–18.[23]

Given these prior statements and the risks the Commission identified, the Commission concluded that NYSE Arca failed to substantiate its assertions regarding bitcoin's purportedly novel antifraud properties.  JA159–160 [87FR40305–06].  *See Susquehanna Int'l Grp.*, 866 F.3d at 447 (holding that "the SEC's unquestioning reliance" on SRO statements is insufficient to approve a proposed rule change); *see also* JA158 n.58, 159–160 & n.89 [87FR40304 n.58, 40305–06 & n.89] (citing *Susquehanna*).

---

[23]  Providing false statements or omissions of material fact in registration statements violates Section 11 of the Securities Act, 15 U.S.C. 77k.

2.      The Commission also rejected the argument that the presence of arbitrageurs in the bitcoin market served as an adequate check against fraud.  Even for equity options, which involve highly liquid markets where arbitrage is straightforward, the Commission has focused on the need for measures such as surveillance-sharing agreements between the exchanges where the options are traded and the exchange where the underlying securities are traded in order to assist in detecting and deterring misconduct.  In short, "price arbitrage is not sufficient to support the finding that a market is uniquely or inherently resistant to manipulation such that the Commission can dispense with surveillance-sharing agreements."  JA160–161 [87FR40306–07] (referencing ADR Options Order, 59FR5621; *see also* Index Options Order, 57FR28224).

3.      NYSE Arca next argued that the use of a proprietary Index to value the bitcoin assets held by Grayscale, which aggregates per-second bitcoin prices obtained from four different spot-trading platforms, JA156–157, 161 [87FR40302–03, 07], sufficiently militated against the risk of fraud and manipulation to forgo traditional surveillance arrangements.[24]  The Commission disagreed.

---

[24] The four spot-trading platforms contributing to the Index are Coinbase Pro and Kraken (based in the United States) and Bitstamp and LMAX Digital (based in the United Kingdom).  JA181 [Amendment 1, 87FR28048].

24

*First*, the Commission concluded that while spot-trading platforms that contribute to the Index follow certain protocols (including FinCEN anti-money laundering and know-your-customer rules and the terms of the New York State Department of Financial Service's BitLicense program),[25] those protocols were insufficient to dispense with traditional surveillance measures.  Bitcoin trading platforms' compliance with some of these alternative protocols is voluntary and could be discontinued at any time.  JA163 [87FR40309].  And, regardless, the protocols are not comparable to the kind of comprehensive regulation and oversight required of registered securities exchanges under the Exchange Act or registered futures exchanges under the Commodities Exchange Act.  JA162–163 [87FR40308–09].

*Second*, the Commission noted that fraudulent activity on spot-trading platforms other than those used to calculate the Index could affect the spot prices underlying the Index.  JA163 [87FR40309].  Grayscale itself warned in its registration statement that "[t]he Index has a limited history and a failure of the

---

[25] The "BitLicense program is 'guidance' that is 'not intended to limit the scope or applicability of any law or regulation,' including the Exchange Act." JA163 & n.116 [87FR40309 & n.116], quoting Maria T. Vullo, N.Y. State Dep't of Fin. Servs., *Guidance on Prevention of Market Manipulation and Other Wrongful Activity* (Feb. 7, 2018), *available at* https://www.dfs.ny.gov/system/files/documents/2020/03/il180207.pdf.

[Index Price] could adversely affect the value of the Shares."  Ex. 99.1 at 18, cited at JA164 & n.128 [87FR40310 & n.128].

*Third*, NYSE Arca did not provide any data on the empirical interrelationship, if any, between Index prices and the putative price of the ETP's shares, which would trade *not* at Index-based prices but at prices determined by the secondary market in those shares.  Accordingly, there was insufficient record evidence from which to assess "the relationship between the Index and secondary market prices generally, or how the use of the Index would mitigate fraud and manipulation of the Shares in the secondary market."  JA164 [87FR40310] (footnote omitted); *see supra* at 11–12.

4.    NYSE Arca also argued that it satisfied the Commission's surveillance-sharing framework—*i.e.*, that it have "a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets," JA164 [87FR40310]—because it has a surveillance-sharing agreement with the CME.  But the CME is a market for trading bitcoin *futures*; *spot* bitcoins (like those held by the Trust) are not traded on the CME.  Rather, they are traded on spot platforms that the Trust acknowledged "may experience fraud" "due to the[ir] unregulated nature and lack of transparency surrounding the[ir] operations."  JA164 & n.126 [87FR40310 n.126], quoting Ex. 99.1 at 16–17 and citing Grayscale 2021 10-K at 10.  The Commission

therefore concluded that the record was insufficient to find that surveillance arrangements between NYSE Arca and the CME *futures* market were adequate to detect and deter fraud in the bitcoin *spot* market.

Specifically, the Commission found that "[t]he record d[id] not demonstrate that there is a reasonable likelihood that a person attempting to manipulate the proposed ETP would have to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP."  JA166 [87FR40312].  *If* a would-be manipulator were to trade on the CME bitcoin futures market itself to manipulate a spot bitcoin ETP, a surveillance-sharing agreement between NYSE Arca and the CME might assist in the detection of such fraudulent and manipulative trading activity.  In understanding whether such a manipulator *would need* to trade on the CME bitcoin futures market, the Commission considered the "lead/lag" relationship between bitcoin spot markets and bitcoin futures markets—*i.e.*, the degree to which prices of one product move before prices of the other.  USBT Order, 85 Fed. Reg. 12595, 12612 (Mar. 3, 2020).  That is because "if the spot market leads the futures market, this would indicate that it would not be necessary to trade on the futures market to manipulate the proposed ETP, even if arbitrage worked efficiently, because the futures price would move to meet the spot price."  JA165 n.139 [87FR40311 n.139], quoting USBT Order, 85FR12612.

