**ORAL ARGUMENT SCHEDULED MARCH 7, 2023**

**No. 22-1142**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

GRAYSCALE INVESTMENTS, LLC,
Petitioner

v.

SECURITIES AND EXCHANGE COMMISSION,
Respondent

On Petition for Review of an Order of the
Securities and Exchange Commission

**FINAL BRIEF OF PETITIONER GRAYSCALE INVESTMENTS, LLC**

Paul S. Mishkin
Joseph A. Hall
Daniel J. Schwartz
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
Paul.Mishkin@davispolk.com

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Sarah E. Weiner
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW,
  Suite 500E
Washington, DC 20001-5369
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Petitioner*

February 3, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and amici

Petitioner is Grayscale Investments, LLC, sponsor of Grayscale Bitcoin Trust (BTC).  Respondent is the Securities and Exchange Commission.  There are currently no amici or intervenors in this Court.

### B.    Rulings under review

The ruling under review is the Securities and Exchange Commission's June 29, 2022 final order titled Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to List and Trade Shares of Grayscale Bitcoin Trust Under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares), Release No. 34-95180, 87 Fed. Reg. 40299 (July 6, 2022).

### C.    Related cases

This case has not previously been before this or any other Court.  Petitioner's counsel are unaware of any related cases pending before this or any other Court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, petitioner Grayscale Investments, LLC, states as follows:

Grayscale Investments, LLC ("Grayscale") is the world's largest digital currency asset manager and the sponsor of Grayscale Bitcoin Trust (BTC) (OTCQX: GBTC).  Grayscale is a wholly owned subsidiary of Digital Currency Group, Inc. No publicly held company has a 10% or greater ownership interest in Grayscale.

Dated:  February 3, 2023                    */s/ Donald B. Verrilli, Jr.*
                                             Donald B. Verrilli, Jr.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF CONTENTS ................................................................ iii

TABLE OF AUTHORITIES ............................................................ v

GLOSSARY OF ABBREVIATIONS .................................................. ix

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ..................................................... 3

STATEMENT OF ISSUES ............................................................. 4

STATUTES AND REGULATIONS .................................................... 4

STATEMENT OF THE CASE .......................................................... 4

STANDARD OF REVIEW .............................................................. 19

SUMMARY OF ARGUMENT .......................................................... 19

STANDING ............................................................................... 22

ARGUMENT .............................................................................. 23

I.      THE COMMISSION HAS ARBITRARILY TREATED A
        PROPOSED SPOT BITCOIN ETP DIFFERENTLY THAN IT
        TREATS SIMILARLY SITUATED BITCOIN FUTURES ETPS ............. 23

        A.      The Commission Arbitrarily Determined That the Proposed
                Rule Change Was Not Designed To Prevent Fraud and
                Manipulation, Even Though the Bitcoin Futures ETPs That the
                Commission Has Approved Are Exposed to Exactly the Same
                Risks of Fraud and Manipulation as the Trust's Proposed Spot
                Bitcoin ETP ...................................................................... 24

                1.      Bitcoin Futures ETPs Are Exposed To The Same Risks
                        of Fraud and Manipulation in the Spot Bitcoin Market as
                        the Trust's Proposed Spot Bitcoin ETP ............................ 24

                2.      The Order Offers No Reasoned Explanation for its
                        Discriminatory Treatment of the Trust ............................ 28

**TABLE OF CONTENTS**
**(continued)**

Page

B.   The Commission Arbitrarily Relaxed the Significant-Market Test for the Benefit of Bitcoin Futures ETPs But Not For the Trust's Proposed Spot Bitcoin ETP ..................................................34

II.   THE COMMISSION UNLAWFULLY DISAPPROVED THE RULE CHANGE BASED ON APPLICATION OF AN ARBITRARY, EXTRATEXTUAL REQUIREMENT .........................................................40

A.   The Commission Has Refused to Approve a Bitcoin-Related Proposed Rule Change Unless the Commission Deems The Significant-Market Test Satisfied........................................................40

B.   The Commission's Exclusive Focus on the Existence of a Surveillance-Sharing Agreement That Meets the Significant-Market Test Violates the Exchange Act...............................................44

C.   The Commission's Test For Establishing that the Exchange's Rules Are Designed To Prevent Fraud Is Unreasoned and Arbitrary ...............................................................................................48

III.   THE EXCHANGE'S PROPOSAL IS DESIGNED TO PREVENT FRAUD AND MANIPULATION AND TO PROTECT INVESTORS AND THE PUBLIC INTEREST...................................................................52

CONCLUSION ....................................................................................56

CERTIFICATE OF COMPLIANCE ....................................................57

CERTIFICATE OF SERVICE .............................................................58

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*All. for Cannabis Therapeutics v. DEA*,
  930 F.2d 936 (D.C. Cir. 1991) ..................................................................51

*Am. Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008) ..................................................................49

*Anglers Conservation Network v. Pritzker*,
  809 F.3d 664 (D.C. Cir. 2016) ..................................................................44

*ANR Storage Co. v. FERC*,
  904 F.3d 1020 (D.C. Cir. 2018) ................................................................29

*Baltimore Gas & Elec. Co. v. FERC*,
  954 F.3d 279 (D.C. Cir. 2020) ..............................................28, 29, 39, 51

*Bus. Roundtable v. SEC*,
  905 F.2d 406 (D.C. Cir. 1990) ..................................................................44

*Carpenters Indus. Council v. Zinke*,
  854 F.3d 1 (D.C. Cir. 2017) ......................................................................23

*Cnty. of Los Angeles v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999) ................................................................31

*Colorado Interstate Gas Co. v. FERC*,
  146 F.3d 889 (D.C. Cir. 1998) ..................................................................39

*Eckstein v. Balcor Film Invs.*,
  8 F.3d 1121 (7th Cir. 1993) ......................................................................48

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..................................................................................50

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
  613 F.3d 1112 (D.C. Cir. 2010) ................................................................50

*Louisiana Energy v. FERC*,
  141 F.3d 364 (D.C. Cir. 1998) ..................................................................23

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Louisiana PSC v. FCC,*
476 U.S. 355 (1986)...........................................................................44

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)...........................................................................23

*Malack v. BDO Seidman, LLP,*
617 F.3d 743 (3d Cir. 2010) .......................................................48, 55

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983)..............................................................................31

*Rapoport v. SEC,*
682 F.3d 98 (D.C. Cir. 2012)...............................................................51

*U.S. Telecom Ass'n v. FCC,*
227 F.3d 450 (D.C. Cir. 2000)..............................................................48

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014).............................................................................47

*\*W. Deptford Energy, LLC v. FERC,*
766 F.3d 10 (D.C. Cir. 2014).........................................................30, 35

*\*Westar Energy, Inc. v. FERC,*
473 F.3d 1239 (D.C. Cir. 2007).................................................1, 23, 39

*Woodhull Freedom Found. v. United States,*
948 F.3d 363 (D.C. Cir. 2020)..............................................................23

FEDERAL STATUTES

5 U.S.C. § 706................................................................................19, 44

15 U.S.C. § 78c(a).............................................................................6, 7

15 U.S.C. § 78e........................................................................................7

\*15 U.S.C. § 78f.........................2, 4, 7, 8, 17, 22, 28, 34, 39, 40, 41, 47, 49, 52, 54

15 U.S.C. § 78s ...............................................1, 4, 7, 24, 40, 42, 44, 47

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

15 U.S.C. § 78y(a) ...................................................................................4

**FEDERAL REGULATIONS AND OTHER FEDERAL REGULATORY AUTHORITIES**

17 C.F.R. § 240.19b-4 ..............................................................................7

17 C.F.R. § 270.6c-11 ..............................................................................7

74 Fed. Reg. 68886 (Dec. 29, 2009) ......................................................46

75 Fed. Reg. 62615 (Oct. 12, 2010) .......................................................46

75 Fed. Reg. 69494 (Nov. 12, 2010) ......................................................46

77 Fed. Reg. 75468 (Dec. 20, 2012) ......................................................46

82 Fed. Reg. 16247 (Apr. 3, 2017) .........................................................11

83 Fed. Reg. 37579 (Aug. 1, 2018).....................................8, 9, 11, 43, 50

83 Fed. Reg. 43923 (Aug. 28, 2018) ......................................................43

85 Fed. Reg. 12595 (Mar. 3, 2020) ........................................................11

86 Fed. Reg. 61804 (Nov. 8, 2021).........................................................12

86 Fed. Reg. 64539 (Nov. 18, 2021) ................................11, 15, 31, 42

87 Fed. Reg. 14932 (Mar. 16, 2022).......................................................11

*87 Fed. Reg. 21676 (Apr. 12, 2022) ..........................8, 9, 10, 11, 24, 25,
                                               27, 29, 33, 35, 36, 37, 38

*87 Fed. Reg. 28043 (May 10, 2022)5, 12, 13, 14, 15, 16, 25, 26, 30, 38, 42, 52, 53

*87 Fed. Reg. 28848 (May 11, 2022) ................................ 11, 25, 27, 35, 36, 38, 43

87 Fed. Reg. 33548 (June 2, 2022) .........................................................11

87 Fed. Reg. 40282 (July 6, 2022).........................................................11

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*87 Fed. Reg. 40299 (July 6, 2022)................................... 4, 6, 8, 9, 14, 17, 18, 19,
................................................................. 24, 26, 29, 30, 31, 32, 33,
................................................................. 35, 36, 37, 38, 39, 40, 41, 42, 43, 44
................................................................. 46, 47, 49, 50, 51, 54

*Exchange-Traded Funds,
2019 WL 4727253 (SEC Sept. 25, 2019) .................................6, 28, 30

## OTHER AUTHORITIES

CFTC, *Bitcoin Basics*, https://www.cftc.gov/sites/default/files/2019-
12/oceo_bitcoinbasics0218.pdf; .............................................5

Chamber of Digital Commerce, *The Crypto Conundrum: Why Won't
the SEC Approve a Bitcoin ETF?* (Sept. 2022) ................................11, 46, 48, 54

CME, CFTC Regulation 40.2(a) Certification (Dec. 1, 2017),
https://www.cftc.gov/sites/default/files/filings/ptc/17/12/ptc120117
cmedcm001.pdf.........................................................26

*CF Benckmarks: CME CF Cryptocurrency Pricing Products*, https://
docs-cfbenchmarks.s3.amazonaws.com/CME+CF+Constituent+
Exchanges.pdf.........................................................25

FINRA, *Exchange-Traded Funds*, https://www.finra.org/investors/
learn-to-invest/types-investments/investment-funds/exchange-
traded-fund ...........................................................5

https://grayscale.com/products/grayscale-bitcoin-trust/ (visited Oct.
11, 2022) .............................................................13

https://tradeblock.com/markets/index/xbx (visited Oct. 11, 2022) .........................25

SEC Chair Gensler, *Prepared Remarks of Gary Gensler on Crypto
Markets Penn Law Capital Markets Association Annual
Conference* (Aug. 4, 2022), https://www.sec.gov/news/speech/
gensler-remarks-crypto-markets-040422...............................5

Statement of CFTC Commissioner Stump (Aug. 23, 2021),
https://www.cftc.gov/media/6306/DigitalAssetsAuthority
Infographic_CommStump082321/download ...................................52

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| Bitcoin Reference Rate | CME CF Bitcoin Reference Rate |
| CFTC | Commodity Futures Trading Commission |
| CME | Chicago Mercantile Exchange |
| Commission | Securities and Exchange Commission |
| ETF | Exchange-Traded Fund |
| ETP | Exchange-Traded Product |
| Exchange | NYSE Arca, Inc. |
| Exchange Act | The Securities Exchange Act of 1934 (codified at 15 U.S.C. § 78a *et seq.*) |
| FINRA | Financial Industry Regulatory Authority |
| Grayscale | Grayscale Investments, LLC |
| Index | CoinDesk Bitcoin Price Index |
| JA | Corrected Joint Appendix |
| NAV | Net Asset Value |
| Order | 87 Fed. Reg. 40299 (July 6, 2022) |
| Proposal | 87 Fed. Reg. 28043 (May 10, 2022) |
| SEC | Securities and Exchange Commission |

| | |
|---|---|
| Teucrium Futures ETP | Teucrium Bitcoin Futures Fund |
| Teucrium Order | 87 Fed. Reg. 21676 (Apr. 12, 2022) |
| Trust | Grayscale Bitcoin Trust |
| Valkyrie Futures ETP | Valkyrie XBTO Bitcoin Futures Fund |
| Valkyrie Order | 87 Fed. Reg. 28848 (May 11, 2022) |
| VanEck Order | 86 Fed. Reg. 64546 (Nov. 18, 2021) |
| Winklevoss Order | 83 Fed. Reg. 37579 (Aug. 1, 2018) |

## INTRODUCTION

"A fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). The order of the Securities and Exchange Commission at issue blatantly violates that fundamental norm.

Petitioner Grayscale Investments, LLC ("Grayscale") is the world's largest digital-currency asset manager and the sponsor of Grayscale Bitcoin Trust (symbol: GBTC) (the "Trust"), the world's largest bitcoin investment fund. The Trust has over $12 billion in assets under management, millions of dollars in daily trading volume, and more than 850,000 investor accounts. The Trust invests exclusively in bitcoin, and investors who purchase shares of the Trust gain exposure to bitcoin without the cost and complexity of purchasing the asset directly.

NYSE Arca, Inc. (the "Exchange") sought the Commission's approval to list shares of the Trust to be traded on the Exchange as an exchange-traded product ("ETP"). The Commission must grant such a proposal so long as the "proposed rule change is consistent with" the Securities Exchange Act of 1934 (the "Exchange Act"). 15 U.S.C. § 78s(b)(2)(C)(i). But the Commission rejected the proposal. The Commission found a risk of fraud and manipulation in the underlying spot bitcoin market and, on that basis, concluded that the proposal did not satisfy the requirement

that the Exchange's rules be "designed to prevent fraudulent and manipulative acts and practices." 15 U.S.C. § 78f(b)(5).

Just months earlier, however, the Commission had approved two separate proposals for ETPs that hold as assets bitcoin futures (a derivative of bitcoin), after finding that those ETPs did not present an unacceptable risk of susceptibility to fraud or manipulation. But the price of bitcoin futures is subject to the *identical* risk of fraud and manipulation as is the spot price of bitcoin. That is because bitcoin futures represent the market's prediction of future spot bitcoin prices, and prices in the bitcoin spot and futures markets align more than 99% of the time. If, as the Commission has concluded, bitcoin futures ETPs do not pose an unacceptably high risk of fraud and manipulation, then by definition neither do spot bitcoin ETPs. But the Commission has treated them as categorically different—a result that violates the bedrock requirements of the Administrative Procedure Act ("APA") as well as the express statutory command that a national securities exchange's rules not discriminate among securities issuers.

The Commission purported to justify that arbitrary discrimination on the ground that bitcoin futures trade on a secondary market, the Chicago Mercantile Exchange ("CME"), that shares market "surveillance" information with the national securities exchanges. But that is a distinction without a difference: the Commission acknowledged that bitcoin futures ETPs may be affected by fraud or manipulation

in non-CME markets, yet found the surveillance sharing between the CME and national securities exchanges sufficient to address such fraud or manipulation. In this case, the Commission has offered no coherent explanation why CME surveillance is sufficient to address the risk of non-CME fraud for bitcoin futures ETPs but insufficient to address the same risk for spot bitcoin ETPs. If any fraud were to occur in the spot bitcoin markets, it would equally affect bitcoin futures ETPs and spot bitcoin ETPs.

Although bitcoin may be a relatively new asset, the legal issue here is straightforward. The Commission has violated the APA's most basic requirements by failing to justify its vastly different treatment of bitcoin futures ETPs and spot bitcoin ETPs. Indeed, the Commission's decision is not merely discriminatory and unreasoned: it harms the 850,000 investors who own shares in the Trust. Given that the Commission did not approve the Trust to trade as an ETP on the Exchange, the value of its shares cannot closely track the value of the Trust's underlying bitcoin assets—depriving Trust shareholders of billions of dollars in value. There is simply no justification for continuing to inflict such serious investor harms.

## JURISDICTIONAL STATEMENT

This petition seeks review of an order of the Securities and Exchange Commission (the "Commission" or the "SEC"), issued on June 29, 2022, disapproving the Exchange's proposal to change its own rules to list and trade shares

of a proposed spot bitcoin ETP, Grayscale Bitcoin Trust (BTC).  *See* 15 U.S.C. § 78s(b); 87 Fed. Reg. 40299 (the "Order") (JA153).  Petitioner, which sponsors the Trust, filed a petition for review the day the Order issued.  *See* Pet. (JA148).  This Court has jurisdiction under 15 U.S.C. § 78y(a).

## STATEMENT OF ISSUES

1.   Whether the Order is arbitrary, capricious, creates "unfair discrimination between . . . issuers," 15 U.S.C. § 78f(b)(5), or is otherwise in excess of statutory authority because the Commission treats bitcoin futures exchange-traded products differently than spot bitcoin exchange-traded products without adequate justification.

