

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
100 F STREET, N.E.
WASHINGTON, D.C. 20549

**Office of the**
**General Counsel**

**Daniel T. Young**
**(202) 551-3078**
**youngda@sec.gov**

April 12, 2023

Mark Langer, Clerk of Court
U.S. Court of Appeals for the District of Columbia Circuit
333 Constitution Avenue, N.W.
Washington, D.C. 20001-2866

Re:   *Grayscale Investments, LLC v. Securities and Exchange Commission*, No. 22-1142
      Supplemental Authority Under Fed. R. App. P. 28(j)

Dear Mr. Langer:

    We write to notify the Court of a recent Order issued by the Commission which further addresses relevant issues. *See VanEck Order*, 88 Fed. Reg. 16055 (Mar. 15, 2023) (attached). After again reviewing the academic literature regarding price movements in the bitcoin futures and spot markets, the VanEck Order reiterated that such analyses "remain inconclusive." *Id.* at 16065 & n.128 (aggregating prior orders' citations to academic studies); *accord* SEC Br. 28 & n.26 (same). *Compare, e.g.*, Robertson & Zhang (2022), https://dx.doi.org/10.2139/ssrn.4012165 (unpublished study cited by Grayscale, JA132, concluding that the CME "consistently leads in bitcoin price discovery"), *with* Alexander & Heck (2020), https://www.sciencedirect.com/science/article/pii/S1572308920300759 (finding that CME bitcoin futures "have a very minor effect on price discovery"). These studies illustrate that ascertaining precisely how information flows between the bitcoin spot and futures markets is a methodologically complex question without an empirical consensus.

    These studies also belie Grayscale's assertion—which it supports with snapshot, once-a-day price correlations—that the "common sense" relationship between spot and futures prices is such that CME bitcoin futures prices "will be affected" by fraud or manipulation of bitcoin spot prices "in like measure" (Grayscale Br. 27). If that were correct, it would suggest, contrary to Grayscale's own finding, that bitcoin spot prices should reliably lead CME bitcoin futures prices. *See* SEC Br. 28 (noting Grayscale's conclusion that "there does not appear to be a significant lead/lag relationship" during one 22-month period). But the academic literature reviewed in the VanEck Order demonstrates that, depending on the time period studied, the methodology used, the data frequency employed (per-minute, per-hour, or per-day), and the particular bitcoin markets included, one can reach different conclusions regarding the nature of the relationship, to the extent one exists.

    Because the evidence is mixed, one cannot simply assume that misconduct targeting Grayscale's proposed spot-based ETP would necessarily have detectable effects on the CME



April 12, 2023
Page 2

market for bitcoin futures.  Without adequate record evidence on that issue, the CME's market-surveillance measures cannot support the required statutory finding that the proposed SRO rule change is "designed to prevent fraudulent and manipulative acts and practices."  15 U.S.C. 78f(b)(5).

                           Respectfully submitted,

                           /s/  Daniel T. Young

DANIEL T. YOUNG
Appellate Counsel
Tracey A. Hardin
Assistant General Counsel
David D. Lisitza
Senior Appellate Counsel
Emily True Parise
Senior Appellate Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
(202) 551-3078 (Young)
youngda@sec.gov

1, is consistent with the Act. Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*http://www.sec.gov/rules/sro.shtml*); or

• Send an email to *rule-comments@sec.gov.* Please include File Number SR–CboeBZX–2023–013 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to File Number SR–CboeBZX–2023–013. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*http://www.sec.gov/rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549 on official business days between the hours of 10:00 a.m. and 3:00 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. All comments received will be posted without change. Persons submitting comments are cautioned that we do not redact or edit personal identifying information from comment submissions. You should submit only information that you wish to make available publicly. All submissions should refer to File Number SR–CboeBZX–2023–013 and should be submitted on or before April 5, 2023.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[13]

**J. Matthew DeLesDernier,**

*Deputy Secretary.*

[FR Doc. 2023–05265 Filed 3–14–23; 8:45 am]

**BILLING CODE 8011–01–P**

---

[13] 17 CFR 200.30–3(a)(12).

## SECURITIES AND EXCHANGE COMMISSION

[Release No. 34–97102; File No. SR–CboeBZX–2022–035]

**Self-Regulatory Organizations; Cboe BZX Exchange, Inc.; Order Disapproving a Proposed Rule Change To List and Trade Shares of the VanEck Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares**

March 10, 2023.

### I. Introduction

On June 24, 2022, Cboe BZX Exchange, Inc. ("BZX" or "Exchange") filed with the Securities and Exchange Commission ("Commission"), pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Exchange Act")[1] and Rule 19b–4 thereunder,[2] a proposed rule change to list and trade shares ("Shares") of the VanEck Bitcoin Trust ("Trust") under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares. The proposed rule change was published for comment in the **Federal Register** on July 13, 2022.[3]

On August 24, 2022, pursuant to Section 19(b)(2) of the Exchange Act,[4] the Commission designated a longer period within which to approve the proposed rule change, disapprove the proposed rule change, or institute proceedings to determine whether to disapprove the proposed rule change.[5] On October 4, 2022, the Commission instituted proceedings under Section 19(b)(2)(B) of the Exchange Act[6] to determine whether to approve or disapprove the proposed rule change,[7] and on December 16, 2022, the Commission designated a longer period for Commission action on the proposed rule change.[8]

This order disapproves the proposed rule change. The Commission concludes that BZX has not met its burden under the Exchange Act and the Commission's Rules of Practice to demonstrate that its proposal is consistent with the requirements of Exchange Act Section 6(b)(5), which requires, in relevant part, that the rules of a national securities exchange be "designed to prevent fraudulent and manipulative acts and practices" and "to protect investors and the public interest."[9]

When considering whether BZX's proposal to list and trade the Shares is designed to prevent fraudulent and manipulative acts and practices, the Commission applies the same analytical framework used in its orders considering previous proposals to list bitcoin[10]-based commodity trusts and bitcoin-based trust issued receipts to assess whether a listing exchange of an exchange-traded product ("ETP") can meet its obligations under Exchange Act Section 6(b)(5).[11]

---

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

[3] *See* Securities Exchange Act Release No. 95218 (July 7, 2022), 87 FR 41755 ("Notice"). BZX previously filed, and the Commission disapproved, a substantially similar proposal to list and trade the Shares of the Trust. *See* Notice of Filing of a Proposed Rule Change To List and Trade Shares of the VanEck Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 91326 (Mar. 15, 2021), 86 FR 14987 (Mar. 19, 2021) ("Previous VanEck Filing"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the VanEck Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93559 (Nov. 12, 2021), 86 FR 64539 (Nov. 18, 2021) (SR–CboeBZX–2021–019) ("Previous VanEck Order").

[4] 15 U.S.C. 78s(b)(2).

[5] *See* Securities Exchange Act Release No. 95596, 87 FR 53038 (Aug. 30, 2022).

[6] 15 U.S.C. 78s(b)(2)(B).

[7] *See* Securities Exchange Act Release No. 95978, 87 FR 61418 (Oct. 11, 2022).

[8] *See* Securities Exchange Act Release No. 96517, 87 FR 78740 (Dec. 22, 2022).

[9] 15 U.S.C. 78f(b)(5).

[10] Bitcoins are digital assets that are issued and transferred via a decentralized, open-source protocol used by a peer-to-peer computer network through which transactions are recorded on a public transaction ledger known as the "bitcoin blockchain." The bitcoin protocol governs the creation of new bitcoins and the cryptographic system that secures and verifies bitcoin transactions. *See, e.g.,* Notice, 87 FR at 41757.

[11] *See* Order Setting Aside Action by Delegated Authority and Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, To List and Trade Shares of the Winklevoss Bitcoin Trust, Securities Exchange Act Release No. 83723 (July 26, 2018), 83 FR 37579 (Aug. 1, 2018) (SR–BatsBZX–2016–30) ("Winklevoss Order"); Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To Amend NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares) and To List and Trade Shares of the United States Bitcoin and Treasury Investment Trust Under NYSE Arca Rule 8.201–E, Securities Exchange Act Release No. 88284 (Feb. 26, 2020), 85 FR 12595 (Mar. 3, 2020) (SR–NYSEArca–2019–39) ("USBT Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the WisdomTree Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93700 (Dec. 1, 2021), 86 FR 69322 (Dec. 7, 2021) (SR–CboeBZX–2021–024) ("WisdomTree Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Valkyrie Bitcoin Fund Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 93859 (Dec. 22, 2021), 86 FR 74156 (Dec. 29, 2021) (SR–NYSEArca–2021–31) ("Valkyrie Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Kryptoin Bitcoin ETF Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 93860 (Dec. 22, 2021), 86 FR 74166 (Dec. 29, 2021) (SR–CboeBZX–2021–029) ("Kryptoin Order"); Order Disapproving a Proposed Rule Change To List and Trade Shares of the First Trust SkyBridge Bitcoin ETF Trust Under NYSE Arca Rule 8.201–

Continued

E, Securities Exchange Act Release No. 94006 (Jan. 20, 2022), 87 FR 3869 (Jan. 25, 2022) (SR–NYSEArca–2021–37) (''SkyBridge Order''); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Wise Origin Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 94080 (Jan. 27, 2022), 87 FR 5527 (Feb. 1, 2022) (SR–CboeBZX–2021–039) (''Wise Origin Order''); Order Disapproving a Proposed Rule Change To List and Trade Shares of the NYDIG Bitcoin ETF Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 94395 (Mar. 10, 2022), 87 FR 14932 (Mar. 16, 2022) (SR–NYSEArca–2021–57) (''NYDIG Order''); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Global X Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 94396 (Mar. 10, 2022), 87 FR 14912 (Mar. 16, 2022) (SR–CboeBZX–2021–052) (''Global X Order''); Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To List and Trade Shares of the ARK 21Shares Bitcoin ETF Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 94571 (Mar. 31, 2022), 87 FR 20014 (Apr. 6, 2022) (SR–CboeBZX–2021–051) (''ARK 21Shares Order''); Order Disapproving a Proposed Rule Change To List and Trade Shares of the One River Carbon Neutral Bitcoin Trust Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 94999 (May 27, 2022), 87 FR 33548 (June 2, 2022) (SR–NYSEArca–2021–67) (''One River Order''); Order Disapproving a Proposed Rule Change To List and Trade Shares of the Bitwise Bitcoin ETP Trust Under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 95179 (June 29, 2022), 87 FR 40282 (July 6, 2022) (SR–NYSEArca–2021–89) (''Bitwise Order''); Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, To List and Trade Shares of Grayscale Bitcoin Trust under NYSE Arca Rule 8.201–E (Commodity-Based Trust Shares), Securities Exchange Act Release No. 95180 (June 29, 2022), 87 FR 40299 (July 6, 2022) (SR–NYSEArca–2021–90) (''Grayscale Order''); Order Disapproving a Proposed Rule Change To List and Trade Shares of the WisdomTree Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 96011 (Oct. 11, 2022), 87 FR 62466 (Oct. 14, 2022) (SR–CboeBZX–2022–006) (''WisdomTree Order II''); Order Disapproving a Proposed Rule Change To List and Trade Shares of the ARK 21Shares Bitcoin ETF Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 96751 (Jan. 26, 2023), 88 FR 6328 (Jan. 31, 2023) (SR–CboeBZX–2021–031) (''ARK 21Shares Order II''). In addition, orders were issued by delegated authority on the following matters: Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, Relating to the Listing and Trading of Shares of the SolidX Bitcoin Trust Under NYSE Arca Equities Rule 8.201, Securities Exchange Act Release No. 80319 (Mar. 28, 2017), 82 FR 16247 (Apr. 3, 2017) (SR–NYSEArca–2016–101) (''SolidX Order''); Order Disapproving a Proposed Rule Change To List and Trade the Shares of the ProShares Bitcoin ETF and the ProShares Short Bitcoin ETF, Securities Exchange Act Release No. 83904 (Aug. 22, 2018), 83 FR 43934 (Aug. 28, 2018) (SR–NYSEArca–2017–139) (''ProShares Order''); Order Disapproving a Proposed Rule Change To List and Trade the Shares of the GraniteShares Bitcoin ETF and the GraniteShares Short Bitcoin ETF, Securities Exchange Act Release No. 83913 (Aug. 22, 2018), 83 FR 43923 (Aug. 28, 2018) (SR–CboeBZX–2018–001) (''GraniteShares Order''); Previous VanEck Order; Order Granting Approval of a Proposed Rule Change, as Modified by Amendment No. 2, To List and Trade Shares of the Teucrium Bitcoin Futures Fund Under NYSE Arca Rule 8.200–E, Commentary .02 (Trust Issued Receipts), Securities Exchange Act Release No. 94620 (Apr. 6, 2022), 87 FR 21676 (Apr. 12, 2022) (SR–NYSEArca–2021–53) (''Teucrium Order''); Order Granting Approval of a Proposed Rule Change, as Modified by Amendment Nos. 1 and 2, To List and Trade Shares of the Valkyrie XBTO Bitcoin Futures Fund Under Nasdaq Rule 5711(g), Securities Exchange Act Release No. 94853 (May 5, 2022), 87 FR 28848 (May 11, 2022) (SR–NASDAQ–2021–066) (''Valkyrie XBTO Order'').

12 As used in this order, the term ''ETFs'' refers to open-end exchange-traded funds that register the offer and sale of their shares under the Securities Act of 1933 (''Securities Act'') and are regulated as investment companies under the Investment Company Act of 1940 (''1940 Act''). The term ''ETPs'' refers to exchange-traded products that register the offer and sale of their shares under the Securities Act but are not regulated under the 1940 Act, such as commodity trusts and trust issued receipts.

13 See USBT Order, 85 FR at 12596. See also Winklevoss Order, 83 FR at 37592 n.202 and accompanying text (discussing previous Commission approvals of commodity-trust ETPs); GraniteShares Order, 83 FR at 43925–27 nn.35–39 and accompanying text (discussing previous Commission approvals of commodity-futures ETPs).

14 See Winklevoss Order, 83 FR at 37594. See also USBT Order, 85 FR at 12596–97; WisdomTree Order, 86 FR at 69322; ARK 21Shares Order, 87 FR at 20015.

15 See USBT Order, 85 FR at 12597.

As the Commission has explained, an exchange that lists bitcoin-based ETPs [12] can meet its obligations under Exchange Act Section 6(b)(5) by demonstrating that the exchange has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets.[13]

In this context, the terms ''significant market'' and ''market of significant size'' include a market (or group of markets) as to which (a) there is a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, so that a surveillance-sharing agreement would assist in detecting and deterring misconduct, and (b) it is unlikely that trading in the ETP would be the predominant influence on prices in that market.[14] A surveillance-sharing agreement entered into with a ''significant market'' assists in detecting and deterring manipulation of the ETP, because a person attempting to manipulate the ETP is reasonably likely to engage also in trading activity on that ''significant market.'' [15]

Although surveillance-sharing agreements are not the exclusive means by which a listing exchange of a commodity-trust ETP can meet its obligations under Exchange Act Section 6(b)(5), such agreements have previously provided the basis for the exchanges that list commodity-trust ETPs to meet those obligations, and the Commission has historically recognized their importance. And where, as here, a listing exchange fails to establish that other means to prevent fraudulent and manipulative acts and practices will be sufficient, the listing exchange must enter into a surveillance-sharing agreement with a regulated market of significant size because such agreements detect and deter fraudulent and manipulative activity.[16]

The Commission has long recognized that surveillance-sharing agreements ''provide a necessary deterrent to manipulation because they facilitate the availability of information needed to fully investigate a manipulation if it were to occur'' and thus ''enable the Commission to continue to effectively protect investors and promote the public interest.'' [17] As the Commission has emphasized, it is essential for an exchange listing a derivative securities product to have the ability that surveillance-sharing agreements provide to obtain information necessary to detect, investigate, and deter fraud and market manipulation, as well as violations of exchange rules and applicable federal securities laws and rules.[18] The hallmarks of a surveillance-sharing agreement are that the agreement provides for the sharing of information about market trading activity, clearing activity, and customer identity; that the parties to the agreement have reasonable ability to obtain access to and produce requested information; and that no existing rules, laws, or practices would impede one party to the agreement from obtaining this information from, or producing it to, the other party.[19]

16 See Amendment to Rule Filing Requirements for Self-Regulatory Organizations Regarding New Derivative Securities Products, Securities Exchange Act Release No. 40761 (Dec. 8, 1998), 63 FR 70952, 70954, 70959 (Dec. 22, 1998) (File No. S7–13–98) (''NDSP Adopting Release''). See also Winklevoss Order, 83 FR at 37593–94; ProShares Order, 83 FR at 43936; GraniteShares Order, 83 FR at 43924; USBT Order, 85 FR at 12596.