27

But after reviewing the "econometric evidence," including approximately 18 independent studies examining the empirical relationship between bitcoin futures prices and bitcoin spot prices,[26] the Commission found that the available data on the "lead/lag" relationship between the bitcoin futures and spot markets remains "inconclusive." JA167 [87FR40313]. NYSE Arca itself acknowledged that there have been "mixed" findings on this score, and an analysis conducted by Grayscale found that "there does not appear to be a significant lead/lag relationship between the two instruments for the period of November 1, 2019 to August 31, 2021." JA187 [Amendment 1, 87FR28054], cited at JA167 & nn.161–62 [87FR40313 & nn.161–62].[27]

5.      This determination that NYSE Arca did not satisfy the first prong of the inquiry into whether the CME could be considered a market of significant size with respect to spot bitcoin was independently sufficient to require disapproval.

---

[26] *See* Grayscale Order, JA165 n.142, 166–167 n.159 (citing Wise Origin Order, 87 Fed. Reg. 5527, 5535 n.115 (Feb. 1, 2022)), 170 n.204 (citing Valkyrie Order, 87FR28851 nn.49–50), 173 n.233 (citing ARK 21Shares Order, 87 Fed. Reg. 20014, 20023 n.131 (Apr. 6, 2022)) [87FR40311 n.142, 87FR40312–13 n.159, 87FR40316 n.204, 87FR40319 n.233]; *see also* USBT Order, 85FR12609 n.180.

[27] While Grayscale claims "that other studies prior to and since such date have found that the CME futures market does lead the Bitcoin spot market," JA187 [Amendment 1, 87FR28054], it does not challenge the Commission's interpretation of the available lead/lag data on appeal.

28

But the Commission also examined the second prong—*i.e.*, whether "it is unlikely that trading in the proposed ETP would be the predominant influence on prices in the CME bitcoin futures market."  JA167 [87FR40313].

To satisfy this prong, NYSE Arca presented statistics about net inflows into the Trust relative to the capitalization of spot bitcoin generally, as well as statistics about the Trust's trading volume relative to that of the CME bitcoin futures market and the Index.  The Commission found these numbers inapposite because they (a) did not address the effect of trading in the proposed ETP on *CME bitcoin-futures prices*, which is the relevant inquiry, (b) did not address whether conversion of the Trust into an ETP would dramatically increase the size of the Trust's holdings, (c) did not attempt to show a causal relationship between Trust inflows or trading volume and the size or activity of the CME bitcoin futures market, or otherwise provide information on the *influence* that is central to the second prong, and (d) did not address the Trust's potential future predominance, considering that, as of April 2022, it held approximately $30 billion worth of bitcoin (3.4% of all outstanding bitcoin)—a number "that far exceeds the value of all open interest in CME bitcoin futures contracts."  JA167–168 [87FR40313–14].

6.    The Commission also addressed the argument that the prior approval of the Teucrium and Valkyrie XBTO futures ETPs required the Commission to approve Grayscale's spot ETP.  JA168 [87FR40314].  As those orders previewed

29

(*see* Teucrium Order, 87FR21679 n.46; Valkyrie Order, 87FR28851 n.42), none of Grayscale's arguments supports the idea that the basis for approving futures-based bitcoin products leads to the same conclusion for spot-based products.

In particular, the Commission rejected Grayscale's argument that the properties of the Index and the Bitcoin Reference Rate ("a once-a-day reference rate of the U.S. dollar price of one bitcoin as of 4 p.m., London time" calculated by "aggregat[ing] the trade flow of its [six] constituent spot bitcoin platforms") supported approval of its product. JA171 [87FR40317]. Pressing its claim, Grayscale offered the following faulty syllogism: (a) "CME bitcoin futures ETFs/ETPs are 'priced according to the Bitcoin Reference Rate;'" (b) the proposed spot bitcoin ETP would be priced based on the Index; and (c) because of the "almost complete overlap" between the spot platforms whose prices are used to calculate the Bitcoin Reference Rate and the Index, "bitcoin futures ETFs/ETPs and the proposed ETP are subject to the 'same risks relating to pricing data quality.'" JA171 [87FR40317].

The Commission explained that this attempt to treat bitcoin spot ETPs and CME bitcoin futures ETPs as equivalent was flawed. First, Grayscale elided the distinction between pricing CME bitcoin futures contracts and pricing the shares of an ETP holding CME bitcoin futures contracts. The Bitcoin Reference Rate "is used to value the final cash settlement of CME bitcoin futures contracts"; by

contrast, "the shares of CME bitcoin futures ETFs/ETPs trade in secondary markets, and there is no evidence in the record for this filing that such intra-day, secondary market trading prices are determined by the [Bitcoin Reference Rate]." JA171 [87FR40317].  Moreover, while the Bitcoin Reference Rate "is used to value the *final* cash settlement of CME bitcoin futures contracts," JA171 [87FR40317] (emphasis added), it is not generally used to calculate the *daily* cash settlement value of CME bitcoin futures contracts, *see* Teucrium Order, 87FR21676.

Similarly, while the Index "is used daily to value the bitcoins held by the Trust," the shares of the Trust trade at their own prices determined "currently on the [over-the-counter] market or in the future on the Exchange" through secondary trading.  JA171 [87FR40317].  Further, the Bitcoin Reference Rate and the Index aggregate data from different bitcoin spot-trading platforms, and thus do not overlap completely.  JA172 [87FR40318].

In any event, for the reasons the Commission identified, Grayscale's focus on the Bitcoin Reference Rate and the Index was inapposite.  The Commission's conclusions regarding the Teucrium and Valkyrie XBTO futures ETPs were not based on how futures contracts are priced at settlement or how bitcoins held by the Trust are valued.  Rather, the Commission focused on the effectiveness of surveillance measures to detect and deter fraud and manipulation.  JA172

31

[87FR40318]. In addition, even if there were a link between pricing mechanisms (like the Bitcoin Reference Rate and the Index) and the detectability of fraud and manipulation, the *extent* of that link is a separate empirical question. Neither NYSE Arca nor Grayscale provided data to substantiate the assertion that the purportedly linked pricing mechanisms would render fraud and manipulation targeting the bitcoin spot market detectable by CME surveillance. *Id.*

7.     Finally, advocates for the proposal argued that permitting the listing of shares of the Trust would be consistent with the Exchange Act even absent a comprehensive surveillance-sharing agreement with a regulated market of significant size because doing so purportedly would, among other things, satisfy investor demand, reduce cybersecurity risks, and permit owners of over-the-counter shares of the Trust to avoid trading at a discount relative to spot bitcoin. JA173–174 [87FR40319–20].