2.   Whether the Order is arbitrary, capricious, creates unfair discrimination between issuers, or is otherwise in excess of statutory authority because the Commission disapproved the proposed rule change on the ground that the Exchange purportedly failed to satisfy the significant-market test, which is unmoored from the requirements established by the Exchange Act and is arbitrary and unreasonable.

## STATUTES AND REGULATIONS

Relevant statutes and regulations are set forth in the Addendum.

## STATEMENT OF THE CASE

1.   *Exchange-traded products*.  An exchange-traded product ("ETP") is an investment vehicle designed to track the value of an underlying asset such as a

security, commodity, or other financial instrument.[1]  ETPs provide a means to gain exposure to the assets held by an ETP without investing directly in those assets. Investors acquire an interest in an ETP by purchasing shares of the ETP.

Some ETPs acquire and hold commodities such as gold, wheat, or oil, while others invest in stocks and bonds.  Still other ETPs invest in "derivatives" of commodities, stocks, or bonds—that is, contracts with a value tied to the value of the underlying asset.  One type of derivative is a futures contract (or "future"), which creates an obligation to buy or sell an asset at a predetermined price at a fixed future date.

In the United States, futures contracts trade on commodities futures exchanges.  The largest such exchange is the Chicago Mercantile Exchange ("CME"), which trades futures contracts for all types of commodities—including bitcoin.[2]  A bitcoin is a digital "token[] of value" that can be "used to pay for goods and services, or . . . converted to fiat currencies, such as the U.S. dollar."  87 Fed. Reg. 28043, 28045 (May 10, 2022) (JA178).  Bitcoins are "issued and transferred

---

[1]  *See generally* FINRA, *Exchange-Traded Funds*, https://www.finra.org/ investors/learn-to-invest/types-investments/investment-funds/exchange-traded-fund.

[2]  *See* CFTC, *Bitcoin Basics*, https://www.cftc.gov/sites/default/files/2019-12/ oceo_bitcoinbasics0218.pdf; SEC Chair Gensler, *Prepared Remarks of Gary Gensler on Crypto Markets Penn Law Capital Markets Association Annual Conference* (Aug. 4, 2022), https://www.sec.gov/news/speech/gensler-remarks-crypto-markets-040422.

via a decentralized, open-source protocol used by a peer-to-peer computer network."
87 Fed. Reg. at 40300 n.10 (JA154). That protocol "governs the creation of new
bitcoins" and "secures and verifies bitcoin transactions." *Id.*

In general, the share price of an ETP closely tracks the value of the ETP's
holdings. If the price of one share of an ETP is lower or higher than the portion of
the ETP's assets attributable to that share—sometimes referred to as the ETP's "net
asset value per share" or simply "NAV per share"—then that mismatch invites
arbitrage. For instance, when the share price falls below the NAV per share, traders
can purchase shares of the ETP at a discount, and then "redeem" those shares for the
ETP's more valuable assets and sell those assets for a profit. *See* Exchange-Traded
Funds, 2019 WL 4727253, *5 (SEC Sept. 25, 2019). In the aggregate, such
purchases and redemptions move the price of the ETP's shares back into sync with
the price of the ETP's underlying assets.

2. *Statutory and regulatory background.* Shares of ETPs trade on national
securities exchanges like the Exchange, which are "self-regulatory organizations"
under the Exchange Act. 15 U.S.C. § 78c(a)(26). An exchange is generally not
permitted to list and trade shares of a new type of ETP without first changing its own

6

internal rules.  Such a rule change requires the Commission's approval.  *See* 15 U.S.C. §§ 78c(a)(1), 78e, 78f(a), 78s(b); 17 C.F.R. §§ 240.19b-4(a)(6), (c).[3]

The Exchange Act sets forth the standard that the Commission must apply in assessing an exchange's proposed rule change.  Under that statute, "[t]he Commission shall approve a proposed rule change of a self-regulatory organization if it finds that such proposed rule change is consistent with the requirements of" the Exchange Act.  15 U.S.C. § 78s(b)(2)(C)(i).  The Exchange Act provides that an exchange's rules must be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade . . . , to remove impediments to and perfect the mechanism of a free and open market," and "to protect investors and the public interest."  15 U.S.C. § 78f(b)(5).  The Exchange Act also provides that those rules must not be "designed to permit unfair discrimination between customers, issuers, brokers, or dealers."  *Id.*

The Commission has never promulgated a rule interpreting the Exchange Act's language regarding self-regulatory organizations' proposals to change their internal rules.  Instead, the Commission has approved or disapproved such proposed rule changes on a case-by-case basis.

---

[3] The Commission has approved "generic listing standards" allowing exchanges to list and trade, without a separate rule-change proposal, shares of any ETP registered under the Investment Company Act of 1940 ("1940 Act").  *See* 17 C.F.R. §§ 240.19b-4(c)(1), (e), 270.6c-11.

3. *Commission orders on bitcoin-related ETPs*. The Commission has approved a number of rule-change proposals for ETPs that invest in bitcoin futures ("bitcoin futures ETPs"). But the Commission has disapproved every rule-change proposal for ETPs that invest in bitcoin itself (known as "spot bitcoin ETPs" because bitcoin, like other commodities, trades on so-called "spot" markets).

a. *The "significant-market test."* In the context of bitcoin-related ETPs—and only bitcoin-related ETPs—the Commission has fashioned a specialized test to assess whether an exchange's proposal to list an ETP is "designed to prevent fraudulent and manipulative acts and practices." 15 U.S.C. § 78f(b)(5).

Under that test (the "significant-market test"), an exchange can demonstrate that a rule change is designed to prevent fraudulent and manipulative acts if the exchange has entered into "a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets." 87 Fed. Reg. 21676, 21677 (Apr. 12, 2022) ("Teucrium Order"); *see, e.g.*, 83 Fed. Reg. 37579, 37580 (Aug. 1, 2018) ("Winklevoss Order"). A surveillance-sharing agreement is an agreement whereby an exchange and another market share "information about market trading activity or clearing activity." 87 Fed. Reg. at 40308 (JA162). The Commission has defined a "market of significant size" as a market as to which (1) "there is a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully

8

manipulate the ETP," and (2) "it is unlikely that trading in the ETP would be the predominant influence on prices in that market."  Teucrium Order, 87 Fed. Reg. at 21678; *see, e.g.*, Winklevoss Order, 83 Fed. Reg. at 37594.  Thus, the ostensible premise of the significant-market test is that fraudulent or manipulative activity would be detected because such activity would necessarily take place on a market that is surveilled by the listing exchange via a surveillance-sharing agreement.

The Commission has stated that, if a surveillance-sharing agreement that meets the significant-market test does not exist, an exchange could conceivably satisfy the Exchange Act's requirements by establishing that "other means . . . will be sufficient to prevent fraudulent and manipulative acts and practices."  Teucrium Order, 87 Fed. Reg. at 21677 n.29; *see, e.g.*, Winklevoss Order, 83 Fed. Reg. at 37580.   But the Commission has made that exceedingly difficult, requiring "resistance to fraud and manipulation" in some "unique[]" and "inherent[]" way that is "novel and beyond those protections that exist in traditional . . . markets" so as to eliminate *any* risk of fraud or manipulation.   87 Fed. Reg. at 40302, 40309-10 (JA156, 163-164).

b. *Bitcoin futures ETPs*.  The Commission has twice approved rule-change proposals allowing listing of bitcoin futures ETPs.  Each holds bitcoin futures contracts that themselves trade on the CME.[4]

In April 2022, the Commission approved a proposal to change the Exchange's rules to permit listing and trading of the Teucrium Bitcoin Futures Fund ("Teucrium Futures ETP").  *See* Teucrium Order, 87 Fed. Reg. at 21678.  Relying on the fact that the Exchange and the CME share surveillance data, the Commission concluded that the Exchange's proposal satisfied the significant-market test—but, in applying the two prongs of that test, the Commission all but abandoned it.  *See id*.  At the first prong, the Commission determined that even though the Exchange had not demonstrated that someone attempting to manipulate the Teucrium Futures ETP would also have to trade on the underlying CME bitcoin futures market (because they could attempt to do so by trading on the spot bitcoin market or non-CME bitcoin futures markets), *id.* at 21680, the surveillance-sharing agreement nonetheless sufficed because the CME's "surveillance c[ould] reasonably be relied upon" to detect attempted manipulation of the proposed futures ETP through "trad[ing] outside . . . the CME bitcoin futures market," *id.* at 21679.  The Commission was

---

[4] Three bitcoin futures ETPs previously began trading on national securities exchanges.  Because those ETPs are registered under the 1940 Act, no specific Commission approval was necessary.  *See* note 3, *supra*.

thus unconcerned that the prices of bitcoin futures contracts could "themselves be[] influenced by activity in other bitcoin markets" such as spot bitcoin markets. *Id.* at 21680. And at the second prong, the Commission looked to only the *present* state of the CME bitcoin futures market in concluding that "it is unlikely that" *future* "trading in the proposed ETP would be the predominant influence on prices" in that market. *Id.* at 21680.

One month later, the Commission approved a Nasdaq rule change allowing the listing and trading of the Valkyrie XBTO Futures ETP ("Valkyrie Futures ETP"). *See* 87 Fed. Reg. 28848, 28848 (May 11, 2022) ("Valkyrie Order"). The Valkyrie Order tracked the reasoning of the Teucrium Order. *See, e.g.*, *id.* at 28851, 28853.

c. *Spot bitcoin ETPs.* In contrast, the Commission has rejected *every* proposal that an exchange has made for a rule change relating to a spot bitcoin ETP.[5] Accordingly, no such ETP is available on U.S. national securities exchanges—despite the fact that at least sixteen spot bitcoin ETPs are successfully trading on exchanges outside the United States, including in Canada and Europe. *See* Coinbase Ltr. 8 (JA27); Harvey Ltr. 1 (JA50); Chamber of Digital Commerce, *The Crypto*

---

[5] *See, e.g.*, 82 Fed. Reg. 16247 (Apr. 3, 2017); Winklevoss Order, 83 Fed. Reg. 37579; 85 Fed. Reg. 12595 (Mar. 3, 2020); 86 Fed. Reg. 64539 (Nov. 18, 2021); 87 Fed. Reg. 14932 (Mar. 16, 2022); 87 Fed. Reg. 33548 (June 2, 2022); 87 Fed. Reg. 40282 (July 6, 2022).

*Conundrum: Why Won't the SEC Approve a Bitcoin ETF?* 10, 12-14 (Sept. 2022) ("*Conundrum*").

4. *Request for rule change relating to Grayscale Bitcoin Trust*. The Order at issue here denied one of those proposals: the Exchange's proposal for a rule change to list and trade shares of the Trust that petitioner sponsors. *See* 87 Fed. Reg. 28043 (May 10, 2022) (JA176) ("Proposal").[6]

a. i. Although the market for bitcoin is deep and liquid, *see* Coinbase Ltr. 3-4 (JA22-23), direct bitcoin purchases can be cumbersome—requiring, among other things, that the purchaser take custody of the digital assets or find some other way to keep them secure. *E.g.*, Harvey Ltr. 1-2 (JA50-51). The Trust is "designed to provide investors with a cost-effective and convenient way to gain investment exposure to Bitcoin" while avoiding such difficulties. Proposal, 87 Fed. Reg. at 28045 (JA178).

The Trust is the world's largest bitcoin investment fund and invests solely in bitcoin. It has been trading since 2015. It holds 3.4% of all outstanding bitcoin, with $12.4 billion in assets under management, hundreds of millions of dollars in daily trading volume, and more than 850,000 investor accounts. *See* Attachment to

---

[6] *See also* 86 Fed. Reg. 61804 (Nov. 8, 2021) (original proposal). Because bitcoin is not considered a security under the 1940 Act, entities holding bitcoin are ineligible to register as investment companies under that Act, and generic listing standards do not apply. *See* notes 3-4, *supra*.

Sowerby Mem. 2 (JA113); https://grayscale.com/products/grayscale-bitcoin-trust/ (visited Oct. 11, 2022). Currently, shares of the Trust may be bought and sold only "over the counter," primarily on the OTCQX Best Market. Grayscale Ltr. 2 (JA6). Grayscale has voluntarily registered the Trust's shares under Exchange Act Section 12(g), and the Trust is subject to public-reporting requirements under Exchange Act Section 13. *See id.* at 5 (JA9).

Although publicly traded, the Trust is not an ETP because it does not have Commission approval to list and trade on a national securities exchange. The Trust is therefore unable to offer the continuous share redemptions and creations that are generally permissible for ETPs, with the result that the Trust's shares usually trade at discounts below or premiums above its net asset value. *See* p. 6, *supra*; *see also* Grayscale Ltr. 2 (JA6); Virtu Ltr. 2 (JA56). Because the Trust cannot be listed as an ETP, its shares currently trade at an approximately 30% discount to the value of the Trust's bitcoin—and because the Trust has approximately $12 billion in assets under management, that means that over $4 billion in value is being kept from existing U.S. investors. *See* https://grayscale.com/products/grayscale-bitcoin-trust/ (visited Oct. 11, 2022).

ii. The value of the Trust's bitcoin is calculated using an "index price"—that is, a "composite reference rate for the price of Bitcoin"—provided by the CoinDesk Bitcoin Price Index (the "Index"). Proposal, 87 Fed. Reg. at 28048 (JA181);

Grayscale Ltr. 5 (JA9).  The Index draws on data from various spot bitcoin markets to generate the index price.  Proposal, 87 Fed. Reg. at 28047-48, 28052 (JA180-181, 185).

The Index protects against fraud and manipulation in numerous ways.  It relies only on data from "U.S. Compliant Exchanges," which "are subject to federal and state reporting requirements of the U.S. Department of Treasury[]" and are policed by other U.S. regulatory regimes.  Proposal, 87 Fed. Reg. at 28052 (JA185).  Before a spot bitcoin market's data can be included in the Index, the market must show that it complies with anti-money laundering and know-your-customer regulations; reliably displays real-time price and volume information; meets trading-volume thresholds; charges trading fees to attach a "quantifiable cost to any manipulation attempts"; and meets additional stringent criteria.  *Id*. at 28048-49 (JA181-182).  To insulate the Index from "temporary price dislocations, . . . limited liquidity[,] or fraudulent activity," the Index's algorithm gives greater weight to spot bitcoin markets with greater liquidity, gives less weight to data points that diverge from other spot bitcoin markets, penalizes "stale" trading data, and excludes unexecuted trades.  *Id.* at 28049, 28053 (JA182, 186); *see* 87 Fed. Reg. at 40308 (JA162).  Empirical data demonstrates that the Index's methodology has insulated the Index from anomalistic pricing.  *See* Harvey Ltr. 4 (JA53).

b.  The Exchange's proposal to list and trade shares of the Trust explained why the Commission was required to approve that proposal.

The rule-change proposal observed that, because the values of bitcoin futures ETPs and spot bitcoin ETPs are both based on bitcoin's underlying price in the spot markets, it would be patently unreasonable to permit bitcoin futures ETPs to trade on national securities exchanges while blocking spot bitcoin ETPs.  Proposal, 87 Fed. Reg. at 28055 (JA188).  For instance, as the proposal explained, bitcoin futures ETPs are "priced by referencing the CME CF Bitcoin Reference Rate," which is derived from pricing data collected from spot bitcoin markets where bitcoin itself is traded—the exact same markets used to derive bitcoin's spot price.  *Id.*.  Thus, "any potential fraud or manipulation" in those underlying spot bitcoin markets would affect "both types of ETP proposals."  *Id.*; *see* Grayscale Ltr. 9 (JA13).  In other words, having decided that the risk of fraud or manipulation in those spot bitcoin markets did not create a risk sufficient to warrant disapproval of bitcoin futures ETPs, the Commission could not rationally conclude that the very same risks in the very same markets warranted disapproval of spot bitcoin ETPs.

As for the significant-market test, the proposal observed that the CME is a "regulated" market related to bitcoin with which the Exchange shares surveillance information.  Proposal, 87 Fed. Reg. at 28054 (JA187); *see, e.g.*, 86 Fed. Reg. 64546, 64546 (Nov. 18, 2021) ("VanEck Order").  Given "the significant size of the CME

futures market" and arbitrage opportunities, the proposal explained, there is "a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that [futures] market," and it is "unlikely that the [proposed] ETP would become the predominant influence on prices" in that market. Proposal, 87 Fed. Reg. at 28054 (JA187).