17 NDSP Adopting Release, 63 FR at 70954, 70959. See also id. at 70959 (''It is essential that the SRO [self-regulatory organization] have the ability to obtain the information necessary to detect and deter market manipulation, illegal trading and other abuses involving the new derivative securities product. Specifically, there should be a comprehensive ISA [information-sharing agreement] that covers trading in the new derivative securities product and its underlying securities in place between the SRO listing or trading a derivative product and the markets trading the securities underlying the new derivative securities product.'').

18 See NDSP Adopting Release, 63 FR at 70959.

19 See Winklevoss Order, 83 FR at 37592–93 (discussing Letter from Brandon Becker, Director, Division of Market Regulation, Commission, to Gerard D. O'Connell, Chairman, Intermarket Surveillance Group (June 3, 1994), available at https://www.sec.gov/divisions/marketreg/mr-noaction/isg060394.htm).

The Commission has explained that the ability of a national securities exchange to enter into surveillance-sharing agreements ''furthers the protection of investors and the public interest because it will enable the [e]xchange to conduct prompt investigations into possible trading violations and other regulatory improprieties.''[20] The Commission has also long taken the position that surveillance-sharing agreements are important in the context of exchange listing of derivative security products, such as equity options, because a surveillance-sharing agreement ''permits the sharing of information'' that is ''necessary to detect'' manipulation and ''provide[s] an important deterrent to manipulation because [it] facilitate[s] the availability of information needed to fully investigate a potential manipulation if it were to occur.''[21] With respect to ETPs, when approving the listing and trading of one of the first commodity-linked ETPs—a commodity-linked exchange-traded note—on a national securities exchange, the Commission continued to emphasize the importance of surveillance-sharing agreements, stating that the listing exchange had entered into surveillance-sharing agreements with each of the futures markets on which pricing of the ETP would be based and stating that ''[t]hese agreements should help to ensure the availability of information necessary to detect and deter potential manipulations and other trading abuses, thereby making [the commodity-linked notes] less readily susceptible to manipulation.''[22]

Consistent with these statements, for the commodity-trust ETPs approved to date for listing and trading, there has been in *every* case at least one significant, regulated market for trading futures on the underlying commodity and the ETP listing exchange has entered into surveillance-sharing agreements with, or held Intermarket Surveillance Group (''ISG'') membership in common with, that market.[23] Moreover, the surveillance-sharing agreements have been consistently present whenever the Commission has approved the listing and trading of derivative securities, even where the underlying securities were also listed on national securities exchanges—such as options based on an index of stocks traded on a national securities exchange—and were thus subject to the Commission's direct regulatory authority.[24]

Listing exchanges have also attempted to demonstrate that other means besides surveillance-sharing agreements will be sufficient to prevent fraudulent and manipulative acts and practices, including that the bitcoin market as a whole or the relevant underlying bitcoin market is ''uniquely'' and ''inherently'' resistant to fraud and manipulation.[25] In response, the Commission has stated that, if a listing exchange could establish that the underlying market inherently possesses a unique resistance to manipulation beyond the protections that are utilized by traditional commodity or securities markets, the listing market would not necessarily need to enter into a surveillance-sharing agreement with a regulated significant market.[26] Such resistance to fraud and manipulation, however, must be novel and beyond those protections that exist in traditional commodity markets or securities markets for which surveillance-sharing agreements in the context of listing derivative securities products have been consistently present.[27]

Here, BZX contends that approval of the proposal is consistent with Section 6(b)(5) of the Exchange Act, and, in particular, Section 6(b)(5)'s requirement that the rules of a national securities exchange be designed to prevent fraudulent and manipulative acts and practices and to protect investors and the public interest.[28] As discussed in more detail below, BZX asserts that the proposal is consistent with Section 6(b)(5) of the Exchange Act because the Exchange has a comprehensive surveillance-sharing agreement with a

---

[20] Securities Exchange Act Release No. 27877 (Apr. 4, 1990), 55 FR 13344 (Apr. 10, 1990) (Notice of Filing and Order Granting Accelerated Approval to Proposed Rule Change Regarding Cooperative Agreements With Domestic and Foreign Self-Regulatory Organizations) (SR–NYSE–90–14).

[21] Securities Exchange Act Release No. 33555 (Jan. 31, 1994), 59 FR 5619, 5621 (Feb. 7, 1994) (SR–Amex–93–28) (order approving listing of options on American Depositary Receipts (''ADR'')) (''ADR Option Order''). The Commission further stated that it ''generally believes that having a comprehensive surveillance sharing agreement in place, between the exchange where the ADR option trades and the exchange where the foreign security underlying the ADR primarily trades, will ensure the integrity of the marketplace. The Commission further believes that the ability to obtain relevant surveillance information, including, among other things, the identity of the ultimate purchasers and sellers of securities, is an essential and necessary component of a comprehensive surveillance sharing agreement.'' *Id.*

[22] Securities Exchange Act Release No. 35518 (Mar. 21, 1995), 60 FR 15804, 15807 (Mar. 27, 1995) (SR–Amex–94–30). *See also* Winklevoss Order, 83 FR at 37593 n.206.

[23] *See* Winklevoss Order, 83 FR at 37594. *See also* SolidX Order, 82 FR at 16254–55 n.125 for a discussion of the representations the Commission has received from listing exchanges in connection with proposals to list commodity-trust ETPs about the existence of a significant, regulated market for trading futures on the underlying commodity and the listing exchanges' ability to obtain trading information with respect to such market. Furthermore, the Commission notes that each of those cases dealt with a futures market that had been trading for a long period of time before an exchange proposed a commodity-trust ETP based on the asset underlying those futures. For example, silver futures and gold futures began trading in 1933 and 1974, respectively, *see* https://www.cmegroup.com/media-room/historical-first-trade-dates.html, and the first ETPs based on spot silver and gold were approved for listing and trading in 2006 and 2004. *See* Securities Exchange Act Release No. 53521 (Mar. 20, 2006), 71 FR 14967 (Mar. 24, 2006) (SR–Amex–2005–072) (order approving iShares Silver Trust); Securities Exchange Act Release No. 50603 (Oct. 28, 2004), 69 FR 64614 (Nov. 5, 2004) (SR–NYSE–2004–22) (order approving streetTRACKS Gold Shares). Platinum futures and palladium futures began trading in 1956 and 1968, respectively, *see* https://www.cmegroup.com/media-room/historical-first-trade-dates.html, and the first ETPs based on spot platinum and palladium were approved for listing and trading in 2009. *See* Securities Exchange Act Release No. 61220 (Dec. 22, 2009), 74 FR 68895 (Dec. 29, 2009) (SR–NYSEArca–2009–94) (order approving ETFS Palladium Trust); Securities Exchange Act Release No. 61219 (Dec. 22, 2009), 74 FR 68886 (Dec. 29, 2009) (SR–NYSEArca–2009–95) (order approving ETFS Platinum Trust). Copper futures began trading in 1988, *see* https://www.cmegroup.com/media-room/historical-first-trade-dates.html#metals, and the first ETPs based on spot copper were approved for listing and trading in 2012. *See* Securities Exchange Act Release No. 68440 (Dec. 14, 2012), 77 FR 75468 (Dec. 20, 2012) (SR–NYSEArca–2012–28) (order approving JPM XF Physical Copper Trust).

[24] *See* USBT Order, 85 FR at 12597; ADR Option Order, 59 FR at 5621. The Commission has also recognized that surveillance-sharing agreements provide a necessary deterrent to fraud and manipulation in the context of index options even when (i) all of the underlying index component stocks were either registered with the Commission or exempt from registration under the Exchange Act; (ii) all of the underlying index component stocks were traded in the U.S. either directly or as ADRs on a national securities exchange; and (iii) effective international ADR arbitrage alleviated concerns over the relatively smaller ADR trading volume, helped to ensure that ADR prices reflected the pricing on the home market, and helped to ensure more reliable price determinations for settlement purposes, due to the unique composition of the index and reliance on ADR prices. *See* Securities Exchange Act Release No. 26653 (Mar. 21, 1989), 54 FR 12705, 12708 (Mar. 28, 1989) (SR–Amex–87–25) (stating that ''surveillance-sharing agreements between the exchange on which the index option trades and the markets that trade the underlying securities are necessary'' and that ''[t]he exchange of surveillance data by the exchange trading a stock index option and the markets for the securities comprising the index is important to the detection and deterrence of intermarket manipulation''). And the Commission has explained that surveillance-sharing agreements ''ensure the availability of information necessary to detect and deter potential manipulations and other trading abuses'' even when approving options based on an index of stocks traded on a national securities exchange. *See* Securities Exchange Act Release No. 30830 (June 18, 1992), 57 FR 28221, 28224 (June 24, 1992) (SR–Amex–91–22).

[25] *See* USBT Order, 85 FR at 12597.

[26] *See* Winklevoss Order, 83 FR at 37580, 37582–91 (addressing assertions that ''bitcoin and [spot] bitcoin markets,'' generally, as well as one bitcoin trading platform, specifically, have unique resistance to fraud and manipulation). *See also* USBT Order, 85 FR at 12597.

[27] *See* USBT Order, 85 FR at 12597, 12599.

[28] *See* Notice, 87 FR at 41767.

regulated market of significant size,[29] and there exist other means to prevent fraudulent and manipulative acts and practices that are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.[30]

In the analysis that follows, the Commission examines whether the proposed rule change is consistent with Section 6(b)(5) of the Exchange Act by addressing: in Section III.B.1 assertions that other means besides surveillance-sharing agreements will be sufficient to prevent fraudulent and manipulative acts and practices; in Section III.B.2 assertions that BZX has entered into a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin; in Section III.B.3 assertions that the Commission must approve the proposal because the Commission has approved the listing and trading of ETFs and ETPs that hold Chicago Mercantile Exchange ("CME") bitcoin futures; and in Section III.C assertions that the proposal is consistent with the protection of investors and the public interest.

Based on its analysis, the Commission concludes that BZX has not established that other means to prevent fraudulent and manipulative acts and practices are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. The Commission further concludes that BZX has not established that it has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin, the underlying bitcoin assets that would be held by the Trust. As discussed further below, BZX repeats various assertions made in prior bitcoin-based ETP proposals, including in the Previous VanEck Filing, that the Commission has previously addressed and rejected, including in the Previous VanEck Order—and more importantly, BZX does not respond to many of the Commission's reasons for rejecting those assertions. As a result, the Commission is unable to find that the proposed rule change is consistent with the statutory requirements of Exchange Act Section 6(b)(5).

The Commission emphasizes that its disapproval of this proposed rule change does not rest on an evaluation of the relative investment quality of a product holding spot bitcoin versus a product holding CME bitcoin futures, or an assessment of whether bitcoin, or blockchain technology more generally, has utility or value as an innovation or an investment. Rather, the Commission is disapproving this proposed rule change because, as discussed below, BZX has not met its burden to demonstrate that its proposal is consistent with the requirements of Exchange Act Section 6(b)(5).

## II. Description of the Proposed Rule Change

As described in more detail in the Notice,[31] the Exchange proposes to list and trade the Shares of the Trust under BZX Rule 14.11(e)(4), which governs the listing and trading of Commodity-Based Trust Shares on the Exchange.

The investment objective of the Trust would be for the Shares to reflect the performance of the MVIS® CryptoCompare Bitcoin Benchmark Rate ("Benchmark"), less the expenses of the Trust's operations.[32] The Benchmark would be used to calculate the Trust's net asset value ("NAV"). The Benchmark is designed to be a price for bitcoin in USD, and there is no component other than bitcoin in the Benchmark. The current platform composition of the Benchmark is Bitstamp, Coinbase, Gemini, itBit, and Kraken. In calculating the Benchmark, the methodology captures trade prices and sizes from the platforms and examines twenty consecutive three-minute periods leading up to 4:00 p.m. E.T. It then calculates an equal-weighted average of the volume-weighted median price of these twenty three-minute periods, removing the highest and lowest contributed prices.[33]

Each Share would represent a fractional undivided beneficial interest in the Trust's net assets. The Trust's assets would consist of bitcoin held by the Custodian on behalf of the Trust.

The Trust generally does not intend to hold cash or cash equivalents. However, there may be situations where the Trust would unexpectedly hold cash on a temporary basis.[34]

The Administrator would determine the NAV and NAV per Share of the Trust on each day that the Exchange is open for regular trading, as promptly as practical after 4:00 p.m. E.T. The NAV of the Trust is the aggregate value of the Trust's assets less its estimated accrued but unpaid liabilities (which include accrued expenses). In determining the Trust's NAV, the Administrator would value the bitcoin held by the Trust based on the price set by the Benchmark as of 4:00 p.m. E.T.[35]

The Trust would provide information regarding the Trust's bitcoin holdings, as well as an Intraday Indicative Value ("IIV") per Share updated every 15 seconds, as calculated by the Exchange or a third-party financial data provider during the Exchange's Regular Trading Hours (9:30 a.m. to 4:00 p.m. E.T.). The IIV would be calculated by using the prior day's closing NAV per Share as a base and updating that value during Regular Trading Hours to reflect changes in the value of the Trust's bitcoin holdings during the trading day.[36]

When the Trust sells or redeems its Shares, it would do so in "in-kind" transactions in blocks of 50,000 Shares at the Trust's NAV. Authorized participants would deliver, or facilitate the delivery of, bitcoin to the Trust's account with the Custodian in exchange for Shares when they purchase Shares, and the Trust, through the Custodian, would deliver bitcoin to such authorized participants when they redeem Shares with the Trust.[37]

## III. Discussion

### A. The Applicable Standard for Review

The Commission must consider whether BZX's proposal is consistent with the Exchange Act. Section 6(b)(5) of the Exchange Act requires, in relevant part, that the rules of a national securities exchange be designed "to prevent fraudulent and manipulative acts and practices" and "to protect investors and the public interest."[38]

---

[29] *See id.* at 41768–70.
[30] *See id.* at 41769.

[31] *See supra* note 3. According to the Exchange, the Sponsor (as defined herein), on behalf of the Trust, has filed Amendment No. 2 to a registration statement on Form S–1 under the Securities Act dated June 22, 2022 (File No. 333–251808) ("Registration Statement"). *See* Notice, 87 FR at 41755 n.7.

[32] *See* Notice, 87 FR at 41765. VanEck Digital Assets, LLC ("Sponsor") is the sponsor of the Trust, and Delaware Trust Company is the trustee. The State Street Bank and Trust Company will be the administrator ("Administrator") and transfer agent. VanEck Securities Corporation will be the marketing agent in connection with the creation and redemption of Shares. VanEck Securities Corporation provides assistance in the marketing of the Shares. *See id.* at 41764. A third-party regulated custodian ("Custodian") will be responsible for custody of the Trust's bitcoin. *See id.* at 41755.

[33] *See id.* at 41765.