The Commission explained that even if those asserted benefits were plausible, these arguments are unavailing. The Commission must disapprove a filing if it is not consistent with each of the applicable requirements of the Exchange Act. JA175 & n.255 [87FR40321 & n.255], citing 15 U.S.C. 78s(b)(2)(C). Here, NYSE Arca "ha[d] not met its burden of demonstrating an adequate basis in the record for the Commission to find that the proposal is consistent with Exchange Act Section 6(b)(5)'s" requirement that an exchange's

32

rules be designed to prevent fraudulent and manipulative acts and practices.  JA175 [87FR40321].

## Standard of Review

The Commission's "action, findings, and conclusions" may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. 706(2)(A).  This standard is "[h]ighly deferential" and "presumes the validity of agency action."  *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000).  The Commission's "determinations based upon highly complex and technical matters are entitled to great deference."  *Citadel Sec. LLC v. SEC*, 45 F.4th 27, 34 (D.C. Cir. 2022).

"The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive."  15 U.S.C. 78y(a)(4); *Steadman v. SEC*, 450 U.S. 91, 96 n.12 (1981).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

**Summary of Argument**

The Commission's order disapproving Grayscale's proposed ETP was reasonable, reasonably explained, supported by substantial evidence, and faithful to the text of the Exchange Act.

I.    There is no inconsistency in the Commission's disapproval of Grayscale's spot ETP despite having approved two CME bitcoin futures ETPs. Futures- and spot-based bitcoin ETPs are fundamentally different products protected by different market-surveillance mechanisms and regulatory oversight to detect and deter fraud and manipulation. The Commission previously approved ETPs that hold only futures contracts that trade on the CME, which is registered with the CFTC; those ETPs' underlying assets are thus subject to robust surveillance. The bitcoin spot market, by contrast, is fragmented and unregulated, and petitioner presented no supportable basis to conclude that the CME's surveillance of futures trading would sufficiently detect and deter fraud and manipulation targeting the bitcoin spot market and thereby protect against fraud and manipulation in Grayscale's product.

II.    The Commission's application of the significant-market framework— *i.e.*, the inquiry into whether an exchange seeking to list a bitcoin ETP has a surveillance-sharing agreement in place with a regulated market of significant size relating to the ETP's underlying assets as means to ensure that the exchange's rules

34

are designed to prevent fraudulent and manipulative acts and practices—was
reasonable.  For decades, the Commission's analysis of exchange-traded products
has focused on adequate market surveillance, especially in assessing whether to
approve the listing of a derivative-type instrument that trades in a separate market
from its reference assets.  This attention to the measures in place to detect and
deter fraud and manipulation is reasonably grounded in the statutory requirement
that exchange rules be "designed to prevent fraudulent and manipulative acts and
practices," 15 U.S.C. 78f(b)(5), and is sufficiently clear to provide guidance to
market participants.  And qualifying for listing under this framework is neither
illusory nor impossible, as the Commission's recent approval of CME bitcoin
futures ETPs proves.

    **III.**   Contrary to petitioner's contention, the Commission's disapproval of
Grayscale's proposed ETP does not reflect an impermissible, merits-based
skepticism of bitcoin as an investment.  Rather, it followed a straightforward
application of the standard for reviewing ETPs mandated by statutory text.  To the
extent Grayscale and *amici* urge disregarding Section 6(b)(5)'s requirement that an
exchange rule be designed to prevent fraud and manipulation in favor of other
purported benefits of Grayscale's ETP, that position finds no support in the statute.

## Argument

Because Grayscale's attacks on the Commission's decision-making are unavailing, this Court should affirm.

## I. The Commission reasonably treated two different products—bitcoin futures ETPs and spot bitcoin ETPs—differently.

Grayscale's primary argument—that the Commission's disapproval of its product was arbitrary in light of its prior approval of two CME bitcoin futures ETPs—rests on a false premise of equivalence. CME futures- and spot-based bitcoin ETPs are fundamentally different products whose underlying assets trade in markets with significantly different regulatory and surveillance mechanisms in place. Contrary to petitioner's assertions, the Commission acted reasonably in taking those differences into account.

*First*, CME bitcoin futures ETPs and bitcoin spot ETPs hold different underlying assets. Both the Teucrium ETP (listed on NYSE Arca) and the Valkyrie XBTO ETP (listed on Nasdaq) hold CME bitcoin futures contracts, cash, and cash equivalents, whereas the Grayscale ETP would hold bitcoins themselves.

*Second*, those underlying assets trade in different markets. The Teucrium and Valkyrie XBTO ETPs hold futures contracts tradable only on the CME, which is regulated by the CFTC. *See* Teucrium Order, 87FR21676–78; Valkyrie Order, 87FR28848–50. By contrast, the bitcoins that would be held by the Grayscale ETP trade on concededly "unregulated" spot-trading platforms, many of which are

36

overseas.  JA159, 164 & n.126 [87FR40305, 40310 & n.126], citing Ex. 99.1 at 16–17.

*Third*, by virtue of common membership in the Intermarket Surveillance Group, both NYSE Arca and Nasdaq have a surveillance-sharing agreement in place with the CME, where the underlying assets held by the Teucrium and Valkyrie XBTO ETPs (bitcoin futures contracts) are exclusively traded.  *See* Teucrium Order, 87FR21678; Valkyrie Order, 87FR28850.  CME's surveillance entails comprehensive efforts to monitor "market conditions and price movements on a real-time and ongoing basis in order to detect and prevent price distortions, including price distortions caused by manipulative efforts."  Teucrium Proposal, 86FR44072 n.85, cited at Teucrium Order, 87FR21679 & n.45.  Such surveillance therefore "can reasonably be relied upon to capture the effects on the CME bitcoin futures market caused by a person attempting to manipulate the proposed futures ETP by manipulating the price of CME bitcoin futures contracts."  Teucrium Order, 87FR21679.  There is no equivalent agreement between NYSE Arca and any bitcoin spot-trading platform, since none is overseen by any federal market regulator.  JA160, 163 & nn.120–22, 164 [87FR40306, 40309 & nn.120–22, 40310].