The proposal also explained that, in addition to satisfying the significant-market test, the unique features of the Index independently provide "a novel means to prevent fraud and manipulation." Proposal, 87 Fed. Reg. at 28051 (JA184). That is so because the Index's safeguards "offer[] protections beyond those that exist in traditional . . . markets." *Id.*

The Commission received more than 11,600 comment letters on the Exchange's rule-change proposal, with more than 99.9% favoring approval. Well-established experts in bitcoin market structure offered empirical data on the depth, liquidity, and transparency of that market; the strong correlation between bitcoin spot and futures prices; and the success of spot bitcoin ETPs in non-U.S. markets. *E.g.*, Coinbase Ltr. 3-4, 7-9 (JA22-23, 26-28); Whaley Ltr. 1-7 (JA137-143). Respected academics explained the advantages to investors of spot bitcoin ETPs over bitcoin futures ETPs; the Trust's ability to use the Index, among other mechanisms, to mitigate any manipulation; and the irrationality of approving bitcoin futures ETPs while disapproving spot bitcoin ETPs. *E.g.*, Angel Ltr. 5-9 (JA66-70);

Dezhbakhsh Ltr. 1-3 (JA102-104); Harvey Ltr. 2-4 (JA51-53); Redel Ltr. (JA105); Whaley Ltr. 1-7 (JA137-143).  Thousands of individual investors, asset managers, investment advisors, and market makers urged the Commission to approve the proposal.  *E.g.*, Flow Traders Ltr. (JA144); Fortress Ltr. (JA107); GTS Ltr. (JA146); Hunting Hill Ltr. (JA47); Horizon Kinetics Ltr. (JA59); Virtu Ltr. (JA55).

c.  In June 2022, just a few months after approving the Teucrium and Valkyrie bitcoin futures ETPs, the Commission disapproved the Exchange's proposal to list and trade shares of the Trust.  *See* 87 Fed. Reg. at 40299 (JA153).

The Commission rejected the Exchange's argument that, because bitcoin futures ETPs approved by the Commission are subject to the same risks of fraud and manipulation in the underlying bitcoin market as are spot bitcoin ETPs, the Commission could not rationally allow bitcoin futures ETPs to trade on national securities exchanges while disallowing spot bitcoin ETPs.  Despite the Exchange Act language focusing on the risk of fraud and manipulation, *see* 15 U.S.C. § 78f(b)(5), the Commission made the remarkable statement that "the Commission's consideration (and approval) of proposals to list and trade CME bitcoin futures ETPs, as well as the Commission's consideration (and thus far, disapproval) of proposals to list and trade spot bitcoin ETPs, *does not focus on an assessment of the overall risk of fraud and manipulation in the spot bitcoin or futures markets, or on the extent to which such risks are similar*."  87 Fed. Reg. at 40316 (JA170) (emphasis

17

added).  Instead, the Commission focused exclusively on the purported "necessity" of "a surveillance-sharing agreement" that meets the significant-market test, *id.* at 40316 n.202 (JA170)—although the Exchange Act says nothing about such agreements or about significant markets.

Applying that test, the Commission opined that the CME is not a "'market of significant size' related to spot bitcoin" and that the Exchange's surveillance-sharing agreement with the CME is therefore insufficient.  87 Fed. Reg. at 40311 (JA165). The Commission asserted that the Exchange had not explained why "a would-be manipulator would be reasonably likely to trade specifically on the CME bitcoin futures market rather than on unregulated bitcoin futures markets or other bitcoin derivatives markets."  *Id.* at 40312 (JA166).  The contrast with the Commission's orders approving bitcoin futures ETPs is notable; there, the Commission found the CME surveillance-sharing agreement sufficient to monitor fraud in those other markets.  The Commission also rejected the Exchange's contention that it is "unlikely that trading in the proposed ETP would be the predominant influence on prices in the CME bitcoin futures market," asserting that the Exchange's data did not reveal exactly how the Trust might later grow.  *Id.* at 40313-14 (JA167-168). Again, the contrast with the futures ETPs is pronounced; the Commission imposed no such requirement of quantifying projected growth when approving them.  *See id.*; p. 11, *supra*.

18

The Commission likewise rejected the argument that other means would ensure that after the proposed rule change the Exchange's rules would be designed to prevent fraud and manipulation. The Commission said that the Index methodology could not "*eliminate*[] the effect of manipulative activity on" spot bitcoin markets included in the Index and thus did not "constitute[] a novel means" to prevent fraud and manipulation. 87 Fed. Reg. at 40310 (JA164) (emphasis added).

## STANDARD OF REVIEW

The APA requires this Court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.

## SUMMARY OF ARGUMENT

The Commission's Order denying the Exchange's rule-change proposal to list and trade shares of the Trust is both arbitrary on its own terms and contrary to the Exchange Act's prohibition against discrimination among issuers. The Order therefore violates the APA.

First, the Commission has arbitrarily treated the proposed spot bitcoin ETP at issue here differently than the bitcoin futures ETPs that the Commission has previously approved. Potential fraudulent or manipulative activity in the spot bitcoin

market would directly affect the bitcoin futures market.  As to the bitcoin futures ETPs, the Commission necessarily determined that the risk of such fraud or manipulation was sufficiently low that the rule change approving those ETPs was adequately designed to prevent that activity, as the Exchange Act requires.  But a spot bitcoin ETP like the one proposed by the Trust faces exactly the same risk of fraud or manipulation in the spot bitcoin market as do the bitcoin futures ETPs, and such a spot bitcoin ETP has in place exactly the same kind of protections against that risk as the bitcoin futures ETPs do.  The Commission's conclusion that the risk is not so great as to prevent approval of bitcoin futures ETPs simply cannot be reconciled with its later conclusion that the same risk *is* too great to allow approval of a spot bitcoin ETP.  No reasoned basis for the disparity exists.

Even apart from that fundamental arbitrariness, the Commission has applied its own test for approval of bitcoin-related ETPs—the significant-market test—very differently to bitcoin futures ETPs than to the proposed spot bitcoin ETP in this case, without any reasoned explanation for the vast difference in treatment.  As to the futures ETPs, the Commission applied an exceedingly lax version of the test, essentially admitting that the test was not strictly satisfied but approving those ETPs anyway.  But in disapproving the proposed spot bitcoin ETP here, the Commission applied an exceedingly stringent version of the test—going so far as to make findings

that *directly* contradict findings that it made in its orders approving the bitcoin futures ETPs. That stark arbitrariness cannot be justified.

Second, the Commission's significant-market test is itself deeply flawed. The Commission relies exclusively on that test in the bitcoin context (and applies it nowhere else); although the Commission has stated that some "other means" might theoretically suffice, the Commission has set the bar so high in that regard that the promise of an alternative route to rule-change approval is illusory. But the significant-market test is unmoored from the text of the Exchange Act, which requires the Commission to assess whether an exchange's rules are designed to prevent fraud and manipulation—not to assess whether an exchange has entered into one *particular* kind of arrangement that may prevent fraud and manipulation. Indeed, the Commission's order in this case, which states in no uncertain terms that the Commission cares only about the significant-market test and not about the risk of fraud and manipulation, essentially admits that the Commission has left the statutory language behind.

In addition, even assuming that insistence on satisfaction of the significant-market test were within the Commission's statutory authority, the Commission has not explained why that test should be the exclusive focus of analysis. It would be difficult for the Commission to do so, given that the Commission has not applied

that test (or anything like it) in assessing rule-change proposals as to ETPs holding commodities other than bitcoin, such as gold.

The Commission thus went badly astray. Unreasonably fixating on the significant-market test, the Commission discounted considerable evidence that the rule change here *is* designed to prevent fraud and manipulation. And the Commission ignored the fact that the Exchange's proposal does the other things that the Exchange Act says *support* a rule change: avoids "discrimination" among issuers, "promote[s] just and equitable principles of trade, . . . remove[s] impediments to and perfect[s] the mechanism of a free and open market," and "protect[s] investors and the public interest." 15 U.S.C. § 78f(b)(5). For the more than 850,000 existing investors in the Trust, converting to a spot bitcoin ETP would unlock over $4 billion of value. In addition, a spot bitcoin ETP is at least as safe for investors as bitcoin futures ETPs—and also provides investors with advantages over a bitcoin futures ETP (or direct purchases of bitcoin), such as less complexity and lower costs. The Commission's arbitrary and unlawful order in this case therefore should be vacated.

## STANDING

As sponsor of the Trust, petitioner Grayscale suffers financial injury by reason of the Order. Some investors who would otherwise invest in the Trust do not do so because it is not listed on the Exchange. For instance, institutional U.S. investors

who seek the advantages of an ETP have access to spot bitcoin ETPs trading in Canada and other non-U.S. jurisdictions. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see also* Coinbase Ltr. 8 (JA27); Harvey Ltr. 1 (JA50).  And, by virtue of the Order, investors seeking to acquire shares of a bitcoin-based ETP on U.S. national securities exchanges can invest only in bitcoin futures ETPs.  *See Louisiana Energy v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998).  The Order blocks shares of the Trust's proposed spot bitcoin ETP from trading on the Exchange.  *See Woodhull Freedom Found. v. United States*, 948 F.3d 363, 374 (D.C. Cir. 2020).

## ARGUMENT

### I.  The Commission Has Arbitrarily Treated A Proposed Spot Bitcoin ETP Differently Than It Treats Similarly Situated Bitcoin Futures ETPs

"A fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy*, 473 F.3d at 1241.  The Commission violated that bedrock requirement.  First, the Commission denied the proposed rule change for a spot bitcoin ETP despite having recently approved several rule changes for bitcoin futures ETPs, even though the stated basis for that denial—a purported risk of fraud and manipulation in the bitcoin markets—applies equally to the bitcoin futures ETPs.  Second, the Commission denied the proposed rule change here on the ground that the relevant surveillance-sharing agreement failed to satisfy the significant-market test, while relieving similarly situated bitcoin futures ETPs of the need to

23

meet that test.  Both errors are classic APA violations, and they also unfairly discriminate among issuers in violation of the Exchange Act's terms.  Vacatur is warranted.

**A.    The Commission Arbitrarily Determined That the Proposed Rule Change Was Not Designed To Prevent Fraud and Manipulation, Even Though the Bitcoin Futures ETPs That the Commission Has Approved Are Exposed to Exactly the Same Risks of Fraud and Manipulation as the Trust's Proposed Spot Bitcoin ETP**

*1.    Bitcoin Futures ETPs Are Exposed To The Same Risks of Fraud and Manipulation in the Spot Bitcoin Market as the Trust's Proposed Spot Bitcoin ETP*

The Commission's statutory duty is to determine whether a "proposal to list and trade" shares of an ETP "is designed to prevent fraudulent and manipulative acts and practices."  Teucrium Order, 87 Fed. Reg. at 21677; *see* 87 Fed. Reg. at 40300 (JA154); 15 U.S.C. § 78s(b)(2)(C)(i).  When approving bitcoin futures ETPs, the Commission necessarily determined—as the Exchange Act requires—that the risk of fraud or manipulation in the spot bitcoin market (which bears directly on the price of bitcoin futures) was sufficiently low that bitcoin futures ETPs could be approved without creating unacceptable risks for investors.  But that risk is exactly the same for spot bitcoin ETPs like the one proposed by the Trust.  It was entirely arbitrary for the Commission to conclude that any such risk was no obstacle to approving bitcoin futures ETPs and then to reverse course and find the identical risk to be too great to allow approval of spot bitcoin ETPs.

24

The Trust and the approved bitcoin futures ETPs (the Teucrium and Valkyrie Futures ETPs) rely on nearly identical sets of spot-market bitcoin pricing data to calculate the value of their holdings. The Trust's bitcoin assets are valued using the CoinDesk Bitcoin Price Index, which computes a composite rate from bitcoin prices on various spot bitcoin markets. At the time of the Order, the four spot bitcoin markets included in the Index were Coinbase Pro, Bitstamp, Kraken, and LMAX Digital, and the same remains true today. *See* 87 Fed. Reg. at 28047 (JA180); https://tradeblock.com/markets/index/xbx (visited Oct. 11, 2022). The Teucrium Futures ETP, meanwhile, calculates its value "using the closing settlement prices of [futures contracts] listed on the CME." Teucrium Order, 87 Fed. Reg. at 21676. Those settlement prices are "based on the CME CF Bitcoin Reference Rate" (the "Bitcoin Reference Rate"), which "aggregates the trade flow of major bitcoin" spot markets "into a once-a-day reference rate of the U.S. dollar price of bitcoin." *Id.* at 21676 & n.17. The Valkyrie Futures ETP also uses the Bitcoin Reference Rate. *See* Valkyrie Order, 87 Fed. Reg. at 28848. As of May 2022, the Bitcoin Reference Rate includes *all* the spot bitcoin markets that are in the Index used to calculate the value of the Trust's holdings, plus two more (itBit and Gemini). *See CF Benckmarks: CME CF Cryptocurrency Pricing Products* 2-4, https://docs-cfbenchmarks.s3.amazonaws.com/CME+CF+Constituent+Exchanges.pdf.

Thus, *every* spot bitcoin market contributing data to the Index price (used to value the Trust) also contributes data to the Bitcoin Reference Rate (used to value bitcoin futures ETPs).[7]  If someone could successfully manipulate bitcoin prices in the spot bitcoin markets that contribute to the Index, then bitcoin futures ETPs would face precisely the same exposure to those manipulated prices as would the Trust. *See* CME, CFTC Regulation 40.2(a) Certification 5 (Dec. 1, 2017) (CME stating, in self-certifying initial listing of bitcoin futures contracts, that the Bitcoin Reference Rate "accurately reflects the underlying spot [bitcoin] market"), https://www.cftc.gov/sites/default/files/filings/ptc/17/12/ptc120117cmedcm001.pdf.

Indeed, the Commission has identified the *same* risk to the Trust and the approved bitcoin futures ETPs arising from potential fraud and manipulation in the spot bitcoin market.  In the Order, the Commission stated that "the Index . . . would not be inherently resistant to manipulation" to the extent that "fraudulent and manipulative trading on the broader bitcoin market could influence prices" in spot bitcoin markets.  87 Fed. Reg. at 40309 (JA163).  Similarly, in the Teucrium Order, the Commission rejected the contention that "the market for CME bitcoin futures contracts . . . is 'not specifically materially influenced' by . . . other bitcoin markets," as it found that "nothing . . . prevents the trade prices that contribute to the daily

---

[7] The three bitcoin futures ETPs that trade under generic listing standards also use the Bitcoin Reference Rate.  *See* Proposal, 87 Fed. Reg. at 28055 (JA188).

settlement price" of bitcoin futures contracts "from themselves being influenced by activity in other bitcoin markets." Teucrium Order, 87 Fed. Reg. at 21680; *see* Valkyrie Order, 87 Fed. Reg. at 28852. As a result, the Commission was not "persuaded that the [Teucrium Futures ETP's] calculation of NAV based on the daily settlement price insulates the NAV from activity in other bitcoin markets." Teucrium Order, 87 Fed. Reg. at 21680.

The conclusion that manipulating the price of bitcoin itself would affect the price of bitcoin futures is also underpinned by common sense, as bitcoin futures are a derivative of bitcoin. The value of a futures contract is largely based on a prediction, by both sides, of what the price of bitcoin will be at some moment in the future. If fraud or manipulation has influenced the price of bitcoin when that prediction is made, the prediction itself—and the financial consequences for the futures contract—will be affected by the fraud in like measure. *See* Coinbase Ltr. 7 & fig. 6 (JA26, 34) (99.9% correlation in the movement of spot bitcoin and bitcoin futures prices); Whaley Ltr. 1-7 (JA137-143) (the Index and Bitcoin Reference Rate are "near perfect substitutes," based on recent year-long quantitative analysis).

Importantly, exposure to fraud or manipulation in the spot bitcoin market would affect not only the net asset value of an ETP's holdings but also the price paid by investors for its shares. An investor who purchases a share of a bitcoin-related ETP is purchasing a slice of that value—a partial ownership in a spot bitcoin ETP's

holdings of bitcoin or in a bitcoin futures ETP's holdings of bitcoin futures. Moreover, to the extent that there is divergence between the share price and the net asset value per share of an ETP trading on a national securities exchange, arbitrage opportunities will quickly close the gap—as the Commission acknowledges. *See* Exchange-Traded Funds, 2019 WL 4727253, at *5.

### 2.    The Order Offers No Reasoned Explanation for its Discriminatory Treatment of the Trust

Although the Trust and bitcoin futures ETPs depend equally on spot-market pricing data, and are therefore equally susceptible to any fraud or manipulation in the spot market, the Commission barred the Exchange from listing shares of the Trust based on an asserted risk of such fraudulent or manipulative activity while permitting the Exchange to list shares of bitcoin futures ETPs notwithstanding that same risk.  The Order thus violates the "black letter administrative law" principle that "like cases must receive like treatment," *Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020) (citation omitted), as well as the Exchange Act requirement that the rules of an exchange may not be "designed to permit unfair discrimination between . . . issuers," 15 U.S.C. § 78f(b)(5).

In large part, the Commission simply refused to explain how its decision to disapprove the Trust's proposed ETP "coheres with previous decisions" approving bitcoin futures ETPs.  *Baltimore Gas*, 954 F.3d at 286.  The Commission insisted that it was unnecessary to "focus on an assessment of the overall risk of fraud and

28

manipulation in the spot bitcoin or futures markets, or on the extent to which such risks are similar." 87 Fed. Reg. at 40316 (JA170); *see id.* at 40317 n.221 (JA171). But to the extent the Commission *did* attempt to "offer[] a[n] . . . explanation for . . . seemingly inconsistent results," *Baltimore Gas*, 954 F.3d at 286, its analysis was not "reasonable and coherent," *id.*, and was "internally inconsistent," *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).