[34] *See id.* at 41764.
[35] *See id.* at 41766.
[36] *See id.* at 41765.
[37] *See id.* at 41764–65.
[38] 15 U.S.C. 78f(b)(5). Pursuant to Section 19(b)(2) of the Exchange Act, 15 U.S.C. 78s(b)(2), the Commission must disapprove a proposed rule change filed by a national securities exchange if it does not find that the proposed rule change is consistent with the applicable requirements of the Exchange Act. Exchange Act Section 6(b)(5) states that an exchange shall not be registered as a

Under the Commission's Rules of Practice, the ''burden to demonstrate that a proposed rule change is consistent with the Exchange Act and the rules and regulations issued thereunder . . . is on the self-regulatory organization ['SRO'] that proposed the rule change.''[39]

The description of a proposed rule change, its purpose and operation, its effect, and a legal analysis of its consistency with applicable requirements must all be sufficiently detailed and specific to support an affirmative Commission finding,[40] and any failure of an SRO to provide this information may result in the Commission not having a sufficient basis to make an affirmative finding that a proposed rule change is consistent with the Exchange Act and the applicable rules and regulations.[41] Moreover, ''unquestioning reliance'' on an SRO's representations in a proposed rule change is not sufficient to justify Commission approval of a proposed rule change.[42]

*B. Whether BZX Has Met Its Burden To Demonstrate That the Proposal Is Designed To Prevent Fraudulent and Manipulative Acts and Practices*

(1) Assertions That Other Means Besides Surveillance-Sharing Agreements Will Be Sufficient To Prevent Fraudulent and Manipulative Acts and Practices

(i) Assertions Regarding the Bitcoin Market

As stated above, the Commission has recognized that a listing exchange could demonstrate that other means to prevent fraudulent and manipulative acts and practices are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets, including by demonstrating that the bitcoin market as a whole or the relevant underlying bitcoin market is uniquely and inherently resistant to fraud and manipulation.[43] Such resistance to fraud and manipulation, however, must be novel and beyond those protections that exist in traditional commodities or securities markets.[44]

(a) BZX's Assertions

BZX asserts that bitcoin is resistant to price manipulation.[45] According to BZX, the geographically diverse and continuous nature of bitcoin trading render it difficult and prohibitively costly to manipulate the price of bitcoin.[46] BZX asserts that fragmentation across bitcoin platforms, the relatively slow speed of transactions, and the capital necessary to maintain a significant presence on each trading platform make manipulation of bitcoin prices through continuous trading activity challenging.[47] In addition, BZX states that, to the extent that there are bitcoin platforms engaged in or allowing wash trading [48] or other activity intended to manipulate the price of bitcoin on other markets, such activity does not normally impact prices on other platforms because participants will generally ignore markets with quotes that they deem non-executable.[49] BZX further argues that the linkage between the bitcoin markets and the presence of arbitrageurs in those markets means that the manipulation of the price of bitcoin on any single venue would require manipulation of the global bitcoin price in order to be effective.[50] According to BZX, arbitrageurs must have funds distributed across multiple trading platforms in order to take advantage of temporary price dislocations, thereby making it unlikely that there will be strong concentration of funds on any particular bitcoin trading venue.[51] As a result, BZX concludes that the potential for manipulation on a bitcoin trading platform would require overcoming the liquidity supply of such arbitrageurs who are effectively eliminating any cross-market pricing differences.[52]

BZX also states that ''the in-kind creation and redemption process and fungibility of bitcoin means that a would be manipulator of a [s]pot [b]itcoin ETP would need to manipulate the price across all bitcoin markets or risk simply providing arbitrage opportunities for authorized participants.'' [53] BZX asserts that ''this arbitrage opportunity also acts to reduce any incentives to manipulate the price of a [s]pot [b]itcoin ETP because the underlying trust will create and redeem shares at set rates of bitcoin per share without regard to the price that the ETP is trading at in the secondary market or the price of the underlying index.'' [54]

(b) Analysis

As with the previous proposals, including the Previous VanEck Filing, the Commission here concludes that the record does not support a finding that the bitcoin market is inherently and uniquely resistant to fraud and manipulation such that the Commission can dispense with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets. BZX does not sufficiently contest the presence of possible sources of fraud and manipulation in the spot bitcoin market that the Commission has identified in previous orders, including: (1) ''wash'' trading; [55] (2) persons with a dominant position in bitcoin manipulating bitcoin pricing; (3)

---

[national securities exchange unless the Commission determines that ''[t]he rules of the exchange are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by this title matters not related to the purposes of this title or the administration of the exchange.'' 15 U.S.C. 78f(b)(5).

[39] Rule 700(b)(3), Commission Rules of Practice, 17 CFR 201.700(b)(3).

[40] *See id.*

[41] *See id.*

[42] *Susquehanna Int'l Group, LLP* v. *Securities and Exchange Commission,* 866 F.3d 442, 447 (D.C. Cir. 2017) (''Susquehanna'').

[43] *See* USBT Order, 85 FR at 12597 n.23. The Commission is not applying a ''cannot be manipulated'' standard. Instead, the Commission is examining whether the proposal meets the requirements of the Exchange Act and, pursuant to its Rules of Practice, places the burden on the listing exchange to demonstrate the validity of its contentions and to establish that the requirements of the Exchange Act have been met. *See id.*

[44] *See id.* at 12597.

[45] *See* Notice, 87 FR at 41763 n.54.

[46] *See id.*

[47] *See id.*

[48] A ''wash trade'' is a transaction such as a purchase and sale simultaneously or within a short period of time, that involves no changes in beneficial ownership, and is a means of creating artificial market activity. *See Silseth,* Admin. Proc. File No. 3–9001, Securities Act Release No. 7317, Securities Exchange Act Release No. 37493, at 2 and n.3 (July 30, 1996); *Reddy* v. *CFTC,* 191 F.3d 109, 115 (2d Cir. 1999). Wash trading is manipulative and defrauds investors. *See Reddy* v. *CFTC,* 191 F.3d 109, 115 (2d Cir. 1999); *Santa Fe Indus.* v. *Green,* 430 U.S. 462, 476–77 (1977); *Ernst & Ernst* v. *Hochfelder,* 425 U.S. 185, 199 (1976). Bitcoin spot markets are subject to such ''usual market manipulation tactics.'' Kevin Dowd & Martin Hutchinson, *Bitcoin Will Bite the Dust,* 35 Cato J. 357, 374 n.13 (2015), *available at* https://object.cato.org/sites/cato.org/files/serials/files/cato-journal/2015/5/cj-v35n2-12.pdf.

[49] *See* Notice, 87 FR at 41763 n. 54.

[50] *See id.*

[51] *See id.*

[52] *See id.*

[53] *Id.* at 41764.

[54] *See id.*

[55] *See also CFTC* v. *Gemini Trust Co., LLC,* No. 22–cv–4563 (S.D.N.Y. filed June 2, 2022) (alleging, among other things, failure by Gemini personnel to disclose to the Commodity Futures Trading Commission (''CFTC'') that Gemini customers could and did engage in collusive or wash trading).

hacking of the bitcoin network and trading platforms; (4) malicious control of the bitcoin network; (5) trading based on material, non-public information (for example, plans of market participants to significantly increase or decrease their holdings in bitcoin, new sources of demand for bitcoin, or the decision of a bitcoin-based investment vehicle on how to respond to a ''fork'' in the bitcoin blockchain, which would create two different, non-interchangeable types of bitcoin) or based on the dissemination of false and misleading information; (6) manipulative activity involving purported ''stablecoins,'' including Tether (USDT); and (7) fraud and manipulation at bitcoin trading platforms.[56]

BZX asserts that, because of how bitcoin trades occur, including through continuous means and through fragmented platforms, arbitrage across the bitcoin platforms essentially helps to keep global bitcoin prices aligned with one another, thus hindering manipulation. The Exchange, however, does not provide any data or analysis to support its assertions, either in terms of how closely bitcoin prices are aligned across different bitcoin trading venues or how quickly price disparities may be arbitraged away.[57] Here, the Exchange provides no evidence to support its assertion of efficient price arbitrage across bitcoin platforms, nor any evidence that price arbitrage in the bitcoin market is novel or unique so as to warrant the Commission dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. As stated above, ''unquestioning reliance'' on an SRO's representations in a proposed rule change is not sufficient to justify Commission approval of a proposed rule change.[58]

In any event, the Commission has explained that efficient price arbitrage is not sufficient to support the finding that a market is uniquely or inherently resistant to manipulation such that the Commission can dispense with surveillance-sharing agreements.[59] The Commission has stated, for example, that even for equity options based on securities listed on national securities exchanges, the Commission relies on surveillance-sharing agreements to detect and deter fraud and manipulation.[60] Equities that underlie such options trade on U.S. equity markets that are deep, liquid, and highly interconnected.[61] Moreover, BZX does not take into account that a market participant with a dominant ownership position would not find it prohibitively expensive to overcome the liquidity supplied by arbitrageurs and could use dominant market share to engage in manipulation.[62]

In addition, the Exchange makes the unsupported claim that, to the extent that there are bitcoin platforms engaged in or allowing wash trading or other activity intended to manipulate the price of bitcoin on other markets, market participants will generally ignore those platforms. However, the record does not demonstrate that wash trading and other possible sources of fraud and manipulation in the broader bitcoin spot market will be ignored by market participants.[63] Without the necessary data or other evidence, the Commission has no basis on which to conclude that bitcoin platforms are insulated from prices of others that engage in or permit fraud or manipulation.[64]

Further, the continuous nature of bitcoin trading does not support the finding that the bitcoin market is uniquely or inherently resistant to manipulation, and neither do linkages among markets, as BZX asserts.[65] Even in the presence of continuous trading or linkages among markets, formal (such as those with consolidated quotations or routing requirements) or otherwise (such as in the context of the fragmented, global bitcoin markets), manipulation of asset prices, as a general matter, can occur simply through trading activity that creates a false impression of supply or demand.[66]

The Exchange also asserts that the Trust's in-kind create/redeem process and the ''fungibility of bitcoin'' means that a would be manipulator of the Trust would ''need to manipulate the price across all bitcoin markets or risk simply providing arbitrage opportunities for authorized participants'' and that these arbitrage opportunities ''[act] to reduce any incentives to manipulate the price of a [s]pot [b]itcoin ETP because the underlying trust will create and redeem shares at set rates of bitcoin per share without regard to the price that the ETP is trading at in the secondary market or the price of the underlying index.'' [67] As discussed above, BZX provides no evidence of the existence of efficient price arbitrage across spot bitcoin platforms,[68] nor does BZX provide any additional data or analysis to support its conclusion that the arbitrage that may exist would counter an attempt to manipulate the proposed ETP.[69]

Finally, BZX does not address risk factors specific to the bitcoin blockchain and bitcoin platforms, described in the Trust's Registration Statement, that undermine the argument that the bitcoin market is inherently resistant to fraud

---

[56] *See* USBT Order, 85 FR at 12600–01 & nn.66–67 (discussing J. Griffin & A. Shams, *Is Bitcoin Really Untethered?* (Oct. 28, 2019), *available at https://ssrn.com/abstract=3195066* and published in 75 J. Finance 1913 (2020)); Winklevoss Order, 83 FR at 37585–86; WisdomTree Order, 86 FR at 69326; Global X Order, 87 FR at 14916; ARK 21Shares Order, 87 FR at 20019; One River Order, 87 FR at 33554; Bitwise Order, 87 FR at 40283–84; Grayscale Order, 87 FR at 40305.

[57] For example, the Registration Statement states that ''[i]f increases in throughput on the Bitcoin network lag behind growth in usage of bitcoin, average fees and settlement times may increase considerably'' and that such increased fees and decreased settlement speeds ''could adversely impact the value of the Shares.'' *See* Registration Statement at 20. BZX does not provide data or analysis to address, among other things, whether such risks of increased fees and bitcoin transaction settlement times may affect the arbitrage effectiveness that BZX asserts. *See also infra* note 72 and accompanying text (referencing statements made in the Registration Statement that contradict assertions made by BZX).

[58] *See supra* note 42 and accompanying text.

[59] *See* Winklevoss Order, 83 FR at 37586; SolidX Order, 82 FR at 16256–57; USBT Order, 85 FR at 12601; WisdomTree Order, 86 FR at 69325; Valkyrie Order, 86 FR at 74159–60; Kryptoin Order, 86 FR at 74170; Wise Origin Order, 87 FR at 5531; ARK 21Shares Order, 87 FR at 20019; Grayscale Order, 87 FR at 40306.

[60] *See, e.g.,* USBT Order, 85 FR at 12601; WisdomTree Order, 86 FR at 69329; Valkyrie Order, 86 FR at 74160; Kryptoin Order, 86 FR at 74170; Wise Origin Order, 87 FR at 5531; ARK 21Shares Order, 87 FR at 20019; Grayscale Order, 87 FR at 40306–07.

[61] *See* Market Data Infrastructure Adopting Release, Securities Exchange Act Release No. 90610 (Dec. 9, 2020); 86 FR 18596, 18606–07 (Apr. 9, 2021); Market Data Infrastructure Proposing Release, Securities Exchange Act Release No. 88216 (Feb. 14, 2020), 85 FR 16726, 16728 (Mar. 24, 2020); Concept Release on Equity Market Structure, Securities Exchange Act Release No. 61358 (Jan. 14, 2010), 75 FR 3594 (Jan. 21, 2010). *See also* ARK 21Shares Order, 87 FR at 20019 n.70.

[62] *See, e.g.,* Winklevoss Order, 83 FR at 37584; USBT Order, 85 FR at 12600–01; WisdomTree Order, 86 FR at 69325.

[63] *See infra* note 87 and accompanying text.

[64] *See* USBT Order, 85 FR at 12601; WisdomTree Order, 86 FR at 69325. The Exchange has not shown that manipulation on spot platforms not included in the Benchmark will not affect prices on the Benchmark's constituent platforms. *See infra* notes 87–89 and accompanying text.

[65] *See* Winklevoss Order, 83 FR at 37585 n.92 and accompanying text.

[66] *See id.* at 37585. *See also, e.g.,* WisdomTree Order, 86 FR at 69325–26; ARK 21Shares Order, 87 FR at 20019.

[67] *See* Notice, 87 FR at 41764.

[68] *See supra* notes 57–58 and accompanying text. In addition, as discussed above, efficient price arbitrage is not sufficient to support the finding that a market is uniquely or inherently resistant to manipulation such that the Commission can dispense with surveillance-sharing agreements. *See supra* notes 59–62 and accompanying text.