The Commission's approval and disapproval decisions are rooted in these differences.  With respect to the approved futures ETPs, the Commission found

"that the CME is a 'significant market' related to CME bitcoin futures contracts, and thus that the Exchange has entered into the requisite surveillance-sharing agreement."  Teucrium Order, 87FR21681; *accord* Valkyrie Order, 87FR28853. That conclusion does not apply, however, to ETPs holding spot bitcoin, as bitcoins trade in different, unregulated markets.  Teucrium Order, 87FR21679 & n.46; Valkyrie Order, 87FR28851 & n.42.  And the Commission reasonably found that the proponents of Grayscale's ETP failed to demonstrate that a surveillance-sharing agreement with the CME would assist in detecting and deterring fraudulent and manipulative conduct affecting the price of the spot bitcoin held by the Grayscale Bitcoin Trust.  JA171 [87FR40317].  The Commission therefore "did not arbitrarily change course" when it treated two different SRO proposals differently and it "distinguished its [earlier] decision."  *Citadel*, 45 F.4th at 35.

Grayscale's complaints about "discrimination" (Br. 2–3, 28–29) similarly miss the mark.  Section 6(b)(5) of the Exchange Act prohibits *exchange rules* from being "designed" to permit "unfair discrimination" between issuers.  15 U.S.C. 78f(b)(5).  It is therefore focused on the exchange's proposed rules themselves, not the impact of the Commission's approval or disapproval decisions.  Nor is a Commission decision "discriminatory" just because it affects issuers offering dissimilar products differently.  The Exchange Act prohibits exchanges from

38

engaging in "unfair discrimination, not discrimination *simpliciter* …." *Timpinaro v. SEC*, 2 F.3d 453, 457 (D.C. Cir. 1993) (quotations omitted); *see also* Release No. 34-13869, 1977 WL 190350, at *2 (Aug. 18, 1977) ("[u]nfair discrimination" exists only where similarly situated groups are treated differently "without any rational basis"). Given the divergent market-surveillance measures in place as between futures- and spot-based bitcoin ETPs, the Commission's decisions have been consistent with the Act.

None of Grayscale's contrary arguments has merit.

### A.    The Commission reasonably found that the ability to detect fraud and manipulation differs across the CME bitcoin futures market and the bitcoin spot market.

Grayscale's argument that CME futures- and spot-based bitcoin ETPs are subject to the same risk profile, and thus the Commission's analysis in approving futures-based products should apply equally to its product, misunderstands the Commission's analysis.

To begin, Grayscale incorrectly focuses on the risk of fraud occurring in bitcoin-related markets, asserting that those risks are the same for futures and spot-based products. Br. 17, 20, 23–24. But rather than focusing on whether fraud *is likely to occur*, the Commission's analysis focuses on the separate question of whether any fraud or manipulation that does occur *will remain undetected*. *See, e.g.*, JA170 n.202 [87FR40316 n.202] (distinguishing "the detection and deterrence

39

of fraud and manipulation" from "the overall risk of fraud and manipulation in the spot bitcoin or futures markets, or the extent to which such risks are similar"). It is this issue of market regulation that underlies the Commission's emphasis on surveillance-sharing agreements, which facilitate the detection and deterrence of fraud. Thus, Grayscale's assertion that in approving CME bitcoin futures products the Commission "necessarily determined that the risk of fraud in the underlying spot market was sufficiently low" (Br. 24) misses the mark.

Grayscale also mischaracterizes the scope of the Commission's inquiry regarding detection and deterrence. It wrongly suggests that the Commission believed, in approving CME bitcoin futures products, that CME surveillance was sufficient to detect *any* fraud and manipulation on the spot market, even if it pertains to *spot bitcoin*. Br. 32–33. But the Commission did not decide that question in its earlier orders. Rather, the Commission's conclusion was a narrower one, reasonably focused on surveillance of trading in *the particular bitcoin asset underlying the ETP before it*.

Because of CME's comprehensive surveillance measures and the one-to-one relationship between the regulated market (the CME) and the underlying assets (CME-tradable bitcoin futures), the Commission concluded that CME's surveillance "can reasonably be relied upon" to capture the effect of attempts "to manipulate the proposed futures ETP by manipulating the price of *CME bitcoin*

*futures contracts*, whether that attempt is made by directly trading on the CME

bitcoin futures market or indirectly by trading outside of the CME bitcoin futures

market." Teucrium Order, 87FR21679 (emphasis added); *see also* Teucrium

Order, 87FR21680 (stating that a would-be manipulator might use "unregulated

futures platforms that permit higher leverage" to perpetrate fraud); Grayscale

Order, JA170 [87FR40316] (discussing "a person attempting to manipulate the

CME bitcoin futures ETP by manipulating the price of CME bitcoin futures

contracts, whether that attempt is made by directly trading on the CME bitcoin

futures market or indirectly by trading outside of the CME bitcoin futures

market").[28]

This focus on direct surveillance of the market where the underlying asset

trades makes sense because an attempt to manipulate the price of a futures-based

bitcoin ETP would likely require manipulation of the bitcoin futures price itself.

Where there is a one-to-one relationship between the underlying asset and the

regulated market (as there was in the CME-futures-based bitcoin ETPs the

Commission has approved), a surveillance-sharing agreement with that market can

be reasonably relied upon to detect and deter the effects of fraud and manipulation

---

[28] *See also* NYDIG Order, 87 Fed. Reg. 14932, 14939 n.105 (Mar. 16, 2022) (noting lower margin requirements for bitcoin futures trading on three unregulated non-CME platforms—BitMex, Deribit, and Binance), cited at Teucrium Order, 87FR21680 n.64.

of that asset.  But the Commission did not speak to the broader question (presented

here) of whether *any* fraud or manipulation on the *spot* market designed to

manipulate *spot* bitcoin would necessarily be detected by CME surveillance of

*futures* trading.