First, the Commission's orders contradict each other as to the significance of the Bitcoin Reference Rate used by all approved bitcoin futures ETPs. In the Order, the Commission rejected the idea that the near-complete overlap between the Index and the Bitcoin Reference Rate is meaningful, and refused to accept that "CME bitcoin futures . . . ETPs are 'priced according to' the [Bitcoin Reference Rate].'" 87 Fed. Reg. at 40317 (JA171). But in the Teucrium Order, the Commission found that bitcoin futures ETPs *are* priced according to the Bitcoin Reference Rate, explaining that (1) "[t]he purchase and redemption price for" shares of the Teucrium Futures ETP "will be based on the NAV"; (2) the Teucrium Futures ETP "calculates daily NAV based on . . . settlement prices" of CME bitcoin futures contracts; and (3) those settlement prices are "based on the . . . Bitcoin Reference Rate." Teucrium Order, 87 Fed. Reg. at 21676-79 (citation omitted). The Commission thus acknowledged that a straight line runs from the Bitcoin Reference Rate, through the price of bitcoin futures contracts, to the share price of a bitcoin futures ETP. The

Commission made no effort to explain its about-face on this key point in the Order, and could not plausibly have done so.

Second, the Commission's assertion that "there is no evidence in the record that the [Trust's] Shares' prices would be determined by the Index" misrepresents the record. 87 Fed. Reg. at 40317 (JA171). The Exchange's rule-change proposal explains that the Index will be used to calculate the daily value of the Trust's holdings as well as "an intra-day indicative value . . . per Share" that is "updated every 15 seconds." Proposal, 87 Fed. Reg. at 28047, 28058 (JA180, 191).

Those values are publicly available, and all market participants can use that information to capitalize on arbitrage opportunities. As the Commission itself has elsewhere recognized, when an ETP's share price is trading above or below net asset value per share, arbitrage transactions will move the prices of both back into sync. *See* Exchange-Traded Funds, 2019 WL 4727253, at *5. To the extent the Order questions that well-understood mechanism, on which every ETP in existence depends, the Commission has arbitrarily changed—without explanation—its view of how the market operates to keep the share price of an ETP in line with the value of the ETP's holdings, thus throwing into question the entire ETP model. *See W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 22 (D.C. Cir. 2014) ("very essence of unreasoned and arbitrary decisionmaking" is when agency "gave the exact opposite

answer" the "last time" it addressed the same question); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Third, the Order attempts to distinguish the Bitcoin Reference Rate from the Index by noting that "the [Bitcoin Reference Rate] includes trade flow from Gemini and itBit, neither of which are included . . . [in] the Index." 87 Fed. Reg. at 40318 (JA172). But an agency does not satisfy the APA's reasoned decisionmaking requirement merely by identifying a difference between two situations. The agency must explain why that difference matters. *See Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022-23 (D.C. Cir. 1999) (agency "offer[ed] insufficient reasons for treating similar situations differently" where "proffered distinction [was] not reasonable" (citation omitted)). Notably absent from the Order is any suggestion that the Index's integrity or accuracy suffers, or that the Bitcoin Reference Rate and the Index meaningfully diverge from each other, as a result of the identified difference. Tellingly, the Commission's prior decisions expose that the lack of "complete overlap" between the spot bitcoin markets included in the Bitcoin Reference Rate and the Index is a red herring, 87 Fed. Reg. at 40318 (JA172), as the Commission has *also* disapproved spot bitcoin ETPs where complete overlap was present, *see* VanEck Order, 86 Fed. Reg. at 64541 n.32.

Finally, the Commission stated that it approved the listing and trading of bitcoin futures ETPs "not because of" the Bitcoin Reference Rate, but because "the

listing exchanges" had "a surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets." 87 Fed. Reg. at 40318 (JA172). Even assuming the validity of the significant-market test, *but see* Section I.B & Part II, *infra*, the existence of that test cannot explain why the Commission has disapproved spot bitcoin ETPs while approving bitcoin futures ETPs. If the Exchange's surveillance-sharing agreement with the CME is sufficient to detect and deter fraudulent or manipulative activity in spot bitcoin markets, then spot bitcoin ETPs and bitcoin futures ETPs are equally protected from such activity. And if the Exchange's surveillance-sharing agreement with the CME is insufficient to detect and deter fraudulent or manipulative activity in spot bitcoin markets, then spot bitcoin ETPs and bitcoin futures ETPs are equally vulnerable to such activity. The risks are the same in either scenario. If a surveillance-sharing agreement with the CME suffices for one, the very same surveillance-sharing agreement must suffice for the other.

The Order does not reasonably address that point. In explaining why the Exchange's surveillance-sharing agreement with the CME insulates bitcoin futures ETPs from fraud and manipulation, the Commission stated that the "CME's surveillance can reasonably be relied upon to capture the effects" of "a person attempting to manipulate [a] CME bitcoin futures ETP by manipulating the price of CME bitcoin futures contracts, whether . . . by directly trading on the CME bitcoin

futures market or . . . by trading *outside* of the CME bitcoin futures market." 87 Fed. Reg. at 40316 (JA170) (emphasis added). But in explaining why the *same* surveillance-sharing agreement could not insulate spot bitcoin ETPs from the *same* fraudulent trading "outside of the CME bitcoin futures market," the Commission reversed itself, finding that no "evidence in the record . . . demonstrates that the CME's surveillance can be reasonably relied upon to capture the effects of manipulation of . . . spot bitcoin assets . . . when such manipulation is not attempted on the CME itself." *Id.* at 40318 (JA172).

To try to reconcile those facially opposite findings, the Commission suggested that the CME's surveillance might not detect manipulation in the spot bitcoin markets if the manipulative activity "does not also similarly impact CME bitcoin futures contracts." 87 Fed. Reg. at 40317 n.209 (JA171). But the Teucrium Order flatly contradicts that assertion. There, the Commission stated unequivocally that "nothing . . . prevents the trade prices that contribute to the daily settlement price" of bitcoin futures contracts "from themselves being influenced by activity in other bitcoin markets." Teucrium Order, 87 Fed. Reg. at 21680.

At bottom, the Commission has arbitrarily rewarded bitcoin-futures ETPs for being vulnerable to *two* theoretical sources of fraud or manipulation—misconduct in the bitcoin futures market *and* misconduct in the spot bitcoin market—while arbitrarily penalizing spot-bitcoin ETPs for being exposed only to *one*. An

exchange's surveillance-sharing agreement with the CME may very well insulate bitcoin futures ETPs from fraud or manipulation in the bitcoin futures market. But the fact that exchanges listing bitcoin-futures ETPs may be able to detect and deter fraudulent or manipulative trading in bitcoin futures contracts—a risk that spot bitcoin ETPs do not face—does not make bitcoin-futures ETPs any less susceptible to being affected by fraud or manipulation occurring in spot bitcoin markets. In ignoring that reality, the Commission has reached an unreasoned decision that unfairly discriminates between issuers in violation of the Exchange Act, *see* 15 U.S.C. § 78f(b)(5)—exactly what the APA forbids.

>    **B.    The Commission Arbitrarily Relaxed the Significant-Market Test for the Benefit of Bitcoin Futures ETPs But Not For the Trust's Proposed Spot Bitcoin ETP**

Even if the existence of a surveillance-sharing agreement that meets the significant-market test could, in theory, distinguish spot bitcoin ETPs from bitcoin futures ETPs, the Commission has nonetheless failed to satisfy the APA's requirement of reasoned decisionmaking because it has not applied the test evenhandedly to both categories of ETPs. Rather, the Commission has significantly *relaxed* that test as to bitcoin futures ETPs, excusing the Exchange and NASDAQ from making certain showings as to bitcoin futures ETPs while disapproving the Trust's spot bitcoin ETP on the ground that the Exchange failed to make the *exact same* showings. To justify such disparate treatment, an agency must "provide a

reasoned analysis, resting on articulated objective, nondiscriminatory, and evenhanded criteria." *W. Deptford Energy*, 766 F.3d at 21. One searches the Order in vain for any such explanation.

The Commission treated bitcoin futures ETPs much more leniently as to both prongs of the significant-market test.[8] With respect to prong one, in assessing the bitcoin futures ETPs the Commission dispensed altogether with the requirement that there be "a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on" the market with which a surveillance-sharing agreement exists in order "to successfully manipulate the ETP." 87 Fed. Reg. at 40300 (JA154). The Valkyrie and Teucrium bitcoin-futures proposals both pointed to surveillance-sharing agreements with the CME and argued that trading on the CME would be necessary to manipulate those futures ETPs. The Commission rejected those arguments and specifically found that the listing exchanges had *not* shown that "a would-be manipulator would choose to use a regulated futures market with limited leverage, such as the CME, to perpetrate its fraud or manipulation," rather than using "unregulated futures platforms." Teucrium Order, 87 Fed. Reg. at 21680; *see* Valkyrie Order, 87 Fed. Reg. at 28851-52. But the Commission nevertheless

---

[8] As noted above, that test requires that (1) it is reasonably likely that a "person attempting to manipulate the ETP would also have to trade on" the other "market to successfully" do so; and (2) it is "unlikely that trading in the ETP would be the predominant influence on prices in" that other "market." 87 Fed. Reg. at 40300, 40310-11 (JA154, 164-165).

concluded that it was "*unnecessary* for [the listing exchange] to establish a reasonable likelihood that the would-be manipulator would have to trade on the CME itself to manipulate the proposed ETP." Teucrium Order, 87 Fed. Reg. at 21678-79, 40316 (emphasis added). The Commission based that conclusion on the premise that "the CME's surveillance can reasonably be relied upon to capture" off-CME manipulation. *Id.*; *see id.* at 21679 (CME surveillance captures attempted manipulation "whether that attempt is made by directly trading on the CME bitcoin futures market *or indirectly by trading outside of the CME bitcoin futures market*" (emphasis added)); Valkyrie Order, 87 Fed. Reg. at 28851.

As to the Trust, however, the Commission found that the Exchange could not rely on the very same surveillance-sharing agreement with the CME unless the Exchange could establish a likelihood that a would-be manipulator would use the CME to perpetrate its fraud or manipulation. The Commission stated that "the Exchange d[id] not explain why" a manipulator "would be reasonably likely to trade specifically on the CME bitcoin futures market rather than on unregulated bitcoin futures markets or other bitcoin derivatives markets." 87 Fed. Reg. at 40312 (JA166).

Those conclusions contradict each other. Indeed, the Commission did not even attempt to explain why the CME's surveillance is adequate in the context of bitcoin *futures* ETPs to capture any manipulation that might take place outside of

36

the CME on "unregulated futures platforms," Teucrium Order, 87 Fed. Reg. at 21678-80, but is somehow inadequate to capture any manipulation "on unregulated bitcoin futures markets," 87 Fed. Reg. at 40312 (JA166), in the context of a *spot* bitcoin ETP like the Trust's. That is doubtless because the contradiction cannot be explained away. If, as the Commission concluded, it is "unnecessary" to show as to bitcoin futures ETPs that a would-be manipulator would have to trade on the market that has entered into the surveillance-sharing agreement, Teucrium Order, 87 Fed. Reg. at 21678-79, then it cannot be necessary to make that showing as to spot bitcoin ETPs relying on the very same agreement with the CME. Regardless of whether it makes sense to require a listing exchange to demonstrate that "a would-be manipulator would have to trade on the CME itself to manipulate a proposed ETP," 87 Fed. Reg. at 40317 (JA171), there is no rational reason why that requirement should apply to spot bitcoin ETPs but not to bitcoin futures ETPs.

The Commission applied the second prong of the significant-market test in a similarly discriminatory way. In concluding that bitcoin futures ETPs satisfied that prong—which requires a listing exchange to show that "it is unlikely that trading in the ETP would be the predominant influence on prices in th[e] market" as to which there is a surveillance-sharing agreement, 87 Fed. Reg. at 40300 (JA154)—the Commission relied on two facts. First, the Commission stated that "the CME bitcoin futures market has 'progressed and matured significantly'" since its inception in

2017. Teucrium Order, 87 Fed. Reg. at 21680; *see* Valkyrie Order, 87 Fed. Reg. at 28853. Second, the Commission stated that, since bitcoin futures ETPs began trading, the Commission has not observed "disruption to the CME bitcoin futures market" or evidence that bitcoin futures ETPs have exerted a dominant influence on that market. Teucrium Order, 87 Fed. Reg. at 21681; *see* Valkyrie Order, 87 Fed. Reg. at 28853. Notably, the Commission never discussed the assets or trading volumes of the proposed bitcoin futures ETPs themselves—not as an absolute or comparative matter, and not in terms of observed or anticipated trends.

The Commission raised the bar considerably when it evaluated the Trust's proposed spot bitcoin ETP. The Trust's trading volume has historically been less than one-quarter the volume of the CME bitcoin futures market. Because yet-to-occur inflows are necessarily speculative, the Exchange offered a proxy—net inflows into the Trust as a percentage of bitcoin market capitalization—to demonstrate that the Trust's assets have remained a relatively small percentage of the overall bitcoin market. Proposal, 87 Fed. Reg. at 28054 (JA187). But the Commission found those showings inadequate. Even though the Teucrium and Valkyrie Orders said nothing about inflows into the bitcoin futures ETPs, whether historical or projected, the Order faulted the Exchange for describing "historical inflows into" the Trust rather than "information on the expected growth in the size of the Trust." 87 Fed. Reg. at 40313 (JA167). And even though the Teucrium and

Valkyrie Orders made no findings about the bitcoin future ETPs' trading volume relative to the bitcoin futures market, the Order here relied on the assertion that the Exchange had failed to explain why the "trading volume" of a spot bitcoin ETP "is not likely to be the predominant influence on prices" in the CME bitcoin futures market.  *Id.* at 40314 (JA168).

That unexplained discriminatory treatment of spot bitcoin and bitcoin futures is impermissibly arbitrary.  Agencies must "justify different results . . . to lend predictability and intelligibility to the announced standard, promote fair treatment, and facilitate judicial review."  *Baltimore Gas*, 954 F.3d at 286.  That is why, "[i]f the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases."  *Westar Energy*, 473 F.3d at 1241.  The Commission failed to do that here.  The Order does not even acknowledge that the Commission applied the significant-market test to the Trust very differently than to the Teucrium and Valkyrie Futures ETPs, much less "explain[] [the agency's] decision to treat" the two types of ETPs "differently in a context where they appear similarly situated."  *Colorado Interstate Gas Co. v. FERC*, 146 F.3d 889, 893 (D.C. Cir. 1998); *see* 15 U.S.C. § 78f(b)(5) (exchange's rules must not be "designed to permit unfair discrimination" between issuers).  That disparity demands vacatur.

39

## II.    The Commission Unlawfully Disapproved the Rule Change Based on Application of an Arbitrary, Extratextual Requirement

The Exchange Act says nothing about surveillance-sharing agreements or "significant markets."   Rather, it requires that the rules of a national securities exchange be "designed to prevent fraudulent and manipulative acts and practices" and "to protect investors and the public interest."   15 U.S.C. § 78f(b).   The Commission has lost sight of that statutory text, choosing instead to make up its own extratextual requirement.   That exercise of legislative power runs afoul of the APA—both because the test itself exceeds the Commission's statutory authority and because the test is arbitrary and unreasoned.

### A.    The Commission Has Refused to Approve a Bitcoin-Related Proposed Rule Change Unless the Commission Deems The Significant-Market Test Satisfied

The Commission is *required* to approve a proposed rule change if, with that change in place, the rules of the exchange would be "designed to prevent fraudulent and manipulative acts and practices" and "to protect investors and the public interest."  15 U.S.C. § 78f(b)(5); *see id.* § 78s(b)(2)(C)(i).  But the Commission has applied a much stingier test in assessing rule-change requests as to spot bitcoin, refusing to approve such requests unless the significant-market test is satisfied.  *See* 87 Fed. Reg. at 40300 & n.11 (JA154); *see also* pp. 8-9, *supra*.

The Order here makes crystal clear that, in assessing bitcoin-related ETPs, the Commission has a "consistent[]," single-minded "focus" on the existence of a

surveillance-sharing agreement that satisfies the significant-market test.  87 Fed. Reg. at 40316 (JA170); *id.* at 40300 (JA154) (stressing "importance" of the "significant market" test); *id.* at 40301 (JA155) (describing existence of surveillance-sharing agreement meeting that test as "essential").  First, the Order states expressly that the Commission will give scant weight to mechanisms in the relevant market that would "prevent fraudulent and manipulative acts and practices," 15 U.S.C. § 78f(b)(5), and thereby reduce any need to rely on surveillance-sharing agreements.  In the Commission's view, "the *central issue* is about the necessity of . . . a surveillance-sharing agreement" that meets the significant-market test, "not the overall risk of fraud and manipulation in the spot bitcoin or futures markets."  87 Fed. Reg. at 40316 & n.202 (JA170) (emphasis added); *see id.* (discounting factors "mitigating . . . against fraud and manipulation").  The Commission has thus all but said that it no longer relies on the significant-market test as a *means* to demonstrate compliance with the statutory standard, but rather regards the significant-market test as a requirement unto itself.