[69] *See also infra* notes 111–113 and accompanying text setting forth the Commission's finding that BZX has not demonstrated that in-kind creations and redemptions provide the Shares with a unique resistance to manipulation.

and manipulation.[70] For example, the Registration Statement acknowledges that "[b]itcoin [platforms] on which bitcoin trades are relatively new and, in some cases, unregulated, and, therefore, may be more exposed to fraud and security breaches than established, regulated exchanges for other financial assets or instruments"; that "[t]he trading for spot bitcoin occurs on multiple trading venues that have various levels and types of regulation, but are not regulated in the same manner as traditional stock and bond exchanges" and if these spot markets "do not operate smoothly or face technical, security or regulatory issues, that could impact the ability of Authorized Participants to make markets in the Shares" which could lead to "trading in the Shares [to] occur at a material premium or discount against the NAV"; that the bitcoin network "is at risk of vulnerabilities and bugs that can potentially be exploited by malicious actors"; that "[s]ecurity breaches, computer malware and computer hacking attacks have been a prevalent concern in relation to digital assets"; that the bitcoin blockchain could be vulnerable to a "51% attack," in which a bad actor that controls a majority of the processing power dedicated to mining on the bitcoin network may be able to alter the bitcoin blockchain on which the bitcoin network and bitcoin transactions rely; that "[t]he nature of the assets held at bitcoin [platforms] makes them appealing targets for hackers and a number of bitcoin [platforms] have been victims of cybercrimes"; and that "[o]ver the past several years, a number of bitcoin [platforms] have been closed or faced issues due to fraud, failure, security breaches or governmental regulation."[71] The Exchange also acknowledges in the proposed rule change that "largely unregulated currency and spot commodity markets do not provide the same protections as the markets that are subject to the Commission's oversight."[72]

(ii) Assertions Regarding the Benchmark and the Create/Redeem Process

(a) BZX's Assertions

BZX also argues that the Benchmark, which would be used to value the Trust's bitcoin, is itself resistant to manipulation based on the Benchmark's methodology.[73] The Exchange states that the Benchmark is calculated by capturing twenty three-minute periods of trade prices and sizes leading up to 4:00 p.m. E.T. from the constituent platforms. An equal-weighted average of the volume-weighted median price of these twenty three-minute periods is then calculated, removing the highest and lowest contributed prices.[74] According to BZX, "[u]sing twenty consecutive three-minute segments over a sixty-minute period means malicious actors would need to sustain efforts to manipulate the market over an extended period of time, or would need to replicate efforts multiple times across exchanges, potentially triggering review."[75] Further, according to BZX, the "use of a median price reduces the ability of outlier prices to impact the NAV," and the "use of a volume-weighted median (as opposed to a traditional median) serves as an additional protection against attempts to manipulate the NAV by executing a large number of low-dollar trades, because any manipulation attempt would have to involve a majority of global spot bitcoin volume in a three-minute window to have any influence on the NAV."[76] BZX also asserts that "removing the highest and lowest prices further protects against attempts to manipulate the NAV, requiring bad actors to act on multiple [platforms] at once to have any ability to influence the price."[77]

The Exchange also states that the Benchmark's constituent bitcoin platforms are sourced from the CryptoCompare Exchange Benchmark review report.[78] The Exchange further states that the CryptoCompare Exchange Benchmark methodology "utilizes a combination of qualitative and quantitative metrics to analyze a comprehensive data set across eight categories of evaluation[:] legal/regulation, KYC/transaction risk, data provision, security, team/exchange, asset quality/diversity, market quality and negative events."[79] The Exchange states that "the CryptoCompare Exchange Benchmark review report assigns a grade to each [spot bitcoin] platform which helps identify what it believes to be the lowest risk [platforms] in the industry."[80] According to the Exchange, "[b]ased on the CryptoCompare Exchange Benchmark, MVIS initially selects the top five spot bitcoin platforms by rank for inclusion in the [Benchmark]."[81]

Simultaneously with its assertions regarding the Benchmark, BZX also states that, because the Trust will engage in in-kind creations and redemptions only, the "manipulability of the Benchmark [is] significantly less important."[82] The Exchange elaborates that, "because the Trust will not accept cash to buy bitcoin in order to create new [S]hares or . . . be forced to sell bitcoin to pay cash for redeemed [S]hares, the price that the Sponsor uses to value the Trust's bitcoin is not particularly important."[83] According to BZX, when authorized participants create Shares with the Trust, they would need to deliver a certain number of bitcoin per Share (regardless of the valuation used), and when they redeem with the Trust, they would similarly expect to receive a certain number of bitcoin per Share.[84] As such, BZX argues that, even if the price used to value the Trust's bitcoin is manipulated, the ratio of bitcoin per Share does not change, and the Trust will either accept (for creations) or distribute (for redemptions) the same number of bitcoin regardless of the value.[85] This, according to BZX, not only mitigates the risk associated with potential manipulation, but also discourages and disincentivizes manipulation of the Benchmark because there is little financial incentive to do so.[86]

(b) Analysis

Based on the assertions made and the information provided with respect to the Benchmark and the create/redeem process, the record is inadequate to conclude that BZX has articulated other means to prevent fraud and manipulation that are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing

---

[70] See Previous VanEck Order, 86 FR at 64544.
[71] See Registration Statement at 7, 13, 14, 17, 19, and 31. See also Winklevoss Order, 83 FR at 37585.
[72] Notice, 87 FR at 41756.
[73] See id. at 41764.
[74] See id. at 41765. The Exchange states that "[t]his extended period also supports authorized participant activity by capturing volume over a longer time period, rather than forcing authorized participants to mark an individual close or auction." See id.
[75] See id.
[76] See id.
[77] See id.
[78] See id.
[79] See id. at 41765 n.62.
[80] See id.
[81] See id. The Exchange further states that, "if an eligible [platform] is downgraded by two or more notches in a semi-annual review and is no longer in the top five by rank, it is replaced by the highest ranked non-component [platform]" and that "[a]djustments to [platform] coverage are announced four business days prior to the first business day of each of March and September at 23:00 CET" and the Benchmark "is rebalanced at 16:00:00 GMT/BST on the last business day of each of February and August." See id.
[82] See id. at 41764.
[83] See id.
[84] See id.
[85] See id.
[86] See id.

agreement with a regulated market of significant size related to spot bitcoin.

The record does not demonstrate that the proposed methodology for calculating the Benchmark would make the proposed ETP resistant to fraud or manipulation sufficient to dispense with the ability to detect and deter fraud and manipulation that is provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. Specifically, BZX has not assessed the possible influence that spot platforms not included among the Benchmark's constituent platforms would have on bitcoin prices used to calculate the Benchmark.[87] As discussed above, BZX does not sufficiently contest the presence of possible sources of fraud and manipulation in the spot bitcoin market generally.[88] Instead, BZX focuses its analysis on the Benchmark's calculation methodology, as well as on the eligibility and attributes of the Benchmark's constituent bitcoin platforms. What the Exchange does not address, however, is that, to the extent that trading on spot bitcoin platforms not directly used to calculate the Benchmark affects prices on the Benchmark's constituent platforms, the activities on those other platforms where various kinds of fraud and manipulation from a variety of sources may be present and persist may affect whether the Benchmark is resistant to manipulation. Importantly, the record does not demonstrate that these possible sources of fraud and manipulation in the broader spot bitcoin market do not affect the Benchmark's constituent bitcoin platforms that represent a portion of the spot bitcoin market. To the extent that fraudulent and manipulative trading on the broader bitcoin market could influence prices or trading activity on the Benchmark's constituent platforms, such platforms (and thus the Benchmark) would not be inherently resistant to manipulation.[89]

In addition, while BZX asserts that aspects of the Benchmark methodology mitigate the impact of fraud and manipulation on the Shares, the Commission can find no basis to conclude that the Benchmark methodology constitutes a novel means beyond the protections utilized by traditional commodity or securities markets to prevent fraud and manipulation that is sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin. BZX has not shown that its proposed use of twenty consecutive three-minute periods over a sixty-minute period leading up to 4:00 p.m. E.T. of trade prices from the constituent platforms to calculate the Benchmark would effectively be able to mitigate fraudulent or manipulative activity that is not transient. As the Commission has previously stated, fraud and manipulation in the spot bitcoin market could persist for a ''significant duration.'' [90] The Exchange does not explain how the use of such partitions would protect against the effects of the wash and fictitious trading that may persist in the spot bitcoin market for a significant duration.[91] While the Benchmark methodology calculates an equal-weighted average of the volume-weighted median price of these twenty three-minute periods and removes the highest and lowest contributed prices, this methodology could at most attenuate, but not eliminate, the effect of manipulative activity on the Benchmark's constituent bitcoin platforms—just as it could at most attenuate, but would not eliminate, the effect of bona fide liquidity demand on those platforms.[92]

Moreover, the Exchange's assertions that the Benchmark's methodology helps make the Benchmark resistant to manipulation conflict with the Registration Statement. Specifically, the Registration Statement represents, among other things, that ''[b]itcoin [platforms] on which bitcoin trades are relatively new and, in some cases, unregulated, and, therefore, may be more exposed to fraud and security breaches than established, regulated exchanges for other financial assets or instruments, which could have a negative impact on the Trust.'' [93] The Benchmark's constituent bitcoin platforms are a subset of the bitcoin trading venues currently in existence.

The Registration Statement also states, specifically with respect to the Benchmark, that the Benchmark is ''based on various inputs which may include price data from various third-party exchanges and markets'' and that these inputs ''may be subject to technological error, manipulative activity, or fraudulent reporting from their initial source.'' [94] Although the Sponsor raises concerns regarding fraud and security of bitcoin platforms in the Registration Statement, as well as concerns specific to the Benchmark, the Exchange does not explain how or why such concerns are consistent with its assertion that the Benchmark is resistant to fraud and manipulation.

In addition, BZX represents that the Benchmark includes only the top five spot bitcoin platforms, as ranked by the CryptoCompare Exchange Benchmark review report based on the following categories: legal/regulation, KYC/transaction risk, data provision, security, team/exchange, asset quality/diversity, market quality and negative events. However, the existing level of oversight of the Benchmark's underlying bitcoin platforms, whose trade flows might contribute to the Benchmark, is not equivalent to the obligations, authority, and oversight of national securities exchanges or futures exchanges and therefore is not an appropriate substitute.[95] For example, the Commission's market oversight of national securities exchanges includes substantial requirements, including the requirement to have rules that are ''designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest.'' [96] Moreover, national securities exchanges must file proposed rules with the Commission regarding certain material aspects of their operations,[97] and the Commission has the authority to disapprove any such rule that is not consistent with the requirements of the Exchange Act.[98]

---

[87] As discussed above, while the Exchange asserts that bitcoin prices on platforms with wash trades or other activity intended to manipulate the price of bitcoin would generally be ignored, the Commission has no basis on which to conclude that bitcoin platforms are insulated from prices of others that engage in or permit fraud or manipulation. *See supra* notes 63–64 and accompanying text.

[88] *See supra* notes 55–56 and accompanying text.

[89] *See* USBT Order, 85 FR at 12601; WisdomTree Order, 86 FR at 69327; Kryptoin Order, 86 FR at 74172; Valkyrie Order, 86 FR at 74161; SkyBridge Order, 87 FR at 3873; ARK 21Shares Order, 87 FR at 20021; Grayscale Order, 87 FR at 40309.

[90] *See* USBT Order, 85 FR at 12601 n.66; *see also id.* at 12607.

[91] *See* WisdomTree Order, 86 FR at 69327.

[92] *See* SolidX Order, 82 FR at 16257.

[93] *See* Registration Statement at 7, 19. *See also supra* note 71 and accompanying text.

[94] *See* Registration Statement at 23.

[95] *See also* USBT Order, 85 FR at 12603–05; Previous VanEck Order, 86 FR at 64545; WisdomTree Order, 86 FR at 69328; Kryptoin Order, 86 FR at 74173.

[96] 15 U.S.C. 78f(b)(5).

[97] 17 CFR 240.19b–4(a)(6)(i).

[98] Section 6 of the Exchange Act, 15 U.S.C. 78f, requires national securities exchanges to register with the Commission and requires an exchange's registration to be approved by the Commission, and

Thus, national securities exchanges are subject to Commission oversight of, among other things, their governance, membership qualifications, trading rules, disciplinary procedures, recordkeeping, and fees.[99] The Benchmark's underlying spot bitcoin platforms have none of these requirements—none are registered as a national securities exchange and none are comparable to a national securities exchange or futures exchange.[100]

The Commission thus concludes that the Exchange has not demonstrated that its Benchmark methodology makes the proposed ETP resistant to manipulation. While the proposed procedures for calculating the Benchmark using only prices from the Benchmark's constituent spot bitcoin platforms are intended to provide some degree of protection against attempts to manipulate the Benchmark, these procedures are not sufficient for the Commission to dispense with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin.[101]

Further, BZX does not explain the significance of the Benchmark's purported resistance to manipulation to the overall analysis of whether the proposal to list and trade the Shares is designed to prevent fraud and manipulation.[102] To the extent that BZX's argument is that the price of the Trust's Shares would be resistant to manipulation if the Benchmark is resistant to manipulation, BZX has not established in the record a basis for this conclusion because BZX has not established a link between the price of the Shares and the Benchmark, either in the primary or secondary market. The Trust uses the Benchmark to calculate the value of the bitcoin it holds according to the methodology discussed above.[103] However, the Trust will create or redeem baskets in the primary market only upon the receipt or distribution of bitcoins from/to authorized participants, and only for the amount of bitcoin represented by the Shares in such baskets, *without* reference to the value of such bitcoin as determined by the Benchmark or otherwise.[104] In the secondary market, the Shares would trade at market-based prices, and market participants may or may not take into account the value of bitcoin as measured by the Benchmark in determining such prices.[105] The Exchange provides no information on the relationship between the Benchmark and secondary market prices generally, or how the use of the Benchmark would mitigate fraud and manipulation of the Shares in the secondary market.[106]

Moreover, the Exchange's arguments are contradictory. While arguing that the Benchmark is resistant to manipulation, the Exchange simultaneously downplays the importance of the Benchmark in light of the Trust's in-kind creation and redemption mechanism.[107] The Exchange points out that the Trust will create and redeem Shares in-kind, not in cash, which renders the NAV calculation, and thereby the ability to manipulate NAV, "significantly less important." [108] In BZX's own words, the Trust will not accept cash to buy bitcoin in order to create Shares or sell bitcoin to pay cash for redeemed Shares, so the price that the Sponsor uses to value the Trust's bitcoin "is not particularly important." [109] If the Benchmark that the Trust uses to value the Trust's bitcoin "is not particularly important," it follows that the Benchmark's resistance to manipulation is not material to the Shares' susceptibility to fraud and manipulation. As the Exchange does not address or provide any analysis with respect to these issues, the Commission cannot conclude

---

Section 19(b) of the Exchange Act, 15 U.S.C. 78s(b), requires national securities exchanges to file proposed rule changes with the Commission and provides the Commission with the authority to disapprove proposed rule changes that are not consistent with the Exchange Act. Designated contract markets ("DCMs") (commonly called "futures markets") registered with and regulated by the CFTC must comply with, among other things, a similarly comprehensive range of regulatory principles and must file rule changes with the CFTC. *See, e.g.,* Designated Contract Markets (DCMs), CFTC, *available at* http://www.cftc.gov/IndustryOversight/TradingOrganizations/DCMs/index.htm.

[99] *See* Winklevoss Order, 83 FR at 37597. The Commission notes that the New York State Department of Financial Services ("NYSDFS") has issued "guidance" to supervised virtual currency business entities, stating that these entities must "implement measures designed to effectively detect, prevent, and respond to fraud, attempted fraud, and similar wrongdoing." *See* Maria T. Vullo, Superintendent of Financial Services, NYSDFS, *Guidance on Prevention of Market Manipulation and Other Wrongful Activity* (Feb. 7, 2018), *available at* https://www.dfs.ny.gov/docs/legal/industry/il180207.pdf. The NYSDFS recognizes that its "guidance is not intended to limit the scope or applicability of any law or regulation" (*id.*), which would include the Exchange Act. Nothing in the record evidences whether the Benchmark's constituent bitcoin platforms have complied with this NYSDFS guidance. Further, as stated previously, there are substantial differences between the NYSDFS and the Commission's regulation. Anti-money laundering ("AML") and know-your-customer ("KYC") policies and procedures, for example, have been referenced in other bitcoin-based ETP proposals as a purportedly alternative means by which such ETPs would be uniquely resistant to manipulation. The Commission has previously concluded that such AML and KYC policies and procedures do not serve as a substitute for, and are not otherwise dispositive in the analysis regarding the importance of, having a surveillance-sharing agreement with a regulated market of significant size relating to the underlying bitcoin assets. For example, AML and KYC policies and procedures do not substitute for the sharing of information about market trading activity or clearing activity that a surveillance sharing agreement would afford and do not substitute for regulation as a national securities exchange. *See* USBT Order, 85 FR at 12603 n.101. *See also, e.g.,* WisdomTree Order, 86 FR at 69328 n.95; Kryptoin Order, 86 FR at 74173 n.98.