Grayscale presents this broader question as a binary one, incorrectly arguing

that either an exchange's "surveillance-sharing agreement with the CME is

sufficient to detect and deter fraudulent or manipulative activity in spot bitcoin

markets" (such that futures- and spot-based products are "equally protected") or "is

insufficient to detect and deter fraudulent or manipulative activity in spot bitcoin

markets" (such that futures- and spot-based products are both "equally

vulnerable").  Br. 32.  But the question of whether and to what extent fraud and

manipulation of spot bitcoin would be detectable by the CME's surveillance of the

futures market is an empirical one insufficiently answered by Grayscale's

submissions.

Grayscale assumes, based only on the proffered 99.9% daily correlation

between the price of CME bitcoin futures contracts and a Coinbase spot price, as

well as "common sense," that "fraud or manipulation influenc[ing] the price of

bitcoin" will affect bitcoin futures contracts "in like measure."  Br. 27.  But as the

Commission pointed out, "correlation analysis" does not "provide evidence of the

causal economic relationship of interest: namely, whether fraud or manipulation

42

that impacts spot bitcoin would also similarly impact CME bitcoin futures contracts."  Grayscale Order, JA172 n.223 [87FR40318 n.223].  And the Commission reasonably found that Grayscale failed to provide data "that assesses the reaction (if any) of CME bitcoin futures contracts to instances of fraud and manipulation in spot bitcoin markets."  JA172 [87FR40318].  Nor does the record "sufficiently demonstrate that attempted manipulation of spot bitcoin would also similarly impact CME bitcoin futures contracts."  JA171 n.209 [87FR40317 n.209].[29]

The Commission thus reasonably disapproved Grayscale's proposed spot ETP.

## B.    The Commission has consistently applied the requirements of the Exchange Act to spot and futures ETPs.

Grayscale's assertion (Br. 34–39) that the Commission impermissibly relaxed its significant-market framework for futures ETPs relative to spot ETPs is without merit.  As already discussed, *see supra* at 36–43, the Commission reasonably explained why the evidence in the record was insufficient to support the

---

[29] Grayscale erroneously asserts (Br. 33) that this statement is contradicted by the Commission's observation in the Teucrium Order that the daily settlement price of bitcoin futures contracts may be "influenced by activity in other bitcoin markets."  87FR21680.  Grayscale attempts to convert a statement about what *might be possible* into a finding that futures- and spot-based ETPs are equally susceptible to spot-market fraud.  The Commission never made such a finding.

43

conclusion "that the CME's surveillance can be reasonably relied upon to capture the effects of manipulation of the *spot* bitcoin assets underlying the proposed [Grayscale] ETP …."  JA172 [87FR40318].   Again, NYSE Arca and Grayscale could have tried to demonstrate that, in fact, fraud and manipulation targeting the spot market is detectable by the CME—wherever it occurs (*contra* Br. 36–37)— but neither provided any such data.  JA172 [87FR40318].[30]  And, contrary to Grayscale's assertion (Br. 37–39), the Commission did not apply an overly stringent version of the independent, second prong of its significant-market test to its product.

This second prong considers whether trading in the proposed ETP would become "the predominant influence on prices" in the market with which the listing exchange claims to have an adequate surveillance-sharing agreement.  JA154 [87FR40300].  Because Grayscale asserted that surveillance-sharing arrangements between NYSE Arca and the CME are sufficient to detect and deter fraud affecting Grayscale's spot ETP, the putative effect of the listing and trading of Grayscale shares "on *prices* in the *CME bitcoin futures market*," JA167 [87FR40313], is the relevant inquiry.  But Grayscale never addressed that effect.  Instead, Grayscale provided only backward-looking market data about inflows into its Trust without

---

[30] Grayscale does not here dispute that spot bitcoin is subject to various risks of fraud and manipulation.  *See supra* at 21–23.

"contemplat[ing] what may happen if the Trust converts to an ETP."  JA167–168 [87FR40313–14].  Grayscale also provided "no information on the impact of … the Trust's trading volume on the CME bitcoin futures market (let alone, on the CME bitcoin futures market's prices)."  JA168 [87FR40314].

Grayscale also fails to account adequately for differences in how the futures and spot markets have developed.  As the Commission explained, in 2021 three CME bitcoin futures ETPs began trading under the 1940 Investment Company Act.  As of March 2022, those three ETPs had approximately $1.39 billion in assets under management, without any observable disruptions to the market for CME bitcoin futures.  Teucrium Order, 87FR21681.  Thus, there was little reason, at the time the Commission was considering the Teucrium and Valkyrie XBTO futures products, to require a projection of inflows into the proposed futures ETPs; there was already an observable market history demonstrating that the introduction of new futures ETPs was unlikely to be the predominant influence on prices in the underlying CME futures market.

Because there are currently no purely spot-based bitcoin products registered under the 1940 Act and trading on an exchange, *see supra* note 13, no similar comparison to spot-market instruments is possible.  And market-predominance concerns are *more* acute with respect to Grayscale's proposed product, "a *single* bitcoin ETP with trading volume close to one-quarter that of the CME bitcoin

futures market" as to which "[t]here is no limit on the amount of mined bitcoins that the Trust may hold."  JA167–168 [87FR40313–14].  Far from arbitrarily different treatment (Br. 39), the Commission's conclusions as to futures versus spot ETPs in this context reasonably account for different factual records and divergent market history.

### C.    Grayscale's focus on the effect of spot-bitcoin pricing data on bitcoin futures misstates key market mechanics and is inapposite.

Finally, Grayscale repeats an argument it made before the Commission regarding the effect of spot-bitcoin pricing on futures markets (Br. 29)—namely, that "because of the 'almost complete overlap' between the spot platforms whose prices are used to calculate the [Bitcoin Reference Rate] and the Index, bitcoin futures ETFs/ETPs and the proposed ETP are subject to the 'same risks relating to pricing data quality.'"  JA171 [87FR40317].  The Commission explained at length why this logic is both "flawed," *id.*, and, in any event, does not address the concerns underlying the significant-market framework.  *See supra* at 30–32.