Second, the Order states that no mechanism other than a surveillance-sharing agreement that satisfies the significant-market test can qualify as adequately fraud-protective unless it is (at minimum) *superior to* such an agreement in preventing fraud and manipulation.  For instance, the Order repeatedly asks whether "other means . . . are sufficient to justify *dispensing with*" a surveillance-sharing agreement.

87 Fed. Reg. at 40308 (JA162) (emphasis added); *see id.* at 40304, 40310 (JA158, 164). The Order also states that the only "other means" that could meet that standard are ones that are better than a surveillance-sharing agreement because they confer truly extraordinary protection against fraud and manipulation—and even then, a surveillance-sharing agreement meeting the significant-market test might *still* be "necessar[y]." *Id.* at 40316 n.201 (JA170) ("*if* a listing exchange could establish" a "*unique* resistance to manipulation," then "the exchange would not *necessarily* need to" meet the significant-market test (emphasis added)); *see, e.g.*, *id.* at 40306, 40310 (JA160, 164).

Third, the Order states that a surveillance-sharing agreement that does *not* meet the significant-market test will not suffice as to a bitcoin-related ETP. Here, the Exchange has a surveillance-sharing agreement with CME, where several bitcoin-based ETPs holding CME futures contracts trade. *See* Proposal, 87 Fed. Reg. at 28054 (JA187); *see also, e.g.*, VanEck Order, 86 Fed. Reg. at 64546. But the Commission rejected reliance on that agreement on the ground that (in the Commission's view) the CME is not a "'market of significant size' related to spot bitcoin." 87 Fed. Reg. at 40311 (JA165).

To be sure, the Commission has paid lip service to the notion that something besides a surveillance-sharing agreement that satisfies the significant-market test might be "consistent with the requirements" of the Exchange Act. 15 U.S.C.

§ 78s(b)(2)(C)(i).    For instance, the Commission stated in the Order that "surveillance-sharing agreements are not the exclusive means by which a listing exchange" may satisfy those requirements, and that a listing exchange may "establish that other means to prevent fraudulent and manipulative acts and practices will be sufficient."  87 Fed. Reg. at 40300 (JA154); *see, e.g.*, Winklevoss Order, 83 Fed. Reg. at 37580; 83 Fed. Reg. 43923, 43924 (Aug. 28, 2018).

In actual effect, however, the Commission has closed the door to such "other means" in relation to bitcoin-related ETPs.  The Commission has *never* found such a showing sufficient, or even explained what kind of showing *could* be sufficient. *See, e.g.*, Valkyrie Order, 87 Fed. Reg. at 28853 n.76.  And in the Order here, the Commission repeatedly rejected any possible "other means" under the impossibly heightened standard described above, which assumes that nothing will be able to measure up to a surveillance-sharing agreement that satisfies the significant-market test.  For instance, the Commission stated that even if "the bitcoin market's size, liquidity, market participation, or arbitrage makes manipulation more difficult or costly," that constitutes merely "*some* resistance to manipulation" and therefore falls short.  87 Fed. Reg. at 40306 (JA160) (emphasis added).  The Commission rejected the argument that the Index's methodology adequately mitigates the possibility of fraud and manipulation, on the ground that the methodology "could attenuate, but would not *eliminate*, the effect of manipulative activity."  *Id.* at 40310 (JA164)

(emphasis added).  And the Commission discounted the protection afforded by the Index provider's oversight of the Index as an insufficiently "*unique* measure to resist or prevent fraud or manipulation."  *Id.* (emphasis added).

### B.     The Commission's Exclusive Focus on the Existence of a Surveillance-Sharing Agreement That Meets the Significant-Market Test Violates the Exchange Act

As a "creature" of the statute that brought it into existence, the Commission has no powers except those specifically conferred by Congress.  *Louisiana PSC v. FCC*, 476 U.S. 355, 374 (1986).  The APA gives teeth to that principle by requiring reviewing courts to hold unlawful any agency action "not in accordance with law" or "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).

In this case, the Commission has exceeded its statutory authority by replacing the Exchange Act's standard with a cramped test of its own creation.  Unlike many other statutory schemes that afford agencies significant discretion in implementing broadly drawn statutory directives, the Exchange Act sets both a floor and a ceiling: "[t]he Commission *shall approve* a proposed rule change . . . if it finds that such proposed rule change is consistent with the requirements of" the Exchange Act, 15 U.S.C. § 78s(b)(2)(C)(i) (emphasis added), and it "shall disapprove a proposed rule change . . . if it does not make [that] finding," *id.* § 78s(b)(2)(C)(ii); *see Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016) ("'shall' indicates a mandatory duty"); *Bus. Roundtable v. SEC*, 905 F.2d 406, 408 (D.C. Cir.

1990) (discussing 15 U.S.C. § 78s(b)(2)). Thus, if a proposed rule change is consistent with the Exchange Act's requirements, the Commission lacks statutory authority to disapprove the rule change on any extra-statutory grounds.

The significant-market test has become one such extra-statutory—and therefore impermissible—ground. To be sure, a surveillance-sharing agreement that meets the significant-market test may be *one* appropriate way to demonstrate compliance with the Exchange Act. But the converse is not true: an exchange that lacks such a surveillance-sharing agreement can still meet the requirements of the statute. It is a classic logical fallacy to assume that because condition A causes outcome B, outcome B cannot exist without condition A.

There is no reason to conclude that having a surveillance-sharing agreement with a regulated market of significant size is essential to, or inherent in, having rules that are designed to prevent fraudulent and manipulative practices. And, indeed, the Commission has not taken that approach in evaluating rule-change proposals regarding commodity-based trusts holding commodities other than bitcoin. For example, in an order approving a rule change regarding a spot ETP holding gold, the Commission noted the existence of a surveillance-sharing agreement between the Exchange and a gold *futures* market, but did not apply the significant-market test to assess whether (for instance) a person attempting to manipulate the spot gold ETP would have to trade on the gold futures market in order to do so successfully. 2004

WL 2723611, at *10 (Oct. 28, 2004). Nor did the Commission mention the existence of that surveillance-sharing agreement other than in passing. Rather, the Commission focused its analysis on other facts—that "the gold spot market is extremely deep and liquid" and that the "specialist" handling the new ETP would be subject to certain reporting and recordkeeping requirements, thus giving the Exchange a sufficient "basis . . . to monitor for fraudulent and manipulative practices in the trading of the [trust's] Shares." *Id.* at *10-11.[9] Notably, the Order here *also* addresses a surveillance-sharing agreement with a futures exchange, a deep and liquid market for the underlying asset, and authorized participants subject to reporting and recordkeeping requirements. And yet the result here was very different, with no reasoned explanation for the disparity.

There is no question that the Commission enjoys some latitude in deciding whether "[t]he rules of [an] exchange are designed to prevent fraudulent and

---

[9] The Commission's statement that, for each "commodity-trust ETP[] approved to date" there has been "at least one significant, regulated market for trading futures on the underlying commodity" with which the exchange had "entered into [a] surveillance-sharing agreement[]," 87 Fed. Reg. at 40306 (JA160), is disingenuous, because it suggests that such an agreement was important to the analysis and that the Commission applied the significant-market test to the agreement. That was not true in the case of this spot gold ETP, and it has not been true as to other commodity-trust ETPs either. *See* 2004 WL 2723611, at *10-11; *see also, e.g.*, 77 Fed. Reg. 75468, 75485-86 (Dec. 20, 2012) (copper); 75 Fed. Reg. 69494, 69500-02 & n.22 (Nov. 12, 2010) (gold); 75 Fed. Reg. 62615, 62615, 62620-21 (Oct. 12, 2010) (silver); 74 Fed. Reg. 68895, 68896 (Dec. 29, 2009) (palladium); 74 Fed. Reg. 68886, 68887-88 (Dec. 29, 2009) (platinum); *Conundrum*, at 24-25.

46

manipulative acts and practices."  15 U.S.C. § 78f(b)(5).  But there is a crucial difference between *elucidating* a statutory requirement through a series of administrative adjudications and *jettisoning* the statutory standard in favor of some much stricter requirement that the Commission would have preferred over what Congress has actually written.  *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325-28 (2014).  Whatever discretion the Commission may have, it does not include the authority to focus narrowly on one particular means of addressing any "risk of fraud and manipulation in the spot bitcoin or futures markets," 87 Fed. Reg. at 40316 n.202 (JA170), or to disapprove a rule change that is, in fact, "designed to prevent fraudulent and manipulative acts and practices," 15 U.S.C. § 78f(b)(5), merely because the rule change would rely on means other than a surveillance-sharing agreement to satisfy the statutory standard.

The Commission's approach to bitcoin-related ETPs is therefore not reasonably encompassed within the agency's statutory authority.  In essence, the Commission has *heightened* the Exchange Act's requirements, thereby usurping the legislature's power, and has violated the statutory command that it "shall approve" proposed rule changes that satisfy Congress's requirements.  15 U.S.C. § 78s(b)(2)(C)(i).  Indeed, the Commission's approach has been fatal in fact.  Because there is no *spot bitcoin* market that the Commission considers to be "regulated" with which the Exchange could enter into a surveillance-sharing

agreement, 87 Fed. Reg. at 40317 (JA171), the agency will not approve the rule change—regardless of whether the Exchange's rules are in fact designed to prevent fraud and manipulation. That is a circular approach that the Commission has applied only to bitcoin and not to ETPs involving other spot commodities that do not themselves trade on markets the Commission views as regulated.

There is only one reasonable conclusion to draw: the Commission is treating spot bitcoin ETPs with special harshness based on its opinion about bitcoin's merits as compared to other types of investments. *See, e.g.*, *Conundrum*, at 18-19. But the SEC's authority simply does not extend to that kind of merit-based regulation. *See Eckstein v. Balcor Film Invs.*, 8 F.3d 1121, 1130-31 (7th Cir. 1993) ("Federal securities law does not include 'merit regulation.'"); *Malack v. BDO Seidman, LLP*, 617 F.3d 743, 752 (3d Cir. 2010).

### C.    The Commission's Test For Establishing that the Exchange's Rules Are Designed To Prevent Fraud Is Unreasoned and Arbitrary

Questions of statutory authority aside, the Commission has offered no reasoned basis for requiring a surveillance-sharing agreement that meets the significant-market test as the only viable means for demonstrating compliance with the Exchange Act in the bitcoin context. *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 460 (D.C. Cir. 2000) (agency action "reflect[ed] a lack of reasoned

decisionmaking" where agency "*asserted*" that certain "capabilities [were] required" by the relevant statute but "never explained . . . the basis for this conclusion").

First, the Commission has never explained the basis for its focus on "a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets." 87 Fed. Reg. at 40300, 40302 (JA154, 156). It is far from obvious why that mechanism is the Commission's gold standard, or why other mechanisms cannot be "designed to prevent fraudulent and manipulative acts and practices" and "to protect investors and the public interest." 15 U.S.C. § 78f(b)(5). In particular, it is unclear why a mechanism that provides protection *similar to*—as opposed to "beyond"—the protection offered by surveillance-sharing agreements that satisfy the significant-market test would fail to meet the statutory standard, as the Commission seems to believe. 87 Fed. Reg. at 40302 (JA156). At minimum, the Commission was "required 'to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.'" *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008) (citation omitted). The Commission has entirely failed to do so.

Second, the Commission has departed from past practice without acknowledging, much less explaining, the departure. "One of the core tenets of reasoned decisionmaking . . . is that 'an agency changing its course is obligated to

supply a reasoned analysis for the change.'" *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (alteration and citation omitted). Certainly "an agency may not . . . depart from a prior policy *sub silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Yet that is exactly what the Commission has done. As explained (pp. 45-46, *supra*), the agency has not applied the same skewed significant-market requirement that it applied here in assessing rule changes related to commodity-trust ETPs that do not hold bitcoin. And various Commission decisions in the bitcoin context have asserted generally that "surveillance-sharing agreements are not the exclusive means by which" a listing exchange "can meet its obligations under [the] Exchange Act," Winklevoss Order, 83 Fed. Reg. at 37580—even though the possibility of showing such "other means" has turned out to be a mirage. Despite the Commission's insistence that it has not applied a "'cannot be manipulated' standard" to every bitcoin-related rule-change proposal that the Commission does not view as meeting the significant-market test, *id.* at 37582; 87 Fed. Reg. at 40316 (JA170), that is in fact exactly what the Commission has done.

Finally, to the extent the Commission *has* left the door ajar for exchanges to demonstrate that "other means" besides surveillance-sharing agreements that meet the significant-market test satisfy the Exchange Act, the standard the Commission has articulated is indeterminate and illusory. In the context of bitcoin-based ETPs—

50

but not other commodity-trust ETPs—the Commission has required a showing of some mechanism "inherently possess[ing] a unique resistance to manipulation" that is "novel and beyond those protections that exist in traditional commodity markets or securities markets." 87 Fed. Reg. at 40302 (citation omitted) (JA156). But the Commission has never explained why that showing is necessary or defined what constitutes a sufficiently "novel," "inherent," or "unique" means to prevent fraud and manipulation—other than to indicate that a proposed means flunks the test unless all risk of fraud and manipulation is "eliminate[d]." *Id.* at 40310 (JA164); *see id.* at 40306 (JA160) (rejecting means providing "some resistance" because it was not "unique resistance"). And the Commission has done so despite finding that surveillance-sharing agreements that meet its significant-market test will suffice so long as they would merely "*assist* in detecting and deterring misconduct" like "manipulation of the ETP" or "potential fraud and manipulation," 87 Fed. Reg. at 40300, 40302 (JA154, 156) (emphasis added), a standard well below total "elimination" of the risk.

"Regulated parties are entitled to know what an agency's rules require and to assume that administration of the rules will be reasonably predictable and coherent across cases." *Baltimore Gas*, 954 F.3d at 286. And an agency's rule "must not be 'vague and indecisive,'" *Rapoport v. SEC*, 682 F.3d 98, 107 (D.C. Cir. 2012) (citation omitted), or "impossible to meet," *All. for Cannabis Therapeutics v. DEA*,

930 F.2d 936, 940 (D.C. Cir. 1991) (citation omitted). As applied by the Commission, however, the ostensible alternative route to demonstrating compliance with the Exchange Act by "other means" is just that: vague, shifting, and impossible to satisfy. It cannot survive scrutiny under the APA.

## III. The Exchange's Proposal Is Designed To Prevent Fraud and Manipulation and To Protect Investors and the Public Interest

For all of the reasons set forth above, vacatur of the Order is plainly warranted. Petitioner also notes that, judged under the appropriate statutory standard, if the Exchange's proposal to list and trade shares of the Trust were approved then the Exchange's rules would indeed be "designed to prevent fraudulent and manipulative acts and practices" and "to protect investors and the public interest," as well as to further the other important goals set forth in the Exchange Act. 15 U.S.C. § 78f(b)(5).

As to whether the rules are designed to prevent fraud and manipulation, the Commission improperly discounted the evidence before it because it applied a flawed test. *See* Proposal, 87 Fed. Reg. at 28051-54 (JA184-187). For instance, the spot bitcoin markets included in the Index are carefully monitored, must satisfy stringent requirements, and are subject to federal and state supervision—including enforcement activity designed to deter fraud and manipulation. *See id.* at 28052 (JA185); Blockchain Ass'n Ltr. 3 (JA3); Statement of CFTC Commissioner Stump (Aug. 23, 2021), https://www.cftc.gov/media/6306/DigitalAssetsAuthority

Infographic_CommStump082321/download.  As an empirical matter, the bitcoin prices on those markets have deviated from each other by less than 0.2% more than 97% of the time—less deviation than many dual-listed stocks.  Coinbase Ltr. 4 & figs. 3-4 (JA23, 31-32).  And the Index itself uses an advanced algorithm to "mitigate[] the impact of instances of fraud, manipulation and other anomalous trading activity in real-time through systematic adjustments," Proposal, 87 Fed. Reg. at 28052 (JA185), with a proven track record of success in doing so, *see* Harvey Ltr. 4 (JA53).

Although the Commission dismissively asserted that the Index would not be sufficiently connected to the price of the shares of the proposed ETP, all the evidence in the record points in the other direction.  Analysis of several ETPs trading on exchanges outside the United States "demonstrates a high correlation between the ETP price and that of the underlying Bitcoin market," meaning that "Bitcoin spot ETPs accurately reflect the underlying Bitcoin market and provide investors exposure to Bitcoin without the need to trade Bitcoin itself."  Coinbase Ltr. 8-9 (JA27-28).  More broadly, the premise of ETP share price not being connected to the price of the ETP's underlying assets would throw into question the entire concept of an ETP and therefore every ETP the Commission has approved to date.