[100] *See* USBT Order, 85 FR at 12603–05 & n.101; Previous VanEck Order, 86 FR at 64545 & n.89; WisdomTree Order, 86 FR at 69328 & n.95; Kryptoin Order, 86 FR at 74173 & n.98; ARK 21Shares Order, 87 FR at 20021–22 & n.107; Grayscale Order, 87 FR at 40308 & n.110.

[101] *See* WisdomTree Order, 86 FR at 69327–28; ARK 21Shares Order, 87 FR at 20021–22.

[102] The Commission has previously considered and rejected similar arguments about the valuation of bitcoin according to a benchmark or reference price. *See, e.g.,* SolidX Order, 82 FR at 16258; Winklevoss Order, 83 FR at 37587–90; USBT Order, 85 FR at 12599–601; WisdomTree Order, 86 FR at 69327–29; Valkyrie Order, 86 FR at 74162; ARK 21Shares Order, 87 FR at 20022; Grayscale Order, 87 FR at 40310.

[103] *See supra* note 35 and accompanying text.

[104] *See* Notice, 87 FR at 41764–65, 41766. According to the Exchange, to create, "[t]he total deposit of bitcoin required is an amount of bitcoin that is in the same proportion to the total assets of the Trust, net of accrued expenses and other liabilities, on the date the order to purchase is properly received, as the number of Shares to be created under the purchase order is in proportion to the total number of Shares outstanding on the date the order is received." The required deposit is determined "for a given day by dividing the number of bitcoin held by the Trust as of the opening of business on that business day, adjusted for the amount of bitcoin constituting estimated accrued but unpaid fees and expenses of the Trust as of the opening of business on that business day, by the quotient of the number of Shares outstanding at the opening of business divided by 50,000." *See id.* at 41766. The Exchange also states that shares of a spot bitcoin ETP would represent interest in bitcoin directly and authorized participants for a spot bitcoin ETP would be able to source bitcoin from any exchange and create or redeem with the applicable trust regardless of the price of the underlying index. *See id.* at 41764.

[105] *See id.* at 41765 (stating that "[a]uthorized participants may then offer Shares to the public at prices that depend on various factors, including the supply and demand for Shares, the value of the Trust's assets, and market conditions at the time of a transaction" and "[s]hareholders who buy or sell Shares during the day from their broker may do so at a premium or discount relative to the NAV of the Shares of the Trust").

[106] *See* WisdomTree Order, 86 FR at 69329 & n.108; Valkyrie Order, 86 FR at 74162; ARK 21Shares Order, 87 FR at 20022; Grayscale Order, 87 FR at 40310.

[107] *See supra* notes 82–86 and accompanying text.

[108] Notice, 87 FR at 41764 ("While the Sponsor believes that the Benchmark which it uses to value the Trust's bitcoin is itself resistant to manipulation based on the methodology further described below, the fact that creations and redemptions are only available in-kind makes the manipulability of the Benchmark significantly less important.").

[109] *Id.* (concluding that "because the Trust will not accept cash to buy bitcoin in order to create new shares or, barring a forced redemption of the Trust or under other extraordinary circumstances, be forced to sell bitcoin to pay cash for redeemed shares, the price that the Sponsor uses to value the Trust's bitcoin is not particularly important").

that the Benchmark aids in the determination that the proposal to list and trade the Shares is designed to prevent fraudulent and manipulative acts and practices.[110]

Finally, the Commission finds that BZX has not demonstrated that in-kind creations and redemptions provide the Shares with a unique resistance to manipulation. The Commission has previously addressed similar assertions.[111] As the Commission stated before, in-kind creations and redemptions are a common feature of ETPs, and the Commission has not previously relied on the in-kind creation and redemption mechanism as a basis for excusing exchanges that list ETPs from entering into surveillance-sharing agreements with significant, regulated markets related to the portfolio's assets.[112] Accordingly, the Commission is not persuaded here that the Trust's in-kind creations and redemptions afford it a unique resistance to manipulation.[113]

(2) Assertions That BZX Has Entered Into a Comprehensive Surveillance-Sharing Agreement With a Regulated Market of Significant Size Related to the Underlying Bitcoin Assets

As BZX has not demonstrated that other means besides surveillance-sharing agreements will be sufficient to prevent fraudulent and manipulative acts and practices, the Commission next examines whether the record supports the conclusion that BZX has entered into a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets. In this context, the term "market of significant size" includes a market (or group of markets) as to which (i) there is a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, so that a surveillance-sharing agreement would assist in detecting and deterring misconduct, and (ii) it is unlikely that trading in the ETP would be the predominant influence on prices in that market.[114]

As the Commission has explained, it considers two markets that are members of the ISG to have a comprehensive surveillance-sharing agreement with one another, even if they do not have a separate bilateral surveillance-sharing agreement.[115] Accordingly, based on the common membership of BZX and the CME in the ISG,[116] BZX has the equivalent of a comprehensive surveillance-sharing agreement with the CME. However, while the Commission recognizes that the CFTC regulates the CME futures market,[117] including the CME bitcoin futures market, and thus such market is "regulated," in the context of the proposed ETP, the record does not, as explained further below, establish that the CME bitcoin futures market is a "market of significant size" related to spot bitcoin, the underlying bitcoin assets that would be held by the Trust.

(i) Whether There Is a Reasonable Likelihood That a Person Attempting To Manipulate the ETP Would Also Have To Trade on the CME Bitcoin Futures Market To Successfully Manipulate the ETP

The first prong in establishing whether the CME bitcoin futures market constitutes a "market of significant size" related to spot bitcoin is the determination that there is a reasonable likelihood that a person attempting to manipulate the ETP would have to trade on the CME bitcoin futures market to successfully manipulate the ETP. In previous Commission orders, the Commission explained that the lead-lag relationship between the bitcoin futures market and the spot market is "central" to understanding this first prong.[118]

(a) BZX's Assertions

According to the Exchange, "publicly available research, including research done as part of rule filings proposing to list and trade shares of [s]pot [b]itcoin ETPs, supports the thesis that [CME] [b]itcoin [f]utures pricing leads the spot market and, thus, a person attempting to manipulate the Shares would also have to trade on that market to manipulate the ETP."[119] BZX asserts that "such research indicates that bitcoin futures lead the bitcoin spot market in price formation."[120] BZX asserts that CME

---

[110] See WisdomTree Order, 86 FR at 69329; ARK 21Shares Order, 87 FR at 20022.

[111] See Winklevoss Order, 83 FR at 37589–90; USBT Order, 85 FR at 12607–08; WisdomTree Order, 86 FR at 69329; ARK 21Shares Order, 87 FR at 20022.

[112] See, e.g., iShares COMEX Gold Trust, Securities Exchange Act Release No. 51058 (Jan. 19, 2005), 70 FR 3749, 3751–55 (Jan. 26, 2005) (SR–Amex–2004–38); iShares Silver Trust, Securities Exchange Act Release No. 53521 (Mar. 20, 2006), 71 FR 14969, 14974 (Mar. 24, 2006) (SR–Amex–2005–072).

[113] Putting aside the Exchange's various assertions about the nature of bitcoin and the bitcoin market, the Benchmark, and the Shares, the Exchange also does not address concerns the Commission has previously identified, including the susceptibility of bitcoin markets to potential trading on material, non-public information (such as plans of market participants to significantly increase or decrease their holdings in bitcoin; new sources of demand for bitcoin; the decision of a bitcoin-based investment vehicle on how to respond to a "fork" in the bitcoin blockchain, which would create two different, non-interchangeable types of bitcoin), or to the dissemination of false or misleading information. See Winklevoss Order, 83 FR at 37585. See also USBT Order, 85 FR at 12600–01.

[114] See Winklevoss Order, 83 FR at 37594.

[115] See id. at 37580 n.19.

[116] See Notice, 87 FR at 41763.

[117] While the Commission recognizes that the CFTC regulates the CME, the CFTC is not responsible for direct, comprehensive regulation of the underlying spot bitcoin market. See Winklevoss Order, 83 FR at 37587, 37599. See also WisdomTree Order, 86 FR at 69330 n.118; Kryptoin Order, 86 FR at 74174 n.119; SkyBridge Order, 87 FR at 3874 n.80; Wise Origin Order, 87 FR at 5534 n.93; ARK 21Shares Order, 87 FR at 20023 n.121; Bitwise Order, 87 FR at 40286 n.54; Grayscale Order, 87 FR at 40311 n.138.

[118] See, e.g., USBT Order, 85 FR at 12612 ("[E]stablishing a lead-lag relationship between the bitcoin futures market and the spot market is central to understanding whether it is reasonably likely that a would-be manipulator of the ETP would need to trade on the bitcoin futures market to successfully manipulate prices on those spot platforms that feed into the proposed ETP's pricing mechanism. In particular, if the spot market leads the futures market, this would indicate that it would not be necessary to trade on the futures market to manipulate the proposed ETP, even if arbitrage worked efficiently, because the futures price would move to meet the spot price."). When considering past proposals for spot bitcoin ETPs, the Commission has discussed whether there is a lead-lag relationship between the regulated market (e.g., the CME) and the market on which the assets held by the ETP would have traded (i.e., spot bitcoin platforms), as part of an analysis of whether a would-be manipulator of the spot bitcoin ETP would need to trade on the regulated market to effect such manipulation. See, e.g., USBT Order, 85 FR at 12612. See also Previous VanEck Order, 86 FR at 64547; WisdomTree Order, 86 FR at 69330–31; Kryptoin Order, 86 FR at 74175–76; SkyBridge Order, 87 FR at 3875–76; Wise Origin Order, 87 FR at 5535–36, 5539–40; ARK 21Shares Order, 87 FR at 20023–24; Bitwise Order, 87 FR at 40287–89; Grayscale Order, 87 FR at 40311–13.

[119] See Notice, 87 FR at 41762.

[120] See id. at 41762–63 and n.51 (citing to (a) the Wise Origin Order; Notice of Filing of a Proposed Rule Change To List and Trade Shares of the ARK 21Shares Bitcoin ETF Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 94982 (May 25, 2022), 87 FR 33250 (Jun. 1, 2022) (SR–CboeBZX–2022–031) ("ARK 21Shares Filing II"); Notice of Filing of Amendment No. 1 to, and Designation of a Longer Period for Commission Action on Proceedings To Determine Whether To Approve or Disapprove, a Proposed Rule Change To List and Trade Shares of Grayscale Bitcoin Trust (BTC) Under NYSE Arca Rule 8.201–E, Securities Exchange Act Release No. 94844 (May 4, 2022), 87 FR 28043 (May 10, 2022) (SR–NYSEArca–2021–90) ("Grayscale Filing"); and Notice of Filing of Proposed Rule Change to List and Trade Shares of the Bitwise Bitcoin ETP Trust Under NYSE Arca Rule 8.201–E; Securities Exchange Act Release No. 93445 (Oct. 28, 2021), 86 FR 60695 (Nov. 3, 2021) (SR–NYSEArca–2021–89) ("Bitwise Filing"); and (b) Hu, Y., Hou, Y. and Oxley, L. (2019), "What role do futures markets play in Bitcoin pricing? Causality, cointegration and price discovery from a time-varying perspective" (available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7481826/) ("Hu, Hou & Oxley")). The Exchange references the following conclusion from the "time-varying price discovery" section of Hu, Hou & Oxley: "There exist no episodes where the Bitcoin spot markets dominates the price discovery processes with regard to Bitcoin futures. This points

bitcoin futures ''represent a growing influence on pricing in the spot bitcoin market as has been laid out . . . in other proposals to list and trade [s]pot [b]itcoin ETPs.''[121]

(b) Analysis

The record does not demonstrate that there is a reasonable likelihood that a person attempting to manipulate the proposed ETP would have to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP. First, the econometric evidence in the record for the proposal does not support the conclusion that an interrelationship exists between the CME bitcoin futures market and the spot bitcoin market such that it is reasonably likely that a person attempting to manipulate the proposed ETP would also have to trade on the CME bitcoin futures market.[122] The Exchange, as it has done previously, relies on the findings of one section of the Hu, Hou & Oxley paper;[123] however, it does not address issues that the Commission has previously raised with respect to this single paper.[124] As the Commission previously explained, including in the Previous VanEck Order, the findings of this paper's Granger causality analysis, which is widely used to formally test for lead-lag relationships, are concededly mixed.[125]

Moreover, while the Exchange highlights data and analyses submitted to the Commission in connection with the Wise Origin Order, the ARK 21Shares Filing II, the Grayscale Filing, and the Bitwise Filing to support the premise that the CME bitcoin futures market leads the spot bitcoin market,[126] the Commission disapproved the proposals related to these submissions, and the Commission raised issues with respect to these submissions—including with the data and analyses therein—that the Exchange does not address.[127]

The Exchange does not provide results of its own analysis and does not present any other data supporting its conclusion. Specifically, the Exchange does not provide results of its own lead-lag analysis or provide any additional evidence of an interrelationship between the CME bitcoin futures market, which is the regulated market, and spot bitcoin platforms, which are the markets on which the assets held by the proposed ETP would trade. As discussed in previous disapprovals, analyses regarding whether the CME bitcoin futures market leads the spot market remain inconclusive.[128] Thus, as in previous disapprovals, because the lead-lag analysis regarding whether the CME bitcoin futures market leads the spot market is ''central'' to understanding the first prong,[129] the Commission determines that the evidence in the record is inadequate to conclude that an interrelationship exists between the CME bitcoin futures market and the spot bitcoin market such that it is reasonably likely that a person attempting to manipulate the proposed ETP would have to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP.[130]

The Commission thus concludes that the information that BZX provides is not sufficient to support a determination that it is reasonably likely that a would-be manipulator of the proposed ETP would have to trade on the CME bitcoin futures market to successfully manipulate the proposed ETP. Therefore, the information in the record also does not establish that the CME bitcoin futures market is a ''market of significant size'' related to the assets to be held by the proposed ETP.

(ii) Whether It Is Unlikely That Trading in the Proposed ETP Would Be the Predominant Influence on Prices in the CME Bitcoin Futures Market

The second prong in establishing whether the CME bitcoin futures market constitutes a ''market of significant size'' related to spot bitcoin is the determination that it is unlikely that trading in the proposed ETP would be the predominant influence on prices in the CME bitcoin futures market.[131]

(a) BZX's Assertions

BZX asserts that trading in the Shares would not be the predominant force on prices in the CME bitcoin futures market (or spot market) because of the in-kind creation and redemption process, the spot market arbitrage opportunities that

---

to a conclusion that the price formation originates solely in the Bitcoin futures market. We can, therefore, conclude that the Bitcoin futures markets dominate the dynamic price discovery process based upon time-varying information share measures. Overall, price discovery seems to occur in the Bitcoin futures markets rather than the underlying spot market based upon a time-varying perspective.'' *Id.* at 41763 n.51.