The Index—a proprietary calculation administered by CoinDesk Indices and "used by the Trust to determine the value of its bitcoin assets" (JA161 [87FR40307]; *see also* JA177 [Amendment 1, 87FR28044])—has no direct bearing on the actual price that retail investors would pay for ETP shares in the secondary market.  JA171 [87FR40317].  Likewise, the Bitcoin Reference Rate is simply "a once-a-day reference rate of the U.S. dollar price of one bitcoin as of

4 p.m., London time." *Id.* While it "is used to value the final cash settlement of CME bitcoin futures contracts, it is not generally used for daily cash settlement of such contracts, nor is it claimed to be used for any intra-day trading of such contracts." *Id.*; *see also supra* at 24–26, 30–32.

Grayscale's claims of error in the Commission's assessment of the relationship between the Index and the Bitcoin Reference Rate are unpersuasive. *First*, Grayscale incorrectly asserts that, in the Teucrium Order, the Commission somehow conceded that the Bitcoin Reference Rate is used to price futures-based ETPs (Br. 29), but rejected that connection here. Although the Commission acknowledged that "the final settlement value for each [CME bitcoin futures] contract is based on the CME CF Bitcoin Reference Rate," Teucrium Order, 87FR21676, it recognized that the price of shares for investors in a futures-based ETP is not perfectly tethered to the final settlement value of one or more of its constituent CME futures contracts. That is because "CME bitcoin futures ETFs/ETPs do not hold their CME bitcoin futures contracts to final cash settlement; rather, the contracts are rolled prior to their settlement dates." JA171 [87FR40317]. Likewise, "shares of CME bitcoin futures ETFs/ETPs trade in secondary markets, and there is no evidence in the record for this filing that such

47

intra-day, secondary market trading prices are determined by the [Bitcoin Reference Rate]." *Id.*[31]

*Second*, Grayscale insists that the Index would, in practice, help determine the price of shares in the ETP because the Index would be used to calculate both the value of the Trust's assets and "an intra-day indicative value … per Share" that, when published, would allow "market participants … to capitalize on arbitrage opportunities." Br. 30. But if the possibility of arbitrage were sufficient to satisfy the Exchange Act's requirements regarding prevention of "fraudulent and manipulative acts and practices," 15 U.S.C. 78f(b)(5), then there would be little need to surveil markets involving derivative-type products at all. Such a view contradicts the Commission's long and consistent history of focusing on adequate surveillance measures in approving such products, even as to easily arbitraged instruments like equity options on stocks. JA160–161 [87FR40306–07].

*Third*, Grayscale incorrectly argues that the Commission erred by failing to explain why it mattered that the collection of spot-trading platforms which contribute to the Bitcoin Reference Rate is different from those that contribute to

---

[31] It is true that the Bitcoin Reference Rate contributes to the Net Asset Value figure used in setting the price for creation and redemption baskets of Teucrium shares. Teucrium Order, 87FR21677. But the price of a creation or redemption basket is not the same thing as the market-based price of a tradeable share of the ETP itself. *See supra* note 8.

the Index.  Br. 31.  But the Commission's accurate statement was one of several,

separately articulated reasons the Commission identified for its finding that,

despite the similarities between the Index and the Rate, the argument that "bitcoin

futures ETFs/ETPs and the proposed ETP are subject to the 'same risks relating to

pricing data quality'" was "flawed."  JA171 [87FR40317].  In the aggregate, *see*

JA172–173 [87FR40318–19] (summarized *supra* at 30–32), those reasons

adequately explain why the Commission rejected Grayscale's contentions.

## II. The Commission reasonably interpreted the Exchange Act by focusing on adequate surveillance when evaluating proposed bitcoin ETPs.

Grayscale's argument that the Commission's significant-market framework

impermissibly departs from the text of the Exchange Act fails because Grayscale

has not shown that the Exchange Act "unambiguously forecloses" the

Commission's interpretation.  V*ill. of Barrington v. Surface Transp. Bd.*, 636 F.3d

650, 661 (D.C. Cir. 2011).  To the contrary, the Commission's emphasis on robust

antifraud measures reasonably and consistently applies the governing statutory

standards.

Sections 19 and 6(b) of the Exchange Act require the Commission, when

evaluating an SRO's proposed rule change, to consider among other criteria

whether the rule is "designed to prevent fraudulent and manipulative acts and

practices, to promote just and equitable principles of trade," and "to protect

investors and the public interest."  15 U.S.C. 78f(b)(5); *see also* 15 U.S.C.

49

78s(b)(2)(C).  And the assessment of whether NYSE Arca "has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets," JA154 [87FR40300], provides an "analytical framework for assessing compliance with the requirements of Exchange Act," JA172 [87FR40318].  While "surveillance-sharing agreements are not the exclusive means by which a listing exchange of a commodity-[based] ETP can meet its obligations under Exchange Act Section 6(b)(5)," JA154 [87FR40300], such agreements are an established method of detecting and deterring fraud and manipulation.

Nor is the Commission's focus on surveillance-sharing agreements unique to bitcoin.  Rather, it is consistent with over three decades of agency practice.[32] Indeed, in recently approving the first ETP relating to futures on dry bulk shipping,[33] the Commission observed that "the listing exchange had represented that 'the Freight Futures trade on well-established, regulated markets that are members of the [Intermarket Surveillance Group]' and found that the exchange

---

[32] *See supra* note 9 (orders regarding commodities-futures ETPs); *supra* note 11 (orders regarding surveillance-sharing arrangements); *supra* note 12 (orders regarding commodity-trust ETPs).

[33] "Dry bulk carriers are ships that have cargo loaded directly into the ship's storage holds" and carry cargo like iron ore, coal, and grains.  82FR61628. "[F]reight futures are financial futures contracts that allow … [for] hedg[ing] against the volatility of freight rates."  *Id.*

would be able to 'share surveillance information with a significant regulated market for trading futures on dry bulk freight.'" GraniteShares Order, 83FR43930 n.87 (quoting Dry Bulk Shipping Order, 82FR61633).