In addition, the Exchange's proposal here furthers numerous considerations that Section 6(b)(5) identifies as reasons to *support* a rule change.  The proposal

serves to avoid "discrimination" among issuers, "promote just and equitable principles of trade, . . . remove impediments to and perfect the mechanism of a free and open market," and "protect investors and the public interest." 15 U.S.C. § 78f(b)(5). The Commission wrote off any consideration of those factors, *see* 87 Fed. Reg. at 40319 (JA173), but they are critical. Presently, an investor desiring to gain exposure to bitcoin can buy bitcoin directly or buy shares of a bitcoin futures ETP. *See* Harvey Ltr. 1-2 (JA50-51). Those options, however, have significant drawbacks. Purchasing bitcoin directly is cumbersome and may require the purchaser to take custody of digital assets—and then keep them secure. *See id.* at 2 (JA51). A bitcoin futures ETP, meanwhile, is a riskier and more volatile investment than a spot bitcoin ETP, given the uncertainty inherent in the predictive futures market. *See id.* A bitcoin futures ETP is also a particularly costly way of investing in bitcoin, as futures products are subject to monthly roll costs that may drive up the ETP's expenses. *See id.* at 3 (JA52); Grayscale Ltr. 14 (JA18); *Conundrum*, at 26.

Permitting investment in a spot bitcoin ETP is therefore more protective of investors than leaving those who wish to invest in bitcoin no choice but to pursue alternative avenues. *See* Harvey Ltr. 3 (JA52). That is doubtless why there is such strong investor demand for access to the Trust. Indeed, as evidenced by the comment letters submitted by many of the Trust's nearly one million shareholders, investors are clamoring to buy and trade shares of the Trust on the Exchange. *See id.*;

Certificate, Doc. No. 1959409, at 2-366.  Allowing investors to do so would put a spot bitcoin ETP on a level playing field with bitcoin futures ETPs—which, under the Commission's orders, enjoy a substantial competitive advantage even though a spot bitcoin ETP is financially superior and would be at least as safe, and likely safer, for investors.  It also would return to U.S. investors over $4 billion of value.  *See* p. 13, *supra*.

It is not the Commission's proper role to pass judgment on the wisdom of investors' preferences.  *See, e.g.*, *Malack*, 617 F.3d at 752.  Rather, the Commission's only role is to assess whether the Exchange Act's requirements have been satisfied.  In concluding that they have not, the Commission exceeded its statutory mandate and acted arbitrarily, capriciously, and contrary to law.  The Commission's Order is unlawful and must be vacated.

## CONCLUSION

This Court should grant the petition for review and vacate the Order.

Dated February 3, 2023                    Respectfully submitted,

                                          */s/ Donald B. Verrilli, Jr.*
Paul S. Mishkin                           Donald B. Verrilli, Jr.
Joseph A. Hall                            Elaine J. Goldenberg
Daniel J. Schwartz                        Sarah E. Weiner
DAVIS POLK & WARDWELL LLP                 MUNGER, TOLLES & OLSON LLP
450 Lexington Avenue                      601 Massachusetts Ave. NW,
New York, NY 10017                          Suite 500E
(212) 450-4000                            Washington, DC 20001-5369
Paul.Mishkin@davispolk.com                (202) 220-1100
                                          Donald.Verrilli@mto.com

*Counsel for Petitioner*

56

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type volume limitation of Rule 32(a)(7)(B).  As measured by the word-processing system used to prepare this brief, there are 13,000 words in the brief excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1).

Dated:  February 3, 2023                    */s/ Donald B. Verrilli, Jr.*
                                             Donald B. Verrilli, Jr.

## CERTIFICATE OF SERVICE

I certify that on February 3, 2023, a true and correct copy of this Petitioner's Brief was filed via the Court's electronic filing system, which will forward a copy to all counsel of record. I certify that all participants in this case are registered CM/ECF users.

Dated: February 3, 2023                    */s/ Donald B. Verrilli, Jr.*
                                            Donald B. Verrilli, Jr.

# ADDENDUM

# TABLE OF CONTENTS

5 U.S.C. § 706 ...................................................................................... A-1

15 U.S.C. § 78c(1), (26) [EXCERPT] ..................................................... A-1

15 U.S.C. § 78e .................................................................................... A-2

15 U.S.C. § 78f(a)-(b) [EXCERPT] ......................................................... A-2

15 U.S.C. § 78s(b) [EXCERPT] .............................................................. A-6

15 U.S.C. § 78y .................................................................................... A-16

17 C.F.R. § 240.19b-4 .......................................................................... A-19

i

## 5 U.S.C. § 706

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 15 U.S.C. § 78c

§ 78c. Definitions and application

**(a) Definitions**

When used in this chapter, unless the context otherwise requires--

**(1)** The term "exchange" means any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the market place and the market facilities maintained by such exchange.

\* \* \*

**(26)** The term "self-regulatory organization" means any national securities exchange, registered securities association, or registered clearing agency, or (solely for purposes of sections 78s(b), 78s(c), and 78w(b) of this title) the Municipal Securities Rulemaking Board established by section 78*o*-4 of this title.

\* \* \*

### 15 U.S.C. § 78e

§ 78e. Transactions on unregistered exchanges

It shall be unlawful for any broker, dealer, or exchange, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security, or to report any such transaction, unless such exchange (1) is registered as a national securities exchange under section 78f of this title, or (2) is exempted from such registration upon application by the exchange because, in the opinion of the Commission, by reason of the limited volume of transactions effected on such exchange, it is not practicable and not necessary or appropriate in the public interest or for the protection of investors to require such registration.

### 15 U.S.C. § 78f

§ 78f. National securities exchanges

**(a) Registration; application**

An exchange may be registered as a national securities exchange under the terms and conditions hereinafter provided in this section and in accordance with the provisions of section 78s(a) of this title, by filing with the Commission an application for registration in such form as the Commission, by rule, may prescribe containing the rules of the exchange and such other information and documents as

the Commission, by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(b) Determination by Commission requisite to registration of applicant as a national securities exchange**

An exchange shall not be registered as a national securities exchange unless the Commission determines that--

**(1)** Such exchange is so organized and has the capacity to be able to carry out the purposes of this chapter and to comply, and (subject to any rule or order of the Commission pursuant to section 78q(d) or 78s(g)(2) of this title) to enforce compliance by its members and persons associated with its members, with the provisions of this chapter, the rules and regulations thereunder, and the rules of the exchange.

**(2)** Subject to the provisions of subsection (c) of this section, the rules of the exchange provide that any registered broker or dealer or natural person associated with a registered broker or dealer may become a member of such exchange and any person may become associated with a member thereof.

**(3)** The rules of the exchange assure a fair representation of its members in the selection of its directors and administration of its affairs and provide that one or more directors shall be representative of issuers and investors and not be associated with a member of the exchange, broker, or dealer.

**(4)** The rules of the exchange provide for the equitable allocation of reasonable dues, fees, and other charges among its members and issuers and other persons using its facilities.

**(5)** The rules of the exchange are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the exchange.

A-3

**(6)** The rules of the exchange provide that (subject to any rule or order of the Commission pursuant to section 78q(d) or 78s(g)(2) of this title) its members and persons associated with its members shall be appropriately disciplined for violation of the provisions of this chapter, the rules or regulations thereunder, or the rules of the exchange, by expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction.

**(7)** The rules of the exchange are in accordance with the provisions of subsection (d) of this section, and in general, provide a fair procedure for the disciplining of members and persons associated with members, the denial of membership to any person seeking membership therein, the barring of any person from becoming associated with a member thereof, and the prohibition or limitation by the exchange of any person with respect to access to services offered by the exchange or a member thereof.

**(8)** The rules of the exchange do not impose any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter.

**(9)(A)** The rules of the exchange prohibit the listing of any security issued in a limited partnership rollup transaction (as such term is defined in paragraphs (4) and (5) of section 78n(h) of this title), unless such transaction was conducted in accordance with procedures designed to protect the rights of limited partners, including--

  **(i)** the right of dissenting limited partners to one of the following:

  **(I)** an appraisal and compensation;

  **(II)** retention of a security under substantially the same terms and conditions as the original issue;

  **(III)** approval of the limited partnership rollup transaction by not less than 75 percent of the outstanding securities of each of the participating limited partnerships;

  **(IV)** the use of a committee of limited partners that is independent, as determined in accordance with rules prescribed by the exchange, of the general partner or sponsor, that has been approved by a majority of the outstanding units of each of the participating limited partnerships, and that has such authority as is necessary to protect the interest of limited partners, including the authority to hire independent advisors, to negotiate with the general partner

A-4

or sponsor on behalf of the limited partners, and to make a recommendation to the limited partners with respect to the proposed transaction; or

**(V)** other comparable rights that are prescribed by rule by the exchange and that are designed to protect dissenting limited partners;

**(ii)** the right not to have their voting power unfairly reduced or abridged;

**(iii)** the right not to bear an unfair portion of the costs of a proposed limited partnership rollup transaction that is rejected; and

**(iv)** restrictions on the conversion of contingent interests or fees into non-contingent interests or fees and restrictions on the receipt of a non-contingent equity interest in exchange for fees for services which have not yet been provided.

**(B)** As used in this paragraph, the term "dissenting limited partner" means a person who, on the date on which soliciting material is mailed to investors, is a holder of a beneficial interest in a limited partnership that is the subject of a limited partnership rollup transaction, and who casts a vote against the transaction and complies with procedures established by the exchange, except that for purposes of an exchange or tender offer, such person shall file an objection in writing under the rules of the exchange during the period during which the offer is outstanding.

**(10)(A)** The rules of the exchange prohibit any member that is not the beneficial owner of a security registered under section 78*l* of this title from granting a proxy to vote the security in connection with a shareholder vote described in subparagraph (B), unless the beneficial owner of the security has instructed the member to vote the proxy in accordance with the voting instructions of the beneficial owner.

**(B)** A shareholder vote described in this subparagraph is a shareholder vote with respect to the election of a member of the board of directors of an issuer, executive compensation, or any other significant matter, as determined by the Commission, by rule, and does not include a vote with respect to the uncontested election of a member of the board of directors of any investment company registered under the Investment Company Act of 1940.

**(C)** Nothing in this paragraph shall be construed to prohibit a national securities exchange from prohibiting a member that is not the beneficial owner of a security

registered under section 78*l* of this title from granting a proxy to vote the security in connection with a shareholder vote not described in subparagraph (A).

* * *

## 15 U.S.C. § 78s

§ 78s. Registration, responsibilities, and oversight of self-regulatory organizations

* * *

**(b) Proposed rule changes; notice; proceedings**

**(1)** Each self-regulatory organization shall file with the Commission, in accordance with such rules as the Commission may prescribe, copies of any proposed rule or any proposed change in, addition to, or deletion from the rules of such self-regulatory organization (hereinafter in this subsection collectively referred to as a "proposed rule change") accompanied by a concise general statement of the basis and purpose of such proposed rule change. The Commission shall, as soon as practicable after the date of the filing of any proposed rule change, publish notice thereof together with the terms of substance of the proposed rule change or a description of the subjects and issues involved. The Commission shall give interested persons an opportunity to submit written data, views, and arguments concerning such proposed rule change. No proposed rule change shall take effect unless approved by the Commission or otherwise permitted in accordance with the provisions of this subsection.

**(2) Approval process**

**(A) Approval process established**

**(i) In general**

Except as provided in clause (ii), not later than 45 days after the date of publication of a proposed rule change under paragraph (1), the Commission shall--

**(I)** by order, approve or disapprove the proposed rule change; or

**(II)** institute proceedings under subparagraph (B) to determine whether the proposed rule change should be disapproved.

**(ii) Extension of time period**

The Commission may extend the period established under clause (i) by not more than an additional 45 days, if--

**(I)** the Commission determines that a longer period is appropriate and publishes the reasons for such determination; or

**(II)** the self-regulatory organization that filed the proposed rule change consents to the longer period.

**(B) Proceedings**

**(i) Notice and hearing**

If the Commission does not approve or disapprove a proposed rule change under subparagraph (A), the Commission shall provide to the self-regulatory organization that filed the proposed rule change--

**(I)** notice of the grounds for disapproval under consideration; and

**(II)** opportunity for hearing, to be concluded not later than 180 days after the date of publication of notice of the filing of the proposed rule change.

**(ii) Order of approval or disapproval**

**(I) In general**

Except as provided in subclause (II), not later than 180 days after the date of publication under paragraph (1), the Commission shall issue an order approving or disapproving the proposed rule change.

**(II) Extension of time period**

The Commission may extend the period for issuance under clause (I) by not more than 60 days, if--

**(aa)** the Commission determines that a longer period is appropriate and publishes the reasons for such determination; or

**(bb)** the self-regulatory organization that filed the proposed rule change consents to the longer period.

A-7

**(C) Standards for approval and disapproval**

**(i) Approval**

The Commission shall approve a proposed rule change of a self-regulatory organization if it finds that such proposed rule change is consistent with the requirements of this chapter and the rules and regulations issued under this chapter that are applicable to such organization.

**(ii) Disapproval**

The Commission shall disapprove a proposed rule change of a self-regulatory organization if it does not make a finding described in clause (i).

**(iii) Time for approval**

The Commission may not approve a proposed rule change earlier than 30 days after the date of publication under paragraph (1), unless the Commission finds good cause for so doing and publishes the reason for the finding.

**(D) Result of failure to institute or conclude proceedings**

A proposed rule change shall be deemed to have been approved by the Commission, if-

**(i)** the Commission does not approve or disapprove the proposed rule change or begin proceedings under subparagraph (B) within the period described in subparagraph (A); or

**(ii)** the Commission does not issue an order approving or disapproving the proposed rule change under subparagraph (B) within the period described in subparagraph (B)(ii).

**(E) Publication date based on Federal Register publishing**

For purposes of this paragraph, if, after filing a proposed rule change with the Commission pursuant to paragraph (1), a self-regulatory organization publishes a notice of the filing of such proposed rule change, together with the substantive terms of such proposed rule change, on a publicly accessible website, the Commission shall thereafter send the notice to the Federal Register for publication thereof under paragraph (1) within 15 days of the date on which such website publication is made. If the Commission fails to send the notice for

A-8

publication thereof within such 15 day period, then the date of publication shall be deemed to be the date on which such website publication was made.

**(F) Rulemaking**

**(i) In general**

Not later than 180 days after July 21, 2010, after consultation with other regulatory agencies, the Commission shall promulgate rules setting forth the procedural requirements of the proceedings required under this paragraph.

**(ii) Notice and comment not required**

The rules promulgated by the Commission under clause (i) are not required to include republication of proposed rule changes or solicitation of public comment.

**(3)(A)** Notwithstanding the provisions of paragraph (2) of this subsection, a proposed rule change shall take effect upon filing with the Commission if designated by the self-regulatory organization as (i) constituting a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing rule of the self-regulatory organization, (ii) establishing or changing a due, fee, or other charge imposed by the self-regulatory organization on any person, whether or not the person is a member of the self-regulatory organization, or (iii) concerned solely with the administration of the self-regulatory organization or other matters which the Commission, by rule, consistent with the public interest and the purposes of this subsection, may specify as without the provisions of such paragraph (2).

**(B)** Notwithstanding any other provision of this subsection, a proposed rule change may be put into effect summarily if it appears to the Commission that such action is necessary for the protection of investors, the maintenance of fair and orderly markets, or the safeguarding of securities or funds. Any proposed rule change so put into effect shall be filed promptly thereafter in accordance with the provisions of paragraph (1) of this subsection.

**(C)** Any proposed rule change of a self-regulatory organization which has taken effect pursuant to subparagraph (A) or (B) of this paragraph may be enforced by such organization to the extent it is not inconsistent with the provisions of this chapter, the rules and regulations thereunder, and applicable Federal and State law. At any time within the 60-day period beginning on the date of filing of such a proposed rule change in accordance with the provisions of paragraph (1), the

Commission summarily may temporarily suspend the change in the rules of the self-regulatory organization made thereby, if it appears to the Commission that such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter. If the Commission takes such action, the Commission shall institute proceedings under paragraph (2)(B) to determine whether the proposed rule should be approved or disapproved. Commission action pursuant to this subparagraph shall not affect the validity or force of the rule change during the period it was in effect and shall not be reviewable under section 78y of this title nor deemed to be "final agency action" for purposes of section 704 of Title 5.

**(4)** With respect to a proposed rule change filed by a registered clearing agency for which the Commission is not the appropriate regulatory agency--

**(A)** The Commission shall not approve any such proposed rule change prior to the thirtieth day after the date of publication of notice of the filing whereof unless the appropriate regulatory agency for such clearing agency has notified the Commission of such appropriate regulatory agency's determination that the proposed rule change is consistent with the safeguarding of securities and funds in the custody or control of such clearing agency or for which it is responsible.