[121] *See id.* at 41763. *See also supra* note 120. In addition, the Exchange asserts that pricing in CME bitcoin futures ''is based on pricing from spot bitcoin markets.'' *See id.* at 41763. The Exchange argues that a statement in the Commission's prior approval of CME bitcoin futures ETPs ''makes clear that the Commission believes that CME's surveillance can capture the effects of trading on the relevant spot markets on the pricing of CME [b]itcoin [f]utures.'' *See id.* BZX further states that if CME's surveillance is sufficient to mitigate concerns related to trading in CME bitcoin futures ''for which the pricing is based directly on pricing from spot bitcoin markets, it's not clear how such a conclusion could apply only to ETPs based on [CME] [b]itcoin [f]utures and not extend to [s]pot [b]itcoin ETPs.'' *See id.* at 41763–64. Moreover, BZX argues that CME bitcoin futures ETPs may be more susceptible to potential manipulation than a spot bitcoin ETP that offers only in-kind creation and redemption, and potential manipulation of a CME bitcoin futures ETF would require manipulation on the spot markets on which the pricing for CME bitcoin futures is based. *See id.* at 41764. Because these assertions relate more generally to whether the CME bitcoin futures market constitutes a ''market of significant size'' related to spot bitcoin and do not relate specifically to the first prong, the Commission responds to these assertions in Section III.B.3 *infra.*

[122] *See also* USBT Order, 85 FR at 12611; WisdomTree Order, 86 FR at 69330–31; Wise Origin Order, 87 FR at 5535; NYDIG Order, 87 FR at 14938; Global X Order, 87 FR at 14920; ARK 21Shares, 87 FR at 20024; Bitwise Order, 87 FR at 40288–89; Grayscale Order, 87 FR at 40312–13.

[123] *See supra* note 120.

[124] *See, e.g.,* Previous VanEck Order, 86 FR at 64547 (discussing that the paper's use of daily price data, as opposed to intraday prices, may not be able to distinguish which market incorporates new information faster; and discussing that the paper found inconclusive evidence that futures prices lead spot bitcoin prices—in particular, that the months at the end of the paper's sample period showed, using Granger causality methodology, that the spot market was the leading market—and that the record did not include evidence to explain why this would not indicate a shift towards prices in the spot market leading the futures market that would be expected to persist into the future). *See also* USBT Order, 85 FR at 12613 n.244; WisdomTree Order, 86 FR at 69331.

[125] *See* Previous VanEck Order, 86 FR at 64547; ARK 21Shares Order, 87 FR at 20024; WisdomTree Order, 86 FR at 69331. The paper finds that the CME bitcoin futures market dominates the spot markets in terms of Granger causality, but that the causal relationship is bi-directional, and a Granger causality episode from March 2019 to June/July 2019 runs from bitcoin spot prices to CME bitcoin futures prices. The paper concludes: ''[T]he Granger causality episodes are not constant throughout the whole sample period. Via our causality detection methods, market participants can identify when markets are being led by futures prices and when they might not be.'' *See* Hu, Hou & Oxley, *supra* note 120.

[126] *See supra* note 120 and accompanying text.

[127] *See, e.g.,* Wise Origin Order, 87 FR at 5534–36, 5539–40; ARK 21Shares Order II, 88 FR 6340–42; Grayscale Order, 87 FR at 40311–14; Bitwise Order, 87 FR at 40287–92.

[128] As the academic literature and listing exchanges' analyses pertaining to the pricing relationship between the CME bitcoin futures market and spot bitcoin market have developed, the Commission has critically reviewed those materials.

*See* WisdomTree Order II, 87 FR at 62476–77; Grayscale Order, 87 FR at 40311–13; Bitwise Order, 87 FR at 40286–89; ARK 21Shares Order, 87 FR at 20024; Global X Order, 87 FR at 14920; Wise Origin Order, 87 FR at 5535–36, 5539–40; Kryptoin Order, 86 FR at 74176; WisdomTree Order, 86 FR at 69330–32; Previous VanEck Order, 86 FR at 64547–48; USBT Order, 85 FR at 12613.

[129] *See supra* note 118.

[130] In addition, BZX fails to address the relationship (if any) between prices on other bitcoin futures markets and the CME bitcoin futures market, the bitcoin spot market, and/or the constituent bitcoin platforms underlying the Benchmark, or where price formation occurs when the entirety of bitcoin futures markets, not just the CME, is considered. *See* ARK 21Shares Order, 87 FR at 20024 n.147; Previous VanEck Order, 86 FR at 64547–48; WisdomTree Order, 86 FR at 69331; Kryptoin Order, 86 FR at 74176; Wise Origin Order, 87 FR at 5535.

[131] *See* Winklevoss Order, 83 FR at 37594; USBT Order, 85 FR at 12596–97.

such in-kind creation and redemption process creates, the significant volume in the CME bitcoin futures market,[132] the size of bitcoin's market capitalization,[133] and the significant liquidity available in the spot market.[134] BZX further provides that the cost to buy or sell $5 million worth of bitcoin averages roughly 48 basis points with a market impact of $139.08.[135] According to the Exchange, "[s]tated another way, a market participant could enter a market buy or sell order for $5 million of bitcoin and only move the market 0.48%."[136] BZX further asserts that more strategic purchases or sales (such as using limit orders and executing through over-the-counter ("OTC") bitcoin trade desks) would likely have less obvious impact on the market, which is consistent with MicroStrategy, Tesla, and Square being able to collectively purchase billions of dollars in bitcoin.[137] Thus, BZX concludes that the combination of in-kind creation and redemption process, the CME bitcoin futures leading price discovery, the overall size of the bitcoin market, and the ability for market participants, including authorized participants creating and redeeming in-kind with the Trust, to buy or sell large amounts of bitcoin without significant market impact, will help prevent the Shares from becoming the predominant force on pricing in either the spot bitcoin or the CME bitcoin futures market.[138]

(b) Analysis

The Commission does not agree with BZX's assertions, which are similar to the assertions that BZX made, and the Commission discussed, in the Previous VanEck Order. Now, as then, the record does not demonstrate that it is unlikely that trading in the proposed ETP would be the predominant influence on prices in the CME bitcoin futures market. As the Commission has already addressed and rejected one of the bases of BZX's assertion—that CME bitcoin futures lead price discovery [139]—the Commission will only address below the other three bases: the in-kind create/redeem mechanism and arbitrage, and the overall size of, and the impact of buys and sells on, the bitcoin market.

BZX's assertions that the Trust's in-kind create/redeem mechanism and resulting arbitrage opportunities will help prevent the Shares from becoming the predominant force on pricing in either the spot bitcoin or the CME bitcoin futures market are general and conclusory. The Exchange provides no further discussion, data or analysis to support its conclusions or to explain further why or how the in-kind create/redeem mechanism or the potential presence of arbitrage implies that it is unlikely that trading in the Shares would be the predominant influence on prices in the CME bitcoin futures market.[140]

Similarly, BZX's assertions about the potential effect of trading in the Shares on the CME bitcoin futures market and spot bitcoin market are general and conclusory, citing to the aforementioned trade volume of the CME bitcoin futures market and the size and liquidity of the spot bitcoin market, as well as the market impact of a single transaction in spot bitcoin, without any analysis or evidence to support these assertions. For example, there is no limit on the amount of mined bitcoin that the Trust may hold. Yet BZX does not provide any information on the expected growth in the size of the Trust and the resultant increase in the amount of bitcoin held by the Trust over time, or on the overall expected number, size, and frequency of creations and redemptions—or how any of the foregoing could (if at all) influence prices in the CME bitcoin futures market. Thus, the Commission cannot conclude, based on BZX's statements alone and absent any evidence or analysis in support of BZX's assertions, that it is unlikely that trading in the ETP would be the predominant influence on prices in the CME bitcoin futures market.[141]

The Commission also is not persuaded by BZX's assertions about the minimal effect a market order to buy or sell bitcoin would have on the bitcoin market.[142] While BZX concludes by way of an example of a $5 million market order that buying or selling large amounts of bitcoin would have insignificant market impact, the conclusion does not analyze the extent of any impact on the CME bitcoin futures market or the CME bitcoin futures market's prices. Accordingly, such statistics, without more, are not relevant to the Commission's consideration of whether trading in the ETP would be the predominant influence on prices in the CME bitcoin futures market.

To the extent that BZX is suggesting that a single $5 million order in bitcoin would have immaterial impact on the prices in the CME bitcoin futures market, the Exchange has not adequately explained why *a single market order in spot bitcoin* is an appropriate proxy for trading in the Shares. As stated above, the second prong in establishing whether the CME bitcoin futures market constitutes a "market of significant size" is the determination that it is unlikely that *trading in the proposed ETP* would be

---

[132] BZX states that the CME began to offer trading in bitcoin futures in 2017. *See* Notice, 87 FR at 41761. According to BZX, nearly every measurable metric related to CME bitcoin futures contracts, which trade and settle like other cash-settled commodity futures contracts, has "generally trended up since launch, although certain notional volume calculations have decreased roughly in line with the decrease in the price of bitcoin." *See id.* For example, according to BZX, there were 219,089 CME bitcoin futures contracts traded in April 2022 (approximately $31.2 billion) compared to 89,852 ($5.4 billion), 118,235 ($4.6 billion), and 201,295 ($55.8 billion) contracts traded in April 2019, April 2020, and April 2021, respectively. *See id.* Additionally, according to BZX, from March 28, 2022, through April 22, 2022, there was approximately $1.3 billion in notional trading volume in CME bitcoin futures on a daily basis, and notional volume was never below $670 million. *See id.* at 41757–58. Additionally, BZX states that open interest was over $2 billion for the entirety of such period, and at one point was over $3 billion. *See id.* at 41758. BZX further states that the number of large interest holders and unique accounts trading CME bitcoin futures have both increased, even in the face of heightened spot bitcoin price volatility. *See id.* at 41762. According to BZX, a large open interest holder in CME bitcoin futures is an entity that holds at least 25 contracts, which is the equivalent of 125 bitcoin, and, at a price of approximately $38,605 per bitcoin on April 30, 2022, more than 80 firms had outstanding positions of greater than $4.8 million in CME bitcoin futures. *See id.* at 41762 n.50.

[133] According to BZX, as of December 1, 2021, the total market cap of all bitcoin in circulation was approximately $1.08 trillion. *See id.* at 41757 n.24.

[134] *See id.* at 41764.

[135] *See id.* According to BZX, these statistics are based on samples of bitcoin liquidity in U.S. dollars (excluding stablecoins or Euro liquidity) based on executable quotes on Coinbase, FTX and Kraken during the one year period ending May 2022. *See id.* at 41764 n.59.

[136] *Id.* at 41764.

[137] *See id.*

[138] *See id.*

[139] *See supra* Section III.B.2.i.b.

[140] As discussed above, the Exchange has presented no evidence or analysis to support its assertions regarding the presence of price arbitrage in the spot bitcoin markets and, in any event, efficient price arbitrage is not sufficient to support the finding that a market is uniquely or inherently resistant to manipulation such that the Commission can dispense with surveillance-sharing agreements. *See supra* notes 57–62 and accompanying text. Also as discussed above, the Trust's in-kind creations and redemptions do not afford it a unique resistance to manipulation. In-kind creations and redemptions are a common feature of ETPs, and the Commission has not previously relied on the in-kind creation and redemption mechanism as a basis for excusing exchanges that list ETPs from entering into surveillance-sharing agreements with significant, regulated markets related to the portfolio's assets. *See supra* notes 111–113 and accompanying text.

[141] *See* Previous VanEck Order, 86 FR at 64548–59; WisdomTree Order, 86 FR at 69332–33; Kryptoin Order, 86 FR at 74177; SkyBridge Order, 87 FR at 3879; Wise Origin Order, 87 FR at 5537; ARK 21Shares Order, 87 FR at 20025; Global X Order, 87 FR at 14921.

[142] *See* Notice, 87 FR at 41764 ("[T]he cost to buy or sell $5 million worth of bitcoin averages roughly 48 basis points with a market impact of $139.08. Stated another way, a market participant could enter a market buy or sell order for $5 million of bitcoin and only move the market 0.48%.").

the predominant influence on prices in the CME bitcoin futures market. While authorized participants of the Trust might transact in the spot bitcoin market as part of their creation or redemption of Shares, the Shares themselves would be traded in the secondary market on BZX. Furthermore, the record does not discuss the expected number or trading volume of the Shares, or establish the potential effect of the Shares' trade prices on CME bitcoin futures prices. For example, BZX does not provide any data or analysis about the potential effect the quotations or trade prices of the Shares might have on market-maker quotations in CME bitcoin futures contracts and whether those effects would constitute a predominant influence on the prices of those futures contracts.[143]

Thus, the Commission cannot conclude, based on the assertions in the filing and absent sufficient evidence or analysis in support of these assertions, that it is unlikely that trading in the proposed ETP would be the predominant influence on prices in the CME bitcoin futures market.

Therefore, because BZX has not provided sufficient information to establish both prongs of the "market of significant size" determination, the Commission cannot conclude that the CME bitcoin futures market is a "market of significant size" related to spot bitcoin such that BZX would be able to rely on a surveillance-sharing agreement with the CME to provide sufficient protection against fraudulent and manipulative acts and practices.

(3) Assertions That the Proposed Spot Bitcoin ETP Is Comparable to Bitcoin Futures-Based ETFs

(i) BZX's Assertions

BZX asserts that, after the Commission has approved the listing and trading of CME bitcoin futures ETPs, disapproving spot bitcoin ETPs "seems . . . arbitrary and capricious."[144] BZX asserts that CME bitcoin futures pricing is based on pricing from spot bitcoin markets and that the pricing mechanism applicable to the Shares is similar to the CME CF Bitcoin Reference Rate ("BRR").[145] BZX argues that a statement in the Commission's prior approval of CME bitcoin futures ETPs "makes clear that the Commission believes that CME's surveillance can capture the effects of trading on the relevant spot markets on the pricing of CME [b]itcoin [f]utures."[146] The Exchange argues that "given that there is significant trading volume on numerous bitcoin exchanges that are not part of the CME CF Bitcoin Reference Rate and that arbitrage opportunities across bitcoin exchanges means that such trading volume will influence spot bitcoin prices across the market," the Commission's belief that CME "can detect attempted manipulation of the [CME] [b]itcoin [f]utures through 'trading outside of the CME bitcoin futures market'" means that "such ability would apply equally to both [CME] [b]itcoin [f]utures ETFs and [s]pot [b]itcoin ETPs."[147] The Exchange further concludes, "such an ability would also seem to be a strong indication that the CME [b]itcoin [f]utures market represents a regulated market of significant size."[148] BZX states that if CME's surveillance is sufficient to mitigate concerns related to trading in CME bitcoin futures "for which the pricing is based directly on pricing from spot bitcoin markets, it's not clear how such a conclusion could apply only to ETPs based on [CME] [b]itcoin [f]utures and not extend to [s]pot [b]itcoin ETPs."[149] BZX asserts that, after approving the listing and trading of CME bitcoin futures ETPs, wherein the Commission concluded that the CME bitcoin futures market is a regulated market of significant size as it relates to CME bitcoin futures, the only consistent outcome would be to approve spot bitcoin ETPs on the basis that the CME bitcoin futures market is also a regulated market of significant size as it relates to the spot bitcoin market.[150]

BZX also states that CME bitcoin futures ETFs may be more susceptible to potential manipulation than a spot bitcoin ETP that offers only in-kind creation and redemption because of the underlying creation and redemption arbitrage mechanism.[151] BZX asserts that any objective review of the proposals to list spot bitcoin ETPs compared to the CME bitcoin futures ETFs and ETPs would lead to the conclusion that spot bitcoin ETPs should be available to U.S. investors because "any concerns related to preventing fraudulent and manipulative acts and practices related to [s]pot [b]itcoin ETPs would apply equally to the spot markets underlying the futures contracts held by a [CME] [b]itcoin [f]utures ETF."[152]

(ii) Analysis

The Commission disagrees with these assertions and conclusions. The proposed rule change does not relate to the same underlying holdings as ETFs that provide exposure to bitcoin through CME bitcoin futures, or CME bitcoin futures-based ETFs. The Commission considers the proposed rule change on its own merits and under the standards applicable to it. Namely, with respect to this proposed rule change, the Commission must apply the standards as provided by Section 6(b)(5) of the Exchange Act, which it has applied in connection with its orders considering previous proposals to list bitcoin-based commodity trusts and bitcoin-based trust issued receipts.[153]

In focusing on whether "concerns related to preventing fraudulent and

---

[143] *See* Previous VanEck Order, 86 FR at 64549; WisdomTree Order, 86 FR at 69333; Kryptoin Order, 86 FR at 74177; SkyBridge Order, 87 FR at 3879; Wise Origin Order, 87 FR at 5537; ARK 21Shares Order, 87 FR at 20025; Global X Order, 87 FR at 14921.