Grayscale ignores the eight historical precedents involving surveillance-sharing agreements from the period between 1989 and 1998 (*see supra* note 11), instead questioning whether the Commission truly focused on adequate surveillance when approving commodity-trust ETPs starting in 2004. Br. 45–46. In particular, Grayscale focuses on the order approving the first commodity-trust ETP, which holds gold. *See* 69 Fed. Reg. 64614 (Nov. 5, 2004) ("Gold Order"). But the Commission there reiterated that "[i]nformation sharing agreements with markets trading securities underlying a derivative are an important part of a self-regulatory organization's ability to monitor for trading abuses in derivative products." *Id.* at 64619. Thus, far from illustrating some radical departure, the Gold Order "demonstrates that the Commission did take into account the availability of surveillance-sharing agreements in approving the first commodity-trust ETP." Winklevoss Order, 83FR37594; *see also id.* ("[T]he Commission's approval of the first precious metal ETP expressly relied on an agreement to share surveillance information between the listing exchange and a significant, regulated market for gold futures.").

The Gold Order also underscored the importance of various information-sharing measures, including a Memorandum of Understanding with a major gold futures market and requirements adopted by the listing exchange to share information regarding trading in physical gold and gold futures contracts.  Gold Order, 69FR64619.  While Grayscale now attempts to rely on a purported equivalency between the 2004 market for gold futures (which had existed for decades) and the current, newer market for bitcoin futures, Grayscale has not demonstrated that antifraud measures in those two markets are of comparable effectiveness in detecting fraud in the spot market.

Grayscale's additional citations (Br. 46 n.9) to other commodity-trust orders are similarly unpersuasive.  The Commission canvassed these orders and identified specific information, either in the notices of proposed rule changes or the approval orders, which led it to conclude that there were adequate surveillance measures in place.  *See* Winklevoss Order, 83FR37592–93 n.202; SolidX Order, 82FR16254–55 n.125; *see also supra* note 12 (collecting notices and approval orders for commodity-trust ETPs).[34]

---

[34] To take one example, Grayscale cites a 2012 copper order, 77 Fed. Reg. 75468 (Dec. 20, 2012), while failing to note the existence of surveillance arrangements between the listing exchange and the London Metal Exchange which covered "trading in copper derivatives (as well as copper)," *id.* at 75468 n.15.  *Cf.* Winklevoss Order, 83FR37595 (rejecting similar arguments).

Grayscale also criticizes the Commission's significant-market framework as "vague" and "indecisive" (Br. 51), but Grayscale's preferred *ad hoc* approach to bitcoin products would provide far less guidance.  If the Commission had not articulated a consistent analytical framework, each proposed ETP would be assessed in isolation based solely on free-floating notions about whether its approval would "prevent fraudulent and manipulative acts and practices." 15 U.S.C. 78f(b)(5).  The Commission's structured (and thus more predictable) framework promotes reasoned decision-making and is consistent with the Exchange Act.

While Grayscale claims that the Commission's standard is "illusory" and "impossible" to meet, Br. 50–52, the history of futures-based ETPs proves precisely the opposite.  When initially considering bitcoin futures ETPs in August 2018, the Commission disapproved the listing of such instruments in part because bitcoin futures markets were undeveloped and there was "insufficient evidence to determine that [those] markets [were] markets of significant size."  ProShares Order, 83FR43940.  But after four years of market development, the Commission concluded that the CME market for bitcoin futures had become a market of significant size related to CME bitcoin futures contracts—the assets underlying the futures-based ETPs—adequate to provide the fraud-detection function for such

53

futures-based ETPs contemplated by the surveillance-sharing-agreement framework. Teucrium Order, 87FR21681.

Moreover, the Commission has acknowledged that "if a listing exchange could establish that the underlying market inherently possesses a unique resistance to manipulation beyond the protections that are utilized by traditional commodity or securities markets, the listing market would not necessarily need to enter into a surveillance-sharing agreement with a regulated significant market." JA155–156 [87FR40301–02]; *see also* JA163 [87FR40309] (NYSE Arca has not demonstrated that the "level of oversight" by the CFTC over spot bitcoin trading platforms is "*sufficient to dispense with* the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.") (emphasis added).

Grayscale challenges this alternative path by claiming that new antifraud tools that are *equally* as effective as traditional market surveillance ought to be sufficient. Br. 9, 51. But Grayscale has never shown that the effectiveness of its alternative antifraud measures would, in fact, be "similar to" (Br. 49) traditional surveillance-sharing agreements. Likewise, Grayscale repeats its assertion that the Index it uses to value assets in the Trust is a sufficiently robust antifraud tool to forgo an adequate surveillance-sharing agreement. Br. 53. But the Commission addressed, in detail, why that is not so. JA162–164 [87FR40308–10]; *see also*

54

*supra* at 24–26, 30–32.  To the extent that Grayscale is simply propounding an alternative understanding of what degree of fraud prevention is sufficient under the Exchange Act, the Commission's interpretation merits deference.  *Cf. NetCoalition*, 615 F.3d at 534 (applying *Chevron* deference in the context of an SRO's proposed rule change).

Grayscale also complains about the Commission using words like "novel" and "unique" to describe alternative means to resist fraud and manipulation that would justify dispensing with surveillance-sharing agreements.  Br. 51.  But these formulations arose because proponents of bitcoin ETPs sought to demonstrate—*in their own words*—that bitcoin's "novel" properties made it "uniquely" resistant to fraud, such that traditional surveillance-sharing arrangements were unnecessary.  *See* Winklevoss Order, 83FR37580 & n.15 (quoting comments from the Bats BZX Exchange); *see also* JA170 n.201 [87FR40316 n.201].

## III.   The Commission acted reasonably under the Exchange Act by disapproving the proposed rule change.

Finally, Grayscale ignores the Exchange Act's express requirement in arguing (Br. 52–55) that its proposed ETP is sufficiently beneficial to investors that the statute compels its approval notwithstanding the lack of support for a finding that the proposed rule change is designed to prevent fraudulent and manipulative acts and practices.

As this Court has recognized, Section 19 of the Exchange Act provides that "[t]he Commission shall disapprove a proposed rule change of [an SRO] if [the Commission] does not make a finding" that "such proposed rule change is consistent with the requirements of" the Exchange Act. *Susquehanna*, 866 F.3d at 448 (quoting 15 U.S.C. 78s(b)(2)(C)). And the language of Section 6 of the Exchange Act is mandatory. If the Commission does not find that a proposed rule is consistent with "the requirement under Section 6(b)(5) that the rules of a national securities exchange be designed to prevent fraudulent and manipulative acts and practices … it must disapprove the filing." JA175 [87FR40321].