**(B)** The Commission shall institute proceedings in accordance with paragraph (2)(B) of this subsection to determine whether any such proposed rule change should be disapproved, if the appropriate regulatory agency for such clearing agency notifies the Commission within thirty days of the date of publication of notice of the filing of the proposed rule change of such appropriate regulatory agency's (i) determination that the proposed rule change may be inconsistent with the safeguarding of securities or funds in the custody or control of such clearing agency or for which it is responsible and (ii) reasons for such determination.

**(C)** The Commission shall disapprove any such proposed rule change if the appropriate regulatory agency for such clearing agency notifies the Commission prior to the conclusion of proceedings instituted in accordance with paragraph (2)(B) of this subsection of such appropriate regulatory agency's (i) determination that the proposed rule change is inconsistent with the safeguarding of securities or funds in the custody or control of such clearing agency or for which it is responsible and (ii) reasons for such determination.

**(D)(i)** The Commission shall order the temporary suspension of any change in the rules of a clearing agency made by a proposed rule change that has taken effect under paragraph (3), if the appropriate regulatory agency for the clearing agency

notifies the Commission not later than 30 days after the date on which the proposed rule change was filed of--

**(I)** the determination by the appropriate regulatory agency that the rules of such clearing agency, as so changed, may be inconsistent with the safeguarding of securities or funds in the custody or control of such clearing agency or for which it is responsible; and

**(II)** the reasons for the determination described in subclause (I).

**(ii)** If the Commission takes action under clause (i), the Commission shall institute proceedings under paragraph (2)(B) to determine if the proposed rule change should be approved or disapproved.

**(5)** The Commission shall consult with and consider the views of the Secretary of the Treasury prior to approving a proposed rule filed by a registered securities association that primarily concerns conduct related to transactions in government securities, except where the Commission determines that an emergency exists requiring expeditious or summary action and publishes its reasons therefor. If the Secretary of the Treasury comments in writing to the Commission on a proposed rule that has been published for comment, the Commission shall respond in writing to such written comment before approving the proposed rule. If the Secretary of the Treasury determines, and notifies the Commission, that such rule, if implemented, would, or as applied does (i) adversely affect the liquidity or efficiency of the market for government securities; or (ii) impose any burden on competition not necessary or appropriate in furtherance of the purposes of this section, the Commission shall, prior to adopting the proposed rule, find that such rule is necessary and appropriate in furtherance of the purposes of this section notwithstanding the Secretary's determination.

**(6)** In approving rules described in paragraph (5), the Commission shall consider the sufficiency and appropriateness of then existing laws and rules applicable to government securities brokers, government securities dealers, and persons associated with government securities brokers and government securities dealers.

**(7) Security futures product rule changes**

**(A) Filing required**

A self-regulatory organization that is an exchange registered with the Commission pursuant to section 78f(g) of this title or that is a national securities association registered pursuant to section 78*o*-3(k) of this title shall file with the

Commission, in accordance with such rules as the Commission may prescribe, copies of any proposed rule change or any proposed change in, addition to, or deletion from the rules of such self-regulatory organization (hereinafter in this paragraph collectively referred to as a "proposed rule change") that relates to higher margin levels, fraud or manipulation, recordkeeping, reporting, listing standards, or decimal pricing for security futures products, sales practices for security futures products for persons who effect transactions in security futures products, or rules effectuating such self-regulatory organization's obligation to enforce the securities laws. Such proposed rule change shall be accompanied by a concise general statement of the basis and purpose of such proposed rule change. The Commission shall, upon the filing of any proposed rule change, promptly publish notice thereof together with the terms of substance of the proposed rule change or a description of the subjects and issues involved. The Commission shall give interested persons an opportunity to submit data, views, and arguments concerning such proposed rule change.

**(B) Filing with CFTC**

A proposed rule change filed with the Commission pursuant to subparagraph (A) shall be filed concurrently with the Commodity Futures Trading Commission. Such proposed rule change may take effect upon filing of a written certification with the Commodity Futures Trading Commission under section 7a-2(c) of Title 7, upon a determination by the Commodity Futures Trading Commission that review of the proposed rule change is not necessary, or upon approval of the proposed rule change by the Commodity Futures Trading Commission.

**(C) Abrogation of rule changes**

Any proposed rule change of a self-regulatory organization that has taken effect pursuant to subparagraph (B) may be enforced by such self-regulatory organization to the extent such rule is not inconsistent with the provisions of this chapter, the rules and regulations thereunder, and applicable Federal law. At any time within 60 days of the date of the filing of a written certification with the Commodity Futures Trading Commission under section 7a-2(c) of Title 7, the date the Commodity Futures Trading Commission determines that review of such proposed rule change is not necessary, or the date the Commodity Futures Trading Commission approves such proposed rule change, the Commission, after consultation with the Commodity Futures Trading Commission, may summarily abrogate the proposed rule change and require that the proposed rule change be refiled in accordance with the provisions of paragraph (1), if it appears to the Commission that such proposed rule change unduly burdens competition

or efficiency, conflicts with the securities laws, or is inconsistent with the public interest and the protection of investors. Commission action pursuant to the preceding sentence shall not affect the validity or force of the rule change during the period it was in effect and shall not be reviewable under section 78y of this title nor deemed to be a final agency action for purposes of section 704 of Title 5.

### (D) Review of resubmitted abrogated rules

#### (i) Proceedings

Within 35 days of the date of publication of notice of the filing of a proposed rule change that is abrogated in accordance with subparagraph (C) and refiled in accordance with paragraph (1), or within such longer period as the Commission may designate up to 90 days after such date if the Commission finds such longer period to be appropriate and publishes its reasons for so finding or as to which the self-regulatory organization consents, the Commission shall--

**(I)** by order approve such proposed rule change; or

**(II)** after consultation with the Commodity Futures Trading Commission, institute proceedings to determine whether the proposed rule change should be disapproved. Proceedings under subclause (II) shall include notice of the grounds for disapproval under consideration and opportunity for hearing and be concluded within 180 days after the date of publication of notice of the filing of the proposed rule change. At the conclusion of such proceedings, the Commission, by order, shall approve or disapprove such proposed rule change. The Commission may extend the time for conclusion of such proceedings for up to 60 days if the Commission finds good cause for such extension and publishes its reasons for so finding or for such longer period as to which the self-regulatory organization consents.

#### (ii) Grounds for approval

The Commission shall approve a proposed rule change of a self-regulatory organization under this subparagraph if the Commission finds that such proposed rule change does not unduly burden competition or efficiency, does not conflict with the securities laws, and is not inconsistent with the public interest or the protection of investors. The Commission shall disapprove such a proposed rule change of a self-regulatory organization if it does not make such finding. The Commission shall not approve any proposed rule change

prior to the 30th day after the date of publication of notice of the filing thereof, unless the Commission finds good cause for so doing and publishes its reasons for so finding.

**(8) Decimal pricing**

Not later than 9 months after the date on which trading in any security futures product commences under this chapter, all self-regulatory organizations listing or trading security futures products shall file proposed rule changes necessary to implement decimal pricing of security futures products. The Commission may not require such rules to contain equal minimum increments in such decimal pricing.

**(9) Consultation with CFTC**

**(A) Consultation required**

The Commission shall consult with and consider the views of the Commodity Futures Trading Commission prior to approving or disapproving a proposed rule change filed by a national securities association registered pursuant to section 78*o*-3(a) of this title or a national securities exchange subject to the provisions of subsection (a) that primarily concerns conduct related to transactions in security futures products, except where the Commission determines that an emergency exists requiring expeditious or summary action and publishes its reasons therefor.

**(B) Responses to CFTC comments and findings**

If the Commodity Futures Trading Commission comments in writing to the Commission on a proposed rule that has been published for comment, the Commission shall respond in writing to such written comment before approving or disapproving the proposed rule. If the Commodity Futures Trading Commission determines, and notifies the Commission, that such rule, if implemented or as applied, would--

**(i)** adversely affect the liquidity or efficiency of the market for security futures products; or

**(ii)** impose any burden on competition not necessary or appropriate in furtherance of the purposes of this section,

the Commission shall, prior to approving or disapproving the proposed rule, find that such rule is necessary and appropriate in furtherance of the purposes of this

section notwithstanding the Commodity Futures Trading Commission's determination.

**(10) Rule of construction relating to filing date of proposed rule changes**

**(A) In general**

For purposes of this subsection, the date of filing of a proposed rule change shall be deemed to be the date on which the Commission receives the proposed rule change.

**(B) Exception**

A proposed rule change has not been received by the Commission for purposes of subparagraph (A) if, not later than 7 business days after the date of receipt by the Commission, the Commission notifies the self-regulatory organization that such proposed rule change does not comply with the rules of the Commission relating to the required form of a proposed rule change, except that if the Commission determines that the proposed rule change is unusually lengthy and is complex or raises novel regulatory issues, the Commission shall inform the self-regulatory organization of such determination not later than 7 business days after the date of receipt by the Commission and, for the purposes of subparagraph (A), a proposed rule change has not been received by the Commission, if, not later than 21 days after the date of receipt by the Commission, the Commission notifies the self-regulatory organization that such proposed rule change does not comply with the rules of the Commission relating to the required form of a proposed rule change.

**(10)** Notwithstanding paragraph (2), the time period within which the Commission is required by order to approve a proposed rule change or institute proceedings to determine whether the proposed rule change should be disapproved is stayed pending a determination by the Commission upon the request of the Commodity Futures Trading Commission or its Chairman that the Commission issue a determination as to whether a product that is the subject of such proposed rule change is a security pursuant to section 8306 of this title.

* * *

## 15 U.S.C. § 78y

§ 78y. Court review of orders and rules

**(a) Final Commission orders; persons aggrieved; petition; record; findings; affirmance, modification, enforcement, or setting aside of orders; remand to adduce additional evidence**

**(1)** A person aggrieved by a final order of the Commission entered pursuant to this chapter may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has his principal place of business, or for the District of Columbia Circuit, by filing in such court, within sixty days after the entry of the order, a written petition requesting that the order be modified or set aside in whole or in part.

**(2)** A copy of the petition shall be transmitted forthwith by the clerk of the court to a member of the Commission or an officer designated by the Commission for that purpose. Thereupon the Commission shall file in the court the record on which the order complained of is entered, as provided in section 2112 of Title 28 and the Federal Rules of Appellate Procedure.

**(3)** On the filing of the petition, the court has jurisdiction, which becomes exclusive on the filing of the record, to affirm or modify and enforce or to set aside the order in whole or in part.

**(4)** The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive.

**(5)** If either party applies to the court for leave to adduce additional evidence and shows to the satisfaction of the court that the additional evidence is material and that there was reasonable ground for failure to adduce it before the Commission, the court may remand the case to the Commission for further proceedings, in whatever manner and on whatever conditions the court considers appropriate. If the case is remanded to the Commission, it shall file in the court a supplemental record containing any new evidence, any further or modified findings, and any new order.

**(b) Commission rules; persons adversely affected; petition; record; affirmance, enforcement, or setting aside of rules; findings; transfer of proceedings**

**(1)** A person adversely affected by a rule of the Commission promulgated pursuant to section 78f, 78i(h)(2), 78k, 78k-1, 78*o*(c)(5) or (6), 78*o*-3, 78q, 78q-1, or 78s of this title may obtain review of this rule in the United States Court of Appeals for the

circuit in which he resides or has his principal place of business or for the District of Columbia Circuit, by filing in such court, within sixty days after the promulgation of the rule, a written petition requesting that the rule be set aside.

**(2)** A copy of the petition shall be transmitted forthwith by the clerk of the court to a member of the Commission or an officer designated for that purpose. Thereupon, the Commission shall file in the court the rule under review and any documents referred to therein, the Commission's notice of proposed rulemaking and any documents referred to therein, all written submissions and the transcript of any oral presentations in the rulemaking, factual information not included in the foregoing that was considered by the Commission in the promulgation of the rule or proffered by the Commission as pertinent to the rule, the report of any advisory committee received or considered by the Commission in the rulemaking, and any other materials prescribed by the court.

**(3)** On the filing of the petition, the court has jurisdiction, which becomes exclusive on the filing of the materials set forth in paragraph (2) of this subsection, to affirm and enforce or to set aside the rule.

**(4)** The findings of the Commission as to the facts identified by the Commission as the basis, in whole or in part, of the rule, if supported by substantial evidence, are conclusive. The court shall affirm and enforce the rule unless the Commission's action in promulgating the rule is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law.

**(5)** If proceedings have been instituted under this subsection in two or more courts of appeals with respect to the same rule, the Commission shall file the materials set forth in paragraph (2) of this subsection in that court in which a proceeding was first instituted. The other courts shall thereupon transfer all such proceedings to the court in which the materials have been filed. For the convenience of the parties in the interest of justice that court may thereafter transfer all the proceedings to any other court of appeals.

**(c) Objections not urged before Commission; stay of orders and rules; transfer of enforcement or review proceedings**

**(1)** No objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so.

**(2)** The filing of a petition under this section does not operate as a stay of the Commission's order or rule. Until the court's jurisdiction becomes exclusive, the Commission may stay its order or rule pending judicial review if it finds that justice so requires. After the filing of a petition under this section, the court, on whatever conditions may be required and to the extent necessary to prevent irreparable injury, may issue all necessary and appropriate process to stay the order or rule or to preserve status or rights pending its review; but (notwithstanding section 705 of Title 5) no such process may be issued by the court before the filing of the record or the materials set forth in subsection (b)(2) of this section unless: (A) the Commission has denied a stay or failed to grant requested relief, (B) a reasonable period has expired since the filing of an application for a stay without a decision by the Commission, or (C) there was reasonable ground for failure to apply to the Commission.

**(3)** When the same order or rule is the subject of one or more petitions for review filed under this section and an action for enforcement filed in a district court of the United States under section 78u(d) or (e) of this title, that court in which the petition or the action is first filed has jurisdiction with respect to the order or rule to the exclusion of any other court, and thereupon all such proceedings shall be transferred to that court; but, for the convenience of the parties in the interest of justice, that court may thereafter transfer all the proceedings to any other court of appeals or district court of the United States, whether or not a petition for review or an action for enforcement was originally filed in the transferee court. The scope of review by a district court under section 78u(d) or (e) of this title is in all cases the same as by a court of appeals under this section.

**(d) Other appropriate regulatory agencies**

**(1)** For purposes of the preceding subsections of this section, the term "Commission" includes the agencies enumerated in section 78c(a)(34) of this title insofar as such agencies are acting pursuant to this chapter and the Secretary of the Treasury insofar as he is acting pursuant to section 78*o*-5 of this title.

**(2)** For purposes of subsection (a)(4) of this section and section 706 of Title 5, an order of the Commission pursuant to section 78s(a) of this title denying registration to a clearing agency for which the Commission is not the appropriate regulatory agency or pursuant to section 78s(b) of this title disapproving a proposed rule change by such a clearing agency shall be deemed to be an order of the appropriate regulatory agency for such clearing agency insofar as such order was entered by reason of a determination by such appropriate regulatory agency pursuant to section 78s(a)(2)(C) or 78s(b)(4)(C) of this title that such registration or proposed rule change would be inconsistent with the safeguarding of securities or funds.

### 17 C.F.R. § 240.19b–4

§ 240.19b–4 Filings with respect to proposed rule changes by self-regulatory organizations.

(a) Definitions. As used in this section:

(1) The term advance notice means a notice required to be made by a designated clearing agency pursuant to Section 806(e) of the Payment, Clearing and Settlement Supervision Act (12 U.S.C. 5465(e));

(2) The term designated clearing agency means a clearing agency that is registered with the Commission, and for which the Commission is the Supervisory Agency (as determined in accordance with section 803(8) of the Payment, Clearing and Settlement Supervision Act (12 U.S.C. 5462(8)), that has been designated by the Financial Stability Oversight Council pursuant to section 804 of the Payment, Clearing and Settlement Supervision Act (12 U.S.C. 5463) as systemically important or likely to become systemically important;

(3) The term Payment, Clearing and Settlement Supervision Act means Title VIII of the Dodd–Frank Wall Street Reform and Consumer Protection Act (124 Stat. 1802, 1803, 1807, 1809, 1811, 1814, 1816, 1818, 1820, 1821; 12 U.S.C. 5461 et seq.);

(4) The term proposed rule change has the meaning set forth in Section 19(b)(1) of the Act (15 U.S.C. 78s(b)(1));

(5) The term security-based swap submission means a submission of identifying information required to be made by a clearing agency pursuant to section 3C(b)(2) of the Act (15 U.S.C. 78c–3(b)(2)) for each security-based swap, or any group, category, type or class of security-based swaps, that such clearing agency plans to accept for clearing;

(6) The term stated policy, practice, or interpretation means:

(i) Any material aspect of the operation of the facilities of the self-regulatory organization; or

(ii) Any statement made generally available to the membership of, to all participants in, or to persons having or seeking access (including, in the case of national securities exchanges or registered securities associations, through a member) to facilities of, the self-regulatory organization ("specified persons"), or to a group or category of specified persons, that establishes or changes any standard, limit, or guideline with respect to:

(A) The rights, obligations, or privileges of specified persons or, in the case of national securities exchanges or registered securities associations, persons associated with specified persons; or

(B) The meaning, administration, or enforcement of an existing rule.