[144] *See* Notice, 87 FR at 41760.

[145] *See id.* at 41759–60. BZX asserts that each CME bitcoin futures contract is based on the BRR. *See id.* at 41761. According to the Exchange, the BRR is based on a publicly available calculation methodology based on pricing sourced from several crypto exchanges and trading platforms, including Bitstamp, Coinbase, Gemini, itBit, Kraken, and LMAX Digital. *See id.* at 41761 n.38.

[146] *Id.* at 41759 (citing Teucrium Order, 87 FR at 21679 ("The CME 'comprehensively surveils futures market conditions and price movements on a real-time and ongoing basis in order to detect and prevent price distortions, including price distortions caused by manipulative efforts.' Thus the CME's surveillance can reasonably be relied upon to capture the effects on the CME bitcoin futures market caused by a person attempting to manipulate the proposed futures ETP by manipulating the price of CME bitcoin futures contracts, whether that attempt is made by directly trading on the CME bitcoin futures market or indirectly by trading outside of the CME bitcoin futures market. As such, when the CME shares its surveillance information with Arca, the information would assist in detecting and deterring fraudulent or manipulative misconduct related to the non-cash assets held by the proposed ETP.")).

[147] *See id.* at 41759–41760.

[148] *See id.* at 41760.

[149] *See id.* at 41763–64.

[150] *See id.*

[151] *See id.* at 41760. BZX states that CME bitcoin futures pricing (and thus the value of the underlying holdings of a CME bitcoin futures ETF) is based on a single price derived from spot bitcoin pricing, and potential manipulation of a CME bitcoin futures ETF would require manipulation on the spot markets on which the pricing for CME bitcoin futures is based. On the other hand, the Exchange states that shares of a spot bitcoin ETP would represent an interest in bitcoin directly and authorized participants would be able to source bitcoin from any exchange and create or redeem with the applicable trust regardless of the price of the underlying index, meaning that a would-be manipulator of a spot bitcoin ETP would need to manipulate the price across all bitcoin markets or risk simply providing arbitrage opportunities for authorized participants. *See id.* at 41760, 41764. BZX also argues that "the structure of [CME] [b]itcoin [f]utures ETFs provides negative outcomes for buy and hold investors as compared to a [s]pot [b]itcoin ETP." *See id. See also infra* Section III.C.1.

[152] *Id.* at 41760. BZX states that while the 1940 Act "does offer certain investor protections, those protections do not relate to mitigating potential manipulation of the holdings of an ETF in a way that warrants distinction between [CME] [b]itcoin [f]utures ETFs and [s]pot [b]itcoin ETPs." *Id.*

[153] *See supra* note 11 and accompanying text.

manipulative acts and practices related to [s]pot [b]itcoin ETPs would apply equally to the spot markets underlying the futures contracts held by a [CME] [b]itcoin [f]utures ETF,'' [154] the Exchange mischaracterizes the framework that the Commission has articulated in the Winklevoss Order. As stated in the Winklevoss Order, the Commission is not applying a ''cannot be manipulated'' approach—either on the CME bitcoin futures market or the spot bitcoin markets. Rather, as the Commission has repeatedly emphasized, and also summarized above, the Commission is examining whether the proposal meets the requirements of the Exchange Act and, pursuant to the Rules of Practice, the burden is on BZX to demonstrate the validity of its contention that other means to prevent fraudulent and manipulative acts and practices are sufficient to justify dispensing with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin,[155] or to establish that it has entered into such a surveillance-sharing agreement.

Consistent with this approach, the Commission's consideration (and thus far, disapproval) of proposals to list and trade spot bitcoin ETPs does not focus on an assessment of the overall risk of fraud and manipulation in the spot bitcoin or futures markets, or on the extent to which such risks are similar.[156] Rather, the Commission's focus has been consistently on whether the listing exchange has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets of the ETP under consideration, so that it would have the ability to detect and deter manipulative activity. For reasons articulated in the orders approving proposals to list and trade CME bitcoin futures-based ETPs (*i.e.,* the Teucrium Order and the Valkyrie XBTO Order), the Commission found that in each such case the listing exchange has entered into such a surveillance-sharing agreement.[157] Applying the same framework to this proposed spot bitcoin ETP, however, as discussed and explained above, the Commission finds that BZX has not.

Moreover, for the CME bitcoin futures ETPs under consideration in the Teucrium Order and the Valkyrie XBTO Order, the proposed ''significant'' regulated market (*i.e.,* the CME) with which the listing exchange has a surveillance-sharing agreement is the *same* market on which the underlying bitcoin assets (*i.e.,* CME bitcoin futures contracts) trade. Thus, the CME's surveillance can reasonably be relied upon to detect and deter manipulative activity caused by a person attempting to manipulate the CME bitcoin futures ETP through directly trading on the CME bitcoin futures market. Additionally, as explained in the Teucrium and the Valkyrie XBTO Orders, the CME's surveillance can also reasonably be relied upon to capture the effects on the CME bitcoin futures market caused by a person attempting to manipulate the CME bitcoin futures ETP by manipulating the price of CME bitcoin futures contracts when that attempt is made indirectly by trading outside of the CME bitcoin futures market.[158] Regarding the approved Teucrium Bitcoin Futures Fund in the Teucrium Order (''Teucrium Fund''), for example, when the CME shares its surveillance information with the listing exchange, the information would assist in detecting and deterring fraudulent or manipulative misconduct related to the non-cash assets held by the Teucrium Fund.[159] Accordingly, the Commission explains in the Teucrium Order and the Valkyrie XBTO Order that it is unnecessary for a listing exchange to establish a reasonable likelihood that a would-be manipulator would have to trade on the CME itself to manipulate a proposed ETP whose only non-cash holdings would be CME bitcoin futures contracts.[160]

However, as the Commission also states in those Orders, this reasoning does not extend to spot bitcoin ETPs. Spot bitcoin markets are not currently ''regulated.''[161] If an exchange seeking to list a spot bitcoin ETP relies on the CME as the regulated market with which it has a comprehensive surveillance-sharing agreement, the assets held by the spot bitcoin ETP would not be traded on the CME. Because of this significant difference, with respect to a spot bitcoin ETP, there would be reason to question whether a surveillance-sharing agreement with the CME would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct affecting the price of the spot bitcoin held by that ETP. If, however, an exchange proposing to list and trade a spot bitcoin ETP identifies the CME as the regulated market with which it has a comprehensive surveillance-sharing agreement, the exchange could overcome the Commission's concern by demonstrating that there is a reasonable likelihood that a person attempting to manipulate the spot bitcoin ETP would have to trade on the CME in order to manipulate the ETP, because such demonstration would help establish that the exchange's surveillance-sharing agreement with the CME would have the intended effect of aiding in the detection and deterrence of fraudulent and manipulative misconduct related to the spot bitcoin held by the ETP.[162]

Because, here, BZX is seeking to list a spot bitcoin ETP that relies on the CME as the purported ''significant'' regulated market with which it has a comprehensive surveillance-sharing agreement, the assets held by the proposed ETP would *not* be traded on the CME. Thus, there is reason to question whether a surveillance-sharing agreement with the CME would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct affecting the price of the spot bitcoin held by the proposed ETP.[163] An exchange can overcome this

---

[154] *See* Notice, 87 FR at 41760.

[155] *See supra* notes 38–41 and accompanying text.

[156] The Commission's past general discussion on the risk of fraud and manipulation in the spot bitcoin or futures markets is only in response to arguments raised by the proposing listing exchanges (or commenters) that mitigating factors against fraud and manipulation in the spot bitcoin or futures markets should compel the Commission to dispense with the detection and deterrence of fraud and manipulation provided by a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets. *See, e.g.,* Winklevoss Order, 83 FR at 37580, 37582–91 (addressing assertions that ''bitcoin and [spot] bitcoin markets,'' generally, as well as one bitcoin trading platform, specifically, have unique resistance to fraud and manipulation). *See also* USBT Order, 85 FR at 12597, 12599–12608. But even in such instance, the central issue was about the need for such a surveillance-sharing agreement, not the overall risk of fraud and manipulation in the spot bitcoin or futures markets, or the extent to which such risks are similar.

[157] *See* Teucrium Order, 87 FR at 21678–81; Valkyrie XBTO Order, 87 FR at 28850–53.

[158] *See* Teucrium Order, 87 FR at 21679; Valkyrie XBTO Order, 87 FR at 28851.

[159] *See* Teucrium Order, 87 FR at 21679.

[160] *See id.*

[161] *See id.* at 21679 n.46 (citing USBT Order, 85 FR at 12604; NYDIG Order, 87 FR at 14936 nn.65–67). *See also* Valkyrie XBTO Order, 87 FR at 28851 n.42.

[162] *See* Teucrium Order, 87 FR at 21679 n.46; Valkyrie XBTO Order, 87 FR at 28851 n.42.

[163] *See* Teucrium Order, 87 FR at 21679 n.46; Valkyrie XBTO Order, 87 FR at 28851 n.42. The Exchange mischaracterizes the Commission's statement in the Teucrium Order when the Exchange asserts that ''the Commission believes that CME's surveillance can capture the effects of trading on the relevant spot markets on the pricing of CME [b]itcoin [f]utures.'' Notice, 87 FR at 41759. What the Commission stated in the Teucrium Order is that for the Teucrium Fun (1) the proposed ''significant'' regulated market (*i.e.,* the CME) with which the listing exchange has a surveillance-sharing agreement is the *same* market on which the underlying assets trade; and (2) therefore that the CME's surveillance can reasonably be relied upon to capture the *effects on the CME bitcoin futures*

concern by demonstrating that there is a reasonable likelihood that a person attempting to manipulate the proposed ETP would have to trade *on the CME* in order to manipulate the ETP because such demonstration would help establish that an exchange's surveillance-sharing agreement with the CME would have the intended effect of aiding in the detection and deterrence of fraudulent and manipulative misconduct related to the spot bitcoin held by the proposed ETP.[164] As discussed and explained above,[165] the Commission finds that BZX has not made such demonstration.

To the extent that the Exchange is arguing that the CME's surveillance would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct that impacts spot bitcoin ETPs in the same way as it would for misconduct that impacts the CME bitcoin futures ETFs/ETPs, the information in the record for this filing does not support such a claim.

BZX asserts that CME bitcoin futures pricing "is based on pricing from spot bitcoin markets" and that "the pricing mechanism applicable to the Shares is similar to the CME CF Bitcoin Reference Rate."[166] However, the Exchange provides no evidence or data to support the assertion that CME bitcoin futures pricing "is based on" pricing from spot bitcoin markets. Moreover, if, as the Exchange claims here in the context of its arbitrary/capricious argument, CME bitcoin futures prices are "based on" spot bitcoin prices, the Exchange does not explain how this is consistent with, and indeed how it does not contradict, the Exchange's claims in the context of its "significant market" arguments that CME bitcoin futures prices "lead" spot bitcoin prices.

In addition, to the extent the Exchange is asserting that CME bitcoin futures pricing "is based on" spot bitcoin pricing because of the BRR, this is also not supported by the evidence in the record for this proposal. While the BRR is used to value the final cash settlement of CME bitcoin futures contracts, it is not generally used for daily cash settlement of such contracts, nor is it claimed to be used for any intra-day trading of such contracts.[167] Moreover, the shares of CME bitcoin futures ETFs/ETPs trade in secondary markets, as would the Shares, and there is no evidence in the record for this filing that such intra-day, secondary market trading prices are, or would be, determined by the BRR. Further, the Commission's determination in the Teucrium Order and the Valkyrie XBTO Order to approve the listing and trading of the relevant CME bitcoin futures ETPs was not based on either the ETPs' or the underlying CME bitcoin futures contracts' pricing mechanism. Rather, as discussed above, the Commission approved the listing and trading of such CME bitcoin futures ETPs because the Commission found that the listing exchanges have a surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets—which for such ETPs are CME bitcoin futures contracts, not spot bitcoin.

Moreover, even if the Exchange had demonstrated a connection between spot bitcoin prices and CME bitcoin futures prices, which it has not, it does not necessarily follow that the CME's surveillance would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct that impacts spot bitcoin ETPs in the same way as it would for misconduct that impacts the CME bitcoin futures ETFs/ETPs—particularly when such misconduct occurs off of the CME itself.[168] This is because it does not—absent supporting data—necessarily follow that *any* manipulation that impacts spot bitcoin *also similarly* impacts CME bitcoin futures contracts. The Exchange has not provided analysis or data that assesses the reaction (if any) of CME bitcoin futures contracts to instances of fraud and manipulation in spot bitcoin markets.

In addition, for the reasons discussed throughout this order, the disapproval of the proposal would not constitute an "arbitrary and capricious" administrative action in violation of the Administrative Procedure Act.[169] Importantly, the issuers are not similarly situated. The issuers of CME bitcoin futures-based ETFs/ETPs propose to hold only CME bitcoin futures contracts (which are traded on the CME itself) as their only non-cash holdings, and the Trust proposes to hold only spot bitcoin (which is not traded on the CME). As explained in detail above, and in the Teucrium Order, the Valkyrie XBTO Order, and the Grayscale Order, because of this important difference, for a spot bitcoin ETP, there is reason to question whether a surveillance-sharing agreement with the CME would, in fact, assist in detecting and deterring fraudulent and manipulative misconduct affecting the price of the spot bitcoin held by that ETP.[170] And as discussed above, neither the Exchange nor any other evidence in the record for this filing, sufficiently demonstrates that the CME's surveillance can be reasonably relied upon to capture the effects of manipulation of the *spot* bitcoin assets underlying the proposed ETP when such manipulation is not attempted on the CME itself.

Moreover, the analytical framework for assessing compliance with the requirements of Exchange Act Section 6(b)(5) that the Commission applies here (*i.e.,* comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying bitcoin assets) is the same one that the Commission has applied in each of its orders considering previous proposals to list bitcoin-based commodity trusts and trust issued receipts.[171] The Commission has applied this framework to each proposal by analyzing the evidence presented by the listing exchange and statements made by commenters.[172] Exchange Act Section 6(b)(5) can be satisfied by a proper showing; the Commission has in fact recently approved proposals by NYSE Arca, Inc. and the Nasdaq Stock Market to list and trade shares of ETPs holding CME bitcoin futures as their

---

*market* (*i.e.,* its own market) caused by a person attempting to manipulate the CME bitcoin futures ETP by *manipulating the price of CME bitcoin futures contracts,* whether that attempt is made by directly trading on the CME bitcoin futures market or indirectly by trading outside of the CME bitcoin futures market. *See* Teucrium Order, 87 FR at 21679. Importantly, the Commission *did not* state that, for spot bitcoin ETPs such as the one proposed here, where the underlying asset would not trade on the CME, the CME's surveillance can similarly be relied upon to capture the effects of a person attempting to manipulate a spot bitcoin ETP by *manipulating the price of spot bitcoin* when the attempt is made by trading outside of the CME bitcoin futures market. Indeed, there is reason to question whether the CME's surveillance would capture manipulation of spot bitcoin that occurs off of the CME, if, for example, off-CME manipulation of spot bitcoin does not also similarly impact CME bitcoin futures contracts. And, as discussed below, the Exchange has not provided any data or analysis to show that CME bitcoin futures would be impacted by instances of fraud and manipulation in the spot bitcoin market that occurs off of the CME.