Grayscale also argues that the Exchange Act's directive to "perfect the mechanism of a free and open market," 15 U.S.C. 78f(b)(5), compels approval of its product because other bitcoin investment vehicles, like its current over-the-counter offering and bitcoin futures, can be "cumbersome" or "riskier" than spot bitcoin. Br. 54. But Section 19 does not establish a balancing test or permit the Commission to ignore one statutory directive in the purported service of another. If the Commission is unable to find that a proposal is consistent with Section 6(b)(5), Section 19 requires disapproval. The Commission's focus on the prevention of fraud and manipulation in the securities markets is also fully consistent with Congress's more general commands. *See* 15 U.S.C. 78b(3) (directing that the Commission should concern itself with "susceptibility" of prices

56

of securities on securities exchanges to "manipulation").  Congress enacted the

Exchange Act largely "for the purpose of avoiding frauds," *Affiliated Ute Citizens*

*of Utah v. United States*, 406 U.S. 128, 151 (1972), and the Supreme Court has

said that the "SEC's very purpose" is to detect and mitigate fraud, *Gabelli v. SEC*,

568 U.S. 442, 451 (2013).  *See* Grayscale Order, JA175 n.255 [87FR40321 n.255]

(citing these cases).

      Grayscale and *amici* proffer other policy arguments in favor of approval, but

they do not show any error by the Commission.  For example, several parties focus

on the discount at which Grayscale's over-the-counter shares currently trade

relative to the Trust's net asset value.  *See* NYSE Arca Br. 23–24.  But the

Commission explained that, even assuming that to be true, these policy arguments

do not provide a basis for ignoring the statutory findings it was required to make.

JA175 [87FR40321].

      Likewise, Coinbase champions the value of private-sector market

surveillance adopted voluntarily by unregulated spot-trading platforms and asserts

that "the largest players in the Bitcoin market" have investors' best interests at

heart.  Coinbase Br. 12.  But Congress passed the securities laws on the premise

that voluntary regulation is not always sufficient.  *Cf. SEC v. Cap. Gains Rsch.*

*Bureau, Inc.*, 375 U.S. 180, 186–87 (1963) ("It requires but little appreciation … of

what happened in this country during the 1920's and 1930's to realize how

57

essential it is that the highest ethical standards prevail' in every facet of the securities industry." (quoting *Silver v. NYSE*, 373 U.S. 341, 366 (1963))). In any event, the Commission reasonably concluded that these entirely voluntary measures, which could be discontinued, are not a substitute for surveillance sharing, are materially weaker than requirements imposed on national securities exchanges, and are an insufficient basis to conclude that the proposal satisfies the statutory standard for approval. JA162–163 [87FR40308–09].

Finally, Grayscale wrongly surmises that the Commission has disapproved its proposed ETP because it is simply skeptical of the wisdom of investing in bitcoin. Br. 55. But the Commission has consistently explained that its decisions in bitcoin ETP cases do not involve "an assessment of whether bitcoin, or blockchain technology more generally, has utility or value as an innovation or an investment." JA172 n.227 [87FR40318], citing Winklevoss Order, 83FR37580. To the extent it has addressed the riskiness of bitcoin itself, the Commission has done so only in response to arguments that bitcoin is uniquely resistant to fraud. JA170 nn.201–02 [87FR40316 nn.201–02]; JA172 n.227 [87FR40318 n.227]. The Commission is bound to evaluate proposed ETPs by applying the statutory factors as Congress directs, and it has repeatedly explained that its focus is on adequate market surveillance. And investors who wish to invest in bitcoin-related products (including spot bitcoin itself) continue to have other avenues to do so.

58

*     *     *

The Commission's data- and fact-based consideration of bitcoin-related products is faithful to the statutory standards set forth by Congress.[35]  Bitcoin markets are rapidly evolving, and the situation facing regulators is dynamic.  The Commission explained in 2017 that, "[o]ver time, regulated bitcoin-related markets may continue to grow and develop" such that a listing exchange could "demonstrate in a proposed rule change that it will be able to address the risk of fraud and manipulation by sharing surveillance information with a regulated market of significant size related to bitcoin, as well as, where appropriate, with the spot markets underlying relevant bitcoin derivatives."  Winklevoss Order, 83FR37580.  That has happened for bitcoin futures ETPs, and it may happen one day for spot instruments like Grayscale's proposed product.  But the Commission reasonably concluded based on the record in this case that the proposal did not meet the statutory standards for approval.

---

[35] Contrary to the Chamber of Commerce's argument, Br. 14–24, "[a]gencies do not ordinarily have to regulate a particular area all at once," *Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.*, 10 F.4th 869, 875 (D.C. Cir. 2021), and "agencies are entitled, just as courts, to proceed case by case," *McClatchy Newspapers, Inc. v. NLRB*, 131 F.3d 1026, 1035 (D.C. Cir. 1997).

59

**Conclusion**

The Court should deny the petition for review.

Respectfully submitted,

/s/  Emily True Parise

MEGAN BARBERO
General Counsel

EMILY TRUE PARISE
Senior Appellate Counsel

MICHAEL A. CONLEY
Solicitor

DANIEL T. YOUNG
Attorney

TRACEY A. HARDIN
Assistant General Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549

DAVID D. LISITZA
Senior Appellate Counsel

(202) 551-5169 (Parise)
parisee@sec.gov

February 3, 2023

60

**Certificate of Compliance**

I certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,868 words, excluding the parts of the brief exempted from the word count by Federal Rule of Appellate Procedure 32(f) and this Court's Rule 32(e)(1).

I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman.

/s/ Emily True Parise
EMILY TRUE PARISE

Dated: February 3, 2023

**CERTIFICATE OF SERVICE**

I certify that on February 3, 2023, I filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system.  All parties and counsel of record were served with copies of this brief on the same date through the Court's CM/ECF system.

/s/ Emily True Parise
EMILY TRUE PARISE