(b)(1) Filings with respect to proposed rule changes by a self-regulatory organization, except filings with respect to proposed rules changes by self-regulatory organizations submitted pursuant to section 19(b)(7) of the Act (15 U.S.C. 78s(b)(7)), shall be made electronically on Form 19b–4 (17 CFR 249.819).

(2) For purposes of Section 19(b) of the Act and this rule, a "business day" is any day other than a Saturday, Sunday, Federal holiday, a day that the Office of Personnel Management has announced that Federal agencies in the Washington, DC area are closed to the public, a day on which the Commission is subject to a Federal government shutdown or a day on which the Commission's Washington, DC office is otherwise not open for regular business.

(c) A stated policy, practice, or interpretation of the self-regulatory organization shall be deemed to be a proposed rule change unless (1) it is reasonably and fairly implied by an existing rule of the self-regulatory organization or (2) it is concerned solely with the administration of the self-regulatory organization and is not a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing rule of the self-regulatory organization.

(d) Regardless of whether it is made generally available, an interpretation of an existing rule of the self-regulatory organization shall be deemed to be a proposed rule change if (1) it is approved or ratified by the governing body of the self-regulatory organization and (2) it is not reasonably and fairly implied by that rule.

(e) For the purposes of this paragraph, new derivative securities product means any type of option, warrant, hybrid securities product or any other security, other than a single equity option or a security futures product, whose value is based, in whole or in part, upon the performance of, or interest in, an underlying instrument.

(1) The listing and trading of a new derivative securities product by a self-regulatory organization shall not be deemed a proposed rule change, pursuant to paragraph (c)(1) of this section, if the Commission has approved, pursuant to section 19(b) of the Act (15 U.S.C. 78s(b)), the self-regulatory organization's trading rules, procedures and listing standards for the product class that would include the new derivative securities product and the self-regulatory organization has a surveillance program for the product class.

(2) Recordkeeping and reporting:

(i) Self-regulatory organizations shall retain at their principal place of business a file, available to Commission staff for inspection, of all relevant records and information pertaining to each new derivative securities product traded pursuant to this paragraph (e) for a period of not less than five years, the first two years in an easily accessible place, as prescribed in § 240.17a–1.

(ii) When relying on this paragraph (e), a self-regulatory organization shall submit Form 19b–4(e) (17 CFR 249.820) to the Commission within five business days after commencement of trading a new derivative securities product.

(f) A proposed rule change may take effect upon filing with the Commission pursuant to Section 19(b)(3)(A) of the Act, 15 U.S.C. 78s(b)(3)(A), if properly designated by the self-regulatory organization as:

(1) Constituting a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing rule;

(2) Establishing or changing a due, fee, or other charge applicable only to a member;

(3) Concerned solely with the administration of the self-regulatory organization;

(4) Effecting a change in an existing service of a registered clearing agency that either:

(i)(A) Does not adversely affect the safeguarding of securities or funds in the custody or control of the clearing agency or for which it is responsible; and

(B) Does not significantly affect the respective rights or obligations of the clearing agency or persons using the service; or

(ii)(A) Primarily affects the clearing operations of the clearing agency with respect to products that are not securities, including futures that are not security futures, swaps that are not security-based swaps or mixed swaps, and forwards that are not security forwards; and

(B) Either

(1) Does not significantly affect any securities clearing operations of the clearing agency or any rights or obligations of the clearing agency with respect to securities clearing or persons using such securities-clearing service, or

(2) Does significantly affect any securities clearing operations of the clearing agency or the rights or obligations of the clearing agency with respect to securities clearing or persons using such securities-clearing service, but is necessary to maintain fair and orderly markets for products that are not securities, including futures that are not security futures, swaps that are not security-based swaps or mixed swaps, and forwards that are not security forwards. Proposed rule changes filed pursuant to this subparagraph II must also be filed in accordance with the procedures of Section 19(b)(1) for approval pursuant to Section 19(b)(2) and the regulations thereunder within fifteen days of being filed under Section 19(b)(3)(A).

(5) Effecting a change in an existing order-entry or trading system of a self-regulatory organization that:

(i) Does not significantly affect the protection of investors or the public interest;

(ii) Does not impose any significant burden on competition; and

(iii) Does not have the effect of limiting the access to or availability of the system; or

(6) Effecting a change that:

(i) Does not significantly affect the protection of investors or the public interest;

(ii) Does not impose any significant burden on competition; and

(iii) By its terms, does not become operative for 30 days after the date of the filing, or such shorter time as the Commission may designate if consistent with the protection of investors and the public interest; provided that the self-regulatory organization has given the Commission written notice of its intent to file the proposed rule change, along with a brief description and text of the proposed rule change, at least five business days prior to the date of filing of the proposed rule change, or such shorter time as designated by the Commission.

(g) Proceedings to determine whether a proposed rule change should be disapproved will be conducted pursuant to 17 CFR 201.700 and 201.701 (Initiation of Proceedings for SRO Proposed Rule Changes and for Proposed NMS Plans and Plan Amendments).

(h) Notice of orders issued pursuant to section 19(b) of the Act will be given by prompt publication thereof, together with a statement of written reasons therefor.

(i) Self-regulatory organizations shall retain at their principal place of business a file, available to interested persons for public inspection and copying, of all filings, notices and submissions made pursuant to this section and all correspondence and other communications reduced to writing (including comment letters) to and from such self-regulatory organization concerning any such filing, notice or submission, whether such correspondence and communications are received or prepared before or after the filing, notice or submission of the proposed rule change, advance notice or security-based swap submission, as applicable.

(j) Filings by a self-regulatory organization submitted on Form 19b–4 (17 CFR 249.819) electronically shall contain an electronic signature. For the purposes of this section, the term electronic signature means an electronic entry in the form of a magnetic impulse or other form of computer data compilation of any letter or series of letters or characters comprising a name, executed, adopted or authorized as a signature. The signatory to an electronically submitted rule filing shall manually sign a signature page or other document, in the manner prescribed by Form 19b–4, authenticating, acknowledging or otherwise adopting his or her signature that appears in typed form within the electronic filing. Such document shall be executed before or at the time the rule filing is electronically submitted and shall be retained by the filer in accordance with § 240.17a–1.

(k) If the conditions of this section and Form 19b–4 (17 CFR 249.819) are otherwise satisfied, all filings submitted electronically on or before 5:30 p.m. Eastern Standard Time or Eastern Daylight Saving Time, whichever is currently in effect, on a business day, shall be deemed filed on that business day, and all filings submitted

A-23

after 5:30 p.m. Eastern Standard Time or Eastern Daylight Saving Time, whichever is currently in effect, shall be deemed filed on the next business day.

(l) The self-regulatory organization shall post each proposed rule change, and any amendments thereto, on its Web site within two business days after the filing of the proposed rule change, and any amendments thereto, with the Commission. If a self-regulatory organization does not post a proposed rule change on its Web site on the same day that it filed the proposal with the Commission, then the self-regulatory organization shall inform the Commission of the date on which it posted such proposal on its Web site. Such proposed rule change and amendments shall be maintained on the self-regulatory organization's Web site until:

(1) In the case of a proposed rule change filed under section 19(b)(2) of the Act (15 U.S.C. 78s(b)(2)), the Commission approves or disapproves the proposed rule change or the self-regulatory organization withdraws the proposed rule change, or any amendments, or is notified that the proposed rule change is not properly filed; or

(2) In the case of a proposed rule change filed under section 19(b)(3)(A) of the Act (15 U.S.C. 78s(b)(3)(A)), or any amendment thereto, 60 days after the date of filing, unless the self-regulatory organization withdraws the proposed rule change or is notified that the proposed rule change is not properly filed; and

(3) In the case of proposed rule changes approved by the Commission pursuant to section 19(b)(2) of the Act (15 U.S.C. 78s(b)(2)) or noticed by the Commission pursuant to section 19(b)(3)(A) of the Act (15 U.S.C. 78s(b)(3)(A)), the self-regulatory organization updates its rule text as required by paragraph (m) of this section; and

(4) In the case of a proposed rule change, or any amendment thereto, that has been disapproved, withdrawn or not properly filed, the self-regulatory organization shall remove the proposed rule change, or any amendment, from its Web site within two business days of notification of disapproval, improper filing, or withdrawal by the SRO of the proposed rule change.

(m)(1) Each self-regulatory organization shall post and maintain a current and complete version of its rules on its Web site.

(2) A self-regulatory organization, other than a self-regulatory organization that is registered with the Commission under section 6(g) of the Act (15 U.S.C. 78f(g)) or pursuant to section 15A(k) of the Act (15 U.S.C. 78*o*–1(k)), shall update its Web site to reflect rule changes filed pursuant to section 19(b)(2) of

the Act (15 U.S.C. 78s(b)(2)) within two business days after it has been notified of the Commission's approval of a proposed rule change, and to reflect rule changes filed pursuant to section 19(b)(3)(A) of the Act (15 U.S.C. 78s(b)(3)(A)) within two business days of the Commission's notice of such proposed rule change.

(3) A self-regulatory organization that is registered with the Commission under section 6(g) of the Act (15 U.S.C. 78f(g)) or pursuant to section 15A(k) of the Act (15 U.S.C. 78*o*–1(k)), shall update its Web site to reflect rule changes filed pursuant to section 19(b)(2) of the Act by two business days after the later of:

(A) Notification that the Commission has approved a proposed rule change; and

(B)(i) The filing of a written certification with the Commodity Futures Trading Commission under section 5c(c) of the Commodity Exchange Act (7 U.S.C. 7a–2(c));

   (ii) Receipt of notice from the Commodity Futures Trading Commission that it has determined that review of the proposed rule change is not necessary; or

   (iii) Receipt of notice from the Commodity Futures Trading Commission that it has approved the proposed rule change.

(4) If a rule change is not effective for a certain period, the self-regulatory organization shall clearly indicate the effective date in the relevant rule text.

(n)(1)(i) A designated clearing agency shall provide an advance notice to the Commission of any proposed change to its rules, procedures, or operations that could materially affect the nature or level of risks presented by such designated clearing agency. Except as provided in paragraph (n)(1)(ii) of this section, such advance notice shall be submitted to the Commission electronically on Form 19b–4 (referenced in 17 CFR 249.819). The Commission shall, upon the filing of any advance notice, provide for prompt publication thereof.

(ii) Any designated clearing agency that files an advance notice with the Commission prior to December 10, 2013, shall file such advance notice in electronic format to a dedicated email address to be established by the Commission. The contents of an advance notice filed pursuant to this paragraph (n)(1)(ii) shall contain the information required to be included for advance notices in the General Instructions for Form 19b–4 (referenced in 17 CFR 249.819).

(2)(i) For purposes of this paragraph (n), the phrase materially affect the nature or level of risks presented, when used to qualify determinations on a change to rules, procedures, or operations at the designated clearing agency, means matters as to which there is a reasonable possibility that the change could affect the performance of essential clearing and settlement functions or the overall nature or level of risk presented by the designated clearing agency.

(ii) Changes to rules, procedures, or operations that could materially affect the nature or level of risks presented by a designated clearing agency may include, but are not limited to, changes that materially affect participant and product eligibility, risk management, daily or intraday settlement procedures, default procedures, system safeguards, governance or financial resources of the designated clearing agency.

(iii) Changes to rules, procedures, or operations that may not materially affect the nature or level of risks presented by a designated clearing agency include, but are not limited to:

(A) Changes to an existing procedure, control, or service that do not modify the rights or obligations of the designated clearing agency or persons using its payment, clearing, or settlement services and that do not adversely affect the safeguarding of securities, collateral, or funds in the custody or control of the designated clearing agency or for which it is responsible; or

(B) Changes concerned solely with the administration of the designated clearing agency or related to the routine, daily administration, direction, and control of employees;

(3) The designated clearing agency shall post the advance notice, and any amendments thereto, on its Web site within two business days after the filing of the advance notice, and any amendments thereto, with the Commission. Such advance notice and amendments shall be maintained on the designated clearing agency's Web site until the earlier of:

(i) The date the designated clearing agency withdraws the advance notice or is notified that the advance notice is not properly filed; or

(ii) The date the designated clearing agency posts a notice of effectiveness as required by paragraph (n)(4)(ii) of this section.

(4)(i) The designated clearing agency shall post a notice on its Web site within two business days of the date that any change to its rules, procedures, or

operations referred to in an advance notice has been permitted to take effect as such date is determined in accordance with Section 806(e) of the Payment, Clearing and Settlement Supervision Act (12 U.S.C. 5465).

(ii) The designated clearing agency shall post a notice on its Web site within two business days of the effectiveness of any change to its rules, procedures, or operations referred to in an advance notice.

(5) A designated clearing agency shall provide copies of all materials submitted to the Commission relating to an advance notice with the Board of Governors of the Federal Reserve System contemporaneously with such submission to the Commission.

(6) The publication and Web site posting requirements contained in paragraphs (n)(1), (n)(3), and (n)(4) of this section do not apply to any information contained in an advance notice for which a designated clearing agency has requested confidential treatment following the procedures set forth in § 240.24b–2.

(o)(1) Every clearing agency that is registered with the Commission that plans to accept a security-based swap, or any group, category, type, or class of security-based swaps for clearing shall submit to the Commission a security-based swap submission and provide notice to its members of such security-based swap submission.

(2)(i) Except as provided in paragraph (o)(2)(ii) of this section, a clearing agency shall submit each security-based swap submission to the Commission electronically on Form 19b–4 (referenced in 17 CFR 249.819) with the information required to be submitted for a security-based swap submission, as provided in § 240.19b–4 and Form 19b–4. Any information submitted to the Commission electronically on Form 19b–4 that is not complete or otherwise in compliance with this section and Form 19b–4 shall not be considered a security-based swap submission and the Commission shall so inform the clearing agency within twenty-one business days of the submission on Form 19b–4 (referenced in 17 CFR 249.819).

(ii) Any clearing agency that files a security-based swap submission with the Commission prior to December 10, 2013, shall file such security-based swap submission in electronic format to a dedicated email address to be established by the Commission. The contents of a security-based swap submission filed pursuant to this paragraph (o)(2)(ii) shall contain the information required to be included for security-based swap submissions in the General Instructions for Form 19b–4.

(3) A security-based swap submission submitted by a clearing agency to the Commission shall include a statement that includes, but is not limited to:

(i) How the security-based swap submission is consistent with Section 17A of the Act (15 U.S.C. 78q–1);

(ii) Information that will assist the Commission in the quantitative and qualitative assessment of the factors specified in Section 3C of the Act (15 U.S.C. 78c–3), including, but not limited to:

(A) The existence of significant outstanding notional exposures, trading liquidity, and adequate pricing data;

(B) The availability of a rule framework, capacity, operational expertise and resources, and credit support infrastructure to clear the contract on terms that are consistent with the material terms and trading conventions on which the contract is then traded;

(C) The effect on the mitigation of systemic risk, taking into account the size of the market for such contract and the resources of the clearing agency available to clear the contract;

(D) The effect on competition, including appropriate fees and charges applied to clearing; and

(E) The existence of reasonable legal certainty in the event of the insolvency of the relevant clearing agency or one or more of its clearing members with regard to the treatment of customer and security-based swap counterparty positions, funds, and property;

(iii) A description of how the rules of the clearing agency prescribe that all security-based swaps submitted to the clearing agency with the same terms and conditions are economically equivalent within the clearing agency and may be offset with each other within the clearing agency, as applicable to the security-based swaps described in the security-based swap submission; and

(iv) A description of how the rules of the clearing agency provide for non-discriminatory clearing of a security-based swap executed bilaterally or on or through the rules of an unaffiliated national securities exchange or security-based swap execution facility, as applicable to the security-based swaps described in the security-based swap submission.

(4) A clearing agency shall submit security-based swaps to the Commission for review by group, category, type or class of security-based swaps, to the extent reasonable and practicable to do so.

(5) A clearing agency shall post each security-based swap submission, and any amendments thereto, on its Web site within two business days after the submission of the security-based swap submission, and any amendments thereto, with the Commission. Such security-based swap submission and amendments shall be maintained on the clearing agency's Web site until the Commission makes a determination regarding the security-based swap submission or the clearing agency withdraws the security-based swap submission, or is notified that the security-based swap submission is not properly filed.

(6) In connection with any security-based swap submission that is submitted by a clearing agency to the Commission, the clearing agency shall provide any additional information requested by the Commission as necessary to assess any of the factors it determines to be appropriate in order to make the determination of whether the clearing requirement applies.

(7) Notices of orders issued pursuant to Section 3C of the Act (15 U.S.C. 78c–3), regarding security-based swap submissions will be given by prompt publication thereof, together with a statement of written reasons therefor.