[164] *See* Teucrium Order, 87 FR at 21679 n.46; Valkyrie XBTO Order, 87 FR at 28851 n.42.

[165] *See supra* Section III.B.2.i.

[166] *See* Notice, 87 FR at 41763, 41769.

[167] *See, e.g.,* Grayscale Order, 87 FR at 40317–18.

[168] *See also supra* note 163.

[169] The Commission is disapproving this proposed rule change because BZX has not met its burden to demonstrate that its proposal is consistent with the requirements of Exchange Act Section 6(b)(5). The Commission's disapproval of this proposed rule change does not rest on an evaluation of the relative investment quality of a product holding spot bitcoin versus a product holding CME bitcoin futures, or an assessment of whether bitcoin, or blockchain technology more generally, has utility or value as an innovation or an investment. *See, e.g.,* Winklevoss Order, 83 FR at 37580; USBT Order, 85 FR at 12597; One River Order, 87 FR at 33550; Grayscale Order, 87 FR at 40318 n.227.

[170] *See supra* note 163 and accompanying text.

[171] *See supra* notes 11–24 and accompanying text.

[172] *See supra* note 11.

only non-cash holdings.[173] And in the orders approving the CME bitcoin futures-based ETPs, the Commission explicitly discussed how an exchange seeking to list and trade a spot bitcoin ETP could overcome the lack of a one-to-one relationship between the regulated market with which it has a surveillance-sharing agreement and the market(s) on which the assets held by a spot bitcoin ETP could be traded: by demonstrating that there is a reasonable likelihood that a person attempting to manipulate the spot bitcoin ETP would have to trade on the regulated market (*i.e.,* on the CME) to manipulate the spot bitcoin ETP.[174]

When considering past proposals for spot bitcoin ETPs, the Commission has, in particular, reviewed the econometric and/or statistical evidence in the record to determine whether the listing exchange's proposal has met the applicable standard.[175] The Commission's assessment fundamentally presents quantitative, empirical questions, but, as discussed above, the Exchange has not provided evidence sufficient to support its arguments.[176]

The requirements of Section 6(b)(5) of the Exchange Act apply to the rules of national securities exchanges. Accordingly, the relevant obligation to have a comprehensive surveillance-sharing agreement with a regulated market of significant size related to spot bitcoin, or other means to prevent fraudulent and manipulative acts and practices that are sufficient to justify dispensing with such a surveillance-sharing agreement, resides with the listing exchange. Because there is insufficient evidence in the record demonstrating that BZX has satisfied this obligation, the Commission cannot approve the proposed ETP for listing and trading on BZX.

*C. Whether BZX Has Met Its Burden To Demonstrate That the Proposal Is Designed To Protect Investors and the Public Interest*

BZX contends that, if approved, the proposed ETP would protect investors and the public interest. However, the Commission must consider these potential benefits in the broader context of whether the proposal meets each of the applicable requirements of the Exchange Act.[177] Because BZX has not demonstrated that its proposed rule change is designed to prevent fraudulent and manipulative acts and practices, the Commission must disapprove the proposal.

(1) BZX's Assertions

The Exchange states that the proposal is designed to protect investors and the public interest. BZX asserts that access for U.S. retail investors to gain exposure to bitcoin via a transparent and U.S. regulated, exchange-traded vehicle remains limited.[178] According to the Exchange, current options include: (i) OTC bitcoin funds with high management fees and potentially volatile premiums and discounts;[179] (ii) facing the technical risk, complexity, and generally high fees associated with buying spot bitcoin;[180] (iii) purchasing shares of operating companies that they believe will provide proxy exposure to bitcoin with limited disclosure about the associated risks;[181] or (iv) purchasing CME bitcoin futures ETFs that represent a sub-optimal investment for long-term investors.[182]

BZX also states that investors in many other countries, including Canada and Brazil, are able to use more traditional exchange-listed and traded products (including exchange-traded vehicles holding spot bitcoin) to gain exposure to bitcoin, disadvantaging U.S. investors and leaving them with more risky means of getting bitcoin exposure.[183] BZX concludes that its proposal limits the risk to U.S. investors that are increasingly seeking exposure to bitcoin by providing direct exposure to bitcoin in a regulated, transparent, U.S. exchange-traded vehicle, by: (i) reducing premium volatility; (ii) reducing management fees through meaningful competition; (iii) providing an alternative to CME bitcoin futures ETFs; (iv) reducing risks associated with investing in operating companies that are imperfect proxies for bitcoin exposure; and (v) providing an alternative to custodying spot bitcoin.[184]

(2) Analysis

The Commission disagrees that the proposal should be approved because it is designed to protect investors and the public interest. Here, even if it were true that, compared to trading in unregulated spot bitcoin markets or OTC bitcoin

---

[173] *See* Teucrium Order and Valkyrie XBTO Order, *supra* note 11.

[174] *See supra* note 162 and accompanying text.

[175] *See, e.g.,* USBT Order, 85 FR at 12612–13; Previous VanEck Order, 86 FR at 64547–48; WisdomTree Order, 86 FR at 69330–32; Kryptoin Order, 86 FR at 74175–76; NYDIG Order, 87 FR at 14938–39; Wise Origin Order, 87 FR at 5534–36; Global X Order, 87 FR at 14919–20; ARK 21Shares Order, 87 FR at 20023–24; Bitwise Order, 87 FR at 40286–92; Grayscale Order, 87 FR at 40311–14.

[176] *See supra* Sections III.B.1 & III.B.2.

[177] *See* Winklevoss Order, 83 FR at 37602. *See also* GraniteShares Order, 83 FR at 43931; ProShares Order, 83 FR at 43941; USBT Order, 85 FR at 12615; WisdomTree Order, 86 FR at 69333; Valkyrie Order, 86 FR at 74163; Kryptoin Order, 86 FR at 74178; SkyBridge Order, 87 FR at 3880; Wise Origin Order, 87 FR at 5537; ARK 21Shares Order, 87 FR at 20026; Global X Order, 87 FR at 14921; Bitwise Order, 87 FR at 40292; Grayscale Order, 87 FR at 40319.

[178] *See* Notice, 87 FR at 41759.

[179] BZX states that "[t]he largest OTC [b]itcoin [f]und has an [assets under management or "AUM"] of $23 billion." *See id.* at 41758 n.38. According to BZX, the premium and discount for OTC bitcoin funds "is known to move rapidly" and "investors are buying shares of a fund that experiences significant volatility in its premium and discount outside of the fluctuations in price of the underlying asset." *See id.* BZX further asserts that "investors that do not directly buy OTC [b]itcoin [f]unds can be disadvantaged by extreme premiums (or discounts) and premium volatility." *See id.*

[180] The Exchange states that "the Trust presents advantages from an investment protection standpoint for retail investors compared to owning spot bitcoin directly," such as "the elimination of the need for an individual retail investor to either manage their own private keys or to hold bitcoin through a cryptocurrency exchange that lacks sufficient protections." *See id.* at 41760.

[181] BZX states that a number of operating companies engaged in unrelated businesses have announced investments as large as $5.3 billion in bitcoin. *See id.* at 41759 n.39. *See also id.* at 41760. BZX argues that, without access to bitcoin ETPs, retail investors seeking investment exposure to bitcoin may purchase shares in these companies in order to gain exposure to bitcoin. BZX contends that such operating companies, however, are imperfect bitcoin proxies and provide investors with partial bitcoin exposure paired with additional risks associated with whichever operating company they decide to purchase. BZX concludes that investors seeking bitcoin exposure through publicly traded companies are gaining only partial exposure to bitcoin and are not fully benefitting from the risk disclosures and associated investor protections that come from the securities registration process. *See id.* at 41759 n.39, 41760–61.

[182] *See id.* at 41758–59. The Exchange asserts that, as a result of rolling CME bitcoin futures contracts and also potentially hitting CME position limits and being forced to invest in non-futures assets for bitcoin exposure, CME bitcoin futures ETFs will "unnecessarily cost U.S. investors significant amounts of money every year compared to [s]pot [b]itcoin ETPs" and the proposed rule change "should be reviewed by the Commission with this important investor protection context in mind." *See id.* at 41760.

[183] *See id.* at 41759. BZX represents that investors in other countries, specifically Canada, generally pay lower fees than U.S. retail investors that invest in OTC bitcoin funds due to the fee pressure that results from increased competition among available bitcoin investment options. BZX also argues that, without an approved spot bitcoin ETP in the U.S. as a viable alternative, U.S. investors could seek to purchase shares of non-U.S. bitcoin vehicles in order to gain access to bitcoin exposure. BZX believes that, given the separate regulatory regime and the potential difficulties associated with any international litigation, such an arrangement would create more risk exposure for U.S. investors than they would otherwise have with a U.S. exchange-listed ETP. BZX further contends that the lack of a U.S.-listed spot bitcoin ETP is not preventing U.S. funds from gaining exposure to bitcoin—several U.S. ETFs are using Canadian bitcoin ETPs to gain exposure to spot bitcoin—and that approving this proposal "would provide U.S. [ETFs] and mutual funds with a U.S.-listed and regulated product to provide such access rather than relying on either flawed products or products listed and primarily regulated in other countries." *See id.* BZX also states that regulators in other countries have either approved or otherwise allowed the listing and trading of bitcoin-based ETPs. *See id.* at 41759 n.40.

[184] *See id.* at 41770.

funds, trading a spot bitcoin-based ETP on a national securities exchange could provide some additional protection to investors, or that the Shares would provide more efficient exposure to bitcoin than other products on the market such as CME bitcoin futures ETFs/ETPs, the Commission must consider this potential benefit in the broader context of whether the proposal meets each of the applicable requirements of the Exchange Act.[185] Pursuant to Section 19(b)(2) of the Exchange Act, the Commission must approve a proposed rule change filed by a national securities exchange if it finds that the proposed rule change is consistent with the applicable requirements of the Exchange Act— including the requirement under Section 6(b)(5) that the rules of a national securities exchange be designed to prevent fraudulent and manipulative acts and practices—and it must disapprove the filing if it does not make such a finding.[186] Thus, even if a proposed rule change purports to protect investors from a particular type of investment risk—such as experiencing a potentially high premium/discount by investing in OTC bitcoin funds or roll costs by investing in bitcoin futures ETFs/ETPs—or purports to provide benefits to investors and the public interest—such as enhancing competition—the proposed rule change may still fail to meet the requirements under the Exchange Act.[187]

For the reasons discussed above, BZX has not met its burden of demonstrating that the proposal is consistent with Exchange Act Section 6(b)(5),[188] and, accordingly, the Commission must disapprove the proposal.[189]

### IV. Conclusion

For the reasons set forth above, the Commission does not find, pursuant to Section 19(b)(2) of the Exchange Act, that the proposed rule change is consistent with the requirements of the Exchange Act and the rules and regulations thereunder applicable to a national securities exchange, and in particular, with Section 6(b)(5) of the Exchange Act.

It Is Therefore Ordered, pursuant to Section 19(b)(2) of the Exchange Act, that proposed rule change SR–CboeBZX–2022–035 be, and it hereby is, disapproved.

By the Commission.

**J. Matthew DeLesDernier,**
*Deputy Secretary.*

[FR Doc. 2023–05298 Filed 3–14–23; 8:45 am]
**BILLING CODE 8011–01–P**

---

### SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–97088; File No. SR–NYSEARCA–2023–23]**

### Self-Regulatory Organizations; NYSE Arca, Inc.; Notice of Filing and Immediate Effectiveness of Proposed Rule Change To Amend Rule 6.62P–O(i)(2)

March 9, 2023.

Pursuant to Section 19(b)(1)[1] of the Securities Exchange Act of 1934 ("Act")[2] and Rule 19b–4 thereunder,[3] notice is hereby given that on March 3, 2023, NYSE Arca, Inc. ("NYSE Arca" or the "Exchange") filed with the Securities and Exchange Commission ("Commission") the proposed rule change as described in Items I and II below, which Items have been prepared by the Exchange. The Commission is publishing this notice to solicit comments on the proposed rule change from interested persons.

### I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

The Exchange proposes to amend Rule 6.62P–O(i)(2) to enhance the Exchange's existing Self Trade Prevention modifiers. The proposed rule change is available on the Exchange's website at *www.nyse.com,* at the principal office of the Exchange, and at the Commission's Public Reference Room.

### II. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the self-regulatory organization included statements concerning the purpose of, and basis for, the proposed rule change and discussed any comments it received on the proposed rule change. The text of those statements may be examined at the places specified in Item IV below. The Exchange has prepared summaries, set forth in sections A, B, and C below, of the most significant parts of such statements.

*A. Self-Regulatory Organization's Statement of the Purpose of, and the Statutory Basis for, the Proposed Rule Change*

1. Purpose

The Exchange proposes to amend Rule 6.62P–O(i)(2) to enhance the Exchange's existing Self Trade Prevention ("STP") modifiers. Specifically, the Exchange proposes to allow OTP Holders or OTP Firms (collectively referred to as "OTP Holders" herein) the option to apply STP modifiers to orders or quotes submitted not only from the same market participant identifier ("MPID") and, if specified, any subidentifier of that MPID, as the current rule provides, but also to orders or quotes submitted from (i) other MPIDs associated with the same Client ID (as designated by the OTP Holder); and (ii) Affiliates of the OTP Holder.

Background

Currently, Rule 6.62P–O(i)(2) offers optional anti-internalization functionality to OTP Holders in the form of STP modifiers that enable an OTP Holder to prevent two of its orders or quotes from executing against each other.[4] Currently, OTP Holders can set the STP modifier to apply at the MPID level and, if specified, at the subidentifier of that MPID level.[5] The STP modifier on the order or quote with the most recent time stamp controls the interaction between two orders or quotes marked with STP modifiers. STP functionality assists market participants

---

[185] *See supra* note 177.

[186] *See* Exchange Act Section 19(b)(2)(C), 15 U.S.C. 78s(b)(2)(C). *See also Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151 (1972) (Congress enacted the Exchange Act largely "for the purpose of avoiding frauds"); *Gabelli v. SEC,* 568 U.S. 442, 451 (2013) (The "SEC's very purpose" is to detect and mitigate fraud.).

[187] *See* SolidX Order, 82 FR at 16259; Previous VanEck Order, 86 FR at 54550–51; WisdomTree Order, 86 FR at 69344; Kryptoin Order, 86 FR at 74179; Valkyrie Order, 86 FR at 74163; SkyBridge Order, 87 FR at 3881; Wise Origin Order, 87 FR at 5538.

[188] 15 U.S.C. 78f(b)(5).

[189] In disapproving the proposed rule change, the Commission has considered its impact on efficiency, competition, and capital formation. *See* 15 U.S.C. 78c(f).

[1] 15 U.S.C. 78s(b)(1).

[2] 15 U.S.C. 78a.

[3] 17 CFR 240.19b–4.

[4] *See* Rule 6.62P–O(i)(2) (providing that "[a]n Aggressing Order or Aggressing Quote to buy (sell) designated with one of the STP modifiers in this paragraph will be prevented from trading with a resting order or quote to sell (buy) also designated with an STP modifier from the same MPID, and, if specified, any subidentifier of that MPID.").

[5] The Exchange will refer simply to "orders" and "quotes" throughout this filing for brevity, but acknowledges that Rule 6.62P–O(i)(2) prevents certain "Aggressing Orders" or "Aggressing Quotes" marked with an STP modifier from trading with certain resting orders or quotes also designated with an STP modifier. Rule 6.76P–O(a)(5) defines "Aggressing Orders" and "Aggressing Quotes" as "a buy (sell) order or quote that is or becomes marketable against sell (buy) interest on the Consolidated Book" and further provides that "[a] resting order or quote may become an Aggressing Order or Aggressing Quote if its working price changes, the NBBO is updated, there are changes to other orders or quotes on the Consolidated Book, or when processing inbound messages."